NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
ALEXANDER WESTERFIELD (SBN 295676)
awesterfield@nossaman.com
ELIZABETH KEY (SBN 323544)
ekey@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:   415.398.3600
Facsimile:    415.398.2438

Attorneys for Petitioners IMMIGRANT LEGAL RE-
SOURCE CENTER; FREEDOM FOR IMMIGRANTS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; FREEDOM FOR IMMI-GRANTS,<br><br>Petitioners,<br><br>vs.<br><br>CITY OF MCFARLAND; MCFAR-LAND PLANNING COMMISSION,<br><br>Respondents,<br><br>THE GEO GROUP, INC.,<br><br>Real Party in Interest. | Case No:  20-at-489<br><br>**PETITIONERS' MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF EX PARTE MOTION FOR TEMPORARY RESTRAIN-ING ORDER & ORDER TO SHOW CAUSE** |

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

57537347.v1

# TABLE OF CONTENTS

I.    INTRODUCTION...........................................................................1

II.   FACTUAL BACKGROUND ........................................................2

III.  STANDARD ................................................................................4

IV.   ARGUMENT ................................................................................5

   A.   The City's approval of the Proposed Modifications violates the only reasonable understanding of Section 1670.9(d).................5

      1.   The City Council held just one meeting on the Proposed Modifications less than 180 days after the Planning Commission rejected them.....................................................6

      2.   The City Council approved the Proposed Modifications less than 180 days after the first public notice.............................9

      3.   The public could not sufficiently participate in the public meetings. ........................................................................... 12

   B.   GEO's constitutional arguments as to Section 1670.9(d) do not affect Petitioners' entitlement to emergency relief................. 15

   C.   Balancing hardships favors Petitioners, as a TRO would simply preserve the status quo to protect the public health. ............... 16

      1.   Allowing Respondents and GEO to take any further action on the Proposed Modifications would immediately threaten public health. ...................................................................... 17

      2.   Against the public's health and well-being, Respondents and GEO have no significant interests. ..................................... 19

   D.   Petitioners are not required to post a bond.............................. 20

V.    CONCLUSION ......................................................................... 20

PETITIONERS' MPA ISO MOT. FOR TRO & OSC
57537347.v1

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Banks v. Booth*,
   No. 20-cv-849, 2020 WL 3303006 (D.D.C. June 18, 2020) ........................ 16, 18

6

*Bernard v. Foley*,
7
   39 Cal. 4th 794 (Cal. 2006) ................................................................................. 7

8

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
9
   766 F.2d 1319, 1325 (9th Cir.1985) ................................................................... 20

10

*Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*,
11
   181 F. Supp. 2d 1111 (E.D. Cal. 2001) ............................................................... 4

12

*Comm. for Responsible Sch. Expansion v.*
   *Hermosa Beach City Sch. Dist.*,
13
   142 Cal. App. 4th 1178 (Cal. Ct. App. 2006) ............................................. 11, 12

14

*Davies Warehouse Co. v. Bowles*,
15
   321 U.S. 144 (1944) ............................................................................................ 15

16

*Dumas v. Gommerman*,
17
   865 F.2d 1093 (9th Cir. 1989) ..................................................................... 4, 5, 6

18

*Fraihat v. U.S. Immigration & Customs Enf't*,
19
   No. 19-cv-1546, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020) ......................... 5

20

*Galbiso v. Orosi Pub. Util. Dist.*,
21
   167 Cal. App. 4th 1063 (Cal. Ct. App. 2008) ................................................... 13

22

*Margan v. Niles*,
   250 F. Supp. 2d 63 (N.D.N.Y. 2003) ................................................................... 7
23

24

*Monsanto Co. v. Off. of Envtl. Health Hazard Assessment*,
   22 Cal. App. 5th 534, 555–56 (Cal. Ct. App. 2018) ........................................... 7

25

*Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.*,
26
   743 F.2d 1365 (9th Cir. 1984) ...................................................................... 4, 5

27

28

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

57537347.v1

*Ortuno v. Jennings*,
   No. 20-cv-02064-MMC, 2020 WL 1701724 (N.D. Cal. Apr. 8,
   2020) ............................................................................................ 16, 18, 20

*Ortuno v. Jennings*,
   No. 20-cv-02064-MMC, 2020 WL 1866122 (N.D. Cal. Apr. 14,
   2020) ............................................................................................................. 16

*People v. DeLeon*,
   3 Cal. 5th 640, 648 (Cal. 2017) ......................................................................... 8

*Ribakoff v. City of Long Beach*,
   27 Cal. App. 5th 150, 172 (Cal. Ct. App. 2018) .............................................. 13

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) .......................................................................... 19

*S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*,
   No. 18-cv-760, 2020 WL 3265533 (D.D.C. June 17, 2020) ............................ 16

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973) .............................................................................................. 16

*Vacco v. Quill*,
   521 U.S. 793 (1997) .......................................................................................... 15

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................ 5

**Constitutions**

Cal. Const. art. I, § 3 ................................................................................... 8, 11, 12

U.S. Const. art. I ................................................................................................... 16

U.S. Const. amend. I.............................................................................................. 16

**Statutes**

Cal. Civ. Code § 4 ................................................................................................. 11

Cal. Civ. Code § 1670.9 .................................................................................*passim*

Cal. Gov. Code § 54951.1 ..................................................................................... 13

PETITIONERS' MPA ISO MOT. FOR TRO & OSC
57537347.v1

Cal. Gov. Code § 54952.2 ................................................................................. 13

Cal. Gov. Code § 54953 ................................................................................... 13

Cal. Gov. Code § 54953.3 ........................................................................... 13, 15

Cal. Gov. Code § 54954.2 ................................................................................. 11

Cal. Gov. Code § 54954.3 ........................................................................... 13, 14

Cal. Gov. Code § 54960.1 ................................................................................. 11

**Municipal Codes**

McFarland, Cal. Mun. Code pt. 2.10.010 .................................................... 10

McFarland, Cal. Mun. Code pt. 17.160.040 ................................................... 9

McFarland, Cal. Mun. Code pt. 17.160.050 .................................................. 10

**Other Authorities**

69 Ops. Cal. Atty. Gen. 290 (1986) .............................................................. 7

Cal. Executive Order N-29-20 ..................................................................... 13

Merriam-Webster's Collegiate Dict. (10th ed. 2000) ........................................ 7, 12

S.B. No. 29 (2017–2018 Reg. Sess.) § 1 ..................................................... 8

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

57537347.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

57537347.v1

## I.      INTRODUCTION

Petitioners Immigrant Legal Resource Center and Freedom for Immigrants ("Petitioners") originally initiated this action in state court seeking, among other re-lief, a temporary restraining order against the City of McFarland.[1] Petitioners' law-suit has now been removed to this Court, and Petitioners request that this Court grant their Ex Parte Motion for Temporary Restraining Order and Order to Show Cause (the "Motion") in order to prevent the immediate, irreparable, and entirely avoidable harms to the public health of McFarland that will occur on or shortly after July 15, 2020. On that date, Real Party in Interest Geo Group, Inc. ("GEO") will be able to accept transfers of civil immigration detainees to, and house those detainees at, the Central Valley and Golden State Modified Community Correctional Facilities in McFarland ("Central Valley" and "Golden State," respectively) pursuant to modifi-cations of McFarland Conditional Use Permits 01-96 and 02-96 (the "Proposed Modifications"). The Proposed Modifications would authorize GEO to operate for-profit immigration detention facilities in both Central Valley and Golden State pur-suant to contracts it executed with United States Immigration and Customs Enforce-ment ("ICE") in December 2019, and retrofitting work began on both facilities shortly thereafter.

Respondent City of McFarland (the "City"), however, approved the Proposed Modifications illegally. Civil Code section 1670.9(d), enacted by the Legislature in 2017, requires 180 days' public notice and multiple hearings before any public entity may take any land-use action that would permit the operation of for-profit immigra-tion detention facilities. After Respondent City of McFarland Planning Commission rejected the Proposed Modifications on February 18, 2020, McFarland City Council

---

[1]      This case originated in California state court as a petition for a writ of mandate under California Code of Civil Procedure section 1085. This Motion accordingly refers to "Petitioners" and "Respondents" in lieu of "Plaintiffs" and "Defendants."

PETITIONERS' MPA ISO MOT. FOR TRO & OSC
57537347.v1

1  approved them after just a single public hearing—conducted remotely and insuffi-

2  ciently open to the public—on April 23, 2020.

3      Given the immediate and extreme risks to public health posed by detainee

4  transfers pursuant to the Proposed Modifications, this Court should immediately en-

5  join both Respondents and GEO from making the Proposed Modifications effective

6  and from housing civil immigration detainees in both Golden State and Central Val-

7  ley.

8  **II.    FACTUAL BACKGROUND**

9      In December 2019, GEO contracted with ICE to operate immigration deten-

10  tion facilities in Central Valley and Golden State. Fialho Decl. ¶ 4.[2] Shortly thereaf-

11  ter, it applied for the Proposed Modifications from the Planning Commission, with-

12  out which GEO would be unable to house federal detainees at Central Valley or

13  Golden State. Fialho Decl. ¶ 4. The City and GEO worked closely on approving the

14  Proposed Modifications as quickly as possible despite Section 1670.9(d), with

15  McFarland City Attorney asking GEO attorneys if they were "comfortable" with a

16  "final decision long before 180 days after the posting of the notices." RJN Ex. A at

17  3. Immediately after entering into the contract with ICE, GEO began preparing both

18  facilities to receive immigration detainees. Fialho Decl. ¶ 4.

19      The Planning Commission first notified the public of the Proposed Modifica-

20  tions on January 10, 2020. Fialho Decl. ¶ 8. The Planning Commission also held two

21  hearings concerning the Proposed Modifications: the first on January 21, 2020, and

22  the second on February 18, 2020. Fialho Decl. ¶ 7. At both meetings, members of

23  the public were not allowed to comment without completing comment cards request-

24  ing that commenters identify themselves by name. Meslin Decl. ¶¶ 4, 6; Gonzalez

27 [2]    The Fialho Declaration, supporting Petitioners' Ex Parte Application for a
28 Temporary Restraining Order in the state case that initiated this Action, is Exhibit 1 to the Westerfield Declaration in Support of the Motion (the "Westerfield Decl.).

Decl. ¶¶ 4, 6.[3] And at the February 18 meeting, City staff required members of the public to fill out comment cards before the meeting began at 6:00 p.m. Meslin Decl. ¶ 6; Gonzalez Decl. ¶ 6. Members of the public who attempted to fill out comments cards at 6:05 p.m. were not permitted by City staff to address the Planning Commission. Meslin Decl. ¶ 7. At the end of the February 18 meeting, the Planning Commission voted to reject the Proposed Modifications. Fialho Decl. ¶ 6.

GEO appealed the Planning Commission's decision to the City Council on February 26, 2020. Fialho Decl. Ex. E. The City Council held a single public meeting, on April 23, 2020, to discuss and vote on the Proposed Modifications. Fialho Decl. ¶ 5. At that meeting, held via teleconference on the Zoom platform and dial-in given the ongoing COVID-19 pandemic, members of the public who wished to offer comment were prevented from doing so due to connectivity issues. Grant Decl. ¶ 5[4]; Gonzalez Decl. ¶ 10. Other members of the public were not called on to speak despite requesting to do so. Sandoval Decl. ¶ 6.[5] And at least one member of the public was blocked by City staff from offering comment on the Proposed Modifications. Gonzalez Decl. ¶ 13. During this meeting, the City Council neither asked questions nor heard testimony concerning detainee transfers and COVID-19. Fialho Decl. Ex. B. The risks associated with detainee transfers, however, were well-understood by April 23, and formed the basis of federal guidance and state executive orders on that subject. Fialho Decl. ¶ 13. The City Council approved the Proposed Modifications by adopting Resolutions 2020-13 and 2020-14. Fialho Decl. Ex. B.

Resolutions 2020-13 and 2020-14 provide that the Proposed Modifications shall not be considered "issued, executed or effective until July 15, 2020." Fialho

---

[3]     The Declarations of Jan Meslin and Alex Gonzalez are Exhibits 2 and 3, respectively, to the Westerfield Declaration. *See* n.2.

[4]     The Declaration of Jim Grant is Exhibit 4 to the Westerfield Declaration. *See* n.2.

[5]     The Declaration of Ivan Sandoval is Exhibit 5 to the Westerfield Declaration. *See* n.2.

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

1  Decl. Exs. C, D. After that date, the Proposed Modifications will allow GEO to ac-
2  cept transfers of federal immigration detainees to, and house them at, Central Valley
3  and Golden State.

4      Petitioners filed this action in Kern County Superior Court to challenge the
5  lawfulness of the City Council's approval of the Proposed Modifications on April
6  23. Given the ongoing COVID-19 pandemic, Petitioners subsequently requested that
7  Court to restrain Respondents and GEO from permitting or accepting transfer of de-
8  tainees into or out of Central Valley or Golden State pending a determination of the
9  legality of the Proposed Modifications' approval.

10      In lieu of answering that request, GEO removed this case to this Court. ECF
11  No. 1.⁶ Petitioners accordingly renew their request, and ask that this Court prohibit
12  Respondents and GEO from issuing, executing, or making the Proposed Modifica-
13  tions effective, and from housing any detainees at Central Valley and Golden State
14  in reliance on the Proposed Modifications.

15  **III.  STANDARD**

16      "The standard for issuing a preliminary injunction is the same as the standard
17  for issuing a temporary restraining order." *Cal. Indep. Sys. Operator Corp. v. Reliant*
18  *Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001). "[T]he party seek-
19  ing [a preliminary] injunction must show either a likelihood of success on the merits
20  and the possibility of irreparable injury or that serious questions going to the merits
21  are raised and the balance of hardships tips sharply in her favor." *Dumas v. Gom-*
22  *merman*, 865 F.2d 1093, 1095 (9th Cir. 1989). "These are not separate tests, but are
23  the ends of a continuum; the greater the relative hardship to the moving party, the
24  less probability of success must be shown." *Nat'l Ctr. for Immigrants Rights, Inc. v.*

25

26

27  ⁶  GEO likewise filed a Notice of Related Case relating this case to The GEO
28  Group, Inc. v. Gavin C. Newsom, et al., No. 20-cv-00533-TLN-AC (E.D. Cal.) (the "Related Case"). Petitioners agree that the same judge should preside over this case and the Related Case.

4  Case No. 20-at-489
**PETITIONERS' MPA ISO MOT. FOR TRO & OSC**
57537347.v1

1   *I.N.S.*, 743 F.2d 1365, 1369 (9th Cir. 1984). Injunctions must likewise be "in the

2   public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

3   **IV. ARGUMENT**

4       If GEO is permitted to house federal detainees pursuant to the Proposed Mod-

5   ifications, the threatened harms are enormous. As courts around the country have

6   recognized, risks of spreading COVID-19 are especially acute in detention facilities,

7   and spikes of the disease inside detention facilities inevitably overwhelm the com-

8   munities outside of them. "Even in the early days of the pandemic, and with few

9   exceptions, courts did not hesitate to find irreparable harm as a result of potential

10   COVID-19 exposure in prison and detention, including in facilities where there had

11   not been a confirmed case. . . . At this stage of the pandemic, the threat is even

12   clearer." *Fraihat v. U.S. Immigration & Customs Enf't*, No. 19-cv-1546, 2020 WL

13   1932570, at \*27 (C.D. Cal. Apr. 20, 2020).

14       As to Petitioners' likelihood of success, Petitioners ask only that this Court

15   read the plain text of Section 1670.9(d) broadly, as the California Constitution re-

16   quires. Under this interpretation, the City's failures to follow that statute are plain:

17   it failed to provide the required public meetings, the required public notice, and the

18   required public access. Its approval of the Proposed Modifications was thus invalid,

19   and this Court should not permit GEO or any other party to act on them. Particularly

20   given the gravity of the looming harm, Petitioners have presented "serious ques-

21   tions" *Dumas*, 865 F.2d, more than sufficient for this Court to grant the Motion.

22       **A. The City's approval of the Proposed Modifications violates the**

23       **only reasonable understanding of Section 1670.9(d).**

24       The City improperly approved the Proposed Modifications, and Petitioners

25   will therefore prevail in this action. Petitioners seek a writ of mandate against the

26   City based on violations of Civil Code section 1670.9(d). That statute provides:

27       (d) A city, county, city and county, or public agency shall not, on and after January 1, 2018, approve or sign a deed,

28       instrument, or other document related to a conveyance of land or issue a permit for the building or reuse of existing

**PETITIONERS' MPA ISO MOT. FOR TRO & OSC**
57537347.v1

buildings by any private corporation, contractor, or vendor to house or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and county, or public agency has done both of the following:

(1) Provided notice to the public of the proposed conveyance or permitting action at least 180 days before execution of the conveyance or permit.

(2) Solicited and heard public comments on the proposed conveyance or permit action in at least two separate meetings open to the public.

The City violated this statute in at least three ways, each of which invalidate its approval of the Proposed Modifications. First, Section 1670.9(d) requires *each* permitting authority to hold at least two separate public meetings, but the City Council approved the Proposed Modifications after a single hearing. Second, the statute requires the public to have at least 180 days' notice of any permitting action that will create a privately-run immigration detention facility, but the City Council approved the Proposed Modifications shortly after first notifying the public. Third and finally, public hearings discussing immigration detention facilities require maximal public participation, but the City limited public input on the Proposed Modifications during meetings discussing them. In email to counsel for GEO, the McFarland City Attorney even recognized that the proposed approval process risked violating the requirements of Section 1670.9(d), asking GEO's attorney to confirm that he was "comfortable" with those risks. RJN Ex. A at 3. These defects in the City's approval process are more than sufficient to raise "serious questions going to the merits." *Dumas*, 865 F.2d at 1095. This Court should thus enjoin the Proposed Modifications.

1. **The City Council held just one meeting on the Proposed Modifications less than 180 days after the Planning Commission rejected them.**

Section 1670.9(d) requires *each* public body considering any action pertaining to an immigration detention facility to provide 180 days' notice, and to hold at least two public meetings, before approving that action. City Council, however, approved

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

the Proposed Modifications after holding a single meeting just three days after announcing that it would consider the Proposed Modifications. That approval accordingly violated Section 1670.9(d).

Section 1670.9(d) states that "*A* city, county, city and county, *or* public agency" shall not take certain actions related to private immigration detention facilities "unless *the* city, county, city and county, or public agency has done *both* of the following . . . ." Cal. Civil Code § 1670.9(d) (emphasis added). By using the indefinite article "*a*" and the disjunction "*or*" in the statute's prefatory clause, the Legislature broadly applied the requirements of Section 1670.9(d) to every public body that might make a decision concerning immigration detention facilities. The indefinite article "*a*" indicates "an indiscriminate and broad coverage," (69 Ops. Cal. Atty. Gen. 290 (1986))—indeed, a common definition of the term is "any." Merriam-Webster's Collegiate Dict. (10th ed. 2000) p. 1; *see also Margan v. Niles*, 250 F. Supp. 2d 63, 70 (N.D.N.Y. 2003) ("By using an indefinite article, the statutory language is broad . . . ."). The disjunction "*or*" likewise indicates that the statute applies equally to cities, counties, cities and counties, *and* public agencies.[7] *See Bernard v. Foley*, 39 Cal. 4th 794, 808 (Cal. 2006) (use of disjunctive part of statute's "broad introductory phraseology"); *Monsanto Co. v. Off. of Envtl. Health Hazard Assessment*, 22 Cal. App. 5th 534, 555–56 (Cal. Ct. App. 2018) (use of disjunctive creates "sweeping" statutory coverage). The statute's subsequent command that "*the* city, county, city and county, or public agency" do "both of the following" clarifies its meaning: whenever *any* public entity considers certain actions pertaining to immigration detention facilities, *that* entity must *both* provide 180 days' notice and two public hearings before it may take that action. In light of this language, Section 1670.9(d) must be read to apply *independently* to municipalities—the City—and to

---

[7]     Neither Section 1670.9(d) nor any related portion of the Civil Code defines "public agency." That term, however, reads naturally as encompassing municipal agencies—such as the Planning Commission—inferior to the municipality's chief body—in this case, City Council.

PETITIONERS' MPA ISO MOT. FOR TRO & OSC
57537347.v1

1   municipal commissions—the Planning Commission—and to require *both* entities to

2   provide at least (1) 180 days' notice and (2) two public meetings.

3          This interpretation honors the statute's purpose and hews to its text. Statutory

4   language must be construed "in context, keeping in mind the nature and obvious

5   purpose of the statute." *People v. DeLeon*, 3 Cal. 5th 640, 648 (Cal. 2017) (quotation

6   omitted). Further, "a statute . . . shall be broadly construed if it furthers the people's

7   right of access" to their government. Cal. Const. art. I, § 3. Section 1670.9 has two

8   complementary purposes, both of which require a broad reading of subsection (d).

9   First, the statute discourages the operation of for-profit immigration detention facil-

10   ities. In enacting Section 1670.9, the Legislature noted its intent to "declare that the

11   state does not tolerate profiting from the incarceration of Californians held in immi-

12   gration detention." S.B. No. 29 (2017–2018 Reg. Sess.) § 1. To that end, the statute

13   bars California municipalities and law enforcement agencies from entering into *new*

14   agreements to operate an immigration detention facility or enlarging existing facili-

15   ties. Cal. Civ. Code § 1670.9(a), (b).[8] Second, Section 1670.9 creates public ac-

16   countability for entities that approve or operate immigration detention facilities,

17   thereby "further[ing] the people's right of access." Cal. Const. art I, § 3. The statute

18   does this primarily through its aforementioned public hearing provision requiring

19   ample public notice and hearings before taking any action related to privately run

20   immigration detention facilities. Cal. Civ. Code § 1670.9(d). The statute also en-

21   hances public oversight by subjecting privately run immigration detention facilities

22   to the California Public Records Act. Cal. Civ. Code § 1670.9(c). In light of the

23   statute's aims and California's constitutional imperative, Section 1670.9(d) must be

24   interpreted to require maximal public participation, i.e., to require that *each* body

25   considering action concerning immigration detention facilities (1) provide 180 days'

26   notice and (2) hold two public meetings.

27   —————————————————

28   [8]    Petitioners do *not* contend that these provisions apply to the Proposed Modi-
fications.

Case No. 20-at-489

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

57537347.v1

The City has plainly failed to meet these requirements as to the Proposed Modifications. Although the Planning Commission held two meetings in January and February—after which it voted *against* the Proposed Modifications given over-whelming public opposition—the *City Council* approved the Proposed Modifications following a single meeting on April 23.[9] This approval violated Section 1670.9(d): to properly approve the Proposed Modifications, the City Council was required to hold at least *two* public hearings, particularly given its decision to over-rule the Planning Commission's decision to the contrary. Likewise, *City Council* first notified the public that it would consider the Proposed Modifications on April 20, 2020, just three days before the City Council meeting discussing them. These unambiguous failures to follow Section 1670.9(d) show that Petitioners will prevail in this action, and this Court should thus enjoin the Proposed Modifications while this case is pending.

## 2. The City Council approved the Proposed Modifications less than 180 days after the first public notice.

Even if the Planning Commission's January 10 notice of the Proposed Modifications counts as notice by the City Council, the City Council's approval of the Proposed Modifications on April 23, 2020 still violates Section 1670.9(d). Although the City Council postdated *execution* of the Proposed Modifications until July 15, 2020—more than the requisite 180 days—Section 1670.9(d) does not permit this.

Section 1670.9(d) prohibits public bodies from "issu[ing] a permit for the building or reuse of existing buildings by any private corporation . . . to house or

---

[9] The City Council considered the Proposed Modifications independently from the Planning Commission. Although the April 23 City Council hearing was styled as an "appeal" of the Planning Commission's denial of the Proposed Modifications, the City Council's consideration was not limited to, and appears not to have even included, information before the Planning Commission. *See* Fialho Decl. Ex. B; *see also* McFarland, Cal. Mun. Code pt. 17.160.040 (no limits on information to be considered by City Council on appeal of Planning Commission decisions). The total independence of the City Council's review from the Planning Commission's demonstrates that Section 1670.9(d) must be interpreted to apply to *each* municipal body empowered to make permitting decisions.

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

1    detain noncitizens for purposes of civil immigration proceedings unless" that body

2    has "[p]rovided notice to the public of the proposed . . . permitting action at least

3    180 days before [its] execution." Cal. Civ. Code § 1670.9(d)(1). This notice require-

4    ment encourages robust public participation in permitting decisions concerning im-

5    migration detention facilities by providing members of the public with at least 180

6    days to inform themselves about, organize around, and prepare public comments

7    concerning such facilities for the required public hearings.

8            The City Council approved the Proposed Modifications on April 23, 2018,

9    just 104 days after first providing the public with notice of them. In its resolutions

10   adopting the Proposed Modifications, however, the City Council stated that, to com-

11   ply with Section 1670.9(d), the Proposed Modifications "shall not be considered is-

12   sued, executed, or effective until July 15, 2020, which is more than 180 days from

13   January 10, 2020." Fialho Decl. Exs. C, D.

14           The City's interpretation of Section 1670.9(d) is incorrect and impermissible

15   for at least two reasons. First, the McFarland Municipal Code does not recognize

16   any distinction between the approval, issuance, and execution of land-use permits.

17   *See generally* McFarland, Cal. Mun. Code ch. 17.160 (discussing permit proce-

18   dures). Indeed, Chapter 17.160, which governs permitting procedures, does not pro-

19   vide for the "execution" of permits, and uses "approval" and "issuance" interchange-

20   ably. *See* McFarland, Cal. Mun. Code pt. 17.160.050 ("Any permit . . . *issued* pur-

21   suant to this chapter may be modified or revoked by the official or decision making

22   body that originally *approved* the permit by the same procedure under which the

23   permit was *issued* . . . .") (emphasis added). And the Code section governing the

24   "[e]xecution of documents" states simply that "[a]ll documents to be signed by the

25   city shall be signed by the mayor." McFarland, Cal. Mun. Code pt. 2.10.010. This

26   was exactly the City's procedure for the resolutions approving the Proposed Modi-

27

28

**PETITIONERS' MPA ISO MOT. FOR TRO & OSC**

fications: they were signed by Mayor Gonzalez. Fialho Decl. Exs. C, D. The distinction between the City Council's April 23 *approval* of the Proposed Modifications and the July 15 *execution* is illusory and insufficient under Section 1670.9(d)(1).

Indeed, the McFarland City Attorney believed this to be a reasonable interpretation of Section 1670.9(d). While coordinating the City's process to approve the Proposed Modifications with GEO, he wrote: "This arguably means that the Planning Commission cannot take action on approving the modification until 180 days after posting the notice . . . ." RJN Ex. A at 6.

Second, the City's ultimate interpretation of Section 1670.9(d) undermines the purpose of that statute. If, as the City appears to believe, a permitting decision can be formally *approved* months before that permit's *execution*, the notice requirement of Section 1670.9(d) would have little effect. Under the City's interpretation, a municipality could provide notice of a permitting action pertaining to a private immigration detention facility on Day One, hold the first meeting required by Section 1670.9(d)(2) on Day Four,[10] approve that permit at the second required meeting the next day (Day Five), and postdate the permit's "execution" to 180 days after Day One. This would render Section 1670.9(d)'s notice requirement a nullity—as discussed above, the statute encourages maximal public participation, yet the City's interpretation leaves it wholly duplicative of the already-applicable Brown Act. *See* fn. 10. Interpretations that render statutory provisions redundant are impermissible, as are crabbed interpretations of statutes encouraging public participation. *See* Cal. Const. art. I, § 3 ("[A] statute . . . shall be broadly construed if it furthers the people's right of access"); Cal. Civ. Code § 4 ("[Civil Code] provisions are to be liberally construed with a view to effect its objects and to promote justice."); *Comm. for Responsible Sch. Expansion v. Hermosa Beach City Sch. Dist.*, 142 Cal. App. 4th 1178,

---

[10]    The Brown Act, which applies to all public meetings at which such permitting actions could be discussed, requires "[a]t least 72 hours" of notice to the public before the meeting of any municipal body. Cal. Gov. Code § 54954.2(a)(1).

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

1189 (Cal. Ct. App. 2006) ("Courts should interpret statutes . . . so as to give force and effect to every provision . . . .").

The City Council failed provide the required 180 days' notice of the Proposed Modifications, and its April 23rd approval violated Section 1670.9(d). Petitioners will thus prevail in this action, and this Court should grant the Motion.

**3.    The public could not sufficiently participate in the public meetings.**

Section 1670.9(d) requires unfettered public participation in its required public hearings. The City Council and Planning Commission, however, each restricted public participation in meetings on the Proposed Modifications. Those hearings did not satisfy Section 1670.9(d), and these failures invalidate the City Council's approval of the Proposed Modifications.

Section 1670.9(d) requires public bodies weighing permitting decisions concerning private immigration detention facilities to "[s]olicit[] and hear[] public comments on the [permitting decision] in at least two separate meetings open to the public." Cal. Civ. Code § 1670.9(d)(2). Two terms in this provision, which must be "broadly construed," (Cal. Const. art. I, § 3(b)(2)) are incompatible with restrictions that prevent members of the public from commenting at or attending the meetings. First, in providing that the public body must "solicit and hear public comments," Section 1670.9(d) requires public bodies to affirmatively encourage, instead of merely permit, public comment. *See* Merriam-Webster's Collegiate Dict. (10th ed. 2000) p. 1115 (defining "solicit" as "to make petition to: entreat" and "to approach with a request or plea"). Second, in providing that hearings discussing permitting modifications be "open to the public," Section 1670.9(d) prohibits impediments to public participation.

PETITIONERS' MPA ISO MOT. FOR TRO & OSC
57537347.v1

1    Further, a meeting cannot satisfy Section 1670.9(d) if it violates the Brown

2    Act.[11] That statute requires that "[a]ll meetings of the legislative body of a local

3    agency shall be open and public, and all persons shall be permitted to attend any

4    meeting of the legislative body of a local agency . . . ." Cal. Gov. Code § 54953(a).[12]

5    The Brown Act also requires that "regular meetings shall provide an opportunity for

6    members of the public to directly address the legislative body." Cal. Gov. Code

7    § 54954.3(a). While this provision allows public bodies to set reasonable boundaries

8    for public participation, it does *not* allow them to bar members of the public from

9    participation. *See Ribakoff v. City of Long Beach*, 27 Cal. App. 5th 150, 172 (Cal.

10   Ct. App. 2018) (upholding three-minute limit on public comment); *cf. Galbiso v.*

11   *Orosi Pub. Util. Dist.*, 167 Cal. App. 4th 1063, 1079–80 (Cal. Ct. App. 2008)

12   ("[T]here is no provision in the Brown Act . . . that would allow a legislative body

13   to prohibit a member of the public from making public comments at the appropriate

14   time during a public meeting merely because the comments would likely relate to

15   pending litigation."). Further, the Brown Act does not permit any encumbrance to

16   the public's participation in meetings. Members of the public cannot be required to

17   sign in, to identify themselves by name, or satisfy any other "condition precedent"

18   in order to attend and speak at a public meeting. Cal. Gov. Code § 54953.3.

19   The City imposed egregious barriers to public participation at the April 23

20   City Council meeting approving the Proposed Modifications—its sole meeting dis-

21   cussing them. This meeting, held remotely in light of the ongoing COVID-19 pan-

22   demic,[13] did not sufficiently allow members of the public to attend and comment.

23

24   _____

     [11]    The Brown Act covers local governments and agencies, and meetings that vi-
25   olate the Brown Act are legal nullities. *See* Cal. Gov. Code §§ 54951.1, 54952.2(a)–
     (b), 54960.1.

26   [12]    Both the Planning Commission and the City Council are "legislative bodies"
     of "local agencies" under the Brown Act. *See id.* §§ 54951.1, 54952.2(a)–(b).

27
     [13]    Executive Order N-29-20, signed on March 17, 2020, suspended physical
28   presence requirements for public meetings. Cal. Exec. Order No. N-29-20 at 2. That
     order, however, did not suspend other requirements of the Brown Act, and indeed

First, although the City offered dial-in and videoconferencing attendance options, it capped videoconference attendance at one hundred. Gonzalez Decl. ¶ 11. However, Zoom—the videoconferencing platform used for the April 23 meeting—permits up to one thousand attendees. RJN Ex. B. This hundred-person participation cap—which Mayor Gonzalez falsely claimed allowed greater participation[14]—was thus artificially imposed by the City. Second, City staff did not allow Alex Gonzalez, a member of the public, to address City Council concerning the Proposed Modifications, claiming that he had exhausted his time. Gonzalez Decl. ¶ 13. This was incorrect. Although Mr. Gonzalez had spoken during the general comment period at the meeting's outset, his comments only addressed the limits on public participation that the City had imposed. Fialho Decl. Ex. B. Third and finally, several members of the public were barred from commenting on the Proposed Modifications because they were unable to connect either through dial-in or videoconference, because their connections were dropped, or because City staff did not select them for comment. Grant Decl. ¶ 5; Gonzalez Decl. ¶ 10; Sandoval Decl. ¶ 6. These restrictions, individually and cumulatively, denied members of the public their right "to directly address" City Council, (Cal. Gov. Code § 54954.3(a)), and thus their right to be "solicited and heard" under Section 1670.9(d)(2).

Respondents also failed to "solicit and hear public comments" in meetings "open to the pubic"—as Section 1670.9(d) requires—at the Planning Commission meetings discussing the Proposed Modifications. At the first Planning Commission meeting, on January 21, City staff members required members of the public to fill out comment cards before addressing the Planning Commission. These comment

"urged" public bodies "to adhere as closely as reasonably possible" to its provisions. *Id.* at 4.

[14] Although McFarland's City Council chambers, where meetings are normally held, holds only fifty, that building has overflow capacity. As a result, approximately two hundred members of the public attended the January 21 Planning Commission meeting, and approximately three hundred attended the February 18 meeting. Meslin Decl. ¶¶ 5, 7.

cards also required members of the public to identify themselves by name. Meslin Decl. ¶ 4; Gonzalez Decl. ¶ 4. And at the second Planning Commission meeting, on February 18, City staff members required members of the public to fill out comment cards—again requesting the commenter's name—before the meeting began at 6:00 p.m. Meslin Decl. ¶ 7; Gonzalez Decl. ¶ 6. City staff then blocked members of the public who had not filled out a comment card in advance from participating. The 6:00 cutoff was applied strictly, with City staff blocking members of the public from commenting even when they sought to fill out comment cards just five minutes late. Meslin Decl. ¶ 7. The restrictions at the two Planning Commission meetings were impermissible "condition[s] precedent" to public participation, (Cal. Gov. Code § 54953.3), and thus neither meeting satisfied the requirements of Section 1670.9(d). The City failed completely to satisfy its statutory obligations at any meeting concerning the Proposed Modifications, and this Court should enjoin them.

**B.      GEO's constitutional arguments as to Section 1670.9(d) do not affect Petitioners' entitlement to emergency relief.**

GEO, in the Related Case, has raised arguments against the constitutionality of Section 1670.9(d) predicated on the statute's alleged discrimination against and regulation of the federal government. Because state legislation is presumed constitutional absent egregious discrimination against or infringement upon *people*, however, GEO's constitutional arguments do not affect the "serious questions going to the merits of" this case as discussed above.

"State statutes . . . are entitled to the presumption of constitutionality until their invalidity is judicially declared." *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944). This presumption wavers only when a statute "infringe[s] fundamental rights []or involve[s] suspect classifications." *Vacco v. Quill*, 521 U.S. 793, 799 (1997).

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

1   GEO argues that Section 1670.9(d) violates the constitution by way of the

2   doctrine of intergovernmental immunity by discriminating against and directly reg-

3   ulating the federal government. *See* Related Case ECF no. 16-1 at 9. The federal

4   government is not a member of any suspect class, nor does it enjoy any "fundamental

5   rights": the Constitution grants "Powers" to the *federal government* but protects

6   "rights" only of *people*. *Compare, e.g.*, U.S. Const. art. I, § 8 (granting "Power[s]"

7   to Congress) *with, e.g.*, U.S. Const. amends. I–X (protecting and creating "right[s]"

8   of the people"; *cf. San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973)

9   (the Constitution, not "importance" of right asserted, determines whether right is

10  fundamental). Section 1670.9(d)—which neither this Court nor any other has en-

11  joined or even interpreted—must thus be presumed constitutional—and therefore

12  enforceable—at this stage. Given this presumption, this Court can and should grant

13  the Motion in its entirety.

14  **C.    Balancing hardships favors Petitioners, as a TRO would simply**

15  **preserve the status quo to protect the public health.**

16  Harm—and the risk of harm—resulting from the infection and spread of

17  COVID-19 plainly outweighs any interest of either GEO or the City. Since the onset

18  of the COVID-19 pandemic, courts around the country have held that such harms

19  and risks outweigh even the harms of extreme remedies, including the release of

20  detainees from immigration detention facilities. *See, e.g.*, *Ortuno v. Jennings*, No.

21  20-cv-02064-MMC, 2020 WL 1701724 (N.D. Cal. Apr. 8, 2020) (ordering release

22  of four detainees from GEO-run immigration detention facility given concerns over

23  COVID-19); *Ortuno v. Jennings*, No. 20-cv-02064-MMC, 2020 WL 1866122 (N.D.

24  Cal. Apr. 14, 2020) (ordering release of two more); *S. Poverty Law Ctr. v. U.S. Dep't*

25  *of Homeland Sec.*, No. 18-cv-760, 2020 WL 3265533 (D.D.C. June 17, 2020) (grant-

26  ing TRO concerning detention conditions against immigration detention facility);

27  *Banks v. Booth*, No. 20-cv-849, 2020 WL 3303006 (D.D.C. June 18, 2020) (convert-

28

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

ing TRO regulating conditions in D.C. detention centers into preliminary injunction). Here, Petitioners request *only a preservation of the status quo* to protect public health while this Court determines the legality of the Proposed Modifications' approval. The balance of hardships plainly favors Petitioners.

> **1.    Allowing Respondents and GEO to take any further action on the Proposed Modifications would immediately threaten public health.**

Respondents and GEO will be able to transfer detainees to Central Valley and Golden State as of Wednesday, July 15, 2020.  The language of the resolutions approving the Proposed Modifications states that the Proposed Modifications become "effective" on that date, and GEO has plainly stated in other proceedings that it has been working since December 2019 to prepare both facilities for the transfer of immigrant detainees. Fialho Decl. ¶¶ 8–10; *see also id.* Exs. A, C, D. Neither Respondents nor GEO have given any indication that immigration detainees will not be transferred to these facilities on or shortly after July 15 despite the substantial, immediate, and *entirely avoidable* public health risks that such a transfer would create.[15]

As this Court is undoubtedly aware, the COVID-19 pandemic continues to worsen in the United States, in California, and in Kern County particularly. Fialho Decl. ¶¶ 11, 15. The California Department of Health attributes the "elevated disease transmission and increasing hospitalization" in Kern County to "outbreaks at [skilled nursing facilities] and *state/federal prisons*." Fialho Decl. ¶ 15; *id.* Ex. P. This conforms to epidemiological forecasting emphasizing the severe risks of COVID-19

---

[15]    Risks associated with COVID-19 are properly considered as part of the public interest in a suit seeking relief under Section 1670.9(d). That statute encourages maximal public deliberation of decisions that would permit the operation of a privately-run immigration detention facility. By violating it, the City deprived the public its opportunity to assess and offer comment on the risks of COVID-19 related to detainee transfers into Central Valley and Golden State. Indeed, neither the GEO representative nor any City Council member offered testimony or questioning on these risks at the April 23 City Council meeting despite the advanced stage of the pandemic at that time. *See* Fialho Decl. Ex. B.

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

spread associated with detention facilities. Lofgren Decl. ¶¶ 11–18.[16] Importantly, the risk of spillover from detention facilities into their surrounding communities is both severe and immediate. Lofgren Decl. ¶¶ 19–23.

Assessing the risks of COVID-19, courts have accepted the scientific consensus. "COVID-19 infections, however, are rapidly increasing in the United States, including California, and, when introduced into a confined space, such as a nursing home, a cruise ship, and, recently, a naval aircraft carrier, it can rapidly spread. Indeed, it has quickly spread in a number of jails and prisons." *Ortuno v. Jennings*, 2020 WL 1701724, at *2. "No man's health is an island. If [detainees] contract COVID-19, they risk infecting others inside the [detention] facilities. [Detainees] also risk infecting [corrections officers] who work inside DOC facilities but also live in the community, thus increasing the number of people vulnerable to infection in the community at large." *Banks*, 2020 WL 1914896, at *12. Likewise, "if [detainees] contract COVID-19 and experience complications, they will be transported to community hospitals—thereby using scarce community resources (ER beds, general hospital beds, ICU beds)." *Id.* (quotation omitted).

The risks of COVID-19 are as acute in immigration detention facilities as in other detention facilities. The Adelanto ICE Processing Center—run by GEO—currently reports one COVID-19 case among its staff and eleven among its detainees, and hundreds of COVID-19 cases are in other ICE facilities. Fialho Decl. ¶ 12. Given the severity of risk associated with COVID-19 in detention facilities, federal and state authorities have cited detainee transfers as an avoidable risk and have cautioned against or temporarily suspended them. Fialho Decl. ¶ 13; *id.* Exs. L (CDC guidance counseling "[r]estrict[ing] transfers of incarcerated/detained persons"), and M (California executive order temporarily halting prisoner transfers). Indeed, the thirtyfold increase in COVID-19 infections in San Quentin State Prison—from

---

[16]    The Declaration of Dr. Eric Lofgren is Exhibit 6 to the Westerfield Declaration. *See* n.2.

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

1   approximately fifty cases to approximately fifteen hundred—from mid-June to mid-

2   July is attributed to a May 30 detainee transfer from the Chico Institution for Men

3   aimed at reducing overcrowding. Fialho Decl. ¶ 14; *id.* Exs. N, O.

4       Permitting transfers to Central Valley and Golden State as of July 15 would

5   create further risks to the public health if this Court later determines that the City

6   Council's approval of the Proposed Modifications violated Section 1670.9(d). In that

7   case, detainees would have to be transferred *back out of* Central Valley and Golden

8   State. That, however, would come too late to protect the health and well-being of the

9   transferred detainees, Central Valley and Golden State Staff, and the broader McFar-

10  land community. It would also imperil detainees, staff, and the surrounding commu-

11  nities at every *transferee* facility. Preventing detainee transfers pursuant to the Pro-

12  posed Modifications best minimizes threats to public health. This Court should

13  therefore preserve the status quo by granting the Motion.

14      **2.    Against the public's health and well-being, Respondents**

15          **and GEO have no significant interests.**

16      Neither Respondents nor GEO have any cognizable interest that could out-

17  weigh the public health. Respondents seek to make the Proposed Modifications ef-

18  fective so that GEO may accept detainee transfers into Central Valley and Golden

19  State. The City Council's approval of the Proposed Modifications, however, violated

20  Section 1670.9(d), and neither Respondents nor GEO could suffer any harm from

21  this Court's prohibition of Respondents' unlawful approval. *See Rodriguez v. Rob-*

22  *bins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (party "cannot suffer harm from an in-

23  junction that merely ends an unlawful practice").

24      Even if Respondents and GEO have cognizable interests, those interests are

25  minimal, particularly when weighed against the threat to public health posed by de-

26  tainee transfers into McFarland. The Motion requests only that Respondents and

27  GEO take no further action pursuant to the Proposed Modifications, preserving the

28  status quo until the City complies with (or proves that it has complied with) Section

1670.9(d). To the extent that this imposes expenses or other financial burdens on Respondents or GEO, Respondents and GEO assumed these risks by deciding that they were "comfortable" with an approval process for the Proposed Modifications so clearly in violation of Section 1670.9(d), RJN Ex. A at 3. As discussed above, COVID-19 risks associated with detention facilities have outweighed far more potent interests related to detention, and have even justified several detainee releases. *Ortuno v. Jennings*, 2020 WL 1701724.

### D. Petitioners are not required to post a bond.

This Court "the district court has discretion to dispense with the security requirement" of Rule 65(c) "where requiring security would effectively deny access to judicial review." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.1985). Petitioners are nonprofit organizations seeking to vindicate the public interest, and any requirement beyond a nominal amount would constitute undue hardship. Petitioners respectfully request this Court to exercise its discretion and waive the security requirement.

## V. CONCLUSION

"[U]nder the highly unusual circumstances presented, i.e., a global pandemic of a type not seen within recent memory, the public interest is served by the requested injunction. Specifically, the public interest in promoting public health is served by efforts to contain the further spread of COVID-19, particularly in detention centers, which typically are staffed by numerous individuals who reside in nearby communities." *Ortuno v. Jennings*, 2020 WL 1701724, at *4.

Petitioners ask only that this Court preserve the status quo to protect the public health from an entirely avoidable and potentially catastrophic harm based on an obvious and plan reading of a state statute. Petitioners therefore request that this Court grant the Motion in its entirety.

PETITIONERS' MPA ISO MOT. FOR TRO & OSC

Date:    July 12, 2020

NOSSAMAN LLP
DAVID C. LEE
ALEXANDER WESTERFIELD
ELIZABETH KEY

By:  /s/ David C. Lee

David C. Lee

Attorneys for Petitioners IMMIGRANT
LEGAL RESOURCE CENTER;
FREEDOM FOR IMMIGRANTS

Case No. 20-at-489
PETITIONERS' MPA ISO MOT. FOR TRO & OSC
57537347.v1