1
2
3
4
5
6
7

NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
ALEXANDER WESTERFIELD (SBN 295676)
awesterfield@nossaman.com
ELIZABETH KEY (SBN 323544)
ekey@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:   415.398.3600
Facsimile:    415.398.2438

8
9

Attorneys for Petitioners IMMIGRANT LEGAL
RESOURCE CENTER; FREEDOM FOR
IMMIGRANTS

10
11
12

13

UNITED STATES DISTRICT COURT

14

EASTERN DISTRICT OF CALIFORNIA

15
16
17
18
19
20
21
22
23
24

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; FREEDOM FOR IMMIGRANTS,<br><br>                Petitioners,<br><br>        vs.<br><br>CITY OF MCFARLAND; MCFARLAND PLANNING COMMISSION,<br><br>                Respondents,<br><br>THE GEO GROUP, INC.,<br><br>                Real Party in Interest. | Case No:  20-at-489<br><br>**DECLARATION OF ALEXANDER WESTERFIELD IN SUPPORT OF EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER & ORDER TO SHOW CAUSE** |

25
26
27
28

Case No. 20-at-489

WESTERFIELD DECL. ISO EX PARTE APP. FOR TRO

57537345.v1

I, Alexander Westerfield, declare as follows:

1.      I am over the age of eighteen and competent to provide testimony, and I am a resident of San Francisco, California. I have personal knowledge of all information provided herein, except as to those matters stated upon my information or belief, and as to those matters I believe it to be true. If called upon to testify, I could and would testify as sworn in this declaration.

2.      I am an associate with the law firm of Nossaman LLP, and I am counsel to Petitioners Immigrant Legal Resource Center and Freedom for Immigrants in this action.

3.      I am providing this declaration in support of Petitioners' Ex Parte Motion for a Temporary Restraining Order and Order to Show Cause (the "Motion").

4.      This action was originally filed in Kern County Superior Court as *Immigrant Legal Resource Center, et al. v. City of McFarland, et al.*, No. BCV-20-101507-JEB (the "State Case"), on June 30, 2020, and was subsequently assigned to Judge Eric Bradshaw.

5.      Based on my experience in other matters, I am informed and believe that, as a result of the ongoing COVID-19 pandemic, there is a days- to weeks-long delay between the filing of an action and the return of a summons to initiate service of process.

6.      Petitioners served Respondents City of McFarland and McFarland Planning Commission ("Respondents") and Real Party in Interest Geo Group, Inc. ("GEO") on Monday, July 6, 2020, the first day that service of process was possible. *See* ECF no. 1 ¶ 2.

7.      On Wednesday, July 8, Petitioners, following the rules and procedures of Kern County Superior Court, requested a hearing date on an Ex Parte Application for a Temporary Restraining Order and an Order to Show Cause from Judge Bradshaw, requesting substantially similar relief to the instant Motion. Petitioners

WESTERFIELD DECL. ISO EX PARTE APP. FOR TRO

1  were told that the earliest available date was Monday, July 13, at 8:30 a.m., which

2  Petitioners reserved.

3  8.      On Friday, July 10, Petitioners, again following the rules and procedures of

4  Kern County Superior Court, provided notice to GEO's counsel of record in related

5  actions before 10:00 a.m. Donovan Collier, who represented GEO in the municipal

6  permitting process underlying this litigation, responded within minutes that GEO

7  and Respondents planned to oppose Petitioners' application.

8  9.      Following the rules and procedures of Kern County Superior Court,

9  Petitioners' Ex Parte Application for a Temporary Restraining Order and Order to

10  Show Cause and all supporting documents thereto were filed before 12:00 p.m.,

11  and thereafter served via email on attorneys for GEO in this action and on the

12  McFarland City Attorney.

13  10.     At 10:54 p.m., I received an email from Viola R. Fennell, a legal assistant to

14  GEO's counsel in this action, notifying me that GEO had removed the State Case

15  to this Court. Accompanying documents identified Bob Joyce of the law firm

16  Lebeau Thelan LLP as counsel for Respondents. *See* ECF no. 1-16.

17  11.     The Notice of Removal, sent by GEO's attorneys, attached Petitioners'

18  Petition for a Writ of Mandate—the equivalent of a complaint—in the State Case,

19  and was emailed to Bob Joyce. All parties to this action have therefore been

20  provided with the complaint in this action.

21  12.     The Notice of Removal further contained a Notice of Related Case, ECF no.

22  1-15, relating this action to *The GEO Group, Inc. v. Gavin C. Newsom, et al.*, No.

23  2:20-cv-00533-TLN-AC (E.D. Cal.) (the "Related Case").

24  13.     On Sunday, July 12, 2020, at 10:41 a.m., I emailed counsel for GEO and

25  Respondents as identified in the Notice of Removal: Michael Shonafelt, Kendie

26  Schlect, Charles Cooper (all counsel for GEO), and Bob Joyce (counsel for

27  Respondents), indicating that Petitioners would renew their request for a temporary

28  restraining order before this Court by way of the Motion.

WESTERFIELD DECL. ISO EX PARTE APP. FOR TRO

14.     At 11:10 a.m., Mr. Cooper acknowledged his receipt and understanding of that email.

15.     Based on the date of the State Action's filing, the delays in state court related to COVID-19, Judge Bradshaw's calendar, and GEO's removal of the State Action to this Court, Petitioners could not possibly have sought relief from this Court by way of noticed motion before July 15, 2020.

16.     As detailed further in the accompanying Memorandum of Points and Authorities, Petitioners require injunctive relief before July 15, 2020. On that date, Respondents will be able to issue, make effective, and/or execute modifications to McFarland Conditional Use Permits 01-96 and 02-96 that would allow GEO to house federal detainees, including immigration detainees, at the Golden State and Central Valley Modified Community Correctional Facilities.

17.     Based on GEO's Complaint in the Related Case, Related Case ECF No. 1, I am informed and believe that GEO will begin to house immigration detainees at both facilities on or shortly after July 15, 2020, and that this would necessitate the transfer of detainees to both facilities.

18.     To expedite the Court's consideration of the Motion, I have attached to this Declaration all supporting declarations that accompanied Petitioners' Ex Parte Application for a Temporary Restraining Order and Order to Show Cause in the State Case.

19.     Attached as **Exhibit 1** is a true and correct copy of the Declaration of Christina Fialho In Support of Petitioners' Ex Parte Application for a Temporary Restraining Order and Order to Show Cause in the State Case, and all exhibits thereto.

20.     Attached as **Exhibit 2** is a true and correct copy of the Declaration of Jan Meslin In Support of Petitioners' Ex Parte Application for a Temporary Restraining Order and Order to Show Cause in the State Case.

21.     Attached as **Exhibit 3** is a true and correct copy of the Declaration of Alex Gonzalez In Support of Petitioners' Ex Parte Application for a Temporary Restraining Order and Order to Show Cause in the State Case.

22.     Attached as **Exhibit 4** is a true and correct copy of the Declaration of Jim Grant In Support of Petitioners' Ex Parte Application for a Temporary Restraining Order and Order to Show Cause in the State Case.

23.     Attached as **Exhibit 5** is a true and correct copy of the Declaration of Ivan Sandoval In Support of Petitioners' Ex Parte Application for a Temporary Restraining Order and Order to Show Cause in the State Case.

24.     Attached as **Exhibit 6** is a true and correct copy of the Declaration of Dr. Eric Lofgren In Support of Petitioners' Ex Parte Application for a Temporary Restraining Order and Order to Show Cause in the State Case, and all exhibits thereto.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12th day of July, 2020 at San Francisco, California.

/s/ Alexander Westerfield

Alexander Westerfield

WESTERFIELD DECL. ISO EX PARTE APP. FOR TRO

57537345.v1

# EXHIBIT 1

1   NOSSAMAN LLP
    DAVID C. LEE (SBN 193743)
2   dlee@nossaman.com
    ALEXANDER WESTERFIELD (SBN 295676)
3   awesterfield@nossaman.com
    ELIZABETH KEY (SBN 323544)
4   ekey@nossaman.com
    50 California Street, 34th Floor
5   San Francisco, CA 94111
    Telephone:  415.398.3600
6   Facsimile:  415.398.2438

7   Attorneys for Petitioners IMMIGRANT LEGAL RESOURCE
    CENTER and FREEDOM FOR IMMIGRANTS
8

9

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                      FOR THE COUNTY OF KERN

13

14   IMMIGRANT LEGAL RESOURCE CENTER,        Case No:     BCV-20-101507-JEB
     FREEDOM FOR IMMIGRANTS,
15                                            Assigned for all purposes to:
                    Petitioners,             Honorable Eric J. Bradshaw
16
            vs.                              **DECLARATION OF CHRISTINA**
17                                           **FIALHO IN SUPPORT OF**
     CITY OF MCFARLAND, CITY OF              **PETITIONERS' APPLICATION FOR**
18   MCFARLAND PLANNING COMMISSION,          **TEMPORARY RESTRAINING ORDER**
                                             **AND ORDER TO SHOW CAUSE**
19                  Respondents,
                                             Date Action Filed: July 1, 2020
20   GEO GROUP, INC.,
                                             Date:  Monday, July 13, 2020
21                  Real party in interest.  Time:  8:30 a.m.
                                             Dept.: T-2
22                                           Judge:  Eric J. Bradshaw

23

24

25

26

27

28

                                  - 1 -
          FIALHO DECL. ISO PETITIONERS' APP. FOR TRO & OSC
57533750.v1

1       I, Christina Fialho, declare as follows:

2  1.     I am over the age of eighteen and competent to provide testimony, and I am a resident of

3  Santa Monica, California. I have personal knowledge of all information provided herein, except

4  as to those matters stated upon my information or belief, and as to those matters I believe it to be

5  true. If called upon to testify, I could and would testify as sworn in this declaration.

6  2.     I am providing this declaration in support of Petitioners' Application for a Temporary

7  Restraining Order and Order to Show Cause.

8  3.     I am the Co-Executive Director of Petitioner Freedom for Immigrants.

9  4.     Real Party in Interest the GEO Group, Inc. ("GEO") sought modifications to McFarland

10  Conditional Use Permits 01-96 and 02-96 (the "Proposed Modifications"), which respectively

11  concern the Golden State and Central Valley Modified Community Correctional Facilities, to

12  operate an immigration detention facility pursuant to contracts with the United States

13  Immigrations and Customs Enforcement ("ICE"). Paragraph 56 of GEO's complaint in *Geo*

14  *Group, Inc., v. Newsom*, No. 20-cv-533-TLN-AC (E.D. Cal.), a true and correct copy of which is

15  attached hereto as **Exhibit A**, states: "On December 30, 2019, having signed its new contract on

16  December 19, 2019 with the Federal Government to convert the Central Valley and Golden State

17  facilities into dedicated ICE detention facilities, GEO applied to the McFarland Planning

18  Commission for modifications to its CUPs to allow the Federal Government to house detainees

19  at Central Valley and Golden State."

20  5.     The McFarland City Council approved those modifications in a regular meeting on April

21  23, 2020 by voting to adopt the Proposed Modifications through Resolutions 2020-13 and 2020-

22  14. A true and correct copy of the minutes of this City Council meeting are attached hereto as

23  **Exhibit B**, and true and correct copies of Resolutions 2020-13 and 2020-14, as considered and

24  approved by the City Council, are attached as **Exhibits C and D**, respectively.

25  6.     The McFarland City Council considered the Proposed Modifications only after the

26  McFarland Planning Commission rejected them on February 18, 2020. True and correct copies

27  of GEO's appeals of the Proposed Modifications to City Council are attached hereto as **Exhibit**

28  **E**.

FIALHO DECL. ISO PETITIONERS' APP. FOR TRO & OSC
57533750.v1

7.      The Planning Commission held two public meetings to discuss the Proposed Modifications, on January 21, 2020 and on February 18, 2020. True and correct copies of the notices of and agendas for those meetings are attached hereto as **Exhibits F and G**.

8.      Resolutions 2020-13 and 2020-14 (**Exhibits C and D**) both state that the Proposed Modifications "shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action."

9.      GEO has begun to modify both Golden State and Central Valley for use as immigration detention facilities. Paragraph 39 of its complaint in *Geo Group v. Newsom* (**Exhibit A**) reads: "Under the [ICE] contract, GEO is obligated to immediately begin "Pre-Transition/Mobilization" activity at Central Valley, with a period of performance beginning on December 20, 2019, during which it must begin preparing the facility to receive ICE detainees. GEO began that process as soon as the contract became effective. Paragraph 43 of the same document reads: "Under the contract, GEO is obligated to immediately begin "Pre-Transition/Mobilization" activity at Golden State, with a period of performance beginning on December 20, 2019, during which it must begin preparing the facility to receive ICE detainees. GEO began that process as soon as the contract became effective."

10.     In light of the complaint in *Geo Group v. Newsom*, and of Resolutions 2020-13 and 2020-14 (**Exhibits A, C, and D**), I am informed and believe that GEO plans to transfer immigration detainees to Central Valley and Golden State in McFarland beginning on July 15, 2020.

11.     The COVID-19 pandemic is ongoing and worsening in the United States and in California. In a July 8, 2020 press release, a true and correct copy of which is attached hereto as **Exhibit H**, the California Department of Public Health announced that "California's positivity rate – a key indicator of community spread – is trending upward in the 14-day average." Data from the United States Center for Disease Control, a true and correct copy of which is attached hereto as **Exhibit I**, indicates that daily infections remain near record highs as of July 8, 2020.

12.     ICE data indicates that there are 45 COVID-19 cases in ICE detention facilities among staff and 871 among detainees, including 11 detainee cases and 1 staff case in the GEO-run

Adelanto ICE Processing Center. A true and correct copy of ICE data as of July 8, 2019, is attached hereto as **Exhibit J**, and a true and correct copy of GEO's Adelanto ICE Processing Center website is attached hereto as **Exhibit K**. **Exhibit J** also states that there have been two detainee deaths attributed to COVID-19, one of them in a California facility run by private detention contractor CoreCivic.

13.     The California and federal governments acknowledge that detention facilities and detainee transfers enhance the risks of the COVID-19 Pandemic. The United States Center for Disease Control states in guidance that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members." A true and correct copy of this guidance is attached hereto as **Exhibit L**. And in Executive Order No. N-36-20, a true and correct copy of which is attached hereto as **Exhibit M**, Governor Newsom acknowledged the risks posed by detainee transfers and temporarily suspended them.

14.     Prisoner transfers have driven an enormous spike in COVID-19 infections at the San Quentin State Prison. According to data from the California Department of Corrections and Rehabilitation, a true and correct copy of which is attached hereto as **Exhibit N**, cases at San Quentin increased approximately thirtyfold—from approximately 50 to 1,500—between mid-June and mid-July. This outbreak is attributed to a detainee transfer from the Chino Institution for Men on May 30, 2020, as reported by the *New York Times*. A true and correct copy of the *New York Times* article is attached hereto as **Exhibit O**.

15.     According to the California Department of Public Health, Kern County, as of July 8, 2020, is already "experiencing elevated disease transmission and increasing hospitalization. Drivers of this include . . . outbreaks at SNFs and state/federal prisons." A true and correct copy of this document is attached hereto as **Exhibit P**.

16.     Based on the foregoing, transferring immigration detainees into Central Valley and Golden State would immediately and irreparably increase the risks of COVID-19 for the

- 4 -

individuals detained there, the individuals employed there, and the surrounding community of McFarland.

17.     If the Proposed Modifications are later invalidated while the COVID-19 pandemic remains ongoing, transfer of detainees out of Central Valley and Golden State will further increase the risks of COVID-19 in transferee facilities and the surrounding communities.

I declare under penalty of perjury that the foregoing is true and correct and executed this 9th day of July, 2020 at Santa Monica, California.

_____

Christina Fialho

FIALHO DECL. ISO PETITIONERS' APP. FOR TRO & OSC
57533750.v1

# EXHIBIT A

Charles J. Cooper (*Pro Hac Vice* Application
Forthcoming), DC Bar No. 248070
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 220-9600
Email: ccooper@cooperkirk.com

Michael B. McClellan, CBN 241570
NEWMEYER & DILLION LLP
895 Dove Street, Fifth Floor
Newport Beach, CA 92660
Telephone: (949) 854-7000
Email: Michael.McClellan@ndlf.com

*Attorneys for Plaintiff The GEO Group, Inc.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE GEO GROUP, INC., | CIVIL ACTION NO: |
| Plaintiff, | **COMPLAINT** |
| v. | |
| GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; XAVIER BECERRA, in his official capacity as Attorney General of the State of California | |
| Defendants. | |

1. Plaintiff The GEO Group, Inc. (GEO) brings this action for declaratory and injunctive relief against Defendants Governor Gavin C. Newsom and Attorney General Xavier Becerra, striking down California Senate Bill 29 (SB-29), codified in relevant part at CAL. CIV. CODE § 1670.9(d), as an unconstitutional attempt by the State of California to regulate and discriminate against the Federal Government and its contractors.

2. Just last term, in *Dawson v. Steager*, the Supreme Court reiterated a constitutional principle "almost as old as the Nation" itself: the State must "treat those

who deal with the federal government as well as it treats those with whom [the State] deals itself." 139 S. Ct. 698,703, 704 (2019) (quotation marks and alterations omitted). That venerable principle, "which so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, [and] so blended with its texture," *McCulloch v. Maryland*, 4 Wheat. (17 U.S.) 316, 426 (1819), is under attack by the State of California.

3.     SB-29, via Section 1670.9(d), purports to require contractors operating federal immigration detention facilities to submit to special requirements for obtaining local zoning permits. Specifically, the statute mandates that the public receive 180 days' notice of a proposed conveyance or permitting action allowing a private corporation to house or detain noncitizens for purpose of civil immigration custody. Further, the public must be allowed to provide comments at two public hearings before a permit may issue.

4.     Because California has now—via another statute called Assembly Bill 32—purported to prohibit the Federal Government from using private detention facilities in California once the current contracts with those facilities expire, there does not appear to be any realistic prospect that SB-29 will ever be applied to another federal contractor other than GEO, since only GEO is obligated under its current contracts with the Federal Government to convert buildings formerly used for other purposes into federal immigration detention facilities.

5.     There is no doubt that California generally has the power to modify the procedures governing the issuance of constitutionally valid zoning permits within the State. But what California may *not* do is "target the federal government alone" for disfavored treatment, *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010), imposing "a specialized burden on federal activity" with the obvious intent and design of delaying and thwarting federal immigration detention, *United States v. California*, 921 F.3d 865, 882 (9th Cir. 2019). Yet, that is precisely what SB-29 does: it singles out contractors who operate federal immigration detention facilities for

COMPLAINT

burdens that it refuses to impose on California's own detention facilities. In so doing, SB-29 asserts the authority to discriminate against, and directly regulate, the Federal Government, flouting the Supreme Court's two-centuries-old teaching about the nature of federal-state relations under the Constitution.

6.     The GEO Group, as the owner and operator of federal immigration detention facilities burdened by SB-29, brings this action to defend the principles first articulated by the Supreme Court two hundred years ago and reiterated just last year. This Court should declare Section 1670.9(d) unconstitutional and enter a preliminary and permanent injunction restraining Defendants from enforcing the statute against GEO.

## JURISDICTION & VENUE

7.     This Court has jurisdiction under 28 U.S.C. § 1331 because the question whether CAL. CIV. CODE § 1670.9(d) violates the Supremacy Clause of the United States Constitution is a federal question.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred, or a substantial part of the property that is the subject of this action is situated, in this District. GEO's Central Valley Modified Community Correctional Facility (MCCF) and Golden State MCCF—two of the immigration detention facilities regulated by Section 1670.9(d)—are located in this District, and the effects of Section 1670.9(d) are felt in this District.

## THE PARTIES

9.     Plaintiff The GEO Group, Inc. is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.

10.     Defendant Gavin C. Newsom is the Governor of the State of California. He has "[t]he supreme executive power" of the State of California (the "State") and is charged with "see[ing] that the law is faithfully executed." CAL. CONST. art. V, § 1.

COMPLAINT



1   As head of the Executive Branch, he has a duty to
2   "supervise the official conduct of all executive and ministerial officers," including
3   the Attorney General. CAL. GOV'T CODE § 12010. In light of these duties, Governor
4   Newsom has responsibility for enforcing Section 1670.9(d). He is sued in his official
5   capacity.

6        11.    Defendant Xavier Becerra is the Attorney General of the State of
7   California. He is "the chief law officer of the State" with "the duty . . . to see that the
8   laws of the State are uniformly and adequately enforced." CAL. CONST. art. V, § 13.
9   In light of these duties, Attorney General Becerra has responsibility for enforcing
10  Section 1670.9(d). He is sued in his official capacity.

11                          **FACTUAL ALLEGATIONS**

12  **I.    Senate Bill 29 and California's Efforts to**
13  **Obstruct Federal Immigration Detention**

14       **A.    Senate Bill 29 (SB-29)**

15       12.    On December 5, 2016, Senate Bill 29 (SB-29) was introduced in the
16  California Legislature. As relevant here, the bill—as enacted—amends the
17  "Unlawful Contracts" title of the California Civil Code to prohibit city, county, and
18  local law enforcement agencies from entering into contracts "with the federal
19  government or any federal agency or a private corporation to house or detain
20  noncitizens for purposes of civil immigration custody" unless those contracts were
21  in effect before January 1, 2018, and it prohibits the renewal or modification of such
22  contracts thereafter "in a manner that would expand the maximum number of contract
23  beds that may be utilized to house or detain in a locked detention facility noncitizens
24  for purposes of civil immigration custody." CAL. CIVIL CODE § 1670.9(a)–(b).

25       13.    SB-29 also restricts the issuance of permits for federal immigration
26  detention facilities:

27              A city, county, city and county, or public agency shall not, on
                and after January 1, 2018, approve or sign a deed, instrument, or
28              other document related to a conveyance of land or issue a permit

COMPLAINT

for the building or reuse of existing buildings by any private corporation, contractor, or vendor to house or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and county, or public agency has done both of the following:

(1) Provided notice to the public of the proposed conveyance or permitting action at least 180 days before execution of the conveyance or permit.

(2) Solicited and heard public comments on the proposed conveyance or permit action in at least two separate meetings open to the public.

*Id.* § 1670.9(d).

14.     The Senate Floor Analysis of SB-29 stated that its enactment was necessary to obstruct federal immigration policy: "President Donald Trump has . . . made it clear that he intends to detain more immigrants and expand private for profit detention facility use. This bill would protect immigrants held in immigrant detention in California."[1]

15.     The Assembly Committee on Judiciary analysis of the bill likewise stated that it was needed "[i]n light of the changed circumstances in the White House,"[2] and it quoted the author as saying that the bill was necessary due to "the new administration's commitment to deport millions."[3]

16.     Governor Jerry Brown signed SB-29 into law on October 5, 2017.

**B.     Assembly Bill 103 (AB-103) and Assembly Bill 32 (AB-32)**

17.     Approximately one month after SB-29 was introduced in the California Legislature, January 10, 2017, Assembly Bill 103 (AB-103) was likewise introduced. Similar to SB-29, AB-103—as enacted—prohibits, among other things, city, county,

---

[1] Senate Rules Comm., Senate Floor Analyses for SB-29, 2017–18 Sess., at 5 (Cal. May 27, 2017), https://bit.ly/2O9c3eP.

[2] Assemb. Comm. on Judiciary, Analysis of SB-29, 2017–18 Sess., at 2 (Cal. June 27, 2017), https://bit.ly/2O9c3eP.

[3] *Id.* at 4.

COMPLAINT

and local law enforcement agencies from entering into contracts "with the federal government or any federal agency to detain adult noncitizens for purposes of civil immigration custody" unless those contracts were in effect before June 15, 2017, and it prohibits the renewal or modification of such contracts thereafter "in such a way as to expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody." CAL. GOV'T CODE § 7310(a)–(b).

18. Governor Jerry Brown signed AB-103 into law on June 27, 2017.

19. The United States has challenged the constitutionality of AB-103, and that challenge remains pending in this Court. *See United States v. California*, No. 18-264 (E.D. Cal.).

20. On December 3, 2018, Assembly Bill 32 was introduced in the California Legislature. AB-32 builds on SB-29 and AB-103 by amending the California Penal Code in two principal ways.

21. First, it generally prohibits the California Department of Corrections and Rehabilitation (CDCR) from contracting with private, for-profit prison facilities to house state inmates, though it contains an important exception that essentially allows CDCR to continue contracting with private detention facilities indefinitely. *See* CAL. PENAL CODE § 5003.1.

22. Second, AB-32 generally prohibits the operation of a private detention facility in the State of California, subject to a handful of exceptions that apply almost exclusively to state facilities. *See* CAL. PENAL CODE §§ 9500–03, 9505.

23. On the day he introduced AB-32, Assembly Member Rob Bonta issued a press release touting the bill, in which he attacked "the Trump Administration['s] . . . cruel immigration policies" and criticized GEO for "facilitating the Trump Administration's political agenda."[4]

---

[4] Press Release, Assembly member Rob Bonta, *Bonta Introduces Bills Ending*

COMPLAINT

24.    The Senate Floor Analysis of AB-32 anticipated litigation challenging its constitutionality by "this anti-immigrant President's Administration."[5]

25.    Christina Fialho, co-founder of Freedom for Immigrants, a group listed as a supporter of AB-32 in the Senate Floor Analysis,[6] observed that AB-32 "will deal a critical blow to the Trump administration's efforts to further expand its system of immigration detention, especially as other states follow our lead."[7]

26.    Governor Newsom signed AB-32 into law on October 11, 2019.

27.    GEO and the United States have each challenged the constitutionality of AB-32, and those cases remain pending in the Southern District of California. *See The GEO Group, Inc. v. Newsom*, No. 19-2491 (S.D. Cal.); *United States v. Newsom*, No. 20-154 (S.D. Cal.).

## II.    U.S. Immigration and Customs Enforcement Detention Authority

28.    In November 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service to the newly created Bureau of Immigration and Customs Enforcement, housed within the Department of Homeland Security.[8] The Bureau began operations in March 2003 and was renamed U.S. Immigration and Customs Enforcement (ICE) in March 2007.[9]

29.    Congress has authorized or required the detention of aliens under several different statutes and conditions. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii),

---

*State's Involvement in For-Profit, Private Prison Industry* (Dec. 3, 2018), https://bit.ly/2Pga7Ch.

[5] Senate Rules Comm., Senate Floor Analyses for AB-32, 2019–20 Sess., at 5 (Cal. Sept. 9, 2019) [hereinafter Senate Floor Analyses for AB-32], https://bit.ly/35htShk.

[6] *Id.* at 8.

[7] Don Thompson & Amy Taxin, *California To End its Use of Private, For-Profit Prisons*, ASSOCIATED PRESS, Oct. 11, 2019, https://bit.ly/2Pgb6C6.

[8] U.S. IMMIGRATION & CUSTOMS ENF'T, CELEBRATING THE HISTORY OF ICE (Mar. 1, 2019), https://bit.ly/35Jas68.

[9] *Id.*



- 7 -                                COMPLAINT

1225(b)(2)(A), 1226(a), 1226(c); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836–38 (2018).

30.     Congress has also directed that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and it has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility," *id.* § 1231(g)(2). Thus, Section 1231(g)(2) authorizes ICE to use private contractors to arrange for detention. *See United States v. California*, 921 F.3d at 882 n.7.

31.     Pursuant to this authority, ICE "manages and oversees the nation's civil immigration detention system."[10]

### III.   GEO's California ICE Detention Facilities

32.     GEO currently operates two dedicated ICE detention facilities in California:

- Mesa Verde ICE Processing Center, located at 425 Golden State Avenue, Bakersfield, CA 93301, with a capacity of 400 beds. GEO has operated the Mesa Verde facility as an ICE detention facility since 2015. The Mesa Verde facility is about a 25.5-mile drive from the City of McFarland, though it is not under the jurisdiction of that city.

- Adelanto ICE Processing Center, located at 10400 Rancho Road, Adelanto, CA 92301, with a capacity of 1,940 beds. GEO has operated the Adelanto facility as an ICE detention facility since 2011.

---

[10] U.S. Immigration & Customs Enf't, Detention Management (Dec. 18, 2019), https://bit.ly/2ZvGnGO.

33.     On December 19, 2019, ICE entered into new contracts with GEO to continue operating the Mesa Verde and Adelanto facilities. The contracts each have a period of performance starting on December 20, 2019, and ending December 19, 2034. ICE has the option of terminating the contracts early every five years, with the first such option occurring on December 20, 2024.

34.     GEO has continued to operate the Mesa Verde and Adelanto facilities under the terms of the new ICE contracts since December 20, 2019, in much the same manner as it was operating those facilities prior to signing the new contracts.

35.     In addition, ICE has entered into contracts with GEO to convert two McFarland-area facilities and one Adelanto-area facility into dedicated ICE detention centers:

- Central Valley Modified Community Correctional Facility (MCCF)), located at 254 Taylor Avenue, McFarland, CA 93250, with a capacity of 700 beds;
- Golden State MCCF, located at 611 Frontage Road, McFarland, CA 93250, with a capacity of 700 beds;
- Desert View MCCF, located at 10450 Rancho Rd, Adelanto, CA 92301, with a capacity of 750 beds.

36.     The Central Valley and Golden State facilities will serve as annexes to the Mesa Verde ICE Processing Center, while the Desert View facility will serve as an annex to the Adelanto ICE Processing Center.

**A.     Central Valley MCCF**

37.     Central Valley MCCF is a GEO-owned prison previously operated under contract with CDCR. CDCR terminated its contract with GEO on July 10, 2019, effective September 30, 2019.

38.     The Central Valley facility is now incorporated into the Mesa Verde contract, with a period of performance starting on December 20, 2019, and ending

COMPLAINT

NEWMEYER DILLION

December 19, 2034. ICE has the option of terminating the contract early every five years, with the first such option occurring on December 19, 2024.

39.     Under the contract, GEO is obligated to immediately begin "Pre-Transition/Mobilization" activity at Central Valley, with a period of performance beginning on December 20, 2019, during which it must begin preparing the facility to receive ICE detainees. GEO began that process as soon as the contract became effective.

40.     GEO has continued to operate the Central Valley facility under the terms of the new ICE contract since December 20, 2019.

**B.     Golden State MCCF**

41.     Golden State MCCF is currently a prison owned and operated by GEO under contract with CDCR. CDCR has notified GEO that it will terminate its contract with GEO effective April 30, 2020.

42.     The Golden State facility is now incorporated into the Mesa Verde contract, with a period of performance starting on December 20, 2019, and ending December 19, 2034. ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024.

43.     Under the contract, GEO is obligated to immediately begin "Pre-Transition/Mobilization" activity at Golden State, with a period of performance beginning on December 20, 2019, during which it must begin preparing the facility to receive ICE detainees. GEO began that process as soon as the contract became effective.

44.     GEO has continued to operate the Golden State facility under the new ICE contract since December 20, 2019, even as it concurrently phases out CDCR operations at Golden State.

/ / /

/ / /

/ / /

- 10 -

### C. Desert View MCCF

45. Desert View MCCF is currently a prison owned and operated by GEO under contract with CDCR. CDCR terminated its contract with GEO effective February 29, 2020.

46. The Desert View facility is now incorporated into the same contract as the Adelanto facility, with a period of performance beginning on December 20, 2019, and continuing through December 20, 2034. ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024.

47. Under the contract, GEO is obligated to immediately begin "Pre-Transition/Mobilization" activity at Desert View, with a period of performance beginning on December 20, 2019, during which it must begin preparing the facility to receive ICE detainees. GEO began that process as soon as the contract became effective.

48. GEO has continued to operate the Desert View facility under the new ICE contract since December 20, 2019, even as it concurrently phases out CDCR operations at Desert View.

### IV. GEO's Efforts To Obtain Amended Conditional Use Permits

49. Pursuant to the McFarland Municipal Code, the Central Valley and Golden State facilities are located in the M-3 zone, which is designated for General Manufacturing. *See* McFarland Municipal Code § 17.08.010. Detention facilities are not identified as a permissible use. *See id.* § 17.92.020. Thus, to operate a detention facility in M-3, GEO must have a conditional use permit (CUP). *See id.* § 17.152.020(D).

50. Central Valley and Golden State were first approved for CUPs in 1996. The City of McFarland modified the Central Valley and Golden State CUPs in 2008 and in 2013 based on changes to the types of CDCR inmates that would be housed at the facilities.

COMPLAINT

51. Mesa Verde, which (as noted above) is not within the jurisdiction of McFarland, was first approved for a CUP in 1987. It was amended in 2000 and 2005 due to changes in the facility's capacity to house detainees.

52. Pursuant to the Adelanto Municipal Code, GEO may only operate "Prisons/Correctional Facilities" and their analogues in specific zones and only after first obtaining a CUP. *See* Adelanto Municipal Code App'x A.

53. The Adelanto ICE Processing Center was first approved for a CUP in 2010. That CUP has not been modified since.

54. The Desert View facility was first approved for a CUP in 1996. The CUP was modified in 2004 due to an increase in facility capacity to house CDCR inmates.

55. GEO's CUPs for the Central Valley, Golden State, and Desert View facilities do not currently allow GEO to house federal male and female detainees. Thus, to ensure the continuing validity of its CUPs under municipal law, GEO was required to apply for modifications to its CUPs in order to house ICE detainees at its Central Valley, Golden State, and Desert View facilities.

56. On December 30, 2019, having signed its new contract on December 19, 2019 with the Federal Government to convert the Central Valley and Golden State facilities into dedicated ICE detention facilities, GEO applied to the McFarland Planning Commission for modifications to its CUPs to allow the Federal Government to house detainees at Central Valley and Golden State.

57. On December 23, 2019, having signed its new contract on December 19 2019 with the Federal Government to convert the Desert View facility into a dedicated ICE detention facility, GEO applied to the Adelanto Planning Commission for a modification to its CUP to allow the Federal Government to house detainees at Desert View.

58. Absent Section 1670.9(d), GEO's applications would have been processed under the McFarland and Adelanto municipal codes, which require only

- 12 -

COMPLAINT

one meeting—rather than two—prior to issuance of a permit. *See* McFarland Municipal Code § 17.148.080; Adelanto Municipal Code § 17.100.040.

59. Moreover, while Section 1670.9(d) requires that the first public notice of a hearing be given at least 180 days prior to the execution of a permit, the McFarland and Adelanto municipal codes require only 10 days' notice before the hearing, *see* McFarland Municipal Code § 17.148.080(B); Adelanto Municipal Code § 17.100.040(a), and in the case of McFarland, the municipal code requires a decision of the Commission within 35 days after the hearing and that the Commission's decision be deemed final if no appeal is made to the City Council within 15 days, *see* McFarland Municipal Code §§ 17.148.080, 17.148.100(A)–(B). Thus, from the issuance of a public notice to the issuance of a permit should take no longer than 60 days under the McFarland Municipal Code, absent an appeal to the City Council (an appeal procedure that is still available under Section 1670.9(d)), and that could require an additional 30 days. Indeed, in GEO's more than 20 years of experience with CUP applications and modifications in Adelanto and McFarland, the process typically requires no more than 90 days from beginning to end, inclusive of appeals to the city council.

60. On January 10, 2020, the McFarland Planning Commission issued the public notice of the first hearing on GEO's CUP-modification applications for Central Valley and Golden State.

61. The first hearing on GEO's CUP-modification applications for Central Valley and Golden State was held on January 21, 2020.

62. On January 11, 2020, the Adelanto Planning Commission issued the public notice of the first hearing on GEO's CUP-modification application for Desert View.

63. The first hearing on GEO's CUP-modification application for Desert View was held on January 22, 2020.

/ / /

- 13 -                                                    COMPLAINT

64.    On February 7, 2020, the McFarland Planning Commission issued the public notice of the second hearing on GEO's CUP-modification applications for Central Valley and Golden State.

65.    The second hearing on GEO's CUP-modification applications for Central Valley and Golden State was held on February 18, 2020.

66.    On February 6, 2020, the Adelanto Planning Commission issued the public notice of the second hearing on GEO's CUP-modification application for Desert View.

67.    The second hearing on GEO's CUP-modification application for Desert View was held on February 19, 2020.

68.    On February 18, 2020, the McFarland Planning Commission failed to approve GEO's CUP-modification applications for Central Valley and Golden State by a 2-2 vote.

69.    On February 19, 2020, the Adelanto Planning Commission approved a resolution that approved GEO's CUP-modification application for Desert View but—in conformity with Section 1670.9(d)— deferred the issuance of the new permits until July 15, 2020, so that at least 180 days will have lapsed since the first public notices was given.

70.    GEO appealed the decision of the McFarland Planning Commission to the McFarland City Council.

71.    The additional hearing required by Section 1670.9(d), as well as the additional delay in the approval of GEO's CUP-modification applications required by Section 1670.9(d)'s 180-day notice period, have injured GEO and will continue to do so.

72.    Because of the additional hearing required by Section 1670.9(d), GEO was forced to expend time, money, and other resources preparing for the additional hearings in McFarland and Adelanto and ensuring that GEO representatives would be present at the additional hearings. In addition, Section 1670.9(d) adds a minimum

COMPLAINT

of 90 days to the normal CUP modification process at both the City of Adelanto and the City of McFarland, which would typically be completed in 90 days, inclusive of any appeal to the City Council.

73. In addition, the delay in approving GEO's CUP-modification applications has prevented GEO from moving more quickly on the Pre-Transition/Mobilization activities it is required to perform under its contracts with the Federal Government. The additional three (3) months referred to in paragraph 72 caused and continues to cause a significant detrimental financial impact to GEO.

74. Section 1670.9(d) results in three (3) months loss of federal revenue to GEO, amounting to several millions of dollars, while GEO awaits the completion of the 180-day period.

75. Section 1670.9(d) also results in three (3) months of additional expenses to GEO in continuing the employment of those individuals working at the previously approved facility who will be transitioning to the re-purposed federal facility.

76. GEO's Desert View and Golden State MCCFs have 274 employees, which will require approximately $3.2 million in estimated payroll and benefit costs during the three (3) additional months required under Section 1670.9(d) in order to be transitioned into a fully operating federal facility.

77. Because the permitting process mandated by Section 1670.9(d) is only 180 days, the process is too short to fully litigate a constitutional challenge to it.

78. GEO has many contracts with the Federal Government and with ICE, in particular, and it is common for the Federal Government to request amendments to its contracts during the period of performance. Because GEO's ICE contracts have a period of performance that runs through December 19, 2034, it is reasonable to expect that the Federal Government will request amendments to one or both contracts at some point in the next fifteen years, and it is reasonable to expect that such amendments will require GEO to seek modifications of its CUPs, as GEO has had to do for its immigration detention facilities in California in the past (except for the

COMPLAINT

Adelanto ICE Processing Center). GEO therefore faces a credible and substantial threat of being subjected to Section 1670.9(d)'s requirements in the future.

**COUNT I: VIOLATION OF INTERGOVERNMENTAL IMMUNITY (DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)**

79. Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

80. GEO, as a contractor for the United States, enjoys and is clothed in the Federal Government's intergovernmental immunity. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180–81 (1988); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).

81. A state law is invalid "if it operates so as to discriminate against the [Federal] Government or those with whom it deals." *United States v. City of Detroit*, 355 U.S. 466, 473 (1958).

82. Section 1670.9(d) *only* regulates land-conveyance documents and zoning permits for private entities carrying out federal operations. *See United States v. California*, 921 F.3d 865, 882, 883 (9th Cir. 2019).

83. By targeting *only* contractors carrying out federal operations, Section 1670.9(d) discriminates against the Federal Government. *See Dawson v. Steager*, 139 S. Ct. 698, 705–06 (2019); *Boeing*, 768 F.3d at 842–43.

84. Section 1670.9(d) is unconstitutional and invalid as applied to GEO.

**COUNT II: VIOLATION OF INTERGOVERNMENTAL IMMUNITY (DIRECT REGULATION OF THE FEDERAL GOVERNMENT)**

85. Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

86. Under the Supremacy Clause of the United States Constitution, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943); *see also North Dakota v. United States*, 495 U.S. 423, 451–52 (1990) (Brennan, J., concurring in the judgment in part and

COMPLAINT

1    dissenting in part) ("[T]hose dealing with the Federal Government enjoy immunity

2    from state control . . . when a state law actually and substantially interferes with

3    specific federal programs.").

4        87.    By forbidding the approval of "a deed, instrument, or other document

5    related to a conveyance of land or [the] issu[ance] [of] a permit for the building or

6    reuse of existing buildings by any private corporation, contractor, or vendor to house

7    or detain noncitizens for purposes of civil immigration" unless the City satisfies SB-

8    29's notice and hearing requirements, Section 1670.9(d) substantially interferes with

9    Federal Government operations.

10       88.    Section 1670.9(d) substantially interferes with the ICE's ability to carry

11   out its detention responsibilities for the Federal Government.

12       89.    Congress has not authorized the State to regulate the Federal

13   Government's activities with respect to federal detention facilities like GEO's.

14       90.    Section 1670.9(d) is unconstitutional and invalid as applied to GEO.

**PRAYER FOR RELIEF**

16       91.    WHEREFORE, The GEO Group, Inc. respectfully requests that this

17   Court enter an order and judgment:

18           a.    Declaring that Senate Bill 29, codified in relevant part at CAL.

19                 CIV. CODE § 1670.9(d), violates the Supremacy Clause of the

20                 United States Constitution and is unconstitutional as applied to

21                 GEO;

22           b.    Preliminarily and permanently enjoining Defendants, as well as

23                 their successors, agents, employees, and all those under their

24                 supervision from enforcing Section 1670.9(d) against GEO;

25           c.    Awarding attorneys' fees and costs as permitted by law; and

26   / / /

27   / / /

28   / / /

- 17 -                                    COMPLAINT

d.  Granting such other and further relief as this Court deems just and proper.

Dated:  March 9, 2020

By: _/s/ Michael B. McClellan_____

Michael B. McClellan, CBN 241570
NEWMEYER & DILLION LLP
895 Dove Street, Fifth Floor
Newport Beach, CA 92660
Telephone: (949) 854-7000
Email: Michael.McClellan@ndlf.com

Charles J. Cooper,* DC Bar No. 248070
Michael W. Kirk,* DC Bar No. 424648
J. Joel Alicea,* DC Bar No. 1022784
Steven J. Lindsay,* VA Bar No. 92363
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 220-9600
Email: ccooper@cooperkirk.com
*Pro Hac Vice Applications Forthcoming

Attorneys for Plaintiff The GEO Group, Inc.

- 18 -                                    COMPLAINT

# EXHIBIT B

REGULAR CITY COUNCIL MINUTES
TELECONFERENCE/VIRTUAL MEETING
April 23, 2020

MCFARLAND CITY COUNCIL
MCFARLAND SUCCESSOR AGENCY
MCFARLAND PUBLIC FINANCE AUTHORITY
MCFARLAND IMPROVEMENT AUTHORITY
MCFARLAND PARKING AUTHORITY

**CALL TO ORDER**

Mayor Gonzalez called the meeting to order at 6:07 p.m. via teleconference/virtual meeting.

**ROLL CALL**

Council Members Present: Gonzalez, McFarland, Rodriguez, Melendez, Perez
Council Members Absent: None

**OFFICIALS PRESENT**

Interim City Manager Pennell, City Attorney Schroeter, Interim Chief of Police/Interim Assistant City Manager Davis, City Clerk Ceja, Administrative Services Director Mosqueda, Community Development Director Lara, and Public Works Director Gonzales

**INVOCATION**

Mayor Pro Tem McFarland

**PLEDGE OF ALLEGIANCE**

Council Member Perez

**PRESENTATIONS AND PROCLAMATIONS**

None

**PUBLIC COMMENTS**

**\*Note: ALL PUBLIC COMMENTS SUBMITTED IN WRITING WERE COPIED AND DISTRIBUTED TO ALL COUNCIL MEMBER PRIOR TO THE MEETING.**

Ms. Dolores Huerta, did not state address. Ms. Huerta urged city council not to make a decision tonight regarding GEO and asked to postpone the matter until everyone can gather safely.

Alondra Duran, did not state address. Ms. Duran is with Victory for Central Valley. Ms. Duran asked council to postpone the item until everyone can gather safely and not to proceed with voting on GEO tonight.

Rosa Lopez, 347 E. Perkins Ave, McFarland. Ms. Lopez expressed her concerns with moving forward with tonight's vote regarding GEO and asked not to proceed with the vote.

Sandra Hernandez, 904 Kala Loop, McFarland. Ms. Hernandez would like the meeting to be postponed until everyone can gather safely.

Alex Gonzalez, did not state his address. Mr. Gonzalez expressed his concern regarding numerous community members not being able to participate in the meeting and asked council to postpone the meeting.

Mayor Gonzalez asked City Attorney if the meeting needed to be cancelled because community members could not join the meeting in which City Attorney replied and said that the meeting did not have to be postponed.

Mayor Gonzalez stated that the teleconference/virtual meeting did have a limit of 100 participants and if the meeting was held at the council chambers the city will not be able to hold 100 participants so this way the city has accommodated to allow for more participants.

1. Motion by Council Member Perez, seconded by Mayor Pro Tem McFarland, and unanimously carried to approve the warrant register for $434,336.21 from March 31, 2020 through April 14, 2020.
   **Vote: 4-0**
   **Ayes:** Perez, McFarland, Melendez, Rodriguez
   **Nays:** None
   **Absent:** None
   **Abstentions:** Gonzalez
   Note: Council Member Gonzales recluses herself from item #1 due to conflict of interest.

2. Motion by Council Member Perez, seconded by Mayor Pro Tem McFarland, and unanimously carried to approve the minutes of regular City Council meeting of April 09, 2020.
   **Vote: 5-0**
   **Ayes:** Perez, McFarland, Melendez, Rodriguez, Gonzalez
   **Nays:** None
   **Absent:** None
   **Abstentions:** None

## PUBLIC HEARING

***Mayor Pro Tem recused himself and left the meeting due to conflict of interest. He is employed with the GEO Group.**

1. Motion by Council Member Perez, seconded by Council Member Rodriguez, and unanimously carried to adopt Resolution No. 2020-0013, its suggested findings, and approve Conditional Use Permit No. 01-96 with the added condition of the scholarship program and consideration to meet with the Superintendent.
   **Vote: 4-0**
   **Ayes: Perez, Rodriguez, Melendez, Gonzalez**
   **Nays: None**
   **Absent: None**
   **Abstain: McFarland (Mayor Pro Tem McFarland recused himself from the meeting due to conflict of interest. He is employed with the GEO Group.**

2. Motion by Council Member Perez, seconded by Council Member Rodriguez, and unanimously carried to adopt Resolution No. 2020-0014, its suggested findings, and approve Conditional Use Permit No. 02-96 with the added condition of the scholarship program and consideration to meet with the Superintendent.
   **Vote: 4-0**
   **Ayes: Melendez, Rodriguez, Perez, Gonzalez**
   **Nays: None**
   **Absent: None**
   **Abstain: McFarland (Mayor Pro Tem McFarland recused himself from the meeting due to conflict of interest. He is employed with the GEO Group.**

Community Development Director Lara read her staff report and Interim City Manager Pennell presented to council his comments of why it is important to vote in favor of both conditional use permits. The comments included the financial restraints the city has, the struggles with street potholes, employees leaving the city for better opportunities, shortage of public safety officers, struggles to pay the County for fire services, and lastly the city will lose its largest water and sewer customer with devastating financial results.

Council Member Melendez asked if there is a formula that the city goes by for impact fees. Community Development Director Lara responded and said there is a formula for the community facilities district but for item #6 it is a mitigation fee that Mr. Pennell and city staff negotiated with GEO Group. Community Development Director Lara stated that for item #7 there is a formula.

Mr. David Venturella gave a presentation on behalf of GEO in which he stated the following:

   a. Creation of 420 jobs (210 jobs at each location).
   b. Pay increase from $16.50 to $46.57 an hour in which City of McFarland residents will have a chance to apply for these jobs.
   c. $511,000 mitigation payment to the city with a 15-year term with a CPI in place.
   d. Remove exterior fencing and secure with new fencing without razor fencing.
   e. New decorative solid fencing along Taylor and extend the wall that runs North South of Mast Ave and partially on Taylor Ave.

g. Repave and add new street lighting along Frontage Rd from W. Sherwood Ave to Taylor Ave.

h. New sidewalks and curbs that will be installed along Frontage Rd and Cliff Ave and plan to extend sidewalks and curbs along the South side of Taylor Ave and along Taylor Ave new street lights to complete the street lighting.

i. New city monument sign north of the facilities and landscaping at the Golden State Hwy Southbound exit ramp to W. Sherwood Ave.

j. Each year, applicant shall award a $1,000.00 scholarship to each graduating senior from the McFarland High School who is accepted to any of the following within one year after his or her graduation: a vocational school, a for-profit college (e.g., Phoenix University), a community college, a state college, or a public or a private university. Each scholarship shall be paid to the student within thirty (30) days of notice to applicant of the student's acceptance to any of the foregoing either by the school district, the City, or the student with appropriate verification. This shall continue annually for the duration of the applicant's contract. Once awarded to a student, the student is not required to refund any portion of the scholarship should the student fail to graduate or remain in school or fail to attend at all. This condition shall become effective thirty (30) days after the opening of the facility.

**Council Member Melendez asked the following questions:**

Melendez: Asked if GEO is only providing housing for inmates that the federal government is bringing in.

Mr. Venturella: GEO is providing housing, medical care, and food as well as some types of programming, recreation, and access to legal materials.

Mr. Melendez: Asked how many ice enforcement agents will be stationed at the facility.

Mr. Venturella: GEO does not expect to have many and he gave an example that in Bakersfield that they house about 400 individuals and ice officers do not have a presence there. They may come in to talk to the detainees to provide paperwork and other documentation so they are not there full time but they do have some work space to work when they are there.

Mr. Melendez: Asked if they are there for the processing party.

Mr. Venturella: Said that that was correct.

Mr. Melendez: Asked how long does an inmate reside at a processing station.

Mr. Venturella: He said that typically the national average is about 51 days which is different than the population that resided there for the State of California which was 2 to 3 years.

Mr. Melendez: Asked why it is important for GEO to follow up on complaints and concerns.

Mr. Venturella: He stated that it is important because they pride themselves in being a high quality professional service provider and they are audited by a number of agencies at the federal and state levels.

Mr. Melendez: Asked how many jobs will McFarland residents be qualified for.

Mr. Venturella: Stated that most of the jobs individuals can qualify for and because of the standards that GEO has in place and the training that they provide a lot of individuals could qualify for any numbers of those positions

Mr. Melendez: Praised Mr. Venturella for helping a lady obtain her permanent status.

Mr. Venturella: He said he was happy to help her and they certainly encourage anyone who is in the process of obtaining permanently status.

Mr. Melendez: Asked if GEO would consider meeting up with our Superintendent of McFarland and maybe form a vocational type of security classes.

**Mayor Gonzalez asked the following questions:**

Mayor Gonzalez: Asked if GEO will be willing to help the police department with the trunk- or-treat or Easter event by donating supplies or even help the community out with resources for the COVID-19 pandemic.

Mr. Venturella: He said absolutely and stated that GEO recently participated in a food drive with the Lions Club.

Mr. Pennell: Asked if GEO would be ok with city council incorporating the scholarship offer into the conditions of approval.

Mr. Venturella: Said he had no.

Mayor Gonzalez: Asked if at any time council can visit the facility to ensure the community that the detainees are being treated fairly.

Mr. Venturella: He responded with a yes and stated the community advisory board has the opportunity to have input and the city has fire and safety and health inspections that are done by the city and the county as well.

Mayor Gonzalez: Asked if in his experience working with Ice, he's seen Ice officers driving around town because community members have that fear.

Mr. Venturella: Stated that he has not seen or experienced that.

Mayor Gonzalez: Asked if an Ice officer is off duty, can they arrest someone?

Mr. Venturella: Stated that no that is not how typically Ice operates. He said that normal policy is that they conduct enforcement operations that are targeted specifically     for individuals that they have arrest warrants for.

**Public Comments:**

**\*City Clerk informed Mayor and Council that there were 848 written comments received. Copies of the written comments were made and delivered to Mayor and Council. Mayor Gonzalez asked Council to acknowledge receipt of written comments in which they all confirmed they received the copies.**

Rosa Lopez, did not state address. Ms. Lopez asked council to allow more community members to join and why the rush to proceed with the GEO vote.

Gabriela Ochoa, did not state address. Ms. Ochoa mentioned that she has witnessed the mistreatment of individuals and urged council not to proceed with the GEO vote.

Sandy Valenciano, did not state address. Ms. Valenciano expressed to council that there has been numerous letters expressing their interest to help the city to find financial solutions and believes the city is rushing the GEO vote.

Floricel, did not state address. Ms. Floricel commented that she had previously been detained by GEO and mentioned to council what she went through while she was detained.

Orlando, did not state address. Mr. Orlando stated his concern with GEO and the mistreatment.

Daniel Newike, did not state address. Ms. Newike expressed her support with GEO.

Marcela Hernandez, did not state address. Ms. Hernandez urged council to deny the appeal for the GEO CUP's.

Cynthia Galas, did not state address. Ms. Galas mentioned that GEO hasn't been truthful, GEO employees are not happy with their job, and there are hunger strikes that are currently happening.

the community and expressed that community members will not feel safe if the GEO vote passes.

Speaker did not state name or address. Speaker urged council not to proceed with the GEO vote and asked the council to focus on protecting and helping the community.

Andy Levin, did not state address. Mr. Levin expressed to council that the protestors are not the outsiders but big corporations like GEO are and mentioned that he will leave McFarland feeling ashamed and embarrassed.

Pastor Trina Turner, did not state address. Pastor Turner mentioned that she is embarrassed of the behavior of the elected officials that have prioritized the needs of GEO and not the community.

Javier Lopez, did not state address. Mr. Lopez expressed his support with GEO because he feels that the city is in need of police services and street maintenance.

Esmeralda Gonzalez, did not state address. Ms. Gonzalez asked GEO said they will help with scholarships and jobs when they haven't helped before.

Aurora Castañeda, did not state address. Ms. Castañeda mentioned that she has been a recipient of the GEO scholarship but is willing to give the money back to support the community that is in fear.

Alejandra Figueroa, did not state address. Ms. Figueroa expressed her discontent with council and said this is an embarrassment for the city.

Amber Hernandez, did not state address. Ms. Hernandez expressed her confusion with council wanting to protect the city yet corrupt police officers are being hired.

Roberto Osorio, did not state address. Mr. Osorio expressed that the main focus should be the protection of the community and not GEO.

Gerry Brochu, did not state address. Mr. Brochu congratulated Mayor Gonzalez and Council Member Rodriguez on their appointment and expressed his discontent with the way the people are expressing themselves about GEO because that is not how GEO operates.

Public comments ended at 8:56 pm.

Chief Davis addressed the concerns of Ambar Hernandez related to corrupt police officers and bad police services and assured Ms. Hernandez that those issues are in the past now and McFarland is now committed to hiring and retaining nothing but the highest quality of officers.

Community Development Director Lara commented that GEO is part of solving some of the financials problems that the city has and although it will not fix the problem it will give the city hope for the future.

Council Member Melendez expressed to City Manager Pennell that if the city does move forward with GEO he would like the money coming in to be monitored closely and for it to go to police and roads only. City Manager Pennell assured Council Member Melendez that the money will go to those priority expenditures.

Motion by Council Member Perez, seconded by Mayor Pro Tem McFarland, and unanimously carried to approve the minutes of regular City Council meeting of April 09, 2020.
**Vote: 5-0**
**Ayes:** Perez, McFarland, Melendez, Rodriguez, Gonzalez
**Nays:** None
**Absent:** None
**Abstentions:** None

**DEPARTMENTAL REPORTS**

a.  Administration – Mr. Pennell informed Council that he will suspend the retention bonus program for employees due to finances. He mentioned there is a vacant seat for the KEDC board. This item will be at the next council meeting for the appointment of a Council Member to the KEDC board.

b.  Police Department – Chief Davis informed Council of a fire at 288 Browning Rd and thanked all staff who assisted the police department.

c.  Finance Department- Mrs. Mosqueda thanked the Council for their tuff decision made tonight and spoke on COVID-19 and the financial impact due to the pandemic.

d.  Public Works Department – Mr. Gonzales reported on changes to the Public Works employees schedule due to COVID-19. Projects are on hold due to COVID-19.

**ADMINISTRATIVE AGENDA**

None

**ORAL REPORTS FROM CITY COUNCIL ON COMMITTEES**

a.  Delano Mosquito Abatement District (DMAD) – None to report.

b.  Kern Council of Governments (KCOG) – None to report.

c.  McFarland Tri-Agency Partners (MTAP) – None to report.

d.  Kern Economic Development Corporation (KEDC) – None to report.

e.  Kern County Association of Cities (KCAC) – None to report.

f.  Poso Creek IRWMP- None to report.

**COUNCIL STATEMENTS**

Mayor Gonzales thanked all staff and the community and expressed that tonight's decision was difficult and they have to do what is best for the community.

Council Member Melendez thanked everyone.

Council Member Perez invited all community members to participate in the council meetings, town hall meetings and community events.

Council Member Rodriguez thanked Council for trusting him to serve in the Council.

**CLOSED SESSION**

None

**ADJOURNMENT**

Motion to adjourn the meeting at 9:35 pm.

Claudia Ceja, City Clerk

# EXHIBIT C

RESOLUTION NO. 2020-0013

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF MCFARLAND, COUNTY OF KERN, CALIFORNIA, MAKING FINDINGS, AND APPROVING THE APPEAL TO REVERSE MCFARLAND PLANNING COMMISSION DECISION OF DENIAL ON MODIFICATIONS TO CONDITIONAL USE PERMIT 01-96, SUBJECT TO CONDITIONS OF APPROVAL, ALLOWING THE REPURPOSE OF THE GOLDEN STATE MODIFIED COMMUNITY CORRECTIONAL FACILITY TO HOUSE FEDERAL INMATES AND DETAINEES, BOTH ADULT MALE AND/ OR FEMALE.  THE FACILITY IS LOCATED AT 611 FRONTAGE, MCFARLAND, COUNTY OF KERN, CALIFORNIA.  ASSESOR PARCEL NUMBERS 201-070-50 AND 201-070-63.**

WHEREAS, Conditional Use Permit No. 01-96, approved May 13, 1996 by the McFarland Planning Commission, authorized the construction and operation of the Golden State Modified Community Correctional Facility (the "Facility") located at 611 Frontage Road, McFarland, California; and

WHEREAS, Paragraph number 11 of Conditional Use Permit 01-96 restricts inmate classification to inmates and parole violators designated as Levels I, II and III, or equivalent classification who do not have high level serious disciplinary problems within the last review period; and

WHEREAS, the applicant, Gresham, Savage, Nolan & Tilden, for The GEO Group, Inc., on January 10, 2020, submitted a request for modifications to Conditional Use Permit 01-96 to allow the Golden State Modified Commmunity Correctional Facility, to house Federal inmates and detainees, both adult male and/or female; and

WHEREAS, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held two duly noticed public hearings on January 21, 2020 and February 18, 2020,  at 6:00 p.m. at the McFarland Council Chamber located at 103 W. Sherwood Ave, McFarland, California and written and oral testimony was received prior to closing the public hearing and considering the application; and

WHEREAS, the City of McFarland Planning Commission on February 18, 2020, voted on the application, a tie-vote (2-2), resulting in a denial of the application to modify of Conditional Use Permit 01-96; and

WHEREAS, the applicant, Gresham, Savage, Nolan & Tilden, for The GEO Group, Inc., on February 26, 2020, submitted an appeal in writing along with the filing fee of $200.00, pursuant to McFarland Municipal Code Section 17.148.100(B)(1)(b) and Resolution No. 2014-0201, requesting an appeal hearing with the City Council of the City of McFarland to consider reversing the decision of the City of McFarland Planning Commission AND approving modifications of CUP 01-96; and

WHEREAS, the City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment; and

NOW, THEREFORE, BE IT RESOLVED by the McFarland City Council as follows:

SECTION 1. The above recitals are all true and correct.

SECTION 2. The City Council has reviewed and considered the information included in the staff reports and as provided by the public testimony prior to taking action on the application. The City Council further finds and determines that the City has complied with the California Environmental Quality Act and the City Council determinations reflect the independent judgment of the City Council.  Based on the foregoing, the City Council hereby approves the application and makes the following modifications to Conditional Use Permit 01-96:

1. Paragraph number 11 to Conditional Use Permit 01-96 is replaced in its entirety by the following:

   "11. The facility may house Federal inmates and detainees, both male and/or female."

SECTION 3. The City Council approval is based on the following findings:

(a) That the proposed Conditional Use Permit modification is consistent with the General Plan;

The project site is designated Industrial, which is consistent with the City's Zoning Code which allows Prisons/Correctional Facilities with approval of a Conditional Use Permit.

(b) That the nature, condition, and development of adjacent uses, buildings, and structures have been considered, and that the use will not adversely affect or be materially detrimental to these adjacent uses, buildings, or structures;

Surrounding properties to east consist of Highway 99. The property to the west is comprised of row crops with residential uses to the north and south.  The application will not alter the use of the existing facilities other than change the classification of individual housed in the facility.

(c) That the site for the proposed use is of adequate size and shape to accommodate the use and buildings proposed;

The current approval is only for the modification of a Conditional Use Permit for an existing structure to allow a change in inmate classification.  There will be no physical expansion of the Facility.

(d) That the proposed use complies with all applicable development standards of the zoning district; and

The proposed project has been designed and conditioned to meet all applicable City zoning and development standards.

(e) That the proposed use observes the spirit and intent of this Zoning Code.

The proposed Project meets the requirements of the Zoning Code. However, to ensure all Code requirements are met, a condition of approval has been added reflecting these requirements.

SECTION 4. The City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14

California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment.

SECTION 5. Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 01-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

SECTION 6. The City Council hereby reverses the City of McFarland Planning Commission AND approves modifications to Conditional Use Permit 01-96 subject to the following conditions of approval, attached as Attachment A and incorporated herein.

PASSED, APPROVED AND ADOPTED by the City Council this _____ day of _____, 2020.


_____
Sally Gonzalez, Mayor
City of McFarland


Attest:


_____
Claudia Ceja, City Clerk
City of McFarland

3

# EXHIBIT D

RESOLUTION NO. 2020-0014

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF MCFARLAND, COUNTY OF KERN, CALIFORNIA, MAKING FINDINGS, AND APPROVING THE APPEAL TO REVERSE MCFARLAND PLANNING COMMISSION DECISION OF DENIAL ON MODIFICATIONS TO CONDITIONAL USE PERMIT 02-96, SUBJECT TO CONDITIONS OF APPROVAL, ALLOWING THE REPURPOSE OF THE CENTRAL VALLEY MODIFIED COMMUNITY CORRECTIONAL FACILITY TO HOUSE FEDERAL INMATES AND DETAINEES, BOTH ADULT MALE AND/ OR FEMALE.  THE FACILITY IS LOCATED AT 254 TAYLOR AVENUE, MCFARLAND, COUNTY OF KERN, CALIFORNIA.  ASSESOR PARCEL NUMBER 201-070-64.**

WHEREAS, Conditional Use Permit No. 02-96, approved May 13, 1996 by the McFarland Planning Commission, authorized the construction and operation of the Central Valley Modified Community Correctional Facility (the "Facility") located at 254 Taylor Avenue, McFarland, California; and

WHEREAS, Paragraph number 11 of Conditional Use Permit 02-96 restricts inmate classification to inmates and parole violators designated as Levels I, II and III, or equivalent classification who do not have high level serious disciplinary problems within the last review period; and

WHEREAS, the applicant, Gresham, Savage, Nolan & Tilden, for The GEO Group, Inc., on January 10, 2020, submitted a request for modifications to Conditional Use Permit 02-96 to allow the Central Valley Modified Community Correctional Facility, to house Federal inmates and detainees, both adult male and/or female; and

WHEREAS, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held two duly noticed public hearings on January 21, 2020 and February 18, 2020,  at 6:00 p.m. at the McFarland Council Chamber located at 103 W. Sherwood Ave, McFarland, California and written and oral testimony was received prior to closing the public hearing and considering the application; and

WHEREAS, the City of McFarland Planning Commission on February 18, 2020, voted on the application, a tie-vote (2-2), resulting in a denial of the application to modify of Conditional Use Permit 02-96; and

WHEREAS, the applicant, Gresham, Savage, Nolan & Tilden, for The GEO Group, Inc., on February 26, 2020, submitted an appeal in writing along with the filing fee of $200.00, pursuant to McFarland Municipal Code Section 17.148.100(B)(1)(b) and Resolution No. 2014-0201, requesting an appeal hearing with the City Council of the City of McFarland to consider reversing the decision of the City of McFarland Planning Commission AND approving modifications of CUP 02-96; and

WHEREAS, the City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment; and

**NOW, THEREFORE, BE IT RESOLVED by the McFarland City Council as follows:**

SECTION 1. The above recitals are all true and correct.

1

SECTION 2. The City Council has reviewed and considered the information included in the staff reports and as provided by the public testimony prior to taking action on the application. The City Council further finds and determines that the City has complied with the California Environmental Quality Act and the City Council determinations reflect the independent judgment of the City Council.  Based on the foregoing, the City Council hereby approves the application and makes the following modifications to Conditional Use Permit 02-96:

1. Paragraph number 11 to Conditional Use Permit 02-96 is replaced in its entirety by the following:

   "11. The facility may house Federal inmates and detainees, both male and/or female."

SECTION 3. The City Council approval is based on the following findings:

(a) That the proposed Conditional Use Permit modification is consistent with the General Plan;

The project site is designated Industrial, which is consistent with the City's Zoning Code which allows Prisons/Correctional Facilities with approval of a Conditional Use Permit.

(b) That the nature, condition, and development of adjacent uses, buildings, and structures have been considered, and that the use will not adversely affect or be materially detrimental to these adjacent uses, buildings, or structures;

Surrounding properties to east consist of Highway 99. The property to the west is comprised of row crops with residential uses to the north and south.  The application will not alter the use of the existing facilities other than change the classification of individual housed in the facility.

(c) That the site for the proposed use is of adequate size and shape to accommodate the use and buildings proposed;

The current approval is only for the modification of a Conditional Use Permit for an existing structure to allow a change in inmate classification.  There will be no physical expansion of the Facility.

(d) That the proposed use complies with all applicable development standards of the zoning district; and

The proposed project has been designed and conditioned to meet all applicable City zoning and development standards.

(e) That the proposed use observes the spirit and intent of this Zoning Code.

The proposed Project meets the requirements of the Zoning Code. However, to ensure all Code requirements are met, a condition of approval has been added reflecting these requirements.

SECTION 4. The City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment.

SECTION 5. Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 02-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

SECTION 6. The City Council hereby reverses the City of McFarland Planning Commission decision and approves modifications to Conditional Use Permit 02-96 subject to the following conditions of approval, attached as Attachment A and incorporated herein.

PASSED, APPROVED AND ADOPTED by the City Council this _____ day of _____, 2020.


_____
Sally Gonzalez, Mayor
City of McFarland


Attest:


_____
Claudia Ceja, City Clerk
City of McFarland

# EXHIBIT E



GRESHAM | SAVAGE
ATTORNEYS AT LAW

Donovan.Collier@GreshamSavage.com · San Bernardino Office
(909) 890-4499 · *fax* (909) 890-0687

February 26, 2020

VIA HAND DELIVERY

Claudia Ceja
City Clerk/Executive Administrative Specialist
City of McFarland
401 W. Kern Avenue
McFarland, CA 93250

Re:      Appeal of Planning Commission Denial of Request to Modify Conditional Use
         Permit No. 01-96

Dear Ms. Ceja:

The GEO Group, Inc. ("GEO"), hereby appeals the action of the City of McFarland
Planning Commission taken on Tuesday, February 18, 2020, denying GEO's request to
modify Conditional Use Permit No. 01-96, to allow the Golden State Modified
Community Correctional Facility to house federal inmates and detainees, adult male
and/or female.

In scheduling the appeal hearing before the City Council, GEO respectfully requests
the appeal to be scheduled and heard at a mutually convenient time.  Moreover, as
provided by City of McFarland Municipal Code Section 17.148.100B.3, GEO requests
that the appeal hearing be scheduled for a time where all five members of the City
Council will be present and have the opportunity to vote.

Accompanying this letter of appeal is a $200.00 check for the appeal filing fee.

Very truly yours,

Donovan C. Collier, of
GRESHAM SAVAGE
NOLAN & TILDEN,
A Professional Corporation

RECEIVED
FEB 26 2020

DCC:djb
Enclosure

SAN BERNARDINO 550 East Hospitality Lane, Suite 300 · San Bernardino, California 92408
SAN DIEGO 401 West A Street, Suite 925 · San Diego, California 92101
RIVERSIDE Mission Inn Plaza · Riverside, California 92501 (By Appointment Only)
GreshamSavage.com

G484-001 – 3826066.1



GRESHAM | SAVAGE

ATTORNEYS AT LAW

Donovan.Collier@GreshamSavage.com · San Bernardino Office
(909) 890-4499 · fax (909) 890-0687

February 26, 2020

VIA HAND DELIVERY

Claudia Ceja
City Clerk/Executive Administrative Specialist
City of McFarland
401 W. Kern Avenue
McFarland, CA 93250

Re:    Appeal of Planning Commission Denial of Request to Modify Conditional Use
       Permit No. 02-96

Dear Ms. Ceja:

The GEO Group, Inc. ("GEO"), hereby appeals the action of the City of McFarland
Planning Commission taken on Tuesday, February 18, 2020, denying GEO's request to
modify Conditional Use Permit No. 02-96, to allow the Central Valley Modified
Community Correctional Facility to house federal inmates and detainees, adult male
and/or female.

In scheduling the appeal hearing before the City Council, GEO respectfully requests
the appeal to be scheduled and heard at a mutually convenient time.  Moreover, as
provided by City of McFarland Municipal Code Section 17.148.100B.3, GEO requests
that the appeal hearing be scheduled for a time where all five members of the City
Council will be present and have the opportunity to vote.

Accompanying this letter of appeal is a $200.00 check for the appeal filing fee.

Very truly yours,

Donovan C. Collier, of
GRESHAM SAVAGE
NOLAN & TILDEN,
A Professional Corporation

DCC:djb
Enclosure

RECEIVED
FEB 2 6 2020

SAN BERNARDINO  550 East Hospitality Lane, Suite 300  ·  San Bernardino, California 92408
SAN DIEGO  401 West A Street, Suite 925  ·  San Diego, California 92101
RIVERSIDE  Mission Inn Plaza  ·  Riverside, California 92501 (By Appointment Only)

GreshamSavage.com

G484-001 – 3825823.1

**EXHIBIT F**

# CITY OF MCFARLAND
## PLANNING COMMISSION AGENDA

Please Note: The City of McFarland City Council Chambers complies with the provisions of the Americans with Disabilities Act (ADA). Anyone needing special assistance should contact the City of McFarland City Hall at (661) 792-3091, at least one (1) business day prior to the meeting so that we may accommodate you.

**LOCATION OF MEETING:**   City Council Chambers
McFarland Veterans Community Center
103 W. Sherwood Avenue
McFarland CA 93250

**DATE/TIME:**   Tuesday, January 21, 2020 at 6:00 p.m.

**ROLL CALL:**   Chairman Dave Borcky, Jr.
Vice Chairman Jose Hernandez
Commissioner Lettie Blanchard
Commissioner Rudy Nuñez

**PLEDGE OF ALLEGIANCE:**
**INVOCATION:**

**APPROVAL OF THE MINUTES OF REGULAR AND / OR SPECIAL PLANNING COMMISSION MEETING:** held on December 17, 2019

**PUBLIC COMMENTS:**
At this time, any member of the public may address the Planning Commission on items of interest to the public that are within the jurisdiction of the Planning Commission which **are not** already on the agenda this evening. Speakers shall be limited in time so please be brief and to the point. No action or discussion shall be taken on any item not appearing on the agenda, except that any Planning Commissioner may briefly respond to statements made, or questions posed, be members of the public. Concerns or complaints will be referred to the Planning Director's office.

**ADMINISTRATIVE ITEMS:**
None

**PUBLIC HEARINGS:**
1)   Discussion of the new Commercial Residential Mixed Use (CRMU) Zoning Ordinance.
   a.   The proposed ordinance is to create opportunities within the City to provide for a compatible mix of land uses, including residential, retail, and offices. The Commercial Residential Mixed Use (CRMU) Zoning District allows properties to be developed with a mix of commercial retail, office and residential uses. The allowable residential density ranges from twenty (20) to thirty – five (35) dwelling units per acre. The CRMU zoning district is consistent with the mixed use land use designation of the General Plan.
   b.   The City of McFarland Planning Commission to consider a proposed Pre-Zoning project related to the proposed annexation of 2200 acres generally bound by the north by the City's limit, on the west by Garzoli Ave, to the south by Whisler Road and to the east by Driver Road.

2)   The Geo Group, Inc. as owner of the Facilities has requested amendments to its CUP Nos. 01-96 and 02-96 as amended

al. This is an opportunity to inform the Commission and the public of the applications and to assist staff in its processing of the applications by taking public testimony regarding the proposals to  amend Conditional Use Permit No.01-96 to  allow the **Golden State Modified Community Correctional Facility Located at 611 Frontage Road** and Conditional Use Permit No. 02-96 to allow the **Central Valley Modified Community Correctional Facility located at 254 Taylor Avenue**, to be repurposed to house federal inmates and detainees, male and/or female. No action will be taken on the applications at this meeting.  This public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d) which requires the city to solicit public comments on the proposals in at least two separate public  meetings.

**CITY OF MCFARLAND PLANNER UPDATE:**
Alexander Lee, City Planner

**COMMISSIONER COMMENTS:**

**ADJOURNMENT:**
Next Meeting: Regular Planning Commission Meeting is scheduled for Tuesday, February 18, 2020.

# EXHIBIT G

**CITY OF MCFARLAND**
**PLANNING COMMISSION AGENDA**

Please Note: The City of McFarland City Council Chambers complies with the provisions of the Americans with Disabilities Act (ADA). Anyone needing special assistance should contact the City of McFarland City Hall at (661) 792-3091, at least one (1) business day prior to the meeting so that we may accommodate you.

**LOCATION OF MEETING:**     City Council Chambers
                            McFarland Veterans Community Center
                            103 W. Sherwood Avenue
                            McFarland CA 93250

**DATE/TIME:**               Tuesday, February 18, 2020 at 6:00 p.m.

**A. ROLL CALL:**            Vice Chairman Jose Hernandez
                            Commissioner Lettie Blanchard
                            Commissioner Rudy Nuñez
                            Commissioner Marco Martinez
                            Commissioner Ricardo Cano- Pending Appointment by Council

**B. PLEDGE OF ALLEGIANCE:**

**C. INVOCATION:**

**D. APPROVAL OF THE MINUTES OF REGULAR AND / OR SPECIAL PLANNING COMMISSION MEETING:** held on January 21, 2020

**E. PUBLIC PRESENTATIONS:**
This portion of the meeting is reserved for persons desiring to address the Commission on any matter **NOT** on this agenda and over which the Commission has jurisdiction.  Speakers are limited to two (2) minutes.   Please state your name and address for the record before making presentation.

No action or discussion shall be taken on any item not appearing on the agenda, except that any Planning Commissioner may briefly respond to statements made, or questions posed, by members of the public. Concerns or complaints will be referred to the Community Development Director's office.

**F. ADMINISTRATIVE ITEMS:**
       1)     Report of Nominating Committee:  Report of nominating committee for
              Planning Commission Officers for Calendar Year 2020

**G. CONSENT AGENDA (CA):  These are items scheduled before the Planning Commission which are being recommended for approval by the staff and the applicant has been informed of any special conditions and has no objections.  The hearing on these items may be expedited if no member of the Commission or audience wishes to comment or ask questions on the case.**
       -    NONE

**H.  PUBLIC HEARINGS:**

1) **CONDITIONAL USE PERMIT NO. 01-96:** A modification to Conditional Use Permit 01-96, to allow the Golden State Modified Community Correctional Facility located at 611 Frontage Road, to be repurposed to house federal inmates and detainees, adult male and or female.
   a.  Presentation by applicant The GEO Group, Inc.

   b.  Take public testimony and adopt Planning Commission Resolution No. 2020-03-PC approving amending Conditional Use Permit No. 01-96. – **STAFF RECOMMENDATION: APPROVE CONDITIONAL USE PERMIT IN ACCORDANCE WITH THE RECOMMENDED CONDITIONS OF APPROVAL (ATTACHMENT A) AND ADOPT SUGGESTED FINDINGS AS SET FORTH IN THE DRAFT RESOLUTION**

2) **CONDITIONAL USE PERMIT NO. 02-96:** A modification to Conditional Use Permit 02-96, to allow the Central Valley Medium Custody Community Correctional Facility located at 254 Taylor Avenue, to be repurposed to house federal inmates and detainees, adult male and or female.
   a.  Presentation by applicant The GEO Group, Inc.

   b.  Take public testimony and adopt Planning Commission Resolution No. 2020-04-PC approving amending Conditional Use Permit No. 02-96. – **STAFF RECOMMENDATION: APPROVE CONDITIONAL USE PERMIT IN ACCORDANCE WITH THE RECOMMENDED CONDITIONS OF APPROVAL (ATTACHMENT A) AND ADOPT SUGGESTED FINDINGS AS SET FORTH IN THE DRAFT RESOLUTION**

**I.  COMMISSIONER COMMENTS:**
On their own initiative, Commission members may make an announcement or a report on their own activities.  They may ask a question for clarification, make referral to staff, or take action to have staff place a matter of business on a future agenda (Government Code Section 54954.2(a)).

---

**NOTICE OF RIGHT TO APPEAL:**
For projects where Planning Commission action is final, actions are subject to appeal to the City Council by any interested person.  No permit or license shall be issued for any use involved in an application, until the same has become final by reason of the failure of any person to appeal or by reason of the action of the city council.

An appeal must be in writing and filed, along with associated appeal fee of **$200.00** pursuant to (Resolution No. 2014-0201), with the City Clerk, 401 W. Kern Ave McFarland, CA 93250.  The filing must be made within fifteen (15) calendar days from, but not including the date of the decision pursuant to (McFarland Municipal Code Section 17.148.100(B) (1) (b)).  If no appeal is received, the action of the Planning Commission is final.

**J. ADJOURNMENT:** The next Planning Commission is scheduled for Tuesday, March 17, 2020.



# PLANNING COMMISSION STAFF REPORT
# CITY OF MCFARLAND, CALIFORNIA
# February 18, 2020

**TO:** Chair and Planning Commissioners

**FROM:** Alexander Lee, City Planner

**DATE:** February 18, 2020

**PROJECT NAME :** Geo Group CUP Modifications 01-96

**ENVIRONMENTAL DOCUMENT:** Notice of Exemption

| Agenda Item | |
|---|---|
| Presentation | |
| Consent | |
| Unfinished Business | |
| New Business | |
| Public Hearing | x |
| Other | |
| **Action Requested** | |
| Ordinance | |
| Resolution | X |
| Motion | |
| Other | |

## PROJECT DESCRIPTION

To take public testimony, consider and take action on the Application of the GEO Group, Inc., to modify Conditional Use Permit No. 01-96 to allow the **Golden State Modified Community Correctional Facility Located at 611 Frontage Road**, to be repurposed to house federal inmates and detainees, male and/or female.  This public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d).

Staff recommends that Planning Commission approve Resolution No. 2020-03-PC, approving Conditional Use Permit 01-96 (Amended 02/18/2020)as conditioned.

## BACKGROUND

The Conditional Use Permit No. 01-96 was amended by Resolution No. 2008-002 adopted by the McFarland Planning Commission on October 14, 2008.

In compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly noticed public hearing on the application on January 21, 2020, took information presented by City Staff and public testimony prior to considering the application.

**ENVIRONMENTAL REVIEW**

The project is exempt from the requirements of the California Environmental Quality Act subject to Section 15061 and 15301 of the CEQA Guidelines.

**PUBLIC NOTICING**

Pursuant to Section 17.148.080 of the McFarland Municipal Code a Legal Notice of Public Hearings were posted (City Hall, Mi Ranchito, Mi Rancho, McFarland Council of Chamber, and city website) and mailed out to all property owners located within 300 feet of the project site.

**ATTACHMENTS**

Attachment 1 – City of McFarland Planning Commission Resolution 2020-03-PC

RESOLUTION NO. 2020-03-PC

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF MCFARLAND, COUNTY OF KERN, CALIFORNIA, APPROVING MODIFICATIONS TO CONDITIONAL USE PERMIT 01-96 TO ALLOW THE GEO GROUP, INC., TO REPURPOSE THE GOLDEN STATE MODIFIED COMMUNITY CORRECTIONAL FACILITY, LOCATED AT 611 FRONTAGE ROAD, TO HOUSE FEDERAL INMATES AND DETAINEES, BOTH MALE AND/ OR FEMALE

**WHEREAS,** Conditional Use Permit No. 01-96, approved May 13, 1996 by the McFarland Planning Commission, authorized the construction and operation of the Golden State Modified Community Correctional Facility (the "Facility") located at 611 Frontage Road, McFarland, California; and

**WHEREAS,** Paragraph number 11 of Conditional Use Permit 01-96 restricts inmate classification to inmates and parole violators designated as Levels I, II and III, or equivalent classification who do not have high level serious disciplinary problems within the last review period; and

**WHEREAS**, the applicant, Gresham, Savage, Nolan & Tilden, for The GEO Group, Inc., requests modifications to Conditional Use Permit 01-96 to allow the Golden State Medium Custody Community Correctional Facility, to house Federal inmates and detainees, both male and/or female; and

**WHEREAS**, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly noticed public hearing on the application on January 21, 2020, took information presented by City Staff and public testimony prior to considering the application;

**WHEREAS**, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly second noticed public hearing on the application on February 18, 2020, took information presented by City Staff and public testimony prior to considering the application;

**WHEREAS,** the City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment; and

**NOW, THEREFORE, BE IT RESOLVED** by the McFarland Planning Commission as follows:

**SECTION 1**. The above recitals are all true and correct.

**SECTION 2**. The Planning Commission has reviewed and considered the information included in the staff reports and as provided by the public testimony prior to taking action on the

application. The Planning Commission further finds and determines that the City has complied with the California Environmental Quality Act and the Planning Commission determinations reflect the independent judgment of the Planning Commission.  Based on the foregoing, the Planning Commission hereby approves the application and makes the following modifications to Conditional Use Permit 01-96:

1.  Paragraph number 11 to Conditional Use Permit 01-96 is replaced in its entirety by the following:

    "11. The facility may house Federal inmates and detainees, both male and/or female."

**SECTION 3**. The Planning Commission approval is based on the following findings:

(a)  That the proposed Conditional Use Permit modification is consistent with the General Plan;

The project site is designated Industrial, which is consistent with the City's Zoning Code which allows Prisons/Correctional Facilities with approval of a Conditional Use Permit.

(b)  That the nature, condition, and development of adjacent uses, buildings, and structures have been considered, and that the use will not adversely affect or be materially detrimental to these adjacent uses, buildings, or structures;

Surrounding properties to east consist of Highway 99. The property to the west is comprised of row crops with residential uses to the north and south.  The application will not alter the use of the existing facilities other than change the classification of individual housed in the facility.

(c)  That the site for the proposed use is of adequate size and shape to accommodate the use and buildings proposed;

The current approval is only for the modification of a Conditional Use Permit for an existing structure to allow a change in inmate classification.  There will be no physical expansion of the Facility.

(d)  That the proposed use complies with all applicable development standards of the zoning district; and

The proposed project has been designed and conditioned to meet all applicable City zoning and development standards.

(e)  That the proposed use observes the spirit and intent of this Zoning Code.

The proposed Project meets the requirements of the Zoning Code. However, to ensure all Code requirements are met, a condition of approval has been added reflecting these requirements.

SECTION 4. The City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment.

SECTION 5. Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 01-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

SECTION 6. The Planning Commission hereby approves modifications to Conditional Use Permit 01-96 subject to the following conditions of approval, attached as Attachment A and incorporated herein.

PASSED, APPROVED AND ADOPTED by the Planning Commission this _____ day of _____, 2020.


_____

_____, 

Planning Commission Chairman


Attest:



_____

_____, Clerk of

The Planning Commission

3

ATTACHMENT A

CITY OF McFARLAND PLANNING COMMISSION
CONDITIONS OF APPROVAL
CONDITIONAL USE PERMIT NO. 01-96 (AMENDED 02/18/2020)

1. The name of the facility shall be the Golden State Annex (GSA).

2. The capacity of the facility shall be 700 beds.

1. The existing and former employees of the GSA will be afforded the opportunity to apply for the new federal jobs and if employment criteria are met, may remain on payroll and transition to the new jobs, as approved by applicant and subject to impact of judicial action.

2. To the extent possible and if employment criteria is met, personnel employed at the facility will be recruited from the McFarland area.

5. Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 01-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

6. As Fiscal Mitigation for the Project's impact on City Services, including, but not limited to, fire protection, police and public safety, and other public services, the applicant shall pay the City of McFarland $1.00 per bed, per day, for each of the 700 beds repurposed at CVA totaling $255,500.00 annually, with payments starting at initial ICE detainee intake and continuing for the duration of the contract. The payments shall be increased annually by the Consumer Price Index (All Urban Consumers) (Base Years   1982-1984   = 100) for Los Angeles-Riverside-Orange County (the"Index") or successor Index between the immediately ending calendar year and the calendar year preceding the immediately ending calendar year.

7. The applicant shall annex GSMCCF to the City of McFarland Community Facilities Districts 2017-1; 2017-2, and 2019-1 for: Landscaping and Street Maintenance; Police Services; and Fire protection. Applicant shall pay the cost of annexation estimated to be $19,500 but subject to change upon completion of the annexations; within six months of the effective date of this Resolution.

8. Frontage Road shall be repaved to City standards from W.  Sherwood Ave to Taylor Avenue full width and installed missing curb, gutter, sidewalk, ADA ramps and city standard lighting, within six months of the effective date of this Resolution.

9. There shall be a GSA Community Relations Board appointed to monitor the planning and ongoing running of the facility, who will report directly to the McFarland City Council. The Board shall be chaired by the CVA Facility Administrator and include of one member of the City Council. The Advisory Board shall meet at least once a year.

10. The facility <u>WILL NOT CONTAIN</u> any federal inmates or detainees that are juveniles or minor children under the age of 18.

11. On a monthly basis the Facility Administrator shall provide the number of inmates or detainees population at the facility to the City Manager via faxed document.  Failure to provide such inmate population figures may adversely affect the ability of the City of McFarland to provide the most efficient representation to the community.

12. The applicant will insure that the facility grounds, perimeter and buildings are secure, maintained free of weeds, trash and free of anything that could create a health & safety hazard or a public nuisance.

13. All curbs along public roadways on the perimeter of the facility shall be posted with "No Parking" signs and be painted in Red to indicate "No Parking".  This requirement is not discretionary and cannot be waived without the McFarland City Manager's written permission.  The Applicant agrees to assist the City on routine maintenance, including repairs, on Frontage Road and Taylor Avenue, the extent of which will be determined through an Agreement with the City, which Agreement shall be executed within 30 days of the effective date of this Resolution.

14. The applicant entered into an Indemnification Agreement with the City of McFarland prior to the hearing date for this Resolution.

15. The applicant shall install additional native and drought tolerant landscaping around the facility perimeter specifically at Mast Avenue to assist the City of McFarland with the Urban Heat Island Effect.

16. Upon identification of any violations of any of these Conditions of Approval (COAs), the City shall provide applicant a written notice specifically identifying the nature of the alleged violation(s) (Notice of Violation).  Upon receipt of a Notice of Violation, applicant shall have sixty (60) days to remedy the identified violation, except in the event of exigent circumstances where the violation cannot be remedied within the 60 day timeframe, additional time shall be provided as appropriate.



# PLANNING COMMISSION STAFF REPORT
# CITY OF MCFARLAND, CALIFORNIA
# February 18, 2020

**TO:** Chair and Planning Commissioners

**FROM:** Alexander Lee, City Planner

**DATE:** February 18, 2020

**PROJECT NAME :** Geo Group CUP Modifications 02-96

**ENVIRONMENTAL DOCUMENT:**   Notice of Exemption

| Agenda Item | |
|---|---|
| Presentation | |
| Consent | |
| Unfinished Business | |
| New Business | |
| Public Hearing | x |
| Other | |
| **Action Requested** | |
| Ordinance | |
| Resolution | X |
| Motion | |
| Other | |

## PROJECT DESCRIPTION

To take public testimony, consider and take action on the Application of the GEO Group, Inc., to modify Conditional Use Permit No. 02-96 to allow the **Central Valley Medium Custody Community Correctional Facility Located at 254 Taylor Avenue**, to be repurposed to house federal inmates and detainees, male and/or female.  This second public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d).

Staff recommends that Planning Commission approve Resolution No. 2020-04-PC, approving Conditional Use Permit 02-96 (Amended 02/18/20) as conditioned.

## BACKGROUND

The Conditional Use Permit No. 02-96 was amended by Resolution No. 2008-002 adopted by the McFarland Planning Commission on October 14, 2008.

In compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly noticed public hearing on the application on January 21, 2020, took information presented by City Staff and public testimony prior to considering the application.

**ENVIRONMENTAL REVIEW**

The project is exempt from the requirements of the California Environmental Quality Act subject to Section 15061 and 15301 of the CEQA Guidelines.


**PUBLIC NOTICING**

Pursuant to Section 17.148.080 of the McFarland Municipal Code a Legal Notice of Public Hearings were posted (City Hall, Mi Ranchito, Mi Rancho, McFarland Council of Chamber, and city website) and mailed out to all property owners located within 300 feet of the project site.


**ATTACHMENTS**

Attachment 1 – City of McFarland Planning Commission Resolution 2020-04-PC

RESOLUTION NO. 2020-04-PC

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF MCFARLAND, COUNTY OF KERN, CALIFORNIA, APPROVING MODIFICATIONS TO CONDITIONAL USE PERMIT 02-96 TO ALLOW THE GEO GROUP, INC., TO REPURPOSE THE CENTRAL VALLEY MODIFIED COMMUNITY CORRECTIONAL FACILITY, LOCATED AT 254 TAYLOR AVENUE, TO HOUSE FEDERAL INMATES AND DETAINEES, BOTH MALE AND OR FEMALE

**WHEREAS**, Conditional Use Permit No. 02-96, approved May 13, 1996 by the McFarland Planning Commission, authorized the construction and operation of the Central Valley Modified Community Correctional Facility (the "Facility") located at 254 Taylor Avenue, McFarland, California; and

**WHEREAS,** Paragraph number 11 of Conditional Use Permit 02-96 restricts inmate classification to inmates and parole violators designated as Levels I, II and III, or equivalent classification who do not have high level serious disciplinary problems within the last review period; and

**WHEREAS**, the applicant, Gresham, Savage, Nolan & Tilden, for The GEO Group, Inc., requests modifications to Conditional Use Permit 02-96 to allow the Central Valley Modified Community Correctional Facility, to house Federal inmates and detainees, both male and/or female; and

**WHEREAS**, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly noticed public hearing on the application on January 21, 2020, took information presented by City Staff and public testimony prior to considering the application;

**WHEREAS**, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly second noticed public hearing on the application on February 18, 2020, took information presented by City Staff and public testimony prior to considering the application;

**WHEREAS,** the City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment; and

**NOW, THEREFORE, BE IT RESOLVED by the Planning Commission as follows:**

**SECTION 1**. The above recitals are all true and correct.

**SECTION 2**. The Planning Commission has reviewed and considered the information included in the staff reports and as provided by the public testimony prior to taking action on the

application. The Planning Commission further finds and determines that the City has complied with the California Environmental Quality Act and the Planning Commission determinations reflect the independent judgment of the Planning Commission.  Based on the foregoing, the Planning Commission hereby approves the application and makes the following modifications to Conditional Use Permit 02-96:

1.  Paragraph number 11 to Conditional Use Permit 02-96 is replaced in its entirety by the following:

    "11. The facility may house Federal inmates and detainees, both male and/or female."

SECTION 3. The Planning Commission approval is based on the following findings:

(a) That the proposed Conditional Use Permit modification is consistent with the General Plan;

The project site is designated Industrial, which is consistent with the City's Zoning Code which allows Prisons/Correctional Facilities with approval of a Conditional Use Permit.

(b) That the nature, condition, and development of adjacent uses, buildings, and structures have been considered, and that the use will not adversely affect or be materially detrimental to these adjacent uses, buildings, or structures;

Surrounding properties to east consist of Highway 99.  The property to the west is comprised of row crops with residential uses to the north and south.  The application will not alter the use of the existing facilities other than change the classification of individual housed in the facility.

(c) That the site for the proposed use is of adequate size and shape to accommodate the use and buildings proposed;

The current approval is only for the modification of a Conditional Use Permit for an existing structure to allow a change in inmate classification.  There will be no physical expansion of the Facility.

(d) That the proposed use complies with all applicable development standards of the zoning district; and

The proposed project has been designed and conditioned to meet all applicable City zoning and development standards.

(e) That the proposed use observes the spirit and intent of this Zoning Code.

The proposed Project meets the requirements of the Zoning Code. However, to ensure all Code requirements are met, a condition of approval has been added reflecting these requirements.

SECTION 4. The City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment.

SECTION 5. Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 02-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

SECTION 6. The Planning Commission hereby approves modifications to Conditional Use Permit 02-96 subject to the following conditions of approval, attached as Attachment A and incorporated herein.

PASSED, APPROVED AND ADOPTED by the Planning Commission this _____ day of _____, 2020.


_____

_____,

Planning Commission Chairman



Attest:



_____

_____, Clerk of

The Planning Commission

3

ATTACHMENT A

CITY OF McFARLAND PLANNING COMMISSION
CONDITIONS OF APPROVAL
CONDITIONAL USE PERMIT NO. 02-96 (AMENDED 02/18/2020)

1.  The name of the facility shall be the CENTRAL VALLEY ANNEX (CVA).

2.  The capacity of the facility shall be 700 beds.

3.  The existing and former employees of the CVA will be afforded the opportunity to apply for the new federal jobs and if employment criteria are met, may remain on payroll and transition to the new jobs, as approved by applicant and subject to impact of judicial action.

4.  To the extent possible and if employment criteria is met, personnel employed at the facility will be recruited from the McFarland area.

5.  Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 02-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

6.  As Fiscal Mitigation for the Project's impact on City Services, including, but not limited to, fire protection, police and public safety, and other public services, the applicant shall pay the City of McFarland $1.00 per bed, per day, for each of the 700 beds repurposed at CVA totaling $255,500.00 annually, with payments starting at initial     ICE detainee intake and continuing for the duration of the contract.  The payments shall be increased annually by the Consumer Price Index (All Urban Consumers) (Base Years    1982-1984 = 100) for Los Angeles-Riverside-Orange County (the"Index") or successor Index between the immediately ending calendar year and the calendar year preceding the immediately ending calendar year.

7.  The applicant shall annex CVMCC to the City of McFarland Community Facilities Districts 2017-1; 2017-2, and 2019-1 for: Landscaping and Street Maintenance; Police Services; and Fire protection. Applicant shall pay the cost of annexation estimated to be $19,500 but subject to change upon completion of the annexations; within six months of the effective date of this Resolution.

8. Frontage Road shall be repaved to City standards from W.  Sherwood Ave to Taylor Avenue full width and installed missing curb, gutter, sidewalk, ADA ramps and city standard lighting, within six months of the effective date of this Resolution.

9. There shall be a CVA Community Relations Board appointed to monitor the planning and ongoing running of the facility, who will report directly to the McFarland City Council. The Board shall be chaired by the CVA Facility Administrator and include one member of the City Council. The Advisory Board shall meet at least once a year.

10. The facility WILL NOT CONTAIN any federal inmates or detainees that are juveniles or minor children under the age of 18.

11. On a monthly basis the Facility Administrator shall provide the number of inmates or detainees population at the facility to the City Manager via faxed document.  Failure to provide such inmate population figures may adversely affect the ability of the City of McFarland to provide the most efficient representation to the community.

12. The applicant will insure that the facility grounds, perimeter and buildings are secure, maintained free of weeds, trash and free of anything that could create a health & safety hazard or a public nuisance.

13. All curbs along public roadways on the perimeter of the facility shall be posted with "No Parking" signs and be painted in Red to indicate "No Parking".  This requirement is not discretionary and cannot be waived without the McFarland City Manager's written permission.  The Applicant agrees to assist the City on routine maintenance, including repairs, on Frontage Road and Taylor Avenue, the extent of which will be determined through an Agreement with the City, which Agreement shall be executed within 30 days of the effective date of this Resolution.

14. The applicant entered into an Indemnification Agreement with the City of McFarland prior to the hearing date for this Resolution.

15. The applicant shall install additional native and drought tolerant landscaping around the facility perimeter specifically at Mast Avenue to assist the City of McFarland with the Urban Heat Island Effect.

16. Upon identification of any violations of any of these Conditions of Approval (COAs), the City shall provide applicant a written notice specifically identifying the nature of the alleged violation(s) (Notice of Violation).  Upon receipt of a Notice of Violation, applicant shall have sixty (60) days to remedy the identified violation, except in the event of exigent circumstances where the violation cannot be remedied within the 60 day timeframe, additional time shall be provided as appropriate.

# EXHIBIT H

# OFFICE OF PUBLIC AFFAIRS

## State Officials Announce Latest COVID-19 Facts

Date: July 8, 2020
Number: NR20-153
Contact: CDPHpress@cdph.ca.gov

SACRAMENTO – The California Department of Public Health today announced the most recent statistics on COVID-19.

- California's positivity rate – a key indicator of community spread – is trending upward in the 14-day average.
- Hospitalization rates are also trending upward in the 14-day average.
- Numbers may not represent true day-over-day change as reporting of test results can be delayed, and the 7-day average more accurately describes trends in number of cases. The 7-day average number of new cases is 8,116 per day. The 7-day average from the week prior was 6,062. California has 289,468 confirmed cases to date. NOTE: Today's case number includes a backlog reported from laboratories in Los Angeles County.
- There have been 4,996,175 tests conducted in California. This represents an increase of 99,805 tests over the prior 24-hour reporting period. As testing capacity continues to increase across the state, an increase in the number of positive cases has been expected – increasing the importance of positivity rates to find signs of community spread.
- There have been 6,562 COVID-19 deaths since the start of the pandemic.

## California COVID-19 By The Numbers

July 8, 2020

Numbers as of July 7, 2020

### CALIFORNIA COVID-19 SPREAD

### 289,468 (+11,694)

TOTAL CASES

**Ages of Confirmed Cases**
- 0-17: 23,960
- 18-49: 170,255
- 50-64: 58,017
- 65+: 36,911
- Unknown/Missing: 325

**Gender of Confirmed Cases**
- Female: 142,868
- Male: 145,044
- Unknown/Missing: 1,556

**6,562 (+114)**
Fatalities

### Hospitalizations

**Confirmed COVID-19**
6,100/1,753
Hospitalized/in ICU

**Suspected COVID-19**
1,605/223
Hospitalized/in ICU

For county-level
hospital data:
bit.ly/hospitalsca

Your actions save lives.

For county-level data:
data.chhs.ca.gov

covid19.ca.gov

CALIFORNIA ALL
Stay Home. Save Lives.

Public Health

## Testing in California

As testing capacity continues to increase across the state, the California Department of Public Health is working to expand access to COVID-19 testing. Testing should be used for medical evaluation of persons with symptoms of COVID-19 as well as for efforts by public health agencies and essential employers to prevent and control the spread of COVID-19. Individuals prioritized for testing include:

- Hospitalized patients
- Symptomatic and asymptomatic healthcare workers, first responders, and other social service employees
- Symptomatic individuals age 65 and older or symptomatic individuals of any age with chronic medical conditions that increase the risk of severe COVID-19 illness
- Individuals who are tested as part of disease control efforts in high-risk settings
- Asymptomatic residents and employees of congregate living facilities when needed to prevent disease transmission
- Symptomatic and asymptomatic individuals in essential occupations such as grocery store and food supply workers, utility workers and public employees
- Other individuals with symptoms consistent with COVID-19

## Data and Tools

California has collected a large of data from its response to COVID-19 and developed tools to help process and analyze that data. The state is making these data and tools open and available for researchers, scientists, and technologists at covid19.ca.gov.

### Racial Demographics – A More Complete Picture

The California Department of Public Health is committed to health equity and collecting more detailed racial and ethnic data that will provide additional understanding for determining future action. Health outcomes are affected by forces including structural racism, poverty and the disproportionate prevalence of underlying conditions such as asthma and heart disease among Latinos and African American Californians. Only by looking at the full picture can we understand how to ensure the best outcomes for all Californians.

The differences in health outcomes related to COVID-19 are most stark in COVID-19 deaths. We have nearly complete data on race and ethnicity for COVID-19 deaths, and we are seeing the following trends. Overall, for adults 18 and older, Latinos and African Americans are dying at disproportionately higher levels. The proportion of COVID-19 deaths in African Americans is more than one-and-a-half times their population representation across all adult age categories. More males are dying from COVID-19 than females, in line with national trends. More information is available at COVID-19 Race and Ethnicity Data.

### Health Care Worker Infection Rates

As of July 7, local health departments have reported 16,629 confirmed positive cases in health care workers and 95 deaths statewide.

### Your Actions Save Lives

Every person has a role to play. Protecting yourself and your family comes down to common sense:

needs/activities following local and state public health guidelines when patronizing approved businesses. To the extent that such sectors are re-opened, Californians may leave their homes to work at, patronize, or otherwise engage with those businesses, establishments or activities.

- Practicing social distancing.

- Wearing a cloth face mask when out in public.

- Washing hands with soap and water for a minimum of 20 seconds.

- Avoiding touching eyes, nose or mouth with unwashed hands.

- Covering a cough or sneeze with your sleeve, or disposable tissue. Wash your hands afterward.

- Avoiding close contact with people who are sick.

- Staying away from work, school or other people if you become sick with respiratory symptoms like fever and cough.

- Answer the call if a contact tracer from the CA COVID Team or your local health department tries to connect. Contact tracers will connect you to free, confidential testing and other resources, if needed.

- Following guidance from public health officials.

**What to Do if You Think You're Sick**

Call ahead: If you are experiencing symptoms of COVID-19 (fever, cough or shortness of breath), call your health care provider before seeking medical care so that appropriate precautions can be taken. More than 100 community testing sites also offer free, confidential testing: Find a COVID-19 Testing Site.

For more information about what Californians can do to prevent the spread of COVID-19, visit Coronavirus (COVID-19) in California.

California continues to issue guidance on preparing and protecting California from COVID-19. Consolidated guidance is available on the California Department of Public Health's Guidance web page.

# EXHIBIT I

Case 1:20-cv-00966-TLN-AC   Document 3-2   Filed 07/12/20   Page 77 of 194

 Centers for Disease Control and Prevention

# Coronavirus Disease 2019 (COVID-19)

# Cases in the U.S.

Updated July 8, 2020            Print

| TOTAL CASES | TOTAL DEATHS |
|:---:|:---:|
| **2,982,900** | **131,065** |
| 50,304 New Cases* | 932 New Deaths* |



**Want More Data?**
CDC COVID Data Tracker

## Cases & Deaths by Jurisdiction

41 jurisdictions report more than 10,000 cases of COVID-19.

This map shows COVID-19 cases and deaths reported by U.S. states, the District of Columbia, New York City, and other U.S.-affiliated jurisdictions. Hover over the map to see the number of cases and deaths reported in each jurisdiction. To go to a jurisdiction's health department website, click on the jurisdiction on the map.



Reported Cases

- ○ 0 to 1,000
- ○ 1,001 to 5,000
- ○ 5,001 to 10,000
- ○ 10,001 to 20,000
- ○ 20,001 to 40,000
- ○ 40,001 or more

AS   GU   MH   FM   MP   PW   PR   VI

Jurisdictions

Add U.S. Map to Your Website



## Cases & Deaths by County

Select a state to view the number of cases and deaths by county. This data is courtesy of USAFacts.org

| Select a State | ⌄ |

View County Data

## New Cases by Day

The following chart shows the number of new COVID-19 cases reported each day in the U.S. since the beginning of the outbreak. Hover over the bars to see the number of new cases by day.



☐ Cases    Reset

| View Data | + |

## Cases & Deaths among Healthcare Personnel

Data were collected from 2,453,248 people, but healthcare personnel status was only available for 525,425 (21.4%) people. For the 95,175 cases of COVID-19 among healthcare personnel, death status was only available for 62,631 (65.8%).



CASES AMONG HCP
**95,175**

DEATHS AMONG HCP
**512**

| Previous Data | + |

CDC has moved the following information to the Previous U.S. COVID-19 Case Data page.

- Level of community transmission by jurisdiction — last updated May 18, 2020
- Total number of cases by day — last updated April 28, 2020
- Number of cases by source of exposure — last updated April 16, 2020

Case 1:20-cv-00856-TLN-AC Document 3-2 Filed 07/12/20 Page 79 of 194

- Number of cases from Wuhan, China and the Diamond Princess cruise — last updated April 16, 2020
- Number of cases by illness start date — last updated April 15, 2020

---

## About the Data                                                                                                    +

### Updated Daily

This page is updated daily based on data confirmed at 4:00pm ET the day before.

### Reported by Jurisdiction's Health Department

Data on this page are reported voluntarily to CDC by each jurisdiction's health department. CDC encourages all jurisdictions to report the most complete and accurate information that best represents the current status of the pandemic in their jurisdiction.

### Number of Jurisdictions

There are currently 56 U.S.-affiliated jurisdictions reporting cases of COVID-19. This includes 50 states, District of Columbia, Guam, New York City, the Northern Mariana Islands, Puerto Rico, and the U.S Virgin Islands. New York State's case and death counts do not include New York City's counts as they are separate jurisdictions.

### Confirmed & Probable Counts

As of April 14, 2020, CDC case counts and death counts include both confirmed and probable cases and deaths. This change was made to reflect an interim COVID-19 position statement [↗] issued by the Council for State and Territorial Epidemiologists on April 5, 2020. The position statement included a case definition and made COVID-19 a nationally notifiable disease. Nationally notifiable disease cases are voluntarily reported to CDC by jurisdictions.

A confirmed case or death is defined by meeting confirmatory laboratory evidence for COVID-19.

A probable case or death is defined by one of the following:

- Meeting clinical criteria AND epidemiologic evidence with no confirmatory laboratory testing performed for COVID-19
- Meeting presumptive laboratory evidence AND either clinical criteria OR epidemiologic evidence
- Meeting vital records criteria with no confirmatory laboratory testing performed for COVID19

Not all jurisdictions report confirmed and probable cases and deaths to CDC. When not available to CDC, it is noted as N/A.

### Accuracy of Data

CDC does not know the exact number of COVID-19 illnesses, hospitalizations, and deaths for a variety of reasons. COVID-19 can cause mild illness, symptoms might not appear immediately, there are delays in reporting and testing, not everyone who is infected gets tested or seeks medical care, and there may be differences in how jurisdictions confirm numbers.

## Changes & Fluctuations in Data

Health departments may update case data over time when they receive more complete and accurate information.

The number of new cases reported each day fluctuates. There is generally less reporting on the weekends and holidays.

## Differences between CDC and Jurisdiction Data

If the number of cases or deaths reported by CDC is different from the number reported by jurisdiction health departments, data reported by jurisdictions should be considered the most up to date. The differences may be due to the timing of the reporting and website updates.

## More Information

COVIDView – A Weekly Surveillance Summary of U.S. COVID-19 Activity

Previous U.S. COVID-19 Case Data

FAQ: COVID-19 Data and Surveillance

Testing Data in the U.S.

World Map

Health Departments

Page last reviewed: July 8, 2020

## COVID-2019 Menu

 Coronavirus Home

 Your Health

 Community, Work & School

 Healthcare Workers

 Laboratories

 Health Departments

 Cases, Data & Surveillance

 More Resources

# EXHIBIT J



Official Website of the Department of Homeland Security

# ICE

Report Crimes: Email or Call 1-866-DHS-2-ICE

NOTICE

Click here for the latest ICE guidance on COVID-19

## ICE Guidance on COVID-19

Overview & FAQs    Employee Confirmed Cases    ICE Detainee Statistics    Judicial Releases    Previous Statements

**ICE EMPLOYEES AT DETENTION CENTERS**

**45**

There have been 45 confirmed cases of COVID-19 among ICE employees working in ICE detention facilities.

- 1 at Adelanto ICE Processing Center (Adelanto, CA)

- 15 at Alexandria Staging Facility (Alexandria, LA)

- 2 at Aurora Contract Detention Facility (Aurora, CO)

- 1 in Bergen County Jail (Hackensack, NJ)

- 1 at Butler County Jail (Hamilton, OH)

- 1 at El Paso Processing Center (El Paso, TX)

- 2 at Elizabeth Contract Detention Facility (Elizabeth, NJ)

- 1 at Eloy Detention Center (Eloy, AZ)

- 1 at Essex County Correctional Facility (Newark, NJ)

- 1 at Florence Correctional Center (Florence, AZ)

- 2 at Houston Contract Detention Facility (Houston, TX)

- 1 at Hudson County Jail (Kearny, NJ)

- 2 at La Salle ICE Processing Center (Jena, AL)

- 11 at Otay Mesa Detention Center (San Diego, CA)

- 2 at Stewart Detention Center (Lumpkin, GA)

- 1 at T. Don Hutto Residential Center (Taylor, TX)

*Updated 06/18/2020 4:55pm*

**ICE EMPLOYEES**

**153**

There have been 153 confirmed cases of COVID-19 among ICE employees not assigned to detention facilities.

*Updated 06/18/2020 4:55pm*

Last Reviewed/Updated: 07/08/2020

 Official Website of the Department of Homeland Security

# ICE

Report Crimes: Email or Call 1-866-DHS-2-ICE

NOTICE

Click here for the latest ICE guidance on COVID-19

## ICE Guidance on COVID-19

Overview & FAQs    Employee Confirmed Cases    ICE Detainee Statistics    Judicial Releases    Previous Statements

**Page information is recorded from a live database; data may change as the agency receives updated case information.**

| DETAINED POPULATION [1] | COVID-19 POSITIVE CASES CURRENTLY IN CUSTODY [2] | DETAINEES TESTED |
|---|---|---|
| AS OF 07/04/2020 | UNDER ISOLATION OR MONITORING AS OF 07/07/2020 | AS OF 07/03/2020 |
| **22,579** | **835** | **11,828** |

### COVID-19 ICE Detainee Statistics by Facility

**AS OF 07/07/2020**

| Custody/AOR/Facility | Confirmed cases currently under isolation or monitoring | Detainee deaths [3] | Total confirmed COVID-19 cases [4] |
|---|---|---|---|
| **Atlanta Field Office** | | | |
| Charleston County Detention Center | 2 | 0 | 2 |
| Folkston ICE Processing Center (D. Ray James) | 6 | 0 | 6 |
| Irwin County Detention Center | 13 | 0 | 15 |
| Stewart Detention Center | 33 | 1 | 64 |
| **Boston Field Office** | | | |
| Bristol County Detention Center | 0 | 0 | 1 |
| Franklin County House of Corrections | 5 | 0 | 6 |
| Strafford County Corrections | 2 | 0 | 2 |
| Wyatt Detention Center | 0 | 0 | 2 |
| **Buffalo Field Office** | | | |
| Buffalo (Batavia) Service Processing Center | 0 | 0 | 49 |
| **Chicago Field Office** | | | |
| Lincoln County Detention Center | 0 | 0 | 1 |
| Pulaski County Detention Center | 5 | 0 | 50 |
| **Dallas Field Office** | | | |

| Custody/AOR/Facility | Detainee cases currently under isolation or monitoring | Detainee deaths [3] | Total confirmed COVID-19 cases [4] |
|---|---|---|---|
| Bluebonnet Detention Facility | 151 | 0 | 286 |
| Johnson County Law Enforcement Center | 1 | 0 | 1 |
| Moore Detention Center | 12 | 0 | 12 |
| Prairieland Detention Facility | 11 | 0 | 55 |
| Rolling Plains Detention Center | 14 | 0 | 55 |
| **Denver Field Office** | | | |
| Aurora Contract Detention Facility | 10 | 0 | 17 |
| **Detroit Field Office** | | | |
| Calhoun County Correctional Center | 3 | 0 | 6 |
| Morrow County Correctional Facility | 0 | 0 | 48 |
| Saint Clair County Jail | 3 | 0 | 10 |
| **El Paso Field Office** | | | |
| El Paso Service Processing Center | 21 | 0 | 133 |
| Otero County Processing Center | 1 | 0 | 142 |
| Torrance County Detention Center | 31 | 0 | 55 |
| **Houston Field Office** | | | |
| Houston Contract Detention Facility | 2 | 0 | 106 |
| IAH Polk Adult Detention Facility | 0 | 0 | 16 |
| Joe Corley Detention Center | 1 | 0 | 42 |
| Montgomery Processing Center (Houston) | 23 | 0 | 202 |
| **Los Angeles Field Office** | | | |
| Adelanto ICE Processing Center | 11 | 0 | 14 |
| **Miami Field Office** | | | |
| Broward Transitional Center | 9 | 0 | 29 |
| Glades County Detention Center | 49 | 0 | 114 |
| Krome North Service Processing Center | 7 | 0 | 41 |
| Wakulla County Jail | 1 | 0 | 1 |
| **Newark Field Office** | | | |
| Elizabeth Detention Center | 0 | 0 | 18 |
| Essex County Jail | 6 | 0 | 8 |
| **New Orleans Field Office** | | | |
| Adams County Correctional Center | 0 | 0 | 35 |
| Alexandria Staging Facility | 22 | 0 | 80 |
| Catahoula Correctional Center | 56 | 0 | 108 |
| Etowah County Jail | 0 | 0 | 1 |
| Jackson Parish Correctional | 2 | 0 | 2 |
| LaSalle ICE Processing Center - Jena | 1 | 0 | 16 |
| LaSalle ICE Processing Center - Olla | 9 | 0 | 15 |

| Custody/AOR/Facility | Confirmed cases currently under isolation or monitoring | Detainee deaths [3] | Total confirmed COVID-19 cases [4] |
|---|---|---|---|
| Pine Prairie ICE Processing Center | 0 | 0 | 30 |
| Richwood Correctional Center | 0 | 0 | 65 |
| River Correctional Center | 5 | 0 | 7 |
| South Louisiana Correctional Center | 2 | 0 | 2 |
| Winn Correctional Center | 1 | 0 | 122 |
| **New York City Field Office** | | | |
| Bergen County Jail | 0 | 0 | 2 |
| Hudson County Jail | 5 | 0 | 14 |
| **Philadelphia Field Office** | | | |
| Pike County Correctional Facility | 0 | 0 | 22 |
| York County Prison | 0 | 0 | 1 |
| **Phoenix Field Office** | | | |
| CCA Florence Correctional Center | 4 | 0 | 11 |
| Eloy Federal Contract Facility | 110 | 0 | 244 |
| Florence Detention Center | 2 | 0 | 34 |
| La Palma Correctional Facility | 7 | 0 | 99 |
| **Salt Lake City Field Office** | | | |
| Nevada Southern Detention Center | 4 | 0 | 4 |
| **San Antonio Field Office** | | | |
| El Valle Detention Facility | 2 | 0 | 2 |
| Karnes County Residential Center | 30 | 0 | 30 |
| Port Isabel Detention Center | 11 | 0 | 83 |
| South Texas ICE Processing Center (Pearsall) | 14 | 0 | 61 |
| Webb County Detention Center (CCA) | 5 | 0 | 6 |
| **San Diego Field Office** | | | |
| Imperial Regional Detention Facility | 0 | 0 | 2 |
| Otay Mesa Detention Center (San Diego CDF) | 4 | 1 | 168 |
| San Luis Regional Detention Center | 2 | 0 | 7 |
| **Seattle Field Office** | | | |
| Tacoma ICE Processing Center (Northwest Detention Center) | 1 | 0 | 4 |
| **St. Paul Field Office** | | | |
| Polk County Jail | 1 | 0 | 12 |
| **Washington D.C. Field Office** | | | |
| Caroline Detention Facility | 0 | 0 | 3 |
| Immigration Centers of America - Farmville | 102 | 0 | 106 |
| TOTAL | 835 | 2 | 3,007 |

*Updated 07/08/2020 5:30pm*

[2]  "Currently under isolation or monitoring" includes detainees who tested positive for COVID-19 and are currently in ICE custody under isolation or monitoring. This number excludes detainees who previously tested positive for COVID-19 and were either returned to the general population after a discontinuation of medical monitoring/isolation or are no longer in ICE custody.

[3] "Detainee deaths" includes detainees who have died after testing positive for COVID-19 while in ICE custody; COVID-19 may not be the official cause of death.

[4] "Total confirmed COVID-19 cases" is the cumulative total of detainees who have tested positive for COVID-19 while in ICE custody since testing began in February 2020. Some detainees may no longer be in ICE custody or may have since tested negative for the virus.

↑ Return to top

Last Reviewed/Updated: 07/08/2020

# EXHIBIT K

# Our Locations





Case 1:20-cv-00966-TLN-AC Document 3-2 Filed 07/12/20 Page 90 of 194



# Adelanto ICE Processing Center

Back To Location ❯ (/Geo-Locations)

 10400 Rancho Road, Adelanto, CA 92301

 (760) 561-6100

 Fax: (760) 561-6195

Capacity: 1,940

Client: U.S. Immigration & Customs Enforcement (ICE)

Accreditations: American Correctional Association (ACA) and National Commission on Correctional Health Care (NCCHC)



$15,000
Annually Given to Scholarships

## BACKGROUND

Adelanto ICE Processing Center was purchased by The GEO Group, Inc. (GEO) in June 2010 from the City of Adelanto. On May 27, 2011, GEO entered into contract with U.S. Immigration & Customs Enforcement (ICE), through an intergovernmental service agreement with the City of Adelanto.

## SCOPE OF WORK:

Medical care, food service, laundry, and general living conditions are provided in accordance with standards required ICE. Visitation, commissary, library, and legal services are provided as well.

## FACILITY DESCRIPTION:

The 408,316 sq. ft. center features a medical area, library, kitchen and dining areas, multipurpose room, visitation area and other support areas.

## ACCREDITATION:

The center achieved their reaccreditation through the American Correctional Association in 2017 with a score of 99.6%. The facility also received accreditation from the National Commission on Correctional Health Care (NCCHC) in 2016.

 Back To Location (/Geo-Locations)

ADELANTO ICE PROCESSING CENTER IN THE NEWS:



Victims of theft, Adelanto Little League gets lift from $10K

# donation

DATE PUBLISHED: 03/13/2018    SHARE STORY: 

(mailto:)    ()    ()

ADELANTO — After the third round of storage facility thefts in two months, the Little League here was granted a bit of relief to the tune of $10,000 worth of new equipment.

The monetar **READ MORE  (/News-Detail/tabid/189/NewsID/482/Default.aspx)**❯



## Bike giveaways, dignitaries mark jubilee for Adelanto's 45th year

DATE PUBLISHED: 12/10/2015    SHARE STORY:

(mailto:)    ()    ()

 A 5-year-old boy was called to the front of the dais, weaving his way between seats and holding on to his mother's hand. The child strolled down an aisle flanked by a full crowd and collected **READ MORE  (/News-Detail/tabid/189/NewsID/62/Default.aspx)**❯

Vendors (/vendors)  |  Privacy (/privacy)  |  Terms of use (/TermsOfUse)

(https://www.facebook.com/GEOGroup)          (https://twitter.com/WeAreGeo)

(https://www.linkedin.com/company/the-geo-group-inc.)

(https://www.youtube.com/user/TheGEOGroupInc)

The GEO Group, Inc. © 1997 - 2018. All Rights Reserved. Equal Opportunity Employer
DESIGNED & DEVELOPED BY: APPDEVELOP.COM (http://www.appdevelop.com)

(https://adasitecompliance.com/xap_geo/)



(http://www.aca.org/) (http://www.iso.org/iso/home.html)

(https://www.jointcommission.org/)

  

(http://www.ncchc.org/)

(https://icpa.org)



(http://www.ceanational.org/)

(http://www.sacs.org/) (http://nsca.org.au/) (http://www.achs.org.au/)

  

## Sign Up For GEO Newsletter

Enter email address & receive the GEO Newsletter by e-mail:

Enter Your Email Address          SIGN UP

# EXHIBIT L

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of **March 23, 2020**.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the following CDC website periodically for updated interim guidance: https://www.cdc.gov/coronavirus/2019-ncov/index.html.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

## In this guidance

- Who is the intended audience for this guidance?
- Why is this guidance being issued?
- What topics does this guidance include?
- Definitions of Commonly Used Terms
- Facilities with Limited Onsite Healthcare Services
- COVID-19 Guidance for Correctional Facilities
- Operational Preparedness
- Prevention
- Management
- Infection Control
- Clinical Care of COVID-19 Cases
- Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons
- Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

## Who is the intended audience for this guidance?



This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement and US Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of COVID-19 in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. **The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.



CS 316182-A    03/27/2020

# Why is this guidance being issued?

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of specific preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19.

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.

- In most cases, incarcerated/detained persons are not permitted to leave the facility.

- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas.

- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex, multi-employer settings that include government and private employers. Each is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.

- Incarcerated/detained persons and staff may have medical conditions that increase their risk of severe disease from COVID-19.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for COVID-19 spread may be high, potentially creating security and morale challenges.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation.

CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care of COVID-19 cases as well as close contacts of cases in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings.

This guidance document provides additional recommended best practices specifically for correctional and detention facilities. **At this time, different facility types (e.g., prison vs. jail) and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.**

## What topics does this guidance include?

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

√   Operational and communications preparations for COVID-19

√   Enhanced cleaning/disinfecting and hygiene practices

√   Social distancing strategies to increase space between individuals in the facility

√   How to limit transmission from visitors

√   Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

√   Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

√   Medical isolation of confirmed and suspected cases and quarantine of contacts, including considerations for cohorting when individual spaces are limited

√   Healthcare evaluation for suspected cases, including testing for COVID-19

√   Clinical care for confirmed and suspected cases

√   Considerations for persons at higher risk of severe disease from COVID-19

## Definitions of Commonly Used Terms

**Close contact of a COVID-19 case**—In the context of COVID-19, an individual is considered a close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on). Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

**Cohorting**—Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group. Ideally, cases should be isolated individually, and close contacts should be quarantined individually. However, some correctional facilities and detention centers do not have enough individual cells to do so and must consider cohorting as an alternative. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of COVID-19**—Community transmission of COVID-19 occurs when individuals acquire the disease through contact with someone in their local community, rather than through travel to an affected location. Once community transmission is identified in a particular area, correctional facilities and detention centers are more likely to start seeing cases inside their walls. Facilities should consult with local public health departments if assistance is needed in determining how to define "local community" in the context of COVID-19 spread. However, because all states have reported cases, all facilities should be vigilant for introduction into their populations.

**Confirmed vs. Suspected COVID-19 case**—A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms. A suspected case shows symptoms of COVID-19 but either has not been tested or is awaiting test results. If test results are positive, a suspected case becomes a confirmed case.

**Incarcerated/detained persons**—For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting where these guidelines are generally applicable. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e, detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Medical Isolation**—Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials (detailed in guidance below). In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion.

**Quarantine**—Quarantine refers to the practice of confining individuals who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease. Quarantine for COVID-19 should last for a period of 14 days. Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19. If symptoms do not develop, movement restrictions can be lifted, and the individual can return to their previous residency status within the facility.

**Social Distancing**—Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication.

**Staff**—In this document, "staff" refers to all public sector employees as well as those working for a private contractor within a correctional facility (e.g., private healthcare or food service). Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff including private facility operators.

**Symptoms**—Symptoms of COVID-19 include fever, cough, and shortness of breath. Like other respiratory infections, COVID-19 can vary in severity from mild to severe. When severe, pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations most at risk for disease and complications are not yet fully understood. Monitor the CDC website for updates on these topics.

## Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails usually employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of confirmed and suspected COVID-19 cases and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with confirmed and suspected COVID-19 cases. Facilities should make contingency plans for the likely event of PPE shortages during the COVID-19 pandemic.

## COVID-19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections can be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness**. This guidance is intended to help facilities prepare for potential COVID-19 transmission in the facility. Strategies focus on operational and communications planning and personnel practices.

- **Prevention.** This guidance is intended to help facilities prevent spread of COVID-19 from outside the facility to inside. Strategies focus on reinforcing hygiene practices, intensifying cleaning and disinfection of the facility, screening (new intakes, visitors, and staff), continued communication with incarcerated/detained persons and staff, and social distancing measures (increasing distance between individuals).

- **Management.** This guidance is intended to help facilities clinically manage confirmed and suspected COVID-19 cases inside the facility and prevent further transmission. Strategies include medical isolation and care of incarcerated/detained persons with symptoms (including considerations for cohorting), quarantine of cases' close contacts, restricting movement in and out of the facility, infection control practices for individuals interacting with cases and quarantined contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas visited by cases.

## Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

### Communication & Coordination

√  **Develop information-sharing systems with partners.**

   o  Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before cases develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.

   o  Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.

- o Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.
- o Where possible, put plans in place with other jurisdictions to prevent confirmed and suspected COVID-19 cases and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.
- o Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.

√ **Review existing pandemic flu, all-hazards, and disaster plans, and revise for COVID-19.**

- o Ensure that physical locations (dedicated housing areas and bathrooms) have been identified to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases. (Medical isolation and quarantine locations should be separate). The plan should include contingencies for multiple locations if numerous cases and/or contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for details regarding individual medical isolation and quarantine locations (preferred) vs. cohorting.
- o Facilities without onsite healthcare capacity should make a plan for how they will ensure that suspected COVID-19 cases will be isolated, evaluated, tested (if indicated), and provided necessary medical care.
- o Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.
- o Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the epidemiologic context changes.

√ **Coordinate with local law enforcement and court officials.**

- o Identify lawful alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of COVID-19 transmission.
- o Explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak.

√ **Post signage throughout the facility communicating the following:**

- o **For all:** symptoms of COVID-19 and hand hygiene instructions
- o **For incarcerated/detained persons:** report symptoms to staff
- o **For staff:** stay at home when sick; if symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting their healthcare provider as soon as possible to determine whether they need to be evaluated and tested, and contacting their supervisor.
- o Ensure that signage is understandable for non-English speaking persons and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

## Personnel Practices

√ **Review the sick leave policies of each employer that operates in the facility.**

- o Review policies to ensure that they actively encourage staff to stay home when sick.
- o If these policies do not encourage staff to stay home when sick, discuss with the contract company.
- o Determine which officials will have the authority to send symptomatic staff home.

√ **Identify staff whose duties would allow them to work from home. Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of COVID-19 transmission.**

- o Discuss work from home options with these staff and determine whether they have the supplies and technological equipment required to do so.
- o Put systems in place to implement work from home programs (e.g., time tracking, etc.).

√ **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.

- o Allow staff to work from home when possible, within the scope of their duties.
- o Identify critical job functions and plan for alternative coverage by cross-training staff where possible.
- o Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.
- o Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.

√ **Consider offering revised duties to staff who are at** higher risk of severe illness with COVID-19**.** Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

- o Facility administrators should consult with their occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to COVID-19.

√ **Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the influenza season.** Symptoms of COVID-19 are similar to those of influenza. Preventing influenza cases in a facility can speed the detection of COVID-19 cases and reduce pressure on healthcare resources.

√ **Reference the Occupational Safety and Health Administration website for recommendations regarding worker health.**

√ **Review** CDC's guidance for businesses and employers to identify any additional strategies the facility can use within its role as an employer.

## Operations & Supplies

√ **Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility.**

- o Standard medical supplies for daily clinic needs
- o Tissues
- o Liquid soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.
- o Hand drying supplies
- o Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)
- o Cleaning supplies, including EPA-registered disinfectants effective against the virus that causes COVID-19

- o Recommended PPE (facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when face masks are acceptable alternatives to N95s.
  - o Sterile viral transport media and sterile swabs to collect nasopharyngeal specimens if COVID-19 testing is indicated

√ **Make contingency plans for the probable event of PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.**
  - o See CDC guidance optimizing PPE supplies.

√ **Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow.** If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty.

√ **Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.** (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)
  - o Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

√ **If not already in place, employers operating within the facility should establish a respiratory protection program as appropriate, to ensure that staff and incarcerated/detained persons are fit tested for any respiratory protection they will need within the scope of their responsibilities.**

√ **Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities.** See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with COVID-19 cases or their close contacts.

## Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified. Both good hygiene practices and social distancing are critical in preventing further transmission.

### Operations

√ **Stay in communication with partners about your facility's current situation.**
  - o State, local, territorial, and/or tribal health departments
  - o Other correctional facilities

√ **Communicate with the public about any changes to facility operations, including visitation programs.**

√ **Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.**

o Strongly consider postponing non-urgent outside medical visits.

o If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **Implement lawful alternatives to in-person court appearances where permissible.**

√ **Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for respiratory symptoms.**

√ **Limit the number of operational entrances and exits to the facility.**

## Cleaning and Disinfecting Practices

√ **Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced.**

√ **Adhere to** CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates.

o Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).

o Staff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs).

o Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants.

o Labels contain instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use.

√ **Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.**

√ **Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.**

## Hygiene

√ **Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).**

√ **Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signage throughout the facility, and communicate this information verbally on a regular basis.** Sample signage and other communications materials **are available on the CDC website.** Ensure that materials can be understood by non-English speakers and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

   o **Practice good cough etiquette:** Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.

   o **Practice good hand hygiene:** Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

   o **Avoid touching your eyes, nose, or mouth without cleaning your hands first.**

   o **Avoid sharing eating utensils, dishes, and cups.**

   o **Avoid non-essential physical contact.**

√ **Provide incarcerated/detained persons and staff no-cost access to:**

   o **Soap—**Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing.

   o **Running water, and hand drying machines or disposable paper towels for hand washing**

   o **Tissues** and no-touch trash receptacles for disposal

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.** Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.

√ **Communicate that sharing drugs and drug preparation equipment can spread COVID-19 due to potential contamination of shared items and close contact between individuals.**

## Prevention Practices for Incarcerated/Detained Persons

√ **Perform pre-intake screening and temperature checks for all new entrants. Screening should take place in the sallyport, before beginning the intake process,** in order to identify and immediately place individuals with symptoms under medical isolation. See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).

   o **If an individual has symptoms of COVID-19** (fever, cough, shortness of breath):

      ▪ Require the individual to wear a face mask.

      ▪ Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.

      ▪ Place the individual under medical isolation (ideally in a room near the screening location, rather than transporting the ill individual through the facility), and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)

      ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care.

- **If an individual is a close contact of a known COVID-19 case (but has no COVID-19 symptoms):**
  - Quarantine the individual and monitor for symptoms two times per day for 14 days. (See Quarantine section below.)
  - Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care.

√ **Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).** Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:

- **Common areas:**
  - Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)
- **Recreation:**
  - Choose recreation spaces where individuals can spread out
  - Stagger time in recreation spaces
  - Restrict recreation space usage to a single housing unit per space (where feasible)
- **Meals:**
  - Stagger meals
  - Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
  - Provide meals inside housing units or cells
- **Group activities:**
  - Limit the size of group activities
  - Increase space between individuals during group activities
  - Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
  - Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out
- **Housing:**
  - If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
  - Arrange bunks so that individuals sleep head to foot to increase the distance between them
  - Rearrange scheduled movements to minimize mixing of individuals from different housing areas
- **Medical:**
  - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering sick call.
  - Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for COVID-19 symptoms or case contact, before they move to other parts of the facility.

√ **Communicate clearly and frequently with incarcerated/detained persons about changes to their daily routine and how they can contribute to risk reduction.**

√ **Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.**

√ **Consider suspending work release programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility.**

√ **Provide** up-to-date information about COVID-19 **to incarcerated/detained persons on a regular basis, including:**

  o Symptoms of COVID-19 and its health risks

  o Reminders to report COVID-19 symptoms to staff at the first sign of illness

√ **Consider having healthcare staff perform rounds on a regular basis to answer questions about COVID-19.**

## Prevention Practices for Staff

√ **Remind staff to stay at home if they are sick.** Ensure that staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

  o In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).

  o Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **Provide staff with up-to-date information about COVID-19 and about facility policies on a regular basis, including:**

  o Symptoms of COVID-19 and its health risks

  o Employers' sick leave policy

  o **If staff develop a fever, cough, or shortness of breath while at work:** immediately put on a face mask, inform supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

  o **If staff test positive for COVID-19:** inform workplace and personal contacts immediately, and do not return to work until a decision to discontinue home medical isolation precautions is made. Monitor CDC guidance on discontinuing home isolation regularly as circumstances evolve rapidly.

  o **If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community):** self-quarantine at home for 14 days and return to work if symptoms do not develop. If symptoms do develop, follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **If a staff member has a confirmed COVID-19 infection, the relevant employers should inform other staff about their possible exposure to COVID-19 in the workplace, but should maintain confidentiality as required by the Americans with Disabilities Act.**

  o Employees who are close contacts of the case should then self-monitor for symptoms (i.e., fever, cough, or shortness of breath).

√ **When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways.**

√ **Ask staff to keep interactions with individuals with respiratory symptoms as brief as possible.**

## Prevention Practices for Visitors

√ **If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.**

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all visitors and volunteers on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

   o Staff performing temperature checks should wear recommended PPE.

   o Exclude visitors and volunteers who do not clear the screening process or who decline screening.

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.**

√ **Provide visitors and volunteers with information to prepare them for screening.**

   o Instruct visitors to postpone their visit if they have symptoms of respiratory illness.

   o If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

   o Display signage outside visiting areas explaining the COVID-19 screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.

√ **Promote non-contact visits:**

   o Encourage incarcerated/detained persons to limit contact visits in the interest of their own health and the health of their visitors.

   o Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.

   o Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.

√ **Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.**

   o If moving to virtual visitation, clean electronic surfaces regularly. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)

   o Inform potential visitors of changes to, or suspension of, visitation programs.

   o Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).

   o If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation would be done in the interest of incarcerated/detained persons' physical health and the health of the general public. However, visitation is important to maintain mental health.

If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them. See above suggestions for promoting non-contact visits.

√ **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

## Management

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

### Operations

√ **Implement alternate work arrangements deemed feasible in the** Operational Preparedness **section.**

√ **Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.**

o If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case—including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to appropriately isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case).** Subsequently in this document, this practice is referred to as **routine intake quarantine**.

√ **When possible, arrange lawful alternatives to in-person court appearances.**

√ **Incorporate screening for COVID-19 symptoms and a temperature check into release planning.**

o Screen all releasing individuals for COVID-19 symptoms and perform a temperature check. (See Screening section below.)

▪ If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case—including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.

▪ If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

▪ Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.

√ **Coordinate with state, local, tribal, and/or territorial health departments.**

  o When a COVID-19 case is suspected, work with public health to determine action. See Medical Isolation section below.

  o When a COVID-19 case is suspected or confirmed, work with public health to identify close contacts who should be placed under quarantine. See Quarantine section below.

  o Facilities with limited onsite medical isolation, quarantine, and/or healthcare services should coordinate closely with state, local, tribal, and/or territorial health departments when they encounter a confirmed or suspected case, in order to ensure effective medical isolation or quarantine, necessary medical evaluation and care, and medical transfer if needed. See Facilities with Limited Onsite Healthcare Services section.

## Hygiene

√ **Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility.** (See above.)

√ **Continue to emphasize practicing good hand hygiene and cough etiquette.** (See above.)

## Cleaning and Disinfecting Practices

√ **Continue adhering to recommended cleaning and disinfection procedures for the facility at large.** (See above.)

√ **Reference specific cleaning and disinfection procedures for areas where a COVID-19 case has spent time (below).**

## Medical Isolation of Confirmed or Suspected COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities with Limited Onsite Healthcare Services, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that COVID-19 cases will be appropriately isolated, evaluated, tested (if indicated), and given care.**

√ **As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.**

√ **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

  o Provide medical care to cases inside the medical isolation space. See Infection Control and Clinical Care sections for additional details.

  o Serve meals to cases inside the medical isolation space.

  o Exclude the individual from all group activities.

  o Assign the isolated individual a dedicated bathroom when possible.

√ **Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters.** Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet.

√ **Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible.** Cohorting should only be practiced if there are no other available options.

o If cohorting is necessary:

- **Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts.**
- Unless no other options exist, do not house COVID-19 cases with individuals who have an undiagnosed respiratory infection.
- Ensure that cohorted cases wear face masks at all times.

√ **In order of preference, individuals under medical isolation should be housed:**

o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

o Separately, in single cells with solid walls but without solid doors

o As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.

o As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.

o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.

o Safely transfer individual(s) to another facility with available medical isolation capacity in one of the above arrangements
(NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative.

√ **If the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other infected individuals. If cohorting is unavoidable, make all possible accommodations to prevent transmission of other infectious diseases to the higher-risk individual. (For example, allocate more space for a higher-risk individual within a shared medical isolation space.)

o Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

o Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.

√ **Custody staff should be designated to monitor these individuals exclusively where possible.** These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility to the extent possible.

√ **Minimize transfer of COVID-19 cases between spaces within the healthcare unit.**

√ **Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:

- o **Cover** their mouth and nose with a tissue when they cough or sneeze

- o **Dispose** of used tissues immediately in the lined trash receptacle

- o **Wash hands** immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

√ **Maintain medical isolation until all the following criteria have been met. Monitor the CDC website for updates to these criteria.**

**For individuals who will be tested to determine if they are still contagious:**

- ▪ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**

- ▪ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**

- ▪ The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart

**For individuals who will NOT be tested to determine if they are still contagious:**

- ▪ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**

- ▪ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**

- ▪ At least 7 days have passed since the first symptoms appeared

**For individuals who had a confirmed positive COVID-19 test but never showed symptoms:**

- o At least 7 days have passed since the date of the individual's first positive COVID-19 test **AND**

- o The individual has had no subsequent illness

√ **Restrict cases from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns.**

- o If an incarcerated/detained individual who is a COVID-19 case is released from custody during their medical isolation period, contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning.

## Cleaning Spaces where COVID-19 Cases Spent Time

**Thoroughly clean and disinfect all areas where the confirmed or suspected COVID-19 case spent time. Note—these protocols apply to suspected cases as well as confirmed cases, to ensure adequate disinfection in the event that the suspected case does, in fact, have COVID-19. Refer to the Definitions section for the distinction between confirmed and suspected cases.**

- o Close off areas used by the infected individual. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions), before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.

- o Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).

√ **Hard (non-porous) surface cleaning and disinfection**

o  If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

o  For disinfection, most common EPA-registered household disinfectants should be effective. Choose cleaning products based on security requirements within the facility.

  ▪ Consult a list of products that are EPA-approved for use against the virus that causes COVID-19. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

  ▪ Diluted household bleach solutions can be used if appropriate for the surface. Follow the manufacturer's instructions for application and proper ventilation, and check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted. Prepare a bleach solution by mixing:

    - 5 tablespoons (1/3rd cup) bleach per gallon of water or
    - 4 teaspoons bleach per quart of water

√ **Soft (porous) surface cleaning and disinfection**

o  For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

  ▪ If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

  ▪ Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and are suitable for porous surfaces.

√ **Electronics cleaning and disinfection**

o  For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.

  ▪ Follow the manufacturer's instructions for all cleaning and disinfection products.

  ▪ Consider use of wipeable covers for electronics.

  ▪ If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

√ **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)

√ **Food service items.** Cases under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ Laundry from a COVID-19 cases **can be washed with other individuals' laundry.**

o  Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after.

o  Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

o  Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

  ○ Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

√ **Consult** cleaning recommendations above **to ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.**

## Quarantining Close Contacts of COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective quarantine, should coordinate with local public health officials to ensure that close contacts of COVID-19 cases will be effectively quarantined and medically monitored.**

√ **Incarcerated/detained persons who are close contacts of a** confirmed or suspected COVID-19 case **(whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days (see CDC guidelines).**

  ○ If an individual is quarantined due to contact with a suspected case who is subsequently tested for COVID-19 and receives a negative result, the quarantined individual should be released from quarantine restrictions.

√ **In the context of COVID-19, an individual (incarcerated/detained person or staff) is considered a close contact if they:**

  ○ Have been within approximately 6 feet of a COVID-19 case for a prolonged period of time OR

  ○ Have had direct contact with infectious secretions of a COVID-19 case (e.g., have been coughed on)

Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

√ **Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.**

  ○ Provide medical evaluation and care inside or near the quarantine space when possible.

  ○ Serve meals inside the quarantine space.

  ○ Exclude the quarantined individual from all group activities.

  ○ Assign the quarantined individual a dedicated bathroom when possible.

√ **Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually.** Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.

  ○ If cohorting of close contacts under quarantine is absolutely necessary, symptoms of all individuals should be monitored closely, and individuals with symptoms of COVID-19 should be placed under medical isolation immediately.

  ○ If an entire housing unit is under quarantine due to contact with a case from the same housing unit, the entire housing unit may need to be treated as a cohort and quarantine in place.

  ○ Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to a COVID-19 case). Under this scenario, avoid mixing individuals quarantined due to exposure to a COVID-19 case with individuals undergoing routine intake quarantine.

○ If at all possible, do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.

√ **If the number of quarantined individuals exceeds the number of individual quarantine spaces available in the facility, be especially mindful of those who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the higher-risk individuals. (For example, intensify social distancing strategies for higher-risk individuals.)

√ **In order of preference, multiple quarantined individuals should be housed:**

○ Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

○ Separately, in single cells with solid walls but without solid doors

○ As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions

○ As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door

○ As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

○ As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.

○ As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.

○ Safely transfer to another facility with capacity to quarantine in one of the above arrangements

(NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

√ **Quarantined individuals should wear face masks if feasible based on local supply, as source control, under the following circumstances** (see PPE section and Table 1):

○ If cohorted, quarantined individuals should wear face masks at all times (to prevent transmission from infected to uninfected individuals).

○ If quarantined separately, individuals should wear face masks whenever a non-quarantined individual enters the quarantine space.

○ All quarantined individuals should wear a face mask if they must leave the quarantine space for any reason.

○ Asymptomatic individuals under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear face masks.

√ **Staff who have close contact with quarantined individuals should wear recommended PPE if feasible based on local supply, feasibility, and safety within the scope of their duties** (see PPE section and Table 1).

○ Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear PPE.

√ **Quarantined individuals should be monitored for COVID-19 symptoms twice per day, including temperature checks.**

- o If an individual develops symptoms, they should be moved to medical isolation immediately and further evaluated. (See Medical Isolation section above.)
- o See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of COVID-19 cases.

√ **If an individual who is part of a quarantined cohort becomes symptomatic:**

- o **If the individual is tested for COVID-19 and tests positive:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.
- o **If the individual is tested for COVID-19 and tests negative:** the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantined cohort for the remainder of the quarantine period.
- o **If the individual is not tested for COVID-19:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

√ **Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.**

√ **Quarantined individuals can be released from quarantine restrictions if they have not developed symptoms during the 14-day quarantine period.**

√ **Meals should be provided to quarantined individuals in their quarantine spaces.** Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ **Laundry from quarantined individuals can be washed with other individuals' laundry.**

- o Individuals handling laundry from quarantined persons should wear disposable gloves, discard after each use, and clean their hands after.
- o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.
- o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
- o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

## Management of Incarcerated/Detained Persons with COVID-19 Symptoms

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that suspected COVID-19 cases will be effectively isolated, evaluated, tested (if indicated), and given care.**

√ **If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.**

√ **Incarcerated/detained individuals with COVID-19 symptoms should wear a face mask and should be placed under medical isolation immediately. Discontinue the use of a face mask if it inhibits breathing. See Medical Isolation section above.**

√ **Medical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated.** Refer to CDC guidelines for information on evaluation and testing. See Infection Control and Clinical Care sections below as well.

√ **If testing is indicated (or if medical staff need clarification on when testing is indicated), contact the state, local, tribal, and/or territorial health department. Work with public health or private labs as available to access testing supplies or services.**

    o If the COVID-19 test is positive, continue medical isolation. (See Medical Isolation section above.)

    o If the COVID-19 test is negative, return the individual to their prior housing assignment unless they require further medical assessment or care.

## Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

√ **Provide clear information to incarcerated/detained persons about the presence of COVID-19 cases within the facility, and the need to increase social distancing and maintain hygiene precautions.**

    o Consider having healthcare staff perform regular rounds to answer questions about COVID-19.

    o Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

√ **Implement daily temperature checks in housing units where COVID-19 cases have been identified, especially if there is concern that incarcerated/detained individuals are not notifying staff of symptoms.** See Screening section for a procedure to safely perform a temperature check.

√ **Consider additional options to intensify** social distancing within the facility.

## Management Strategies for Staff

√ **Provide clear information to staff about the presence of COVID-19 cases within the facility, and the need to enforce social distancing and encourage hygiene precautions.**

    o Consider having healthcare staff perform regular rounds to answer questions about COVID-19 from staff.

√ **Staff identified as close contacts of a COVID-19 case should self-quarantine at home for 14 days and may return to work if symptoms do not develop.**

    o See above for definition of a close contact.

    o Refer to CDC guidelines for further recommendations regarding home quarantine for staff.

## Infection Control

Infection control guidance below is applicable to all types of correctional facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with confirmed or suspected COVID-19 cases.

√ **All individuals who have the potential for direct or indirect exposure to COVID-19 cases or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.**

- o Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.

- o Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).

√ **Staff should exercise caution when in contact with individuals showing symptoms of a respiratory infection.** Contact should be minimized to the extent possible until the infected individual is wearing a face mask. If COVID-19 is suspected, staff should wear recommended PPE (see PPE section).

√ **Refer to PPE section to determine recommended PPE for individuals persons in contact with confirmed COVID-19 cases, contacts, and potentially contaminated items.**

## Clinical Care of COVID-19 Cases

√ **Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.**

- o If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital.

- o The initial medical evaluation should determine whether a symptomatic individual is at higher risk for severe illness from COVID-19. Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

√ **Staff evaluating and providing care for confirmed or suspected COVID-19 cases should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.**

√ **Healthcare staff should evaluate persons with respiratory symptoms or contact with a COVID-19 case in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the suspected case is wearing a face mask.**

- o If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.

√ **Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza).**

√ **The facility should have a plan in place to safely transfer persons with severe illness from COVID-19 to a local hospital if they require care beyond what the facility is able to provide.**

√ **When evaluating and treating persons with symptoms of COVID-19 who do not speak English, using a language line or provide a trained interpreter when possible.**

## Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

√ **Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with confirmed and suspected COVID-19 cases.**

- o Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95s) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program.
- o For PPE training materials and posters, please visit the CDC website on Protecting Healthcare Personnel.

√ **Ensure that all staff are trained to perform hand hygiene after removing PPE.**

√ **If administrators anticipate that incarcerated/detained persons will request unnecessary PPE, consider providing training on the different types of PPE that are needed for differing degrees of contact with COVID-19 cases and contacts, and the reasons for those differences (**see Table 1). **Monitor linked CDC guidelines in Table 1 for updates to recommended PPE.**

√ **Keep recommended PPE near the spaces in the facility where it could be needed, to facilitate quick access in an emergency.**

√ **Recommended PPE for incarcerated/detained individuals and staff in a correctional facility** will vary based on the type of contact they have with COVID-19 cases and their contacts (see Table 1). Each type of recommended PPE is defined below. **As above, note that PPE shortages are anticipated in every category during the COVID-19 response.**

- o **N95 respirator**

See below for guidance on when face masks are acceptable alternatives for N95s. N95 respirators should be prioritized when staff anticipate contact with infectious aerosols from a COVID-19 case.

- o **Face mask**
- o **Eye protection—**goggles or disposable face shield that fully covers the front and sides of the face
- o **A single pair of disposable patient examination gloves**

Gloves should be changed if they become torn or heavily contaminated.

- o **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**
  - If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with the individual. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
  - If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, care activities where splashes and sprays are anticipated, and high-contact patient care activities that provide opportunities for transfer of pathogens to the hands and clothing of staff.

√ **Note that shortages of all PPE categories are anticipated during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category can be found on CDC's website:**

- o **Guidance in the event of a shortage of N95 respirators**
  - Based on local and regional situational analysis of PPE supplies, **face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.
- o **Guidance in the event of a shortage of face masks**
- o **Guidance in the event of a shortage of eye protection**
- o **Guidance in the event of a shortage of gowns/coveralls**

**Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional Facility during the COVID-19 Response**

| Classification of Individual Wearing PPE | N95 respirator | Face mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of a COVID-19 case*) | Apply face masks for source control as feasible based on local supply, especially if housed as a cohort | | | | |
| Incarcerated/detained persons who are confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19 | – | ✓ | – | – | – |
| Incarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Incarcerated/detained persons in a work placement cleaning areas where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of a COVID-19 case* (but not performing temperature checks or providing medical care) | – | Face mask, eye protection, and gloves as local supply and scope of duties allow. | | | – |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | – | ✓ | ✓ | ✓ | ✓ |
| Staff having direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases (see CDC infection control guidelines) | ✓** | ✓ | ✓ | ✓ | |
| Staff present during a procedure on a confirmed or suspected COVID-19 case that may generate respiratory aerosols (see CDC infection control guidelines) | ✓ | – | ✓ | ✓ | ✓ |
| Staff handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Staff cleaning an area where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |

\*   If a facility chooses to routinely quarantine all new intakes (without symptoms or known exposure to a COVID-19 case) before integrating into the facility's general population, face masks are not necessary.

\*\* A NIOSH-approved N95 is preferred. However, based on local and regional situational analysis of PPE supplies, face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

√ **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**

  o *Today or in the past 24 hours, have you had any of the following symptoms?*

  ▪ *Fever, felt feverish, or had chills?*

  ▪ *Cough?*

  ▪ *Difficulty breathing?*

  o *In the past 14 days, have you had contact with a person known to be infected with the novel coronavirus (COVID-19)?*

√ **The following is a protocol to safely check an individual's temperature:**

  o Perform hand hygiene

  o Put on a face mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves

  o Check individual's temperature

  o **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned routinely as recommended by CDC for infection control.

  o Remove and discard PPE

  o Perform hand hygiene

# EXHIBIT M

# EXECUTIVE DEPARTMENT
# STATE OF CALIFORNIA

### EXECUTIVE ORDER N-36-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the impacts of COVID-19; and

**WHEREAS** despite sustained efforts, COVID-19 continues to spread and is impacting nearly all sectors of California; and

**WHEREAS**, state and local correctional and public safety leaders are building on their longstanding partnership, to protect public health and safety in the context of the COVID-19 crisis; and

**WHEREAS** the California Department of Corrections and Rehabilitation (CDCR) has infectious disease management plans in place to address communicable disease outbreaks such as influenza, measles, mumps, norovirus, and varicella, and CDCR has taken a series of additional proactive steps to reduce the risk of introducing and spreading COVID-19 in CDCR facilities, including:

- educating staff, inmates, and visitors regarding ways they can protect themselves and those around them from COVID-19;

- screening staff before they enter work locations;

- increasing cleaning and sanitation of CDCR facilities and providing staff and inmates with access to additional soap and sanitizing products;

- quarantining inmates arriving from county jails;

- restricting visitors and volunteers, and offering free methods for inmates to communicate with family members, friends, and attorneys;

- limiting inmate transfers including suspending out-of-state parole or inmate transfers to California for 30 days; and

- suspending scheduled in-person parole visits, except when statutorily required, for critical needs, or in emergencies; and

- eliminating parole revocations in many cases; and

**WHEREAS** the Governor's Office of Emergency Services has operated and continues to operate a multi-agency correctional task force to identify additional steps necessary, as this emergency develops, for action to protect health and safety; and

**WHEREAS** many inmates who are confined in state prison are entitled to timely parole hearings under the California Constitution, the Penal Code, and a federal three-judge court order; and

**WHEREAS** COVID-19 and the response thereto have impaired the Board of Parole Hearings' ability to meet the usual statutory and regulatory requirements to timely conduct parole hearings in person; and



**WHEREAS** inmates, inmates' counsel, victims and their representatives, and representatives of the people have the right to be heard at parole hearings, but such hearings must be secure and safe for all participants; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic.

**NOW, THEREFORE, I, GAVIN NEWSOM**, Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8627, 8567, and 8571, do hereby issue the following order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1. To protect the health, safety, and welfare of inmates in the custody of CDCR and staff who work in the facilities, I direct the Secretary of CDCR to use his emergency authority under California Penal Code section 2900(b) to suspend intake into state facilities for 30 days by directing that all persons convicted of felonies shall be received, detained, or housed in the jail or other facility currently detaining or housing them for that period. Consistent with California Penal Code section 2900(b), the time during which such person is housed in the jail or other facility shall be computed as part of the term of judgment. I further order the Secretary to suspend intake into Division of Juvenile Justice (DJJ) facilities for 30 days. To the extent that any statutory or other provisions require DJJ to accept new juveniles into its facilities, such provisions are waived or suspended. The Secretary may grant one or more 30-day extensions of the suspension of intake or commitment if suspension continues to be necessary to protect the health, safety, and welfare of inmates and juveniles in CDCR's custody and staff who work in the facilities.

2. The Board of Parole Hearings is directed to develop a process for conducting parole hearings by videoconference and shall confer with stakeholders in developing this process. The Board of Parole Hearings shall endeavor to make parole hearings conducted via videoconference accessible to all participants specified in the Penal Code and the California Code of Regulations. This process shall be operational no later than April 13, 2020.

3. To protect the health and welfare of inmates, hearing board officers, inmates' counsel, victims and their representatives, and representatives of the people, the Board of Parole Hearings is directed to cease conducting in-person parole hearings for 60 days and shall postpone any scheduled parole hearings until April 13, 2020, or an earlier date at which it is able to accommodate conducting parole hearings by video conference. The Secretary may grant one or more 30-day extensions of the prohibition on in-person parole hearings if it continues to be necessary to protect the health, safety, and welfare of inmates in CDCR's custody, staff who work in the facilities, hearing officers, victims and their representatives, and representatives of the people.

4. For the next 60 days, and for the term of any extensions, inmates scheduled for a parole hearing can elect to continue with their timely parole hearing by videoconference, to accept a postponement of their parole hearing, or to waive their hearing.

   a. Any parole hearing postponed under this provision shall be rescheduled for the earliest practicable date.

   b. All rights for all participants delineated by state law will be applied to hearings postponed and rescheduled.

   c. To the extent that an inmate is required to show good cause to waive or postpone his or her hearing under California Code of Regulations, title 15, section 2253, subdivisions (b)(3) and (d)(2), such requirements are suspended for the next 60 days, and for the term of any extensions.

5. For the next 60 days, and for the term of any extensions, to the extent that any law or regulation gives any person the right to be present at a parole hearing, that right is satisfied by the opportunity to appear by videoconference. Specifically:

   a. For inmates who choose to go forward with their parole hearing by videoconference during the next 60 days, and during the term of any extensions, the inmate's right to be present and to meet with a Board of Parole Hearing's panel under Penal Code sections 3041, subdivision (a)(2), 3041.5, subdivision (a)(2), and California Code of Regulations, title 15, section 2247, is satisfied by appearance through videoconference.

   b. For inmates who choose to go forward with their parole hearing by videoconference during the next 60 days, and during the term of any extensions, Penal Code section 3041.7 and California Code of Regulations, title 15, section 2256, which provide that an inmate has the right to be represented by an attorney at parole hearings, will be satisfied by the attorney appearing by videoconference and by providing for privileged teleconferencing between the inmate and attorney immediately before and during the hearing. Such inmates will also be provided reasonable time and opportunity for privileged communications by telephone with their retained or appointed counsel prior to the hearing at no charge to either party.

   c. For hearings conducted by videoconference during the next 60 days, and during the term of any extensions, the right of victims, victims' next of kin, members of the victims' family and victims' representatives to be present at a parole hearing will be satisfied by the opportunity to appear by videoconference, teleconference, or by written or electronically recorded statement, consistent with California Constitution, Article I, section 28, subdivision (b)(7), Penal Code section 3043, subdivision (b)(1) and California Code of Regulations, title 15, section 2029, and as provided in Penal Code sections 3043.2 and 3043.25.

   d. For hearings conducted by videoconference during the next 60 days, and during the term of any extensions, Penal Code section 3041.7 providing that the prosecuting attorney may represent the interests of the people at the hearing will be satisfied by the opportunity to appear by videoconference, teleconference, or a written statement.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 24th day of March 2020.

GAVIN NEWSOM
Governor of California

**ATTEST:**

_____

ALEX PADILLA
Secretary of State

# EXHIBIT N

# CDCR PATIENTS: COVID-19 BY INSTITUTION


CA State Prison, San Quentin

**CONFIRMED CASES:** Cumulative Count

| | ACTIVE | | | |
|---|---|---|---|---|
| NEW IN LAST 14 DAYS | CUSTODY | RELEASED | RESOLVED | DEATHS |
| 845 | 1,309 | 20 | 299 | 7 |

**TESTING:** Institution Count

| CURRENT POPULATION | PATIENTS TESTED IN LAST 14 DAYS | % OF POPULATION TESTED IN LAST 14 DAYS |
|---|---|---|
| 3,593 | 1,731 | 48% |

**ACTIVE CASES IN CUSTODY**



*Patients who resolved, died, or released before they resolved are not included in graph above. Active case count by date may be delayed 2-3 days while awaiting test results.

**PATIENTS TESTED BY DAY**



*Released or transfered patients are in the 'Tested By Day' graph but not included in the 'Last 14 Days' count if no longer at the selected institution. Counts may be delayed 2-3 days while awaiting results.

**CONFIRMED CASES:** Rate Comparison

Cumulative Per 1,000 People

| Institution: SQ | CDCR | California | United States |
|---|---|---|---|
| 455.1 | 50.7 | 4.7 | 7.0 |

**TESTING:** Rate Comparison

Cumulative Per 1,000 People

| | CDCR | California | United States |
|---|---|---|---|
| 825.8 | 406.4 | 86.3 | 83.9 |

Data Last Updated: Jul 8 2020 5:46PM

| Confirmed | Confirmed Table View | Testing | Trended | Trended Table View | Institution View | Definitions | Version History |

# EXHIBIT O

# San Quentin Prison Was Free of the Virus. One Decision Fueled an Outbreak.

The virus arrived in San Quentin after busloads of prisoners were transferred from another facility where infections were rising. What happened is a warning for the nation's prisons, experts say.

**By Timothy Williams and Rebecca Griesbach**

June 30, 2020

The coughing and complaints of sickness began as a procession of busloads of prisoners made its way late last month from a Southern California prison to San Quentin, California's oldest and most widely known prison, perched on a bluff overlooking San Francisco Bay, not far from the Golden Gate Bridge.

The inmates were being moved to San Quentin as part of a plan to halt the spread of the coronavirus by reducing the number of inmates at the California Institution for Men in Chino, where nine inmates had died and nearly 700 had been infected.

At the time, there were no inmates known to have had the virus at San Quentin.

Within days, some of the 121 prisoners from the buses introduced the virus at San Quentin, public health officials say. More than 1,100 of the 3,700 prisoners have since been infected at San Quentin, the foreboding structure surrounded by barbed wire fences and dotted with guard towers that was once famously home to inmates including Charles Manson; Sirhan Sirhan, who assassinated Robert F. Kennedy; and George Jackson, an inmate who wrote "Soledad Brother," a series of letters from prison.

The transfer of inmates — an effort intended to slow the virus, which instead apparently created a new outbreak — has been denounced by health officials, a federal judge and a growing number of state lawmakers as a public health failure. How San Quentin went from being a prison that had held off the virus for months to a place inundated with sick inmates represents a cautionary tale for the nation's prison system amid the pandemic.

"What happened — what's happening — it can really happen anywhere, particularly in an overcrowded prison, which unfortunately is the norm," said Dr. David Sears, a physician and professor of medicine at the University of California, San Francisco, who toured San Quentin on June 13 and warned state officials about the emerging crisis. "San Quentin's not the first prison to have a large outbreak, and unfortunately it won't be the last."

Days into the outbreak, the prison has grown increasingly chaotic, inmates and others say. More than 160 of San Quentin's 725 death row inmates have been infected, prison officials said, including one who has died. A number of older prisoners have hung handwritten signs outside their cells that read "Immune Compromised" so that guards will wear masks around them. Other inmates refuse to leave their cells out of fear of catching the virus, according to an inmate, and in recent days, guards have been heard screaming over their radios, "Man down!" after sickened inmates were unable to stand up.

The conversation has been dominated by talk of death.

"I don't want to see them die," Rahsaan Thomas, a 49-year-old inmate said of some of the older prisoners in a telephone interview. "I don't know if I'm tough enough to survive Covid."

The California Department of Corrections and Rehabilitation said in a statement that it was very concerned about the surge in infections in San Quentin, adding that prison workers had increased testing among inmates and had limited the number of transfers between prisons.

At a hearing before the State Senate on Wednesday, prison officials took some responsibility for the outbreak. "We care about the inmates, we care about the staff," said Ralph Diaz, secretary of the state's Department of Corrections and Rehabilitation told the committee. "Could we have done better in many instances? Of course we can."

Broadly, Dana Simas, a spokeswoman for the agency, said that California officials were confident that they could halt the spread of the virus given that the prison system had longstanding plans for managing other outbreaks of influenza, norovirus, measles and mumps.

**Latest Updates: Global Coronavirus Outbreak**   Updated 2h ago

- The U.S. sets another daily record for new cases, surpassing 59,000.

- As cases surge in the Tulsa area, top health official says the spike may be linked to Trump rally.

- The C.D.C. announces it will issue new guidelines for reopening schools, hours after Trump assailed its recommendations.

More live coverage: **Markets**

Across the United States, the number of prison and jail inmates known to be infected has doubled during the past month to more than 80,000, according to a New York Times database. Prison deaths tied to the coronavirus have also risen significantly, by nearly 30 percent since mid-May. Nine of the 10 largest known clusters of the virus in the United States are inside correctional institutions, The Times's data shows.

In California prisons, the number of cases has risen by nearly 200 percent and deaths by 144 percent during the past month.



San Quentin opened in 1852, and is at 117 percent of its capacity, according to state data. As many as half of all inmates suffer from health conditions that make them especially vulnerable to the virus. Justin Sullivan/Getty Images

Public health officials in California and elsewhere have been bracing for months for what they say was inevitable — the spreading of the coronavirus in correctional facilities, which possess unique vulnerabilities.

Most jails and prisons were designed to focus on security. Ventilation is often poor and access to health care is inconsistent. Prison health care in California has historically been so substandard that health services are administered by a federal receiver.

California prisons have required everyone to wear masks, but social distancing policies and mask-wearing rules among prison guards are nearly impossible to enforce. Longstanding prohibitions on cleaning supplies that contain bleach or alcohol have made it difficult for crowded facilities like San Quentin to meet even basic sanitary standards given that hundreds of inmates share a limited number of toilets, telephones and shower stalls.

Since the pandemic, California has agreed to release as many as 3,500 inmates up to six months early and is considering more early releases, but the prison system remains at 124 percent of capacity, according to state records.

Public health experts said deficiencies were made worse at San Quentin. The prison is dominated by row after row of barred cells. Paint peels from walls, state work orders show, and puddles form after rain showers because the ceilings leak.

The prison opened in 1852, and is at 117 percent of its capacity, according to state data. As many as half of all inmates suffer from health conditions that make them especially vulnerable to the virus.

"There's no way to address a public health problem when you need to isolate people but your system is bursting at the seams," said Adamu Chan, a San Quentin inmate.

Dr. Brie Williams, a physician and professor of medicine at the University of California, San Francisco, and director of the university's Criminal Justice & Health Program, said absent a coronavirus vaccine, prisons were outmatched, despite their plans for managing other sorts of outbreaks.

"The difference with this infection is that with all of those other conditions we were able to essentially, eventually throw money at them in the way of fancy medications," she said.

Dr. Matt Willis, the top public health official in Marin County, where San Quentin is located, said prison officials had told him they were capable of handling the virus on their own.

The county's health department was told by state prison leaders "very clearly that this is not part of our jurisdiction," Dr. Willis said. The corrections system, he said, has a "lot of control over every aspect of their processes" and has not been transparent about their handling of the virus.

"It may work in certain settings," he added, "but when you have a complex disaster that's moving quickly, I think we're finding that the process is just not matching our needs."

San Quentin's crisis began with a handful of decisions that were made as officials were trying to quell the outbreak in Chino, interviews with inmates, correctional officers, elected officials and health experts show.

On May 30, the inmates from Chino boarded buses for San Quentin after being told they were being transferred to reduce overcrowding, which would protect vulnerable inmates at the prison they were leaving, the California Institution for Men.

Each of the 121 inmates who boarded the buses had been tested at various points over the previous several months, but few — if any — had been tested during the previous three weeks, prison officials have acknowledged.

Arriving at San Quentin, prisoners' temperatures were taken and they were placed in a holding area, but no Covid-19 tests were given.

For days, the men used the same showers and ate in the same dining hall as other San Quentin inmates.

It took only days, data from the prison system shows, for the virus to make its way through the prison, where hundreds of inmates sleep in bunk beds within a few inches of one another in a crowded dormitory that was once a gymnasium. In other parts of the prison, men are paired inside 4-by-9 foot cells.

Over the past week, the prison has conducted mass testing. So far, more than half the inmates tested have seen positive results, state data shows.

The virus has spread so rapidly and there is so little unoccupied space left at the sprawling prison that some infected inmates have been placed in small isolation cells where, in normal times, death row inmates are sent for punishment.

Marion Wickerd got a call last week from her husband Tommy Wickerd, 53, an inmate in San Quentin.

"He said, 'People are dropping right and left in front of me, but I'm OK," Ms. Wickerd said.

A few hours later, though, he called back. He had tested positive. She said she had not spoken to him in several days.

"All I know is that my husband is not dead because no one has called to tell me that," she said. "Worried? You bet. Scared? You bet."

Reporting was contributed by Brendon Derr, Danya Issawi, Ann Hinga Klein, Savannah Redl and Maura Turcotte.

A version of this article appears in print on July 1, 2020, Section A, Page 8 of the New York edition with the headline: 121 Inmates Were Moved to San Quentin. The Virus Came, Too.

# EXHIBIT P

## COVID-19

# County Data Monitoring

**Step 2: Targeted Engagement with CDPH**

## <u>County Data Chart</u>

In partnership, CDPH will work with Local Health Departments to set up strategy calls and provide technical assistance. The following areas will be discussed:

- Identify the drivers of the changing situation and whether it is increasing confirmed cases, uptick in hospitalizations and ICU patients, outbreaks in congregate settings such as skilled nursing facilities (SNFs) or jails/prisons, or community transmissions in settings such as churches, workplaces, or agriculture, and amongst other specific populations experiencing disease disproportionately.
- Review of the strategies already in place by the Local Health Department and community to address each of the areas of concern, including locally defined plans and protocols published through variance attestations.
- Discuss additional steps that should be taken in various environments such as more aggressive testing strategies, any issues with contact tracing, need for healthcare resources or infection control strategies.
- Discuss issues that may develop as a result of currently identified issues, e.g. additional SNF or community outbreaks leading to a healthcare surge.
- Discuss any gaps in resources and clear articulation of any additional roles for the state and/or local jurisdiction.  Resource gaps should include commodities such as personal protective equipment (PPE), testing supplies, or other consumables.
- Review of business sectors that are open and whether any other state agencies may be needed in the discussion given their ownership of the facility or role in regulating that business sector.
- Review of Local Containment Triggers and Consideration of renewing non-pharmaceutical interventions (NPI).

The state will work closely with Local Health Departments to identify action steps and timelines for addressing issues that impact indicators of concern. Counties currently being monitored at this step, the drivers of their situation, and key action steps identified are below:

- **Colusa County (has variance)** is experiencing elevated disease transmission. Drivers of this include family and community gatherings. Actions to address these concerns include 1) NPI interventions such as encouraging social distancing, use of face coverings and hand hygiene.  2) Increasing case investigators and contact tracing 3) reassign staff to assist investigators and contact tracers 4) provide just in time training to current DHHS bilingual staff so they can immediately begin case investigation and contact tracing. 5) identify bilingual staff that can be reassigned within the County that can assist with translation only, not investigation or tracing 6) utilize the language line to allow non-bilingual staff to case investigate and contact trace 7) daily Facebook posts encouraging individuals to wear face coverings 8)Media campaign to explain the importance of both isolation and quarantine.

Contra Costa County (has variance) is experiencing elevated disease transmission and increasing hospitalization. There is a concerning rise in the number of people hospitalized. This is in parallel to a rise in overall cases.  Key actions to address the increase include 1) delaying the opening of additional business and activities in an effort to encourage people to stay home and avoid gatherings, 2) continuing to adhere to the State's guidance on face coverings and enforcement activities, 3) working with communities and community-based organizations to share messaging about face coverings and other prevention techniques along with the importance of testing, and 4) continuing to provide infection prevention expertise to assist skilled nursing facilities and other congregate care facilities on infection control practices and proper use of PPE.

- **Fresno County (has variance)** is experiencing elevated disease transmission. A driver of this are outbreaks in SNFs and the impact of the Avenal State Prison outbreak on staff who live in surrounding counties, such as Fresno. Key actions to address concerns include 1) continuing to provide Infection Preventionists expertise to assist SNFs on infection control practices; 2) ensure baseline testing of SNF residents and health care workers; 3) ensure adequate and proper use of PPE; and, 4) coordination and communication between CDCR, CDPH, and the Local Health Department to mitigate outbreaks at state prisons with employees who return to live in Fresno County.

- **Glenn County (has variance)** is experiencing elevated disease transmission. Drivers of this include an increase in outbreaks and clusters related to 1) household contacts, 2) social gatherings 3) businesses in the county 4) one church gathering and 5) one case that traveled to Mexico. Actions to address these concerns include 1) Working with businesses on health check screenings and NPI enforcement and monitoring 2) Increasing case investigators and contact tracing 3) Increase testing and media campaigning for those that are symptomatic 4) Develop a process to handle incoming cases in a timely and efficient manner.

- **Imperial County** is experiencing elevated disease transmission. Drivers of this include U.S. citizens/residents traveling to or from Mexicali to work and/or seek healthcare and other services, continued need for staffing solutions at hospitals, and outbreak at meat packing facility.  Key actions to address concerns include 1) building additional testing capacity, 2) training and onboarding contact tracing staff, 3) transporting patients to hospitals in neighboring counties when hospital capacity is full or limited; and, 4) stand up support for alternative care sites.

- **Kern County (has variance)** is experiencing elevated disease transmission and increasing hospitalization. Drivers of this include 1) outbreaks at SNFs and state/federal prisons and 2) residents in surrounding counties being admitted to their county hospital. Key action steps include: 1) communicate and coordinate with CDPH to provide Infection Preventionists expertise to assist SNFs and to ensure baseline testing at these facilities; 2) promote community testing sites; and, 3) targeted outreach and improve public messaging and education on the importance personal protection measures across various sectors.

- **Kings County (has variance)** is experiencing elevated disease transmission, increasing hospitalizations, and limited hospital capacity. Drivers of this include county experiencing outbreaks at Avenal State prison within their jurisdiction, resulting in secondary infection to staff working within the central and satellite kitchens; outbreak at local Adventist Health (AH) admitting COVID positive patients from Tulare, Reedley, and SNF outbreaks. Key actions to address concerns include 1) coordination and communication between local health department, CDPH, and California Department of Corrections and Rehabilitation (CDCR) to mitigate outbreak at Avenal State Prison; 2) order needed resources through the Standardized Emergency Management System

Case 1:20-cv-00966-TLN-AC Document 52-2 Filed 07/13/20 Page 136 of 194

...so close our entire health care staff, easing in PPE and remain to engage with SNFs on infection control measures.

- **Los Angeles County (has variance)** is experiencing the possibility of elevated disease transmission. Drivers of this include having a high case rate that is highly related to high testing capacity and volume countywide, which also includes testing all residents and staff at over 235 SNFs. Key actions to monitor the situation include 1) monitoring positivity rate among those tested to ensure that there isn't a significant increase that may signal more community transmission; 2) continuing to provide Infection Preventionists expertise to assist SNFs and to ensure baseline testing at every SNF that has not reported any positive cases; and, 3) working with the state to ensure supply chain issues related to PPE at SNFs are resolved

- **Madera County (has variance)** is experiencing elevated disease transmission and limited hospital capacity. Drivers of this include an increase in community spread cases related to 1) social gatherings 2) work exposure 3) person-to-person transmission in large households. Actions to address these concerns include 1) contact tracing 2) local and regional messaging campaigns 3) education and technical assistance with businesses. 4) collaborate with regional hospitals to make plans to transfer if needed 5) Setup Alternate Care Site for patients.

- **Marin County (has variance)** is experiencing elevated disease transmission, increasing hospitalizations, and limited hospital capacity. Drivers of this include county experiencing an outbreak at San Quentin State Prison within their jurisdiction; increased community transmission among essential workers; and outbreaks in congregate settings and Latinx neighborhoods. Key actions to address concerns include 1) coordination and communication between local health department, CDPH, and California Department of Corrections and Rehabilitation (CDCR) to mitigate outbreak at San Quentin State Prison; 2) enhanced infection control practices and testing at residential care facilities for the elderly (RCFE) and skilled nursing facilities (SNF); and 3) partnerships with community-based organizations to increase testing, access to care and supports for vulnerable populations.

- **Merced County (has variance)** is experiencing elevated disease transmission, increasing hospitalizations, and limited hospital capacity. Drivers of this include increased community transmission, increased exposures at work places (including several small outbreaks), and household clusters, particularly in the Latinx/Hispanic community. Action steps to address these concerns include: 1) increased marketing of community testing among priority populations; 2) increasing culturally responsive public messaging and education on the importance personal protection measures including face coverings; and, 3) educational outreach to businesses to convey importance of implementing safety measures in order to prevent future shutdown.

- **Monterey County (has variance)** is experiencing elevated disease transmission. Drivers include 1) community transmission as more individuals leave their homes to work or to seek services, and 2) workplace transmission followed by household transmission. Key actions to slow transmission of COVID-19 include 1) promoting and building additional testing capacity in geographic areas with low testing rates; 2) continuing case and contact investigations; 3) continuing to coordinate with local hospitals, clinics, and skilled nursing facilities to ensure surge response readiness, and; 4) focusing additional outreach and educational messaging in geographic areas and among populations disproportionately affected by COVID-19.

- **Napa County (has variance)** is experiencing increased disease transmission. Drivers of this include family and community gatherings, increased community transmission, increased transmission among the Latino population within crowded household settings, and disproportionate impact on agricultural workers. Actions to address these concerns include: 1) NPI interventions such as encouraging social distancing, use of face coverings and hand hygiene; 2) increasing bilingual case investigators and contact tracing staff; 3) education on staying within household bubbles, using traditional and social media and door-hanger campaigns; 4) public education of social distancing and face coverings through radio, Facebook Live, newspaper and social media; 5) testing of all case contacts, surveillance testing of skilled nursing facilities and farmworkers within vineyard management with exposures or outbreaks; 6) formation of an intergovernmental compliance task force to enforce social distancing and face coverings; and 7) engagement of industry groups and community based organizations for vulnerable populations.

- **Orange County (has variance)** is experiencing an increase in hospitalization. Drivers of this include: a) community transmission from gatherings, b) workplace transmission, c) outbreaks in non-medical congregate livings such as assisted living facilities, memory care facilities, etc. Orange County's key action steps to address concerns include: 1) collaborating with cities and the business community to increase public messaging on the importance of social distancing, not gathering, and mandate face covering. 2) increase testing sites and education outreach in communities where positive cases are high; and, aggressive targeted educational outreach to ethnic communities, 3) working with hospital and health systems to monitor and understand hospitalizations and prepare for the surge, 4) implementation of hospital criteria for shifting to Crisis Care Strategies (surge plan activations), 5) prioritizing medical resource distribution to hospitals most burdened with COVID-19 patients. 6) monitoring positivity rate among those tested to ensure that there isn't a significant increase that may signal more community transmission, 7) contracting with community-based organizations to provide outreach to specific ethnic groups; share messaging about face coverings and other prevention techniques along with the importance of testing; provide necessary supports for social determinant of health needs, 8) providing infection prevention expertise to assist skilled nursing facilities and other congregate care facilities on infection control practices and proper use of PPE.

- **Riverside County (has variance)** is experiencing elevated disease transmission. Drivers of this include: 1) outbreaks at state prisons and skilled nursing facilities (SNFs), 2) potential transmission at public protests with large numbers of people in close proximity without face coverings, 3) in-county patient transfers from Imperial County, 4) patients seeking care from Northern Baja California and traveling along SR-86 corridor into Coachella Valley and 5) general increases in local gatherings. Key action steps to address concerns include: 1) close monitoring of data; 2) increase testing volume at county and state sites; 3) continue SNF outreach and support and implement Quick Response Task Force assistance for high risk facilities; 4) expand contact tracing workforce; 5) increase public messaging on the importance of personal protection measures; and 6) coordination and communication between the local health department, CDPH, and California Department of Corrections and Rehabilitation (CDCR) to mitigate outbreaks at state prisons.

- **Sacramento County (has variance)** has experienced the possibility of increasing hospitalization. Drivers of this include community transmission due to holiday gatherings amongst large families. Key action steps to address concerns include (1) increase of public messaging on the importance of social distancing, not gathering, and mandate face covering, (2) more testing sites and education outreach in communities where positive cases are high, and (3) targeted educational outreach to ethnic communities.

- **San Benito County (has variance)** is experiencing elevated disease transmission. Drivers of this include an increase in outbreaks and clusters related to 1) household contacts, 2) social gatherings and 3) businesses in the county. Actions to address these concerns include: 1) working with businesses on health check

Case 2:20-cv-00966-TAD-KK Document 3 Filed 07/13/20 Page 138 of 194

increasing testing and media campaigning for those that are symptomatic; and 4) working with external partners to improve efficient case reporting and processing.

- **San Bernardino County (has variance)** is experiencing elevated disease transmission and increasing hospitalizations. Drivers of this include: 1) community transmission from gatherings, 2) workplace transmission, 3) transmissions at state prison, state hospital, county jails and academy, and skilled nursing facilities, 4) transfer of patients from Imperial County. Action steps to address these concerns include: 1) expanding community testing and testing among priority populations; 2) coordination and communication between local health department, CDPH, and California Department of Corrections and Rehabilitation (CDCR) to mitigate outbreaks at state prisons; and with CDPH for outbreak mitigation at the State Hospital, 3) providing SNF Taskforce support and Infection Prevention expertise to support SNFs; 4) increasing public messaging and education on the importance personal protection measures including face coverings and personal responsibility; 5) working with labs and employers to increase turn-around time from diagnosis to isolation and initiation of case contacting; and 6) increasing number of contact tracers.

- **San Diego County (has variance)** has an elevated case rate due to widespread COVID-19 disease transmission. County has taken following key actions to **mitigate** the situation 1) closing restaurants, bar, and breweries to decrease access, exposure, and gatherings; 2) requiring customers of these venues to be seated at socially distanced tables; 3) encouraging outdoor dining, which contributes to a lower risk of infection; 4) encouraging the younger population to use face coverings and practice social distancing through outreach to universities, colleges, transitional age youth, and other community youth organizations; and 5) working with industry associations to conduct education and outreach. County has taken the following key actions to **manage** the situation 1) continuing to onboard sufficient case investigators and contact tracers to prevent additional community transmission; 2) increasing testing sites to reach vulnerable and younger populations; 3) deploying County strike teams to conduct site assessment at skilled nursing facility (SNFs), non-SNFs/long-term care facilities, and community setting outbreaks; and 4) evaluating and modifying efforts to ensure testing is available throughout the community for all populations.  Lastly, county has taken the following key actions to **monitor** the situation include 1) monitoring the positivity rate among those tested to ensure that there is not a significant increase that may indicate more community transmission; 2) continuing to work with congregate care facilities to implement infection prevention and control measure and assist with education and testing; and 3) continuing to monitor, identify and assess impacts due to local demographics.

- **San Joaquin County (has variance)** is experiencing increasing hospitalization and limited hospital capacity. Drivers of this include 1) community transmission due to gatherings, 2) workplace transmission followed by household transmission; 3) SNF outbreaks; and, 4) increase in widespread testing. Action steps to address concerns include: 1) increase public messaging on the importance of personal protection measures and the risks involved with mass gatherings in multiple languages; 2) continuing to provide Infection Preventionists expertise to assist SNFs on infection control practices, ensure baseline testing and proper use of PPE.

- **Santa Barbara County (has variance)** is experiencing increasing hospitalization related to increasing cases in our north county region. Drivers of this increase include 1) community transmission due to gatherings, 2) workplace transmission and household transmission; 3) SNF outbreaks; and 4) increase in widespread community testing.  Key action areas to address concerns include 1) engage community leaders,

steps include: 1) continue to work with SNFs on actions to prevent further transmission and prevention messaging through multiple mediums; 3) continue to enhance contact tracing; and 4) continuing to provide Infection Preventionists expertise to assist SNFs on infection control practices, ensure baseline testing, and proper use of PPE.

- **Solano County (has variance)** is experiencing increasing hospitalization. Drivers include a large outbreak among farm workers in the vineyards in Sonoma and Napa who are residing in Solano, as well as an ongoing surge in cases related to family gatherings and other social gatherings on the weekends.  The farm worker cases total many dozens over the past one to two weeks, and the close-contact cases appear to have begun with weekend activities in early May and are continuing to the present.  The large number of such cases overall is resulting in an increase in hospitalized cases.  These cases are not at present resulting in a strain on the hospitals or in ICU admissions but the county is monitoring this closely. County reports that hospitals in their jurisdiction have multiple levels of surge capacity for hospitalizations and for ICU admissions, if these become necessary. Key action steps include: working with the neighboring counties and with the vineyard management companies to implement social distancing measures; 2) educating the workers themselves (using Spanish interpreters) on social distancing measures; 3) providing appropriate cautionary messages through social media and the press about the risks of gatherings, not social distancing and not using personal protection measures.

- **Stanislaus County (has variance)** is experiencing increasing hospitalization. Drivers of this include an 1) increase in outbreaks and clusters related to family gatherings, businesses (in and out of county) and healthcare facilities; 2) the hospital being a regional hospital accepting patients that are residents outside the county; 3) decreased attention to personal protection measures such as face coverings and social distancing. Action steps to address concerns include 1) prioritizing rapid contact tracing, isolation and quarantine by public health staff for new positive cases; 2) continual monitoring of tests being conducted in the county and relocating sites, when necessary, to more densely populated and higher incidence areas, 3) continually offering businesses resources and technical assistance to comply with local requirements; 4) closely monitoring healthcare facilities and continuing to provide Infection Preventionist expertise to assist SNFs with planning and response; 5) retaining trained employees from other county departments to continue to assist in contact tracing; 6) partnering with  community-based organizations serving minorities for outreach, education, and mobile testing; and 7) increased messaging including a public media campaign to promote face covering and social distancing.

- **Tulare County (has variance)** is experiencing elevated disease transmission. Drivers of this include outbreaks in skilled nursing facilities and work places and barriers to preventing transmission within households.  Increased hospitalizations and ICU utilization have been related to multiple conditions other than  COVID19.  Key action areas to address concerns include  1) continue to engage with SNFs and businesses and with ongoing collaboration with Licensing and Certification and the HAI program;  2) continue to enhance contact tracing; and, 3) continue public messaging through multiple mediums about actions to prevent community transmission.

- **Ventura County (has variance)** is experiencing increasing hospitalizations related to increasing cases in our county. Drivers of this increase include: 1) community transmission due to gatherings; 2) essential workplace transmission followed by household transmission; 3) transmission in overcrowded housing; 4) SNF outbreaks; and 5) increase in widespread community testing through our drive-thru testing locations.  Key action areas to address concerns include: 1) engage community leaders, stakeholders, and members in

taking active prevention and community transmission; 2) continue prevention messaging through multiple mediums including visiting workplaces/residential complexes in areas where we have increased community transmission; 3) continue to enhance case investigation and contact tracing efforts; and 4) continuing to provide Infection Preventionists expertise to assist SNFs on infection control practices, ensure baseline testing, and proper use of PPE.

- **Yolo County (has variance)** is experiencing elevated disease transmission and limited hospital capacity. Drivers of this include: 1) community transmission due to social and family gatherings; 2) workplace transmission; and 3) an increase in widespread testing at skilled nursing facilities. Action steps to address concerns include: 1) increase in disease investigation and contact tracing; 2) ongoing support for long-term care and congregate community facilities on infection control practices; 3) public messaging on social distancing and face covering mandates; 4) targeted educational outreach to religious groups and Latino communities; and 5) increased enforcement of mandated health and safety measures.

Page Last Updated : July 8, 2020

# EXHIBIT 2

1   NOSSAMAN LLP
    DAVID C. LEE (SBN 193743)
2   dlee@nossaman.com
    ALEXANDER WESTERFIELD (SBN 295676)
3   awesterfield@nossaman.com
    ELIZABETH KEY (SBN 323544)
4   ekey@nossaman.com
    50 California Street, 34th Floor
5   San Francisco, CA 94111
    Telephone:  415.398.3600
6   Facsimile:  415.398.2438

7   Attorneys for Petitioners IMMIGRANT LEGAL RESOURCE
    CENTER and FREEDOM FOR IMMIGRANTS
8

9

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                     FOR THE COUNTY OF KERN

13

14  IMMIGRANT LEGAL RESOURCE CENTER,      Case No:      BCV-20-101507-JEB
    FREEDOM FOR IMMIGRANTS,
15                                         Assigned for all purposes to:
               Petitioners,                Honorable Eric J. Bradshaw
16
        vs.                                **DECLARATION OF JAN MESLIN IN**
17                                         **SUPPORT OF PETITIONERS'**
    CITY OF MCFARLAND, CITY OF             **APPLICATION FOR TEMPORARY**
18  MCFARLAND PLANNING COMMISSION,         **RESTRAINING ORDER AND ORDER**
                                           **TO SHOW CAUSE**
19             Respondents,
                                           Date:     July 13, 2020
20  GEO GROUP, INC.,                       Time:     8:30 a.m.
                                           Dept.:    T-2
21             Real party in interest.     Judge:    Eric J. Bradshaw

22

23

24

25

26

27

28

                                  - 1 -

1    I, Jan Meslin, declare as follows:

2    1.    I am over the age of eighteen and competent to provide testimony. I have personal

3    knowledge of all information provided herein, except as to those matters stated upon my

4    information or belief, and as to those matters I believe it to be true. If called upon to testify, I

5    could and would testify as sworn in this declaration.

6    2.    I am the Director of Social Change Development with Petitioner Freedom for

7    Immigrants.

8    3.    I personally attended the January 21, 2020 and February 18, 2020 hearings of the

9    McFarland Planning Commission.

10   4.    At the January 21, 2020 Planning Commission meeting, members of the public who

11   wished to address the Planning Commission were required by McFarland staff members to fill

12   out comment cards. On information and belief, these comment cards required individuals to

13   identify themselves by name. City staff did not permit any member of the public who did not fill

14   out a comment card to address the Planning Commission.

15   5.    On information and belief, approximately one hundred and fifty to two hundred members

16   of the public attended the January 21, 2020 Planning Commission Meeting.

17   6.    At the February 18, 2020 Planning Commission meeting, members of the public who

18   wished to comment were required to fill out a comment card before the meeting began at 6:00

19   p.m. On information and belief, these comment cards required individuals to identify themselves

20   by name. City staff did not permit any member of the public who did not fill out a comment card

21   before 6:00 p.m. to address the Planning Commission.

22   7.    I intended to offer public comment at the February 18, 2020 hearing. I asked to fill out a

23   comment card at approximately 6:05 p.m., but was not allowed to by City staff. I was thereby

24   denied a chance to offer public comment to the Planning Commission.

25   8.    On information and belief, approximately three hundred members of the public attended

26   the February 18, 2020 Planning Commission meeting.

27

28

MESLIN DECL. ISO PETITIONERS' APP. FOR TRO & OSC
57532104.v1

1       I declare under penalty of perjury that the foregoing is true and correct and

2   executed this 7th day of July, 2020 at Cayucos , California.

3

4   _____

5                                          Ian Meslin

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

57532104.v1

# EXHIBIT 3

NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
ALEXANDER WESTERFIELD (SBN 295676)
awesterfield@nossaman.com
ELIZABETH KEY (SBN 323544)
ekey@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:  415.398.3600
Facsimile:  415.398.2438

Attorneys for Petitioners IMMIGRANT LEGAL RESOURCE
CENTER and FREEDOM FOR IMMIGRANTS

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF KERN

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER, FREEDOM FOR IMMIGRANTS,<br><br>Petitioners,<br><br>vs.<br><br>CITY OF MCFARLAND, CITY OF MCFARLAND PLANNING COMMISSION,<br><br>Respondents,<br><br>GEO GROUP, INC.,<br><br>Real party in interest. | Case No:      BCV-20-101507-JEB<br><br>Assigned for all purposes to:<br>Honorable Eric J. Bradshaw<br><br>**DECLARATION OF ALEX GONZALEZ IN SUPPORT OF PETITIONERS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**<br><br>Date:  July 13, 2020<br>Time:  8:30 a.m.<br>Dept.: T-2<br>Judge:   Eric J. Bradshaw |

- 1 -

GONZALEZ DECL. ISO PETITIONERS' APP. FOR TRO & OSC

57532081.v1

1    I, Alex Gonzalez, declare as follows:

2    1.    I am over the age of eighteen and competent to provide testimony. I have personal

3    knowledge of all information provided herein, except as to those matters stated upon my

4    information or belief, and as to those matters I believe it to be true. If called upon to testify, I

5    could and would testify as sworn in this declaration.

6    2.    I am a resident of Kern County and an organizer with Faith in the Valley, a faith-based

7    community organizing group.

8    3.    I personally attended the January 21, 2020 and February 18, 2020 hearings of the

9    McFarland Planning Commission.

10   4.    At the January 21, 2020 Planning Commission meeting, members of the public who

11   wished to address the Planning Commission were required by McFarland staff members to fill

12   out comment cards. On information and belief, these comment cards required individuals to

13   identify themselves by name. City staff did not permit any member of the public who did not fill

14   out a comment card to address the Planning Commission.

15   5.    On information and belief, approximately one hundred and fifty to two hundred members

16   of the public attended the January 21, 2020 Planning Commission Meeting. Although the

17   maximum capacity for McFarland City Council chambers, where the January 21, 2020 meeting

18   was held, is fifty, the City provided overflow capacity outdoors.

19   6.    At the February 18, 2020 Planning Commission meeting, members of the public who

20   wished to comment were required to fill out a comment card before the meeting began at 6:00

21   p.m. On information and belief, these comment cards required individuals to identify themselves

22   by name. City staff did not permit any member of the public who did not fill out a comment card

23   before 6:00 p.m. to address the Planning Commission.

24   7.    On information and belief, approximately three hundred members of the public attended

25   the February 18, 2020 Planning Commission meeting. The City again provided overflow

26   capacity outdoors.

27   8.    I personally attended, via the Zoom videoconferencing platform, the April 23, 2020

28   meeting of the McFarland City Council.

- 2 -

GONZALEZ DECL. ISO PETITIONERS' APP. FOR TRO & OSC

57532081.v1

9.      Although I was able to connect to the City Council meeting through Zoom, I began receiving text messages from several community members shortly after the meeting began at 6:00 p.m. These individuals wrote to let me know that they were unable to connect to the hearing through Zoom or the dial-in number the City had provided, and they included McFarland resident C. Navarro.

10.     McFarland residents G. Santiago and J. Hernandez, both monolingual Spanish speakers, later informed me that they also were unable to connect. On information and belief, both intended to offer public comment. As a result of technical difficulties, they were unable to.

11.     At the April 23, 2020 City Council meeting, I addressed the City Council during its open public comment session. I requested that the meeting be postponed given the difficulties that many members of the public were experiencing connecting to the meeting. McFarland Mayor Sally Gonzalez responded that the Zoom platform enabled one hundred members of the public to attend, more than the maximum capacity of the City Council chambers.

12.     Shortly after addressing City Council during the open public comment session, my videoconference connection was dropped. I was able to reconnect via videoconference approximately thirty minutes later.

13.     During the period for public comments pertaining specifically to the modifications of Conditional Use Permits 01-96 and 02-96, which would allow the Geo Group, Inc. to house federal immigration detainees in McFarland-based facilities, I was not allowed by City staff to offer public comment. I was told by City staff that I had exhausted my time with my earlier comment, which addressed an entirely separate issue.

        I declare under penalty of perjury that the foregoing is true and correct and executed this _7th_ day of July, 2020 at Bakersfield, California.

_____

Alex Gonzalez

# EXHIBIT 4

1  NOSSAMAN LLP
   DAVID C. LEE (SBN 193743)
2  dlee@nossaman.com
   ALEXANDER WESTERFIELD (SBN 295676)
3  awesterfield@nossaman.com
   ELIZABETH KEY (SBN 323544)
4  ekey@nossaman.com
   50 California Street, 34th Floor
5  San Francisco, CA 94111
   Telephone:  415.398.3600
6  Facsimile:  415.398.2438

7  Attorneys for Petitioners IMMIGRANT LEGAL RESOURCE
   CENTER and FREEDOM FOR IMMIGRANTS
8

9

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                     FOR THE COUNTY OF KERN

13

| | |
|---|---|
| 14  IMMIGRANT LEGAL RESOURCE CENTER, FREEDOM FOR IMMIGRANTS, | Case No:    BCV-20-101507-JEB |
| 15 | Assigned for all purposes to: |
| 16              Petitioners, | Honorable Eric J. Bradshaw |
| 17          vs. | **DECLARATION OF JIM GRANT IN SUPPORT OF PETITIONERS'** |
| 18  CITY OF MCFARLAND, CITY OF MCFARLAND PLANNING COMMISSION, | **APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE** |
| 19              Respondents, | Date:    July 13, 2020 |
| 20  GEO GROUP, INC., | Time:    8:30 a.m. |
| 21          Real party in interest. | Dept.:    T-2 |
| 22 | Judge:    Eric J. Bradshaw |

23

24

25

26

27

28

- 1 -

1    I, Jim Grant, declare as follows:

2    1.    I am over the age of eighteen and competent to provide testimony. I have personal

3    knowledge of all information provided herein, except as to those matters stated upon my

4    information or belief, and as to those matters I believe it to be true. If called upon to testify, I

5    could and would testify as sworn in this declaration.

6    2.    I am the Director of Social Justice Ministries for the Diocese of Fresno.

7    3.    I personally attended, via the Zoom videoconferencing platform, the April 23, 2020

8    meeting of the McFarland City Council.

9    4.    I intended to address the City Council at that meeting concerning the proposed

10   modifications of Conditional Use Permits 01-96 and 02-96, which would allow the Geo Group,

11   Inc. to house federal immigration detainees in McFarland-based facilities.

12   5.    Although I was able to connect to the City Council meeting through Zoom, my

13   connection was dropped shortly after I connected, and before the public comment period

14   concerning the aforementioned conditional use permits began. Despite my best efforts, I was

15   unable to reconnect to the City Council meeting through the Zoom platform or through the dial-

16   in number the City provided.

17   6.    I was accordingly unable to address the City Council.

18       I declare under penalty of perjury that the foregoing is true and correct and executed this

19   8th day of July, 2020 at Fresno, California.

20

21                                                        Jim Grant

22                                                        Jim Grant

23

24

25

26

27

28

- 2 -

57532136.v1

# EXHIBIT 5

1  NOSSAMAN LLP
   DAVID C. LEE (SBN 193743)
2  dlee@nossaman.com
   ALEXANDER WESTERFIELD (SBN 295676)
3  awesterfield@nossaman.com
   ELIZABETH KEY (SBN 323544)
4  ekey@nossaman.com
   50 California Street, 34th Floor
5  San Francisco, CA 94111
   Telephone:  415.398.3600
6  Facsimile:  415.398.2438

7  Attorneys for Petitioners IMMIGRANT LEGAL RESOURCE
   CENTER and FREEDOM FOR IMMIGRANTS
8

9

10

11            SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                    FOR THE COUNTY OF KERN

13

14  IMMIGRANT LEGAL RESOURCE CENTER,      Case No:     BCV-20-101507-JEB
    FREEDOM FOR IMMIGRANTS,
15                                         Assigned for all purposes to:
                Petitioners,               Honorable Eric J. Bradshaw
16
          vs.                              **DECLARATION OF IVAN SANDOVAL
17                                         IN SUPPORT OF PETITIONERS'
    CITY OF MCFARLAND, CITY OF             APPLICATION FOR TEMPORARY
18  MCFARLAND PLANNING COMMISSION,         RESTRAINING ORDER AND ORDER
                                           TO SHOW CAUSE**
19                Respondents,
                                           Date:     Monday, July 13, 2020
20  GEO GROUP, INC.,                       Time:     8:30 a.m.
                                           Dept.:    T-2
21                Real party in interest.  Judge:    Eric J. Bradshaw
22

23

24

25

26

27

28

                                    - 1 -

I, Ivan Sandoval, declare as follows:

1.      I am over the age of eighteen and competent to provide testimony. I have personal knowledge of all information provided herein, except as to those matters stated upon my information or belief, and as to those matters I believe it to be true. If called upon to testify, I could and would testify as sworn in this declaration.

2.      I am a resident of McFarland, and I live just one block away from the Central Valley and Golden State Modified Community Correctional Facilities.

3.      I personally attended the January 21, 2020 Planning Commission meeting.

4.      I personally attended, via the Zoom videoconferencing platform, the April 23, 2020 meeting of the McFarland City Council.

5.      I intended to address City Council about the proposed modifications of Conditional Use Permits 01-96 and 02-96, which would allow the Geo Group, Inc. to house federal immigration detainees in the Central Valley and Golden State Modified Community Correctional Facilities.

6.      During the meeting, I used Zoom's "hand-raise" function to indicate that I wished to address City Council. Despite this, I was never permitted to address City Council.

I declare under penalty of perjury that the foregoing is true and correct and executed this 8th day of July, 2020 at McFarland, California.


_Ivan Sandoval_
_____
Ivan Sandoval

SANDOVAL DECL. ISO PETITIONERS' APP. FOR TRO & OSC
57532121.v1

**EXHIBIT 6**

NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
ALEXANDER WESTERFIELD (SBN 295676)
awesterfield@nossaman.com
ELIZABETH KEY (SBN 323544)
ekey@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:  415.398.3600
Facsimile:  415.398.2438

Attorneys for Petitioners IMMIGRANT LEGAL RESOURCE
CENTER and FREEDOM FOR IMMIGRANTS

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF KERN

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER, FREEDOM FOR IMMIGRANTS,<br><br>  Petitioners,<br><br>  vs.<br><br>CITY OF MCFARLAND, CITY OF MCFARLAND PLANNING COMMISSION,<br><br>  Respondents,<br><br>GEO GROUP, INC.,<br><br>  Real party in interest. | Case No:    BCV-20-101507-JEB<br><br>Assigned for all purposes to:<br>Honorable Eric J. Bradshaw<br><br>**DECLARATION OF DR. ERIC LOFGREN IN SUPPORT OF PETITIONERS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**<br><br>Date Action Filed: July 1, 2020<br><br>Date:  Monday, July 13, 2020<br>Time:  8:30 a.m.<br>Dept.: T-2<br>Judge:  Eric J. Bradshaw |

- 1 -

I, Dr. Eric Lofgren, declare as follows:

1.      I am over the age of eighteen and competent to provide testimony, and I am a resident of Pullman, Washington. I have personal knowledge of all information provided herein, except as to those matters stated upon my information or belief, and as to those matters I believe it to be true. If called upon to testify, I could and would testify as sworn in this declaration.

2.      I am providing this declaration in support of Petitioners' Application for a Temporary Restraining Order and Order to Show Cause. Based on my professional experience as an epidemiologist, I believe that the transfer of detainees to and/or from detention facilities in McFarland, California would result in immediate and irreparable harm to public health in light of the ongoing COVID-19 pandemic. Based my research concerning this subject, these dangers are not limited to detainees—corrections officers and the surrounding community are also at risk.

3.      I have not been and do not expect to be compensated for my time in preparing this declaration.

4.      I am an Assistant Professor in Washington State University's Paul G. Allen School for Global Animal Health, and have been employed in that position since December 2015. I am also an Adjunct Professor in the university's Department of Math and Statistics, and am affiliated with the university's Center for Interdisciplinary Statistical Education and Research.

5.      I received my PhD in Epidemiology from the University of North Carolina, Chapel Hill's Gillings School of Global Public Health in 2013.

6.      My research primarily concerns the spread and control of infectious diseases through mathematics and computer simulation.

7.      My lab has worked on such projects as controlling healthcare-associated infections as part of the CDC's Modeling Infectious Diseases in Healthcare Network, modeling the spread of infectious diseases between humans and animals, understanding and combatting emerging infectious diseases, and eliminating rabies in Kenya.

8.      I was heavily involved in the response to the 2014 West African Ebola epidemic as well as the initial outbreak of Middle East Respiratory Syndrome (MERS), another novel coronavirus. This included leading the creation of a position paper on the role of modeling in public health

response and working closely with federal agencies including the Defense Threat Reduction Agency (DTRA) and the Biomedical Advanced Research and Development Authority (BARDA). Additionally, my research group is one of five in the nation funded by the Centers for Disease Control and Prevention (CDC) to model the spread of healthcare-associated infections, and we have been actively working on COVID-19 related research.

9.      More details concerning my work, honors, and publications can be found in my curriculum vitae, a true and correct copy of which is attached hereto as **Exhibit A**.

10.     In forming the opinions expressed in this declaration, I relied on a mathematical model that I designed to investigate the epidemiological and public-health consequences of jail operations during the ongoing COVID-19 pandemic.

11.     A paper describing this model, and contrasting it with proposed interventions designed to reduce adverse health outcomes, is attached hereto as **Exhibit B**. I co-authored that paper, *The Epidemiological Implications of Incarceration Dynamics in Jails for Community, Corrections Officer, and Incarcerated Population Risks from COVID-19*, with statisticians, mathematicians, and biologists.

12.     This model uses data from Allegheny County, Pennsylvania, to simulate an urban area of 1.2 million people with a jail of 2500 people. While different cities will necessarily have different raw numbers based on the size of the community, the size of their jail, city-specific arrest rates, etc., the results of this model in terms of trends and patterns are broadly generalizable to jails and other types of detention facilities in other communities.

13.     The paper provides estimates of the infection risks, and likely loss of life, that arise from current incarceration practices. It also provides estimates for in-custody deaths and shows how the dynamics within the jail create spill-over risks affecting not only incarcerated persons but also corrections officers and the surrounding community.

14.     The model shows that, given a typical dynamic between a jail and a community, operating in a business-as-usual way will result in significant and rapid loss of life. Large scale reductions in incarcerations will likely save the lives of incarcerated persons, corrections staff, and the community at large.

15.     The model also shows that measures taken to reduce COVID-19 transmission outside of the detention facility do little to reduce its spread inside a detention facility. Even if the community surrounding a detention facility implements a shelter-in-place or other social distancing protocol, there is no discernable effect on the individuals incarcerated within or working at a detention facility.

16.     In general, interventions that do not reduce the population of incarcerated persons are ineffective to reduce the spread of COVID-19 among incarcerated persons, correctional staff, and surrounding communities.

17.     Further, detention facilities can re-seed infection into communities working to mitigate or contain ongoing outbreaks, and may reintroduce diseases into otherwise disease-free populations. These adverse effects occur even if no detained persons are released into the community, as corrections staff and vendors move between detention facilities and the surrounding communities.

18.     The conditions of detention facilities themselves foster the spread of diseases such as COVID-19. Incarcerated people are shuttled back and forth to court or, where court proceedings are halted due to this pandemic, forced to remain in their cells or dorms. Incarcerated people are also moved between facilities. Incarcerated people occupy shared spaces in which physical distancing is impossible either due to space, overcrowding, or the requirement of constant supervision. Incarcerated people are often not provided with the means to practice good personal hygiene or disinfect their surroundings.

19.     Based on this model, the underlying research, and my experience as an epidemiologist, it is my professional judgment that the transfer of detainees into detention facilities within McFarland would increase the severity and duration of the COVID-19 pandemic among the population of detained persons, corrections officers employed at detention facilities, and the community of McFarland at large.

20.     Given the contagiousness of COVID-19 and the aforementioned conditions of detention facilities, risks related to COVID-19 would increase immediately upon the transfer of detainees into detention facilities within McFarland.

21.     Likewise, it is my professional judgment that the transfer of detainees out of detention facilities within McFarland would increase the increase the severity and duration of the COVID-19 pandemic among the population of detained persons, corrections officers employed at detention facilities, and the community surrounding the transferee facilities.

22.     I again emphasize that the health of persons in detention facilities and the health of the surrounding community are inherently and inextricably linked.

23.     Health in detention facilities is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community.

        I declare under penalty of perjury that the foregoing is true and correct and executed this 9th day of July, 2020 at Pullman, Washington.


_____

Dr. Eric Lofgren

LOFGREN DECL. ISO PETITIONERS' APP. FOR TRO & OSC
57532323.v1

# EXHIBIT A

# Eric T. Lofgren, MSPH PhD

Eric.Lofgren@gmail.com   •   (509) 335-4022

## Research Interests

Computational and mathematical modeling of infectious diseases, with a focus on hospital epidemiology as well as emerging, enteric, and respiratory pathogens.

## Education

**Virginia Tech, Virginia Bioinformatics Institute, Blacksburg, Virginia**
**Network Dynamics and Simulation Science Laboratory**
Postdoctoral Associate: September 2013 to December 2015
Supervisor: Dr. Stephen Eubank

**University of North Carolina at Chapel Hill, UNC Gillings School of Global Public Health, Chapel Hill, North Carolina**
**Department of Epidemiology**
PhD: May 2013   Advisor: Dr. David Weber
MSPH: December 2009     Advisor: Dr. Jennifer Smith

**Tufts University, Medford, Massachusetts**
BA: January 2007
Major: Biology with Highest Thesis Honors

## Professional Appointments

**Assistant Professor, Washington State University, Paul G. Allen School for Global Animal Health**. December 2015 to present.

**Postdoctoral Research, Virginia Tech, Virginia Bioinformatics Institute, Network Dynamics and Simulation Science Lab**. September 2013 to December 2015.

**Research Assistant, UNC Gillings School of Global Public Health, Department of Epidemiology**. January 2009 to May 2009 and August 2011 to May 2013.

**Teaching Assistant, UNC Gillings School of Global Public Health, Department of Epidemiology.**  August to December 2008, August to May 2010.

**Summer Lab Manager, Rutgers University, Center for Discrete Mathematics and Theoretical Computer Science. Fefferman Lab**. May 2008 to August 2013.

**Research Assistant, Tufts University, Initiative for the Modeling and Forecasting of Infectious Disease**. August 2005 to July 2007.

## Teaching Experience

**Instructor, College of Veterinary Medicine, Washington State University.** 2018 to present.
- – VetPath 571: Methods of Analysis in Epidemiology
- – VetClin 570: Infectious Disease Journal Club

**Session Organizer, "A gentle introduction to mathematical modeling: Lessons from the living-dead", American Public Health Association Annual Meeting Learning Institute**. November 2011, 2012 and 2014.

**Teaching Assistant, UNC Gillings School of Global Public Health, Department of Epidemiology.** 2008 – 2010.
- – EPID 722: Epidemiologic Analysis of Time-to-Event Data
- – EPID 750: Fundamentals of Public Health Surveillance

## Publications

Calderwood, M.S., V.M. Deloney, D.A. Anderson, V. Cheng, S. Gohil, J.H. Kwon, L. Mody, E. Monsees, V.M. Vaughn, T.L. Wiemken, M.J. Ziegler, **E.T. Lofgren**. Policies and Practices of SHEA Research Network Hospitals during the COVID-19 Pandemic. *Infection Control and Hospital Epidemiology*. *In press.*

Slayton, R.B., J.J. O'Hagan, S. Barnes, S. Rhea, R. Hilscher, M. Rubin, **E. Lofgren**, B. Singh. 2020. Modeling Infectious Diseases in Healthcare Network Framework for Describing Multidrug Resistant Organism and Healthcare-Associated Infections Agent Based Modeling Methods. *Clinical Infectious Diseases*. *In press.*

Perkins, A.V., D.C. Sellon, J.M. Gay, **E.T. Lofgren**, D.A. Moore, L.P. Jones, M.A. Davis. 2020. Prevalence of methicillin-resistant *Staphylococcus pseudintermedius* on hand-contact and animal-contact surfaces in companion animal community hospitals. *Canadian Veterinary Journal*, 61(6): 613

Short, C.S., M.S. Mietchen, **E.T. Lofgren.** 2020. Assessing the Potential Impact of a Long-acting Skin Disinfectant in the Prevention of Methicillin-resistant *Staphylococcus aureus* Transmission. *Int. J. Environ. Res. Public Health*, 17(5): 1500

Suarez, G., O. Udiani, B. Allan, C. Price, S. Ryan, **E. Lofgren**, A. Coman, C. Stone, L. Gallos, N. Fefferman. 2020. A generic arboviral model framework for exploring trade-offs between vector control and environmental concerns. *Journal of Theoretical Biology*, 490: 110161

Chowdhury, A., **E.T. Lofgren**, R.W. Moehring, S. Broschat. 2020. Identifying Predictors of Antimicrobial Exposure in Hospitalized Patients Using a Machine Learning Approach. *Journal of Applied Microbiology*, 128(3): 688-96

Madhobi, K., M. Kamruzzaman, A. Kalyanaraman, **E. Lofgren**, R. Moehring, B. Krishnamoorthy. 2019. A Visual Analytics Framework for Analysis of Patient

Trajectories. Proc. *ACM Conference on Bioinformatics, Computational Biology and Health Informatics (ACM-BCB'19)*.

Herbert, S., **E.T. Lofgren**, K. Keyloun. 2019. Long-Acting Antibiotic Pathways Improve ED Metrics Versus Standard Care for Acute Bacterial Skin and Skin Structure Infection Treatment: A Discrete-Event Simulation. *Journal of Medical Economics*, 22(7):652-661

Halloran, M.E., K. Auranen, S. Baird, N.E. Basta, S.E. Bellan, R. Brookmeyer, B.S. Cooper, V. DeGruttola, J.P. Hughes, J. Lessler, **E.T. Lofgren**, I.M. Longini, J-P. Onella, B. Özler, G.R. Seage, T.A. Smith, A. Vespignani, E. Vynnycky, M. Lipsitch. 2017. Simulations for Designing and Interpreting Intervention Trials in Infectious Diseases. *BMC Medicine*, 15:223

**Lofgren, E.T**. 2017. Estimating the impact of past randomization changes in staff behavior in infection prevention trials: a mathematical modeling approach. *BMC Infectious Diseases*, 17:539

Omulo, S., **E.T. Lofgren**, M. Mugoh et al. 2017. The impact of fecal sample processing on prevalence estimates for antibiotic-resistant *Escherichia coli. Journal of Microbiological Methods*, 136: 71-77.

**Lofgren, E.T.,** A.M. Egizi, N.H. Fefferman. 2016. Patients as Patches: Ecology and Epidemiology in Healthcare Environments. *Infection Control and Hospital Epidemiology,* 37(12): 1507-1512.

**Lofgren, E.T.** 2016. Unlocking the black box: teaching mathematical modeling with popular culture. *FEMS Microbiology Letters*, 363(20): 1-3.

Dicks, K.V., **E.T. Lofgren**, S.S. Lewis, R.W. Moehring, D.J. Sexton, D.J. Anderson. 2016. A Multicenter Pragmatic Interrupted Time Series Analysis of Chlorhexidine Gluconate Bathing in Community Intensive Care Units. *Infection Control and Hospital Epidemiology*, 37(17): 791-7.

**Lofgren, E.T.,** K.M. Collins, T.C. Smith, R.A. Cartwright. 2016. Equations of the End: Teaching Mathematical Modeling using the Zombie Apocalypse. *Journal of Microbiology & Biology Education*, 17(1):137-142

Rivers, C.M., M.S. Majumder, D.N. Fisman, **E.T. Lofgren**. Risk of Death and Severe Disease in Patients with MERS-CoV, 2012 to 2016. *American Journal of Epidemiology*, 184(6): 460-464

**Lofgren, E.T.** 2015. Pools versus Queues: The Variable Dynamics of Stochastic "Steady States". *PLoS One,* 10(6): e0130574.

**Lofgren, E.T.** et al. 2014. Mathematical Models: A Key Tool for Ebola Outbreak Response. *Proceedings of the National Academy of Sciences*, 111(51): 18095-18096.

Fisman, D.N., C.M. Rivers, **E.T. Lofgren**, Majumder,M.S. 2014. Estimation of MERS-Coronavirus Reproductive Number and Case Fatality Rate for the Spring 2014 Saudi Arabia Outbreak: Insights from Publically Available Data. *PLoS Currents Outbreaks*.

Rivers, C.M. et al. 2014. Ebola: Models Do More Than Forecast. *Nature*, 515(7528): 492.

Halloran, M.E. et al. 2014. Ebola: Mobility data. *Science*, 346(6208): 433.
K.A. Alexander et al. 2014. What factors might have led to the emergence of Ebola in West Africa? *PLoS Neglected Tropical Diseases*.

Rivers, C.M., **E.T. Lofgren**, M. Marathe, S. Eubank, B.L. Lewis. 2014. Modeling the Impact of Interventions on an Epidemic of Ebola in Sierra Leone and Liberia. *PLoS Currents Outbreaks*.

**Lofgren, E.T.**, S.R. Cole, D.J. Weber, D.J. Anderson, R.W. Moehring. 2014. Estimating All-cause Mortality and Length of Stay in Incident, Healthcare Facility-associated *Clostridium difficile* Cases Using Parametric Mixture Models. *Epidemiology,* 25(4): 570-575.

**Lofgren, E.T.**, R.W. Moehring, D.J. Weber, D.J. Anderson, N.H. Fefferman. 2014. A Mathematical Model to Evaluate the Routine Use of Fecal Transplantation to Prevent Incident and Recurrent *Clostridium difficile* Infection. *Infection Control and Hospital Epidemiology*, 35(1):18-27.

Moehring, R.W., **E.T. Lofgren**, D.J. Anderson. 2013. Impact of Change to Molecular Testing for *Clostridium difficile* Infection on Healthcare Facility-Associated Incidence Rates.  *Infection Control and Hospital Epidemiology*, 34(10): 1055-1061.

**Lofgren, E.T.** 2012. Visualizing Results from Transmission Models: A Case Against "Confidence Intervals". *Epidemiology*, 23(5): 738-741.

Chu, H., **E.T. Lofgren**, M.E. Halloran, P.F. Kuan, M. Hudgens, S.R. Cole. 2011. Performance of Rapid Influenza H1N1 Diagnostic Tests: a Meta-analysis. *Influenza and Other Respiratory Viruses*, 6(2): 80-86.

**Lofgren, E.T.**, J.B. Wenger, N.H. Fefferman, D. Bina, S. Gradus, S. Bhattacharyya, Y.N. Naumov, J. Gorski, E.N. Naumova. 2010. Disproportional Effects in Populations of Concern for Pandemic Influenza: Insights from Seasonal Epidemics in Wisconsin, 1967-2004. *Influenza and Other Respiratory Viruses*, 4(4): 205-12.

**Lofgren, E.T.**, J. Rogers, M. Senese, N.H. Fefferman. 2008. Pandemic Preparedness Strategies for School Systems: Is Closure Really the Only Way? *Annales Zoologici Fennici,* 44(6): 449-458.

**Lofgren, E.T.** and N.H. Fefferman. 2007. The Untapped Potential of Virtual Game Worlds to Shed Light on Real World Epidemics. *The Lancet Infectious Diseases,* 7(9):625-629.

**Lofgren, E.T.**, N.H. Fefferman, Y.N. Naumov, J. Gorski, E.N. Naumova. 2007. Influenza Seasonality: Underlying Causes and Modeling Theories. *Journal of Virology*, 81(11):5429-5436.

**Lofgren, E.T.**, N.H. Fefferman, M. Doshi, E.N. Naumova 2007. Assessing Seasonal Variation in Multisource Surveillance Data: Annual Harmonic Regression. *Lecture Notes in Computer Science.* BioSurveillance 2007. Eds D. Zeng et al. 4506:114-123.

## Book Chapters

**Lofgren, E.T.** 2017. Systems Dynamics Models. In *Systems Science and Population Health*. El- Sayed and Galea, eds. Oxford University Press : Oxford. pp. 77-85.

## Submitted Manuscripts

N.H. Fefferman, S. DeWitte, S.S. Johnson, **E.T. Lofgren**. Leveraging Insight from Centuries of Outbreak Preparedness to Improve Modern Planning Efforts. *In review*. Preprint available at: https://arxiv.org/abs/2005.099336

**Lofgren, E.T.**, K. Lum, A. Horowitz, B. Madubuonwu, N. Fefferman. The Epidemiological Implications of Incarceration Dynamics in Jails for Community, Corrections Officer, and Incarcerated Population Risks from COVID-19. *In review*. Preprint available at: medrxiv.org/content/10.1101/2020.04.08.20058842v2

Fefferman, N.H., **E.T. Lofgren**, N. Li, P. Blue, D. Weber, A. Yakubu. Fear, Access and the Real-Time Estimation of Etiological Parameters for Outbreaks of Novel Pathogens. *In review*. Preprint available at: medrxiv.org/content/10.1101/2020.03.19.20038729v1

**Lofgren, E.T.**, M.S. Mietchen, C.S. Short, K.V. Dicks, R.W. Moehring, D.A. Anderson. Estimating the Per-use Effectiveness of Chlorhexidine Gluconate and Mupirocin in Methicillin-resistant *Staphylococcus aureus* Decolonization in Intensive Care Units. *In submission.* Preprint available at: medrxiv.org/content/10.1101/19012732v1

C.S. Short, M.S. Mietchen, **E.T. Lofgren**. Transient Dynamics of Infection Transmission in a Simulated Intensive Care Unit. *In submission.* Preprint available at: arxiv.org/abs/1909.11878

Mietchen, M.S., C.S. Short, M. Samore, **E.T. Lofgren**. 2019. Population Structure Drives Differential Methicillin-resistant *Staphylococcus aureus* Colonization Dynamics in ICUs. *In submission*. Preprint available at medrxiv.org/content/10.1101/19002402v2.

Myers, K., **E.T. Lofgren**, N.H. Fefferman. 2018. 30 Relaxed Fit vs. 32 Slim Cut: Structural Nonidentifiability in Outbreak Models. *In submission.*

Omulo, S., **E.T. Lofgren**, S. Lockwood, et al. 2017. Saturated prevalence of antimicrobial resistance in an informal urban community. *In submission.*

## Invited Talks

*Synthesizing the Clinical Literature using Approximate Bayesian Computation*. 2019. SIAM Conference on Computational Science and Engineering. Spokane, WA.

*Meet the Professor: Building a Virtual Laboratory to Inform Improved Infection Control with Facility-Level Mathematical Modeling*. 2018. IDWeek, San Francisco, CA.

*The Patient-Patch: Hospital Epidemiology as an Ecology Problem*. 2017. National Institute for Mathematical and Biological Synthesis, University of Tennessee, Knoxville, TN.

*Adventures in Modeling for Policy*. 2017. University of Utah, Salt Lake City, UT.

*Agent-based Models and Population Health*. 2016. Center for Health and Society at the University of Copenhagen, Copenhagen, Denmark.

*Beyond Forecasting: Modeling for Decision Support, Policy and Translational Research*. 2015. Society for Vector Ecology, Albuquerque, NM.

*Epidemiology on Networks: Human and Otherwise*. 2014. Department of Mathematics, Tulane University, New Orleans, LA.

*Mathematical Modeling of In-Hospital Transmission of Infectious Diseases*. 2013. Infectious Disease Grand Rounds, Duke University School of Medicine, Durham, NC.

*Defining Epidemics: Detection, Behavior, and Intervention*. 2011. Department of Homeland Security US-Sweden Workshop "A Visualization and Analytics Approach to Flooding and Pandemics". Norrköping, Sweden.

*The Plagues of Azeroth: Outbreaks and Epidemiology in Virtual Worlds*. 2011. UNC Gillings School of Global Public Health, Chapel Hill, NC.

## Funding

U01CK000533-01        Lofgren, Eric T. (PI)      08/01/17 – 07/31/20
Centers for Disease Control and Prevention
Model-driven Surveillance and Intervention Evaluation in Highly Stochastic Healthcare Settings
Role: PI

200-2018-96423        Lofgren, Eric T. (WSU PI)   01/01/2018 – 06/30/19
Centers for Disease Control and Prevention
Identifying Predictors of Antimicrobial Exposure for Application in the Standardized Antimicrobial Administration Ratio Risk Adjustment Strategy
Role: PI of WSU Subcontract from Duke University

1UO1GH002143-01    Njenga, M. Kariuki (PI)    09/30/16-09/29/21
Centers for Disease Control and Prevention
Conducting Communicable Disease Research in Kenya
Role: Co-I

WSU College of Veterinary Medicine  Lofgren, Eric (PI)    07/01/16 – 06/30/17
Intramural Award
Modeling Emerging Infections in Frontline Veterinary Care Settings
Role: PI

## Awards and Honors

2007   University Merit Assistantship, UNC Gillings School of Global Public Health

2017   Finalist, Society for Healthcare Epidemiology of America Epi Project Competition

## Professional Memberships

2010 -   Member, Society for Epidemiological Research

                2017 – Membership Committee

2010 -   Member, Society for Industrial and Applied Mathematics

2012 -   Member, Society for Healthcare Epidemiology of America

                2017 – Journal Club

                2018 – Research Committee, Publications Committee

2015 -   Member, Association for Computing Machinery

2017 -   Member, American Association for the Advancement of Science

## Other Experience and Service

**Manuscript Referee:**  *Epidemiology, American Journal of Epidemiology, Infection Control and Hospital Epidemiology, BMJ, BMJ Open, Environmental Health Perspectives, Scientific Data, BMC Infectious Diseases, Clinical Infectious Diseases, Bulletin of Mathematical Biology, PLoS One, PLoS Computational Biology* among others.

**Editorial Boards:** *Epidemiology*

**U.S. Research Delegate:** DHS US-Sweden Workshop 'A Visualization and Analytics Approach to Flooding and Pandemics'. Norrköping, Sweden. 2010.

**Expert Witness:** American Civil Liberties Union, Defender Services Office of the Administrative Office of the U.S. Courts

## Press Coverage

**Television:** BBC World News, CBS News, Canada Television, Discovery Channel
**Radio:** BBC UK News, National Public Radio, North Carolina Public Radio, CBC, BBC4
**Print/Online News:** ABC News, ABS CBN News, Canadian Press, The Economist, Forbes, Fox News, New Scientist, Science News, Reuters, TIME, The Washington Post, FiveThirtyEight among others

# EXHIBIT B

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

# The Epidemiological Implications of Incarceration Dynamics in Jails for Community, Corrections Officer, and Incarcerated Population Risks from COVID-19

Eric Lofgren[1❂]*, Kristian Lum[2❂], Aaron Horowitz[3], Brooke Madubuowu[3], Nina Fefferman[4,5]*,

**1** Paul G. Allen School for Global Animal Health, Washington State University, Pullman, WA USA
**2** Department of Computer and Information Science, University of Pennsylvania, Philadelphia, PA, USA
**3** ACLU Analytics, American Civil Liberties Union, New York, NY USA
**4** Department of Mathematics, University of Tennessee, Knoxville, TN, USA
**5** Department of Ecology and Evolutionary Biology, University of Tennessee, Knoxville, TN, USA

❂These authors contributed equally to this work.
* nfefferm@utk.edu

## Abstract

COVID-19 challenges the daily function of nearly every institution of society. It is the duty of any society to be responsive to such challenges by relying on the best tools and logic available to analyze the costs and benefits of any mitigative action. We here provide a mathematical model to explore the epidemiological consequences of allowing standard intake and unaltered within-jail operational dynamics to be maintained during the ongoing COVID-19 pandemic, and contrast this with proposed interventions to reduce the burden of negative health outcomes. In this way, we provide estimates of the infection risks, and likely loss of life, that arise from current incarceration practices. We provide estimates for in-custody deaths and show how the within-jail dynamics lead to spill-over risks, not only affecting the incarcerated people, but increasing the exposure, infection, and death rates for both corrections officers with whom they interact within the jail system, and the broader community beyond the justice system. We show that, given a typical jail-community dynamic, operating in a business as usual way will result in significant and rapid loss of life. Large scale reductions in arrest and speeding of releases are likely to save the lives of incarcerated people, staff and the community at large.

## Introduction

As the COVID-19 pandemic sweeps the globe, one of the critical functions of epidemiology is to consider how society can transform current practice to increase the health and safety of the public. The widespread risk of infection and the high case fatality rates, especially in older or medically compromised populations, mean that we, as a society, must be willing to consider structural reforms to our institutions to promote an overall greater good. To these ends, we have already seen systemic shifts in institutional practices that would be unthinkable under normal conditions:

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

shelter-in-place orders closing businesses and restricting freedom of individual movement [1], school closures to limit transmission compromising the ongoing education of children [2], etc. Another clearly important institution that affects a substantial portion of the public directly [3] and an even greater portion indirectly [4–7], is our criminal legal system. It would be unpardonable to allow the ongoing function of this institution to continue unchanged without performing rigorous analyses of the costs and benefits to society, including incarcerated people and their families, inherent in maintaining current practices. We therefore explore the epidemiological costs associated with our current system's functions as a necessary part of the policy conversation that must ensue to decide whether or not they should be maintained or altered in response to a growing global crisis. Analyzing incarcerated populations poses a unique epidemiological problem. The population experiences high rates of movement and turnover [8,9] , incarcerated people are responsible for purchasing their own hygiene products with limited resources, [10,11] it is difficult or impossible for incarcerated people to practice CDC recommendations such as social distancing [12], the incarcerated population has a higher expected rate of existing health conditions than the community from which they come [13–15], jails are dependent completely on a workforce that moves in and out of the jail and the community including vendors, lawyers, corrections officers, medical staff, etc., and there is strong evidence that incarceration itself has profound adverse effects on the health of incarcerated people [16–18]. These descriptors make jails highly likely not only to place detained people at increased risk of infection and resulting severe outcomes, but also to function as a driver for increased infectivity, adversely impacting attempts to contain and mitigate disease spread in the broader communities in which jails are located. To study the dynamics of this system and provide quantitative metrics for risk to incarcerated populations and the populations with which incarcerated people necessarily interact, we construct and tailor a epidemiological model of COVID-19 transmission, and then use that model to consider how some possible reforms to the system (i.e. reduction in arrest intake, increased rates of returning incarcerated people to their homes, and improvement of conditions within the jails) will alter these baseline risks.

## Model/Methods

### Transmission Model

We begin by tailoring a standard SEIR model to the specific dynamics of COVID-19. We first split our total population into four categories of risk: Children under 18 (denoted with the subscript $K$), Low-risk adults (denoted with the subscript $L$), High-risk adults (denoted with the subscript $H$), and Elderly adults (denoted with the subscript $E$). We also designate a separate population category for jail staff, $O$ (note: while $O$ was the selected notation, it is meant to capture all staff working at the jail, not only the corrections officers). These populations are then assigned into disease-related health status compartments: Susceptible ($S$), Exposed (in which individuals are presymptomatic, but do already produce low levels of infection transmission to others, $E$), Infected (in which individuals are both symptomatic themselves and fully infectious to others, $I$), Medically Treated (those infectious individuals whose disease severity and healthcare access results in removal from the population into a medical care facility that prevents any further transmission of infection back into the population, $M$), and Removed (those who have either recovered from the infection and are now immune or those who have died, $R$). We also allow for the possibility that an Infected person with sufficient disease severity to warrant medical treatment is unable to obtain care, and designate rates associated with this case, $U$. For clarity of the results, we do not

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

consider death from any non-COVID-19 cause; this is done to highlight the
COVID-19-specific dynamics. Additionally, as a simplifying assumption due to their low
rates of both infections and complications, we do not model hospitalizations or deaths
in children. Similarly, once hospitalized, patients are assumed not to spread COVID-19
further, as additionally modeling the impact of healthcare-associated COVID-19 cases is
well beyond the scope of this model. Lastly, we split our population into segments
depending on the subsection of the community or jail system in which they are
currently functioning: the community at large, $C$, the processing system for the jail, $P$,
the court system $T$, and the jail system, $J$.

A schematic for this model can be seen in 1, and the differential equations
comprising the model are in SI Appendix 1. The model was implemented in R 3.6.3
using the deSolve package, with the visualization of results primarily using ggplot2.
Statistical analysis of one parameter (see below) was done using the flexsurv package.
As this study used only publicly available data and does not involve human subjects,
IRB approval was not required.



**Fig 1.** Schematic for a mathematical model of COVID-19 in a linked urban community
- jail system. The population is represented in one of five possible compartments:
Suseptible (S), Exposed (E), Infected (I), Needing Medical Care (M) and
Recovered/Removed (R). Additionally, the population is divided into five distinct
sub-populations: Children under 18 years of age, Elderly Adults over 65 years of age,
Low Risk Adults between 18 and 65, High Risk Adults between 18 and 65 and Jail Staff
(assumed to be between 18 and 65 years of age). Arrested adults move between the
Community, Processing and the Court System and Jail, while Jail Staff move between
the Community and Jail. Children are assumed not to be eligible for arrest.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

## Population Movement Into, Within, and Out Of the Jail System

Our model captures movement between the community (denoted with subscript, $C$), processing ($P$),jail (denoted with subscript, $J$), and court appointments (denoted with $T$ for trial, though this is meant to encompass all court appointments). It assumes staff move only between the community and jail; they are not arrested in our model. We base the parameters of movement into, within, and out of the jail on Allegheny County, Pennsylvania, where detailed data on the jail population and facilities are available, including an automatically updating dashboard giving statistics for the jail population.[1] In Allegheny County, the population at large is approximately 1.2 million people. The size of the jail population hovers around 2,500. We use these population figures to initialize our model.

In our model, individuals in the community are arrested at a rate of approximately 100 people per day.[2] Arrested individuals are brought to processing. From processing, individuals can either be released back into the community (60%) or taken to jail (40%).[3] This results in an in-flow to the jail of approximately 40 individuals per day, which is consistent with Allegheny County's reporting. While in jail, individuals transition back and forth between the jail and court appointments. The number of movements between jail and court appointments is described as "well over 100" on the jail's website. We assume movement of approximately 150 people per day between the jail and court. For each court appointment, we assume individuals spend half a day on average at the court facility. Importantly, we also assume that there is mixing in the court facility between those who are there for processing after arrest and those that are present there for court appointments. From jail, individuals are released back into the community at a rate that is consistent with the reported 62 day average length of stay. One limitation of our model is that we do not account for post-jail destinations that are not the community, i.e. we do not model people moving from jail to prison. According to [19], the yearly number of admissions to prison is about 600,000 while the yearly number of admissions to jail is around 10.6 million. So, assuming that all prison admissions first had one jail admissions, around 95% of all jail admissions do not go on to prison; they are released back into the community as in our model. Thus, we expect that the omission of prison from our model does not substantially impact the overall findings.

An online database of public employees salaries in Allegheny County shows a population of 384 people whose job title is corrections officer, whose job location is the jail, and who are listed as active. Although this is certainly an underestimate of the total number of the jail's staff, which includes other types of employees, we think this is a useful approximation to the total number of staff. We use this figure as the number of staff members moving between community and jail. Staff transition between community and jail at a rate that assumes 8 hour shift lengths in the jail per day with the remaining 16 hours per day spent in the community.

## Estimation Population Mixing and Contact Rates

We estimate parameters that describe the relative rate of transmission between each of the community categories: Children, Low-risk adults, High-risk adults, and Elderly adults from other studies. We use $\beta_{qr}^{C*}$ to denote the relative rate of transmission to category $q$ from category $r$. We estimate this as

$$\beta_{qr}^{C*} = m_{qr} c_q p_q^{-1} t_q.$$

---

[1]https://perma.cc/93RG-4WZ8
[2]https://perma.cc/K992-KHCH
[3]https://perma.cc/93RG-4WZ8

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint **(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .

$m_{qr}$ is the number of times a person in category $q$ is in contact with a person in category $r$. We use the category-category contact rates given in [20]. $c_q$ is the proportion of COVID-19 cases that occurred for people in category $q$ and $p_q$ is the proportion of the total population in category $q$. The ratio of these two terms, $c_q p_q^{-1}$, is meant to capture the relative proclivity for people in group $q$ to be infected by the virus. We use case counts and population information for South Korea as reported by Statista.[45] $t_i$ is the number of daily contacts for individuals in category $q$, as reported in [21]. The $\beta^*$s are normalized such that the Child-Child transmission is equal to one. The resulting values of $\beta^{C*}$ is shown in Table 1.

|         | child | adult | elderly |
|---------|-------|-------|---------|
| child   | 1.00  | 0.51  | 0.08    |
| adult   | 0.57  | 2.43  | 1.05    |
| elderly | 0.02  | 0.30  | 0.49    |

**Table 1.** Relative transmission rates of COVID-19, scaled so that the Child-Child rate is one.

Within the jail and processing, we assume that mixing patterns are not category-dependent. We set $\beta^{J*} = \beta_{qr}^{J*} = \beta_{LL}^{C*} c_j$ and $\beta^{P*} = \beta_{qr}^{P*} = \beta_{LL}^{C*} c_p$, where $\beta_{LL}^{C*}$ is the low risk adult to low risk adult base transmission rate in the community and $c_j$ and $c_p$ are factors that denotes how times more contacts per day a person in jail or processing, respectively, has than a person in the community. We set these values to be $c_j = 3$ and $c_p = 6$, corresponding to an assumption of three and six times more contact in jail and processing, respectively, than take place in the community.

The $\beta^*$s are defined on an arbitrary scale. To get simulations that resemble the real spread of the virus, we calibrated the model. We set $\beta_{qr}^C = \frac{c_0 \beta_{qr}^{C*}}{n_c}$, $\beta^J = \frac{c_0 \beta^{J*}}{n_j}$, and $\beta^P = \frac{c_0 \beta^{P*}}{n_p}$, where $n_c = 1,200,000$, $n_j = 2,600$, and $n_p = 250$ are the size of the population in the community, jail, and processing, respectively, and $c_0$ is a calibration parameter. Scaling each of the $\beta$ terms in the model by the population sizes amounts to the assumption that transmission is contact-based. This assumption leads to conservative estimates of the speed of the spread in the jail system relative to a fomite-based transmission model. To calibrate the model, we then find a $c_0$ such that approximately 80% of the population is ultimately infected by the time the spread dies out in our model. We selected an 80% final infection rate for consistency with predictions of the spread of COVID-19 under the assumption of no mitigation measures in place from an influential micro-simulation model [22].

## Estimation of Other Model Parameters

Parameters concerning the natural history of COVID-19, patient progression, etc. were primarily obtained from existing estimates in the modeling literature, where possible using estimates from as close to the modeled catchment area as possible (i.e. CHIME from UPenn Medicine, https://penn-chime.phl.io/). Citations for specific parameter values may be found in Table 2.

In one case, $\hat{\gamma}$, or the asymptomatic period$^{-1}$, the original source reported that their estimate was likely an underestimation due to censoring. However, given that the authors provided the data within their manuscript [23], the data was re-estimated to account for censoring using a parametric survival model assuming an exponential distribution (the distribution typically implied by the uniform hazard of transitioning

---

[4] COVID-19 case proportions: https://www.statista.com/statistics/1102730/south-korea-coronavirus-cases-by-age/
[5] .

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

from one compartment to another within a compartmental model). The fit for this   156
exponential model may be found in SI Appendix 2.   157

## Modeled Scenarios and Interventions   158

We represented the effects of several policy interventions or failures as changes to various   159
parameters in this model. We consider four categories of scenarios that could vary the   160
rate of spread: in addition to modeling shelter-in-place (reduced mixing) conditions in   161
the community, we modeled scenarios related to reductions in arrest rates, increases in   162
release rates, and changes to within-jail conditions. These scenarios are detailed below   163
in Table 3. Most scenarios are additive; that is, all arrest reduction interventions   164
assume a baseline scenario of shelter-in-place in the community. The scenarios involving   165
faster release of individuals in jail all assume both shelter-in-place in the community,   166
and were each run under each of the "Arrest Reduction" scenarios to determine the   167
cumulative effects of arrest reduction, increased release rates, and community   168
shelter-in-place conditions. The mixing reduction scenario in the jail assumes   169
shelter-in-place in the community as well as a 25% reduction in arrests (equivalent to   170
the "Bail Eligible" Arrest Reduction scenario), as it is unlikely that jails will be able to   171
effectively reduce contact rates without reducing their average daily population. Finally,   172
in the reduced detection scenario, we assume shelter-in-place, but vary the likelihood   173
that serious cases of COVID-19 is caught and treated in a timely manner.   174

Below, vulnerable populations are defined as individuals over the age of 65 or at   175
increased risk of complications form COVID-19 due to other co-morbidities. We   176
estimate that 40% of the jail population is vulnerable by this definition, according to   177
information from the Bureau of Justice Statistics [29]. We estimate that around 25% of   178
those arrested are bail eligible, based on information from Allegheny county that cash   179
bail was used in 28% of cases between February and June of 2019 [30].   180

# Results   181

Unsurprisingly given the epidemiological dynamics of COVID-19, absent any   182
intervention there is a substantial outbreak in the community, causing 926,402 infections   183
(both symptomatic and asymptomatic) as well as requiring 51,578 hospitalizations and   184
ultimately resulting in 12,161 fatalities over the 180 days of the simulation, with the   185
peak of infections occurring 83 days after the first infective case appeared in the   186
population. Among those incarcerated, the outbreak is considerably more severe,   187
causing a cumulative 5,311 cases requiring 449 hospitalizations and 134 deaths among   188
those incarcerated, the 2500 person jail being 0.2% the size of the wider community (Fig   189
2). The peak of this within-jail epidemic is also considerably earlier, with the peak of   190
the epidemic occurring 30 days after the first infective case appeared in the community.   191

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842 .this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

| | Parameter | Value | Description |
|---|---|---|---|
| 1 | $\sigma$ | 0.50 | Percent reduction in transmission during asymptomatic period (compared to symptomatic) [24] |
| 2 | $\gamma^{-1}$ | 5.1 days | Incubation Period [25] |
| 3 | $\hat{\gamma}^{-1}$ | 6.7 days | Asymptomatic Period [23] |
| 4 | $\delta^{-1}$ | 10 days | Symptomatic Period [24] |
| 5 | $\delta_{Discharge}^{-1}$ | 9 days | Hospitalization Length of Stay (Discharged Alive) [26][6] |
| 6 | $\delta_{Death}^{-1}$ | 4.2 days | Hospitalization Length of Stay (Discharge Dead) [26] |
| 7 | $\delta_{DeathU}^{-1}$ | 4.2 days-1 | Time to Death for Unhospitalized Critical Cases |
| 8 | $\omega_L^{-1}$ | 5.9 days * 0.0625 | Time from Symptom Onset to Hospitalization * Probability of Needing Hospitalization (low risk) [26,27] |
| 9 | $\omega_H^{-1}$ | 5.9 days * 0.118 | Time from Symptom Onset to Hospitalization * Probability of Needing Hospitalization (high risk) [26,27] |
| 10 | $\nu$ | 95% | Hospitalized Case Survival Rate (low risk) [28] |
| 11 | $\nu_H$ | 66.6% | Hospitalized Case Survival Rate (high risk) [28] |
| 12 | $\nu_U$ | 0.0% | Unhospitalized Critical Case Survival Rate (low risk) |
| 13 | $\nu_{UH}$ | 0.0% | Unhospitalized Critical Case Survival Rate (high risk) |
| 14 | $\alpha_L$ | 3.57e-06 | Per Capita Hourly Arrest Rate (low risk). Equates to 60 arrests per day. |
| 15 | $\alpha_E$ | 7.35e-06 | Per Capita Hourly Arrest Rate (elderly). Equates to 1 arrest per day. |
| 16 | $\alpha_H$ | 1.11e-03 | Per Capita Hourly Arrest Rate (high risk). Equates to 40 arrests per day. |
| 17 | $\psi_C^{-1}$ | 12 hours*0.60 | Processing Time from Arrest to Returning to Community * Probability of Release After Arrest |
| 18 | $\psi_J^{-1}$ | 12 hours*0.40 | Processing Time from Arrest to Jail * Probability of Jail After Arrest |
| 19 | $\kappa$ | 2.60e-03 | Per Capita Hourly Probability of Scheduled Court Appearance |
| 20 | $\tau$ | 12 hours | Time from Scheduled Court Appearance to Return to Jail |
| 21 | $\rho^{-1}$ | 62 days | Length of Stay in Jail [7] |
| 22 | $\mu_C^{-1}$ | 8 hours | Shift Length for Jail Staff |
| 23 | $\mu_J^{-1}$ | 16 hours | Time Spent in the Community for Jail Staff |
| 24 | $\zeta$ | 1.00 | Probability an Incarcerated Person Needing Treatment Will Receive It |
| 25 | $pop$ | 1.22 million people | Population of Jail Catchment Area |

**Table 2.** Parameter values, meanings and sources for a community-jail transmission model of COVID-19.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

| Scenario Name | Parameters | Multiplier of Baseline | Scenario Description |
|---|---|---|---|
| Shelter in Place | $\beta_*^C$ | 0.625 | Effective contact rate in the community is reduced by a factor of $1/1.65$. |
| *Arrest Reduction* | | | |
| Bail Eligible | $\alpha_L, \alpha_H, \alpha_E$ | 0.75 | Divert all bail-eligible arrests (estimated at 25% of all arrests) |
| Vulnerable Only | $\alpha_H, \alpha_E$ | 0.10 | Divert arrests of 90% of vulnerable populations. [9] |
| Low Level | $\alpha_L, \alpha_H, \alpha_E$ | 0.17 | Divert all low-level arrests (estimated at 83% of arrests). |
| Arrest Fewer People | $\alpha_L, \alpha_H, \alpha_E$ | 0.10 | Divert 90% of current arrests. |
| *Faster Release* | | | |
| Increase Release Speed | $\rho^{-1}$ | 2 | 2x rate of release from jail |
| Vulnerable Only | $\rho_H^{-1}$ | 2 | 2x rate of release for vulnerable only |
| *In-Jail Scenarios* | | | |
| Mixing Reduction | $\beta_T, \beta_P, \beta_J$ | 0.625 | Reduction of baseline contact rates in jails by the same factor as the community under shelter-in-place |
| Reduced Detection | $\zeta$ | 0.99,0.95,0.90 | Reduction in infection detection and timely hospitalization in jails by $1-\zeta$ |

**Table 3.** Scenarios and parameter adjustments for a number of policy-based interventions to curtail COVID-19 in jail and the community.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .



**Fig 2.** Epidemic curves from a simulated COVID-19 epidemic in an urban community (right) and the connected population of persons in a jail (left). The magnitude of the peak in the population in jail is much higher and shifted a full 63 days earlier.

Given the dominant approach to controlling COVID-19 in the community and the widespread calls to "flatten the curve", for the remaining results we assume the presence of a shelter-in-place order or similar social distancing intervention *only in the community* as the comparator scenario, represented as a halving in the mixing frequency of all age groups in the community. In line with the experience of communities undergoing such distancing interventions, this decrease in overall contacts results in a substantially delayed epidemic, with 486,193 infections in the community as well as far lower burdens in terms of both hospitalizations and fatalities. In contrast, the early dynamics of the COVID-19 outbreak within the incarcerated population are identical, while in the latter half of the simulation the outbreak dynamics in the incarcerated population are markedly worse, resulting in 8058 infections after 180 days and proportionately more hospitalizations and COVID-19 related fatalities (Fig 3). Shelter-in-place orders had no discernible impact on the health outcomes of the staff of the jail.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .



**Fig 3.** Cumulative infections, hospitalizations and deaths in the community (first column), among persons in jail (second column) and among jail staff (third column) for scenarios with (green) and without (orange) a shelter-in-place social distancing intervention. Such social distancing dramatically reduces the burden of infections and resulting adverse outcomes in the community, but results in a larger and more prolonged outbreak among persons in jail.

All of the four considered arrest deferral scenarios had substantial impacts on the course of the epidemic in the incarcerated population, while also lessening the impact of the epidemic on the community and, to a lesser extent, the jail's staff. Discontinuing the arrest of bail-eligible individuals, which corresponds to a ≈25% reduction of admissions into the jail, resulted in a 22.1% reduction in infections in the incarcerated population, and a 2.4% reduction in infections within the community.

Broader, more sweeping arrest deferral programs resulted in correspondingly larger impacts in both the incarcerated population and the community as a whole. The discontinuation of arresting individuals for low level offenses (≈83.4% reduction) and the blanket reduction of arrests by 90% resulted in a 71.8% and 76.6% reduction in infections within the incarcerated population (with correspondingly fewer hospitalizations and deaths) respectively. These strategies also resulted in the greatest decrease in infections among staff (2.4% and 3.5%) and in the community at large (12.1% and 13.7%). Finally, a strategy built off deferring the arrest of individuals at

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

high risk of developing COVID-19 related complications by 90%, tailoring the [219]
intervention to groups of epidemiological importance rather than the nature of their [220]
offense, resulted in a 27.2% decrease in infections within the incarcerated population [221]
and a 56.1% decrease in deaths among the same population. [222]

In comparison, a strategy deferring the same number of people with no regard to [223]
their underlying risk ($\approx$36.5%), resulted in a 6.8% decrease in overall infections within [224]
the incarcerated population, but a 61.7% increase in deaths among incarcerated persons [225]
compared to the scenario specifically targeting those at greatest risk of averse outcomes [226]
for deferred arrest (Fig 4). The deferral strategy targeting individuals for high risk [227]
outcomes caused 4095 more infections in the community compared to the same [228]
proportionately large but broader strategy, and the decreased number of deaths among [229]
persons in jail was partially offset by this increase, with the targeted strategy resulting [230]
in a combined number of COVID-19 fatalities in both the population of persons in jail [231]
and in the community of 5001 compared to 4969 fatalities under the broader strategy. [232]

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .



**Fig 4.** Cumulative infections, hospitalizations and deaths in the community (first row), among persons in jail (second row) and among jail staff (third row) for several incarceration deferment scenarios. More aggressive scenarios, such as a 90% decrease in all incarcerations or discontinuing incarceration for low level offenses result in large improvements in the epidemic within the jail, with a smaller impact among staff and the community. Deferring incarceration for people particularly at risk for adverse outcomes results in a markedly pronounced decrease in deaths among persons in jail.

Pairing increased arrest deferral with a more rapid release of persons who were already incarcerated enhanced the impact of those interventions, reducing infections, hospitalizations and deaths among the incarcerated — as well as the staff of the jails — as the rate of release increased (Fig 5). The one exception to this was the outcomes in the wider community, which, when paired with less aggressive arrest deferral scenarios, experienced a slight increase in the number of infections, hospitalizations and deaths at lower levels of accelerated release schedules. This phenomenon peaks at a release rate 1.5 times faster than the default release rate, with a 0.3% increase in community infections. At rates faster than this, the effect is considerably reduced, with a release rate twice as fast as the default release rate resulting in a 0.02% increase in community infections.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint **(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .



**Fig 5.** Cumulative infections, hospitalizations and deaths in the community (first row), among persons in jail (second row) and among jail staff (third row) for several combinations of incarceration deferment and accelerated release. Negative outcomes among persons in jail as well as staff improve with faster levels of release, while the community experiences slightly higher rates of negative outcomes, especially in moderate release scenarios, peaking at a release rate 1.5 times normal.

When accompanied by the deferred arrest of bail-eligible individuals to reduce the incarcerated population, supplementary measures to reduce transmission among incarcerated persons have a marked benefit in both reducing the amplitude of the epidemic curve in incarcerated people and jail staff, as well as shifting the overall community epidemic curve later (Fig 6). These interventions may be thought of as either measures to reduce mixing — such as allowing greater space between individuals in common areas or the staggering of the use of shared facilities — or the provision of supplies such as soap and hand sanitizer that reduces the level of viral contamination of patient's hands, physical surfaces, etc. Compared to the baseline mixing rate among persons in jail, a reduction to an equivalent level of mixing as the community while sheltering in place would reduce infections in this population by 10.9% as well as delay the peak of the epidemic by close to two weeks.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .



**Fig 6.** Epidemic curves for the community (top panel), persons in jail (middle panel) and jail staff (bottom panel) under a shelter in place order as well as the deferment of bail-eligible persons. The curves show the impact of increased reduction in mixing (e.g. from the ability to physically distance persons in jail while in common areas) from baseline (dark blue) to identical to the community's shelter-in-place order (green). This shifts the epidemic curve in the community slightly, and results in both a shifted and decreased curve among persons in jail as well as staff.

An increase in the detection of severe COVID-19 cases among incarcerated persons from 95% to 100% (equivalent to the same detection of the need for medical treatment available in the community) unsurprisingly increased the number of hospitalizations, as 5 out of every 100 incarcerated persons needing hospitalization were no longer missed, either for lack of access to care, insufficient diagnostic capacity, or other reasons. Similarly, owing to the vast reduction in the case fatality rate between hospitalized (CFR = 5% for low risk and 33.3% for high risk) severe cases and unhospitalized severe cases (CFR = 100% for both groups), the number of deaths dropped by 72.2% when the detection of severe cases rose to the same level as the community. Between these scenarios, the number of infections rose slightly with better detection, increasing by 0.6% (Fig 7). This is likely due to the slightly longer time an untreated severe case spends in the incarcerated population before they are removed due to death vs. when a treated case is transferred for hospitalization. This effect will only be present if the level

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

of viral shedding is constant (or increasing) over the course of a clinical infection. If
instead the mechanism by which a severe COVID-19 patient dies is a cytokine storm or
other process not involving the virus overwhelming the immune system, we would not
expect this effect to be observed. However, even in the pessimistic case wherein viral
shedding is constant throughout the clinical course of infection, the slight rise in
infections is offset by the decrease in the number of COVID-19 related fatalities.



**Fig 7.** Infections, hospitalizations and deaths from COVID-19 among incarcerated
persons under three scenarios of the probability that a severe case will be detected and
receive adequate medical care. Increasing this probability results in more
hospitalizations, dramatically reduced deaths, and a slight rise in the number of
infections among incarcerated persons.

# Discussion

Failure to adequately protect jail populations will have a profound impact on the health
of incarcerated people, corrections officers, workers in the judicial system, and members
of the general population. Our models clearly demonstrate that, in the absence of
community mitigation such as strict social distancing, by only 30 days after the
introduction of the first infection to the community, we can expect 2886 infections
among incarcerated people, resulting in eight in-custody deaths. When contrasted with
a baseline model of the general population without interaction with a jail, we see that
the existence of jail-driven disease dynamics increase the total number of cases in the
population by 922 and the total number of deaths by 301.

These results clearly follow from the features of the jail system themselves in
challenging ways. While only 1% of the population entering into the jail system are
elderly [31], incarceration in jail itself degrades the health of incarcerated people [16–18],
leaving them more vulnerable to infection and severe outcomes from infection [32]. As
individual robustness to disease decreases, the epidemiological result is the increased
vulnerability of the whole jail population.

Beyond the direct implications for the health of incarcerated people, jail populations
have high rates of re-entry into the general community and they depend on people who
regularly mix with the outside community. Jail populations are largely composed of
individuals who have not been convicted of a crime, and therefore will be released
quickly back into the general community rather than to further incarceration within the
carceral system. Jails with disease prevalence higher than the general populations they

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

serve will therefore act as sources of infection, re-seeding infection into communities that may be striving to contain or mitigate ongoing outbreaks, or even reintroducing infection into otherwise disease-free populations. It is important to note that this would happen even if no one were released given the volume of people coming in and out of jails in staff and vendor roles, so should therefore not be construed as an implication that releases should be suspended or impeded.

We are not helpless to effect change. Some obvious potential courses of action suggest themselves immediately. New arrests of people of unknown disease status may be regularly brought into jails, increasing the likely severity of outbreaks both by the plausible continuous introduction of new sources of infection and by the maintenance of higher rates of contact among susceptible incarcerated people due to the density and structure of jail housing arrangements. If jurisdictions across the country reduce their intake by significant percentages, our models demonstrate that we will meaningfully directly reduce the disease incidence in the incarcerated population (as seen in Fig 4). Moreover, these same strategies also clearly produced a reduction in the source of risk to incarcerated people's families and the broader community (Fig 4). These strategies could be enacted in a number of ways, such as (but not limited to) replacing misdemeanor arrests with citations, avoiding recommendations for jail time or prohibitive terms for bail conditions, or refusing to detain anyone for nonpayment of fines or fees during the course of the outbreak.

Having considered these potential strategies for categorical reduction in intake into jails, we also considered the case in which the categorical consideration for reduction in intake stemmed instead from the health of the arrested person. In this case, we get the expected reduction in the within-jail outbreak that would have been associated with a general reduction of the same percent intake ($\approx$36.9%, allowing for a small number of incarcerations in these groups), but we fail to achieve any significant reduction in disease burden in the broader community by taking this action. It is therefore more effective to reduce the intake rate across the entire population than to attempt to single out particular categories of individuals due to their likely susceptibility to severe morbidity or mortality from infection. The larger the reduction in overall intake, the greater the reduction in disease achieved for all populations (incarcerated people, the broader community, and jail staff, in decreasing proportion of effect). These broader interventions are also likely to be relatively straightforward to implement administratively, without knowledge of an individual's underlying comorbidities, if any.

In addition to reducing rates of intake into the jail system, another obvious, concrete step we might take to reduce disease risks for everyone is to increase the rate of release from jails. This should clearly be coupled with a decreased rate of intake rather than enacted in isolation, since increasing release rates while maintaining the same rate of intake would increase infection risks for incarcerated people, the staff who work at the jails and court systems, and the broader community. This may even still occur when expedited release is coupled with decreased rates of intake if the rate of release is insufficient; see Fig 5. Again, our results clearly demonstrate that the greater the proportion of the incarcerated population we can include in such a policy, the more effective the intervention is at mitigating the outbreak.

To be maximally effective, each of these interventions should anticipate, rather than react to, widespread infection incidence in jail populations.

Critically, the factors that cause these outbreak dynamics and drive the resulting efficacy of proposed interventions are features implicit in the nature of the jail system itself. The living conditions foster disease spread. Incarcerated people are shuttled back and forth to court or, where court proceedings are halted due to this pandemic, forced to remain in their cells or dorms. Incarcerated people occupy shared spaces in which physical distancing is impossible either due to space, overcrowding, or the requirement

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

of constant supervision. Incarcerated people are often not provided with the means to disinfect their surroundings or practice all of the hygiene guidelines suggested by the CDC. Improved facility sanitation, access to free personal hygienic care, such as warm water, free soap, free hand sanitizer, and free cleaning products, increased time spent outside, increased physical/social distancing measures, decreased population density achieved by releasing people, increased access to free medical care, and improved nutrition are all factors with instant and obvious resulting improvements in individual health outcomes for people incarcerated within the jail system. Alterations to function and practice of the jail system that can correct for these challenges are unlikely to occur quickly enough or substantially enough to improve the epidemiological risks for the incarcerated people within the jail system. As our results have shown, even when the within-jail transmission rates are improved by interventions such as reduction in intake from new arrests leading to a decrease in the size of the incarcerated population, we cannot effectively reduce the outbreak of infection in either the staff or incarcerated people down to the levels of the broader community.

As with all models, the conclusions of this study depend on an accurate representation of the flow of individuals between the jail system and the wider community, either due to arrests or due to their employment as jail staff, as well as the values of the parameters used to determine how swiftly this flow occurs. The inherent nature of emerging epidemics makes both of these things uncertain — the clinical and biological aspects of the pathogen might not be fully understood, and the data needed to parameterize these models is often sparse and incomplete. This problem is especially acute in models of this sort, which seek to present a "what-if" scenario to stave off a public health crisis, rather than analyze how that crisis unfolded after the fact. Nevertheless, while the exact projected magnitudes may be sensitive to these unknowns, in truth, the greatest utility of models such as these in in determining best courses of action and likely magnitudes of the effects that can be gained from those actions, rather than exact predictions of precise numbers of individuals [33]. Due to the logical nature of the processes studied, so long as errors in the parameters used are consistent across scenarios, they will not impact the understanding that results from our projections about which courses of action achieve the best outcomes, even if those errors would alter our understanding of the precise amount of effect achieved by each intervention.

## Conclusion

Conditions within jails must be immediately improved to decrease the probabilities of disease transmission and support better health for incarcerated people to protect not only themselves, but also jail staff and the community at large. Decreasing population density both directly decreases disease exposure, interrupting transmission dynamics, and also facilitates many other interventions. It is a natural result of reduced intake. We can achieve/enable many desired benefits with just that one, simple action, but to achieve maximal benefits to society, preventing the greatest burden from disease both within the jails and without, broad actions that include alterations to both intake and release and also many of the within-jail strategies for improving the individual means to enact personal hygiene, protection through social distancing, and access to medical care are all needed.

## Acknowledgments

EL was supported by the CDC Cooperative Agreement RFA-CK-17-001-Modeling Infectious Diseases in Healthcare Program (MInD-Healthcare).

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

# References

1. Mervosh S, Lu D, Swales V. See Which States and Cities Have Told Residents to Stay at Home. New York Times. 2020;.

2. Bayham J, Fenichel EP. The Impact of School Closure for COVID-19 on the US Healthcare Workforce and the Net Mortality Effects. Available at SSRN 3555259. 2020;.

3. Sharp R. The Incarceration Nation: Interpreting the United States Imprisonment Rate. 2018;.

4. Sykes BL, Pettit B. Measuring the Exposure of Parents and Children to Incarceration. In: Handbook on Children with Incarcerated Parents. Springer; 2019. p. 11–23.

5. Weidner RR, Schultz J. Examining the relationship between US incarceration rates and population health at the county level. SSM-Population Health. 2019;9:100466.

6. Kelley S. MASS INCARCERATION. Human Ecology. 2019;47(1):15–15.

7. Enns PK, Yi Y, Comfort M, Goldman AW, Lee H, Muller C, et al. What percentage of Americans have ever had a family member incarcerated?: Evidence from the family history of incarceration survey (FamHIS). Socius. 2019;5:2378023119829332.

8. Lester HD, Miller MJ. Discrete Event Simulation of Jail Operations in Pursuit of Organizational Culture Change. In: Computer Security. Springer; 2019. p. 307–322.

9. Minton TD. Jail Inmates at Midyear 2010 - Statistical Tables. Bureau of Justice Statistics. 2011;.

10. Raher S. The Company Store: A Deeper Look at Prison Commissaries; 2018. Available from: https://www.prisonpolicy.org/reports/commissary.html.

11. Bick JA. Infection control in jails and prisons. Clinical Infectious Diseases. 2007;45(8):1047–1055.

12. Hoge CW, Reichler MR, Dominguez EA, Bremer JC, Mastro TD, Hendricks KA, et al. An Epidemic of Pneumococcal Disease in an Overcrowded, Inadequately Ventilated Jail. New England Journal of Medicine. 1994;331(10):643–648. doi:10.1056/NEJM199409083311004.

13. Nowotny KM. Health care needs and service use among male prison inmates in the United States: A multi-level behavioral model of prison health service utilization. Health & justice. 2017;5(1):9.

14. Mignon S. Health issues of incarcerated women in the United States. Ciencia & saude coletiva. 2016;21:2051–2060.

15. Barnert ES, Perry R, Morris RE. Juvenile incarceration and health. Academic pediatrics. 2016;16(2):99–109.

16. McClelland DC, Alexander C, Marks E. The need for power, stress, immune function, and illness among male prisoners. Journal of Abnormal Psychology. 1982;91(1):61.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

17. Jacobs ET, Mullany CJ. Vitamin D deficiency and inadequacy in a correctional population. Nutrition. 2015;31(5):659–663.

18. Kouyoumdjian FG, Andreev EM, Borschmann R, Kinner SA, McConnon A. Do people who experience incarceration age more quickly? Exploratory analyses using retrospective cohort data on mortality from Ontario, Canada. PloS one. 2017;12(4).

19. Wagner P, Sakala L. Mass incarceration: The whole pie. Prison Policy Initiative. 2014;12.

20. Yuan HY, Baguelin M, Kwok KO, Arinaminpathy N, van Leeuwen E, Riley S. The impact of stratified immunity on the transmission dynamics of influenza. Epidemics. 2017;20:84–93.

21. Rohani P, Zhong X, King AA. Contact network structure explains the changing epidemiology of pertussis. Science. 2010;330(6006):982–985.

22. Ferguson N, Laydon D, Nedjati Gilani G, Imai N, Ainslie K, Baguelin M, et al. Report 9: Impact of non-pharmaceutical interventions (NPIs) to reduce COVID19 mortality and healthcare demand. 2020;.

23. Hu Z, Song C, Xu C, Jin G, Chen Y, Xu X, et al. Clinical characteristics of 24 asymptomatic infections with COVID-19 screened among close contacts in Nanjing, China. Science China Life Sciences. 2020; p. 1–6.

24. Weitz JS. COVID-19 Epidemic Risk Assessment for Georgia. Available on GitHub. 2020;.

25. Lauer SA, Grantz KH, Bi Q, Jones FK, Zheng Q, Meredith HR, et al. The incubation period of coronavirus disease 2019 (COVID-19) from publicly reported confirmed cases: estimation and application. Annals of internal medicine. 2020;.

26. Verity R, Okell LC, Dorigatti I, Winskill P, Whittaker C, Imai N, et al. Estimates of the severity of COVID-19 disease. MedRxiv. 2020;.

27. Tindale L, Coombe M, Stockdale JE, Garlock E, Lau WYV, Saraswat M, et al. Transmission interval estimates suggest pre-symptomatic spread of COVID-19. medRxiv. 2020;.

28. COVID C. Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19)—United States, February 12–March 16, 2020;.

29. Maruschak LM, Berzofsky M, Unangst J. Medical problems of state and federal prisoners and jail inmates, 2011-12. US Department of Justice, Office of Justice Programs, Bureau of Justice . . . ; 2015.

30. Pennsylvania A. Punishing Poverty: Cash Bail In Allegheny County; 2019. Available from: https://aclupa.org/sites/default/files/field_documents/allegheny_county_report_final.pdf.

31. Allegheny County Jail Population Management: Interactive Dashboards; 2020. Available from: https://www.alleghenycountyanalytics.us/index.php/2019/11/04/allegheny-county-jail-population-management-dashboards-2/.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

32. Binswanger IA, Blatchford PJ, Forsyth SJ, Stern MF, Kinner SA. Epidemiology
of infectious disease–related death after release from prison, Washington State,
United States, and Queensland, Australia: A Cohort Study. Public Health
Reports. 2016;131(4):574–582.

33. Lofgren ET, Halloran ME, Rivers CM, Drake JM, Porco TC, Lewis B, et al.
Opinion: Mathematical models: A key tool for outbreak response. Proceedings of
the National Academy of Sciences. 2014;111(51):18095–18096.

# Supporting information

**SI Appendix 1.**  According to the logic presented in the Model/Methods section 1
define the following system of equations to capture the epidemiological dynamics of our
system:

Within the Broader Community:

$$\frac{dS_K^C}{dt} = -\beta_{KK}^C S_K^C \left( I_K^C + _K^C \right) - \beta_{KL}^C S_K^C \left( I_L^C + I_O^C + \sigma \left( E_L^C + E_O^C \right) \right)$$
$$- \beta_{KE}^C S_K^C \left( I_E^C + _E^C \right) - \beta_{KH}^C S_K^C \left( I_H^C + _H^C \right)$$

$$\frac{dE_K^C}{dt} = \beta_{KK}^C S_K^C \left( I_K^C + \sigma E_K^C \right) + \beta_{KL} + \beta_{KH} S_K^C \left( I_H^C + \sigma E_H^C \right) - \gamma E_K^C - \hat{\gamma} E_K^C$$

$$\frac{dI_K^C}{dt} = \gamma E_K^C - \delta I_K^C$$

$$\frac{dR_K^C}{dt} = \delta I_K^C + \hat{\gamma} E_K^C$$

$$\frac{dS_L^C}{dt} = -\beta_{LK}^C S_L^C \left( I_K^C + _K^C \right) - \beta_{LL}^C S_L^C \left( I_L^C + I_O^C + \sigma \left( E_L^C + E_O^C \right) \right)$$
$$- \beta_{LE}^C S_L^C \left( I_E^C + \sigma E_E^C \right) - \beta_{LH}^C S_L^C \left( I_H^C + \sigma E_H^C \right) - \alpha_L S_L^C + \psi_C S_L^P + \rho S_L^J$$

$$\frac{dE_L^C}{dt} = \beta_{LK}^C S_L^C \left( I_K^C + \sigma E_K^C \right) + \beta_{LL}^C S_L^C \left( I_L^C + I_O^C + \sigma \left( E_L^C + E_O^C \right) \right)$$
$$+ \beta_{LE}^C S_L^C \left( I_E^C + \sigma E_E^C \right) + \beta_{LH}^C S_L^C \left( I_H^C + \sigma E_H^C \right) - \gamma E_L^C - \hat{\gamma} E_L^C$$
$$- \alpha_L E_L^C + \psi_C E_L^P + \rho E_L^J$$

$$\frac{dI_L^C}{dt} = \gamma E_L^C - \delta I_L^C - \omega I_L^C - \alpha_L I_L^C + \psi_C I_L^P + \rho I_L^J$$

$$\frac{dM_L^C}{dt} = \omega I_L^C - \delta_{Discharge} \nu M_L^C - \delta_{Death}(1-\nu) M_L^C$$

$$\frac{dR_L^C}{dt} = \delta I_L^C + \hat{\gamma} E_L^C + \delta_{Discharge} \nu M_L^C + \delta_{Death}(1-\nu) M_L^C - \alpha_L R_L^C + \psi_C R_L^P$$
$$+ \rho R_L^J$$

$$\frac{dS_E^C}{dt} = -\beta_{EK}^C S_E^C \left( I_K^C + _K^C \right) - \beta_{EL}^C S_E^C \left( I_L^C + I_O^C + \sigma \left( E_L^C + E_O^C \right) \right)$$
$$- \beta_{EE}^C S_E^C \left( I_E^C + \sigma E_E^C \right) - \beta_{EH}^C S_E^C \left( I_H^C + \sigma E_H^C \right) - \alpha_E S_E^C + \psi_C S_E^P + \rho S_E^J$$

$$\frac{dE_E^C}{dt} = \beta_{EK}^C S_E^C \left( I_K^C + _K^C \right) + \beta_{EL}^C S_E^C \left( I_L^C + I_O^C + \sigma \left( E_L^C + E_O^C \right) \right) + \beta_{EE}^C S_E^C \left( I_E^C + _E^C \right)$$
$$+ \beta_{EH}^C S_E^C \left( I_H^C + _H^C \right) - _E^C - \hat{\gamma} E_E^C - \alpha_E E_E^C + \psi_C E_E^P + \rho E_E^J$$

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

$$\frac{dI_E^C}{dt} = \gamma E_E^C - \delta I_E^C - \omega_H I_E^C - \alpha_E I_E^C + \psi_C I_E^P + \rho I_E^J$$

$$\frac{dM_E^C}{dt} =_E^C -\delta_{Discharge}\nu_M M_E^C - \delta_{Death}(1-\nu_H)M_E$$

$$\frac{dR_E^C}{dt} = \delta I_E^C + \hat{\gamma} E_E^C + \delta_{Discharge}\nu_H M_E^C + \delta_{Death}(1-\nu_H)M_E^C - \alpha_L R_L^C + \psi_C R_L^P + \rho R_L^J$$

$$\frac{dS_H^C}{dt} = -\beta_{HK}^C S_H^C \left(I_K^C + \sigma E_K^C\right) - \beta_{HL}^C S_H^C \left(I_L^C + I_O^C + \sigma\left(E_L^C + E_O^C\right)\right)$$
$$- \beta_{EH}^C S_H^C \left(I_E^C + \sigma E_E^C\right) - \beta_{HH}^C S_H^C \left(I_H^C + \sigma E_H^C\right) - \alpha_H S_H^C + \psi_C S_H^P + \rho S_H^J$$

$$\frac{dE_H^C}{dt} = \beta_{HK}^C S_H^C \left(I_K^C + {}_K^C\right) + \beta_{HL}^C S_H^C \left(I_L^C + I_O^C + \sigma\left(E_L^C + E_O^C\right)\right) + \beta_{EH}^C S_H^C \left(I_E^C + {}_E^C\right)$$
$$+ \beta_{HH}^C S_H^C \left(I_H^C + \sigma E_H^C\right) - {}_H^C - \hat{\gamma} E_H^C - \alpha_H E_H^C + \psi_C E_H^P + \rho E_H^J$$

$$\frac{dI_H^C}{dt} = \gamma E_H^C - \delta I_H^C - \omega_H I_H^C - \alpha_H I_H^C + \psi_C I_H^P + \rho I_H^J$$

$$\frac{dM_H^C}{dt} = \omega_H I_H^C - \delta_{Discharge}\nu_H M_H^C - \delta_{Death}(1-\nu_H)M_H^C$$

$$\frac{dR_H^C}{dt} = \delta I_H^C + \hat{\gamma} E_H^C + \delta_{Discharge}\nu_H M_H^C + \delta_{Death}(1-\nu_H)M_H^C - \alpha_H R_H^C + \psi_C R_H^P$$
$$+ \rho R_H^J$$

$$\frac{dS_O^C}{dt} = -\beta_{OK}^C S_O^C \left(I_K^C + {}_K^C\right) - \beta_{OL}^C S_O^C \left(I_L^C + I_O^C + \sigma\left(E_L^C + E_O^C\right)\right) - \beta_{OE}^C S_O^C \left(I_E^C + {}_E^C\right)$$
$$- \beta_{OH}^C S_O^C \left(I_H^C + {}_H^C\right) - \mu_J S_O^C + \mu_C S_O^J$$

$$\frac{dE_O^C}{dt} = \beta_{OK}^C S_O^C \left(I_K^C + \sigma E_K^C\right) + \beta_{OL}^C S_O^C \left(I_L^C + I_O^C + \sigma\left(E_L^C + E_O^C\right)\right)$$
$$+ \beta_{OH}^C S_O^C \left(I_E^C + \sigma E_E^C\right) + \beta_{OH}^C S_O^C \left(I_H^C + \sigma E_H^C\right) - \gamma E_O^C - \hat{\gamma} E_O^C - \mu_J E_O^C + \mu_C E_O^J$$

$$\frac{dI_O^C}{dt} = \gamma E_O^C - \delta I_O^C - \omega I_O^C - \mu_J I_O^C + \mu_C I_O^J$$

$$\frac{dM_O^C}{dt} = \omega\left(I_O^C + I_O^J\right) - \delta_{Discharge}\nu M_O^C - \delta_{Death}(1-\nu)M_O^C$$

$$\frac{dR_O^C}{dt} =_O^C + \hat{\gamma} E_O^C + \delta_{Discharge}\nu M_O^C + \delta_{Death}(1-\nu)M_O^C \mu_J - \mu_J R_O^C + \mu_C R_O^J$$

Within the Processing System:

$$\frac{dS_L^P}{dt} = -\beta_{LL}^P S_L^P \left(I_L^P + I_L^T + \sigma\left(E_L^P + E_L^T\right)\right) - \beta_{LE}^P S_L^P \left(I_E^P + I_E^T + \sigma\left(E_E^P + E_E^T\right)\right)$$
$$- \beta_{LH}^P S_L^P \left(I_H^P + I_H^T + \sigma\left(E_H^P + E_H^T\right)\right) + \alpha_L S_L^C - \psi_C S_L^P - \psi_J S_L^P$$

$$\frac{dE_L^P}{dt} = \beta_{LL}^P S_L^P \left(I_L^P + I_L^T + \sigma\left(E_L^P + E_L^T\right)\right) + \beta_{LE}^P S_L^P \left(I_E^P + I_E^T + \sigma\left(E_E^P + E_E^T\right)\right)$$
$$+ \beta_{LH}^P S_L^P \left(I_H^P + I_H^T + \sigma\left(E_H^P + E_H^T\right)\right) - \gamma E_L^P + \alpha_L E_L^C - \psi_C E_L^P - \psi_J E_L^P$$

$$\frac{dI_L^P}{dt} = \gamma E_L^P - \delta I_L^P + \alpha_L I_L^C - \psi_C I_L^P - \psi_J I_L^P$$

$$\frac{dR_L^P}{dt} = \alpha_L R_L^C - \psi_C R_L^P - \psi_J R_L^P + \delta I_L^P$$

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
**(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

$$\frac{dS_E^P}{dt} = -\beta_{EL}^P S_E^P \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) - \beta_{EE}^P S_E^P \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$- \beta_{EH}^P S_E^P \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) + \alpha_E S_E^C - \psi_C S_E^P - \psi_J S_E^P$$

$$\frac{dE_E^P}{dt} = \beta_{EL}^P S_E^P \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) + \beta_{EE}^P S_E^P \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$+ \beta_{EH}^P S_E^P \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) - \gamma E_E^P + \alpha_E E_E^C - \psi_C E_E^P - \psi_J E_E^P$$

$$\frac{dI_E^P}{dt} = \gamma E_E^P - \delta I_E^P + \alpha_E I_E^C - \psi_C I_E^P - \psi_J I_E^P$$

$$\frac{dR_E^P}{dt} = \alpha_E R_E^C - \psi_C R_E^P - \psi_J R_E^P + \delta I_E^P$$

$$\frac{dS_H^P}{dt} = -\beta_{HL}^P S_H^P \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) - \beta_{HE}^P S_H^P \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$- \beta_{HH}^P S_H^P \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) + \alpha_H S_H^C - \psi_C S_H^P - \psi_J S_H^P$$

$$\frac{dE_H^P}{dt} = \beta_{HL}^P S_H^P \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) + \beta_{HE}^P S_H^P \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$+ \beta_{HH}^P S_H^P \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) - \gamma E_H^P$$

$$\frac{dI_H^P}{dt} = \gamma E_H^P - \delta I_H^P + \alpha_H I_H^C - \psi_C I_H^P - \psi_J I_H^P$$

$$\frac{dR_H^P}{dt} = \alpha_H R_H^C - \psi_C R_H^P - \psi_J R_H^P + \delta I_H^P$$

Within the Trial System:

$$\frac{dS_L^T}{dt} = -\beta_{LL}^T S_L^T \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) - \beta_{LE}^T S_L^T \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$- \beta_{LH}^T S_L^T \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) + \kappa \tau S_L^J - \kappa S_L^T$$

$$\frac{dE_L^T}{dt} = \beta_{LL}^T S_L^T \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) + \beta_{LE}^T S_L^T \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$+ \beta_{LH}^T S_L^T \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) - \gamma E_L^T + \kappa \tau E_L^J - \kappa E_L^T$$

$$\frac{dI_L^T}{dt} = \gamma E_L^T - \delta I_L^T + \kappa \tau I_L^J - \kappa I_L^T$$

$$\frac{dR_L^T}{dt} = \kappa \tau R_L^J - \kappa R_L^T + \delta I_L^T$$

$$\frac{dS_E^T}{dt} = -\beta_{EL}^T S_E^T \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) - \beta_{EE}^T S_E^T \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$- \beta_{EH}^T S_E^T \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) + \kappa \tau S_E^J - \kappa S_E^T$$

$$\frac{dE_E^T}{dt} = \beta_{EL}^T S_E^T \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) + \beta_{EE}^T S_E^T \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$+ \beta_{EH}^T S_E^T \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) - \gamma E_E^T + \kappa \tau E_E^J - \kappa E_E^T$$

$$\frac{dI_E^T}{dt} = \gamma E_E^T - \delta I_E^T + \kappa \tau I_E^J - \kappa I_E^T$$

$$\frac{dR_L^T}{dt} = \kappa \tau R_E^J - \kappa R_E^T + \delta I_E^T$$

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint **(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .

$$\frac{dS_H^T}{dt} = -\beta_{HL}^T S_H^T \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) - \beta_{HE}^T S_H^T \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$- \beta_{HH}^T S_H^T \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) + \kappa \tau S_H^J - \kappa S_H^T$$

$$\frac{dE_H^T}{dt} = \beta_{HL}^T S_H^T \left( I_L^P + I_L^T + \sigma \left( E_L^P + E_L^T \right) \right) + \beta_{HE}^T S_H^T \left( I_E^P + I_E^T + \sigma \left( E_E^P + E_E^T \right) \right)$$
$$+ \beta_{HH}^T S_H^T \left( I_H^P + I_H^T + \sigma \left( E_H^P + E_H^T \right) \right) - \gamma E_H^T + \kappa \tau E_H^J - \kappa E_H^T$$

$$\frac{dI_H^T}{dt} = \gamma E_H^T - \delta I_H^T + \kappa \tau I_H^J - \kappa I_H^T$$

$$\frac{dR_L^T}{dt} = \kappa \tau R_H^J - \kappa R_H^T \ + \ \delta I_H^T$$

**Within the Jail System:**

$$\frac{dS_L^J}{dt} = -\beta_{LL}^J S_L^J \left( I_L^J + \sigma E_L^J \right) - \beta_{LE}^J S_L^J \left( I_E^J + \sigma E_E^J \right) - \beta_{LH}^J S_L^J \left( I_H^J + \sigma E_H^J \right)$$
$$- \beta_{LO}^J S_L^J \left( I_O^J + \sigma E_O^J \right) + \ \psi_J S_L^P - \ \kappa \tau S_L^J - \ \rho S_L^J + \kappa S_L^T$$

$$\frac{dE_L^J}{dt} = \beta_{LL}^J S_L^J \left( I_L^J + \sigma E_L^J \right) + \beta_{LE}^J S_L^J \left( I_E^J + \sigma E_E^J \right) + \beta_{LH}^J S_L^J \left( I_H^J + \sigma E_H^J \right)$$
$$+ \beta_{LO}^J S_L^J \left( I_O^J + \sigma E_O^J \right) - \gamma E_L^J + \ \psi_J E_L^P - \ \kappa \tau E_L^J - \rho E_L^J + \kappa E_L^T$$

$$\frac{dI_L^J}{dt} = \gamma E_L^J - \delta I_L^J - \omega \zeta I_L^J - (1 - \nu_U)(1 - \zeta) \delta_{Death_U} I_L^J - \nu_U (1 - \zeta) \delta_{Discharge} I_L^J +$$
$$\psi_J I_L^P - \ \kappa \tau I_L^J - \ \rho I_L^J + \kappa I_L^T$$

$$\frac{dM_L^J}{dt} = \omega \zeta I_L^J - \delta_{Discharge} \nu M_L^J - \delta_{Death}(1 - \nu) M_L^J$$

$$\frac{dR_L^J}{dt} = \delta I_L^J + \delta_{Discharge} \nu M_L^J + \delta_{Death}(1 - \nu) M_L^J + \delta_{Death_U}(1 - \nu)(1 - \zeta) I_L^J$$
$$+ \delta_{Discharge} \nu_U (1 - \zeta) I_L^J + \ \psi_J R_L^P - \ \kappa \tau R_L^J - \rho R_L^J + \kappa R_L^T$$

$$\frac{dS_E^J}{dt} = -\beta_{EL}^J S_E^J \left( I_L^J + \sigma E_L^J \right) - \beta_{EE}^J S_E^J \left( I_E^J + \sigma E_E^J \right) - \beta_{EH}^J S_E^J \left( I_H^J + \sigma E_H^J \right)$$
$$- \beta_{EO}^J S_E^J \left( I_O^J + \sigma E_O^J \right) + \ \psi_J S_E^P - \ \kappa \tau S_E^J - \ \rho S_E^J + \kappa S_E^T$$

$$\frac{dE_E^J}{dt} = \beta_{EL}^J S_E^J \left( I_L^J + \sigma E_L^J \right) + \beta_{EE}^J S_E^J \left( I_E^J + \sigma E_E^J \right) + \beta_{EH}^J S_E^J \left( I_H^J + \sigma E_H^J \right)$$
$$+ \beta_{EO}^J S_E^J \left( I_O^J + \sigma E_O^J \right) - \gamma E_E^J + \ \psi_J E_E^P - \ \kappa \tau E_E^J - \rho E_E^J + \kappa E_E^T$$

$$\frac{dI_E^J}{dt} = \gamma E_E^J - \delta I_E^J - \omega_H \zeta I_E^J - (1 - \nu_{UH})(1 - \zeta) \delta_{Death_U} I_E^J - \nu_{UH} (1 - \zeta) \delta_{Discharge} I_E^J +$$
$$\psi_J I_E^P - \ \kappa \tau I_E^J - \ \rho I_E^J + \kappa I_E^T$$

$$\frac{dM_E^J}{dt} = \omega_H \zeta I_E^J - \delta_{Discharge} \nu_H M_E^J - \delta_{Death}(1 - \nu_H) M_E^J$$

$$\frac{dR_E^J}{dt} = \delta I_E^J + \delta_{Discharge} \nu_H M_E^J + \delta_{Death}(1 - \nu_H) M_E^J + \delta_{Death_U}(1 - \nu_{UH})(1 - \zeta) I_E^J$$
$$+ \delta_{Discharge} \nu_{UH} (1 - \zeta) I_E^J + \psi_J R_E^P - \ \kappa \tau R_E^J - \ \rho R_E^J + \kappa R_E^T$$

$$\frac{dS_H^J}{dt} = -\beta_{HL}^J S_H^J \left( I_L^J + \sigma E_L^J \right) - \beta_{HE}^J S_H^J \left( I_E^J + \sigma E_E^J \right) - \beta_{HH}^J S_H^J \left( I_H^J + \sigma E_H^J \right)$$
$$- \beta_{HO}^J S_H^J \left( I_O^J + \sigma E_O^J \right) + \ \psi_J S_H^P - \ \kappa \tau S_H^J - \rho S_H^J + \kappa S_H^T$$

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

$$\frac{dE_H^J}{dt} = \beta_{HL}^J S_H^J \left(I_L^J + \sigma E_L^J\right) + \beta_{HE}^J S_H^J \left(I_E^J + \sigma E_E^J\right) + \beta_{HH}^J S_H^J \left(I_H^J + \sigma E_H^J\right)$$
$$+ \beta_{HO}^J S_H^J \left(I_O^J + \sigma E_O^J\right) - \gamma E_H^J + \psi_J E_H^P - \kappa \tau E_H^J - \gamma E_H^J + \kappa E_H^T$$

$$\frac{dI_H^J}{dt} = \gamma E_H^J - \delta I_H^J - \omega_H \zeta I_H^J - (1 - \nu_{UH})(1 - \zeta)\,\delta_{Death_U} I_H^J - \nu_{UH}(1 - \zeta)\,\delta_{Discharge} I_H^J +$$
$$\psi_J I_H^P - \kappa \tau I_H^J - \rho I_H^J + \kappa I_H^T$$

$$\frac{dM_H^J}{dt} = \omega_H \zeta I_H^J - \delta_{Discharge} \nu_H M_H^J - \delta_{Death}(1 - \nu_H) M_H^J$$

$$\frac{dR_H^J}{dt} = \delta I_H^J + \delta_{Discharge} \nu_H M_H^J + \delta_{Death}(1 - \nu_H) M_H^J + \delta_{Death_U}(1 - \nu_H)(1 - \zeta)\,I_H^J$$
$$+ \nu_H (1 - \zeta)\,\delta_{Discharge} I_H^J + \psi_J R_H^P - \kappa \tau R_H^J - \rho R_H^J + \kappa R_H^T$$

$$\frac{dS_O^J}{dt} = -\beta_{OL}^J S_O^J \left(I_L^J + I_E^J + I_H^J + \sigma \left(E_L^J + E_E^J + E_H^J\right)\right) - \beta_{OO}^J S_O^J \left(I_O^J + \sigma E_O^J\right) + \mu_J S_O^C$$
$$- \mu_C S_O^J$$

$$\frac{dE_O^J}{dt} = \beta_{OL}^J S_O^J \left(I_L^J + I_E^J + I_H^J + \sigma \left(E_L^J + E_E^J + E_H^J\right)\right) + \beta_{OO}^J S_O^J \left(I_O^J + \sigma E_O^J\right)$$
$$+ \mu_J E_O^C - \mu_C E_O^J - \gamma E_O^J$$

$$\frac{dI_O^J}{dt} = \mu_J I_O^C - \mu_C I_O^J + \gamma E_O^J - \delta I_O^J - \omega I_O^J$$

$$\frac{dR_O^J}{dt} = \mu_J R_O^C - \mu_C R_O^J + \delta I_O^J$$

**SI Appendix 2.** The exponential survival model fit to Hu et al., 2020 estimated a mean asymptomatic shedding period of 11.79 days (95% CI: 7.86, 18.61), which is indeed a higher estimate than that found in the original manuscript, which did not account for censoring. As 5.1 of those days are already accounted for in the original estimate for $\gamma^{-1}$, this yielded an estimate for $\hat{\gamma}^{-1}$ of 6.7 days. Compared to a Kaplan-Meier fit of the available data, the exponential model fit well, and adequately models underlying survival function (Fig 8).

medRxiv preprint doi: https://doi.org/10.1101/2020.04.08.20058842.this version posted April 14, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .



**Fig 8.** Proportion of patients with viral shedding among a cohort of asymptomatic COVID-19 patients in China. Original data from Hu et al., 2020. Dashed black line depicts a non-parameteric Kaplan-Meier fit, while the solid blue line depicts the fit of an exponential survival function.