1   Charles J. Cooper (appearing *Pro Hac Vice*)
    COOPER & KIRK, PLLC
2   1523 New Hampshire Ave., N.W.
    Washington, DC 20036
3   Telephone: (202) 220-9600
    Email: ccooper@cooperkirk.com
4
    Michael W. Shonafelt, CBN 186853
5   NEWMEYER & DILLION LLP
    895 Dove Street, Fifth Floor
6   Newport Beach, California  92660
    Telephone:   (949) 854-7000
7   Email: Michael.Shonafelt@ndlf.com

8   *Attorneys for Real Party in Interest,*
    *The GEO Group, Inc.*
9

10                  UNITED STATES DISTRICT COURT

11                 EASTERN DISTRICT OF CALIFORNIA



| 12  IMMIGRANT LEGAL RESOURCE CENTER FREEDOM FOR IMMIGRANTS, et al., | CASE NO: 1:20-CV-00966-TLN-AC |
|---|---|
| 13 | RELATED TO CASE NO.: 2:20-cv-00533-TLN-AC |
| 14              Petitioners, | JUDGE: Hon. Troy L. Nunley |
| 15  vs. | [Originally filed in California Superior Court, County of Kern as Case No. BCV-20-101507] |
| 16  CITY OF MCFARLAND, et al., | |
| 17              Respondents, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONSE TO ORDER TO SHOW CAUSE** |
| 18  THE GEO GROUP, INC., | |
| 19              Real party in interest. | *[Declarations of David Venturella, Joseph Smith and C. Kendie Schlecht, Request for Judicial Notice and Appendix of Exhibits filed concurrently herewith]* |
| 20 | |
| 21 | FILE DATE: July 10, 2020 |
| 22 | TRIAL DATE: Not Set |

23

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

                                    PTS & AUTH SUPP. RESPONSE TO OSC

1

**TABLE OF CONTENTS**

2

**Page**



STATEMENT .............................................................................................................. 3

    I.      GEO's Immigration Detention Facilities In California .......................... 3

    II.     Senate Bill 29 And California's Efforts To Obstruct Federal Immigration
          Detention ................................................................................................ 3

    III.    GEO's Efforts To Obtain Amended Conditional Use Permits ............... 5

ARGUMENT ............................................................................................................. 6

    I.      Plaintiffs Are Not Likely To Succeed on the Merits. ........................... 7

          A.    The City of McFarland Fully Complied With Section 1670.9(d). ............. 7

          B.    Section 1670.9(d) Violates the Intergovernmental-Immunity
               Doctrine. ...................................................................................... 12

               1.    Section 1670.9(d) discriminates against the Federal
                    Government. ...................................................................... 12

               2.    Section 1670.9(d) directly regulates the Federal
                    Government. ...................................................................... 16

    II.     The Remaining Equitable Factors Favor Denial of a Preliminary
          Injunction. .......................................................................................... 19

CONCLUSION ......................................................................................................... 21

1

**TABLE OF AUTHORITIES**

2

<u>**Federal Cases**</u>                                                                     **Page**

3

4

*Arizona v. California,*
   283 U.S. 423 (1931) ......................................................................................... 16

5

*Az. Dream Act Coal. v. Brewer,*
   757 F.3d 1053 (9th Cir. 2014) ........................................................................ 21

6

7

*Black Hills Power & Light Co. v. Weinberger,*
   808 F.2d 665 (8th Cir. 1987) .......................................................................... 16

8

*Blackburn v. United States,*
   100 F.3d 1426 (9th Cir. 1996) ........................................................................ 16

9

10

*Boardman v. Pac. Seafood Grp.,*
   822 F.3d 1011 (9th Cir. 2016) ........................................................................ 19

11

*Boeing Co. v. Movassaghi,*
   768 F.3d 832 (9th Cir. 2014) .................................................................... 13, 14

12

13

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
   596 F.3d 1098 (9th Cir. 2010) ........................................................................ 21

14

*United States v. California,*
   2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) ........................................ 14, 15, 18

15

16

*Clark v. Suarez Martinez,*
   543 U.S. 371 (2005) .......................................................................................... 3

17

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
   473 U.S. 788 (1985) ........................................................................................ 11

18

19

*Davis v. Mich. Dep't of Treasury,*
   489 U.S. 803 (1989) ........................................................................................ 13

20

*Dawson v. Steager,*
   139 S. Ct. 698 (2019) ............................................................................ 7, 12, 13

21

22

*Disney Enterprises, Inc. v. VidAngel, Inc.,*
   869 F.3d 848 (9th Cir. 2017) ............................................................................ 6

23

*Gartrell Const. Inc. v. Aubry,*
   940 F.2d 437 (9th Cir. 1991) .......................................................................... 18

24

25

*Goodyear Atomic Corp. v. Miller,*
   486 U.S. 174 (1988) ........................................................................................ 16

26

*Hancock v. Train,*
   426 U.S. 167 (1976) .............................................................................. 16, 17, 18

27

28

*Johnson v. Maryland,*
   254 U.S. 51 (1920) ................................................................................ 16, 17, 18



*Leslie Miller, Inc. v. Arkansas*,
    352 U.S. 187 (1956) ............................................................................................. 17

*Lydo Enterprises, Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) .............................................................................. 19

*Madison Sch. Dist. v. Wis. Empt. Relations Comm'n*,
    429 U.S. 167 (1976) ............................................................................................. 11

*Mayo v. United States*,
    319 U.S. 441 (1943) ............................................................................................. 16

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) ......................................................................... 7, 12

*Norse v. City of Santa Cruz*,
    629 F.3d 966 (9th Cir. 2010) ................................................................................ 12

*North Dakota v. United States*,
    495 U.S. 423 (1990) .................................................................................. 12, 13, 16

*Osborn v. Bank of the United States*,
    22 U.S. (9 Wheat.) 738 (1824) ............................................................................ 16

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*,
    361 U.S. 376 (1960) ........................................................................................ 13, 14

*Pub. Util. Comm'n of Cal. v. United States*,
    355 U.S. 534 (1958) ............................................................................................. 18

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .............................................................................. 21

*South Carolina v. Baker*,
    485 U.S. 505 (1988) ............................................................................................. 12

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .............................................................................. 20

*Union Bridge Co. v. United States*,
    204 U.S. 364 (1907) ............................................................................................... 8

*United States v. Arizona*,
    641 F.3d 339 (9th Cir. 2011) ................................................................................ 21

*United States v. California*,
    314 F. Supp. 3d 1077 (E.D. Cal. 2018) ............................................................... 15

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ......................................................................... passim

*United States v. City of Arcata*,
    629 F.3d 986 (9th Cir. 2010) ................................................................................ 14

*United States v. City of St. Paul*,

NEWMEYER
DILLION

- iii -

258 F.3d 750 (8th Cir. 2001) ..................................................................................... 18

*United States v. Ga. Pub. Serv. Comm'n,*
   371 U.S. 285 (1963) ............................................................................................... 17

*United States v. Town of Windsor,*
   765 F.2d 16 (2d Cir. 1985) ..................................................................................... 18

*United States v. Virginia,*
   139 F.3d 984 (4th Cir. 1998) ................................................................................. 18

*Valle del Sol Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013) ............................................................................... 21

*White v. City of Norwalk,*
   900 F.2d 1421 (9th Cir. 1990) ............................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..................................................................................................... 6

**State Cases**

*A Local & Reg'l Monitor v. City of Los Angeles,*
   16 Cal. Rptr. 2d 358 (Ct. App. 1993) ..................................................................... 8

*Killian v. City & Cty. of San Francisco,*
   143 Cal. Rptr. 430 (Ct. App. 1978) ......................................................................... 8

*Lopez v. Sony Elecs., Inc.,*
   420 P.3d 767 (Cal. 2018) ................................................................................. 10, 11

*Nielsen Constr. Co. v. Int'l Iron Prod.,*
   22 Cal. Rptr. 2d 497 (Ct. App. 1993) ................................................................... 10

*Roccaforte v. City of San Diego,*
   152 Cal. Rptr. 558 (Ct. App. 1979) ......................................................................... 8

*Russian Hill Imp. Ass'n v. Bd. of Permit Appeals of City & Cty. of San Francisco,*
   423 P.2d 824 (Cal. 1967) ...................................................................................... 10

*San Francisco Planning & Urban Renewal Ass'n v. Central Permit Bureau,*
   106 Cal. Rptr. 670 (Ct. App. 1973) ....................................................................... 10

*United Ass'n of Journeymen v. City & Cty. of San Francisco,*
   38 Cal. Rptr. 2d 280 (Ct. App. 1995) ..................................................................... 8

*Volkswagen Pac., Inc. v. City of Los Angeles,*
   496 P.2d 1237 (Cal. 1972) .................................................................................... 10

*Wheeler v. Gregg,*
   203 P.2d 37 (Cal. Ct. App. 1949) .................................................................... 8, 10

**Federal Statutes**

6 U.S.C. § 557 .......................................................................................................... 3

PTS & AUTH SUPP. RESPONSE TO OSC

8 U.S.C. § 1231(g)(1).................................................................................................3

8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c).......................................3

28 U.S.C. § 1442.......................................................................................................6

**State Statutes**

Cal. Civ. Code § 1670.9(a).........................................................................................4

Cal. Civ. Code § 1670.9(d)..............................................................................passim

Cal. Gov. Code §§ 54950-54963...............................................................................11

Cal. Gov. Code § 12532.......................................................................................13, 14

Cal. Civ. Code § 1670.9(d)(1)......................................................................................7

Cal. Civ. Code §1670.9(d)(2).................................................................................7, 8

Cal. Civ. Code §1670.9(d).........................................................................................13

Cal. Civ. Code §12532(a)–(b).................................................................................13, 14

PTS & AUTH SUPP. RESPONSE TO OSC

Late on Sunday, July 12, 2020 Plaintiffs sought the extraordinary remedy of a Temporary Restraining Order ("TRO") barring the Federal Government from receiving and housing immigration detainees at two facilities in the City of McFarland ("City") based on alleged violations of a California statute, Senate Bill 29 ("SB-29") (codified at CAL. CIV. CODE § 1670.9(d)), that purports to regulate the issuance of land-use permits to federal immigration detention facilities operated by private contractors on behalf of the Federal Government. As Plaintiffs were fully aware, the challenged resolutions were adopted April 23, 2020, with effective dates of July 15, 2020, yet Plaintiffs waited more than two months before filing suit and submitted their TRO request two business days before the resolutions were to take effect. And they demanded that the Court rule by the close of business on July 14, 2020, providing the Defendants virtually no time to respond.

The Court "frown[ed] upon . . . the timing of [Plaintiffs'] Motion and the impact it had on Respondents' ability to file a thoughtful opposition," Dkt. 8 at 3 n.1, but granted the request and ordered the Defendants to show cause why a preliminary injunction should not issue.

Plaintiffs are not entitled to a preliminary injunction. First, they cannot succeed on the merits of their legal claims. The City fully complied with SB-29. Second, in any event, that statute is unconstitutional under the intergovernmental-immunity doctrine. The supremacy of federal law depends on the principle that the States may not directly interfere with the operations of the Federal Government nor discriminate against it. Section 1670.9(d) disregards these essential tenets of the American constitutional order, as did Plaintiffs' TRO request. The GEO Group, Inc. ("GEO"), as the owner and operator of the federal immigration detention facilities burdened by Section 1670.9(d) and subject to the Court's TRO, respectfully urges the Court to vindicate the supremacy of federal law, declare Section 1670.9(d) unconstitutional, and deny Plaintiffs a preliminary injunction against execution of the permits at issue.

Nor have Plaintiffs demonstrated irreparable harm. They point generally to the risks associated with COVID-19, but those risks have absolutely nothing whatever to do with the alleged procedural violations of SB-29. Moreover, Plaintiffs have submitted no evidence supporting the proposition that the Federal Government intends to populate the Central Valley and Golden State facilities with detainees transferred from other facilities (as opposed to newly detained individuals).

- 2 -

**STATEMENT**

**I.   GEO's Immigration Detention Facilities In California**

In November 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service to the newly created Bureau of Immigration and Customs Enforcement, within the Department of Homeland Security.[1] The Bureau began operations in March 2003 and was renamed U.S. Immigration and Customs Enforcement (ICE) in March 2007.[2]

Congress has authorized or required the detention of aliens under several different statutes. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c). Congress has also directed that "[t]he [Secretary of Department of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1),[3] and it has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility," *id.* § 1231(g)(2). Thus, Section 1231(g) authorizes ICE to use private contractors to arrange for detention. *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

GEO is a publicly traded corporation that entered into contracts with ICE to convert the Golden State Modified Correctional Facility (Golden State) and the Central Valley Modified Community Correctional Facility (Central Valley) into immigration detention facilities. GEO has previously operated Golden State and Central Valley as State correctional facilities under contract with the California Department of Corrections and Rehabilitation (CDCR). Martin Decl. ¶ 5.[4]

**II.   Senate Bill 29 And California's Efforts To Obstruct Federal Immigration Detention**

Shortly after the 2016 election, the California Legislature began enacting a series of

---

[1] U.S. IMMIGRATION & CUSTOMS ENF'T, CELEBRATING THE HISTORY OF ICE (Mar. 1, 2019), https://bit.ly/35Jas68, Ex. F at 67.

[2] *Id.*, Ex. F at 75.

[3] Following the enactment of the Homeland Security Act of 2002, many references to the Attorney General in the Immigration and Naturalization Act are now read to mean the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

[4] The Declaration of Amber Martin (Martin Decl.) was originally filed in support of GEO's pending motion for a preliminary injunction in *GEO Group, Inc. v. Newsom, et al.*, No. Case No. 2:20-cv-00533-TLN-AC, Dkt. 16-2.  *See* Ex. G and GEO's Request for Judicial Notice.

PTS & AUTH SUPP. RESPONSE TO OSC

1    measures designed to interfere with the new Trump Administration's immigration policy.

2         On December 5, 2016, Senate Bill 29 (SB-29) was introduced in the California Legislature.

3    As enacted, the bill prohibits city, county, and local law enforcement agencies from entering into

4    contracts "with the federal government or any federal agency or a private corporation to house or

5    detain noncitizens for purposes of civil immigration custody" unless those contracts were in effect

6    before January 1, 2018. CAL. CIV. CODE § 1670.9(a). The statute also prohibits the renewal or

7    modification of such contracts thereafter "in a manner that would expand the maximum number of

8    contract beds that may be utilized to house or detain in a locked detention facility noncitizens for

9    purposes of civil immigration custody." *Id.* § 1670.9(b).

10        SB-29, however, also prohibits cities, counties, and public agencies from "approv[ing] or

11   sign[ing] a deed, instrument, or other document related to a conveyance of land or issue a permit for

12   the building or reuse of existing buildings by any private corporation, contractor, or vendor to house

13   or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and

14   county, or public agency" first satisfies two conditions: "(1) Provide[] notice to the public of the

15   proposed conveyance or permitting action at least 180 days before execution of the conveyance or

16   permit"; and "(2) Solicit[] and hear[] public comments on the proposed conveyance or permit

17   action in at least two separate meetings open to the public." *Id.* § 1670.9(d).

18        The Senate Floor Analysis of SB-29 expressed the bill's purpose to obstruct federal

19   immigration policy: "President Donald Trump has . . . made it clear that he intends to detain more

20   immigrants and expand private for profit detention facility use. This bill would protect immigrants

21   held in immigrant detention in California."[5] The Assembly Committee on Judiciary analysis of the

22   bill likewise stated that it was needed "[i]n light of the changed circumstances in the White House,"[6]

23   and it quotes SB-29's author as saying that the bill was necessary due to "the new administration's

24   commitment to deport millions."[7] Governor Jerry Brown signed SB-29 into law on October 5, 2017.

---

25   
26        [5] Senate Rules Comm., Senate Floor Analyses for SB-29, 2017–18 Sess., at 5 (Cal. May 27, 2017), https://bit.ly/2O9c3eP, Ex. H at 88.

27        [6] Assemb. Comm. on Judiciary, Analysis of SB-29, 2017–18 Sess., at 2 (Cal. June 27, 2017), https://bit.ly/2O9c3eP, Ex. I at 93.

28        [7] *Id.*, Ex. I at 95.

PTS & AUTH SUPP. RESPONSE TO OSC

III.    **GEO's Efforts To Obtain Amended Conditional Use Permits**

The Central Valley and Golden State facilities are located in the "M-3 zone" of the City, which is designated for General Manufacturing. *See* City of McFarland Municipal Code § 17.08.010. Detention facilities are not identified as a permissible use. *See id.* § 17.92.020. Thus, to operate a detention facility in M-3 in conformance with the McFarland Municipal Code, GEO must have a conditional use permit ("CUP"). *See id.* § 17.152.020(D). Central Valley and Golden State were first approved for CUPs in 1996. Long Decl. ¶ 3.[8] The City modified the Central Valley and Golden State CUPs in 2008 and in 2013 based on changes to the types of California Department of Corrections and Rehabilitation ("CDCR") inmates that were housed at the facilities. *Id.*

GEO's existing CUPs for the Central Valley and Golden State facilities did not permit GEO to house federal male and female detainees. Long Decl. ¶ 5. Thus, to comply with municipal law, on December 30, 2019, GEO applied to the McFarland Planning Commission ("the Planning Commission") for modifications to its CUPs to allow the Federal Government to house detainees at Central Valley and Golden State. *Id.* ¶¶ 6–7.

On January 10, 2020, the Planning Commission issued the public notice of the first hearing on GEO's CUP-modification applications for Central Valley and Golden State. *Id.* ¶ 8. The first hearing on GEO's CUP-modification applications for Central Valley and Golden State was held on January 21, 2020. *Id.* ¶ 9. On February 7, 2020, the Planning Commission issued the public notice of the second hearing on GEO's CUP-modification applications. *Id.* ¶ 12. The second hearing on GEO's CUP-modification applications was held on February 18, 2020. *Id.* ¶ 13. On February 18, 2020, the Planning Commission failed to approve GEO's CUP-modification applications for Central Valley and Golden State by a 2-2 vote. *Id.* ¶ 16.

GEO appealed the decision of the Planning Commission to the McFarland City Council (City Council). On April 23, 2020, the City Council adopted resolutions that approved GEO's CUP-modification applications for Central Valley and Golden State by a 4-0 vote. Fialho Decl. Ex. C, D, Dkt. 1-12 at 34-40. In accordance with Section 1670.9(d), the City Council deferred the issuance

---

[8] The Declaration of Richard Long (Long Decl.) was originally filed in support of GEO's pending motion for a preliminary injunction in *GEO Group, Inc. v. Newsom, et al.*, Case No. 2:20-cv-00533-TLN-AC, Dkt. 16-3. *See* Ex. J and GEO's Request for Judicial Notice.

of the new permits until July 15, 2020, such that at least 180 days will have lapsed since the first public notice was given. *Id.* at 36, § 5; 40, § 5.

Despite the fact that Plaintiffs knew on April 23 that the CUP modifications would be issued on July 15, they waited until June 30, 2020, before bringing suit in the Superior Court of California for Kern County, naming the City as Respondent and GEO as real party in interest. Plaintiffs allowed another 10 days to lapse before seeking a TRO from the State court on July 10, 2020, shortly after GEO was served. That same day, GEO removed the case to this Court pursuant to 28 U.S.C. § 1442. Plaintiffs allowed two more days to pass by before filing their motion for a TRO on late in the evening on Sunday, July 12, along with a demand that the Court rule by close of business on Tuesday, July 14. Plaintiffs' unilaterally imposed schedule thus effectively gave GEO and the City only two business days to respond if they were to be heard before the Court ruled.

As GEO was preparing its response on Tuesday afternoon, the Court granted Plaintiffs' TRO request, enjoining the City from taking any action to issue, execute, or make effective the CUP modifications approved on April 23, 2020, and enjoining GEO from transferring any ICE detainees into or out of, and accepting any transfer of any detainee into or out of, and housing any detainee at Central Valley or Golden State in reliance on those CUP modifications. Dkt. 8 at 8. The Court ordered the City and GEO to respond in writing within seven days to explain why a preliminary injunction should not issue.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the plaintiff, and (4) an injunction is in the public interest. *Id.* Because likelihood of success on the merits "is the most important" *Winter* factor, "if a movant fails to meet this threshold inquiry, the court need not consider the other factors." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quotation omitted). As demonstrated below, Plaintiffs have not come close to clearing the high threshold for obtaining the "extraordinary" remedy of a preliminary injunction.

NEWMEYER
DILLION

**I.    Plaintiffs Are Not Likely To Succeed on the Merits.**

Plaintiffs claim they can establish likelihood of success on the merits on three grounds:  (1) the City allegedly failed to hold two public hearings, as required by Section 1670.9(d)(2); (2) the City allegedly failed to provide 180 days' notice "before execution of the conveyance or permit," in violation of Section 1670.9(d)(1); and (3) the City somehow allegedly failed to allow adequate public participation in the hearings on the CUP modifications.

Not one of Plaintiffs' contentions finds any support in fact or law. In fact, the City complied with the clear commands of Section 1670.9(d) and otherwise employed ample public participation measures. And, in any event, Section 1670.9(d) itself violates "a legal doctrine almost as old as the Nation" itself: the doctrine of intergovernmental immunity. *Dawson v. Steager*, 139 S. Ct. 698, 702 (2019). As the Supreme Court first recognized two hundred years ago in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), the supremacy of the Federal Government within its legitimate sphere of action necessarily precludes States from interfering with federal activity. *Id.* at 427-30. Section 1670.9(d) contravenes this basic principle in two independent ways: (1) it discriminates against the Federal Government, and (2) it directly regulates the Federal Government.

**A.    The City of McFarland Fully Complied With Section 1670.9(d).**

Plaintiffs begin with a misplaced contention that the City failed to hold at least two public meetings in violation of Section 1670.9(d)(2).  Section 1670.9(d) provides:

> (d)  A city, county, city and county, or public agency shall not, on and after January 1, 2018, approve or sign a deed, instrument, or other document related to a conveyance of land or issue a permit for the building or reuse of existing buildings by any private corporation, contractor, or vendor to house or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and county, or public agency has done both of the following:
>
> (1)  Provided notice to the public of the proposed conveyance or permitting action at least 180 days before execution of the conveyance or permit.
>
> (2)  Solicited and heard public comments on the proposed conveyance or permit action in at least two separate meetings open to the public.

Thus, Section 1670.9(d)(2) only requires that "[a] city" "solicit[] and hear[] public comments" on a CUP modification "in at least two separate meetings open to the public."

In fact, the City held no fewer than *three* public meetings on the CUP-modifications: two before the City's Planning Commission and one before the City Council.  See Long Decl. ¶¶ 9, 13,

1   18; Fialho Decl. ¶ 5. In its TRO order, the Court observed that a potential "reasonable

2   interpretation" of Section 1670(d) would require that "each municipal body considering a

3   permitting decision must independently satisfy" the statute's meeting requirement. Dkt. 8 at 6. Even

4   if that interpretation is correct, the City complied with Section 1670(d)(2) as so interpreted because

5   the City Council and the Planning Commission are not separate "municipal bod[ies]," but are

6   instead subordinate units of a single municipal body—the City of McFarland. Plaintiffs conceded

7   that three hearings took place, *see* Dkt. 3-1 at 2, but nonetheless contend that the CUP modifications

8   violate Section 1670.9(d)(2) because the City is distinct from the Planning Commission and cannot,

9   therefore, conduct its required hearings through the Planning Commission.

10      This theory ignores blackletter local government law. It is well settled that municipalities

11   can and often must delegate certain zoning powers to their planning commissions. *See, e.g.*,

12   *Wheeler v. Gregg*, 203 P.2d 37 (Cal. Ct. App. 1949). A municipality's decision-making

13   commissions are not, as Plaintiffs suggest, distinct from the municipality itself; they are subordinate

14   units of the municipality and act on its behalf.  As the appellate court observed in *Wheeler*, even by

15   the late-1940s it had "become increasingly imperative that many quasi legislative and quasi judicial

16   functions . . . [must be] intrusted to departments, boards, commissions, and agents." *Id.* at 46-47.

17   To suggest that governments cannot act through their subordinate bodies "would be to stop the

18   wheels of government and bring about confusion, if not paralysis, in the conduct of the public

19   business." *Union Bridge Co. v. United States*, 204 U.S. 364, 374 (1907) (quotation marks omitted).

20      For decades, California courts have recognized that commissions are an "arm" or an "agent"

21   of the cities that establish them. *See, e.g.*, *United Ass'n of Journeymen v. City & Cty. of San*

22   *Francisco*, 38 Cal. Rptr. 2d 280, 282 (Ct. App. 1995); *A Local & Reg'l Monitor v. City of Los*

23   *Angeles*, 16 Cal. Rptr. 2d 358, 366 (Ct. App. 1993); *Roccaforte v. City of San Diego*, 152 Cal. Rptr.

24   558, 562 (Ct. App. 1979); *Killian v. City & Cty. of San Francisco*, 143 Cal. Rptr. 430, 439 (Ct.

25   App. 1978). In contrast, Plaintiffs attribute to the California Legislature, acting in 2017, an

26   understanding of "city" that totally disregards the foundational—and commonsensical—principle

27   that a city may act through its subordinate departments, commissions, and boards. There is no world

28   in which the State Legislature adopted such an antiquated meaning of "city" in Section 1670.9(d).

- 8 -

If that alone were not enough, the City's own municipal code further confirms that the City itself shares GEO's straightforward understanding that a "city" includes its subordinate Commissions. The City of McFarland Municipal Code makes clear that the Planning Commission's permitting decisions are "final," unless timely appealed. City of McFarland Municipal Code ("Code") § 17.148.100.B.1.b; *see also id.* § 17.148.130; § 17.160.030. If hearings before the Planning Commission do not qualify as public hearings conducted by the City itself (as Plaintiffs' interpretation suggests) its decisions could not be the "final" decisions of the City. And yet, Plaintiffs seem to concede that if the Planning Commission *approved* GEO's CUP application after two public meetings, that would have satisfied Section 1670.9(d). *See* Dkt. 3-1 at 9. Plaintiffs' theory therefore treats the Planning Commission as independent from the City when the Commission's decision does not finally resolve a permitting application even as it recognizes the Commission as the City's agent when its decision marks the conclusion of proceedings. But there is no sound basis for this slice-and-dice approach to municipal government law, let alone enough evidence to show that the State Legislature had this approach in mind when enacting SB-29.

Properly understood, the Planning Commission here acted on behalf of the City in considering GEO's CUP modifications. The City Council then functioned as an appellate body to the Planning Commission, exercising its own delegated authority to act on behalf of the City. *See* Code § 17.160.030.D. Therefore, the City, acting by and through authority delegated to the Planning Commission *and* the City Council conducted a total of three public hearings. Under the procedures set forth in the City of McFarland's municipal code, both the Planning Commission and the City Council have distinct functions that together produce the City's final decision on permitting questions. *See* Code § 17.160.030. Here, the City, through its two subordinate units, conducted three public hearings. Plaintiffs' arguments to the contrary should not be credited.

The City also complied with Section 1670.9(d)'s 180-day notice requirement. The City issued notice of the CUP modifications on January 10, 2020. Long Decl. ¶ 8. The City then interpreted its own zoning powers to allow for the delayed *execution* of those CUP modification approvals until July 15, 2020. The City Council Resolutions each stated that "this approval of modification to Conditional Use Permit 01-96 shall not be considered issued, executed or effective

- 9 -

until July 15, 2020 . . . .” Dkt. 1-12 at 36, § 5; *id.* at 40 § 5 (Permit 02-96). It has long been settled that “a municipality may simply set the effective date of [its] ordinance,” and courts routinely defer to the effective date adopted by the municipality. *Russian Hill Imp. Ass’n v. Bd. of Permit Appeals of City & Cty. of San Francisco*, 423 P.2d 824, 832 (Cal. 1967); *see also, e.g.*, *San Francisco Planning & Urban Renewal Ass’n v. Central Permit Bureau*, 106 Cal. Rptr. 670, 677 (Ct. App. 1973). Accordingly, the City acted well within its authority in setting the date of issuance, execution, and effectiveness as July 15, 2020, and complied with the letter of Section 1670.9(d), which requires only that the City provide “notice to the public of the proposed conveyance or permitting action at least 180 days before *execution* of the conveyance or permit” (emphasis added).

Plaintiffs nonetheless contend that Section 1670.9(d) prohibited the City from *publicly approving* the CUP modifications fewer than 180 days after providing notice. That interpretation reads words into the statute that the California Legislature did not write. On its face, Section 1670.9(d) requires only 180 days’ notice before the *execution* of permits, not before their approval in a public meeting. That difference matters because “executing” a permit means “bring[ing it] into its final, legally enforceable form,” *Black’s Law Dictionary* (11th ed. 2019), and the City Council’s April 23, 2020, approval decision expressly specified that the CUP modification would not be legally enforceable until July 15, 2020. *See also Nielsen Constr. Co. v. Int’l Iron Prod.*, 22 Cal. Rptr. 2d 497, 498 (Ct. App. 1993). If the California Legislature intended to require public hearings to conclude no earlier than the 180th day after first providing notice, it could—and would—have said so. *See, e.g.*, *Volkswagen Pac., Inc. v. City of Los Angeles*, 496 P.2d 1237, 1247 (Cal. 1972). But it did not. The City followed the controlling, plain meaning of the statute, as written. *See Lopez v. Sony Elecs., Inc.*, 420 P.3d 767, 771 (Cal. 2018). Plaintiffs’ contrary interpretation deviates from the plain text of Section 1670.9(d) and cannot justify nullifying the CUP modifications.

Finally, Plaintiffs assert that the April 23, 2020, City Council meeting, which was held virtually because of the COVID-19 pandemic, imposed “egregious barriers” to public participation because it capped video conference participation to 100 members of the public and imposed the common requirement of speaker cards. *See* Dkt. 3-1 at 13. Plaintiffs’ exaggerated condemnations ignore reality. The City Council agenda for the April 23 meeting made clear that, in addition to

- 10 -

video conferencing, the public could also participate by teleconference without any participation cap. *See* Ex. K to the Appendix of Exhibits; GEO's Request for Judicial Notice. Mayor Gonzalez further observed that the City Council chamber itself did not even have the physical means to accommodate 100 participants under ordinary circumstances, so the teleconferencing and video protection measures afforded *more* public participation than under typical conditions. *Id.* Moreover, the minutes of the hearing reveal that only *seven* people spoke during the public comment period and only *nineteen* spoke on the agenda item for the CUP modifications. *See* Ex. L to the Appendix of Exhibits; GEO's Request for Judicial Notice. The record therefore yields no evidence whatsoever that the videoconference cap impeded public participation or otherwise prejudiced Plaintiffs.

The reasonableness of the City Council's approach is confirmed by the fact that it is consistent with the public-health measures endorsed by the State itself. In the wake of the pandemic, Governor Newsom signed Emergency Order N-29-20 (March 17, 2020), Ex. M; GEO's Request for Judicial Notice, which excused many of the ordinary protections secured by the State's statutory vehicle for ensuring public participation in municipal meetings, the Brown Act, CAL. GOV. CODE, §§ 54950-54963. Pertinent here, Governor Newsom waived certain requirements for teleconference meetings; eliminated physical meeting locations if there is a teleconference meeting; and simplified notice and accessibility requirements. *See id.* Importantly, Governor Newsom required local governments only to provide for participation "telephonically or otherwise electronically," with no requirement to provide *unlimited* videoconferencing. *Id.*

Even in ordinary times, local governments do not unlawfully impede public participation when they impose speech-channeling procedures such as speaker cards, restrictions on what can be addressed, and how much time a speaker may have to make comments. That is because a city's public meetings "are the focus of highly important individual *and* governmental interests." *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) (emphasis added). To give municipalities breathing room to balance both goals, courts recognize that local governments does not unlawfully encumber public participation when, for example, they restrict public speakers to the subject at hand. *See Madison Sch. Dist. v. Wis. Empt. Relations Comm'n*, 429 U.S. 167, 175 (1976); *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985). A local government may also

PTS & AUTH SUPP. RESPONSE TO OSC

1    impose reasonable time and topic limits on speakers to facilitate efficient and smooth running of a

2    public meeting. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 975 (9th Cir. 2010) ("A council can

3    regulate not only the time, place, and manner of speech in a limited public forum, but also the

4    content of speech—as long as content-based regulations are viewpoint neutral and enforced that

5    way."). Here, the City employed manifestly reasonable measures to ensure both efficient

6    transacting of the City's business *and* adequate public participation, especially during the highly

7    anomalous backdrop of the COVID-19 pandemic. It follows that Plaintiffs have no basis for

8    alleging that the City violated the Brown Act during its April 23, 2020, meeting.

9              **B.      Section 1670.9(d) Violates the Intergovernmental-Immunity Doctrine.**

10                      **1.      Section 1670.9(d) discriminates against the Federal Government.**

11             The constitutional prohibition of state regulatory discrimination against the Federal

12   Government prevents states from "defeat[ing] the legitimate operations of a supreme government."

13   *McCulloch*, 17 U.S. (4 Wheat.) at 427. If a state had the authority to tax or regulate the Federal

14   Government's operations without imposing the same tax or regulation on its own activities, it could

15   do so without fear of political repercussion from its constituents. *Id.* at 128; *South Carolina v.*

16   *Baker*, 485 U.S. 505, 525 n.15 (1988). Thus, "[t]he nondiscrimination rule finds its reason in the

17   principle that the States may not directly obstruct the activities of the Federal Government." *See*

18   *North Dakota v. United States*, 495 U.S. 423, 437-38 (1990) (plurality opinion).

19             Of course, it does not matter whether the discriminatory state law does, in fact, interfere

20   with federal operations; unlike the direct-regulation line of cases (discussed below), the

21   intergovernmental-immunity doctrine forbids *any* discrimination against the Federal Government,

22   no matter how *de minimis* its burden on federal activity. *See Dawson*, 139 S. Ct. at 704; *California*,

23   921 F.3d at 883. And because the Federal Government often uses private contractors to carry out

24   its activities, the nondiscrimination principle protects federal contractors just as it protects the

25   Federal Government itself:

26             Since a regulation imposed on one who deals with the Government has as much
27             potential to obstruct governmental functions as a regulation imposed on the
               Government itself, the Court has required that the regulation be one that is imposed
28             on some basis unrelated to the object's status as a Government contractor or

                                                        - 12 -

supplier, that is, that it be imposed equally on other similarly situated constituents of the State.

*North Dakota*, 495 U.S. at 438. Accordingly, a state must "treat those who deal with the [Federal] Government as well as it treats those with whom it deals itself." *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385 (1960); *see also Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814–15 (1989); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 842–43 (9th Cir. 2014).

In applying the nondiscrimination principle, the key question is whether the state law at issue "treat[s] similarly situated persons differently." *Dawson*, 139 S. Ct. at 705. "[T]he State's interest in adopting the discriminatory [law], no matter how substantial, is simply irrelevant." *Id.* at 704 (quotation marks omitted).

Under these principles, Section 1670.9(d) is facially discriminatory. A city, county, or public agency must comply with the statute's unique procedural requirements and is prohibited from "issu[ing] a permit for the building or reuse of existing buildings by any private corporation, contractor, or vendor" *only if* the new building or reused existing building is used "to house or detain noncitizens for purposes of civil immigration proceedings." Because only the Federal Government "house[s] or detain[s] noncitizens for purposes of civil immigration proceedings," Section 1670.9(d) targets contractors carrying out federal operations for disfavored treatment, imposing on them additional procedural requirements and burdens that do not apply to contractors who detain individuals for purposes of the State. *See* Long Decl. ¶¶ 26–27.

Indeed, the Ninth Circuit has already held as much in a closely related context. Assembly Bill 103, codified in relevant part at CAL. GOV'T CODE § 12532, was introduced in the California Legislature and signed into law around the same time as SB-29. Like Section 1670.9(d), Section 12532 "applies only to facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California." *California*, 921 F.3d at 882 (quotation marks omitted). The relevant language of the two statutes is strikingly similar:

- Section 1670.9(d): applies to "the building or reuse of existing buildings" "to house or detain noncitizens for purposes of civil immigration proceedings"

- Section 12532(a)–(b): applies to "facilities in which noncitizens are being housed

PTS & AUTH SUPP. RESPONSE TO OSC

or detained for purposes of civil immigration proceedings in California"

Based on the language of Section 12532, the Ninth Circuit has held that the statute "impose[d] a specialized burden on federal activity." *California*, 921 F.3d at 882; *see also id.* at 883 ("These additional requirements burden federal operations, and *only* federal operations."). The same, therefore, must be true of Section 1670.9(d) under binding Ninth Circuit case law.

In *California*, the State was nonetheless able to salvage parts of Section 12532(b) "[i]n the context of [an] appeal from the denial of a preliminary injunction" because the State offered a "limited construction" of the statute that made the burdens of those provisions "analogous" to burdens imposed on State facilities by other provisions. *California*, 921 F.3d at 884-85. So, even though the Ninth Circuit concluded that Section 12532(b), by its terms, "impose[d] a specialized burden on federal activity," *id.* at 882, that burden was equalized *elsewhere* in the California Code.

No such equalizing provisions exist here. Nowhere does the California Code impose burdens on contractors carrying out state operations like those imposed on contractors carrying out federal operations by Section 1670.9(d). GEO's experience confirms that to be true. When GEO was a CDCR contractor tasked with detaining *state* inmates, GEO applied for the issuance or modification of CUPs for Central Valley, Golden State, and Desert View eight times over the course of more than two decades, yet GEO was *never* required to comply with any procedures comparable to those imposed by Section 1670.9(d). *See* Long Decl. ¶ 27. Only after GEO switched from being a *state* contractor to being a *federal* contractor did GEO become subject to SB-29's specialized burdens on federal operations. *Id.* Under the Ninth Circuit's holding in *California*, that alone dooms the constitutionality of Section 1670.9(d). *See also United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (ordinances that "target[ed] the federal government alone" are unconstitutional); *see also Phillips Chem. Co.*, 361 U.S. at 387; *Boeing*, 768 F.3d at 842–43.

In this sense, Section 1670.9(d) is very similar to two California statutes this Court has recently held unconstitutional under the intergovernmental immunity doctrine. In *United States v. California*, the Court considered the constitutionality of Senate Bill 50 ("SB-50"), which established a policy of "discourag[ing] conveyances that transfer ownership of federal public lands in California from the federal government." 2018 WL 5780003, at *1 (E.D. Cal. Nov. 1, 2018). It

generally forbade the Lands Commission from issuing a certificate of compliance—a prerequisite for the recording of a deed or other document relating to a land conveyance with a county recorder—to the any person acquiring federal land in California unless the person first gave the Lands Commission a right of first refusal to acquire the land, though it required the Commission to issue certificates for transactions relating to specific categories of federal land. *Id.* at \*1-2. This Court held that SB-50 violated the doctrine of intergovernmental immunity by discriminating against the Federal Government, emphasizing that "[t]he statutory language of SB 50 makes clear that it applies only to purchasers and grantees of federal public lands: only those trying to record documents related to conveyances of federal public lands must present a certificate of compliance from the Lands Commission, and only they are subject to monetary penalties if they fail to do so." *Id.* at \*5.  This Court invalidated SB-50 *even as applied to those categories of land for which the Commission was obligated to issue a certificate*: "Requesting a Lands Commission certificate of compliance to which one is automatically entitled may be a relatively minor inconvenience.  It is, however . . . a burden born exclusively by those who deal with the federal government." *Id.*

In holding SB-50 unconstitutional, this Court relied on its own prior decision striking down part of Senate Bill 450 ("SB-450"), which imposed escalating fines on employers who allowed federal immigration authorities access to nonpublic areas of a place of labor. *See United States v. California*, 314 F. Supp. 3d 1077, 1094 (E.D. Cal. 2018), *aff'd in part, rev'd in part and remanded*, 921 F.3d 865. This Court observed that SB-450 "inflict[ed] a burden on those employers who acquiesce[d] in a federal investigation but not on those who d[id] not," and "[g]iven that immigration enforcement is the province of the Federal Government, it demand[ed] no stretch of reason to see that [the relevant provisions of SB-450], in effect, target[ed] the operations of *federal* immigration enforcement." *Id.* at 1096. Because these provisions of SB-450 discriminated against the Federal Government, they were unconstitutional. *Id.*

The same is true of Section 1670.9(d): it applies *solely* to persons carrying out federal operations. Accordingly, regardless of whether the burden imposed by the statute is great or minimal, it is unconstitutional. Notably, the State chose not to appeal this Court's decisions enjoining SB-50 or part of SB-450 as unconstitutional, perhaps recognizing that they were

PTS & AUTH SUPP. RESPONSE TO OSC

1    indefensible. Section 1670.9(d) is equally indefensible, and it too must fall.

2               **2.      Section 1670.9(d) directly regulates the Federal Government.**

3         The doctrine of intergovernmental immunity also forbids a state from directly regulating

4    the Federal Government. *See North Dakota*, 495 U.S. at 436. A state need not expressly name the

5    Federal Government in the law at issue to engage in impermissible direct regulation; the Supreme

6    Court has repeatedly held unconstitutional the application of generally applicable state laws to

7    federal activities under the intergovernmental-immunity doctrine. *See, e.g.*, *Mayo v. United States*,

8    319 U.S. 441, 447–48 (1943); *Arizona v. California*, 283 U.S. 423, 451 (1931); *Johnson v.*

9    *Maryland*, 254 U.S. 51, 56-57 (1920); *see also Blackburn v. United States*, 100 F.3d 1426, 1435

10   (9th Cir. 1996). Rather, what matters is whether the application of a state law to the Federal

11   Government would substantially interfere with federal operations. *See Hancock v. Train*, 426 U.S.

12   167, 180 (1976); *Mayo*, 319 U.S. at 447-48; *Arizona*, 283 U.S. at 451; *Johnson*, 254 U.S. at 56-57.

13        The same principle holds true when state laws are applied to federal activities carried out

14   by private contractors. In *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824), Chief

15   Justice Marshall wrote that "the right of the State to control [a federal contractor's] operations, if

16   those operations be necessary to its character, as a machine employed by the government, cannot

17   be maintained." *Id.* at 867. The rule announced in *Osborn* has been repeatedly reaffirmed by the

18   Supreme Court. For example, in *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988), the Court

19   held that "a federally owned facility performing a federal function is shielded from direct state

20   regulation, even though the federal function is carried out by a private contractor, unless Congress

21   clearly authorizes such regulation." *Id.* at 181.[9] Because states can just as readily interfere with

22   federal operations by regulating the federal activities of private contractors as by regulating the

23   activities of federal employees, the doctrine must extend to both. *See Hancock*, 426 U.S. at 174

24   n.23, 180; *see also Black Hills Power & Light Co. v. Weinberger*, 808 F.2d 665, 669 n.4 (8th Cir.

25

26            [9] The Court ultimately held that the state regulation could be applied to the nuclear facility
     because federal law authorized the state's workers' compensation scheme. *See Goodyear Atomic*
27   *Corp. v. Miller*, 486 U.S. 174, 182 (1988). But the important point is that the Supreme Court drew
     no distinction between federal activities carried out by federal employees and federal activities
28   carried out by federal contractors for purposes of intergovernmental immunity.

                                                                PTS & AUTH SUPP. RESPONSE TO OSC

NEWMEYER
DILLION

1987). As the Ninth Circuit said in *California*: "For purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself." 921 F.3d at 882 n.7.

The Supreme Court has repeatedly held that state permit requirements, in particular, may violate the Constitution. For example, in *Johnson v. Maryland*, a Post Office employee who was delivering U.S. mail was arrested for driving without a state-issued driver's license. 254 U.S. at 55. The Supreme Court held Maryland's generally applicable driver's license law unconstitutional as applied to federal employees carrying out their federal functions because the driver's license law "la[id] hold of [federal employees] in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient." *Id.* at 57.

The Court again applied the holding of *Johnson* to federal contractors in *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956). There, the Arkansas fined a federal contractor for "submitting a bid, executing a contract, and commencing work as a contractor" for "construction of facilities at an Air Force Base" without first obtaining a state contractor's license. *Id.* at 187-89. Relying on *Johnson*, the Court held that "[s]ubjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review over the federal determination of" a contractor's fitness to carry out federal operations. *Id.* at 190. Because Arkansas's licensing requirement gave the state the power to veto the Federal Government's choice of contractor, it substantially interfered with federal operations and was unconstitutional. *Id.*

The same was true in *Hancock v. Train*, where Kentucky forbade any person from operating an air contaminant source without first obtaining a permit from the commonwealth. 426 U.S. at 172-73. When Kentucky sought to enforce this permit requirement against a federal contractor operating a plant on behalf of the Atomic Energy Commission, the contractor refused to comply, *id.* at 174 & n.23, and Kentucky sued, *id.* at 176. The Supreme Court held that the permit requirement substantially interfered with federal operations: "It is clear from the record that prohibiting operation of the air contaminant sources for which the State seeks to require permits, is tantamount to prohibiting operation of the federal installations on which they are located." *Id.* at 180 (citation omitted). Thus, the permit requirement was unconstitutional as applied to the federal contractor. *Id.* at 198-99; *see also United States v. Ga. Pub. Serv. Comm'n*, 371 U.S. 285, 292-93

(1963); *Pub. Util. Comm'n of Cal. v. United States*, 355 U.S. 534, 544 (1958). The courts of appeals have likewise repeatedly held permit requirements invalid when applied to federal contractors. *See Gartrell Const. Inc. v. Aubry*, 940 F.2d 437, 439 (9th Cir. 1991); *see also United States v. City of St. Paul*, 258 F.3d 750, 754 (8th Cir. 2001); *United States v. Virginia*, 139 F.3d 984, 988–99 (4th Cir. 1998); *United States v. Town of Windsor*, 765 F.2d 16, 20 (2d Cir. 1985).

Here, as in *Hancock*, *Leslie Miller*, and *Johnson*, a permit is necessary for a private contractor to carry out a federal operation, and as in those cases, the State has threatened to withhold the issuance of the permit unless certain criteria are met. Unless GEO submits to the burdens and procedures imposed on it by Section 1670.9(d), McFarland may not issue the necessary CUP modifications to GEO. *See* Long Decl. ¶¶ 23–24; Martin Decl. ¶¶ 10–11.

Again, Section 1670.9(d) is materially indistinguishable from SB-50, which this Court held was an unconstitutional direct regulation of the Federal Government. In doing so, this Court observed: "SB 50 may not expressly name the federal government as its intended object of regulation, but that does not mean the law does not directly regulate the United States." *United States v. California*, 2018 WL 5780003, at *4. Because SB-50 "condition[ed] purchasers' ability to record a title to recently acquired federal public lands on whether the government provided the Lands Commission with refusal rights in those lands," it "trespasse[d] on the federal government's ability to convey land to whomever it wants" and "subject[ed] federal determinations about the conveyance of federal land to review by the Lands Commission." *Id.* In the same way, Section 1670.9(d) conditions the ability of a contractor to carry out federal immigration detention operations on compliance with the state statute's notice-and-comment requirements, and it subjects the Federal Government to review by municipal zoning commissions.

By enacting Section 1670.9(d), the State has "la[id] hold of [federal contractors] in their specific attempt to obey orders and requires qualifications in addition to those that the [Federal] Government has pronounced sufficient." *Johnson*, 254 U.S. at 57. "Enforcement of the substance of the permit requirement against the contractors would have the same effect as direct enforcement against the [Federal] Government," *Town of Windsor*, 765 F.2d at 19, and Section 1670.9(d)'s permit requirements are therefore unconstitutional.

PTS & AUTH SUPP. RESPONSE TO OSC

**II.    The Remaining Equitable Factors Favor Denial of a Preliminary Injunction.**

Plaintiffs have not demonstrated that they will suffer irreparable harm if a preliminary injunction is denied. As an initial matter, Plaintiffs' egregious delay in seeking the TRO, standing alone, compels rejection of any effort to convert the TRO to a preliminary injunction. Again, Plaintiffs have known since April 23 that GEO's CUP modifications would take effect on July 15, yet they waited until July 10 to seek a TRO from the state court and until late in the evening of July 12 to seek such relief from this Court, while demanding that the Court rule two days later. Indeed, Plaintiffs' invocation of the COVID-19 pandemic to justify the suspension of GEO's CUP modifications is bare opportunism: the challenges that the pandemic poses for detention facilities is a contrived attempt to create urgency and distract from the fact that their nearly three-month delay cuts strongly against their showing of irreparable harm. *See Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984). Both the City Council's approval of the CUP modifications *and* the pandemic were known by Plaintiffs for months, and yet they sat on their hands. Rewarding their delay with a preliminary injunction would be anything but equitable.

In any event, the harms Plaintiffs claim have nothing to do with the procedural violations they allege. Moreover, Plaintiffs have offered nothing but speculation to support their allegation that permitting GEO to begin operating Central Valley and Golden State would somehow foster the spread of the coronavirus. And it is well established that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quotation omitted). Rather, "a plaintiff must *demonstrate* immediate threatened injury." *Id.*

Plaintiffs have not presented any evidence supporting their claim of irreparable harm beyond generalized reports of outbreaks in some other detention facilities. Indeed, as Plaintiffs themselves admit, GEO's Adelanto ICE Processing Center has successfully limited spread, reporting only one staff case and 11 detainee cases at a facility with the capacity to hold 1,940 detainees. *See* Dkt. 3-1 at 18. Given the precautions that GEO has undertaken at its facilities mitigate the spread of the virus, *see* Venturella Decl. ¶¶ 19–35, especially during the transfer process, *see* Smith Decl. ¶ 11, it should come as no surprise that Plaintiffs have no concrete

- 19 -

1  evidence to back up their allegations of irreparable harm.

2  Nor have Plaintiffs explained how the specific remedy they seek here—an injunction

3  against the *issuance* of a permit—is at all tailored to the irreparable harm they allege—illness

4  caused by the *transfer* of detainees. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir.

5  2009). Pointedly, Plaintiffs have entirely failed to explain how execution of the CUP modifications

6  here leaves them unable to protect their interest in detainee safety through other, more tailored,

7  means in the unlikely event that evidence of COVID-19 outbreaks associated with the new facilities

8  is ever be presented. And, in fact, there are dozens of pending habeas suits and class actions that

9  address the very concerns of detainee well-being that Plaintiffs raise. *See* Ex. P, UCLA, *UCLA*

10 *Covid-19 Behind Bars Data Project – Court Orders*, https://bit.ly/2YBsFBn; Ex. Q, Civil Rights

11 Litigation Clearinghouse, *COVID-19 (novel coronavirus)*, https://bit.ly/3dfiVRi. None of these

12 cases seek relief requiring detention facilities *cease operations* entirely in light of the coronavirus.

13 Plaintiffs should not be allowed to demand such extraordinary relief—relief that has not been

14 granted even in cases where it was undisputed that a COVID-19 outbreak had actually occurred—

15 in a suit challenging the procedures associated with the issuance of a zoning permit.

16 In contrast with the speculative and otherwise remediable harm that Plaintiffs allege, if GEO

17 is enjoined against operating Central Valley and Golden State, both GEO and the City will suffer

18 immediate harm. GEO would not be able to fulfill its contractual obligations to ICE and would lose

19 $79.6 million per year with an injunction in effect. *See* Venturella Decl. ¶ 16. GEO would also be

20 required to eliminate at least 420 jobs with an annual payroll loss totaling $36 million. *See id.*

21 ¶¶ 10–11. If this were not bad enough, the consequences facing the City are dire. Without Central

22 Valley and Golden State operating, the City would lose more than roughly $2.7 million in fees,

23 taxes, and awards that GEO's operation of the ICE facilities would have generated. According to

24 the City's financial director, shuttering the facilities would deprive the City of nearly 20% of its

25 annual budget. *See* Mosqueda Decl. ¶ 9; *see generally City of McFarland Adopted Annual*

26 *Operation Budget Fiscal Year 2019–2020*, CITY OF MCFARLAND (August 2019),

27 https://bit.ly/2DTSN23. This financial harm is acutely felt given that the City—like virtually every

28 municipality—is currently struggling with budget shortfalls prompted by the effects of COVID-19.

PTS & AUTH SUPP. RESPONSE TO OSC

Moreover, if GEO were enjoined even temporarily from operating these facilities because of an unconstitutional law, it would never be able to recoup those losses from the State because of California's sovereign immunity or from Plaintiffs (who undoubtedly lack the resources to post a bond covering them). Thus, GEO's certain financial harm is unambiguously irreparable. *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1113-14 (9th Cir. 2010), *vacated on other grounds and remanded sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012).

Beyond the financial harm to GEO, the preliminary injunction Plaintiffs seek would necessarily restrict the Federal Government's flexibility in assigning detainees to available facilities. Particularly at a time when social distancing requires ICE to limit the number of detainees at each facility to populations far below normal capacity in order to mitigate the spread of COVID-19, Plaintiffs have not come close to meeting their burden of demonstrating that the relief they seek will not have the unintended consequence of *furthering* the spread of the disease.

Finally, because Section 1670.9(d) violates the Federal Constitution, GEO has necessarily "established that both the public interest and the balance of the equities favor" the denial of an injunction premised on the unconstitutional law. *Az. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). "[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). "In such circumstances, the interest of preserving the Supremacy Clause is paramount." *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (quotation omitted); *see also California*, 921 F.3d at 893. Moreover, Plaintiffs seeking to enforce an unconstitutional law cannot claim hardship from being denied an injunction "because [they] cannot suffer harm from [a court order] that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

## CONCLUSION

Defendant GEO respectfully requests that this Court not convert its July 14, 2020, TRO into a preliminary injunction and that it declare Section 1670.9(d) unconstitutional as applied to GEO.

PTS & AUTH SUPP. RESPONSE TO OSC

Dated:        July 21, 2020

By:___/s/ Michael W. Shonafelt_____

Michael W. Shonafelt, CBN 186853
Michael B. McClellan, CBN 241570
C. Kendie Schlecht, CBN 190978
NEWMEYER & DILLION LLP
895 Dove Street, Fifth Floor
Newport Beach, CA  92660
Telephone: (949) 854-7000
Email: Michael.Shonafelt@ndlf.com

Charles J. Cooper,* DC Bar No. 248070
Michael W. Kirk,* DC Bar No. 424648
Steven J. Lindsay,* VA Bar No. 92363
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 220-9600
Email: ccooper@cooperkirk.com
*Appearing *Pro Hac Vice*

*Attorneys for Real Party in Interest,*
*The GEO Group, Inc.*



PTS & AUTH SUPP. RESPONSE TO OSC

1

# CERTIFICATE OF SERVICE

2

*Immigrant Legal Resources Center, et al. v. City of McFarland, et al.*
U.S.D.C. Eastern District of CA Case No. 1:20-cv-00966-TLN-AC

3

| | |
|---|---|
| STATE OF CALIFORNIA | ) |
| | )   ss. |
| COUNTY OF ORANGE | ) |

4

5

6

I, Chelsea Snow, declare:

7

I am a citizen of the United States and employed in Orange County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 895 Dove Street, 5th Floor, Newport Beach, California  92660.  My business e-mail address is Chelsea.Snow@ndlf.com. On July 21, 2020, I served a copy of the within document(s):

8

9

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONSE TO ORDER TO SHOW CAUSE**

10

11

☒      **VIA CM/ECF SYSTEM – VIA NOTICE OF ELECTRONIC FILING:** I certify that on the date referenced above, I electronically transmitted the document(s) listed for submission to the United States District Court – Eastern District of California, using the ECF System required for filing and transmission of Electronic Notices to the ECF registrants/recipients registered with the United States District Court – Eastern District of California.

12

13

14

15

16

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the foregoing is true and correct. Executed on July 21, 2020, at Newport Beach, California.

17

18

19

_____
Chelsea Snow

20

21

22

23

24

25

26

27

28

4530.102 / 8853090.1