1    Charles J. Cooper (*Pro Hac Vice*), DC Bar No. 248070
     COOPER & KIRK, PLLC
2    1523 New Hampshire Avenue, NW
     Washington, DC 20036
3    Telephone: (202) 220-9600
     Email: ccooper@cooperkirk.com
4
     Michael W. Shonafelt, CBN 186853
5    NEWMEYER & DILLION LLP
     895 Dove Street, Fifth Floor
6    Newport Beach, CA 92660
     Telephone:    (949) 854-7000
7    Email: Michael.Shonafelt@ndlf.com

8    *Attorneys for Real Party in Interest,*
     *The GEO Group, Inc.*
9

10                    UNITED STATES DISTRICT COURT

11                    EASTERN DISTRICT OF CALIFORNIA

12

13   IMMIGRANT LEGAL RESOURCE           CASE NO: 1:20-CV-00966-TLN-AC
     CENTER FREEDOM FOR
14   IMMIGRANTS, et al.                 RELATED TO CASE NO.: 2:20-cv-00533-TLN-AC

15            Petitioners,              JUDGE: Hon. Troy L. Nunley

16   vs.                               [Originally filed in California Superior Court,
                                        County of Kern as Case No. BCV-20-101507]
17   CITY OF MCFARLAND, et al.

18            Respondents,             **APPENDIX OF EXHIBITS IN SUPPORT
                                        OF RESPONSE TO ORDER TO SHOW
19   THE GEO GROUP, INC.,               CAUSE**

20            Real party in interest.   *[Response to OSC, Declarations of David
                                        Venturella, Joseph Smith and C. Kendie Schlecht
21                                       and Request for Judicial Notice filed
                                        concurrently herewith]*
22
                                        FILE DATE: July 10, 2020
23                                       TRIAL DATE: Not Set

24

25          The GEO Group, Inc. (GEO) hereby submits this appendix of exhibits in support of its

26   Response to Order to Show Cause:

27   / / /

28   / / /

**APPENDIX OF EXHIBITS**

| Exh. No. | Document | Pages |
|---|---|---|
| A | City of McFarland Legal Notice of Public Hearing for Tuesday, January 21, 2020 at 6:00 p.m. re Application of the GEO Group, Inc. to modify Conditional Use Permit Nos. 01-96 and 02-96 (Exhibit A to the Declaration of Richard Long) | 6 - 9 |
| B | City of Adelanto Notice of Special/Public Planning Commission Meeting for Wednesday, January 22, 2020 at 7:00 p.m. re application of the GEO Group, Inc. to modify Conditional Use Permit 96-11 (Exhibit B to the Declaration of Richard Long) | 11 - 16 |
| C | City of McFarland Legal Notice of Second Public Hearing for Tuesday, February 18, 2020 at 6:00 p.m. re application of the GEO Group, Inc. to modify Conditional Use Permit Nos. 02-96 and 01-96 (Exhibit C to the Declaration of Richard Long) | 18 - 36 |
| D | City of Adelanto Notice of Public Hearing for Wednesday, February 19, 2020 at 7:00 p.m. re modification of Conditional Use Permit 96-11 (Exhibit D to the Declaration of Richard Long) | 38 - 60 |
| E | City of Adelanto Resolution No. P-20-03 approving modification of Conditional Use Permit 96-11 (Exhibit E to the Declaration of Richard Long) | 62 - 65 |
| F | U.S. Immigration & Customs Enf't, Celebrating the History of ICE (Mar. 1, 2019), https://bit.ly/35Jas68 | 67 - 78 |
| G | Declaration of Amber Martin filed in support of GEO's motion for a preliminary injunction in the related case entitled, *The GEO Group, Inc. v. Newsom, et. al.*, Case No. 2:20-cv-00533-TLN-AC, as Dkt. 16-2 | 80 - 82 |

APPENDIX OF EXHIBITS ISO RESPONSE TO
ORDER TO SHOW CAUSE

| H | Senate Rules Comm., Senate Floor Analyses for SB-29, 2017–18 Sess. (Cal. May 27, 2017), https://bit.ly/2O9c3eP | 84 - 90 |
|---|---|---|
| I | Assemb. Comm. on Judiciary, Analysis of SB-29, 2017–18 Sess. (Cal. June 27, 2017), https://bit.ly/2O9c3eP | 92 - 101 |
| J | Declaration of Richard Long filed in support of GEO's motion for a preliminary injunction in the related case entitled, The GEO Group, Inc. v. Newsom, et. al., Case No. 2:20-cv-00533-TLN-AC, as Dkt. 16-3 | 103 - 107 |
| K | Agenda McFarland City Council dated April 23, 2020, https://www.mcfarlandcity.org/AgendaCenter/ViewFile/Agenda/_04232020-223 | 109 - 114 |
| L | Regular City Council Minutes Teleconference/Virtual Meeting dated April 23, 2020, https://www.mcfarlandcity.org/AgendaCenter/ViewFile/Minutes/_04232020-223 | 116 - 121 |
| M | Executive Department State of California Executive Order N-29-20 signed by Gavin Newsom on March 17 2020, https://www.gov.ca.gov/wp-content/uploads/2020/03/3.17.20-N-29-20-EO.pdf | 123 - 126 |
| N | Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) In Correctional and Detention Facilities (most recently updated July 14, 2010), published by the Centers for Disease Control and Prevention | 128 - 152 |
| O | Order Denying Motion for Temporary Restraining Order dated April 6, 2020 signed by Chief United States District Judge Ricardo S. Martinez | 154 - 173 |
| P | UCLA, *UCLA Covid-19 Behind Bars Data Project – Court Orders*, https://bit.ly/2YBsFBn | 175 - 178 |
| Q | Civil Rights Litigation Clearinghouse, *COVID-19 (novel coronavirus)*, https://bit.ly/3dfiVRi | 180 - 183 |



APPENDIX OF EXHIBITS ISO RESPONSE TO
ORDER TO SHOW CAUSE

1  Dated:       July 21, 2020

2                                              By:   /s/ Michael W. Shonafelt

3                                              Michael W. Shonafelt, CBN 186853
                                               Michael B. McClellan, CBN 241570
4                                              C. Kendie Schlecht, CBN 190978
                                               NEWMEYER & DILLION LLP
5                                              895 Dove Street, Fifth Floor
                                               Newport Beach, CA  92660
6                                              Telephone: (949) 854-7000
                                               Email: Michael.Shonafelt@ndlf.com

7                                              Charles J. Cooper,* DC Bar No. 248070
                                               Michael W. Kirk,* DC Bar No. 424648
8                                              Steven J. Lindsay,* VA Bar No. 92363
                                               COOPER & KIRK, PLLC
9                                              1523 New Hampshire Avenue, NW
                                               Washington, DC 20036
10                                             Telephone: (202) 220-9600
                                               Email: ccooper@cooperkirk.com
11                                             *Appearing Pro Hac Vice

12                                             Attorneys for Real Party in Interest,
                                               The GEO Group, Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX OF EXHIBITS ISO RESPONSE TO
                                                            ORDER TO SHOW CAUSE

# EXHIBIT A

# LEGAL NOTICE OF PUBLIC HEARING
## CITY OF MCFARLAND, CALIFORNIA
## PLANNING COMMISSION

NOTICE is hereby given that the Planning Commission of the City of McFarland, County of Kern, State of California, will hold a public hearing on Tuesday, January 21, 2020 at 6:00 pm in the McFarland Council Chambers located in the McFarland Veteran's Community Center, 103 W. Sherwood Ave, McFarland CA 93250. The Planning Commission will consider the following item(s):

1. To take public testimony regarding the Application of the GEO Group, Inc., to modify Conditional Use Permit No. 01-96  to allow the **Golden State Modified Community Correctional Facility located at 611 Frontage Road**, to be repurposed to house federal inmates and detainees, male and/or female.  This public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d).

**Environmental Determination:** The project is exempt from the requirements of the California Environmental Quality Ave subject to Section 15061(b)(3) the General Rule that states *"The activity is covered by the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment. Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA."*

The staff report(s) and supporting environmental documentation are available for review at the City of McFarland City Hall located at 401 W. Kern Avenue, McFarland CA between the hours of 8:00 AM and 5:00 PM Monday through Thursday. Any written comments must be received by 5:00 PM on January 21, 2020. Any challenge of this item shall be limited to only those issues raised at the public hearing.

For further information please contact Maria Lara, Community Development Director at (661) 792-3091 or by e-mail at mlara@mcfarlandcity.org.

# LEGAL NOTICE OF PUBLIC HEARING
## CITY OF MCFARLAND, CALIFORNIA
## PLANNING COMMISSION

NOTICE is hereby given that the Planning Commission of the City of McFarland, County of Kern, State of California, will hold a public hearing on Tuesday, January 21, 2020 at 6:00 pm in the McFarland Council Chambers located in the McFarland Veteran's Community Center, 103 W. Sherwood Ave, McFarland CA 93250. The Planning Commission will consider the following item(s):

1. To take public testimony regarding the Application of the GEO Group, Inc., to modify Conditional Use Permit No. 02-96 to allow the **Central Valley Modified Community Correctional Facility located at 254 Taylor Avenue**, to be repurposed to house federal inmates and detainees, male and/or female. This public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d).

**Environmental Determination:** The project is exempt from the requirements of the California Environmental Quality Ave subject to Section 15061(b)(3) the General Rule that states *"The activity is covered by the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment. Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA."*

The staff report(s) and supporting environmental documentation are available for review at the City of McFarland City Hall located at 401 W. Kern Avenue, McFarland CA between the hours of 8:00 AM and 5:00 PM Monday through Thursday. Any written comments must be received by 5:00 PM on January 21, 2020. Any challenge of this item shall be limited to only those issues raised at the public hearing.

For further information please contact Maria Lara, Community Development Director at (661) 792-3091 or by e-mail at mlara@mcfarlandcity.org.

# CITY OF MCFARLAND
# PLANNING COMMISSION AGENDA

Please Note: The City of McFarland City Council Chambers complies with the provisions of the Americans with Disabilities Act (ADA). Anyone needing special assistance should contact the City of McFarland City Hall at (661) 792-3091, at least one (1) business day prior to the meeting so that we may accommodate you.

| | |
|---|---|
| **LOCATION OF MEETING:** | City Council Chambers |
| | McFarland Veterans Community Center |
| | 103 W. Sherwood Avenue |
| | McFarland CA 93250 |
| | |
| **DATE/TIME:** | Tuesday, January 21, 2020 at 6:00 p.m. |
| | |
| **ROLL CALL:** | Chairman Dave Borcky, Jr. |
| | Vice Chairman Jose Hernandez |
| | Commissioner Lettie Blanchard |
| | Commissioner Rudy Nuñez |

**PLEDGE OF ALLEGIANCE:**
**INVOCATION:**

**APPROVAL OF THE MINUTES OF REGULAR AND / OR SPECIAL PLANNING COMMISSION MEETING:** held on December 17, 2019

**PUBLIC COMMENTS:**
At this time, any member of the public may address the Planning Commission on items of interest to the public that are within the jurisdiction of the Planning Commission which **are not** already on the agenda this evening. Speakers shall be limited in time so please be brief and to the point. No action or discussion shall be taken on any item not appearing on the agenda, except that any Planning Commissioner may briefly respond to statements made, or questions posed, be members of the public. Concerns or complaints will be referred to the Planning Director's office.

**ADMINISTRATIVE ITEMS:**
None

**PUBLIC HEARINGS:**
1) Discussion of the new Commercial Residential Mixed Use (CRMU) Zoning Ordinance.
   a. The proposed ordinance is to create opportunities within the City to provide for a compatible mix of land uses, including residential, retail, and offices. The Commercial Residential Mixed Use (CRMU) Zoning District allows properties to be developed with a mix of commercial retail, office and residential uses. The allowable residential density ranges from twenty (20) to thirty – five (35) dwelling units per acre. The CRMU zoning district is consistent with the mixed use land use designation of the General Plan.
   b. The City of McFarland Planning Commission to consider a proposed Pre-Zoning project related to the proposed annexation of 2200 acres generally bound by the north by the City's limit, on the west by Garzoli Ave, to the south by Whisler Road and to the east by Driver Road.

2) The Geo Group, Inc. as owner of the Facilities has requested amendments to its CUP Nos. 01-96 and 02-96 as amended

a.  This is a presentation to inform the Commission and the public of the applications and to assist staff in its processing of the applications by taking public testimony regarding the proposals to amend Conditional Use Permit No.01-96 to allow the **Golden State Modified Community Correctional Facility Located at 611 Frontage Road** and Conditional Use Permit No. 02-96 to allow the **Central Valley Modified Community Correctional Facility located at 254 Taylor Avenue**, to be repurposed to house federal inmates and detainees, male and/or female. No action will be taken on the applications at this meeting.  This public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d) which requires the city to solicit public comments on the proposals in at least two separate public- meetings.

**CITY OF MCFARLAND PLANNER UPDATE:**
Alexander Lee, City Planner

**COMMISSIONER COMMENTS:**

**ADJOURNMENT:**
Next Meeting: Regular Planning Commission Meeting is scheduled for Tuesday, February 18, 2020.

# EXHIBIT B

# CITY OF ADELANTO
# NOTICE OF SPECIAL / PUBLIC
# PLANNING COMMISSION MEETING

NOTICE is hereby given that the Special / Public Planning Commission Meeting of the City of Adelanto, County of San Bernardino, State of California, will hold a public hearing on the following:

> To take public testimony regarding the application of the GEO Group, Inc., to modify **Conditional Use Permit 96-11** to allow the Desert View Modified Community Correctional Facility located at 10450 Rancho Road, to be repurposed to house federal inmates and detainees, male and/or female. This special / public hearing on the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d).  No action will be taken on the application at this hearing.

The special / public hearing will be held in the City Council Chambers, Civic Center, 11600 Air Expressway, Adelanto, California, on Wednesday, January 22, 2020, at 7:00 P.M., or as soon thereafter the matter may be heard.

Due to time constraints and the number of persons wishing to give oral testimony, time restrictions may be placed on oral testimony at any hearing about this project.

The project may be reviewed during regular business hours at the Adelanto City Hall, Planning Department, located at 11600 Air Expressway, Adelanto, California 92301. Further information concerning this matter may be obtained by contacting the Planning Department at (760) 246-2300 Ext.11187.



G484-008 -- 3795917.1



# AGENDA

### SPECIAL / PUBLIC MEETING OF THE PLANNING COMMISSION AND PARKS AND RECREATION COMMISSION
### January 22, 2020
### 7:00 P.M.

### Adelanto Governmental Center
### City Council Chambers

**Planning Commission**
**Parks & Recreation Commission**
Keron Jones, Chair
Jayshawn Johnson, Vice Chair
Daniel Ramos, Commissioner
Ricardo Rubalcava, Commissioner
Terry Delgado, Commissioner

**Development Services**
David Martinez

**City Attorney**
Colin O'Neil

Meetings held:
1st and 3rd Wednesday of the month

---

*NOTE: PLEASE TURN CELL PHONES OFF OR PLACE THEM ON VIBRATE DURING THE PLANNING / PARKS AND RECREATION COMMISSION MEETING AS A COURTESY TO OTHERS. Thank you, Administrative Staff*

The Planning / Parks and Recreation Commission packet may be reviewed by the public at the reception counter in City Hall. Any writings or documents pertaining to an open session item, provided to a majority of the Planning / Parks and Recreation Commissioners within 72 hours of a regular meeting, shall be made available for public inspection at the reception counter in City Hall at 11600 Air Expressway, Adelanto, CA 92301, during normal business hours. Members of the public can view the agenda or download any staff reports in advance by accessing the City website at www.ci.adelanto.ca.us on Thursday the week before the scheduled meeting.

*AMERICANS WITH DISABILITIES ACT: In compliance with the Americans with Disabilities Act, if you need special assistance to participate in this meeting, please contact the Planning Department, (760) 246-2300 ext. 11142 no later than 72 hours prior to the meeting. (28 CFR 34.102.104 ADA TITLE II)*

## A. CALL TO ORDER

TIME: _____

ROLL CALL:     *Chair Jones*                    _____
               *Vice Chair Johnson*             _____
               *Commissioner Delgado*           _____
               *Commissioner Ramos*             _____
               *Commissioner Rubalcava*         _____

INVOCATION:_____

FLAG SALUTE:_____

1

**SPECIAL MEETING**
**PLANNING COMMISSION**
**PARK AND RECREATION COMMISSION**
**January 22, 2020**

## B. DELETIONS/ADDITIONS TO AGENDA

1. Director of Development Services to announce if there are any additions/removals of items from the agenda.

## C. PRESENTATIONS

## D. CONFLICT OF INTEREST

Planning Commissioners will announce any possible Conflicts of Interests for the Planning Commission Meeting.

## E. PUBLIC COMMUNICATIONS

Opened at: _____       Closed at: _____

Members of the public wishing to address the Planning / Parks and Recreation Commission are required to fill out a speaker card and hand it to the Clerk of the meeting. This is the time and place for members of the public to comment on any matter within the jurisdiction of the Adelanto Planning Commission or Parks and Recreation Commission. After receiving recognition from the Chair, the speaker will walk to the podium and state their name for the record. There is a time limit of three (3) minutes when giving your presentation.

Members of the audience may address the Planning / Parks and Recreation Commission on non-agenda items; however, in accordance with Government Code Section 54954.2, the Planning Commission may not take action on an item not appearing on the posted agenda.

2

- 13 -

11600 Air Expressway • Adelanto, CA 92301 • (760) 246-2300 • www.ci.adelanto.ca.

**SPECIAL MEETING**
**PLANNING COMMISSION**
**PARK AND RECREATION COMMISSION**
**January 22, 2020**

---

### F.  CONSENT CALENDAR – PLANNING COMMISSION

Items on the Consent Calendar are considered routine in nature, require no further discussion by the Planning Commission, and may be acted on in one motion unless a member of the Planning Commission or staff requests a separate discussion on an item.

---

### G. PUBLIC HEARING – PLANNING COMMISSION

**PUBLIC HEARING OPEN:** _____     **PUBLIC HEARING CLOSED:** _____

1. **Conditional Use Permit 96-11 Modification:**  A request to take public testimony regarding the application of the GEO Group, Inc., to modify **Conditional Use Permit 96-11** to allow the Desert View Modified Community Correctional Facility to be repurposed to house federal inmates and detainees, male and/or female located at 10450 Rancho Road, within the City of Adelanto, County of San Bernardino. Assessor Parcel Number: 0459-411-28 & 33.

---

### H.  PARKS AND RECREATION COMMISSION ITEMS

**PUBLIC HEARING OPEN:** _____     **PUBLIC HEARING CLOSED:** _____

M_____ S_____ ACTION_____

---

### I. NEW BUSINESS

M_____ S_____ ACTION_____

3

11600 Air Expressway • Adelanto, CA 92301 • (760) 246-2300 • www.ci.adelanto.ca.

**SPECIAL MEETING**
**PLANNING COMMISSION**
**PARK AND RECREATION COMMISSION**
**January 22, 2020**

---

### J.  PLANNING MANAGER/COMMISSIONER'S ANNOUNCEMENTS AND/OR REPORTS

1.  Director Development Services Comments.

2.  Planning / Parks and Recreation Commissioner Comments.

### K. ADJOURNMENT

TIME OUT: _____

M_____  S_____  ACTION_____

### L.  DECLARATION OF POSTING

I, NYEKA ALLEN, SECRETARY OF PLANNING COMMISSION AND PARKS AND RECREATION COMMISSION, HEREBY CERTIFY THAT A TRUE, ACCURATE COPY OF THE FOREGOING AGENDA WAS POSTED ON JANUARY 16, 2020 SEVENTY-TWO (72) HOURS PRIOR TO THE MEETING PER GOVERNMENT CODE 54954.2 IN THE GOVERNMENTAL CENTER'S DISPLAY CASE, 11600 AIR EXPRESSWAY, ADELANTO, CALIFORNIA.

*Nyeka Allen*
Nyeka Allen
Secretary of Planning Commission

4



City of
# ADELANTO

**Gabriel Reyes**
*Mayor*

**Gerardo Hernandez**
*Mayor Pro Tem*

**Ed Camargo**
*Council Member*

**Stevevonna Evans**
*Council Member*

**Joy Jeannette**
*Council Member*

**Jessie Flores**
*City Manager*

# SPECIAL / PUBLIC
# MEETING NOTICE

### NOTICE OF SPECIAL / PUBLIC MEETING OF THE ADELANTO PLANNING COMMISSION AND PARKS AND RECREATION COMMISSION

NOTICE IS HEREBY GIVEN that the Regular Meeting of the Planning Commission will meet at the following time and place:

### TIME

Regular Meeting
Wednesday: 7:00 P.M.
January 22, 2020

### PLACE

Adelanto Governmental Center
Adelanto Council Chambers
11600 Air Expressway
Adelanto, CA 92301


*Nyeka Allen*
Nyeka Allen
Secretary of Planning Commission


DATED: January 16, 2020

# EXHIBIT C

# LEGAL NOTICE OF SECOND PUBLIC HEARING
## CITY OF MCFARLAND, CALIFORNIA
## PLANNING COMMISSION

NOTICE is hereby given that the Planning Commission of the City of McFarland, County of Kern, State of California, will hold the second public hearing on **Tuesday, February 18, 2020 at 6:00 p.m.** in the McFarland Council Chambers located in the McFarland Veteran's Community Center, 103 W. Sherwood Ave, McFarland CA 93250. The Planning Commission will consider the following item(s):

1. To take public testimony, consider and take action on the Application of the GEO Group, Inc., to modify Conditional Use Permit No. 02-96 to allow the **Central Valley Modified Community Correctional Facility located at 254 Taylor Avenue**, to be repurposed to house federal inmates and detainees, adult male and/or female. This public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d).

**Environmental Determination:** The project is exempt from the requirements of the California Environmental Quality Act (CEQA) pursuant to Sections 15061 and 15301 of the CEQA Guidelines.

The staff report and supporting documentation are available for review at the City of McFarland City Hall located at 401 W. Kern Avenue, McFarland CA between the hours of 8:00 AM and 5:00 PM Monday through Thursday.  Any written comments must be received by 5:00 PM on February 18, 2020. Any challenge of this item shall be limited to only those issues raised at the public hearing or in written correspondence delivered to the Planning Commission at, or prior to, the public hearing.

For further information please contact Maria Lara, Community Development Director at (661) 792-3091 or by e-mail at mlara@mcfarlandcity.org.

# LEGAL NOTICE OF SECOND PUBLIC HEARING
## CITY OF MCFARLAND, CALIFORNIA
## PLANNING COMMISSION

NOTICE is hereby given that the Planning Commission of the City of McFarland, County of Kern, State of California, will hold the second public hearing on **Tuesday, February, 18, 2020 at 6:00 pm** in the McFarland Council Chambers located in the McFarland Veteran's Community Center, 103 W. Sherwood Ave, McFarland CA 93250. The Planning Commission will consider the following item(s):

1. To take public testimony, consider and take action on the Application of the GEO Group, Inc., to modify Conditional Use Permit No. 01-96 to allow the **Golden State Modified Community Correctional Facility located at 611 Frontage Road**, to be repurposed to house federal inmates and detainees, adult male and/or female.  This public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d).

**Environmental Determination:** The project is exempt from the requirements of the California Environmental Quality Act (CEQA) pursuant to Sections 15061 and 15301 of the CEQA Guidelines.

The staff report(s) and supporting documentation are available for review at the City of McFarland City Hall located at 401 W. Kern Avenue, McFarland CA between the hours of 8:00 AM and 5:00 PM Monday through Thursday. Any written comments must be received by 5:00 PM on January 21, 2020. Any challenge of this item shall be limited to only those issues raised at the public hearing.

For further information please contact Maria Lara, Community Development Director at (661) 792-3091 or by e-mail at mlara@mcfarlandcity.org.

## CITY OF MCFARLAND
## PLANNING COMMISSION AGENDA

Please Note: The City of McFarland City Council Chambers complies with the provisions of the Americans with Disabilities Act (ADA). Anyone needing special assistance should contact the City of McFarland City Hall at (661) 792-3091, at least one (1) business day prior to the meeting so that we may accommodate you.

**LOCATION OF MEETING:**   City Council Chambers
McFarland Veterans Community Center
103 W. Sherwood Avenue
McFarland CA 93250

**DATE/TIME:**   Tuesday, February 18, 2020 at 6:00 p.m.

**A. ROLL CALL:**   Vice Chairman Jose Hernandez
Commissioner Lettie Blanchard
Commissioner Rudy Nuñez
Commissioner Marco Martinez
Commissioner Ricardo Cano- Pending Appointment by Council

**B. PLEDGE OF ALLEGIANCE:**

**C. INVOCATION:**

**D. APPROVAL OF THE MINUTES OF REGULAR AND / OR SPECIAL PLANNING COMMISSION MEETING:** held on January 21, 2020

**E. PUBLIC PRESENTATIONS:**
This portion of the meeting is reserved for persons desiring to address the Commission on any matter **NOT** on this agenda and over which the Commission has jurisdiction.  Speakers are limited to two (2) minutes.   Please state your name and address for the record before making presentation.

No action or discussion shall be taken on any item not appearing on the agenda, except that any Planning Commissioner may briefly respond to statements made, or questions posed, by members of the public. Concerns or complaints will be referred to the Community Development Director's office.

**F. ADMINISTRATIVE ITEMS:**
1)   Report of Nominating Committee:  Report of nominating committee for Planning Commission Officers for Calendar Year 2020

**G. CONSENT AGENDA (CA):  These are items scheduled before the Planning Commission which are being recommended for approval by the staff and the applicant has been informed of any special conditions and has no objections.  The hearing on these items may be expedited if no member of the Commission or audience wishes to comment or ask questions on the case.**
   -   NONE

Page **1** of **3**

## H.  PUBLIC HEARINGS:

1) **CONDITIONAL USE PERMIT NO. 01-96:** A modification to Conditional Use Permit 01-96, to allow the Golden State Modified Community Correctional Facility located at 611 Frontage Road, to be repurposed to house federal inmates and detainees, adult male and or female.
   a.  Presentation by applicant The GEO Group, Inc.

   b.  Take public testimony and adopt Planning Commission Resolution No. 2020-03-PC approving amending Conditional Use Permit No. 01-96. — **STAFF RECOMMENDATION: APPROVE CONDITIONAL USE PERMIT IN ACCORDANCE WITH THE RECOMMENDED CONDITIONS OF APPROVAL (ATTACHMENT A) AND ADOPT SUGGESTED FINDINGS AS SET FORTH IN THE DRAFT RESOLUTION**

2) **CONDITIONAL USE PERMIT NO. 02-96:** A modification to Conditional Use Permit 02-96, to allow the Central Valley Medium Custody Community Correctional Facility located at 254 Taylor Avenue, to be repurposed to house federal inmates and detainees, adult male and or female.
   a.  Presentation by applicant The GEO Group, Inc.

   b.  Take public testimony and adopt Planning Commission Resolution No. 2020-04-PC approving amending Conditional Use Permit No. 02-96. — **STAFF RECOMMENDATION: APPROVE CONDITIONAL USE PERMIT IN ACCORDANCE WITH THE RECOMMENDED CONDITIONS OF APPROVAL (ATTACHMENT A) AND ADOPT SUGGESTED FINDINGS AS SET FORTH IN THE DRAFT RESOLUTION**

## I.  COMMISSIONER COMMENTS:

On their own initiative, Commission members may make an announcement or a report on their own activities.  They may ask a question for clarification, make referral to staff, or take action to have staff place a matter of business on a future agenda (Government Code Section 54954.2(a)).

---

**NOTICE OF RIGHT TO APPEAL:**

For projects where Planning Commission action is final, actions are subject to appeal to the City Council by any interested person.  No permit or license shall be issued for any use involved in an application, until the same has become final by reason of the failure of any person to appeal or by reason of the action of the city council.

An appeal must be in writing and filed, along with associated appeal fee of **$200.00** pursuant to (Resolution No. 2014-0201), with the City Clerk, 401 W. Kern Ave McFarland, CA 93250.  The filing must be made within fifteen (15) calendar days from, but not including the date of the decision pursuant to (McFarland Municipal Code Section 17.148.100(B) (1) (b)).  If no appeal is received, the action of the Planning Commission is final.

---

Page **2** of **3**

**J.** **ADJOURNMENT:**  The next Planning Commission is scheduled for Tuesday, March 17, 2020.



# PLANNING COMMISSION STAFF REPORT
# CITY OF MCFARLAND, CALIFORNIA
# February 18, 2020

| Agenda Item | |
|---|---|
| Presentation | |
| Consent | |
| Unfinished Business | |
| New Business | |
| Public Hearing | x |
| Other | |
| **Action Requested** | |
| Ordinance | |
| Resolution | X |
| Motion | |
| Other | |

**TO:**  Chair and Planning Commissioners

**FROM:**  Alexander Lee, City Planner

**DATE:**  February 18, 2020

**PROJECT NAME :**  Geo Group CUP Modifications 01-96

**ENVIRONMENTAL DOCUMENT:**  Notice of Exemption

## PROJECT DESCRIPTION

To take public testimony, consider and take action on the Application of the GEO Group, Inc., to modify Conditional Use Permit No. 01-96 to allow the **Golden State Modified Community Correctional Facility Located at 611 Frontage Road**, to be repurposed to house federal inmates and detainees, male and/or female.  This public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d).

Staff recommends that Planning Commission approve Resolution No. 2020-03-PC, approving Conditional Use Permit 01-96 (Amended 02/18/2020)as conditioned.

## BACKGROUND

The Conditional Use Permit No. 01-96 was amended by Resolution No. 2008-002 adopted by the McFarland Planning Commission on October 14, 2008.

In compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly noticed public hearing on the application on January 21, 2020, took information presented by City Staff and public testimony prior to considering the application.

**ENVIRONMENTAL REVIEW**

The project is exempt from the requirements of the California Environmental Quality Act subject to Section 15061 and 15301 of the CEQA Guidelines.

**PUBLIC NOTICING**

Pursuant to Section 17.148.080 of the McFarland Municipal Code a Legal Notice of Public Hearings were posted (City Hall, Mi Ranchito, Mi Rancho, McFarland Council of Chamber, and city website) and mailed out to all property owners located within 300 feet of the project site.

**ATTACHMENTS**

Attachment 1 – City of McFarland Planning Commission Resolution 2020-03-PC

RESOLUTION NO. 2020-03-PC

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF MCFARLAND, COUNTY OF KERN, CALIFORNIA, APPROVING MODIFICATIONS TO CONDITIONAL USE PERMIT 01-96 TO ALLOW THE GEO GROUP, INC., TO REPURPOSE THE GOLDEN STATE MODIFIED COMMUNITY CORRECTIONAL FACILITY, LOCATED AT 611 FRONTAGE ROAD, TO HOUSE FEDERAL INMATES AND DETAINEES, BOTH MALE AND/ OR FEMALE

WHEREAS, Conditional Use Permit No. 01-96, approved May 13, 1996 by the McFarland Planning Commission, authorized the construction and operation of the Golden State Modified Community Correctional Facility (the "Facility") located at 611 Frontage Road, McFarland, California; and

WHEREAS, Paragraph number 11 of Conditional Use Permit 01-96 restricts inmate classification to inmates and parole violators designated as Levels I, II and III, or equivalent classification who do not have high level serious disciplinary problems within the last review period; and

WHEREAS, the applicant, Gresham, Savage, Nolan & Tilden, for The GEO Group, Inc., requests modifications to Conditional Use Permit 01-96 to allow the Golden State Medium Custody Community Correctional Facility, to house Federal inmates and detainees, both male and/or female; and

WHEREAS, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly noticed public hearing on the application on January 21, 2020, took information presented by City Staff and public testimony prior to considering the application;

WHEREAS, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly second noticed public hearing on the application on February 18, 2020, took information presented by City Staff and public testimony prior to considering the application;

WHEREAS, the City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment; and

NOW, THEREFORE, BE IT RESOLVED by the McFarland Planning Commission as follows:

SECTION 1. The above recitals are all true and correct.

SECTION 2. The Planning Commission has reviewed and considered the information included in the staff reports and as provided by the public testimony prior to taking action on the

1

application. The Planning Commission further finds and determines that the City has complied with the California Environmental Quality Act and the Planning Commission determinations reflect the independent judgment of the Planning Commission.  Based on the foregoing, the Planning Commission hereby approves the application and makes the following modifications to Conditional Use Permit 01-96:

1. Paragraph number 11 to Conditional Use Permit 01-96 is replaced in its entirety by the following:

   "11. The facility may house Federal inmates and detainees, both male and/or female."

**SECTION 3.** The Planning Commission approval is based on the following findings:

(a) That the proposed Conditional Use Permit modification is consistent with the General Plan;

The project site is designated Industrial, which is consistent with the City's Zoning Code which allows Prisons/Correctional Facilities with approval of a Conditional Use Permit.

(b) That the nature, condition, and development of adjacent uses, buildings, and structures have been considered, and that the use will not adversely affect or be materially detrimental to these adjacent uses, buildings, or structures;

Surrounding properties to east consist of Highway 99. The property to the west is comprised of row crops with residential uses to the north and south.  The application will not alter the use of the existing facilities other than change the classification of individual housed in the facility.

(c) That the site for the proposed use is of adequate size and shape to accommodate the use and buildings proposed;

The current approval is only for the modification of a Conditional Use Permit for an existing structure to allow a change in inmate classification.  There will be no physical expansion of the Facility.

(d) That the proposed use complies with all applicable development standards of the zoning district; and

The proposed project has been designed and conditioned to meet all applicable City zoning and development standards.

(e) That the proposed use observes the spirit and intent of this Zoning Code.

The proposed Project meets the requirements of the Zoning Code. However, to ensure all Code requirements are met, a condition of approval has been added reflecting these requirements.

2

**SECTION 4.** The City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment.

**SECTION 5.** Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 01-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

**SECTION 6.** The Planning Commission hereby approves modifications to Conditional Use Permit 01-96 subject to the following conditions of approval, attached as Attachment A and incorporated herein.

PASSED, APPROVED AND ADOPTED by the Planning Commission this _____ day of _____, 2020.



_____

_____,

Planning Commission Chairman


Attest:



_____

_____, Clerk of

The Planning Commission


3

ATTACHMENT A

CITY OF McFARLAND PLANNING COMMISSION
CONDITIONS OF APPROVAL
CONDITIONAL USE PERMIT NO. 01-96 (AMENDED 02/18/2020)

1. The name of the facility shall be the Golden State Annex (GSA).

2. The capacity of the facility shall be 700 beds.

1. The existing and former employees of the GSA will be afforded the opportunity to apply for the new federal jobs and if employment criteria are met, may remain on payroll and transition to the new jobs, as approved by applicant and subject to impact of judicial action.

2. To the extent possible and if employment criteria is met, personnel employed at the facility will be recruited from the McFarland area.

5. Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 01-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

6. As Fiscal Mitigation for the Project's impact on City Services, including, but not limited to, fire protection, police and public safety, and other public services, the applicant shall pay the City of McFarland $1.00 per bed, per day, for each of the 700 beds repurposed at CVA totaling $255,500.00 annually, with payments starting at initial ICE detainee intake and continuing for the duration of the contract.   The payments shall be increased annually by the Consumer Price Index (All Urban Consumers) (Base Years   1982-1984   = 100) for Los Angeles-Riverside-Orange County (the"Index") or successor Index between the immediately ending calendar year and the calendar year preceding the immediately ending calendar year.

7. The applicant shall annex GSMCCF to the City of McFarland Community Facilities Districts 2017-1; 2017-2, and 2019-1 for: Landscaping and Street Maintenance; Police Services; and Fire protection. Applicant shall pay the cost of annexation estimated to be $19,500 but subject to change upon completion of the annexations; within six months of the effective date of this Resolution.

8. Frontage Road shall be repaved to City standards from W.  Sherwood Ave to Taylor Avenue full width and installed missing curb, gutter, sidewalk, ADA ramps and city standard lighting, within six months of the effective date of this Resolution.

4

9. There shall be a GSA Community Relations Board appointed to monitor the planning and ongoing running of the facility, who will report directly to the McFarland City Council. The Board shall be chaired by the CVA Facility Administrator and include of one member of the City Council. The Advisory Board shall meet at least once a year.

10. The facility <u>WILL NOT CONTAIN</u> any federal inmates or detainees that are juveniles or minor children under the age of 18.

11. On a monthly basis the Facility Administrator shall provide the number of inmates or detainees population at the facility to the City Manager via faxed document.  Failure to provide such inmate population figures may adversely affect the ability of the City of McFarland to provide the most efficient representation to the community.

12. The applicant will insure that the facility grounds, perimeter and buildings are secure, maintained free of weeds, trash and free of anything that could create a health & safety hazard or a public nuisance.

13. All curbs along public roadways on the perimeter of the facility shall be posted with "No Parking" signs and be painted in Red to indicate "No Parking".  This requirement is not discretionary and cannot be waived without the McFarland City Manager's written permission.  The Applicant agrees to assist the City on routine maintenance, including repairs, on Frontage Road and Taylor Avenue, the extent of which will be determined through an Agreement with the City, which Agreement shall be executed within 30 days of the effective date of this Resolution.

14. The applicant entered into an Indemnification Agreement with the City of McFarland prior to the hearing date for this Resolution.

15. The applicant shall install additional native and drought tolerant landscaping around the facility perimeter specifically at Mast Avenue to assist the City of McFarland with the Urban Heat Island Effect.

16. Upon identification of any violations of any of these Conditions of Approval (COAs), the City shall provide applicant a written notice specifically identifying the nature of the alleged violation(s) (Notice of Violation).  Upon receipt of a Notice of Violation, applicant shall have sixty (60) days to remedy the identified violation, except in the event of exigent circumstances where the violation cannot be remedied within the 60 day timeframe, additional time shall be provided as appropriate.

5



**PLANNING COMMISSION STAFF REPORT**
**CITY OF MCFARLAND, CALIFORNIA**
**February 18, 2020**

|  |  |
|---|---|
| **Agenda Item** | |
| Presentation | |
| Consent | |
| Unfinished Business | |
| New Business | |
| Public Hearing | x |
| Other | |
| **Action Requested** | |
| Ordinance | |
| Resolution | X |
| Motion | |
| Other | |

**TO:** Chair and Planning Commissioners

**FROM:** Alexander Lee, City Planner

**DATE:** February 18, 2020

**PROJECT NAME :** Geo Group CUP Modifications 02-96

**ENVIRONMENTAL DOCUMENT:**   Notice of Exemption

**PROJECT DESCRIPTION**

To take public testimony, consider and take action on the Application of the GEO Group, Inc., to modify Conditional Use Permit No. 02-96 to allow the **Central Valley Medium Custody Community Correctional Facility Located at 254 Taylor Avenue**, to be repurposed to house federal inmates and detainees, male and/or female.  This second public hearing of the Planning Commission is intended to comply with the provisions of California Civil Code Section 1670.9(d).

Staff recommends that Planning Commission approve Resolution No. 2020-04-PC, approving Conditional Use Permit 02-96 (Amended 02/18/20) as conditioned.

**BACKGROUND**
The Conditional Use Permit No. 02-96 was amended by Resolution No. 2008-002 adopted by the McFarland Planning Commission on October 14, 2008.

In compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly noticed public hearing on the application on January 21, 2020, took information presented by City Staff and public testimony prior to considering the application.

**ENVIRONMENTAL REVIEW**

The project is exempt from the requirements of the California Environmental Quality Act subject to Section 15061 and 15301 of the CEQA Guidelines.

**PUBLIC NOTICING**

Pursuant to Section 17.148.080 of the McFarland Municipal Code a Legal Notice of Public Hearings were posted (City Hall, Mi Ranchito, Mi Rancho, McFarland Council of Chamber, and city website) and mailed out to all property owners located within 300 feet of the project site.

**ATTACHMENTS**

Attachment 1 – City of McFarland Planning Commission Resolution 2020-04-PC

RESOLUTION NO. 2020-04-PC

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF MCFARLAND, COUNTY OF KERN, CALIFORNIA, APPROVING MODIFICATIONS TO CONDITIONAL USE PERMIT 02-96 TO ALLOW THE GEO GROUP, INC., TO REPURPOSE THE CENTRAL VALLEY MODIFIED COMMUNITY CORRECTIONAL FACILITY, LOCATED AT 254 TAYLOR AVENUE, TO HOUSE FEDERAL INMATES AND DETAINEES, BOTH MALE AND OR FEMALE

WHEREAS, Conditional Use Permit No. 02-96, approved May 13, 1996 by the McFarland Planning Commission, authorized the construction and operation of the Central Valley Modified Community Correctional Facility (the "Facility") located at 254 Taylor Avenue, McFarland, California; and

WHEREAS, Paragraph number 11 of Conditional Use Permit 02-96 restricts inmate classification to inmates and parole violators designated as Levels I, II and III, or equivalent classification who do not have high level serious disciplinary problems within the last review period; and

WHEREAS, the applicant, Gresham, Savage, Nolan & Tilden, for The GEO Group, Inc., requests modifications to Conditional Use Permit 02-96 to allow the Central Valley Modified Community Correctional Facility, to house Federal inmates and detainees, both male and/or female; and

WHEREAS, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly noticed public hearing on the application on January 21, 2020, took information presented by City Staff and public testimony prior to considering the application;

WHEREAS, in compliance with state law and the City's Municipal Code, the City of McFarland Planning Commission held a duly second noticed public hearing on the application on February 18, 2020, took information presented by City Staff and public testimony prior to considering the application;

WHEREAS, the City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment; and

NOW, THEREFORE, BE IT RESOLVED by the Planning Commission as follows:

SECTION 1. The above recitals are all true and correct.

SECTION 2. The Planning Commission has reviewed and considered the information included in the staff reports and as provided by the public testimony prior to taking action on the

1

application. The Planning Commission further finds and determines that the City has complied with the California Environmental Quality Act and the Planning Commission determinations reflect the independent judgment of the Planning Commission.  Based on the foregoing, the Planning Commission hereby approves the application and makes the following modifications to Conditional Use Permit 02-96:

1.  Paragraph number 11 to Conditional Use Permit 02-96 is replaced in its entirety by the following:

    "11. The facility may house Federal inmates and detainees, both male and/or female."

**SECTION 3.** The Planning Commission approval is based on the following findings:

(a) That the proposed Conditional Use Permit modification is consistent with the General Plan;

The project site is designated Industrial, which is consistent with the City's Zoning Code which allows Prisons/Correctional Facilities with approval of a Conditional Use Permit.

(b) That the nature, condition, and development of adjacent uses, buildings, and structures have been considered, and that the use will not adversely affect or be materially detrimental to these adjacent uses, buildings, or structures;

Surrounding properties to east consist of Highway 99.  The property to the west is comprised of row crops with residential uses to the north and south.  The application will not alter the use of the existing facilities other than change the classification of individual housed in the facility.

(c) That the site for the proposed use is of adequate size and shape to accommodate the use and buildings proposed;

The current approval is only for the modification of a Conditional Use Permit for an existing structure to allow a change in inmate classification.  There will be no physical expansion of the Facility.

(d) That the proposed use complies with all applicable development standards of the zoning district; and

The proposed project has been designed and conditioned to meet all applicable City zoning and development standards.

(e) That the proposed use observes the spirit and intent of this Zoning Code.

2

The proposed Project meets the requirements of the Zoning Code. However, to ensure all Code requirements are met, a condition of approval has been added reflecting these requirements.

**SECTION 4.** The City of McFarland, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment.

**SECTION 5.** Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 02-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

**SECTION 6.** The Planning Commission hereby approves modifications to Conditional Use Permit 02-96 subject to the following conditions of approval, attached as Attachment A and incorporated herein.

PASSED, APPROVED AND ADOPTED by the Planning Commission this _____ day of _____, 2020.

_____

_____,

Planning Commission Chairman

Attest:

_____

_____, Clerk of

The Planning Commission

3

ATTACHMENT A

CITY OF McFARLAND PLANNING COMMISSION
CONDITIONS OF APPROVAL
CONDITIONAL USE PERMIT NO. 02-96 (AMENDED 02/18/2020)

1.  The name of the facility shall be the CENTRAL VALLEY ANNEX (CVA).

2.  The capacity of the facility shall be 700 beds.

3.  The existing and former employees of the CVA will be afforded the opportunity to apply for the new federal jobs and if employment criteria are met, may remain on payroll and transition to the new jobs, as approved by applicant and subject to impact of judicial action.

4.  To the extent possible and if employment criteria is met, personnel employed at the facility will be recruited from the McFarland area.

5.  Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 02-96 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 10, 2020, the date of notice to the public of the proposed permitting action.

6.  As Fiscal Mitigation for the Project's impact on City Services, including, but not limited to, fire protection, police and public safety, and other public services, the applicant shall pay the City of McFarland $1.00 per bed, per day, for each of the 700 beds repurposed at CVA totaling $255,500.00 annually, with payments starting at initial     ICE detainee intake and continuing for the duration of the contract.  The payments shall be increased annually by the Consumer Price Index (All Urban Consumers) (Base Years    1982-1984 = 100) for Los Angeles-Riverside-Orange County (the"Index") or successor Index between the immediately ending calendar year and the calendar year preceding the immediately ending calendar year.

7.  The applicant shall annex CVMCC to the City of McFarland Community Facilities Districts 2017-1; 2017-2, and 2019-1 for: Landscaping and Street Maintenance; Police Services; and Fire protection. Applicant shall pay the cost of annexation estimated to be $19,500 but subject to change upon completion of the annexations; within six months of the effective date of this Resolution.

4

8. Frontage Road shall be repaved to City standards from W. Sherwood Ave to Taylor Avenue full width and installed missing curb, gutter, sidewalk, ADA ramps and city standard lighting, within six months of the effective date of this Resolution.

9. There shall be a CVA Community Relations Board appointed to monitor the planning and ongoing running of the facility, who will report directly to the McFarland City Council. The Board shall be chaired by the CVA Facility Administrator and include one member of the City Council. The Advisory Board shall meet at least once a year.

10. The facility <u>WILL NOT CONTAIN</u> any federal inmates or detainees that are juveniles or minor children under the age of 18.

11. On a monthly basis the Facility Administrator shall provide the number of inmates or detainees population at the facility to the City Manager via faxed document. Failure to provide such inmate population figures may adversely affect the ability of the City of McFarland to provide the most efficient representation to the community.

12. The applicant will insure that the facility grounds, perimeter and buildings are secure, maintained free of weeds, trash and free of anything that could create a health & safety hazard or a public nuisance.

13. All curbs along public roadways on the perimeter of the facility shall be posted with "No Parking" signs and be painted in Red to indicate "No Parking". This requirement is not discretionary and cannot be waived without the McFarland City Manager's written permission. The Applicant agrees to assist the City on routine maintenance, including repairs, on Frontage Road and Taylor Avenue, the extent of which will be determined through an Agreement with the City, which Agreement shall be executed within 30 days of the effective date of this Resolution.

14. The applicant entered into an Indemnification Agreement with the City of McFarland prior to the hearing date for this Resolution.

15. The applicant shall install additional native and drought tolerant landscaping around the facility perimeter specifically at Mast Avenue to assist the City of McFarland with the Urban Heat Island Effect.

16. Upon identification of any violations of any of these Conditions of Approval (COAs), the City shall provide applicant a written notice specifically identifying the nature of the alleged violation(s) (Notice of Violation). Upon receipt of a Notice of Violation, applicant shall have sixty (60) days to remedy the identified violation, except in the event of exigent circumstances where the violation cannot be remedied within the 60 day timeframe, additional time shall be provided as appropriate.

5

# EXHIBIT D



## CITY OF ADELANTO
## NOTICE OF PUBLIC HEARING

**NOTICE IS HEREBY GIVEN** that a public hearing for the following project will be held before the City of Adelanto Planning Commission in the City Council Chambers, 11600 Air Expressway, Adelanto, California 92301, on **Wednesday, February 19, 2020 at 7:00 p.m.**

**Conditional Use Permit 96-11(Modification):**
The property owner, CPT Operating Partnership (The Geo Group, Inc), requests approval of a modification to Conditional Use Permit 96-11 to modify condition number 12 to allow housing of Federal inmates and detainees and to allow the Desert View Correctional Facility to house male and/or female inmates and detainees. The facility is currently located at 10450 Rancho Road in the Manufacturing/Industrial (MI) zone within the City of Adelanto, County of San Bernardino. Assessor Parcel Numbers: 0459-441-28 and 0459-441-33.

The project appears to meet the criteria for a Categorical Exemption pursuant to Section 15301, Class 1 of the California Environmental Quality Act Guidelines.

Any person may submit written comments to the Planning Commission before the hearing or may appear and be heard before the Planning Commission at the time of the hearing. If you challenge the City's action in court, you may be limited to raising only those issues you or someone else raised at the public hearing described in this notice, or in written correspondence delivered to the Planning Commission at or before the public hearing. At the hearing or during deliberations, the Planning Commission could approve a modified project, or changes to the project proposal.

The proposed project application plans and environmental documents may be reviewed during regular business hours at the Adelanto City Hall, Planning Department, located at 11600 Air Expressway, Adelanto, California 92301. Further information concerning this matter may be obtained by contacting the Planning Department at (760) 246-2300 Ext.11187.

Published February 6, 2020
**CUP 96-11 (Modification)**



RECEIVED

FEB 1 0 2020

Gresham Savage Nolan & Tilden, PC











**AGENDA**

# REGULAR MEETING
# OF THE
# PLANNING COMMISSION
# AND PARKS AND RECREATION
# COMMISSION
## February 19, 2020
## 7:00 P.M.

### Adelanto Governmental Center
### City Council Chambers

**Planning Commission**
**Parks & Recreation Commission**
Keron Jones, Chair
Jayshawn Johnson, Vice Chair
Daniel Ramos, Commissioner
Ricardo Rubalcava, Commissioner
Terry Delgado, Commissioner

**Development Services**
David Martinez

**City Attorney**
Colin O'Neil

Meetings held:
1st and 3rd Wednesday of the month

---

*NOTE: PLEASE TURN CELL PHONES OFF OR PLACE THEM ON VIBRATE DURING THE PLANNING / PARKS AND RECREATION COMMISSION MEETING AS A COURTESY TO OTHERS. Thank you, Administrative Staff*

The Planning / Parks and Recreation Commission packet may be reviewed by the public at the reception counter in City Hall. Any writings or documents pertaining to an open session item, provided to a majority of the Planning / Parks and Recreation Commissioners within 72 hours of a regular meeting, shall be made available for public inspection at the reception counter in City Hall at 11600 Air Expressway, Adelanto, CA 92301, during normal business hours. Members of the public can view the agenda or download any staff reports in advance by accessing the City website at www.ci.adelanto.ca.us on Thursday the week before the scheduled meeting.

*AMERICANS WITH DISABILITIES ACT: In compliance with the Americans with Disabilities Act, if you need special assistance to participate in this meeting, please contact the Planning Department, (760) 246-2300 ext. 11142 no later than 72 hours prior to the meeting. (28 CFR 34.102.104 ADA TITLE II)*

## A. CALL TO ORDER

**TIME:** _____

**ROLL CALL:**     Chair Jones              _____
                  Vice Chair Johnson       _____
                  Commissioner Delgado     _____
                  Commissioner Ramos       _____
                  Commissioner Rubalcava   _____

**INVOCATION:** _____

**FLAG SALUTE:** _____

**REGULAR MEETING**
**PLANNING COMMISSION**
**PARK AND RECREATION COMMISSION**
**February 19, 2020**

## B. DELETIONS/ADDITIONS TO AGENDA

1. Director of Development Services to announce if there are any additions/removals of items from the agenda.

## C. PRESENTATIONS

## D. CONFLICT OF INTEREST

Planning Commissioners will announce any possible Conflicts of Interests for the Planning Commission Meeting.

## E. PUBLIC COMMUNICATIONS

Opened at: _____    Closed at: _____

Members of the public wishing to address the Planning / Parks and Recreation Commission are required to fill out a speaker card and hand it to the Clerk of the meeting. This is the time and place for members of the public to comment on any matter within the jurisdiction of the Adelanto Planning Commission or Parks and Recreation Commission. After receiving recognition from the Chair, the speaker will walk to the podium and state their name for the record. There is a time limit of three (3) minutes when giving your presentation.

Members of the audience may address the Planning / Parks and Recreation Commission on non-agenda items; however, in accordance with Government Code Section 54954.2, the Planning Commission may not take action on an item not appearing on the posted agenda.

**REGULAR MEETING**
**PLANNING COMMISSION**
**PARK AND RECREATION COMMISSION**
**February 19, 2020**

---

**F.  CONSENT CALENDAR – PLANNING COMMISSION**

Items on the Consent Calendar are considered routine in nature, require no further discussion by the Planning Commission, and may be acted on in one motion unless a member of the Planning Commission or staff requests a separate discussion on an item.

---

**G. PUBLIC HEARING – PLANNING COMMISSION**

---

**PUBLIC HEARING OPEN:** _____     **PUBLIC HEARING CLOSED:** _____

1. **Conditional Use Permit 96-11 (Modification):** A request by CPT Operating Partnership (The Geo Group, Inc.), for a modification to Conditional Use Permit 96-11 to modify condition Number 12 to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and/or female inmates and detainees. The facility is located at 10450 Rancho Road in the Manufacturing/Industrial (MI) zoning district, within the City of Adelanto, County of San Bernardino. The Assessor Parcel Numbers:  0459-441-28 and 0459-441-33**.**

**STAFF RECOMMENDATION:**

1. **ADOPT** Resolution P-20-03, **ADOPT** findings and **APPROVE** Conditional Use Permit 96-11 (Modification No. 2), to modify condition number 12 to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and /or female inmates and detainees, finding the project qualifies as a Class 1, Existing Facilities Project Exemption pursuant to Section 15301 of the California Environmental Quality Act Guidelines.

2. **ADOPT** Resolution P-20-04, **ADOPT** findings and **DENY** Conditional Use Permit 96-11 (Modification No. 2), to modify condition number 12 to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and /or female inmates and detainees.

M_____ S_____ ACTION_____

### RESOLUTION NO. P-20-03

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF
ADELANTO, SAN BERNARDINO COUNTY, CALIFORNIA, MAKING
FINDINGS, AND APPROVING A SECOND MODIFICATION TO
CONDITIONAL USE PERMIT 96-11 SUBJECT TO CONDITIONS OF
APPROVAL TO MODIFY CONDITION NUMBER 12 TO ALLOW HOUSING
FOR FEDERAL INMATES AND DETAINEES AND ALLOW THE DESERT
VIEW CORRECTIONAL FACILITY TO HOUSE MALE AND/OR FEMALE
INMATES AND DETAINEES. THE FACILITY IS LOCATED AT 10450
RANCHO ROAD WITHIN THE CITY OF ADELANTO, COUNTY OF SAN
BERNARDINO, CA. LIFORNIA. ASSESSOR PARCEL NUMBERS 0459-441-
28 AND 0459-441-33.

### RESOLUTION NO. P-20-04

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF
ADELANTO, SAN BERNARDINO COUNTY, CALIFORNIA, MAKING
FINDINGS, AND DENYING CONDITIONAL USE PERMIT 96-11
(MODICATION NO.2)  TO DENY MODIFYING CONDITION NUMBER
12 AND DENYING THE    HOUSING OF FEDERAL INMATES AND
DETAINEES AND DENY THE DESERT VIEW CORRECTIONAL
FACILITY TO HOUSE MALE AND/OR FEMALE INMATES AND
DETAINEES. THE FACILITY IS LOCATED AT 10450 RANCHO ROAD
WITHIN THE CITY OF ADELANTO, COUNTY OF SAN BERNARDINO,
CALIFORNIA.  ASSESSOR PARCEL NUMBERS:  0459-441-28 AND
0459-441-33

M_____S_____ACTION_____

## H.  PARKS AND RECREATION COMMISSION ITEMS

PUBLIC HEARING OPEN: _____    PUBLIC HEARING CLOSED: _____

M_____S_____ACTION_____

**REGULAR MEETING**
**PLANNING COMMISSION**
**PARK AND RECREATION COMMISSION**
**February 19, 2020**

## I. NEW BUSINESS

M_____ S_____ ACTION_____

## J. PLANNING MANAGER/COMMISSIONER'S ANNOUNCEMENTS AND/OR REPORTS

1. Director Development Services Comments

2. Planning / Parks and Recreation Commissioner Comments.

## K. ADJOURNMENT

TIME OUT:_____

M_____ S_____ ACTION_____

## L. DECLARATION OF POSTING

I, NYEKA ALLEN, SECRETARY OF PLANNING COMMISSION AND PARKS AND RECREATION COMMISSION, HEREBY CERTIFY THAT A TRUE, ACCURATE COPY OF THE FOREGOING AGENDA WAS POSTED ON FEBRUARY 13, 2020 SEVENTY-TWO (72) HOURS PRIOR TO THE MEETING PER GOVERNMENT CODE 54954.2 IN THE GOVERNMENTAL CENTER'S DISPLAY CASE, 11600 AIR EXPRESSWAY, ADELANTO, CALIFORNIA.

*Nyeka Allen*

Nyeka Allen
Secretary of Planning Commission



City of

**ADELANTO**

**Gabriel Reyes**
*Mayor*

**Gerardo Hernandez**
*Mayor Pro Tem*

**Ed Camargo**
*Council Member*

**Stevevonna Evans**
*Council Member*

**Joy Jeannette**
*Council Member*

**Jessie Flores**
*City Manager*

# MEETING NOTICE

### NOTICE OF REGULAR MEETING OF THE ADELANTO PLANNING COMMISSION AND PARKS AND RECREATION COMMISSION

NOTICE IS HEREBY GIVEN that the Regular Meeting of the Planning Commission will meet at the following time and place:

| <u>TIME</u> | <u>PLACE</u> |
|---|---|
| <span style="color:red">Regular Meeting</span><br>Wednesday: 7:00 P.M.<br>February 19, 2020 | Adelanto Governmental Center<br>Adelanto Council Chambers<br>11600 Air Expressway<br>Adelanto, CA 92301 |

*Nyeka Allen*
Nyeka Allen
Secretary of Planning Commission

DATED: February 13, 2020

# PLANNING COMMISSION AGENDA REPORT

ADELANTO GOVERNMENTAL CENTER | 11600 AIR EXPRESSWAY | ADELANTO, CALIFORNIA 92301

---

**DATE:**      February 19, 2020

**TO:**       Honorable Chairman and Members of the Planning Commission

**FROM:**    Dave Martinez, Director of Development Services
**BY:**      Shelby Williams, Project Planner

---

**SUBJECT:**   **Conditional Use Permit 96-11 (Modification):**  A request by CPT Operating Partnership (The Geo Group, Inc.), for a modification to Conditional Use Permit 96-11 to modify condition Number 12 to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and/or female inmates and detainees. The facility is located at 10450 Rancho Road in the Manufacturing/Industrial (MI) zoning district, within the City of Adelanto, County of San Bernardino. The Assessor Parcel Numbers:  0459-441-28 and 0459-441-33.

---

**PLANNING COMMISSION OPTIONS:**

1. **ADOPT** Resolution P-20-03, **ADOPT** findings and **APPROVE** Conditional Use Permit 96-11 (Modification No. 2), to modify condition number 12 to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and /or female inmates and detainees, finding the project qualifies as a Class 1, Existing Facilities Project Exemption pursuant to Section 15301 of the California Environmental Quality Act Guidelines.

2. **ADOPT** Resolution P-20-04, **ADOPT** findings and **DENY** Conditional Use Permit 96-11 (Modification No. 2), to modify condition number 12 to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and /or female inmates and detainees.

**BACKGROUND:**

Applicant:                        Donovan Collier
                                  Gersham Savage Nolan & Tilden, PC

2

550 E. Hospitality Ln.
San Bernardino, CA 92408

| | |
|---|---|
| General Location: | The project site is located at 10450 Rancho Road, within the City of Adelanto, County of San Bernardino. |
| Assessor's Parcel Nos: | 0459-441-28 & 0459-441-33 |
| Environmental Determination: | Exempt under section 15301 (a Class 1, Existing Facilities Project Exemption) |
| Related Cases: | Location and Development Plan 96-04; Conditional Use Permit 96-11 and Modification to Conditional Use Permit 96-11 (2004). |
| Existing General Plan & Current Zoning Designation: | Manufacturing/Industrial (MI) |

Surrounding General Plan and Zoning:

| Direction | General Plan | Zoning |
|---|---|---|
| North | Manufacturing/Industrial | MI |
| South | Manufacturing /Industrial | MI |
| West | Manufacturing/Industrial | MI |
| East | Manufacturing/Industrial | MI |

| | |
|---|---|
| Existing Land Use: | The project site is presently developed with GEO facility, which is approximately 96,963 square feet in size more or less. |
| Surrounding Land Uses: | The following chart shows the surrounding land uses: |

| Direction | Land Use |
|---|---|
| North | Vacant Land |
| South | Vacant Land |
| East | Desert Community Bank |
| West | Adelanto ICE Processing Center - West |

## BACKGROUND INFORMATION

The latest application submitted by GEO is a request to modify Conditional Use Permit 96-11 for the second time. Specifically, to modify condition Number 12 of the Conditions of Approval (Location and Development Plan No. 96-04, Conditional Use Permit 96-11), to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and/or female inmates and detainees.  Modification of this Condition would also result in the creation of up to eleven (11) new positions at the facility. Condition Number 12 currently states

the following:

> 12. *Inmates will be Male Levels I, II, and III in accordance with California Department of Corrections Inmate Screening Criteria (sample attached).*

If the proposed request is approved, Condition Number 12 would be modified to add language to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and/or female inmates and detainees.

In response to questions raised earlier at the previous public hearing regarding the applicability of Assembly Bill No, 32 (AB 32) to the proposed GEO facility, Staff has attached a copy of AB 32 for information purposes.  More specifically, AB 32, states the following:

- Assembly Bill No. 32   -   This bill, on or after January 1, 2020, would prohibit the California Department of Corrections and Rehabilitation from entering into or renewing a contract with a private, for-profit prison to incarcerate state prison inmates, but would not prohibit the department from renewing or extending a contract to house state prison inmates in order to comply with any court ordered population cap.  The bill would also prohibit, after January 1, 2028, a state prison inmate or other person under the jurisdiction of the department from being incarcerated in a private, for-profit prison facility. This bill would also prohibit, with exceptions, the operation of a private detention facility, as defined, within the state.

In addition, Staff also attached a copy of the February 2019, City and County Contract with the U.S. Immigration and Customs Enforcement Report, for information purposes, which found the following:

- Local governments must improve their oversight of such contracts to address cost overruns and serious health and safety concerns at contracted detention facilities.  The State Auditor found that three cities – Adelanto, McFarland, and Holtville- subcontracted to private operators nearly all of their responsibilities under their ICE contracts, including providing detainees with housing, safekeeping, subsistence, and medical services. The cities provide little or no oversight of the private operators and simply passed federal payments from ICE to these subcontractors despite the fact that federal inspections have found serious health and safety problems at these private detention facilities.  For example, a recent federal inspection of the Adelanto Detention Facility reported one suicide and three suicide attempts, inadequate dental care, and cursory medical assessments.

**PROJECT DESCRIPTION**

The GEO Group, Inc.("GEO") has filed an application to modify Conditional Use Permit 96-11, which governs the operation of the Desert View Modified Community Correctional Facility, located at 10450 Rancho Road, to amend Condition 12 to allow the facility to house federal inmates and detainees, male and/or female, pursuant to contract with the United States Department of Homeland Security United States immigration and Customs Enforcement ("ICE").  Conditional Use

Permit (CUP) 96-11, was originally approved by the City of Adelanto ("City") in January 1997, and authorized the construction and operation of a correctional facility with a maximum capacity of 550 beds.  GEO has operated the facility under contract with the California Department of Corrections and Rehabilitation

In 2004, the City approved a modification to the Conditional Use Permit increasing the allowable bed capacity to 750.  . The current application **does not** request a modification to the maximum bed capacity of the facility. Additionally, the current application **does not** request physical expansion of the facility.  However, based on discussions with ICE, GEO may construct certain site improvements, including additional landscaping, fencing, improvements to the outdoor recreation areas, parking lot rehabilitation and internal tenant improvements to provide additional office and courtroom spaces. However, none of the proposed improvements will result in expansion of the facility or increased inmate capacity.  Ultimately, upon approval of the application, the Desert View Facility will operate in conjunction with the ICE processing facility in the City.

*Source:  Gresham Savage Nolan & Tilden, PC.*

### SUMMARY OF PROPOSED FACILITY OPERATION CRITERIA MODIFICATIONS

Table 1 below outlines the existing facility operation criteria as compared to the proposed modifications.

| Table 1 – CUP 96-11 EXISTING & PROPOSED FACILITY OPERATION CRITERIA | | |
|---|---|---|
| *APPROVED FACILITY OPERATION CRITERIA* | *EXISTING CRITERIA* | *PROPOSED CHANGES TO CRITERIA* |
| Facility Number of Beds | 750 Beds | **No Change** |
| Total Building Square Feet | 96,963 Square Feet | **No Change** |
| Number of Employees | 154 | **165 (+ 11 new positions)** |
| Condition # 12 – Inmate Population (per California Dept. of Corrections Inmate Screening Criteria) | *Inmates will be Male Levels I, II, and III* | ***Inmates will be Male Levels I, II, and III  and federal inmates and detainees, male and/or female*** |

### ENVIRONMENTAL CONSIDERATIONS:

The proposed project qualifies for a Categorical Exemption pursuant to Section 15301, Class 1 Existing Facilities of the California Environmental Quality Act Guidelines. Accordingly, a Notice of Exemption will be filed if the project is approved.

### ATTACHMENTS:

Resolution P-20-03 – Confirming Resolution
Resolution P-20-04 – Denial Resolution
Conditions of Approval
Letter dated November 24, 2004, Resolution No. 04-73, Conditions of Approval LDP 96-04, CUP

96-11 and Vicinity Map and Plans.
Assembly Bill No. 32
City and County Contracts with U.S. Immigration and Customs Enforcement – February 2019

**RESOLUTION NO. P-20-03**

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF ADELANTO, SAN BERNARDINO COUNTY, CALIFORNIA, MAKING FINDINGS, AND APPROVING A SECOND MODIFICATION TO CONDITIONAL USE PERMIT 96-11 SUBJECT TO CONDITIONS OF APPROVAL TO MODIFY CONDITION NUMBER 12 TO ALLOW HOUSING FOR FEDERAL INMATES AND DETAINEES AND ALLOW THE DESERT VIEW CORRECTIONAL FACILITY TO HOUSE MALE AND/OR FEMALE INMATES AND DETAINEES. THE FACILITY IS LOCATED AT 10450 RANCHO ROAD WITHIN THE CITY OF ADELANTO, COUNTY OF SAN BERNARDINO, CA. LIFORNIA. ASSESSOR PARCEL NUMBERS 0459-441- 28 AND 0459-441-33.

WHEREAS, the applicant Donovan Collier with Gersham Savage Nolan & Tilden, PC, representing the Geo Group, Inc., has initiated an application to modify an existing Conditional Use Permit 96-11 within the City of Adelanto, County of San Bernardino; State of California, located at 10450 Rancho Road; and

WHEREAS, the applicant has consented to all conditions of approval; and

WHEREAS, a duly noticed public hearing was held on February 19, 2020 to hear and consider testimony for or against the proposed project; and

WHEREAS, the City of Adelanto, as lead agency, determined that the project qualifies, as a Class 1, Existing Facilities Project Exemption pursuant to Section 15301 of the California Environmental Quality Act; and

WHEREAS, a Notice of Exemption is proposed for adoption; and

NOW, THEREFORE, BE IT RESOLVED by the Planning Commission as follows:

SECTION 1. The above recitals are all true and correct.

SECTION 2. The Planning Commission has reviewed and considered the environmental information included in the staff report prior to taking action on a proposed second Modification to Conditional Use Permit 96-11. The Planning Commission further finds and determines that the City has complied with the California Environmental Quality Act and the Planning Commission determinations reflect the independent judgment of the Planning Commission.

SECTION 3. The Planning Commission hereby finds and determines that:

Conditional Use Permit 96-11 (Modification No. 2):

(a)     That the proposed Conditional Use Permit is consistent with the General Plan;

The project is consistent with the General Plan as the site is designated Manufacturing/Industrial (MI) which is consistent with Appendix A of Title 17 of the Zoning Code which allows Prisons/Correctional Facilities uses with approval of a Conditional Use Permit.

RESOLUTION NO. P-20-03
February 19, 2020
Page 2

(b)     That the nature, condition, and development of adjacent uses, buildings, and structures have been considered, and that the use will not adversely affect or be materially detrimental to these adjacent uses, buildings, or structures;

Surrounding properties to the north and south are currently vacant, and the properties to the east and west are developed with the Desert Community Bank and the Adelanto ICE Processing Center, so the project is not expected to adversely affect surrounding properties.

(c)     That the site for the proposed use is of adequate size and shape to accommodate the use and buildings proposed;

The Conditional Use Permit 96-11 (Modification No.2) is to modify condition number 12 to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and/or female inmates and detainees. The present request will not modify the maximum bed capacity of the facility and it does not call for the physical expansion of the existing facility.

(d)     That the proposed use complies with all applicable development standards of the Zoning district; and The proposed project has been designed and conditioned to meet all applicable City zoning and development standards.

(e)     That the proposed use observes the spirit and intent of this Zoning Code.

The proposed project meets the requirements of the Zoning Code. However, to ensure all Code requirements are met, conditions of approval has been added reflecting these requirements.

SECTION 4.  The City of Adelanto, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment.

SECTION 5. Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 96-11 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 11, 2020, the date of notice to the public of the proposed permitting action.

SECTION 6. The Planning Commission hereby approves, Conditional Use Permit 96-11 (Modification No.2).

RESOLUTION NO. P-20-03
February 19, 2020
Page 3


ATTACHMENTS:

1. Conditions of Approval

PASSED, APPROVED AND ADOPTED by the Planning Commission this 19th day, February, 2020.


_____
                                                    Keron Jones
                        Chairman of the Planning Commission


_____
Nyeka Allen
Secretary to the Planning Commission




I, Nyeka Allen, Planning Secretary for the Planning Commission of the City of Adelanto, California, do hereby certify that the foregoing Resolution No. P-20-03 was duly and regularly adopted at a regular meeting of the Planning Commission of the City of Adelanto on the 19th day of February 2020, by the following vote, to-wit:

AYES:


NOES:


ABSENT:


ABSTAIN:

IN WITNESS WHEREOF, I hereunto set my hand and affix the official seal of the City of Adelanto on the 19th day of February 2020

_____

Nyeka Allen
Secretary to the Planning Commission

**RESOLUTION NO. P-20-04**

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF ADELANTO, SAN BERNARDINO COUNTY, CALIFORNIA, MAKING FINDINGS, AND DENYING CONDITIONAL USE PERMIT 96-11 (MODICATION NO.2)   TO DENY MODIFYING CONDITION NUMBER 12 AND DENYING THE   HOUSING OF FEDERAL INMATES AND DETAINEES AND DENY THE DESERT VIEW CORRECTIONAL FACILITY TO HOUSE MALE AND/OR FEMALE INMATES AND DETAINEES. THE FACILITY IS LOCATED AT 10450 RANCHO ROAD WITHIN THE CITY OF ADELANTO, COUNTY OF SAN BERNARDINO, CALIFORNIA.   ASSESSOR PARCEL NUMBERS:  0459-441-28 AND 0459-441-33

WHEREAS, the applicant Donovan Collier with Gersham Savage Nolan & Tilden, PC, representing the Geo Group, Inc., initiated an application to modify an existing Conditional Use Permit 96-11. The project is located at 10450 Rancho Road within the City of Adelanto, County of San Bernardino; and

WHEREAS, the applicant has not received any conditions of approval; and

WHEREAS, a duly noticed public hearing was held on February 19, 2020 to hear and consider testimony for or against the proposed project; and

WHEREAS, the City of Adelanto, as lead agency, determined that the project does not qualify, as a Class 1, Existing Facilities Project Exemption pursuant to Section 15301 of the California Environmental Quality Act; and

WHEREAS, a Notice of Exemption is not proposed for adoption; and

NOW, THEREFORE, BE IT RESOLVED by the Planning Commission as follows:

SECTION 1.   The above recitals are all true and correct.

SECTION 2.   The Planning Commission has reviewed and considered the environmental information included in the staff report prior to action on proposed Conditional Use Permit 96-11 (Modification No. 2) The Planning Commission further finds and determines that the City has complied with the California Environmental Quality Act and the Planning Commission determinations reflect the independent judgment of the Planning Commission.

SECTION 3.   The Planning Commission hereby finds and determines that:

Conditional Use Permit 96-11 (Modification No.2):

(a)   That the proposed Conditional Use Permit is consistent with the General Plan;

The project is deemed to be detrimental based upon its present location and not consistent with the City's community polices provided in the General Plan as the site is designated Manufacturing/Industrial(MI) and which is not deemed consistent with Appendix A of Title 17 of the Zoning Code at this time the City is not prepared to grant the project approval of a Conditional Use Permit to allow  the housing of Federal inmates and detainees and deny the Desert View Correctional Facility to house male and/or female inmates and detainees.

RESOLUTION NO. P-20-04
February 19, 2020
Page 2

(b)     That the nature, condition, and development of adjacent uses, buildings, and structures have been considered, and that the use will not adversely affect or be materially detrimental to these adjacent uses, buildings, or structures;

Although surrounding properties to the north and south are currently vacant, the properties to the east and west are developed with the Desert Community Bank and the Adelanto ICE Processing Center, the project may have a negative impact on the City because of the health and safety concerns raised by the Auditor of the State of California regarding the Adelanto Detention Facility.

(c)     That the site for the proposed use is of adequate size and shape to accommodate the use and buildings proposed;

The overall site is 739,164 square feet and the existing Adelanto Correctional Facility which is 96,963 square feet, however, the Auditor of the State of California in a Report dated February 2019 raised health and safety concerns relating to the operations of the existing Adelanto Detention Facility. At this time, the City has concerns about the health and welfare of inmates and detainees being housed at the existing Adelanto Correctional Facility.

(d)     That the proposed use complies with all applicable development standards of the Zoning district; and

At this time, the proposed project does not appear to meet all applicable City zoning and development standards.

(e) That the proposed use observes the spirit and intent of this Zoning Code.

At this time no conditions of approval will be considered to allow the proposed project, because the City believes the proposed project will be detrimental to the policies adopted by the City to improve the community's image.


SECTION 5.   The Planning Commission hereby denies, Conditional Use Permit 96-11 (Modification No. 2).

PASSED, DENIED AND ADOPTED by the Planning Commission this 19th day, February 2020.


_____
Keron Jones
Chairman of the Planning Commission


_____
Nyeka Allen
Secretary to the Planning Commission

RESOLUTION NO. P-20-04
February 19, 2020
Page 3

I, Nyeka Allen, Planning Secretary for the Planning Commission of the City of Adelanto, California, do hereby certify that the foregoing Resolution No. P-20-04 was duly and regularly adopted at a regular meeting of the Planning Commission of the City of Adelanto on the 19th day of February 2020, by the following vote, to-wit:

AYES:

NOES:

ABSENT:

ABSTAIN:

IN WITNESS WHEREOF, I hereunto set my hand and affix the official seal of the City of Adelanto on the 19th day of February 2020.

_____
Nyeka Allen
Secretary to the Planning Commission

**Attachment A**
**RESOLUTION P-20-03**
**February 19, 2020**

**Conditions of Approval**
**Conditional Use Permit 96-11 (Modification No.2)**

***PROJECT:  A request to approve Conditional Use Permit (Modification No.2), to modify condition Number 12 to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and/or female inmates and detainees. The facility is located at 10450 Rancho Road in the Manufacturing/Industrial (MI) zoning district within the City of Adelanto, County of San Bernardino.  Assessor Parcel Numbers: 0459-441-28 and 0459-441-33.***

***Applicant:   Donovan Collier with Gersham Savage Nolan & Tilden, PC, representing the Geo Group, Inc.***

---

## PLANNING DEPARTMENT

### General Conditions:

1.   **Approval Period.  Approval of this project will become valid only after a signed copy of the City's approval letter is received by the Planning Department acknowledging acceptance of all conditions of approval.  If not received within 10 working days after approval action, this approval will be null and void.**

     Pursuant to the provisions of California Civil Code Section 1670.9(d) this approval of Modification to Conditional Use Permit 96-11, shall not be considered issued, executed or effective until July 15, 2020 which is more than 180 day(s) from January 11, 2020 the date of  notice to the public of the proposed permitted action.

     This approval shall be used within two (2) years of the effective date of this project; **by July 15, 2022**, otherwise, it shall become null and void and of no effect whatsoever.  Use means the beginning of the substantial construction under this approval within the two (2) year period which is thereafter diligently pursued to completion and in the event the use hereby permitted ceases operation for a period of one (1) year or more, this approval shall become null and void.

2.   **Previous Conditions of Approval.**  All conditions in the original approval of Conditional Use Permit 96-11 shall apply and the conditions of approval for Conditional Use Permit 96-11 Modification.  See the attached original conditions for CUP 96-11 and Resolution No. 04-73.

3.   **Indemnity.**   The applicant shall defend (with attorneys approved by the City), indemnify and hold harmless the City of Adelanto, its agents, officers, and employees from any claims, damages, action, or proceeding against the City or its agents, officers, or employees to attack, set aside, void, or annul, an approval of the City, its advisory agencies, appeal boards, or legislative body concerning Conditional Use Permit 96-11

Conditional Use Permit 96-11 (Modification No. 2)
Conditions of Approval

Page 2

(Modification No. 2).  The City will promptly notify the permittee of any such claim, action, or proceeding against the City and will cooperate fully in the defense.

4.  **Fish and Game.**  The applicant/owner shall pay a fee of $50 for the Department of Fish and Wildlife determination.  This fee shall be submitted to the Planning Division within two (2) days after the date of conditional approval.  **Payments shall be made with a check for $50 made payable to the "Clerk of the Board of Supervisors".**   The Planning Division shall then file the Notice of Determination within five (5) days after the effective date of conditional approval.   The applicant should be aware that Section21089(b) of the Public Resources Code provides that any project approved under CEQA is not operative, vested or final until the required fee is paid.  Proof of fee payment will be required prior to issuance of any permits.

5.  **City Codes.**  The project shall comply with all disabled access requirements of the Americans with Disabilities Act and Title 24 of the State Code, and all local requirements of the City of Adelanto Municipal Code, including Title 17 (Zoning Code), especially the following: Manufacturing/Industrial (MI) zoning district regulations and Chapter 17.30 regarding Prisons/Correctional Facilities:

- Minimum Lot Size:                 20,000 square feet
- Minimum Lot Width:             100 feet
- Minimum Lot Depth:             100 feet
- Minimum Front Setbacks:
  - To Building                 25 feet
  - To Parking                  10 feet
- Minimum Side Setback:
  - Street Side to Building     25 feet
  - Street Side to Parking      10 feet
  - All others                  0 feet
- Minimum Rear Setback:          0 feet
- Maximum Height                 50 feet

6.  **Parking.**  Access to Parking and Parking of any vehicle, trailer, equipment, truck or any personal vehicles shall be on an improved surface.   No vehicle, trailer, equipment, truck or any personal vehicle shall be parked or accessed on the dirt.   Any of the above mentioned vehicles parked or accessed on the dirt shall be subject to a code violation citation in accordance with Title 17 of the Adelanto Municipal Code .

7.  **Approved Uses.**  All new uses within the property boundaries shall be reviewed and approved by the Planning Department.  Should the developer propose a more intensive use requiring additional parking spaces, additional employees, more restroom facilities, significant change from original conceptual landscaping plans, etc., the proposed use shall be presented for review by the Planning Department for compliance with the original approval.  The new proposed use may be subject, but not limited to: a Modification to Conditional Use Permit, a new Conditional Use Permit Application, and/or a new Location and Development Plan application.

8.  **Required Approvals**. The developer shall obtain the following clearances or approvals:

Conditional Use Permit 96-11 (Modification No. 2)
Conditions of Approval

Page 3

    a. Verification from the Planning Department that all pertinent conditions of approval have been met, including any administrative development plan review approvals, as mandated by the Adelanto Municipal Code.

    b. Building and Safety Department approval.

    c. Engineering Department.

    d. San Bernardino County Fire Department.

    e. Any other required approval from an outside agency.

9. **Signed Approval Letter.** A signed copy of the City's approval letter shall be on file with the Planning Department. If ownership of the property or the developer of the property has changed since the original approval, a new copy of the City approval letter shall be signed by the current development parties.

10. **Signage**. Proposed signs for this development shall require a separate application approval by the Planning Department prior to installation. Furthermore, all signs proposed for this development shall be consistent with the signage for Business and Manufacturing Districts .

11. Mandatory Organic Recycling in accordance with AB 1826. Contact Burrtec - Robert Rios ( robert@burrtec.com) for recycling information.

12. "Saving by Design" Southern California Edison Energy Efficiency – Contact Maya Aubrey maya.aubrey@sce.com for electrical efficiency information.

13. For water conservation, use Hydroponics or other low water use irrigation systems. Water should be recycled as much as possible.

14. **ENGINEERING -** Please contact the City Engineering Department.

15. **BUILDING AND SAFETY-** Please contact the City Building and Safety.

16. **FIRE DEPARTMENT -.** San Bernardino County Fire Department.

# EXHIBIT E

**RESOLUTION NO. P-20-03**

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF ADELANTO, SAN BERNARDINO COUNTY, CALIFORNIA, MAKING FINDINGS, AND APPROVING A SECOND MODIFICATION TO CONDITIONAL USE PERMIT 96-11 SUBJECT TO CONDITIONS OF APPROVAL TO MODIFY CONDITION NUMBER 12 TO ALLOW HOUSING FOR FEDERAL INMATES AND DETAINEES AND ALLOW THE DESERT VIEW CORRECTIONAL FACILITY TO HOUSE MALE AND/OR FEMALE INMATES AND DETAINEES. THE FACILITY IS LOCATED AT 10450 RANCHO ROAD WITHIN THE CITY OF ADELANTO, COUNTY OF SAN BERNARDINO, CA. LIFORNIA. ASSESSOR PARCEL NUMBERS 0459-441- 28 AND 0459-441-33.

WHEREAS, the applicant Donovan Collier with Gersham Savage Nolan & Tilden, PC, representing the Geo Group, Inc., has initiated an application to modify an existing Conditional Use Permit 96-11 within the City of Adelanto, County of San Bernardino; State of California, located at 10450 Rancho Road; and

WHEREAS, the applicant has consented to all conditions of approval; and

WHEREAS, a duly noticed public hearing was held on February 19, 2020 to hear and consider testimony for or against the proposed project; and

WHEREAS, the City of Adelanto, as lead agency, determined that the project qualifies, as a Class 1, Existing Facilities Project Exemption pursuant to Section 15301 of the California Environmental Quality Act; and

WHEREAS, a Notice of Exemption is proposed for adoption; and

NOW, THEREFORE, BE IT RESOLVED by the Planning Commission as follows:

SECTION 1. The above recitals are all true and correct.

SECTION 2. The Planning Commission has reviewed and considered the environmental information included in the staff report prior to taking action on a proposed second Modification to Conditional Use Permit 96-11. The Planning Commission further finds and determines that the City has complied with the California Environmental Quality Act and the Planning Commission determinations reflect the independent judgment of the Planning Commission.

SECTION 3. The Planning Commission hereby finds and determines that:

Conditional Use Permit 96-11 (Modification No. 2):

(a)     That the proposed Conditional Use Permit is consistent with the General Plan;

The project is consistent with the General Plan as the site is designated Manufacturing/Industrial (MI) which is consistent with Appendix A of Title 17 of the Zoning Code which allows Prisons/Correctional Facilities uses with approval of a Conditional Use Permit.

RESOLUTION NO. P-20-03
February 19, 2020
Page 2

(b)     That the nature, condition, and development of adjacent uses, buildings, and structures have been considered, and that the use will not adversely affect or be materially detrimental to these adjacent uses, buildings, or structures;

Surrounding properties to the north and south are currently vacant, and the properties to the east and west are developed with the Desert Community Bank and the Adelanto ICE Processing Center, so the project is not expected to adversely affect surrounding properties.

(c)     That the site for the proposed use is of adequate size and shape to accommodate the use and buildings proposed;

The Conditional Use Permit 96-11 (Modification No.2) is to modify condition number 12 to allow housing for Federal inmates and detainees and allow the Desert View Correctional Facility to house male and/or female inmates and detainees. The present request will not modify the maximum bed capacity of the facility and it does not call for the physical expansion of the existing facility.

(d)     That the proposed use complies with all applicable development standards of the Zoning district; and

The proposed project has been designed and conditioned to meet all applicable City zoning and development standards, for the Manufacturing/Industrial (MI) zoning district.

(e)     That the proposed use observes the spirit and intent of this Zoning Code.

The proposed project meets the requirements of the Zoning Code. However, to ensure all Code requirements are met, conditions of approval has been added reflecting these requirements.

SECTION 4.   The City of Adelanto, as lead agency, has determined that the project is exempt from the provisions of the California Environmental Quality Act pursuant to Title 14 California Code of Regulations Section 15301 because the modification of the Conditional Use Permit represents the continued operation of an existing facility involving negligible or no expansion and pursuant to Section 15061(b)(3) because the proposed modification does not have the potential for causing a significant effect on the environment.

SECTION 5. Pursuant to the provisions of California Civil Code Section 1670.9(d), this approval of modification to Conditional Use Permit 96-11 shall not be considered issued, executed or effective until July 15, 2020, which is more than 180 days from January 11, 2020, the date of notice to the public of the proposed permitting action.

SECTION 6. The Planning Commission hereby approves, Conditional Use Permit 96-11 (Modification No.2).

RESOLUTION NO. P-20-03
February 19, 2020
Page 3


ATTACHMENTS:

1. Conditions of Approval

PASSED, APPROVED AND ADOPTED by the Planning Commission this 19th day, February, 2020.

                                                    Keron Jones
                                    Chairman of the Planning Commission


Nyeka Allen
Secretary to the Planning Commission




I, Nyeka Allen, Planning Secretary for the Planning Commission of the City of Adelanto, California, do hereby certify that the foregoing Resolution No. P-20-03 was duly and regularly adopted at a regular meeting of the Planning Commission of the City of Adelanto on the 19th day of February 2020, by the following vote, to-wit:

AYES:   Chair Jones, Commissioners Delgado, Ramos, Rubulcava


NOES:   Vice Chair Johnson


ABSENT:
              None

ABSTAIN:
              None

IN WITNESS WHEREOF, I hereunto set my hand and affix the official seal of the City of Adelanto on the 19th day of February 2020

Nyeka Allen
Secretary to the Planning Commission

# EXHIBIT F





## CELEBRATING THE HISTORY OF ICE

2003  2019

## ICE

# It's a story that began sixteen years ago...

With its passage in November 2002, the Homeland Security Act set into motion what would be the single-largest government reorganization since the creation of the Department of Defense. Opening its doors in March 2003, one of the component agencies in the new Department of Homeland Security was the Bureau of Immigration and Customs Enforcement, now known as U.S. Immigration and Customs Enforcement or ICE.

ICE was granted a unique combination of civil and criminal authorities to better protect national security and strengthen public safety in response to the deadly attacks perpetrated on 9/11.

Leveraging those authorities, ICE has become a powerful and sophisticated federal law enforcement agency.

Throughout 2017, ICE is looking back at its achievements and history through a series of stories, images and milestones, focusing on significant events and accomplishments, one year at a time, beginning with 2003.



## September 11, 2001: 19 terrorists hijack commercial airliners and carry out massive attack on the United States



Terrorists take advantage of security weaknesses in our aviation system to kill nearly 3,000 innocent men, women and children, including citizens of more than 90 countries. It is the deadliest terrorist attack on American soil.

## November 2002: Homeland Security Act

The Homeland Security Act of 2002 is introduced in the aftermath of the Sept. 11 attacks and subsequent mailings of anthrax spores. The act is co-sponsored by 118 members of Congress and signed into law by President George W. Bush Nov. 2002. The Homeland Security Act creates the U.S. Department of Homeland Security and the new cabinet-level position of secretary of homeland security.

Case 1:20-cv-00965-TLN-AC   Document 20-5   Filed 07/21/20   Page 69 of 184



## 2003

## March 2003: U.S. Department of Homeland Security officially begins operations



The U.S. Department of Homeland Security's (http://www.dhs.gov/creation-department-homeland-security) mission is to prevent terrorism and enhance security; secure and manage U.S. borders; enforce and administer U.S. immigration laws; safeguard and secure cyberspace; and ensure resilience to disasters. March 1, 2003, the U.S. Department of Homeland Security is created through the integration of all or part of 22 different federal agencies and programs into a unified, integrated department. The U.S. Department of Homeland Security absorbed the Immigration and Naturalization Service and the U.S. Customs Service and assumed their

Policy.) Under the new department, 22 agencies fell under its leadership
and created three new agencies: Bureau of Customs and Border Protection, Bureau of
Citizenship and Immigration Services and Bureau of Immigration and Customs Enforcement.

## Michael J. Garcia nominated as the assistant secretary for Bureau of Immigration and Customs Enforcement



In March 2003 President Bush appoints Michael J. Garcia (http://georgewbush-
whitehouse.archives.gov/government/garciam-bio.html) as the assistant secretary
(http://www.gpo.gov/fdsys/pkg/CHRG-108shrg91347/pdf/CHRG-108shrg91347.pdf) of
homeland security for the Bureau of Immigration and Customs Enforcement and he is
unanimously confirmed by the Senate, Nov. 2003. Garcia served as Acting Commissioner of
the U.S. Immigration and Naturalization Service from Dec. 2002 to Feb. 2003 before it was
integrated into the U.S. Department of Homeland Security. From Aug. 2001 to Nov. 2002, he
was the top federal enforcer of dual-use export control laws as the assistant secretary of
commerce for export enforcement.



## Highlights

- Detention and Removal Operations establishes the first eight Fugitive Operations
  Teams. They arrest 1,900 illegal aliens.

Case 1:20-cv-00966-TLN-AC   Document 20-5   Filed 07/21/20   Page 71 of 184

Removal Operations officers in less than a month.

- The first special agent training graduation is held, marking the graduation of the first class of special agents.

- Office of Investigations launches Cornerstone, an outreach initiative to identify vulnerabilities in financial systems through which criminals launder their illicit proceeds.

- Office of Investigations launches Operation Predator, an initiative to protect children from sexual predators by targeting child pornographers, child-sex tourists and people involved in all levels of child pornography.

- A tip line is launched to collect tips in support of Operation Predator.

- The Office of the Principal Legal Advisor secures a removal order against Juan Emilio Aboy, a known Cuban spy.



## 2004

## Highlights

- The National Fugitive Operations Program adds 10 additional Fugitive Operations Teams to bring the number of teams to 18.

- The Alternatives to Detention Program is established. This tool uses technology and case management to increase compliance with release conditions and facilitate alien compliance with final orders while allowing aliens to remain in their communities.

- The Northern Virginia Internet Crimes Against Children Task Force moves into the Cyber Crimes Center.

- The General Counsel Electronic Management System, a web-based case management tool, is deployed in all 26 Office of the Principal Legal Advisor's Chief Counsel Offices.

Case 1:20-cv-00966-TLN-AC   Document 20-5   Filed 07/21/20   Page 72 of 184



# 2005

## Highlights

- The agency becomes a board member and the primary U.S. law enforcement representative of the Virtual Global Taskforce, an international alliance of law enforcement agencies and private industry sector partners working together to combat online child sexual abuse.

- The National Fugitive Operations Program adds 26 additional Fugitive Operations Teams to bring the total number of teams to 44. The teams arrest 7,959 illegal aliens.

- Office of Investigations, in partnership with the U.S. Department of State, begins conducting cross-border, financial investigation trainings around the world.

- The Border Enforcement Security Task Force is created.

- The case for removal of Kelbessa Negewo, who used fraud to obtain asylum, permanent residency and naturalization in the U.S., is secured through the work of Atlanta's Office of the Principal Legal Advisor.

- The agency launches Operation Community Shield after a threat assessment by field offices identified Mara Salvatrucha (MS-13) as one of the largest and most violent street gangs in the country.

Case 1:20-cv-00966-TLN-AC    Document 20-5    Filed 07/21/20    Page 73 of 184



## 2006



## January 2006: Julie L. Myers is appointed assistant secretary for Bureau of Immigration and Customs Enforcement

In Jan. 2006 President George Bush appointed Julie L. Myers (http://georgewbush-whitehouse.archives.gov/government/j-myers-bio.html) as assistant secretary of homeland security for the Bureau of Immigration and Customs Enforcement. Prior to her appointment, Myers served as special assistant to the president for presidential personnel. Before that, she served as assistant secretary for export enforcement at the Department of Commerce. In that role, Myers supervised a nationwide law enforcement agency that specialized in export control violation, both civil and criminal.

## Highlights

- Detention and Removal Operations initiates the Detention Enforcement and Processing of Offenders by Remote Technology Center in Chicago to serve as the designated centralized interview and processing site for convicted criminal aliens incarcerated by the Federal Bureau of Prisons.

- The Fugitive Operations Support Center is established to enhance the efficiency and effectiveness of the National Fugitive Operations Program.

- The Electronic Monitoring Program, an alternative to detention is initiated.

- The 287(g) program, which allows a state or local law enforcement entity to enter into a partnership with ICE to perform immigration law enforcement functions within their jurisdictions, is created.

- The Office of the Principal Legal Advisor headquarters provides 40 hours of customs law training for all of its offices.

- Operation Wagon Train, one of the largest worksite enforcement operations in U.S. history, is launched.



2 0 0 7

## January 29, 2007: ICE removes Majid Al-Massari

ICE removed Majid Al-Massari, 35, a native and citizen of Saudi Arabia belonging to an undesignated terrorist organization. Al-Massari was ordered removed June 30, 2005, and was removed Jan. 29, 2007. At the time of his arrest, Al-Massari was a Seattle area computer security specialist who used his cyber skills to engage in terrorist activities. He purposely used

Case 1:20-cv-00966-TNM-ACS Document 20-5 Filed 07/21/20 Page 75 of 184

to communicate on how to conduct terrorist attacks and commit the Defense of Legitimate Rights and incite hatred against other groups of people. Al-Massari moderated an Internet chatroom for members of the group and posted Al Qaeda's weekly magazine at his site.



## March: Bureau of Immigration and Customs Enforcement renamed U.S. Immigration and Customs Enforcement

The U.S. Department of Homeland Security changes the name (http://www.uscis.gov/ilink/docView/FR/HTML/FR/0-0-0-1/0-0-0-123038/0-0-0-123059/0-0-0-125494.html) of the Bureau of Immigration and Customs Enforcement to U.S. Immigration and Customs Enforcement, and the Bureau of Customs and Border Protection to U.S. Customs and Border Protection.

## June: Detention and Removal Operations assumes programmatic responsibility of the Criminal Alien Program from the Office of Investigations

Detention and Removal Operations assumes responsibility for the Criminal Alien Apprehension Program June 1. ICE aims to arrest and remove criminal aliens by securing a final order of removal before they are released from prison or jail. Identifying and processing incarcerated criminal aliens, prior to release from jails and prisons, decreases or eliminates the time spent in ICE custody, which reduces the overall cost to the federal government.

## September: ICE implements the electronic travel document system, significantly reducing the amount of time required for partner countries to issue a travel document

Sept. 1, 2007 (http://www.ice.gov/doclib/foia/contracts/gs35f0323jhsceop07f01158electronicdatasystemscorporation.pdf) ICE launches their electronic travel document system, a system used to review travel document requests and issue travel documents electronically.



October: The National Fugitive Operations Program, with significant assistance from the Fugitive Operations Support Center, reduces the nation's fugitive alien population for the first time (http://www.ice.gov/doclib/news/library/factsheets/pdf/fop2007-fact-sheet.pdf)

As of Oct. 1, 2007, ICE's fugitive case backlog consisted of less than 595,000 fugitive aliens, which was approximately 38,000 fewer fugitives than the population recorded Oct. 1, 2006.

ICE established the first Fugitive Operations Teams in 2003 to expand the agency's efforts to locate, arrest and remove fugitives from the United States.

December: Value of counterfeit or pirated merchandize seizures increases by more than 20% (http://www.ice.gov/doclib/iprcenter/pdf/ipr-fy-2011-seizure-report.pdf) compared to 2006 totals

Although the total number of seizures dropped from 14,675 in 2006 to 13,657 in 2007, the total value of those seizures increased from $155,369,236 to $196,754,377.

Case 1:20-cv-00966-TLN-AC   Document 20-5   Filed 07/21/20   Page 77 of 184



## 2008



## July: National Intellectual Property Rights Coordination Center opens in Virginia

The U.S. Immigration and Customs Enforcement-led Intellectual Property Rights Coordination Center co-locates, for the first time, the regulators and law enforcement agencies that work to protect public safety and national security by stopping the importation of counterfeit, substandard and tainted products and the theft of intellectual property. The IPR Center's early partners include U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, the Department of Commerce, Health and Human Services' Food and Drug Administration, the Department of Justice's Federal Bureau of Investigation and the U.S. Postal Inspection Service.



## November: U.S. Immigration and Customs Enforcement opens new headquarters

Case 1:20-cv-00966-TLN-AC Document 20-5 Filed 07/21/20 Page 78 of 184

employee's at one ICE U.S. Immigration and Customs Enforcement overview headquarters building, Potomac Center North, in southwest Washington, D.C. This new building gives the growing agency the space and resources it needs to fulfill its expanding mission.

## Highlights

- The Criminal Alien Program initiates the Violent Criminal Alien Section to enforce violations of criminal immigration law found through the enforcement activities of Detention and Removal Operations.

- Secure Communities, an initiative to modernize the process used in identification and removal begins planning its first activations.

- ICE signs a memorandum of understanding with Vietnam, allowing for the repatriation of Vietnamese citizens who entered the United States on or after July 12, 1995.

- The Office of the Principal Legal Advisor facilitates the creation of the ICE Suspension and Debarment Program.

- An ICE investigation leads to the conviction of Chuckie Taylor, an American citizen and the son of former Liberian president Charles Taylor, who was charged with five counts of torture, conspiracy to torture and two federal firearm offenses for his role in the torture and murder of several victims in Liberia during his father's regime.

- ICE's Operation Devil Horns leads to the indictment of twenty-two individuals in the San Francisco Bay Area on federal racketeering and other charges arising from their participation in the Mara Salvatrucha (MS-13) gang.

Continue to Part 2 (/features/history/2#content1) ⊙

Last Reviewed/Updated: 03/01/2019



✉ (http://service.govdelivery.com/service/multi_subscribe.html?code=USDHSICE) 📘 (http://www.facebook.com/wwwicegov) 🐦 (http://twitter.com/ICEgov) 🔴 (/rss/)
📺 (http://youtube.com/wwwICEgov) 💼 (https://www.linkedin.com/company/u-s-immigration-and-customs-enforcement-ice) 🎙 (/podcasts) 📷 (https://www.instagram.com/icegov)

Archive (/archive)    |    DHS.gov (http://www.dhs.gov)    |    NTAS (https://www.dhs.gov/ntas-widget)    |    USA.gov (http://www.usa.gov)    |    OIG (http://www.oig.dhs.gov)    |

FOIA (/foia/overview)    |    Metrics (/metrics)    |    No Fear Act (/leadership/dcr)    |    Site Map (/sitemap)    |    Site Policies & Plug-Ins (/site-policies)

# EXHIBIT G

1  Charles J. Cooper (Appearing *Pro Hac Vice*), DC Bar No. 248070
   COOPER & KIRK, PLLC
2  1523 New Hampshire Avenue, NW
   Washington, DC 20036
3  Telephone: (202) 220-9600
   Email: ccooper@cooperkirk.com
4
   Michael B. McClellan, CBN 241570
5  NEWMEYER & DILLION LLP
   895 Dove Street, Fifth Floor
6  Newport Beach, CA 92660
   Telephone: (949) 854-7000
7  Email: Michael.McClellan@ndlf.com

8  *Attorneys for Plaintiff The GEO Group, Inc.*

9              UNITED STATES DISTRICT COURT

10            EASTERN DISTRICT OF CALIFORNIA

11 THE GEO GROUP, INC.,                    Case No. 2:20-cv-00533-TLN-AC

12            Plaintiff,                   District Judge: Hon. Troy L. Nunley
                                           Magistrate Judge: Hon. Allison Claire
13 v.
                                           **DECLARATION OF AMBER MARTIN IN**
14 GAVIN C. NEWSOM, in his official capacity **SUPPORT OF MOTION FOR**
   as Governor of the State of California;  **PRELIMINARY INJUNCTION**
15 XAVIER BECERRA, in his official capacity
   as Attorney General of the State of California *[Notice of Motion and Motion, Memorandum of*
16                                          *Points and Authorities, Declaration of Richard*
             Defendants.                    *Long, Declaration of C. Kendie Schlecht,*
17                                          *Appendix of Exhibits filed concurrently*
                                           *herewith; Order lodged concurrently herewith]*
18
                                           Date:    May 28, 2020
19                                          Time:    2:00 p.m.
                                           Place:   501 I. Street, Courtroom 2
20                                                   Sacramento, CA 95814

21                                          FILE DATE: March 9, 2020
                                           TRIAL DATE:      No Date Set
22

23

24 I, Amber Martin, declare as follows:

25         1.     I am the Executive Vice President of Contract Administration for The GEO Group,

26 Inc. (GEO). I submit this declaration in support of GEO's motion for preliminary injunction.

27 Except as stated upon information and belief, I have personal knowledge of the facts set forth in

28 this declaration and, if called as a witness, I could and would testify under oath competently thereto.

                                    - 1 -
                                                MARTIN DECL. ISO MOT.PRELIM. INJ.

2. The GEO Group, Inc. is a publicly traded corporation that owns and operates detention facilities worldwide. As a contractor for the Federal Government, GEO provides detention services for Immigration and Customs Enforcement (ICE) in the State of California.

**I.    GEO's California ICE Detention Facilities**

3. In California, GEO currently operates detention facilities on behalf of ICE in or near the cities of McFarland and Adelanto.

4. In the City of Bakersfield (near the City of McFarland), GEO operates the Mesa Verde ICE Processing Center under a 15-year contract with ICE that GEO signed on December 19, 2019. As part of the same Mesa Verde contract, GEO operates the Central Valley Modified Community Correctional Facility (MCCF) and Golden State MCCF as annexes to the Mesa Verde ICE Processing Center, both of which are located in McFarland.

5. Central Valley was used by the California Department of Corrections and Rehabilitation (CDCR) for detention of state inmates through September 30, 2019, while Golden State's contract with CDCR will phase out by April 30, 2020.

6. In the City of Adelanto, GEO operates the Adelanto ICE Processing Center under a 15-year contract with ICE that GEO signed on December 19, 2019. As part of the same Adelanto contract, GEO operates Desert View MCCF.

7. Desert View was used by CDCR for detention of state inmates through February 29, 2020.

**II.   Financial Impact of SB-29 on GEO**

8. My understanding is that California Senate Bill 29 (SB-29), codified in relevant part at CAL. CIV. CODE § 1670.9(d), will require GEO to wait 180 days from the day that the planning commission of the relevant city (e.g., Adelanto or McFarland) gives public notice of GEO's request to modify its conditional use permits before the city may issue such a permit. It is also my understanding, from my review of Richard Long's declaration, that this will result in a permit-modification process that is approximately 90 days or three months longer than GEO has had to endure in the last 20 years of permitting proceedings in Adelanto or McFarland. Finally, it is my understanding that SB-29 has forced GEO to prepare for and send representatives to one additional

- 2 -                              MARTIN DECL. ISO MOT.PRELIM. INJ.

NEWMEYER DILLION

1    hearing at each of Adelanto and McFarland before the planning commissions in those cities could

2    vote on GEO's applications. Based on my familiarity with GEO's contracts with ICE relating to

3    the California detention facilities discussed above, as well a financial-impact analysis prepared

4    under my supervision, I can testify to the financial impact that SB-29 will have on GEO.

5         9.     Because of the additional hearing required by SB-29, GEO was forced to expend

6    time, money, and other resources preparing for the additional hearings in McFarland and Adelanto

7    and ensuring that GEO representatives would be present at the additional hearings.

8         10.     The delay in approving GEO's CUP-modification applications has prevented GEO

9    from moving more quickly on activities it is required to perform under its contracts with the Federal

10    Government. The additional three-month delay has caused and continues to cause a significant

11    detrimental financial impact to GEO—resulting in a loss of federal revenue to GEO amounting to

12    several millions of dollars—while GEO awaits the completion of the 180-day period.

13         11.     SB-29 also results in three months of additional expenses to GEO in continuing the

14    employment of those individuals working at the previously approved facility who will be

15    transitioning to the re-purposed federal facility. GEO's Desert View and Golden State MCCFs have

16    274 employees, which will require approximately $3.2 million in estimated payroll and benefit

17    costs during the three additional months required under SB-29 in order to be transitioned into a

18    fully operating federal facility.

19         I declare under penalty of perjury under the laws of the United States of America and the

20    State of California that the foregoing is true and correct. Executed this 16th of March, 2020, in

21    Boca Raton, Florida.

22

23

24                                  Amber Martin

25

26

27

28



- 3 -         MARTIN DECL. ISO MOT. PRELIM. INJ.

# EXHIBIT H

SENATE RULES COMMITTEE                                       SB 29
Office of Senate Floor Analyses
(916) 651-1520    Fax: (916) 327-4478

THIRD READING

Bill No:    SB 29
Author:     Lara (D)
Introduced: 12/5/16
Vote:       21

SENATE JUDICIARY COMMITTEE: 5-2, 3/28/17
AYES: Jackson, Hertzberg, Monning, Stern, Wieckowski
NOES: Moorlach, Anderson

SENATE APPROPRIATIONS COMMITTEE: 5-2, 5/25/17
AYES: Lara, Beall, Bradford, Hill, Wiener
NOES: Bates, Nielsen

**SUBJECT:** Law enforcement:  immigration

**SOURCE:** Community Initiatives for Visiting Immigrants in Confinement
Immigrant Legal Resource Center

**DIGEST:** This bill prohibits local law enforcement agencies and local governments from contracting with for-profit entities to detain immigrants on behalf of federal immigration authorities.  This bill requires that immigrant detention facilities adhere to national immigration standards for the detention of immigrants.  This bill further requires that immigrants in detention be provided other legal rights, as specified.  This bill authorizes suits against detention facilities for violations of the national detention standards or violations of other legal rights created by this bill.

**ANALYSIS:**

Existing law:

1) Provides that everyone has the right to seek and to enjoy in other countries asylum from persecution.

2) Protects asylum seekers by prohibiting the federal government from returning to their home countries people who have fled persecution on account of race, religion, nationality, political opinion, or membership in a social group.

3) Provides that victims of certain crimes may obtain immigration relief through a Victim of Crime Visa (U-Visa) and victims of human trafficking may obtain immigration relief through a Victim of Human Trafficking Visa (T-Visa).

4) Provides immigration relief that relies on a state's interest in the welfare of children and provides for Special Immigrant Juvenile Status where a state determines that reunification with one or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or similar basis found under state law and that it would not be in the child's best interest to return to their home country.

5) Establishes that the care and custody of unaccompanied minors is the responsibility of the Office of Refugee Resettlement in the Department of Health and Human Services instead of the Department of Homeland Security.

6) Holds that immigrant detainees with mental disabilities who are facing deportation and who are unable to adequately represent themselves are entitled to qualified legal representatives provided by the federal government for representation during all phases of their immigration proceedings, including appeals and custody hearings.

This bill:

1) Prohibits, as of January 1, 2019, local governments or local law enforcement from entering into or renewing a contract, or modifying a contract to extend the length of the contract, with a private corporation, contractor or vendor to detain immigrants in civil immigration proceedings for profit.

2) Provides that a city, county, city and county, or a local law enforcement agency that chooses to enter into a contract, renews a contract, or modifies a contract to extend the length of the contract, to detain immigrants in civil immigration proceedings, shall detain immigrants only pursuant to a contract that requires the immigration detention facility operator to adhere to the standards for detaining those individuals described in the 2011 Operations Manual Immigration and Customs Enforcement (ICE) Performance-Based National Detention Standards as corrected and clarified in February 2013 and ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

3) Makes clear that an immigration detention facility can exceed the 2011 Operations Manual ICE Performance-Based National Detention Standards as corrected and clarified in February 2013 or ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

4) Prohibits immigrant detention facilities, agents of immigration detention facility operators, or those acting on their behalf from depriving immigrant detainees: (a) access to legal representatives; (b) access to translation or interpreters; (c) medical care (which would still include, and not be limited to, HIV medication and transition-related health care, and would still need to be provided even if an immigrant is likely to be released or deported); (d) freedom from harm or harassment; and (e) privacy.

5) Prohibits the involuntary placement of immigration detainees in segregated housing because of the detainee's actual or perceived gender, gender identity, gender expression, or sexual orientation. This bill also requires that transgender and gender non-conforming immigration detainees be given the option to choose a housing placement consistent with their gender identity.

6) Authorizes civil actions for injunctive and other appropriate equitable relief and a civil penalty of $25,000, as specified, when an immigrant detention facility operator, or its agent or person acting on its behalf violates rights created under this bill or the 2011 Operations Manual ICE Performance-Based National Detention Standards as corrected and clarified in February 2013, or ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

7) Requires that if a civil penalty is requested, the civil penalty shall be assessed individually against each person who is determined to have violated the legal rights of a detained immigrant and awarded to each individual who has been injured.

8) Subjects any facility that detains an immigrant pursuant to a contract with a city, county, city and county, or a local law enforcement agency to the California Public Records Act.

9) Makes related legislative findings and declarations, and includes definitions.

## Background

In California, and around the country, for-profit detention facilities are increasingly relied upon to detain immigrants who are oftentimes eligible for Asylum, Special Immigrant Juvenile Status immigration relief, U-Visas, T-Visas, or other forms of immigration relief. Additionally, a few local government and local law enforcement entities choose to enter into agreements with federal immigration authorities to detain immigrants in their county or city jails on behalf of the federal immigration authorities.

For-profit detention facilities are accountable to their shareholders and not the people of the State of California. Oftentimes, immigrants in immigrant detention facilities are escaping persecution in their countries of origin and in need of special care due to their persecution or because they have suffered arduous journeys as unaccompanied children. Ensuring that immigrants are provided with the services they need to heal oftentimes is in contrast to corporate interests. Because these facilities are private, they routinely claim exemptions to the California's Public Records Act and the federal Freedom of Information Act. Despite the lack of access to records through these acts, there have been reports of inadequate medical care, suicide attempts, sexual assault, and even deaths at for-profit immigrant detention facilities. Somewhat perversely, because immigration detention is technically a civil form of confinement, immigrants in immigrant detention facilities lack many of the safeguards of the criminal justice system, including access to counsel.

Local government and law enforcement entities that choose to contract with immigration authorities to detain immigrants are supposed to adhere to national immigration detention standards, promulgated by ICE regardless of whether they detain the immigrants in their local jails or contract their immigrant detention duties out to private for-profit corporations. But many detainees have reported experiencing deplorable conditions at city and county immigrant detention facilities in violation of the national standards. No meaningful enforcement mechanism currently exists to hold immigration detention facilities accountable, whether for-profit or run by local governmental agency, when they violate immigrant detainee's rights. Various reports indicate that the rights of Lesbian, Gay, Bisexual, and Transgender (LGBT) detained immigrants have been extensively violated at both types of detention facilities.

Last year, the Legislature passed SB 1289 (Lara), a bill identical to SB 29, but the Governor vetoed the bill. In his veto message the Governor wrote:

I have been troubled by recent reports detailing  unsatisfactory conditions and limited  access to counsel in private immigration  detention facilities.  The Department of Homeland Security, however, is now considering whether private contracting should continue for immigrant  detention, and if so under what conditions.  Their recommendations are expected in November.  These actions indicate that a more permanent solution to this issue may be at hand.  I urge the federal authorities  to act swiftly.

Since the veto of SB 1289, a new President was elected who has made it clear in his executive orders and his administration's enforcement guidelines  that every undocumented immigrant  could be a target of deportation.  President Donald Trump has also made it clear that he intends to detain more immigrants and expand private for profit detention facility use.  This bill would protect immigrants  held in immigrant  detention in California.

## Comments

The author writes:

In 2011 ICE developed the Operations Performance-Based National Detention Standards, which lays out the basic health  and safety standards detainees should receive while in detention.  However, these standards are not codified and are unenforceable.  There have been widespread reports of human right's abuses in detention facilities,  including  physical and sexual abuse, poor access to healthcare, little  access to legal counsel, overuse of solitary confinement, and even death.  LGBT detainees have reported facing discrimination,  harassment, and abuse due to their sexual orientation.  In many of these instances, even the Department of Homeland Security has found these deaths were preventable.  Tragically, the incidents often go unaddressed and victims have no recourse.

Private, for-profit immigration  detention facilities  present a host of problems.  The facilities  are not subject to the Freedom of Information Act and operate with little  to no oversight.  Many also operate under a perverse incentive, where they are guaranteed a minimum number of detainees in their facility at all times, ensuring their profits.  For example in Adelanto Detention Facility in Adelanto, California, ICE is guaranteed 975 detainees at all times  with a per diem rate of $111 per bed per day.  The private detention contracts are designed to incentivize  filling  the most beds at all times, regardless of public safety or their destructive effects on communities.  Private companies make billions  in profits every year from

incarcerating mothers, fathers, children, and others in our broken immigration system.

**FISCAL EFFECT:** Appropriation:  No    Fiscal Com.:  Yes    Local:  No

According to the Senate Appropriations Committee:

- Department of Justice:  Potentially significant workload increase (General Fund) should the Attorney General choose to bring civil actions for injunctive and other equitable relief, offset in part by civil penalty revenues. To the extent the number and complexity of cases brought forward is significant, costs could rise into the hundreds of thousands of dollars annually.

- Local prosecutors: Potentially significant non-reimbursable local costs (local funds) to bring civil actions for injunctive and other equitable relief, offset in part by civil penalty revenues.

- Local governments/agencies:  Potentially significant loss of future revenue (local funds) due to the inability to contract with for-profit entities for immigrant detention services. To the extent a local law enforcement agency opts to detain immigrants in its facilities through a direct contract with the federal government, the agency could incur potentially significant non-reimbursable costs (local funds) to ensure immigrant detainee rights as prescribed are met.

- Private contractors/vendors: Unknown, potentially major costs (private funds) to adhere to the specified standards and processes for detainee transfers and rights to counsel, translators, interpreters, and medical care and comply with public record requests as outlined in the bill.

**SUPPORT:** (Verified  5/25/17)

Community Initiatives for Visiting Immigrants in Confinement (co-source)
Immigrant Legal Resource Center (co-source)
AFSCME, AFL-CIO
AFSCME, Local 685
Alliance for Boys and Men of Color
American Academy of Pediatrics, California
Antelope Valley League of United Latin American Citizens
Association for Los Angeles Deputy Sheriffs
Association of Deputy District Attorneys
California Catholic Conference

California Environmental Justice Alliance
California Health+ Advocates
California Immigrant Policy Center
California Latinas for Reproductive Justice
Community Clinic Association of Los Angeles County
Council on American-Islamic Relations
Equality California
Harvey Milk LGBT Democratic Club
Human Rights Defense Center
Inland Coalition for Immigrant Rights
Jewish Public Affairs Committee of California
Latino Coalition for a Healthy California
League of Women Voters of California
Los Angeles County Probation Officers' Union
Los Angeles County Professional Peace Officers Association
Los Angeles LGBT Center
Los Angeles Police Protective League
Mixteco/Indigena Community Organizing Project
National Association of Social Workers, California Chapter
Pangea Legal Services
Riverside Sheriffs' Association
Service Employees International Union
Services, Immigrant Rights and Education Network
Transgender Law Center
United Farm Workers

**OPPOSITION:** (Verified 5/25/17)

California State Sheriffs' Association
Imperial County Board of Supervisors


Prepared by: Margie Estrada / JUD. / (916) 651-4113
5/27/17 18:32:27

**\*\*\*\* END \*\*\*\***

# EXHIBIT I

Date of Hearing:  June 27, 2017

ASSEMBLY COMMITTEE ON JUDICIARY
Mark Stone, Chair
SB 29 (Lara) – As Introduced December 5, 2016

**SENATE VOTE**: 26-13

**SUBJECT**:  LAW ENFORCEMENT:  IMMIGRATION DETENTION FACILITIES

**KEY ISSUES**:

1) BECAUSE OF THE LACK OF PUBLIC OVERSIGHT AND ACCOUNTABILITY IN PRIVATE FACILITIES, SHOULD LOCAL GOVERNMENTS AND LAW ENFORCEMENT AGENCIES BE PROHIBITED FROM CONTRACTING WITH COMPANIES THAT OPERATE PRIVATE FACILITIES FOR PROFIT TO DETAIN IMMIGRANTS IN CIVIL IMMIGRATION PROCEEDINGS?

2) IN LIGHT OF REPORTED ABUSE OF IMMIGRANTS DETAINED IN SUCH FACILITIES, SHOULD IMMIGRATION DETENTION FACILITIES IN CALIFORNIA THAT ARE OPERATED BY FOR-PROFIT COMPANIES BE REQUIRED TO UPHOLD NATIONAL MINIMUM STANDARDS FOR THE HUMANE TREATMENT OF DETAINEES?

**SYNOPSIS**

*Federal immigration authorities, namely the U.S. Immigration & Customs Enforcement (ICE) or the U.S. Marshals, enter into Intergovernmental Service Agreements (IGSAs) with local governments or local law enforcement whereby the local entity agrees to detain immigrants on behalf of the federal government.  Local governments or local law enforcement can then choose to detain the immigrants in their own publicly-run facilities (i.e. county jails) or to subcontract with for-profit operators of private detention facilities instead.  The author contends that because these private detention facilities operate with little to no public oversight and are not subject to public disclosure laws, such as the Freedom of Information Act, they are essentially accountable only to their shareholders and not the people of the State of California.  As a result, abuse and inhumane treatment of detainees is reportedly tolerated and persists in these facilities because the public has no dependable mechanism for getting information about what is going on behind closed doors.  To corroborate these claims, the Committee has received a number of reports and letters from immigrant advocates, watchdog organizations, and human rights advocates describing investigations that have uncovered widespread incidents of abuse and mistreatment of immigrants who are held in private detention facilities in California.*

*This bill, co-sponsored by Community Initiatives for Visiting Immigrants in Confinement (CIVIC) and the Immigrant Legal Resource Center, seeks to prohibit local governments and law enforcement from contracting with companies that operate for-profit immigration detention facilities, and requires these facilities to uphold national standards for humane treatment of detainees.  These national standards are promulgated by ICE itself to govern conditions of confinement in its detention facilitates established through contracts with those facility operators, and are known as the Performance-Based National Detention Standards 2011 (aka "PBNDS 2011").  Among the standards codified by this bill are provisions that prohibit*

*immigrant detainees from being deprived of access to an attorney or other authorized legal representative; access to translation or interpreters; medical care; freedom from harm or harassment; and privacy. The bill also creates a number of other protections and rights for immigrant detainees that would be enforceable under the bill.*

*This bill is needed, proponents contend, to address the fact that although the PBNDS 2011 standards may apply under contracts between ICE and detention facilities, the standards are ultimately unenforceable because neither federal nor state law requires adherence to them. Accordingly, this bill would require that immigrant detention facilities adhere to the PBNDS 2011 standards and ICE Directive 11065.1, and protect other rights granted by this bill. The Attorney General, district attorneys, and city attorneys are empowered to enforce these provisions on behalf of the people, although there is no private right of action. This bill is a follow-up to AB 1289 (Lara) of 2016, which was approved by this Committee last year, but ultimately vetoed by Governor Brown, who stated he wanted to wait to see possible new federal regulations from the Obama administration before signing the bill. In light of the changed circumstances in the White House, this bill was introduced in December and is supported by a broad coalition of immigrant advocates, labor organizations, human rights advocates, and some local public safety groups. The bill is opposed by the California State Sheriffs Association and Imperial County, who contend, among other things, that their authority to contract with private detention facilities should not be limited, and that there is already sufficient oversight under federally-created standards and minimum standards provided by state regulations.*

**SUMMARY:** Prohibits local governments and law enforcement from contracting with companies that operate for-profit immigration detention facilities, and requires these facilities to uphold national standards for humane treatment of detainees. Specifically, **this bill**:

1) Prohibits a city, county, city and county, or a local law enforcement agency from entering into or renewing a contract, or modifying a contract to extend the length of the contract, with a private corporation, contractor, or vendor to detain immigrants in civil immigration proceedings for profit.

2) Provides that when an immigration detention facility chooses to enter into a contract to detain immigrants in civil immigration proceedings, it shall detain immigrants only pursuant to a contract that requires the entity contracting with DHS or other federal agency to adhere to the standards for detaining those individuals described in the 2011 Operations Manual Immigration and Customs Enforcement (ICE) Performance-Based National Detention Standards as corrected and clarified in February 2013 and ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

3) Prohibits immigration detention facilities, their agents, or those acting on their behalf from depriving immigrant detainees from: (a) access to an attorney or other authorized legal representative; (b) access to translation or interpreters; (c) medical care; (d) freedom from harm or harassment; and (e) privacy.

4) Prohibits the involuntary placement of immigrant detainees in segregated housing because of the detainee's actual or perceived gender, gender identity, gender expression, or sexual orientation.

5) Clarifies that an immigration detention facility can provide more rights than are required under the 2011 Operations Manual ICE Performance-Based National Detention Standards as

corrected and clarified in February 2013 or ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

6) Authorizes the Attorney General, any district attorney, or city attorney to bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California and seek a civil penalty of $25,000, as specified, when an immigration detention facility, or its agent or person acting on its behalf deprives an immigrant detainee of their rights created under this bill or rights under the 2011 Operations Manual ICE Performance-Based National Detention Standards as corrected and clarified in February 2013, or ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

7) Requires that if a civil penalty is requested by the Attorney General, a district attorney, or city attorney, the civil penalty shall be assessed individually against each person who is determined to have violated the legal rights of a detained immigrant and awarded to each individual who has been injured under these provisions.

8) Defines the key terms "immigration detention facility," "immigration detention facility operator," and "segregated housing."

**EXISTING STATE LAW**:

1) Permits the board of supervisors of any county to contract on behalf of the sheriff of that county, and the legislative body of any city may contract on behalf of the chief of police of that city, to provide supplemental law enforcement services to specified entities under certain conditions, including to private individuals or private entities to preserve the peace at special events or occurrences that happen on an occasional basis. (Government Code 53069.8 (a).)

2) Requires the Board of State and Community Corrections to establish minimum standards for local correctional facilities, which standards shall include, but not be limited to, the following areas: health and sanitary conditions, fire and life safety, security, rehabilitation programs, recreation, treatment of persons confined in local correctional facilities, and personnel training. (Penal Code Section 6030.)

3) Pursuant to the Unruh Civil Rights Act, provides that all persons within the jurisdiction of California are free and equal no matter their national origin, citizenship, or immigration status and are entitled to full and equal accommodations, facilities, and privileges in all business establishments of every kind. (Civil Code Section 51.)

**EXISTING FEDERAL LAW:**

1) Pursuant to the Immigration and Naturalization Act, protects all asylum seekers by prohibiting the federal government from returning to their home countries people who have fled persecution on account of race, religion, nationality, political opinion, or membership in a particular social group. (8 U.S.C. Sec. 1101 (a)(42)(A).)

2) Pursuant to the Immigration and Naturalization Act, provides that victims of certain crimes may obtain immigration relief through a Victim of Crime Visa (U-Visa) and victims of human trafficking may obtain immigration relief through a Victim of Trafficking Visa (T-Visa). (8 U.S.C. Sec. 1101 (a)(15)(U); 8 U.S.C. Sec. 1101 (a)(15)(T).)

3) Pursuant to case law, establishes that immigrant detainees with mental disabilities who are facing deportation and who are unable to adequately represent themselves are entitled to qualified legal representatives provided by the federal government for representation during all phases of their immigration proceedings, including appeals and custody hearings. (*Franco-Gonzalez v. Holder*, CV 10-02211-DMG.)

**FISCAL EFFECT**: As currently in print this bill is keyed fiscal.

**COMMENTS**: In one of his first interviews after being elected President, the current occupant of the White House echoed his campaign promises and told "60 Minutes" he intended to deport "millions and millions of undocumented immigrants" after his inauguration in January, focusing on those "who have criminal records" and promising to later "make a determination" on possible deportation of remaining undocumented immigrants. (Amy Wang, "Donald Trump plans to immediately deport 2 million to 3 million undocumented immigrants." Washington Post, Nov. 14, 2016. Available at: https://www.washingtonpost.com/news/the-fix/wp/2016/11/13/donald-trump-plans-to-immediately-deport-2-to-3-million-undocumented-immigrants). According to the Washington Post writer: "What would be new is the speed and scale with which Trump has vowed to remove undocumented immigrants with criminal records. His proposal to deport '2 to 3 million' people would be roughly equivalent to the number of people removed over the course of about six years under Obama's presidency. It is unclear how Trump would feasibly implement such a plan immediately after inauguration, as promised, without monumental expense and potentially exposing Americans to all kinds of disruptions." (*Id.*)

On January 25, 2017, the president issued Executive Order 13767 (82 FR 8793), titled "Border Security and Immigration Enforcement Improvements," which, among other things, calls for the immediate detainment and deportation of illegal immigrants and directs the U.S. Customs and Border Protection to hire 5,000 additional border patrol agents. EO 13767 clearly places a large number of California residents at greater risk of being deported. According to the author, Department of Homeland Security (DHS) figures show that over 400,000 people nationally are held each year awaiting a civil deportation proceeding, even though nothing in the law requires immigrants to be detained as immigration proceedings are civil, not criminal matters. Furthermore, the data indicate that today over 50% of detainees are held in private immigration detention facilities (i.e. run by private companies who contract with ICE), up from a rate of just 25% only ten years ago. According to the author:

> With the new administration's commitment to deport millions, it is even more crucial now than ever before that California insists on humane and just treatment for all immigrants in our state.
>
> There have been consistent reports of human rights abuses in private detention facilities, including physical and sexual abuse, poor access to healthcare, little access to legal counsel, and overuse of solitary confinement, and even death. SB 29 will prohibit local governments from contracting with private companies to detain immigrants for profit. This bill will also require detention facilities to meet the basic standards laid out by ICE's 2011 Performance-Based National Detention Standards. Ultimately, SB 29 will ensure that immigrants who are being detained do not face abuse or neglect in detention.

*Immigration detention facilities in California.* Local governments and local law enforcement entities are not required to detain immigrants on behalf of federal immigration authorities. The

ones in California that decide to detain immigrants do so by choice. Federal immigration authorities, either U.S. Immigration & Customs Enforcement (ICE) or the U.S. Marshals, enter into Intergovernmental Service Agreements (IGSAs) with local governments or local law enforcement whereby the local entity agrees to detain immigrants on behalf of the federal government. Local governments or local law enforcement can then choose to detain the immigrants in their own facilities or subcontract with for-profit detention facilities instead.

According to figures provided by CIVIC, 62% of all ICE immigration detention beds in the U.S. are operated by for-profit prison corporations, up from 49% in 2009. They contend that operators of these private detention facilities make billions in profit each year from holding undocumented persons, while the California county and city partners in these intergovernmental service agreements experience little economic gain. There are currently four for-profit detention facilities in California:

> (1) ICE contracts with the City of Adelanto, who in turn contracts with GEO Group to detain immigrants at the Adelanto Detention Facility (Adelanto).

> (2) ICE contracts with the City of McFarland, who in turn contracts with GEO Group to detain immigrants at the Mesa Verde Detention Facility (Bakersfield).

> (3) ICE contract with the City of Holtville, who in turn contracts with Management & Training Corp. (MTC) to detain immigrants at the Imperial Regional Detention Facility. (Calexico).

> (4) U.S. Marshals contract with Corrections Corporation of America (CCA) to detain immigrants at the Otay Detention Facility (San Diego).

According to the author, these four privately run facilities hold almost 85% of detainees statewide, approximately 3,700 people, with the rest held in county jail facilities that contract with federal immigration authorities. Specifically, ICE and the U.S. Marshals have intergovernmental service agreements with five counties, for the detention of immigrants at the Yuba County Jail (Marysville), Rio Consumnes Correctional Center (Elk Grove), the West County Detention Facility (Richmond), James Musick Facility (Irvine), and the Theo Lacy Facility (Orange). Lastly, they contract with the City of Santa Ana to detain immigrants at the Santa Ana City Jail. Altogether, CIVIC reports that a total of approximately 6,276 immigrants per day are held in civil confinement in these facilities. Proponents contend that many of these facilities operate under a perverse contractual incentive where they are guaranteed a minimum number of detainees in their facility at all times, thus ensuring their profits. For example, according to CIVIC, at the Adelanto Detention Facility (ADF), ICE is guaranteed 975 detainees at all times with a per diem rate of $111 per bed per day.

***Private immigration detention facilities operate with no mechanism for public oversight.*** The author contends that because private for-profit detention facilities operate with little to no oversight, they are essentially accountable only to their shareholders and not the people of the state of California. For-profit detention facilities claim exemptions to the public disclosure requirements under the Freedom of Information Act (FOIA) (5 U.S.C. Sec. 552) because they are private corporations, which makes the potentially unlawful conduct occurring within the facility hidden from discovery. For example, a 2013 article in Forbes noted that "if serious questions arise about…the 16,500 federal immigration detainees held in privately-operated facilities under contracts with the U.S. Department of Homeland Security, there's no legal remedy in place

forcing those questions to be answered." (Matt Stroud, Private Prisons Are Exempted From Federal Disclosure Laws; Advocates Say that Should Change, (Feb. 7, 2013) Forbes.)

Private detention facilities similarly claim exemptions to the California Public Records Act (CPRA) (Gov. Code Sec 6250 *et seq*). CIVIC notes that despite numerous reports of inadequate medical care, suicide attempts, sexual assault, and even deaths at for profit immigration detention facilities, it is difficult to obtain information about these facilities. CIVIC explains the process for obtaining information about private, for-profit immigration detention facilities as follows:

> [A] person can FOIA the IGSA between ICE and the private prison. When this occurs, ICE is required to ask the corporation if they are OK with the government disclosing it. If the corporation is OK, then it will be disclosed. However, it is completely in the discretion of the private prison corporation whether any document pertaining to the IGSA or any other aspect of the business is disclosed through a FOIA request.

As a result, abuse and inhumane treatment of detainees is reportedly tolerated and persists in these facilities because the public has no dependable mechanism for getting information about what is going on behind closed doors. Journalists and advocacy groups like CIVIC are occasionally able to document problems and incidents of mistreatment at these facilities, but only with the cooperation of the facilities themselves. The public policy of California is certainly not to allow the abuse of people who are detained by the government in facilities where there is no transparency or oversight. Accordingly, this bill would prohibit local governments and law enforcement from contracting with companies that operate for-profit immigration detention facilities to detain immigrants. While the Legislature lacks authority to prohibit private immigration detention facility operators from contracting directly with ICE or federal authorities to hold immigrants, this bill does not attempt to preclude those contracting practices. Rather, this bill attempts to bring more transparency to the operation of these facilities by making any facility that detains an immigrant pursuant to a contract with a city, county, city and county, or a local law enforcement agency subject to the California Public Records Act.

***Despite lack of transparency, advocates have documented patterns of widespread abuse of immigrants held in private detention facilities.*** The Committee has received a number of reports and letters in support of this bill from immigrant advocates, watchdog organizations, and human rights advocates describing widespread incidents of abuse and mistreatment of immigrants held in private detention facilities in California, as well as in facilities in other states operated by the same companies that operate facilities in California. In its report "*Abuse in Adelanto: An Investigation into a California Town's Immigration Jail*," CIVIC details a number of disturbing examples of prolonged detention, medical abuse and neglect, violations of religious freedom, attempted suicides, and the negligent deaths of detainees—just at the Adelanto facility alone. The National Immigrant Justice Center reports that among LGBT individuals in the detained population, there are higher accounts of the use of solitary confinement, sexual abuse, and poor medical care in immigration detention facilities. (See National Immigrant Justice Center, Stop Abuse of Detained LGBT Immigrants; available at: http://www.immigrantjustice.org/stop-abuse-detained-lgbt-immigrants.) Human Rights Watch reports that it interviewed many transgender women in immigration detention who report being subjected to sexual assault and regular strip searches by male guards, including at the Santa Ana City jail, and others who report being held in abusive conditions of indefinite solitary confinement that are justified by prison authorities as a measure for transgender detainees' protection. Finally, CIVIC summarizes cases from several other states where the same private detention companies (namely,

Geo Group, CCA, and MTC) have faced lawsuits (and in some cases been held civilly liable) for acts of sexual harassment, wrongful death, and medical neglect, among other things.

To address these issues, the bill prohibits immigration detention facilities, their agents, or those acting on their behalf, from depriving immigrant detainees of medical care, freedom from harm or harassment, and privacy. The bill also prohibits the involuntary placement of immigrant detainees in segregated housing because of the detainee's actual or perceived gender, gender identity, gender expression, or sexual orientation.

***Lack of access to legal representation and telephone communication.*** Because immigration proceedings are civil, not criminal, detainees have fewer rights than criminal defendants, including the right to an attorney. CIVIC reports, for example, that of the 89 people detained at ADF that it monitored over a six-month period, only 12.3 percent had legal representation—below the already low national average of 16 percent (*Abuse in Adelanto: An Investigation into a California Town's Immigration Jail* (October 2015); CIVIC and Detention Watch Network.) Because most detainees go completely without legal representation, it is essential that they have access to a law library or telephone communications where they can communicate with advocates or family members outside the center who can arrange assistance. Even where detainees at Adelanto had legal representation, CIVIC reported the difficulties that these people experienced due to obstructive actions taken by facility staff. The lack of access to legal representation is even more tragic because many detainees in custody may, in fact, qualify to remain in the U.S., but are instead deported because they were never able to obtain the assistance of legal counsel. Accordingly, this bill specifically prohibits immigration detention facilities from depriving immigrant detainees access to an attorney or other authorized legal representative, and access to translation or interpreters.

***Codifying the national standards for basic care in immigration detention facilities, promulgated by ICE for facilities it contracts with.*** ICE has promulgated a series of national standards laying out the requirements for basic care in immigration detention facilities, known as the Performance-Based National Detention Standards 2011 as corrected and clarified in February 2013 (Hereafter, PBNDS 2011). ICE uses national detention standards to govern conditions of confinement in its detention facilitates established through contracts with those facilities. (United States Government Accountability Office, "Immigration Detention" Additional Actions Could Strengthen DHS Efforts to Address Sexual Abuse, p. 12 (Nov. 2013), Available at: http://www.gao.gov/assets/660/659145.pdf) Immigration detention facilities agree to follow these standards pursuant to the Inter-governmental Service Agreements (IGSAs) between the federal government and the local governments, including when the local entities contract out with for-profit corporations. (See e.g. Mesa Verde IGSA pp. 4, 7, 19; available at http://www. documentcloud.org/ documents/ 2631228-Mesa-Verde-CA-IGSA-Contract.html.)

An additional federal policy, ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees), was created to govern the placement of immigrant detainees in solitary confinement. The directive was created after a joint study by two human rights organizations revealed that immigrant detainees were increasingly placed in solitary confinement due to mental illness, sexual orientation, or not speaking English. (See *Invisible in Isolation: The Use of Segregation and Solitary Confinement in Immigration Detention* (Sept. 2012), Heartland Alliance and Physicians for Human Rights.) Unfortunately, this policy directive is equally unenforceable as there is no law requiring it to be followed.

This bill is necessary, proponents contend, to address the fact that although the PBNDS 2011 standards may be agreed to under the contract, the standards are unenforceable because adherence is not required under any federal or state law. They contend that many of the abuses documented in California violate the PBNDS 2011, but because the standards are not legally binding and have only been implemented at select facilities that have voluntarily elected to modify their operating agreements with ICE, there is virtually no recourse for detainees under existing law when the detention facilities violate these standards.

Accordingly, this bill seeks to create enforceable rights for immigrant detainees centered on the national standards described above. The bill provides that when an immigration detention facility chooses to enter into a contract to detain immigrants in civil immigration proceedings, it shall detain immigrants only pursuant to a contract that requires the entity contracting with DHS or other federal agency to adhere to the PBNDS 2011 standards, as well as ICE Directive 11065.1. The bill makes clear that, as a policy matter, every immigration detention facility in California should be subject to the same national standards for the detention of immigrants, including private detention facilities contracted with local governments. Mandating that private immigration detention facilities in California meet national standards is intended to prevent and reduce patterns of abuse that have been documented in these facilities.

***Enforcement provisions.*** This bill would require that immigration detention facilities adhere to the PBNDS 2011 standards, ICE Directive 11065.1, and other rights granted by this bill. Unlike its predecessor legislation, SB 1289 (2016), there is no private right of action to enable detainees to sue on their own behalf. Instead, enforcement of these provisions is much more limited; the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California. The prosecuting attorney may also seek a civil penalty of $25,000, as specified, when an immigration detention facility deprives an immigrant detainee of their rights created under this bill, or their rights under the PBNDS 2011 standards or ICE Directive 11065.1.

***ARGUMENTS IN SUPPORT***: In addition to immigrant advocates and human rights groups, the bill is supported by some law enforcement organizations, including the Los Angeles Professional Peace Officers Association and the Riverside Sheriffs Association (RSA). RSA writes in support:

> Numerous studies have demonstrated that main objective of these Wall Street private prison cash-cows is to maximize profits for their shareholders. For-profit private prison companies accomplish this goal by implementing relaxed hiring standards, reduced staffing levels, inadequate employee training and by paying their workers substantially less in wages and benefits when compared to professional, public correctional peace officers.

> Stocks for the out-of-state prison corporations are traded on the New York Stock Exchange and must meet the financial goals of the institutional investors. As the CEO of the largest for-profit private prison company, Corrections Corporation of America, once stated, "Inmates are a commodity in our line of work."

> Private, for-profit prisons continue to treat their charges as "commodities" and "lower the bar" when it comes to the entire corrections profession. While we in the public sector are constantly trying to improve operations, the private, for-profit corporations seek only to improve profits. The 4,000-plus members of the

RSA support efforts that improve public safety and save precious tax dollars. SB 29 accomplishes both of these objectives. Private prison companies make all of us in local, state or federal corrections look bad.

*ARGUMENTS IN OPPOSITION*: The bill is opposed by the California State Sheriffs' Association, who state:

> We believe SB 29 inappropriately inserts the state into matters that are appropriately governed by federal authorities. [I]t is certainly possible that this measure would be preempted by federal law. Additionally, by creating a public right of action for alleged violations . . . SB 29 exposes local governments to state civil liability despite federal oversight and enforcement. The costs of litigation resulting from this bill are likely to be significant. We are also concerned that the ban on contracting with private entities could result in overcrowded local facilities being left as the only viable option for immigration detention.

Committee staff notes that this bill merely restricts the ability of local government and law enforcement to contract with private companies, and imposes certain standards of treatment to be upheld in private detention facilities. Neither of these actions interfere or conflict with the federal government's ability to enforce federal immigration laws, and thus are not likely to cause this bill to be preempted by federal law if challenged in court.

*Previously related legislation.* SB 1289 (Lara) of 2016 is substantially similar to this bill, and would have prohibited local governments and law enforcement from contracting with companies that operate for-profit immigration detention facilities. The bill also would have required these facilities to uphold national standards for humane treatment of detainees, enforceable by a private right of action. In his September 2016 veto message of SB 1289, the Governor reasoned that Department of Homeland Security regulations under the Obama administration may shortly resolve the issue of whether private contracting for immigration detention should continue, and if so, under what conditions. After the November presidential election, however, no additional regulations on the issue are expected, and for reasons described earlier, greater use of private detention facilities is anticipated, not less.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Community Initiatives for Visiting Immigrants in Confinement (CIVIC) (co-sponsor)
Immigrant Legal Resource Center (co-sponsor)
AFSCME
Alliance for Boys and Men of Color
American Academy of Pediatrics
Antelope Valley League of United Latin American Citizens
California Catholic Conference
California Environmental Justice Alliance
California Federation of Teachers
California Health+ Advocates
California Latinas for Reproductive Justice
California Immigrant Policy Center
Council on American-Islamic Relations, California

Equality California
Harvey Milk LGBT Democratic Club
Human Rights Defense Center
Immigrant Legal Resource Center
Inland Coalition for Immigrant Justice
In the Public Interest (ITPI)
Jewish Public Affairs Committee of California
Latino Coalition for a Healthy California
League of Women Voters of California
Los Angeles LGBT Center
Los Angeles Professional Peace Officers Association
Mixteco Idigena Community Organizing Project
National Association of Social Workers
Pangea Legal Services
Riverside Sheriffs Association
SEIU California
Services, Immigrant Rights, Education Network (SIREN)
Transgender Law Center
The United Farm Workers

**Opposition**

California State Sheriffs Association
County of Imperial

**Analysis Prepared by**: Anthony Lew / JUD. / (916) 319-2334

# EXHIBIT J

1   Charles J. Cooper (Appearing *Pro Hac Vice*), DC Bar No. 248070
    COOPER & KIRK, PLLC
2   1523 New Hampshire Avenue, NW
    Washington, DC 20036
3   Telephone: (202) 220-9600
    Email: ccooper@cooperkirk.com
4
    Michael B. McClellan, CBN 241570
5   NEWMEYER & DILLION LLP
    895 Dove Street, Fifth Floor
6   Newport Beach, CA 92660
    Telephone: (949) 854-7000
7   Email: Michael.McClellan@ndlf.com

8   *Attorneys for Plaintiff The GEO Group, Inc.*

9              UNITED STATES DISTRICT COURT

10            EASTERN DISTRICT OF CALIFORNIA

11  THE GEO GROUP, INC.,                  Case No. 2:20-cv-00533-TLN-AC

12              Plaintiff,                District Judge: Hon. Troy L. Nunley
                                          Magistrate Judge: Hon. Allison Claire
13  v.
                                          **DECLARATION OF RICHARD LONG IN**
14  GAVIN C. NEWSOM, in his official capacity   **SUPPORT OF MOTION FOR**
    as Governor of the State of California;      **PRELIMINARY INJUNCTION**
15  XAVIER BECERRA, in his official capacity
    as Attorney General of the State of California  [*Notice of Motion and Motion, Memorandum of*
16                                          *Points and Authorities, Declaration of Amber*
                Defendants.                 *Martin, Declaration of C. Kendie Schlecht,*
17                                          *Appendix of Exhibits filed concurrently*
                                            *herewith; Order lodged concurrently herewith*]
18
                                          Date:      May 28, 2020
19                                        Time:      2:00 p.m.
                                          Place:     501 I. Street, Courtroom 2
20                                                   Sacramento, CA 95814

21                                        FILE DATE: March 9, 2020
                                          TRIAL DATE:      No Date Set
22

23

24  I, Richard Long, declare as follows:

25          1.      I am the Senior Vice President of Project Development for The GEO Group, Inc.

26  (GEO). I submit this declaration in support of GEO's motion for preliminary injunction. Except

27  as stated upon information and belief, I have personal knowledge of the facts set forth in this

28  declaration and, if called as a witness, I could and would testify under oath competently thereto.

                                - 1 -
                                                LONG DECL. ISO MOT.PRELIM. INJ.

2.     My declaration assumes familiarity with the GEO facilities described herein, which are discussed in more detail in Amber Martin's declaration dated March 16, 2020.

**I.     Permit History of GEO's Adelanto and McFarland Detention Facilities**

3.     Central Valley Modified Community Correctional Facility (MCCF) and Golden State MCCF were first approved for conditional use permits (CUPs) in 1996. The City of McFarland modified the Central Valley and Golden State CUPs in 2008 and in 2013 based on changes to the types of CDCR inmates that would be housed at the facilities.

4.     Desert View MCCF was first approved for a CUP in 1996. The CUP was modified in 2004 due to an increase in facility capacity to house CDCR inmates.

**II.    GEO's Efforts To Obtain Amended Conditional Use Permits**

5.     GEO's CUPs for the Central Valley, Golden State, and Desert View facilities do not currently allow GEO to house federal male and female detainees. Thus, it is my understanding that, to ensure the continuing validity of its CUPs under municipal law, GEO was required to apply for modifications to its CUPs in order to house ICE detainees at its Central Valley, Golden State, and Desert View facilities.

6.     On December 30, 2019, having signed its new contract on December 19, 2019 with the Federal Government to convert the Central Valley and Golden State facilities into annexes to the Mesa Verde ICE Processing Center, GEO applied to the McFarland Planning Commission for modifications to its CUPs to allow the Federal Government to house detainees at Central Valley and Golden State.

7.     On December 23, 2019, having signed its new contract on December 19 2019 with the Federal Government to convert the Desert View facility into an annex to the Adelanto ICE Processing Center, GEO applied to the Adelanto Planning Commission for a modification to its CUP to allow the Federal Government to house detainees at Desert View.

8.     On or about January 10, 2020, the McFarland Planning Commission issued the public notice of the first hearing on GEO's CUP-modification applications for Central Valley and Golden State.



- 2 -

LONG DECL. ISO MOT.PRELIM. INJ.

9.     The first hearing on GEO's CUP-modification applications for Central Valley and Golden State was held on January 21, 2020.

10.    On or about January 11, 2020, the Adelanto Planning Commission issued the public notice of the first hearing on GEO's CUP-modification application for Desert View.

11.    The first hearing on GEO's CUP-modification application for Desert View was held on January 22, 2020.

12.    On or about February 7, 2020, the McFarland Planning Commission issued the public notice of the second hearing on GEO's CUP-modification applications for Central Valley and Golden State.

13.    The second hearing on GEO's CUP-modification applications for Central Valley and Golden State was held on February 18, 2020.

14.    On or about February 6, 2020, the Adelanto Planning Commission issued the public notice of the second hearing on GEO's CUP-modification application for Desert View.

15.    The second hearing on GEO's CUP-modification application for Desert View was held on February 19, 2020.

16.    On February 18, 2020, the McFarland Planning Commission failed to approve GEO's CUP-modification applications for Central Valley and Golden State by a 2-2 vote.

17.    On February 19, 2020, the Adelanto Planning Commission approved a resolution that approved GEO's CUP-modification application for Desert View but—in conformity with Section 1670.9(d)— deferred the issuance of the new permits until July 15, 2020, so that at least 180 days will have lapsed since the first public notices was given.

18.    GEO appealed the decision of the McFarland Planning Commission to the McFarland City Council.

**III.    Copies of Documents From CUP Application Processes**

19.    Attached to the Appendix of Exhibits as Exhibit A is a true and accurate copy of City of McFarland Legal Notice of Public Hearing for Tuesday, January 21, 2020 at 6:00 p.m. re Application of the GEO Group, Inc. to modify Conditional Use Permit Nos. 01-96 and 02-96.

- 3 -     LONG DECL. ISO MOT.PRELIM. INJ.

20.     Attached to the Appendix of Exhibits as Exhibit B is a true and accurate copy of City of Adelanto Notice of Special/Public Planning Commission Meeting for Wednesday, January 22, 2020 at 7:00 p.m. re application of the GEO Group, Inc. to modify Conditional Use Permit 96-11.

21.     Attached to the Appendix of Exhibits as Exhibit C is a true and accurate copy of City of McFarland Legal Notice of Second Public Hearing for Tuesday, February 18, 2020 at 6:00 p.m. re application of the GEO Group, Inc. to modify Conditional Use Permit Nos. 02-96 and 01-96.

22.     Attached to the Appendix of Exhibits as Exhibit D is a true and accurate copy of City of Adelanto Notice of Public Hearing for Wednesday, February 19, 2020 at 7:00 p.m. re modification of Conditional Use Permit 96-11.

23.     Attached to the Appendix of Exhibits as Exhibit E is a true and accurate copy of City of Adelanto Resolution No. P-20-03 approving modification of Conditional Use Permit 96-11.

**IV.    Effect of SB-29 On GEO's Efforts To Obtain Amended CUPs**

24.     My understanding is that California Senate Bill 29 (SB-29), codified in relevant part at Cal. Civil Code § 1670.9(d), will require GEO to wait 180 days from the day that the planning commission of the relevant city (e.g., Adelanto or McFarland) gives public notice of GEO's request to modify its conditional use permits before the city may issue such a permit.

25.     It is also my understanding that, absent SB-29, GEO's applications would have been processed under the McFarland and Adelanto municipal codes.

26.     In GEO's more than 20 years of experience with CUP applications and modifications in Adelanto and McFarland, the process typically requires no more than 90 days from beginning to end, inclusive of appeals to the city council. SB-29 therefore imposes an additional delay of approximately 90 days or three months before GEO can obtain modified CUPs from Adelanto and McFarland, which it needs to operate the Central Valley, Desert View, and Golden State facilities on behalf of the Federal Government.



- 4 -

LONG DECL. ISO MOT.PRELIM. INJ.

27.     In more than 20 years of experience with CUP applications and modifications in Adelanto and McFarland, GEO had never been required to comply with any requirements comparable to those imposed by SB-29.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.  Executed this 16th of March, 2020, in Boca Raton, Florida.

/s/ *Richard Long* (original signature retained by attorney Charles J. Cooper)
Richard Long

LONG DECL. ISO MOT.PRELIM. INJ.

# EXHIBIT K

# AGENDA
## MCFARLAND CITY COUNCIL
## MCFARLAND SUCCESSOR AGENCY
## MCFARLAND PUBLIC FINANCE AUTHORITY
## MCFARLAND IMPROVEMENT AUTHORITY
## MCFARLAND PARKING AUTHORITY

**REGULAR MEETING**
**CITY COUNCIL CHAMBERS**                                                **April 23, 2020**
**103 W. SHERWOOD AVE, MCFARLAND, CA**                                   **6:00 PM**

<mark>**TELECONFERENCE/VIRTUAL MEETING**</mark>

### NOTICE TO THE PUBLIC

CORONAVIRUS (COVID-19) Due to the Coronavirus pandemic, the City of McFarland will not be holding in person meetings. Governor Newsom, by State of California Executive Order N-29-20, has modified the Brown Act to allow meetings to be held by teleconference. **YOU WILL BE ABLE TO PARTICIPATE IN THE COUNCIL MEETING VIA VIDEO OR TELEPHONE:**

**To participate via video**: Please enter the link below to join the webinar
**https://us02web.zoom.us/j/84878293697**

**To participate via telephone**: Please dial
1(669) 900-9128 or 1 (346) 248-7799 or 1 (646) 558-8656 or 1 (253) 215-8782 or
1 (301) 715-8592 or 1 (312) 626-6799
Once connected, it will ask for the WEBINAR/MEETING ID: 848 7829 3697#

If you have a comment, a statement or question, please submit these in writing to the City Clerk by mail at 401 W. Kern Ave, McFarland, CA 93250 or email at claudia@mcfarlandcity.org. Comments will also be taken during public comments. **COMMENTS MUST BE RECEIVED NO LATER THAN NOON (12:00 PM) ON THURSDAY, APRIL 23, 2020.**

**CALL TO ORDER**

**ROLL CALL:**
Mayor/Chairman, Sally Gonzalez
Mayor Pro Tem, Stephen McFarland
Council Member/Board Member, Eric Rodriguez
Council Member/Board Member, Rafael Melendez
Council Member/Board Member, Maria T. Perez

**INVOCATION**

**PLEDGE OF ALLEGIANCE**

**PRESENTATIONS, INTRODUCTIONS AND AWARDS**

None

**PUBLIC COMMENT:** The public may address the Council/Board Member on items, which do not appear on the agenda. Council/Board Members may respond briefly to statements made or questions posed. They may ask a question for clarification; may refer the item to staff for further study or for placement on a future agenda. **Speakers are limited to two minutes for each person. Please state your name and address for the record prior to making a presentation. Fifteen minutes total will be allowed for any one subject.**

**CONSENT AGENDA:** The Consent Agenda consists of items that in staff's opinion are routine and non-controversial. These items are approved in one motion unless a Council Member/Board Member removes a particular item.

1. Warrant register for $617,850.21 from March 31, 2020 through April 14, 202

2. Minutes of regular City Council meeting of April 09, 2020.

   Staff recommends approval of the consent agenda items

**PUBLIC HEARINGS**

1. **CONDITIONAL USE PERMIT NO. 01-96:** A modification to Conditional Use Permit 01-96, to allow the Golden State Modified Community Correctional Facility located at 611 Frontage Road, to be repurposed to house federal inmates and detainees, adult male and or female.

   a. Presentation by applicant The GEO Group, Inc.

   b. Take public testimony and adopt Resolution No. 2020-0013 approving amending Conditional Use Permit No. 01-96. Speakers are limited to 2 minutes for each person (and equal time for any translation). 1-hour total time will be allowed for comments.

   **STAFF RECOMMENDATION: APPROVE CONDITIONAL USE PERMIT IN ACCORDANCE WITH THE RECOMMENDED CONDITIONS OF APPROVAL (ATTACHMENT A) AND ADOPT SUGGESTED FINDINGS AS SET FORTH IN THE DRAFT RESOLUTION.**

2. **CONDITIONAL USE PERMIT NO. 02-96:** A modification to Conditional Use Permit 02-96, to allow the Central Valley Medium Custody Community Correctional Facility located at 254 Taylor Avenue, to be repurposed to house federal inmates and detainees, adult male and or female.

   c. Presentation by applicant The GEO Group, Inc.

   d. Take public testimony and adopt Resolution No. 2020-0014 approving amending Conditional Use Permit No. 02-96. Speakers are limited to 2 minutes for each person (and equal time for any translation). 1-hour total time will be allowed for comments.

**STAFF RECOMMENDATION: APPROVE CONDITIONAL USE PERMIT IN
ACCORDANCE WITH THE RECOMMENDED CONDITIONS OF APPROVAL
(ATTACHMENT A) AND ADOPT SUGGESTED FINDINGS AS SET FORTH IN THE
DRAFT RESOLUTION.**

**DEPARTMENTAL REPORTS**

    a.   Administration
    b.   Finance Department
    c.   Public Works Department

**ADMINISTRATIVE AGENDA**

None

**REPORTS FROM CITY COUNCIL ON COMMITTEE/SPECIAL DISTRICT MEETINGS**

    **a.**   Delano Mosquito Abatement District (DMAD) – Council Member Rafael Melendez
    **b.**   Kern Council of Governments (KCOG) – Mayor Sally Gonzalez or Alternate Mayor Pro Tem Stephen McFarland
    **c.**   McFarland Tri-Agency Partners (MTAP) – Mayor Sally Gonzalez or Alternate Council Member Maria Perez
    **d.**   Kern Economic Development Corp. (KEDC) – Mayor Sally Gonzalez
    **e.**   Kern County Association of Cities (KCAC)
    **f.**   Poso Creek IRWMP – Council Member Rafael Melendez

**COUNCIL STATEMENTS AND REPORTS**

On their own initiative, Council Members may make a brief announcement or a brief report on their own activities. In addition, Council Members may ask a question of staff or the public for clarification on any matter, provide a reference to staff or other resources for information. Alternatively, request staff to report to the City Council at a later meeting concerning any matter. Furthermore, the City Council, or any member thereof, may take action to direct staff to place a matter of business on a future agenda.

**CLOSED SESSION**

None

**ADJOURNMENT**

This is to certify this agenda was posted at McFarland City Hall on April 20, 2020.

_____

Claudia Ceja, City Clerk

Next Meeting: Regular City Council Meeting May 14, 2020.

The City of McFarland does not discriminate on the basis of disability and complies with the provisions of the Americans with Disabilities Act (ADA). If you need special assistance to participate in this meeting, please contact the City Clerk's Office at (661) 792-3091 at least one business day prior to the meeting to make reasonable arrangements to ensure accessibility to this meeting.

**AGENDA**

### CONCILIO DE LA CIUDAD DE MCFARLAND
### AGENCIA SUCESORA DE MCFARLAND
### AUTORIDADES DE FINANCIAMIENTO PÚBLICO DE MCFARLAND
### AUTORIDADES DEL MEJORAMIENTO DE MCFARLAND
### AUTORIDADES DE PARQUES DE MCFARLAND

**JUNTA REGULAR**
**Sala de Juntas del Concilio de la Ciudad**                                    **Abril 23, 2020**
**103 W. SHERWOOD AVE, MCFARLAND, CA**                                    **6:00 PM**

### TELECONFERENCIA/ JUNTA VIRTUAL

### AVISO AL PÚBLICO

CORONAVIRUS (COVID-19) Debido a la pandemia del Coronavirus, la Ciudad de McFarland no tendrá juntas en persona. El Gobernador Newsom, por medio de Orden Ejecutiva del Estado de California,  ha modificado el Acto Brown para permitir que las juntas se lleven a cabo por medio de teleconferencia. **PODRA PARTICIPAR EN LA JUNTA DEL CONCILIO POR TELEFONO O POR VIDEO:**

**Para participar por video**: Ingrese el siguiente enlace para unirse al seminario web
**https://us02web.zoom.us/j/84878293697**

**Para participar por teléfono**: Por favor marque al
1(669) 900-9128 o 1 (346) 248-7799 o 1 (646) 558-8656 o 1 (253) 215-8782 o
1 (301) 715-8592 o 1 (312) 626-6799
Una vez que se haya conectado, le pedirá el ID DEL WEBINAR/LA JUNTA: 848 7829 3697#

Si tiene algún comentario, alguna declaración, o alguna pregunta, favor de enviarlos por escrito por medio del correo a la Secretaria de la Ciudad a 401 W. Kern Ave, McFarland, CA 93250 o por email a claudia@mcfarlandcity.org. Los comentarios tambien se tomaran durante los comentarios públicos. **LOS COMENTARIOS DEBEN RECIBERSE ANTES DE MEDIODIA (12:00 PM) EL JUEVES, ABRIL 23, 2020.**

**LLAMADO AL ORDEN**

**LISTA DE PRESENTES:**
Alcalde/Miembro de la Junta, Sally González
Alcalde Pro Tem, Stephen McFarland
Miembro del Concilio / Miembro de la Junta, Eric Rodríguez
Miembro del Concilio / Miembro de la Junta, Rafael Meléndez
Miembro del Concilio / Miembro de la Junta, María T. Pérez

**INVOCACIÓN**

**JURAMENTO DE LEALTAD**

Ninguna

**COMENTARIOS DEL PÚBLICO:** El público se podrá dirigir a los Miembros del Concilio/Mesa sobre temas que no aparecen en la agenda. Los Miembros del Concilio/Mesa podrán brevemente responder a las declaraciones o preguntas que se hagan. Podrá hacer preguntas con fines de aclaración; hacer referencia al personal para pedir información o solicitar que se reporte a los Miembros del concilio/en una junta posterior. **Los Oradores están limitados a dos minutos por cada persona. Favor de declarar su nombre y dirección para el acta antes de hacer una presentación. Se permitirán quince minutos en total para cualquier tema.**

**AGENDA ACORDADA:** La Agenda Acordada es compuesta de asuntos que en la opinión del Personal de la Ciudad son rutinarios y no controversiales. Estos artículos serán aprobados por una sola moción a menos que un Miembro del Concilio/Mesa elimine un asunto particular.

1. Registro de facturas en la cantidad de $617,850.21 desde Marzo 31, 2020 hasta Abril 14, 2020

2. Minutas de la junta regular del Concilio de la Ciudad de Abril 09, 2020.

El Personal recomienda la aprobación de los asuntos en la agenda acordada.

**AUDIENCIAS PÚBLICAS**

1. **PERMISO DE USO CONDICIONAL NO. 01-96:** Una modificación al Permiso de Uso Condicional 01-96, para permitir que la Instalación Correccional Comunitaria Modificada de Golden State ubicada en 611 Frontage Road, sea reutilizada para albergar internos federales y detenidos, adultos hombres y o mujeres.

   a. Presentación por el solicitante The GEO Group, Inc.

   b. Tomar testimonio público y adoptar la Resolución No. 2020-0013 aprobando y enmendando el Permiso de Uso Condicional No. 01-96. Los Oradores están limitados a dos minutos para cada persona (e igual tiempo para cualquier traducción). 1-hora será el tiempo total permitido para comentarios.

   **RECOMENDACION DEL PERSONAL: APROBAR EL PERMISO DEL USO CONDICIONAL EN ACUERDO CON LAS CONDICIONES DE APROBACION RECOMENDADAS (EL DOCUMENTO ADJUNTO A) Y ADOPTAR LOS HALLAZGOS SUGERIDOS COMO LOS ESTABLECE EL DOCUMENTO DE LA RESOLUCIONN.**

2. **PERMISO DE USO CONDICIONAL NO. 02-96:** Una modificación al Permiso de Uso Condicional 02-96, para permitir que, la Instalación Correccional Comunitaria del Valle de Custodia Media ubicada en 254 Taylor Avenue, sea reutilizada para albergar internos federales y detenidos, adultos hombres y o mujeres.

   c. Presentación por el solicitante The GEO Group, Inc.

   d. Tomar testimonio público y adoptar la Resolución No. 2020-0014 aprobando y enmendando el Permiso de Uso Condicional No. 02-96. Los Oradores están limitados a dos minutos para cada persona (e igual tiempo para cualquier traducción). 1-hora

**RECOMENDACION DEL PERSONAL: APROBAR EL PERMISO DEL USO CONDICIONAL EN ACUERDO CON LAS CONDICIONES DE APROBACION RECOMENDADAS (EL DOCUMENTO ADJUNTO A) Y ADOPTAR LOS HALLAZGOS SUGERIDOS COMO LOS ESTABLECE EL DOCUMENTO DE LA RESOLUCION.**

## INFORMES DEPARTAMENTALES

      a.   Administración
      b.   Departamento de Finanzas
      c.   Departamento de Obras Públicas

## AGENDA ADMINISTRATIVA

Ninguna

## REPORTES DEL CONCILIO DE LA CIUDAD SOBRE LAS JUNTAS DE LA COMISON/DISTRITOS ESPECIALES

      **a.**   Distrito de Delano de Abatimiento de Mosquitos (DMAD) – Miembro del Concilio Rafael Meléndez
      **b.**   Concilio de Gobiernos de Kern (KCOG)– Alcalde Sally Gonzales o Alcalde Pro Tem Alterno Stephen McFarland
      **c.**   Agencia Triple de Socios de McFarland(MTAP) – Alcalde Sally Gonzales o Miembro Alterno del Concilio María Pérez
      **d.**   Desarrollo Económico de Kern Corp. (KEDC) – Alcalde Sally Gonzales
      **e.**   Instalaciones de la Asociación del Condado de Kern (KCAC)
      **f.**   Poso Creek IRWMP – Miembro del Concilio Rafael Melendez

## REPORTES Y DECLARACIONES DEL CONCILIO

Por su iniciativa propia, los Miembros del Concilio podrán hacer anuncios breves o un reporte breve sobre sus propias actividades. Adicionalmente, los Miembros del Concilio podrán hacer preguntas al Personal o al público con fines de aclaración sobre cualquier asunto, proporcionar una referencia al Personal u otros recursos con fines de información. Alternativamente, podrán solicitar que el personal se reporte al Concilio de la Ciudad en una junta posterior sobre cualquier tema. Además, el Concilio de la Ciudad, o cualquier miembro del mismo, podrán tomar medidas para indicar al personal que incluya un asunto de negocios en una agenda futura.

## SESIÓN CERRADA

Ninguna

## SE LEVANTA LA SESION

Esto es para certificar que esta agenda fue publicada en La Sala de Juntas del Concilio de la Ciudad de McFarland en Abril 20, 2020.

_____
Claudia Ceja, Secretaria de la Ciudad

Siguiente Junta: Junta Regular del Concilio de la Ciudad en Mayo 14, 2020.

La Ciudad de McFarland no discrimina sobre la base de la discapacidad y cumple con las disposiciones del Acto de los Americanos con Discapacidades (ADA). Si usted necesita asistencia especial para poder participar durante esta junta, favor de comunicarse con la Oficina de la Secretaria de la Ciudad al (661) 792-3091 por lo menos 1 día laboral previo a la junta para que podamos darles acomodo razonable que asegure la facilidad de acceso para esta junta.

# EXHIBIT L

**MCFARLAND CITY COUNCIL**
**MCFARLAND SUCCESSOR AGENCY**
**MCFARLAND PUBLIC FINANCE AUTHORITY**
**MCFARLAND IMPROVEMENT AUTHORITY**
**MCFARLAND PARKING AUTHORITY**

**CALL TO ORDER**

Mayor Gonzalez called the meeting to order at 6:07 p.m. via teleconference/virtual meeting.

**ROLL CALL**

Council Members Present: Gonzalez, McFarland, Rodriguez, Melendez, Perez
Council Members Absent:  None

**OFFICIALS PRESENT**

Interim City Manager Pennell, City Attorney Schroeter, Interim Chief of Police/Interim Assistant City Manager Davis, City Clerk Ceja, Administrative Services Director Mosqueda, Community Development Director Lara, and Public Works Director Gonzales

**INVOCATION**

Mayor Pro Tem McFarland

**PLEDGE OF ALLEGIANCE**

Council Member Perez

**PRESENTATIONS AND PROCLAMATIONS**

None

**PUBLIC COMMENTS**

**\*Note: ALL PUBLIC COMMENTS SUBMITTED IN WRITING WERE COPIED AND DISTRIBUTED TO ALL COUNCIL MEMBER PRIOR TO THE MEETING.**

Ms. Dolores Huerta, did not state address. Ms. Huerta urged city council not to make a decision tonight regarding GEO and asked to postpone the matter until everyone can gather safely.

Alondra Duran, did not state address. Ms. Duran is with Victory for Central Valley. Ms. Duran asked council to postpone the item until everyone can gather safely and not to proceed with voting on GEO tonight.

Rosa Lopez, 347 E. Perkins Ave, McFarland. Ms. Lopez expressed her concerns with moving forward with tonight's vote regarding GEO and asked not to proceed with the vote.

Sandra Hernandez, 904 Kala Loop, McFarland. Ms. Hernandez would like the meeting to be postponed until everyone can gather safely.

Alex Gonzalez, did not state his address. Mr. Gonzalez expressed his concern regarding numerous community members not being able to participate in the meeting and asked council to postpone the meeting.

Mayor Gonzalez asked City Attorney if the meeting needed to be cancelled because community members could not join the meeting in which City Attorney replied and said that the meeting did not have to be postponed.

Mayor Gonzalez stated that the teleconference/virtual meeting did have a limit of 100 participants and if the meeting was held at the council chambers the city will not be able to hold 100 participants so this way the city has accommodated to allow for more participants.

1.  Motion by Council Member Perez, seconded by Mayor Pro Tem McFarland, and unanimously carried to approve the warrant register for $434,336.21 from March 31, 2020 through April 14, 2020.
    **Vote: 4-0**
    **Ayes:** Perez, McFarland, Melendez, Rodriguez
    **Nays:** None
    **Absent:** None
    **Abstentions:** Gonzales
    Note: Council Member Gonzales recluses herself from item #1 due to conflict of interest.

2.  Motion by Council Member Perez, seconded by Mayor Pro Tem McFarland, and unanimously carried to approve the minutes of regular City Council meeting of April 09, 2020.
    **Vote: 5-0**
    **Ayes:** Perez, McFarland, Melendez, Rodriguez, Gonzalez
    **Nays:** None
    **Absent:** None
    **Abstentions:** None

## PUBLIC HEARING

**\*Mayor Pro Tem recused himself and left the meeting due to conflict of interest. He is employed with the GEO Group.**

1.  Motion by Council Member Perez, seconded by Council Member Rodriguez, and unanimously carried to adopt Resolution No. 2020-0013, its suggested findings, and approve Conditional Use Permit No. 01-96 with the added condition of the scholarship program and consideration to meet with the Superintendent.
    **Vote: 4-0**
    **Ayes: Perez, Rodriguez, Melendez, Gonzalez**
    **Nays: None**
    **Absent: None**
    **Abstain: McFarland (Mayor Pro Tem McFarland recused himself from the meeting due to conflict of interest. He is employed with the GEO Group.**

2.  Motion by Council Member Perez, seconded by Council Member Rodriguez, and unanimously carried to adopt Resolution No. 2020-0014, its suggested findings, and approve Conditional Use Permit No. 02-96 with the added condition of the scholarship program and consideration to meet with the Superintendent.
    **Vote: 4-0**
    **Ayes: Melendez, Rodriguez, Perez, Gonzalez**
    **Nays: None**
    **Absent: None**
    **Abstain: McFarland (Mayor Pro Tem McFarland recused himself from the meeting due to conflict of interest. He is employed with the GEO Group.**

    Community Development Director Lara read her staff report and Interim City Manager Pennell presented to council his comments of why it is important to vote in favor of both conditional use permits. The comments included the financial restraints the city has, the struggles with street potholes, employees leaving the city for better opportunities, shortage of public safety officers, struggles to pay the County for fire services, and lastly the city will lose its largest water and sewer customer with devastating financial results.

    Council Member Melendez asked if there is a formula that the city goes by for impact fees. Community Development Director Lara responded and said there is a formula for the community facilities district but for item #6 it is a mitigation fee that Mr. Pennell and city staff negotiated with GEO Group. Community Development Director Lara stated that for item #7 there is a formula.

    Mr. David Venturella gave a presentation on behalf of GEO in which he stated the following:

    a.  Creation of 420 jobs (210 jobs at each location).
    b.  Pay increase from $16.50 to $46.57 an hour in which City of McFarland residents will have a chance to apply for these jobs.
    c.  $511,000 mitigation payment to the city with a 15-year term with a CPI in place.
    d.  Remove exterior fencing and secure with new fencing without razor fencing.
    e.  New decorative solid fencing along Taylor and extend the wall that runs North South of Mast Ave and partially on Taylor Ave.

g. Repave and add new street lighting along Frontage Rd from W. Sherwood Ave to Taylor Ave.

h. New sidewalks and curbs that will be installed along Frontage Rd and Cliff Ave and plan to extend sidewalks and curbs along the South side of Taylor Ave and along Taylor Ave new street lights to complete the street lighting.

i. New city monument sign north of the facilities and landscaping at the Golden State Hwy Southbound exit ramp to W. Sherwood Ave.

j. Each year, applicant shall award a $1,000.00 scholarship to each graduating senior from the McFarland High School who is accepted to any of the following within one year after his or her graduation: a vocational school, a for-profit college (e.g., Phoenix University), a community college, a state college, or a public or a private university. Each scholarship shall be paid to the student within thirty (30) days of notice to applicant of the student's acceptance to any of the foregoing either by the school district, the City, or the student with appropriate verification. This shall continue annually for the duration of the applicant's contract. Once awarded to a student, the student is not required to refund any portion of the scholarship should the student fail to graduate or remain in school or fail to attend at all. This condition shall become effective thirty (30) days after the opening of the facility.

**Council Member Melendez asked the following questions:**

Melendez: Asked if GEO is only providing housing for inmates that the federal government is bringing in.

Mr. Venturella: GEO is providing housing, medical care, and food as well as some types of programming, recreation, and access to legal materials.

Mr. Melendez: Asked how many ice enforcement agents will be stationed at the facility.

Mr. Venturella: GEO does not expect to have many and he gave an example that in Bakersfield that they house about 400 individuals and ice officers do not have a presence there. They may come in to talk to the detainees to provide paperwork and other documentation so they are not there full time but they do have some work space to work when they are there.

Mr. Melendez: Asked if they are there for the processing party.

Mr. Venturella: Said that that was correct.

Mr. Melendez: Asked how long does an inmate reside at a processing station.

Mr. Venturella: He said that typically the national average is about 51 days which is different than the population that resided there for the State of California which was 2 to 3 years.

Mr. Melendez: Asked why it is important for GEO to follow up on complaints and concerns.

Mr. Venturella: He stated that it is important because they pride themselves in being a high quality professional service provider and they are audited by a number of agencies at the federal and state levels.

Mr. Melendez: Asked how many jobs will McFarland residents be qualified for.

Mr. Venturella: Stated that most of the jobs individuals can qualify for and because of the standards that GEO has in place and the training that they provide a lot of individuals could qualify for any numbers of those positions

Mr. Melendez: Praised Mr. Venturella for helping a lady obtain her permanent status.

Mr. Venturella: He said he was happy to help her and they certainly encourage anyone who is in the process of obtaining permanently status.

Mr. Melendez: Asked if GEO would consider meeting up with our Superintendent of McFarland and maybe form a vocational type of security classes.

**Mayor Gonzalez asked the following questions:**

Mayor Gonzalez: Asked if GEO will be willing to help the police department with the trunk- or-treat or Easter event by donating supplies or even help the community out with resources for the COVID-19 pandemic.

Mr. Venturella: He said absolutely and stated that GEO recently participated in a food drive with the Lions Club.

Mr. Pennell: Asked if GEO would be ok with city council incorporating the scholarship offer into the conditions of approval.

Mr. Venturella: Said he had no.

Mayor Gonzalez: Asked if at any time council can visit the facility to ensure the community that the detainees are being treated fairly.

Mr. Venturella: He responded with a yes and stated the community advisory board has the opportunity to have input and the city has fire and safety and health inspections that are done by the city and the county as well.

Mayor Gonzalez: Asked if in his experience working with Ice, he's seen Ice officers driving around town because community members have that fear.

Mr. Venturella: Stated that he has not seen or experienced that.

Mayor Gonzalez: Asked if an Ice officer is off duty, can they arrest someone?

Mr. Venturella: Stated that no that is not how typically Ice operates. He said that normal policy is that they conduct enforcement operations that are targeted specifically    for individuals that they have arrest warrants for.

**Public Comments:**

**\*City Clerk informed Mayor and Council that there were 848 written comments received. Copies of the written comments were made and delivered to Mayor and Council. Mayor Gonzalez asked Council to acknowledge receipt of written comments in which they all confirmed they received the copies.**

Rosa Lopez, did not state address. Ms. Lopez asked council to allow more community members to join and why the rush to proceed with the GEO vote.

Gabriela Ochoa, did not state address. Ms. Ochoa mentioned that she has witnessed the mistreatment of individuals and urged council not to proceed with the GEO vote.

Sandy Valenciano, did not state address. Ms. Valenciano expressed to council that there has been numerous letters expressing their interest to help the city to find financial solutions and believes the city is rushing the GEO vote.

Floricel, did not state address. Ms. Floricel commented that she had previously been detained by GEO and mentioned to council what she went through while she was detained.

Orlando, did not state address. Mr. Orlando stated his concern with GEO and the mistreatment.

Daniel Newike, did not state address. Ms. Newike expressed her support with GEO.

Marcela Hernandez, did not state address. Ms. Hernandez urged council to deny the appeal for the GEO CUP's.

Cynthia Galas, did not state address. Ms. Galas mentioned that GEO hasn't been truthful, GEO employees are not happy with their job, and there are hunger strikes that are currently happening.

the community and expressed that community members will not feel safe if the GEO vote passes.

Speaker did not state name or address. Speaker urged council not to proceed with the GEO vote and asked the council to focus on protecting and helping the community.

Andy Levin, did not state address. Mr. Levin expressed to council that the protestors are not the outsiders but big corporations like GEO are and mentioned that he will leave McFarland feeling ashamed and embarrassed.

Pastor Trina Turner, did not state address. Pastor Turner mentioned that she is embarrassed of the behavior of the elected officials that have prioritized the needs of GEO and not the community.

Javier Lopez, did not state address. Mr. Lopez expressed his support with GEO because he feels that the city is in need of police services and street maintenance.

Esmeralda Gonzalez, did not state address. Ms. Gonzalez asked GEO said they will help with scholarships and jobs when they haven't helped before.

Aurora Castañeda, did not state address. Ms. Castañeda mentioned that she has been a recipient of the GEO scholarship but is willing to give the money back to support the community that is in fear.

Alejandra Figueroa, did not state address. Ms. Figueroa expressed her discontent with council and said this is an embarrassment for the city.

Amber Hernandez, did not state address. Ms. Hernandez expressed her confusion with council wanting to protect the city yet corrupt police officers are being hired.

Roberto Osorio, did not state address. Mr. Osorio expressed that the main focus should be the protection of the community and not GEO.

Gerry Brochu, did not state address. Mr. Brochu congratulated Mayor Gonzalez and Council Member Rodriguez on their appointment and expressed his discontent with the way the people are expressing themselves about GEO because that is not how GEO operates.

Public comments ended at 8:56 pm.

Chief Davis addressed the concerns of Ambar Hernandez related to corrupt police officers and bad police services and assured Ms. Hernandez that those issues are in the past now and McFarland is now committed to hiring and retaining nothing but the highest quality of officers.

Community Development Director Lara commented that GEO is part of solving some of the financials problems that the city has and although it will not fix the problem it will give the city hope for the future.

Council Member Melendez expressed to City Manager Pennell that if the city does move forward with GEO he would like the money coming in to be monitored closely and for it to go to police and roads only. City Manager Pennell assured Council Member Melendez that the money will go to those priority expenditures.

Motion by Council Member Perez, seconded by Mayor Pro Tem McFarland, and unanimously carried to approve the minutes of regular City Council meeting of April 09, 2020.
**Vote: 5-0**
**Ayes:** Perez, McFarland, Melendez, Rodriguez, Gonzalez
**Nays:** None
**Absent:** None
**Abstentions:** None

- 120 -

**DEPARTMENTAL REPORTS**

a. Administration – Mr. Pennell informed Council that he will suspend the retention bonus program for employees due to finances. He mentioned there is a vacant seat for the KEDC board. This item will be at the next council meeting for the appointment of a Council Member to the KEDC board.

b. Police Department – Chief Davis informed Council of a fire at 288 Browning Rd and thanked all staff who assisted the police department.

c. Finance Department- Mrs. Mosqueda thanked the Council for their tuff decision made tonight and spoke on COVID-19 and the financial impact due to the pandemic.

d. Public Works Department – Mr. Gonzales reported on changes to the Public Works employees schedule due to COVID-19. Projects are on hold due to COVID-19.

**ADMINISTRATIVE AGENDA**

None

**ORAL REPORTS FROM CITY COUNCIL ON COMMITTEES**

a. Delano Mosquito Abatement District (DMAD) – None to report.

b. Kern Council of Governments (KCOG) – None to report.

c. McFarland Tri-Agency Partners (MTAP) – None to report.

d. Kern Economic Development Corporation (KEDC) – None to report.

e. Kern County Association of Cities (KCAC) – None to report.

f. Poso Creek IRWMP- None to report.

**COUNCIL STATEMENTS**

Mayor Gonzales thanked all staff and the community and expressed that tonight's decision was difficult and they have to do what is best for the community.

Council Member Melendez thanked everyone.

Council Member Perez invited all community members to participate in the council meetings, town hall meetings and community events.

Council Member Rodriguez thanked Council for trusting him to serve in the Council.

**CLOSED SESSION**

None

**ADJOURNMENT**

Motion to adjourn the meeting at 9:35 pm.

Claudia Ceja, City Clerk

CITY OF McFARLAND
INCORPORATED
JULY 18, 1957
CALIFORNIA

# EXHIBIT M

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

**EXECUTIVE ORDER N-29-20**

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** despite sustained efforts, the virus continues to spread and is impacting nearly all sectors of California; and

**WHEREAS** the threat of COVID-19 has resulted in serious and ongoing economic harms, in particular to some of the most vulnerable Californians; and

**WHEREAS** time bound eligibility redeterminations are required for Medi-Cal, CalFresh, CalWORKs, Cash Assistance Program for Immigrants, California Food Assistance Program, and In Home Supportive Services beneficiaries to continue their benefits, in accordance with processes established by the Department of Social Services, the Department of Health Care Services, and the Federal Government; and

**WHEREAS** social distancing recommendations or Orders as well as a statewide imperative for critical employees to focus on health needs may prevent Medi-Cal, CalFresh, CalWORKs, Cash Assistance Program for Immigrants, California Food Assistance Program, and In Home Supportive Services beneficiaries from obtaining in-person eligibility redeterminations; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567 and 8571, do hereby issue the following order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1. As to individuals currently eligible for benefits under Medi-Cal, CalFresh, CalWORKs, the Cash Assistance Program for Immigrants, the California Food Assistance Program, or In Home Supportive Services benefits, and to the extent necessary to allow such individuals to maintain eligibility for such benefits, any state law, including but not limited to California Code of Regulations, Title 22, section 50189(a) and Welfare and Institutions Code sections 18940 and 11265, that would require redetermination of such benefits is suspended for a period of 90 days from the date of this Order. This Order shall be construed to be consistent with applicable federal laws, including but not limited to Code of Federal Regulations, Title 42, section 435.912, subdivision (e), as interpreted by the Centers for Medicare and Medicaid Services (in guidance issued on January 30, 2018) to permit the extension of

otherwise-applicable Medicaid time limits in emergency situations.

2. Through June 17, 2020, any month or partial month in which California Work Opportunity and Responsibility to Kids (CalWORKs) aid or services are received pursuant to Welfare and Institutions Code Section 11200 et seq. shall not be counted for purposes of the 48-month time limit set forth in Welfare an Institutions Code Section 11454.  Any waiver of this time limit shall not be applied if it will exceed the federal time limits set forth in Code of Federal Regulations, Title 45, section 264.1.

3. Paragraph 11 of Executive Order N-25-20 (March 12, 2020) is withdrawn and superseded by the following text:

Notwithstanding any other provision of state or local law (including, but not limited to, the Bagley-Keene Act or the Brown Act), and subject to the notice and accessibility requirements set forth below, a local legislative body or state body is authorized to hold public meetings via teleconferencing and to make public meetings accessible telephonically or otherwise electronically to all members of the public seeking to observe and to address the local legislative body or state body.  All requirements in both the Bagley-Keene Act and the Brown Act expressly or impliedly requiring the physical presence of members, the clerk or other personnel of the body, or of the public as a condition of participation in or quorum for a public meeting are hereby waived.

In particular, any otherwise-applicable requirements that

(i) state and local bodies notice each teleconference location from which a member will be participating in a public meeting;

(ii) each teleconference location be accessible to the public;

(iii) members of the public may address the body at each teleconference conference location;

(iv) state and local bodies post agendas at all teleconference locations;

(v) at least one member of the state body be physically present at the location specified in the notice of the meeting; and

(vi) during teleconference meetings, a least a quorum of the members of the local body participate from locations within the boundaries of the territory over which the local body exercises jurisdiction

are hereby suspended.

A local legislative body or state body that holds a meeting via teleconferencing and allows members of the public to observe and address the meeting telephonically or otherwise electronically, consistent with the notice and accessibility requirements set forth below, shall have satisfied any requirement that the body allow

members of the public to attend the meeting and offer public comment. Such a body need not make available any physical location from which members of the public may observe the meeting and offer public comment.

Accessibility Requirements: If a local legislative body or state body holds a meeting via teleconferencing and allows members of the public to observe and address the meeting telephonically or otherwise electronically, the body shall also:

(i)   Implement a procedure for receiving and swiftly resolving requests for reasonable modification or accommodation from individuals with disabilities, consistent with the Americans with Disabilities Act and resolving any doubt whatsoever in favor of accessibility; and

(ii)  Advertise that procedure each time notice is given of the means by which members of the public may observe the meeting and offer public comment, pursuant to subparagraph (ii) of the Notice Requirements below.

Notice Requirements: Except to the extent this Order expressly provides otherwise, each local legislative body and state body shall:

(i)   Give advance notice of the time of, and post the agenda for, each public meeting according to the timeframes otherwise prescribed by the Bagley-Keene Act or the Brown Act, and using the means otherwise prescribed by the Bagley-Keene Act or the Brown Act, as applicable; and

(ii)  In each instance in which notice of the time of the meeting is otherwise given or the agenda for the meeting is otherwise posted, also give notice of the means by which members of the public may observe the meeting and offer public comment. As to any instance in which there is a change in such means of public observation and comment, or any instance prior to the issuance of this Order in which the time of the meeting has been noticed or the agenda for the meeting has been posted without also including notice of such means, a body may satisfy this requirement by advertising such means using "the most rapid means of communication available at the time" within the meaning of Government Code, section 54954, subdivision (e); this shall include, but need not be limited to, posting such means on the body's Internet website.

All of the foregoing provisions concerning the conduct of public meetings shall apply only during the period in which state or local public health officials have imposed or recommended social distancing measures.

All state and local bodies are urged to use sound discretion and to make reasonable efforts to adhere as closely as reasonably possible to the provisions of the Bagley-Keene Act and the Brown Act, and other applicable local laws regulating the conduct of public meetings, in order to maximize transparency and provide the public access to their meetings.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 17th day of March 2020.

GAVIN NEWSOM
Governor of California

**ATTEST:**

ALEX PADILLA
Secretary of State

# EXHIBIT N

 CDC  Centers for Disease
Control and Prevention

Coronavirus Disease 2019 (COVID-19)

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

Updated July 14, 2020                                    Print

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of the date of posting, July 14, 2020.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the CDC website periodically for updated interim guidance.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

## Who is the intended audience for this guidance?

This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., U.S. Immigration and Customs Enforcement and U.S. Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of SARS-CoV-2 (the virus that causes Coronavirus Disease 2019, or COVID-19) in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes.

**The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

## Why is this guidance being issued?

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of SARS-CoV-2 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19.

- Incarcerated/detained persons live, work, eat, study, and participate in activities within congregate environments, heightening the potential for SARS-CoV-2 to spread once introduced.
- In most cases, incarcerated/detained persons are not permitted to leave the facility.
- Many opportunities exist for SARS-CoV-2 to be introduced into a correctional or detention facility, including daily staff movements; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members.

- Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to SARS-CoV-2 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce SARS-CoV-2 from different geographic areas.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent hand washing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Social distancing options within correctional and detention settings may be limited due to crowded living conditions.

- Incarcerated/detained persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements, stigma and fear of isolation.

- Incarcerated/detained persons and staff may have underlying medical conditions that increase their risk of severe illness from COVID-19.

- Options for medical isolation for people with COVID-19 are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex settings that may include both government and private employers. Each employer is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for SARS-CoV-2 to spread may be high, potentially creating security and morale challenges.

CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care for individuals with COVID-19 as well as their close contacts in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings.

This guidance document provides additional recommended best practices specifically for correctional and detention facilities. **At this time, different facility types (e.g., prison vs. jail) and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.**

# What topics does this guidance include?

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

- Operational and communications preparations for COVID-19

- Enhanced cleaning/disinfecting and hygiene practices

- Social distancing strategies to increase space between individuals in the facility

- Strategies to limit transmission from visitors

- Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

- Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

- Testing considerations for SARS-CoV-2

- Medical isolation of individuals with confirmed and suspected COVID-19 and quarantine of close contacts, including considerations for cohorting when individual spaces are limited

- Healthcare evaluation for individuals with suspected COVID-19

- Clinical care for individuals with confirmed and suspected COVID-19

- Considerations for people who are at increased risk for severe illness from COVID-19

# Definitions of Commonly Used Terms

**Close contact of someone with COVID-19** – Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient). The definition of close contact does not change if the infected individual is wearing a mask or cloth face covering.

**Cloth face covering** – Cloth face coverings cover the nose and mouth and are intended to help prevent people who have the virus from transmitting it to others, even if they do not have symptoms. CDC recommends wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain. Cloth face coverings prevent the person wearing the covering from spreading respiratory droplets when talking, sneezing, or coughing. If everyone wears a cloth face covering in congregate settings, the risk of exposure to SARS-CoV-2 can be reduced. Anyone who has trouble breathing, or is unconscious, incapacitated, younger than 2 years of age or otherwise unable to remove the mask without assistance should not wear a cloth face covering (for more details see Guidelines on how to safely wear cloth face coverings). **Cloth face coverings are a type of "source control," intended to help slow the spread of COVID-19 and are not personal protective equipment (PPE).** Individuals working under conditions that require PPE should not use a cloth face covering when a surgical mask or N95 is indicated (see Table 1). Surgical masks and N95 respirators should be reserved for situations where the wearer needs PPE. Detailed recommendations for wearing cloth face coverings can be found here.

**Cohorting** – In this guidance, cohorting refers to the practice of isolating multiple individuals with laboratory-confirmed COVID-19 together or quarantining close contacts of an infected person together as a group due to a limited number of individual cells. While cohorting those with confirmed COVID-19 is acceptable, cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting as a harm reduction strategy to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of COVID-19** – Community transmission of SARS-CoV-2 occurs when individuals are exposed to the virus through contact with someone in their local community, rather than through travel to an affected location. Once community transmission is identified in a particular area, correctional facilities and detention centers are more likely to start seeing infections inside their walls. Facilities should consult with local public health departments if assistance is needed to determine how to define "local community" in the context of SARS-CoV-2's spread. However, because all states have reported cases, all facilities should be vigilant for the virus's introduction into their populations.

**Confirmed vs. suspected COVID-19** – A person has **confirmed COVID-19** when they have received a positive result from a COVID-19 viral test, but they may or may not have symptoms. A person has **suspected COVID-19** if they show symptoms of COVID-19 but either have not been tested via a viral test or are awaiting test results. If their test result is positive, suspected COVID-19 is reclassified as confirmed COVID-19.

**Incarcerated/detained persons** – For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e., detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Medical isolation** – Medical isolation refers to separating someone with confirmed or suspected COVID-19 infection to prevent their contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical, time-based, and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials. In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion, and should ensure that the conditions in medical isolation spaces are distinct from those in punitive isolation.

**Quarantine** – Quarantine refers to the practice of separating individuals who have had close contact with someone with COVID-19 to determine whether they develop symptoms or test positive for the disease. Quarantine also reduce the risk of transmission if an individual is later found to have COVID-19. Quarantine for COVID-19 should last for a period of 14 days after the exposure has ended. Ideally, each quarantined individual should be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, and/or a quarantined individual receives a positive viral test result for SARS-CoV-2, the individual should be placed under medical isolation and evaluated by a healthcare professional. If symptoms do not develop during the 14-day period and the individual does not receive a positive viral test result for SARS-CoV-2, quarantine restrictions can be lifted. (NOTE: Some facilities may also choose to implement a "routine

intake quarantine," in which individuals newly incarcerated/detained ("new intakes") are housed separately or as a group for 14 days before being integrated into general housing. This type of quarantine is conducted to prevent introduction of SARS-CoV-2 from incoming individuals whose exposure status is unknown, rather than in response to a known exposure to someone infected with SARS-CoV-2.)

**Social distancing** – Social distancing is the practice of increasing the space between individuals and decreasing their frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. People who have been infected with SARS-CoV-2 but do not have symptoms can still spread the infection, making social distancing even more important. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication . Examples of potential social distancing strategies for correctional and detention facilities are detailed in the guidance below.

**Staff** – In this document, "staff" refers to all public or private-sector employees working within a correctional facility (e.g., including private healthcare or food service workers). Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff, including private facility operators.

**Symptoms** – Symptoms of COVID-19 include cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat, and new loss of taste or smell. This list is not exhaustive. Other less common symptoms have been reported, including nausea and vomiting. Like other respiratory infections, COVID-19 can vary in severity from mild to severe, and pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations at increased risk for severe illness are not yet fully understood. Monitor the CDC website for updates on symptoms.

# Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of persons with confirmed and suspected COVID-19 infection and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they identify incarcerated/detained persons or staff with confirmed or suspected COVID-19, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with persons with confirmed and suspected COVID-19 infection.

# COVID–19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections should be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness**. This guidance is intended to help facilities prepare for potential SARS-CoV-2 transmission in the facility. Strategies focus on operational and communications planning, training, and personnel practices.
- **Prevention**. This guidance is intended to help facilities prevent spread of SARS-CoV-2 within the facility and between the community and the facility. Strategies focus on reinforcing hygiene practices; intensifying cleaning and disinfection of the

community and the importance of hand hygiene, respiratory hygiene, and cough etiquette, cleaning and disinfection of the facility; regular symptom screening for new intakes, visitors, and staff; continued communication with incarcerated/detained persons and staff; social distancing measures; as well as, testing symptomatic and asymptomatic individuals in correctional and detention facilities.(refer to the Interim Guidance on Testing for SARS-CoV-2 in Correctional and Detention Facilities for more information on how to implement testing in correctional and detention settings).

- **Management.** This guidance is intended to help facilities clinically manage persons with confirmed and suspected COVID-19 inside the facility and prevent further transmission of SARS-CoV-2. Strategies include medical isolation and care of incarcerated/detained persons with COVID-19 (including considerations for cohorting), quarantine and testing of close contacts, restricting movement in and out of the facility, infection control practices for interactions with persons with COVID-19 and their quarantined close contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas where infected persons spend time.

# Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and the importance of reporting those symptoms if they develop. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, training staff on proper use of personal protective equipment (PPE) that may be needed in the course of their duties, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

## Communication and Coordination

- **Develop information-sharing systems with partners.**
  - Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before SARS-CoV-2 infections develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.
  - Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.
  - Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.
  - Where possible, put plans in place with other jurisdictions to prevent individuals with confirmed and suspected COVID-19 and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding.
  - Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.
- **Review existing influenza, all-hazards, and disaster plans, and revise for COVID-19.**
  - Train staff on the facility's COVID-19 plan. All personnel should have a basic understanding of COVID-19, how the disease is thought to spread, what the symptoms of the disease are, and what measures are being implemented and can be taken by individuals to prevent or minimize the transmission of SARS-CoV-2.
  - Ensure that **separate** physical locations (dedicated housing areas and bathrooms) have been identified to 1) isolate individuals with confirmed COVID-19 (individually or cohorted), 2) isolate individuals with suspected COVID-19 (individually – do not cohort), and 3) quarantine close contacts of those with confirmed or suspected COVID-19 (ideally individually; cohorted if necessary). The plan should include contingencies for multiple locations if numerous infected individuals and/or close contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for more detailed cohorting considerations.
  - Facilities without onsite healthcare capacity should make a plan for how they will ensure that individuals with suspected COVID-19 will be isolated, evaluated, tested, and provided necessary medical care.
  - Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.
  - Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the disease transmission patterns change.
- **Coordinate with local law enforcement and court officials.**
  - Identify legally acceptable alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of SARS-CoV-2 transmission.

- Consider options to prevent overcrowding (e.g., diverting new intakes to other facilities with available capacity, and encouraging alternatives to incarceration and other decompression strategies where allowable).

- **Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signs throughout the facility and communicate this information verbally on a regular basis.** Sample signage and other communications materials are available on the CDC website. Ensure that materials can be understood by non-English speakers and those with low literacy and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or have low-vision.
  - **For all:**
    - Practice good cough and sneeze etiquette: Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.
    - Practice good hand hygiene: Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating; before and after preparing food; before taking medication; and after touching garbage.
    - Wear face coverings, unless PPE is indicated.
    - Avoid touching your eyes, nose, or mouth without cleaning your hands first.
    - Avoid sharing eating utensils, dishes, and cups.
    - Avoid non-essential physical contact.
  - **For incarcerated/detained persons**: the importance of reporting symptoms to staff; social distancing and its importance for preventing COVID-19; the purpose of quarantine and medical isolation
  - **For staff**: stay at home when sick; if symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting their healthcare provider as soon as possible to determine whether they need to be evaluated and tested, and contacting their supervisor.

# Personnel Practices

- **Review the sick leave policies of each employer that operates within the facility.**
  - Review policies to ensure that they are flexible, non-punitive, and actively encourage staff not to report to work when sick.
  - Determine which officials will have the authority to send symptomatic staff home.

- **Identify duties that can be performed remotely.** Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of SARS-CoV-2 transmission.

- **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.
  - Identify critical job functions and plan for alternative coverage.
  - Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.
  - Review CDC guidance on safety practices for critical infrastructure workers (including correctional officers, law enforcement officers, and healthcare workers) who continue to work after a potential exposure to SARS-CoV-2.
  - Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.

- **Consider offering revised duties to staff who are at** increased risk for severe illness from COVID-19. Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, moderate to severe asthma, heart disease, chronic kidney disease, severe obesity, and diabetes. See CDC's website for a complete list and check regularly for updates as more data become available.
  - Consult with occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to SARS-CoV-2.

- **Make plans in advance for how to change staff duty assignments to prevent unnecessary movement between housing units during a COVID-19 outbreak.**
  - If there are persons with COVID-19 inside the facility, it is **essential** for staff members to maintain a consistent duty assignment in the same area of the facility across shifts to prevent transmission across different facility areas.
  - Where feasible, consider the use of telemedicine to evaluate persons with COVID-19 symptoms and other health conditions to limit the movement of healthcare staff across housing units.

- Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the influenza season. Symptoms of COVID-19 are similar to those of influenza. Preventing influenza in a facility can speed the detection of COVID-19 and reduce pressure on healthcare resources.
- Reference the Occupational Safety and Health Administration website ⧉ for recommendations regarding worker health.
- Review CDC's guidance for businesses and employers to identify any additional strategies the facility can use within its role as an employer, or share with others.

## Operations, Supplies, and PPE Preparations

- Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available and have a plan in place to restock as needed.
  - Standard medical supplies for daily clinic needs
  - Tissues
  - Liquid or foam soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing
  - Ensure a sufficient supply of soap for each individual
  - Hand drying supplies
  - Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)
  - Cleaning supplies, including EPA-registered disinfectants effective against SARS-CoV-2 ⧉ , the virus that causes COVID-19
  - Recommended PPE (surgical masks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when surgical masks are acceptable alternatives to N95s. Visit CDC's website for a calculator to help determine rate of PPE usage.
  - Cloth face coverings
  - SARS-CoV-2 specimen collection and testing supplies
- Make contingency plans for possible PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.
  - See CDC guidance optimizing PPE supplies.
- Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting, where security concerns allow. If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty, and placing dispensers at facility entrances/exits and in PPE donning/doffing stations.
- Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing. (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)
  - Provide liquid or foam soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing, and ensure that individuals do not share bars of soap.
- If not already in place, employers operating within the facility should establish a respiratory protection program as appropriate, to ensure that staff and incarcerated/detained persons are fit-tested for any respiratory protection they will need within the scope of their responsibilities.
- Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities.
  - See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with persons with COVID-19 or their close contacts.
  - Visit CDC's website for PPE donning and doffing training videos and job aids 📄 .
- Prepare to set up designated PPE donning and doffing areas outside all spaces where PPE will be used. These spaces should include:
  - A dedicated trash can for disposal of used PPE
  - A hand washing station or access to alcohol-based hand sanitizer
  - A poster demonstrating correct PPE donning and doffing procedures
- Review CDC and EPA guidance for cleaning and disinfecting of the facility.

# Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of SARS-CoV-2 and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with SARS-CoV-2 do not display symptoms, the virus could be present in facilities before infections are identified. Good hygiene practices, vigilant symptom screening, wearing cloth face coverings (if able), and social distancing are critical in preventing further transmission.

Testing symptomatic and asymptomatic individuals and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts, can help prevent spread of SARS-CoV-2.

## Operations

- Stay in communication with partners about your facility's current situation.
  - State, local, territorial, and/or tribal health departments
  - Other correctional facilities
- Communicate with the public about any changes to facility operations, including visitation programs.
- Limit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding.
  - Consider postponing non-urgent outside medical visits. Use telehealth to the extent possible as a social distancing measure within the facility and to help minimize movement between the facility and the community.
  - If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for suspected COVID-19 infection – including giving the individual a cloth face covering (unless contraindicated), if not already wearing one, immediately placing them under medical isolation, and evaluating them for SARS-CoV-2 testing.
  - Ensure that the receiving facility has capacity to properly quarantine or isolate the individual upon arrival.
  - See Transportation section below on precautions to use when transporting an individual with confirmed or suspected COVID-19.
- Make every possible effort to modify staff assignments to minimize movement across housing units and other areas of the facility. For example, ensure that the same staff are assigned to the same housing unit across shifts to prevent cross-contamination from units where infected individuals have been identified to units with no infections.
- Consider suspending work release and other programs that involve movement of incarcerated/detained individuals in and out of the facility, especially if the work release assignment is in another congregate setting, such as a food processing plant
- Implement lawful alternatives to in-person court appearances where permissible.
- Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for possible COVID-19 symptoms.
- Limit the number of operational entrances and exits to the facility.

Where feasible, consider establishing an on-site laundry option for staff so that they can change out of their uniforms, launder them at the facility, and wear street clothes and shoes home. If on-site laundry for staff is not feasible, encourage them to change clothes before they leave the work site, and provide a location for them to do so. This practice may help minimize the risk of transmitting SARS-CoV-2 between the facility and the community.

## Cleaning and Disinfecting Practices

- Even if COVID-19 has not yet been identified inside the facility or in the surrounding community, implement intensified cleaning and disinfecting procedures according to the recommendations below. These measures can help prevent spread of SARS-CoV-2 if introduced, and if already present through asymptomatic infections.

- **Adhere to** CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates.
  - Visit the CDC website for a tool to help implement cleaning and disinfection.
  - Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, telephones, and computer equipment).
  - Staff should clean shared equipment (e.g., radios, service weapons, keys, handcuffs) several times per day and when the use of the equipment has concluded.
  - Use household cleaners and EPA-registered disinfectants effective against SARS-CoV-2, the virus that causes COVID-19 ⧉ as appropriate for the surface.
  - Follow label instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use, and around people. Clean according to label instructions, to ensure safe and effective use, appropriate product dilution and contact time.
- **Consider increasing** the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.
- **Ensure adequate supplies** to support intensified cleaning and disinfection practices and have a plan in place to restock rapidly if needed.

# Hygiene

- **Encourage all staff and incarcerated/detained persons** to wear a cloth face covering as much as safely possible, to prevent transmission of SARS-CoV-2 through respiratory droplets that are created when a person talks, coughs, or sneezes ("source control").
  - Provide cloth face coverings at no cost to incarcerated/detained individuals and launder them routinely.
  - Clearly explain the purpose of cloth face coverings and when their use may be contraindicated. Because many individuals with COVID-19 do not have symptoms, it is important for everyone to wear cloth face coverings in order to protect each other: "My mask protects you, your mask protects me."
  - Ensure staff know that cloth face coverings should not be used as a substitute for surgical masks or N95 respirators that may be required based on an individual's scope of duties. Cloth face coverings are not PPE, but are worn to protect others in the surrounding area from respiratory droplets generated by the wearer.
  - Surgical masks may also be used as source control but should be conserved for situations requiring PPE.
- **Reinforce** healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).
- **Provide incarcerated/detained persons and staff no-cost access to:**
  - **Soap** – Provide liquid or foam soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing, and ensure that individuals are not sharing bars of soap.
  - **Running water, and hand drying machines or disposable paper towels** for hand washing
  - **Tissues** and (where possible) no-touch trash receptacles for disposal
  - Cloth face coverings
- **Provide alcohol-based hand sanitizer** with at least 60% alcohol where permissible based on security restrictions. Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.
- **Communicate that sharing drugs and drug preparation equipment** can spread SARS-CoV-2 due to potential contamination of shared items and close contact between individuals.

## Testing for SARS-CoV-2

Correctional and detention facilities are high-density congregate settings that present unique challenges to implementing testing for SARS-CoV-2, the virus that causes COVID-19. Refer to Testing guidance for details regarding testing strategies in correctional settings.

## Prevention Practices for Incarcerated/Detained Persons

- **Provide cloth face coverings (unless** contraindicated**) and perform pre-intake symptom screening and temperature checks for all new entrants in order to identify and immediately place individuals with symptoms under medical isolation. Screening should take place in an outdoor space prior to entry, in the sally port, or at the point of entry into the facility immediately upon entry, before beginning the intake process.** See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).
    - ○ If an individual has symptoms of COVID-19:
        - ▪ Require the individual to wear a cloth face covering (as much as possible, use cloth face coverings in order to reserve surgical masks for situations requiring PPE). Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a cloth face covering.
        - ▪ Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.
        - ▪ Place the individual under medical isolation and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)
        - ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care. See Transport section and coordinate with the receiving facility.
    - ○ If an individual is an asymptomatic close contact of someone with COVID-19:
        - ▪ Quarantine the individual and monitor for symptoms at least once per day (ideally twice per day) for 14 days. (See Quarantine section below.)
        - ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care.
- **Implement** social distancing **strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of symptoms), and to minimize mixing of individuals from different housing units.** Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:
    - ○ Common areas:
        - ▪ Enforce increased space between individuals in holding cells as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)
    - ○ Recreation:
        - ▪ Choose recreation spaces where individuals can spread out
        - ▪ Stagger time in recreation spaces
        - ▪ Restrict recreation space usage to a single housing unit per space (where feasible)
    - ○ Meals:
        - ▪ Stagger meals in the dining hall (one housing unit at a time)
        - ▪ Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
        - ▪ Provide meals inside housing units or cells
    - ○ Group activities:
        - ▪ Limit the size of group activities
        - ▪ Increase space between individuals during group activities
        - ▪ Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
        - ▪ Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out
    - ○ Housing:
        - ▪ If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
        - ▪ Arrange bunks so that individuals sleep head to foot to increase the distance between their faces
        - ▪ Minimize the number of individuals housed in the same room as much as possible
        - ▪ Rearrange scheduled movements to minimize mixing of individuals from different housing areas
    - ○ Work details:

- Modify work detail assignments so that each detail includes only individuals from a single housing unit.
  - **Medical:**
    - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering individuals' sick call visits.
    - Stagger pill line, or stage pill line within individual housing units.
    - Identify opportunities to implement telemedicine to minimize the movement of healthcare staff across multiple housing units and to minimize the movement of ill individuals through the facility.
    - Designate a room near the intake area to evaluate new entrants who are flagged by the intake symptom screening process before they move to other parts of the facility.

- **Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.**
- **Provide** up-to-date information about COVID-19 **to incarcerated/detained persons on a regular basis.** As much as possible, provide this information in person and allow opportunities for incarcerated/detained individuals to ask questions (e.g., town hall format if social distancing is feasible, or informal peer-to-peer education). Updates should address:
  - Symptoms of COVID-19 and its health risks
  - Reminders to report COVID-19 symptoms to staff at the first sign of illness
    - Address concerns related to reporting symptoms (e.g., being sent to medical isolation), explain the need to report symptoms immediately to protect everyone, and explain the differences between medical isolation and solitary confinement.
  - Reminders to use cloth face coverings as much as possible
  - Changes to the daily routine and how they can contribute to risk reduction

# Prevention Practices for Staff

- **Remind staff to stay at home if they are sick.** Ensure staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.
- See strategies for testing of asymptomatic incarcerated or detained individuals and staff without known SARS-CoV-2 exposure for early identification of SARS-CoV-2 in correctional and detention facilities.
- **Perform verbal screening and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.
  - In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).
  - Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.
- **Provide staff with** up-to-date information about COVID-19 **and about facility policies on a regular basis, including:**
  - Symptoms of COVID-19 and its health risks
  - Employers' sick leave policy
- **If staff develop a fever or other** symptoms of COVID-19 **while at work**, they should immediately put on a cloth face covering (if not already wearing one), inform supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

If a staff member has a confirmed SARS-CoV-2 infection, the relevant employers should inform other staff about their possible exposure in the workplace but should maintain the infected employee's confidentiality as required by the Americans with Disabilities Act ⧉ .

Follow guidance from the Equal Employment Opportunity Commission ⧉ when offering testing to staff. Any time a positive test result is identified, ensure that the individual is rapidly notified, connected to appropriate medical care, and advised how to self-isolate.

- **Staff identified as close contacts of someone with COVID-19 should self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine.**
  - Staff identified as close contacts should self-monitor for symptoms and consider seeking testing

- Staff identified as close contacts may remain at work, with daily symptom checking and PPE, in lieu of quarantine, to ensure continuity of operations and to allow for additional testing.
  - Refer to CDC guidelines for further recommendations regarding home quarantine.
  - To ensure continuity of operations, **critical infrastructure workers (including corrections officers, law enforcement officers, and healthcare staff) may be permitted to continue work following potential exposure to SARS-CoV-2 , provided that they remain** <u>asymptomatic</u> **and additional precautions are implemented to protect them and the community.**
    - **Screening:** The facility should ensure that temperature and symptom screening takes place daily before the staff member enters the facility.
    - **Regular Monitoring:** The staff member should self-monitor under the supervision of their employer's occupational health program. If symptoms develop, they should follow CDC guidance on isolation with COVID-19 symptoms.
    - **Wear a Cloth Face Covering:** The staff member should wear a cloth face covering (unless contraindicated) at all times while in the workplace for 14 days after the last exposure (if not already wearing one due to universal use of cloth face coverings).
    - **Social Distance:** The staff member should maintain 6 feet between themselves and others and practice social distancing as work duties permit.
    - **Disinfect and Clean Workspaces:** The facility should continue enhanced cleaning and disinfecting practices in all areas including offices, bathrooms, common areas, and shared equipment.
- **Staff with confirmed or suspected COVID-19 should inform workplace and personal contacts immediately. These staff should be required to meet CDC criteria for ending home isolation before returning to work.** Monitor CDC guidance on discontinuing home isolation regularly, as circumstances evolve rapidly.
- **When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with** COVID-19 symptoms **while interviewing, escorting, or interacting in other ways, and to wear** recommended PPE **if closer contact is necessary.**
- **Ask staff to keep interactions with individuals with COVID-19 symptoms as brief as possible.**

## Prevention Practices for Visitors

- **If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.**
- **Require visitors to wear** cloth face coverings **(unless** contraindicated**), and perform verbal screening and temperature checks for all visitors and volunteers on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.
  - Staff performing temperature checks should wear recommended PPE.
  - Exclude visitors and volunteers who do not clear the screening process or who decline screening.
- **Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.**
- **Provide visitors and volunteers with information to prepare them for screening.**
  - Instruct visitors to postpone their visit if they have COVID-19 symptoms.
  - If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.
  - Display signage outside visiting areas explaining the COVID-19 symptom screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.
- **Promote non-contact visits:**
  - Encourage incarcerated/detained persons to limit in-person visits in the interest of their own health and the health of their visitors.
  - Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.
  - Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.
- **Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.**
  - If moving to virtual visitation, clean electronic surfaces regularly after each use. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)
  - Inform potential visitors of changes to, or suspension of, visitation programs.

- Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).
- If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation should only be done in the interest of incarcerated/detained persons' physical health and the health of the general public. Visitation is important to maintain mental health. If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them.

- **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

# Management

If there is an individual with suspected COVID-19 inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing individuals with suspected or confirmed COVID-19 under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

Testing symptomatic and asymptomatic individuals (incarcerated or detained individuals and staff) and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts, can help prevent spread of SARS-CoV-2 in correctional and detention facilities. Continue following recommendations outlined in the Preparedness and Prevention sections above.

# Operations

- **Coordinate with state, local, tribal, and/or territorial health departments.** When an individual has suspected or confirmed COVID-19, notify public health authorities and request any necessary assistance with medical isolation, evaluation, and clinical care, and contact tracing and quarantine of close contacts. See Medical Isolation, Quarantine and Clinical Care sections below.
- Implement alternate work arrangements deemed feasible in the Operational Preparedness section.
- **Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release), unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding.**
- Set up PPE donning/doffing stations as described in the Preparation section.
- **If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (separately from other individuals who are quarantined due to contact with someone who has COVID-19).** This practice is referred to as **routine intake quarantine**.
- **Consider** testing **all newly incarcerated/detained persons before they join the rest of the population in the correctional or detention facility.**
- **Minimize interactions between incarcerated/detained persons living in different housing units, to prevent transmission from one unit to another.** For example, stagger mealtimes and recreation times, and consider implementing broad movement restrictions.
- **Ensure that work details include only incarcerated/detained persons from a single housing unit, supervised by staff who are normally assigned to the same housing unit.**
  - If a work detail provides goods or services for other housing units (e.g., food service or laundry), ensure that deliveries are made with extreme caution. For example, have a staff member from the work detail deliver prepared food to a set location, leave, and have a staff member from the delivery location pick it up. Clean and disinfect all coolers, carts, and other objects involved in the delivery.
- Incorporate COVID-19 prevention practices into release planning.
  - Consider implementing a release quarantine (ideally in single cells) for 14 days prior to individuals' projected release date.
  - Consider testing individuals for SARS-CoV-2 before release, particularly if they will be released to a congregate

- Screen all releasing individuals for COVID-19 symptoms and perform a temperature check (see Screening section below.)
  - If an individual does not clear the screening process, follow the protocol for suspected COVID-19 – including giving the individual a cloth face covering, if not already wearing one, immediately placing them under medical isolation, and evaluating them for SARS-CoV-2 testing.
  - If the individual is released from the facility before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.
  - Before releasing an incarcerated/detained individual who has confirmed or suspected COVID-19, or is a close contact of someone with COVID-19, contact local public health officials to ensure they are aware of the individual's release and anticipated location. If the individual will be released to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation or quarantine as needed.

- **Incorporate COVID-19 prevention practices into re-entry programming.**
  - Ensure that facility re-entry programs include information on accessing housing, social services, mental health services, and medical care within the context of social distancing restrictions and limited community business operations related to COVID-19.
    - Provide individual about to be released with COVID-19 prevention information, hand hygiene supplies, and cloth face coverings.
    - Link individuals who need medication-assisted treatment for opioid use disorder to substance use, harm reduction, and/or recovery support systems ↗ . If the surrounding community is under movement restrictions due to COVID-19, ensure that referrals direct releasing individuals to programs that are continuing operations.
    - Link releasing individuals to Medicaid enrollment and healthcare resources ↗ , including continuity of care for chronic conditions that may place an individual at increased risk for severe illness from COVID-19.
    - When possible, encourage releasing individuals to seek housing options among their family or friends in the community, to prevent crowding in other congregate settings such as homeless shelters. When linking individuals to shared housing, link preferentially to accommodations with the greatest capacity for social distancing.

# Hygiene

- Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility (see above).
- Continue to emphasize practicing good hand hygiene and cough etiquette (see above).

# Cleaning and Disinfecting Practices

- Continue adhering to recommended cleaning and disinfection procedures for the facility at large (see above).

- Reference specific cleaning and disinfection procedures for areas where individuals with COVID-19 spend time (see below).

# Management of Incarcerated/Detained Persons with COVID-19 Symptoms

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that individuals with suspected COVID-19 will be effectively isolated, evaluated, tested (if indicated), and given care.

- Staff interacting with incarcerated/detained individuals with COVID-19 symptoms should wear recommended PPE (see Table 1).
- If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.

- Incarcerated/detained individuals with COVID-19 symptoms should wear a cloth face covering (unless contraindicated) and should be placed under medical isolation immediately. See Medical Isolation section below.

- Medical staff should evaluate symptomatic individuals to determine whether SARS-CoV-2 testing is indicated. Refer to CDC guidelines for information on evaluation and testing See Infection Control and Clinical Care sections below as well. Incarcerated/detained persons with symptoms are included in the high-priority group for testing in CDC's recommendations due to the high risk of transmission within congregate settings.
  - If the individual's SARS-CoV-2 test is positive, continue medical isolation. (See Medical Isolation section below.)
  - If the SARS-CoV-2 test is negative, the individual can be returned to their prior housing assignment unless they require further medical assessment or care or if they need to be quarantined as a close contact of someone with COVID-19.

- Work with public health or private labs, as available, to access testing supplies or services.

# Medical Isolation of Individuals with Confirmed or Suspected COVID-19

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that individuals with confirmed or suspected COVID-19 will be appropriately isolated, evaluated, tested, and given care.

  - As soon as an individual develops symptoms of COVID-19 or tests positive for SARS-CoV-2 they should be given a cloth face covering (if not already wearing one and if it can be worn safely), immediately placed under medical isolation in a separate environment from other individuals, and medically evaluated.

  - Ensure that medical isolation for COVID-19 is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice. Because of limited individual housing spaces within many correctional and detention facilities, infected individuals are often placed in the same housing spaces that are used for solitary confinement. To avoid being placed in these conditions, incarcerated/detained individuals may be hesitant to report COVID-19 symptoms, leading to continued transmission within shared housing spaces and, potentially, lack of health care and adverse health outcomes for infected individuals who delay reporting symptoms. Ensure that medical isolation is *operationally* distinct from solitary confinement, even if the same housing spaces are used for both. For example:
    - Ensure that individuals under medical isolation receive regular visits from medical staff and have access to mental health services.
    - Make efforts to provide similar access to radio, TV, reading materials, personal property, and commissary as would be available in individuals' regular housing units.
    - Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.
    - Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

- Keep the individual's movement outside the medical isolation space to an absolute minimum.
  - Provide medical care to isolated individuals inside the medical isolation space, unless they need to be transferred to a healthcare facility. See Infection Control and Clinical Care sections for additional details.
  - Serve meals inside the medical isolation space.
  - Exclude the individual from all group activities.
  - Assign the isolated individual(s) a dedicated bathroom when possible. When a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result. Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation.

- Ensure that the individual is wearing a cloth face covering if they must leave the medical isolation space for any reason, and whenever another individual enters. Provide clean masks as needed. Masks should be washed routinely and changed when visibly soiled or wet.

- If the facility is housing individuals with confirmed COVID-19 as a cohort:
  - Only individuals with laboratory-confirmed COVID-19 should be placed under medical isolation as a cohort. Do not cohort those with confirmed COVID-19 with those with suspected COVID-19, or with close contacts of individuals with confirmed or suspected COVID-19.

- Do not house individuals with undiagnosed respiratory infection (who do not meet the criteria of suspected COVID-19) with individuals with suspected COVID-19.
- Ensure that cohorted groups of people with confirmed COVID-19 wear cloth face coverings whenever anyone (including staff) enters the isolation space. (Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a cloth face covering.)
- Use one large space for cohorted medical isolation rather than several smaller spaces. This practice will conserve PPE and reduce the chance of cross-contamination across different parts of the facility.

- **If the facility is housing individuals with confirmed COVID-19 as a cohort, use a well-ventilated room with solid walls and a solid door that closes fully.**

- **If possible, avoid transferring infected individual(s) to another facility unless necessary for medical care. If transfer is necessary, see** Transport **section for safe transport guidance.**

- **Staff assignments to isolation spaces should remain as consistent as possible, and these staff should limit their movements to other parts of the facility as much as possible.** These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility.
  - If staff must serve multiple areas of the facility, ensure that they change PPE when leaving the isolation space. If PPE supplies necessitate reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE, to prevent cross-contamination. For example, start in a housing unit where no one is known to be infected, then move to a space used as quarantine for close contacts, and end in an isolation unit. Ensure that staff are highly trained in infection control practices, including use of recommended PPE.

- **Minimize transfer of individuals with confirmed or suspected COVID-19 between spaces within the facility.**

- **Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:
  - **Cover** their mouth and nose with a tissue when they cough or sneeze
  - **Dispose** of used tissues immediately in the lined trash receptacle
  - Wash hands immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

- **Maintain medical isolation at least until CDC criteria for discontinuing home-based isolation have been met. These criteria have changed since CDC corrections guidance was originally issued and may continue to change as new data become available. Monitor the sites linked below regularly for updates.** This content will not be outlined explicitly in this document due to rapid pace of change.
  - CDC's recommended strategy for release from isolation can be found here.
  - Detailed information about the data informing the symptom-based strategy, and considerations for extended isolation periods for persons in congregate settings including corrections, can be found here.
  - If persons will require ongoing care by medical providers, discontinuation of transmission-based precautions (PPE) should be based on similar criteria found here.

# Cleaning Spaces where Individuals with COVID-19 Spend Time

- **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)

- **Thoroughly and frequently** clean and disinfect **all areas where individuals with confirmed or suspected COVID-19 spend time.**
  - After an individual has been medically isolated for COVID-19 close off areas that they have used prior to isolation. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions) before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.
  - Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).
  - Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation.

- **Hard (non-porous) surface cleaning and disinfection**
  - If surfaces are soiled, they should be cleaned using a detergent or soap and water prior to disinfection.

- Consult a list of products that are EPA-approved for use against the virus that causes COVID-19 ⧉ . Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).
  - Diluted household bleach solutions can be used if appropriate for the surface. Follow the manufacturer's instructions for application and proper ventilation, and check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted. Prepare a bleach solution by mixing:
    - 5 tablespoons (1/3rd cup) bleach per gallon of water or
    - 4 teaspoons bleach per quart of water
- **Soft (porous) surface cleaning and disinfection**
  - For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:
    - If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.
    - Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 ⧉ and are suitable for porous surfaces.
- **Electronics cleaning and disinfection**
  - For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.
    - Follow the manufacturer's instructions for all cleaning and disinfection products.
    - Consider use of wipeable covers for electronics.
    - If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

  Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.
- **Food service items.** Individuals under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed following food safety requirements. Individuals handling used food service items should clean their hands immediately after removing gloves.
- Laundry from individuals with COVID-19 **can be washed with other's laundry.**
  - Individuals handling laundry from those with COVID-19 should wear disposable gloves and gown, discard after each use, and clean their hands immediately after.
  - Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air. Ensure that individuals performing cleaning wear recommended PPE (see PPE section below).
  - Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
  - Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

# Transporting Individuals with Confirmed and Suspected COVID-19 and Quarantined Close Contacts

- Refer to CDC guidance for Emergency Medical Services (EMS) **on safely transporting individuals with confirmed or suspected COVID-19.** This guidance includes considerations for vehicle type, air circulation, communication with the receiving facility, and cleaning the vehicle after transport.
  - If the transport vehicle is not equipped with the features described in the EMS guidance, at minimum drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open.
- **Use the same precautions when transporting individuals under quarantine as close contacts of someone with COVID-19.**
- See Table 1 **for the recommended PPE for staff transporting someone with COVID-19.**

# Quarantining Close Contacts of Individuals with COVID-19

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space to implement effective quarantine should coordinate with local public health officials to ensure that close contacts of individuals with COVID-19 will be effectively quarantined and medically monitored.

- To determine who is considered a close contact of an individual with COVID-19, see definition of close contact above and the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan 📄 for more information.
- Contact tracing can be a useful tool to help contain disease outbreaks. When deciding whether to perform contact tracing, consider the following:
  - Have a plan in place for how close contacts of individuals with COVID-19 will be managed, including quarantine logistics.
  - Contact tracing can be especially impactful when:
    - There is a small number of infected individuals in the facility or in a particular housing unit. Aggressively tracing close contacts can help curb transmission before many other individuals are exposed.
    - The infected individual is a staff member or an incarcerated/detained individual who has had close contact with individuals from other housing units or with other staff. Identifying those close contacts can help prevent spread to other parts of the facility.
    - The infected individual is a staff member or an incarcerated/detained individual who has recently visited a community setting. In this situation, identifying close contacts can help reduce transmission from the facility into the community.
  - Contact tracing may be more feasible and effective in settings where incarcerated/detained individuals have limited contact with others (e.g., celled housing units), compared to settings where close contact is frequent and relatively uncontrolled (e.g., open dormitory housing units).
  - If there is a large number of individuals with COVID-19 in the facility, contact tracing may become difficult to manage. Under such conditions, consider broad-based testing in order to identify infections and prevent further transmission.
- Incarcerated/detained persons who are close contacts of someone with confirmed or suspected COVID-19 (whether the infected individual is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days (Refer to the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan 📄 for more information):
  - If the close contact is tested for SARS-CoV-2 and tests positive for SARS-CoV-2, the individual should be medically isolated rather than quarantined.
  - If quarantined individual is tested during quarantine and they test negative, they should continue to quarantine for a full 14 days after last exposure and follow all recommendations of public health authorities.
  - If an individual is quarantined due to contact with someone with suspected COVID-19 who is subsequently tested and receives a negative result, they can be released from quarantine and retesting should be considered. See Interim Guidance on Testing for SARS-CoV-2 in Correctional and Detention Facilities for more information about testing strategies in correctional and detention settings.
  - Testing is recommended for all close contacts 📄 of persons with SARS-CoV-2 infection, regardless of whether the close contacts have symptoms.
    - Medically isolate those who test positive to prevent further transmission.
    - Asymptomatic close contacts testing negative should still quarantine for 14 days from their last exposure
  - Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.
    - Provide medical evaluation and care inside or near the quarantine space when possible.
    - Serve meals inside the quarantine space.
    - Exclude the quarantined individual from all group activities.
    - Assign the quarantined individual a dedicated bathroom when possible. When a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result.
- Staff assignments to quarantine spaces should remain as consistent as possible, and these staff should limit their movements to other parts of the facility. These staff should wear recommended PPE as appropriate for their level of contact with the individuals under quarantine (see PPE section below) and should limit their own movement between different parts of the facility.
  - If staff must serve multiple areas of the facility, ensure that they change PPE when leaving the quarantine space. If PPE supplies necessitate reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE, to prevent cross-contamination.

- **Facilities should make every possible effort to individually quarantine cases of confirmed COVID-19, and close contacts of individuals with confirmed, or suspected COVID-19.** Cohorting multiple quarantined close contacts could transmit SARS-CoV-2 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.
  - If cohorting of close contacts under quarantine is absolutely necessary, symptoms of all individuals should be monitored closely, and individuals with symptoms of COVID-19 or who test positive for SARS-CoV-2 should be placed under medical isolation immediately. If an individual is removed from the cohort due to COVID-19 symptoms and tests positive (or is not tested), the 14-day quarantine clock should restart for the remainder of the quarantined cohort.
  - If an entire housing unit is under quarantine due to contact with an individual from the same housing unit who has COVID-19, the entire housing unit may need to be treated as a cohort and quarantine in place.
  - Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to someone with COVID-19). **Under this scenario, avoid mixing individuals quarantined due to exposure someone with COVID-19 with individuals undergoing routine intake quarantine.**
  - Do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.
- **If cohorting close contacts is absolutely necessary, be especially mindful of those who are at increased risk for severe illness from COVID-19.** Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the increased-risk individuals. (For example, intensify social distancing strategies for increased-risk individuals.)
- **If single cells for isolation (of those with suspected COVID-19) and quarantine (of close contacts) are limited, prioritize them in rank order as follows to reduce the risk of further SARS-CoV-2 transmission and adverse health outcomes:**
  - Individuals with suspected COVID-19 who are at increased risk for severe illness from COVID-19
  - Others with suspected COVID-19
  - Quarantined close contacts of someone with COVID-19 who are themselves at increased risk for severe illness from COVID-19
  - Other quarantined close contacts
- **In order of preference, multiple quarantined individuals should be housed:**
  - **IDEAL:** Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
  - Separately, in single cells with solid walls but without solid doors
  - As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions
  - As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door
  - As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
  - As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.
  - As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.
  - Safely transfer to another facility with capacity to quarantine in one of the above arrangements. (See Transport section.)
    (NOTE – Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

  If the ideal choice does not exist in a facility, use the next best alternative as a harm reduction approach.
- **Meals should be provided to quarantined individuals in their quarantine spaces.** Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands immediately after removing gloves.

- If quarantined individuals leave the quarantine space for any reason, they should wear cloth face coverings (unless contraindicated) as source control, if not already wearing them.
  - Quarantined individuals housed as a cohort should wear cloth face coverings at all times.
  - Quarantined individuals housed alone should wear cloth face coverings whenever another individual enters the quarantine space.
  - Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a cloth face covering.
- Staff who have close contact with quarantined individuals should wear recommended PPE if feasible based on local supply, feasibility, and safety within the scope of their duties (see PPE section and Table 1).
  - Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to someone with COVID-19) do not need to wear PPE but should still wear a cloth face covering as source control.
- Quarantined individuals should be monitored for COVID-19 symptoms at least once per day (ideally twice per day) including temperature checks.
  - If an individual develops symptoms or tests positive for SARS-CoV-2, they should be moved to medical isolation (individually, and separately from those with confirmed COVID-19 and others with suspected COVID-19) immediately and further evaluated. (See Medical Isolation section above.)
  - See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of someone with COVID-19.
- If an individual who is part of a quarantined cohort becomes symptomatic:
  - If the individual is tested for SARS-CoV-2 and tests positive: the 14-day quarantine clock for the remainder of the cohort must be reset to 0.
  - If the individual is tested for SARS-CoV-2 and tests negative: the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantined cohort for the remainder of the quarantine period as their symptoms and diagnosis allow.
  - If the individual is not tested for SARS-CoV-2: the 14-day quarantine clock for the remainder of the cohort must be reset to 0.
- Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.
- Quarantined individuals can be released from quarantine restrictions if they have not developed COVID-19 symptoms during the 14-day quarantine period.
  - Place any individuals testing positive under medical isolation, and if the individual testing positive was part of a quarantine cohort, restart the 14-day quarantine clock for the remainder of the cohort.
  - Consider re-testing individuals in quarantine cohort every 3-7 days to identify and isolate infected individuals and to minimize the amount of time infected individuals spend with the rest of the cohort.
- Laundry from quarantined individuals can be washed with other's laundry.
  - Individuals handling laundry from quarantined persons should wear disposable gloves and gown, discard after each use, and clean their hands immediately after.
  - Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.
  - Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
  - Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

# Management Strategies for Incarcerated/Detained Persons without COVID–19 Symptoms

- Provide clear information to incarcerated/detained persons about the presence of COVID-19 within the facility, and the need to increase social distancing and maintain hygiene precautions.
  - As much as possible, provide this information in person and allow opportunities for incarcerated/detained individuals to ask questions (e.g., town hall format if social distancing is feasible, or informal peer-to-peer education).

- Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or have low-vision.

- If individuals with COVID-19 have been identified among staff or incarcerated/detained persons anywhere in a facility, consider implementing regular symptom screening and temperature checks in housing units that have *not* yet identified infections, until no additional infections have been identified in the facility for 14 days. Because some incarcerated/detained persons are hesitant to report symptoms, it is very important to monitor for symptoms closely even though doing so is resource intensive. See Screening section for a procedure to safely perform a temperature check.

- Consider additional options to intensify social distancing within the facility.

## Management Strategies for Staff

- Provide clear information to staff about the presence of COVID-19 within the facility, and the need to enforce use of universal cloth face coverings (unless contraindicated) and social distancing and to encourage hygiene precautions.
  - As much as possible, provide this information in person (if social distancing is feasible) and allow opportunities for staff to ask questions.

- Staff identified as close contacts of someone with COVID-19 should be tested for SARS-CoV-2 and self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine of those who are asymptomatic (see considerations for critical infrastructure workers). Refer to the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan 🔒 for more information about close contact tracing.
  - Close contacts should self-monitor for symptoms and consider seeking testing.
  - Refer to CDC guidelines for further recommendations regarding home quarantine.
- Staff who have confirmed or suspected COVID-19 should meet CDC criteria for ending home isolation before returning to work. Monitor CDC guidance on discontinuing home isolation regularly, as circumstances evolve rapidly.

# Infection Control

Infection control guidance below is applicable to all types of correctional and detention facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with someone with confirmed or suspected COVID-19.

- All individuals who have the potential for direct or indirect exposure to someone with COVID-19 or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.
  - Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.
  - Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).
- Staff should exercise caution and wear recommended PPE when in contact with individuals showing COVID-19 symptoms. Contact should be minimized to the extent possible until the infected individual is wearing a cloth face covering (if not already wearing one and if not contraindicated) and staff are wearing PPE.
- Refer to PPE section to determine recommended PPE for individuals in contact with individuals with COVID-19, their close contacts, and potentially contaminated items.
- Remind staff about the importance of limiting unnecessary movements between housing units and through multiple areas of the facility, to prevent cross-contamination.
- Ensure that staff and incarcerated/detained persons are trained to doff PPE after they leave a space where PPE is required, as needed within the scope of their duties and work details. Ideally, staff should don clean PPE before entering a different space within the facility that also requires PPE.
  - If PPE shortages make it impossible for staff to change PPE when they move between different spaces within the facility, ensure that they are trained to move from areas of low exposure risk ("clean") to areas of higher exposure risk ("dirty") while wearing the same PPE, to minimize the risk of contamination across different parts of the facility.

# Clinical Care for Individuals with COVID-19

- **Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.**
  - If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital (including notifying the facility/hospital in advance). See Transport section. The initial medical evaluation should determine whether a symptomatic individual is at increased risk for severe illness from COVID-19. Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions, including chronic kidney disease, serious heart conditions, and Type-2 diabetes. See CDC's website for a complete list and check regularly for updates as more data become available to inform this issue.
  - Based on available information, **pregnant people seem to have the same risk of COVID-19 as adults who are not pregnant.** However, much remains unknown about the risks of COVID-19 to the pregnant person, the pregnancy, and the unborn child. Prenatal and postnatal care is important for all pregnant people, including those who are incarcerated/detained. Visit the CDC website for more information on pregnancy and breastfeeding in the context of COVID-19.
- **Staff evaluating and providing care for individuals with confirmed or suspected COVID-19 should follow the** CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) **and monitor the guidance website regularly for updates to these recommendations.**
- **Healthcare staff should evaluate persons with COVID-19 symptoms and those who are close contacts of someone with COVID-19 in a separate room, with the door closed if possible, while wearing** recommended PPE **and ensuring that the individual being evaluated is wearing a** cloth face covering.
  - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.
- **Clinicians are strongly** encouraged to test for other causes of respiratory illness **(e.g., influenza).** However, presence of another illness such as influenza does not rule out COVID-19.
- **When evaluating and treating persons with symptoms of COVID-19 who do not speak English, use a language line or provide a trained interpreter when possible.**

# Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

- **Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with individuals with confirmed and suspected COVID-19. Ensure strict adherence to OSHA PPE requirements.**
  - Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95 respirator) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program. If individuals wearing N95s have facial hair, it should not protrude under the respirator seal, or extend far enough to interfere with the device's valve function (see OSHA regulations ⧉ ).
  - For PPE training materials and posters, visit the CDC website on Protecting Healthcare Personnel.
- **Ensure that all staff are trained to perform hand hygiene after removing PPE.**
- **Ensure that PPE is readily available where and when needed, and that PPE donning/doffing/disposal stations have been set up as described in the Preparation section.**
- **Recommended PPE for incarcerated/detained individuals and staff in a correctional facility** will vary based on the type of contact they have with someone with COVID-19 and their close contacts (see Table 1). Each type of recommended PPE is defined below. **As above, note that PPE shortages are anticipated in every category during the COVID-19 response.**
  - **N95 respirator**
    See below for guidance on when surgical masks are acceptable alternatives for N95s. N95 respirators should be prioritized when staff anticipate contact with infectious aerosols or droplets from someone with COVID-19.
  - **Surgical mask**
    Worn to protect the wearer from splashes, sprays, and respiratory droplets generated by others. (NOTE: Surgical masks are distinct from cloth face coverings, which are not PPE but are worn to protect others in the surrounding area from respiratory droplets generated by the wearer.)

- ○ **Eye protection**
  Goggles or disposable face shield that fully covers the front and sides of the face

- ○ **A single pair of disposable patient examination gloves**
  Gloves should be changed if they become torn or heavily contaminated.

- ○ **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**
  - ■ If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with an individual with confirmed or suspected COVID-19, and that clothing is changed as soon as possible and laundered. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
  - ■ If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, activities where splashes and sprays are anticipated, and high-contact activities that provide opportunities for transfer of pathogens to the hands and clothing of staff.

- • Note that shortages of all PPE categories have been seen during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category (including strategies to reuse PPE safely) can be found on CDC's website:
  - ○ Strategies for optimizing the supply of N95 respirators
    - ■ Based on local and regional situational analysis of PPE supplies, **surgical masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.
  - ○ Strategies for optimizing the supply of surgical masks
    - ■ Reserve surgical masks for individuals who need PPE. Issue cloth face coverings to incarcerated/detained persons and staff as source control, in order to preserve surgical mask supply (see recommended PPE).

  - ○ Strategies for optimizing the supply of eye protection
  - ○ Strategies for optimizing the supply of gowns/coveralls
  - ○ Strategies for optimizing the supply of disposable medical gloves

## Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional or Detention Facility during the COVID-19 Response

| Classification of Individual Wearing PPE | N95 respirator | Surgical mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of someone with COVID-19*) | Use surgical masks or cloth face coverings as source control (NOTE: cloth face coverings are NOT PPE and may not protect the wearer. Prioritize cloth face coverings for source control among all persons who do not meet criteria for N95 or surgical masks, and to conserve surgical masks for situations that require PPE.) | | | | |
| Incarcerated/detained persons who have confirmed or suspected COVID-19, or showing symptoms of COVID-19 | | | | | |
| Incarcerated/detained persons handling laundry or used food service items from someone with COVID-19 or their close contacts | | | | X | X |
| Incarcerated/detained persons cleaning an area where someone with COVID-19 spends time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | X | X |
| **Staff** | | | | | |

| Classification of Individual Wearing PPE | N95 respirator | Surgical mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of someone with COVID-19* (but not performing temperature checks or providing medical care) | | Surgical mask, eye protection, and gloves as local supply and scope of duties allow. | | | |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | | X | X | X | |
| Staff having direct contact with (including transport) or offering medical care to individuals with confirmed or suspected COVID-19 (See CDC infection control guidelines). For recommended PPE for staff performing collection of specimens for SARS-CoV-2 testing see the Standardized procedure for SARS-CoV-2 testing in congregate settings. | X** | | X | X | X |
| Staff present during a procedure on someone with confirmed or suspected COVID-19 that may generate infectious aerosols (See CDC infection control guidelines) | X | | X | X | X |
| Incarcerated/detained persons handling laundry or used food service items from someone with COVID-19 or their close contacts | | | | X | X |
| Staff cleaning an area where someone with COVID-19 spends time | | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | X | X |

Classification of Individual Wearing PPE

\* If a facility chooses to routinely quarantine all newly incarcerated/detained intakes (without symptoms or known exposure to someone with COVID-19) before integrating into the general population, surgical masks are not necessary. Cloth face coverings are recommended.
\*\*A NIOSH-approved N95 respirator is preferred. However, based on local and regional situational analysis of PPE supplies, surgical masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

- **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**
  - *Today or in the past 24 hours, have you had any of the following symptoms?*
    - *Fever, felt feverish, or had chills?*
    - *Cough?*
    - *Difficulty breathing?*

- Difficulty breathing
  - *In the past 14 days, have you had close contact with a person known to be infected with the novel coronavirus (COVID-19)?*
- **The following is a protocol to safely check an individual's temperature:**
  - Perform hand hygiene
  - Put on a surgical mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves
  - Check individual's temperature
  - **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned with an alcohol wipe (or isopropyl alcohol on a cotton swab) between each individual.
  - Remove and discard PPE

Page last reviewed: July 14, 2020

## COVID-2019 Menu

 Coronavirus Home

 Your Health

 Community, Work & School

 Healthcare Workers

 Laboratories

 Health Departments

 Cases, Data & Surveillance

 More Resources

# EXHIBIT O

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

CLAUDIA FABIOLA ALMEIDA,

CASE NO. C20-0490RSM-MLP

11

Petitioner,

ORDER DENYING MOTION
FOR TEMPORARY
RESTRAINING ORDER

v.

12
13

WILLIAM P. BARR,

14

Respondent.

15

## I.   INTRODUCTION

16

Before the court is Petitioner Claudia Fabiola Almeida's emergency motion for

17

immediate relief, which the court construes as a motion for a temporary restraining order

18

("TRO").  (*See* Mot. (Dkt. # 2).)  Specifically, Ms. Almeida seeks immediate release

19

from custody in the Tacoma Northwest Detention Center ("the NWDC") due to the

20

COVID-19 pandemic, which she alleges renders detained individuals, like herself,

21

"vulnerable to serious health complications and or [sic] death."  (*See id.* at 2.)  Ms.

22

Almeida originally filed her motion in the Ninth Circuit Court of Appeals as part of her 8

ORDER - 1

1   U.S.C. § 1252(a)(1) petition for review of the Board of Immigration Appeals' ("the

2   Board") final order of removal.  *See Almeida v. Barr*, No. 19-72254 (9th Cir.), Dkt. # 20

3   (filed March 25, 2020).  The Ninth Circuit construed Ms. Almeida's emergency motion

4   as a petition for a writ of habeas corpus under 28 U.S.C. § 2241 and transferred her

5   motion to this court for "prompt[]" consideration.  *See id.*, Dkt. # 24 (filed March 31,

6   2020); (*see also* 9th Cir. Transfer Order (Dkt. # 1-1) at 2)).  Respondent William P. Barr

7   ("the Attorney General") opposes the motion.  (*See* Resp. (Dkt. # 3).)  The court has

8   considered the motion, all submissions filed in support of and in opposition to the motion,

9   the relevant portions of the record, and the applicable law.  Being fully advised, the court

10  DENIES Ms. Almeida's motion.

11                              **II.  BACKGROUND**

12  A.      **Ms. Almeida's Immigration Proceedings and Appeal to the Ninth Circuit**

13          Ms. Almeida is a citizen of Mexico, who became a lawful permanent resident of

14  the United States on January 20, 1990.  (Administrative Record ("AR") at 1014.)[1]

15  Subsequently, she was convicted of two forgery offenses and possession of a controlled

16  substance, methamphetamine.  (*Id.* at 820, 1014.)

17          On February 6, 2015, Ms. Almeida sought admission to the United States as

18  lawful permanent resident.  (*Id.*)  However, at the time of her application for admission,

19

20          [1] The court refers to the administrative record on file in the Ninth Circuit.  *See Almeida v.
       Barr*, No. 19-72254 (9th Cir.) Dkt. # 6 (filed Sept. 24, 2019).  In transferring Ms. Almeida's

21     motion to this court, the Ninth Circuit neglected to transfer the administrative record to which the
       briefing on this matter refers.  Nevertheless, the court takes judicial notice of the administrative
       record on file in the Ninth Circuit.  *Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001)

22     ("[U]nder Fed. R. Evid. 201, a court may take judicial notice of 'matters of public record.'").

ORDER - 2

1   she was found to be in possession of 1.88 kilograms of methamphetamine concealed in

2   her car.  (*Id.* at 820, 823, 828-32, 1014.)  She was subsequently convicted in United

3   States District Court for smuggling goods in violation of 18 U.S.C. § 545.  (*Id.* at 824,

4   1014.)  The court sentenced her to 36 months' imprisonment.  (*Id.* at 825.)

5          Due to her criminal record, the United States Department of Homeland Security

6   ("DHS") initiated removal proceedings against Ms. Almeida and filed a Notice to Appear

7   in Immigration Court.  (*Id.* at 1012-14.)  The Notice to Appear charged Ms. Almeida with

8   three counts of removability, including (1) as a noncitizen convicted of a crime involving

9   moral turpitude, *see* 8 U.S.C. § 1182(a)(2)(A)(i)(I); (2) as a noncitizen convicted of a

10  controlled substance offense, *see* 8 U.S.C. § 1182(a)(2)(A)(i)(II); and (3) as a noncitizen

11  the Attorney General has reason to believe was involved in the illicit trafficking of a

12  controlled substance, *see* 8 U.S.C. § 1182(a)(2)(C)(i).  (AR at 1014.)

13         On August 8, 2018, Ms. Almeida, through counsel, conceded that she was

14  removable as a noncitizen convicted of a crime involving moral turpitude and a

15  controlled substance offense, but denied that she was removable as an illicit trafficker of

16  a controlled substance.  (*Id.* at 141.)  However, on November 7, 2018, Ms. Almeida filed

17  a motion to amend her pleadings, arguing that she was no longer removable as a

18  noncitizen convicted of a controlled substance offense based on the Ninth Circuit's initial

19  2018 decision in *Lorenzo v. Sessions*, 902 F.3d 930, 932 (9th Cir. 2018), *opinion*

20  *withdrawn on denial of reh'g sub nom. Lorenzo v. Whitaker*, 913 F.3d 930 (9th Cir. 2019)

21  ("*Lorenzo II*"), *and opinion superseded on denial of reh'g sub nom. Lorenzo v. Whitaker*,

22  752 F. App'x 482 (9th Cir. 2019) ("*Lorenzo III*").  (AR at 942-45.)  The immigration

ORDER - 3

1    judge denied Ms. Almeida's motion to withdraw her concession.  (*Id.* at 175-77.)  Ms.

2    Almeida then sought asylum and related relief and protection from removal, as well as

3    cancellation of removal for certain permanent residents.  (*Id.* at 142, 166-67, 788-99,

4    803-04.)

5        On February 7, 2019, the immigration judge issued a written decision finding Ms.

6    Almeida removable pursuant to all charges of removability and ineligible for relief and

7    protection from removal.  (*Id.* at 49-83.)  The immigration judge denied Ms. Almeida's

8    request for cancellation of removal as a matter of discretion and found Ms. Almeida

9    statutorily barred from asylum and withholding of removal because her conviction for

10   smuggled goods constitutes a particularly serious crime.  (*Id.* at 70-74 (citing 8 U.S.C.

11   §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii)).)  The immigration judge held in the alternative

12   that Ms. Almeida did not establish eligibility for relief and protection from removal on

13   the merits of her claims.  (*Id.* at 74-81.)  Finally, the immigration judge denied Ms.

14   Almeida's request for a continuance.  (*Id.* at 81-82.)

15       On July 29, 2019, the Board dismissed Ms. Almeida's appeal of the immigration

16   judge's decision.  (*Id.* at 3-7.)  First, the Board held that it was unnecessary to reach Ms.

17   Almeida's challenge to the controlled substance ground of removability because she

18   conceded removability as a noncitizen who committed a crime involving moral turpitude.

19   (*Id.* at 3.)  Further, the Board noted that the Ninth Circuit's decision in *Lorenzo*, on which

20   Ms. Almeida relied to challenge her removability, was withdrawn.  (*Id.* at 3-4 (citing

21   *Lorenzo II*, 913 F.3d 930; *Lorenzo III*, 752 F. App'x  482).)  Second, the Board agreed

22   with the immigration judge's denial of the cancellation of removal as a matter of

ORDER - 4

1   discretion.  (*Id.* at 4-5.)  Third, the Board upheld the immigration judge's denial of

2   asylum and withholding of removal based on the particularly serious crime bar.  (*Id.* at

3   5-7.)  Finally, the Board held that the immigration judge's denial of Ms. Almeida's

4   request for deferral of removal under the Convention Against Torture was not clearly

5   erroneous because Ms. Almeida was never tortured in the past and her fear of harm was

6   speculative.  (*Id.* at 7.)

7          On September 3, 2019, Ms. Almeida filed a petition for review with the Ninth

8   Circuit and a motion for a stay of removal.  *See Almeida v. Barr*, No. 19-72254 (9th Cir.)

9   Dkt. # 1 (filed Sept. 3, 2019).  The Attorney General opposes Ms. Almeida's petition.

10  *See id.*, Dkt. # 9 (filed Oct. 29, 2019).  On November 5, 2019, Ms. Almeida filed a

11  motion to hold her petition in abeyance while she applied for U and T nonimmigrant

12  visas.  *See id.*, Dkt. # 11.  The Attorney General also opposes the abeyance motion.  *See*

13  *id.*, Dkt. # 12.  Ms. Almeida's petition in the Ninth Circuit is presently in the Ninth

14  Circuit's mediation program.  (*See* Mot. at 4-5; Resp. at 6.)  She is currently in DHS

15  custody and detained at the NWDC pursuant to 8 U.S.C. § 1225(b)(2)(A).  She has been

16  detained at the NWDC since August 16, 2018.  (Mot. at 4.)

17  **B.     Ms. Almeida's Emergency Motion for Immediate Release**

18         On March 23, 2020, Ms. Almeida filed her present emergency motion for release

19  from custody in the Ninth Circuit.  (*See* Mot.)  The Ninth Circuit panel assigned to Ms.

20  //

21  //

22  //

ORDER - 5

1    Almeida's appeal construed Ms. Almeida's motion as a petition for a writ of habeas

2    corpus under 28 U.S.C. § 2241 and transferred it to this court.[2]  (*See* Transfer Order at 2.)

3         In her present motion, Ms. Almeida, who is 40 years old, asserts that her

4    underlying health conditions, including obesity, unspecified, and impaired glucose

5    tolerance (prediabetes) elevate her risk of becoming severely ill if she contracts

6    COVID-19.  (*See* Mot. at 5 (citing Att. E[3]).)  She provides her NWDC patient summary

7    as evidence of these underlying health conditions.  (*See id.*)

8    //

9         [2] The United States Supreme Court has not yet resolved the question of whether a

10   conditions of confinement claim, such as Ms. Almeida's claim here, may be brought in the form
     of a petition for a writ of habeas corpus.  *See Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979)

11   ("Thus, we leave to another day the question of the propriety of using a writ of habeas corpus to
     obtain review of the conditions of confinement, as distinct from the fact or length of the

12   confinement itself.").  The majority of federal circuit courts allow detainees to challenge their
     conditions of confinement via a habeas petition.  *See Aamer v. Obama*, 742 F.3d 1023, 1036-37

13   (D.C. Cir. 2014) (citing *United States v. DeLeon*, 444 F.3d 41, 59 (1st Cir. 2006); *Thompson v.
     Choinski*, 525 F.3d 205, 209 (2d Cir. 2008); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235,

14   242 & n.5 (3d Cir. 2005); *McNair v. McCune*, 527 F.2d 874, 875 (4th Cir. 1975); *Adams v.
     Bradshaw*, 644 F.3d 481, 482 83 (6th Cir. 2011)).  The Ninth Circuit has not yet decided the

15   issue.  *See Nettles v. Grounds*, 830 F.3d 922, 931 (9th Cir. 2016) (holding that if a state
     prisoner's claim "would not necessarily spell speedier release," it does not lie at "the core of

16   habeas corpus," and must be brought, if at all, under 42 U.S.C. § 1983; but explicitly stating that
     the court would not address how this standard "applies to relief sought by prisoners in federal
     custody").

17        Nevertheless, the three-judge panel assigned to Ms. Almeida's appeal instructed this
     court to construe Ms. Almeida's motion, in which she challenges her detention based on alleged

18   conditions at the NWDC that increase the risk of a COVID-19 infection, as a petition for habeas
     corpus under 28 U.S.C. § 2241.  (*See* Transfer Order at 2.)  Although the Ninth Circuit's transfer
     order holding that this district has jurisdiction to hear this motion as a habeas petition is

19   unpublished and therefore does not definitively resolve this unsettled area of law, this court will
     follow the Ninth Circuit's direction in this case and not consider the issue further.

20        [3] In transferring this case to the Western District of Washington, the Ninth Circuit

21   neglected to transfer the attachments to Ms. Almeida's motion.  (*See* Mot.)  However, the court
     has reviewed the attachments that Ms. Almeida filed with her motion in the Ninth Circuit, *see*

22   *Almeida v. Barr*, No. 19-72254 (9th Cir.) Dkt. # 20 (filed March 25, 2020), and takes judicial
     notice of them, *see supra* n.1 (citing *Lee*, 250 F.3d at 689).

ORDER - 6

1    To bolster her motion, Ms. Almeida also relies on a letter from two physicians, Dr.

2   Scott A. Allen, MD, FACP, and Dr. Josiah Rich, MS, MPH, who both serve as medical

3   subject matter experts for DHS's Office of Civil Rights and Civil Liberties ("CRCL"),

4   which the physicians sent to the Chairpersons and Ranking Members of the House

5   Committee on Homeland Security, the House Committee on Oversight and Reform, and

6   the Senate Committee on Homeland Security and Governmental Affairs.  (*Id.* at 7-8

7   (citing Att. D[4]).)  In their letter, the physicians state that they are "gravely concerned

8   about the need to implement immediate and effective mitigation strategies to slow the

9   spread of the coronavirus and resulting infections of COVID-19."  (*Id.*, Att. D at 2.)  The

10  physicians note that there have been clusters of COVID-19 identified in "congregant

11  settings" in Chinese and Iranian prisons and that an inmate and officer have reportedly

12  tested positive for the virus at New York's Rikers Island.  (*Id.*)  They also note recent

13  reporting indicating that immigrant detainees at ICE's Aurora facility are in isolation for

14  possible exposure to coronavirus that a member of ICE's medical staff at a private

15  detention center in New Jersey has tested positive for coronavirus.  (*Id.*)  The physicians

16  do not provide any statements or information concerning conditions at the NWDC.  (*See*

17  *generally id.*)

18  **C.**      **Conditions at the NWDC & Additional Safety Precautions**

19       In his response to Ms. Almeida's motion, the Attorney General submits the

20  declaration of Drew H. Bostock, who is the Officer in Charge ("OIC") with DHS, ICE,

21  //

22  ---

[4] *See supra* n.3.

ORDER - 7

1   Enforcement and Removal Operations ("ERO") in the Seattle Field Office ("ERO

2   Seattle").  (Bostock Decl. (Dkt. # 3) ¶ 1.)[5]  Although Ms. Almeida challenges the

3   sufficiency of measures implemented at the NWDC and described in OIC Bostock's

4   declaration, she does not challenge the accuracy of his declaration.  (*See* Reply (Dkt. # 4)

5   at 8-9).)  OIC Bostock attests to the following facts concerning the NWDC, its present

6   conditions, and precautions implemented at the facility to prevent an outbreak of

7   COVID-19:

8       The NWDC[6] is a private detention center run by The GEO Group, Inc. ("GEO").

9   (Bostock Decl. ¶ 4.)  It has the capacity to house 1,575 detainees and historically operates

10  near capacity.  (*Id.* ¶ 6.)  However, presently, the NWDC has only 838 detainees, which

11  represents only 53.2% of its typical number of detainees.  (*Id.*)  ICE last transferred

12  detainees from the southern border to the NWDC on March 5, 2020, and does not

13  anticipate any additional transfers from that area in the reasonably foreseeable future.

14  (*Id.* ¶ 7.)

15      On March 18, 2020, ICE announced that due to the ongoing COVID-19 pandemic,

16  it would adjust enforcement to focus on public safety risks and individuals subject to

17  mandatory detention based on criminal grounds.  (*Id.* ¶ 8.)  For individuals who do fall

18  within these categories, ICE is currently exercising its discretion to delay enforcement

19  //

20
       [5] The Declaration of Drew H. Bostock is attached to the Attorney General's response to
21  Ms. Almeida's motion.  (*See* Resp. (attaching Bostock Decl.).)

22      [6] The NWDC is also referred to as the Northwest ICE Processing Center ("NWIPC").
    (*See* Bostock Decl. ¶ 1.)

1   actions until after the COVID-19 crisis or to use alternatives to detention, where

2   appropriate.  (*Id.*)  Due to this change, ICE expects only a limited number of incoming

3   detainees at the NWDC during the COVID-19 crisis—the majority of whom will be

4   aliens who represent public safety risks and are subject to mandatory custody provisions.

5   (*Id.* ¶ 9.)

6   　　　As a response to the COVID-19 crisis, the ICE Health Services Corps ("IHSC"),

7   which oversees medical care at the NWDC, implemented certain safety protocols.  (*Id.*

8   ¶ 11.)  On March 26, 2020, IHSC implemented temperature and prescreening checks for

9   all new detainees arriving at the NWDC prior to entrance into the facility.  (*Id.*)  Regular

10   procedures at the NWDC require that all incoming detainees' personal property and

11   valuable are inventories and stored.  (*Id.* ¶ 12.)  Further, all incoming detainees are

12   afforded the opportunity to shower and provided with clean clothing, bedding, towels,

13   and personal hygiene items.  (*Id.*)

14   　　　GEO provides all detainees with an instructional flyer outlining proper hand

15   washing hygiene and the importance of covering coughs.  (*Id.* ¶ 13.)  In response to the

16   COVID-19 pandemic, additional posters in multiple languages concerning hand washing

17   hygiene and covering coughs have been placed in each housing unit at the NWDC.  (*Id.*)

18   　　　As of March 20, 2020, all incoming detainees who do not meet current IHSC

19   protocol requirements for isolation monitoring due to possible COVID-19 symptoms,

20   exposure, or testing, are placed in two separate housing units for 14 days of monitoring

21   for signs or symptoms of COVID-19.  (*Id.* ¶ 14.)  Detainees in the 14-day observation

22   period are not allowed to commingle with other detainees in common areas during the

ORDER - 9

1    14-day period.  (*Id.*)  Detainees admitted on the same date and who are determined to be

2    at the same risk classification may be housed in the same cell for the 14-day observation

3    period.  (*Id.*)  Detainees admitted on separate dates and those at different risk

4    classification levels are not housed together.  (*Id.*)  If the 14-day period passes without

5    any detainees in a cell displaying signs or symptoms of COVID-19, the detainees are

6    released to other housing units in the facility.  (*Id.*)  A separate remote medical unit has

7    been established to monitor detainees undergoing the 14-day observation.  (*Id.*)

8         In response to COVID-19, GEO has enhanced its cleaning in all units, food

9    preparation and service areas, intake rooms and other work centers with increased

10   emphasis on cleaning contact areas with disinfectant cleaners approved as effective

11   against COVID-19.  (*Id.* ¶ 16.)  GEO makes soap and cleaning supplies available to

12   detainees in all housing units and work areas at the NWDC and has increased the amount

13   of soap, disinfectant cleaner, and food service sanitizer in every housing unit in response

14   to COVID-19.  (*Id.* ¶ 17.)  GEO also holds weekly town hall meetings with detainees in

15   every housing unit to educate detainees on hand washing and covering coughs.  (*Id.* ¶ 18.)

16   GEO instructs detainees to clean tables and horizontal surfaces before each meal and to

17   disinfect such surfaces after each meal.  (*Id.*)  GEO also instructs detainees to clean

18   countertops, microwave handles, door handles, exercise equipment, electronic tablets,

19   telephones, and any high-risk contact areas with disinfectant cleaner.  (*Id.*)

20        On March 13, 2020, ICE temporarily suspended social visitation at the NWDC,

21   and other detention facilities, to prevent the spread of COVID-19, and cancelled all tours

22   of the NWDC.  (*Id.* ¶¶ 19-20.)  GEO screens all contractors, vendors, attorneys, and court

1   visitors through a questionnaire that covers whether the individual is currently

2   experiencing any possible COVID-19 symptoms and recent travel history and prohibits

3   entry to anyone who positively reports symptoms or possible exposure to COVID-19.

4   (*Id.* ¶ 21.)  Visitors are limited to noncontact visits unless a contact visit is absolutely

5   necessary and has been approved by the OIC or Assistant OIC.  (*Id.* ¶ 22.)  If an

6   attorney's request for a contact visit is approved, the attorney must wear personal

7   protective equipment ("PPE"), including a mask.  (*Id.*)  In addition, ICE has implemented

8   a daily duty officer to facilitate unmonitored attorney-client phone calls from each

9   housing unit so that detainees do not have to move throughout the facility.  (*Id.*)

10          ICE and GEO are collaborating on a process to implement temperature checks of

11   all employees and staff for GEO, ICE, and Executive Office for Immigration Review

12   ("EOIR") at the NWDC starting on March 27, 2020.  (*Id.* ¶ 24.)  ICE and GEO

13   employees are instructed to stay home if they are sick, experiencing any possible

14   COVID-19 symptoms, or have been in close contact with someone diagnosed with

15   COVID-19.  (*Id.* ¶ 25.)  GEO is voluntarily notifying ICE if any of its employees test

16   positive or are diagnosed with COVID-19.  (*Id.*)  As of March 27, 2020, no ICE or GEO

17   employee or staff at the NWDC had reported testing positive for COVID-19.  (*Id.*)  In

18   addition, ICE instituted a telework program for its employees at the NWDC to minimize

19   the number of employees present at the facility.  (*Id.* ¶ 26.)

20          Finally, in late March 2020, ERO Tacoma began conducting a discretionary

21   review of certain detainees' cases identified IHSC, based on their medical records, as

22   detainees who meet the current CDC criteria as at-risk due to COVID-19.  (*Id.* ¶ 31.)  The

ORDER - 11

1   review requires that IHSC identify detainees who fall within an at-risk category and who

2   are not subject to various mandatory custody provisions based on their immigration and

3   criminal histories.  (*Id.*)  If an identified detainee is not subject to mandatory custody,

4   ERO Tacoma determines whether the detainee is otherwise a danger to the public and/or

5   a flight risk such that release is not appropriate.  (*Id.*)  As a result of this labor-intensive

6   review, by March 27, 2020, ICE had already released six detainees from custody.  (*Id.*

7   ¶¶ 31-32.)

## III.  ANALYSIS

### A.  Standards for a TRO

The standard for issuing a TRO is the same as the standard for issuing a

preliminary injunction.  *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434

U.S. 1345, 1347 n.2 (1977).  A TRO is "an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "The proper legal standard for

preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to

succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of

preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an

injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th

Cir. 2009) (citing *Winter*, 555 U.S. at 20).

As an alternative to this test, a preliminary injunction is appropriate if "serious

questions going to the merits were raised and the balance of the hardships tips sharply" in

the moving party's favor, thereby allowing preservation of the status quo when complex

1   legal questions require further inspection or deliberation.  *All. for the Wild Rockies v.*

2   *Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).  However, the "serious questions"

3   approach supports a court's entry of a TRO only so long as the moving party also shows

4   that there is a likelihood of irreparable injury and that the injunction is in the public

5   interest.  *Id*. at 1135.  The moving party bears the burden of persuasion and must make a

6   clear showing that he is entitled to such relief.  *Winter*, 555 U.S. at 22.

7       **B.  Ms. Almeida's Motion**

8        The court concludes that Ms. Almeida has not made a clear showing that she is

9   entitled to the extraordinary remedy that she requests.

10       1.   <u>Likelihood of Success on the Merits</u>

11        To obtain a TRO, Ms. Almeida must make a clear showing that she is likely to

12   succeed on the merits or, alternatively, has raised serious questions going to the merits of

13   her habeas petition on Fifth Amendment grounds.  To succeed on her habeas petition,

14   Ms. Almeida must show that she is "in custody in violation of the Constitution or laws or

15   treaties of the United States."  *See* 28 U.S.C. § 2241.  Ms. Almeida argues that her

16   detention violates the Fifth Amendment's Due Process Clause because her detention

17   "gravely heightens her risk of contracting COVID-19 due to the congregate carceral

18   setting," and her "underlying health issues make her particularly vulnerable to severe

19   illness."  (Mot. at 5, 8.)  For the reasons stated below, the court concludes that Ms.

20   Almeida fails to make a clear showing that she is likely to succeed on the merits of her

21   claim or that she has raised serious questions going to the merits of her claim.

22   *//*

1       When the government detains a person pursuant to an immigration violation, the

2  person is a civil detainee.  *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  To evaluate

3  the constitutionality of civil detention conditions under the Fifth Amendment, a district

4  court must determine whether those conditions "amount to punishment of the detainee."

5  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Kingsley v. Hendrickson*, --- U.S. ---,

6  135 S. Ct. 2466, 2473-74 (2015).  Punishment may be shown through an express intent to

7  punish or a condition that is not "reasonably related to a legitimate governmental

8  objective."  *Bell*, 441 U.S. at 539; *see also Kingsley*, 135 S. Ct. at 2473-74 (clarifying that

9  "a pretrial detainee can prevail by providing only objective evidence that the challenged

10 governmental action is not rationally related to a legitimate governmental objective or

11 that it is excessive in relation to that purpose").  In addition, "when the State takes a

12 person into its custody and holds him there against his will, the Constitution imposes

13 upon it a corresponding duty to assume some responsibility for his safety and general

14 well-being."  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200

15 (1989).[7]  Thus, for example, the government violates the Due Process Clause if it fails to

16 provide civil detainees with "food, clothing, shelter, medical care, and reasonable safety."

17 *Id.* at 200.  In the context of a Due Process Clause failure-to-protect claim, the Ninth

18 Circuit declared that "the defendant's conduct must be objectively unreasonable, a test

19 that will necessarily 'turn on the facts and circumstances of each particular case.'"

20

21          [7] In *DeShaney*, the Supreme Court analyzed the petitioners' rights under the Fourteenth
   Amendment.  *See* 489 U.S. at 194-95.  Fifth Amendment due process claims and Fourteenth
22 Amendment due process claims are analyzed in the same way.  *See Paul v. Davis*, 424 U.S. 693,
   702 n.3 (1976).

1    *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (quoting *Kingsley*, 135 S. Ct.

2    at 2473) (alterations and internal quotation marks omitted).[8]

3          Ms. Almeida does not present allegations or evidence to show an "express intent"

4    to punish her.  (*See generally* Mot.)  Moreover, preventing detained aliens from

5    absconding and ensuring that they appear for removal proceedings is a legitimate

6    governmental objective.  *See Jennings v. Rodriguez*, --- U.S. ---, 138 S. Ct. 830, 836

7    (2018); *Demore v. Kim*, 538 U.S. 510, 520-22 (2003); *Zadvydas*, 533 U.S. at 690-91.

8    Ms. Almeida fails to present evidence establishing that her current confinement is not

9    reasonably related to, or is excessive in relation to, that objective. Therefore, Ms.

10   Almeida may succeed on her Fifth Amendment claim only if she shows that the Attorney

11   General has failed to provide for her reasonable safety.  *See DeShaney*, 489 U.S. at 200.

12         As of the date of this order, there is no evidence of a COVID-19 case among any

13   detainees or staff at the NWDC.  Nevertheless, Ms. Almeida contends that her continued

14   detention at NWDC "gravely heightens her risk of contracting COVID-19" due to the

15   nature of the virus at issue, its endemic presence in the surrounding community, and "the

16   congregate carceral" nature of detention itself.  (Mot. at 5-6.)  She also contends that her

17   "underlying health issues make her particularly vulnerable to severe illness due to

18   COVID-19."  (*Id.* at 5.)  Yet, Ms. Almeida never addresses the actual conditions at the

19   NWDC or the measures that facility has implemented to provide for detainees' safety

20

21         [8] "[T]he Supreme Court has treated medical care claims substantially the same as other
     conditions of confinement violations including failure-to-protect claims."  *Gordon v. Cty. of
22   Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v.
     Gordon*, 139 S. Ct. 794, 202 L. Ed. 2d 571 (2019).

1    during the present COVID-19 pandemic.  Indeed, she submits no evidence or testimony

2    concerning her actual experience at the NWDC and instead relies on generalized

3    statements from Drs. Allen and Rich about the potential risks to immigrant detainees

4    generally due to the COVID-19 pandemic.  (*See* Mot. Att. D.)  The court does not dismiss

5    these concerns but notes that nothing in Drs. Allen and Rich's letter addresses the actual

6    conditions at the NWDC.  (*See generally id.*)  Instead, Drs. Allen and Rich point to

7    reported conditions at prisons in China and Iran, the presence of COVID-19 at New

8    York's Rikers Island, the possible presence of COVID-19 among immigrant detainees at

9    ICE's Aurora facility, and a reported positive COVID-19 test for a member of ICE's

10    medical staff at a detention center in New Jersey.  (*See id.* at 3.)  None of this is relevant

11    to the circumstances before the court, which involve the conditions facing Ms. Almeida

12    at the NWDC.

13           Under the Fifth Amendment, the Attorney General is not required to eliminate any

14    risk to Ms. Almeida.  Instead, the Attorney General is only required to provide for her

15    "reasonable safety."  *See DeSahney*, 489 U.S. at 200.  First, the court notes that although

16    the NWDC has a capacity to house 1,575 detainees, the detainee population has been

17    reduced to 838 individuals—representing approximately only 53.2% of the number of

18    detainees ordinarily housed there.  (Bostock Dec. ¶ 6.)  These figures suggest that the

19    NWDC is not currently overcrowded; indeed, they suggest the opposite.  Further, there is

20    substantial evidence before the court of robust measures at the NWDC to prevent an

21    outbreak of COVID-19, to contain one should it occur, and generally to provide for the

22    safety of the detainees housed there during the pandemic.  As detailed above, those

ORDER - 16

1   measures include (1) policies limiting transfers of detainees from the southern border of

2   the United States (*id.* ¶ 7); (2) exercising discretion to delay certain enforcement actions

3   that limit the number of new detainees arriving the NWDC (*id.* ¶¶ 8-9); (3) implementing

4   temperature and prescreening checks on all new detainees prior to their entrance into the

5   NWDC (*id.* ¶ 11); (4) providing additional information in multiple languages and

6   conducting weekly town hall meetings with detainees concerning hand washing hygiene

7   and the importance of covering a cough (*id.* ¶¶ 13, 18); (5) providing for the segregation

8   of incoming detainees for 14 days of monitoring for signs or symptoms of COVID-19 (*id.*

9   ¶ 14); (6) enhanced cleaning measures (*id.* ¶ 16); (7) providing additional soap, hand

10  sanitizer, and cleaning supplies to both detainees and employees (*id.* ¶¶ 17, 23); (8)

11  instituting temperature checks for employees and instructing employees to stay home if

12  they are symptomatic or have been exposed to someone diagnosed with COVID-19 (*id.*

13  ¶¶ 24-25); and (9) implementing a telework program under which only half of ERO

14  employees are present at the NWDC at any given time (*id.* ¶ 26).  In addition, the court

15  notes the newly implemented review process under which at-risk detainees are assessed

16  for release and under which six detainees have already been released.  (*Id.* ¶¶ 31-32.)

17         Ms. Almeida argues in her reply memorandum that the measures implemented at

18  the NWDC are insufficient.  (*See* Reply at 8-9.)  Significantly, however, the measures

19  implemented by the NWDC generally track the recommendations of DHS's medical

20  subject matter experts, Drs. Allen and Rich, upon whom Ms. Almeida relies.  (*See* Mot.

21  Att. D at 5 (recommending "[p]rocesses for screening, testing, isolation, and quarantine,"

22  "limiting transport and transfer of immigrant detainees" and "implementing alternatives

1    to detention to facilitate as much social distancing as possible").  Although Drs. Allen

2    and Rich may recommend "releasing all detainees in high risk medical groups" (*id.*), the

3    Attorney General cannot do so without first assessing whether such release is otherwise

4    authorized by law and in the public's interest in any given case.  Indeed, the Attorney

5    General is presently engaged in such a case-by-case analysis and has begun to release

6    high-risk detainees on this basis.  (*See* Bostock Decl. ¶¶ 31-32.)  Given the evidence of

7    the extensive measures that the NWDC has implemented, and the lack of any contrary

8    evidence concerning actual conditions at the facility, the court cannot conclude that Ms.

9    Almeida has made a clear showing that she is likely to prevail on her Fifth Amendment

10   claim or that she has raised serious questions going to the merits of her claim.

11        Finally, the court understands that several other district courts have granted TROs

12   in favor of immigration detainees on Fifth Amendment grounds due to conditions at those

13   facilities.  *See Castillo et al. v. Barr et al.*, --- F. Supp. 3d ----, 2020 WL 1502864, at *6

14   (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, No. 20 CIV 2518 (AT), 2020 WL

15   1481503, at *7 (S.D.N.Y. Mar. 26, 2020); *Coronel v. Decker*, --- F. Supp. 3d ----, 2020

16   WL 1487274, at *10 (S.D.N.Y. Mar. 27, 2020).  However, the facts in those cases

17   diverge from those before this court in meaningful ways.  *See Basank*, 2020 WL

18   1481503, at *7 ("Each of the jails where a Petitioner is being housed has reported

19   confirmed cases of COVID-19."); *Coronel*, 2020 WL 1487274 at *4 (stating that, unlike

20   in this case, "the record demonstrates that ICE has not taken any action to address the

21   particular risks COVID-19 poses to high-risk individuals"); *Castillo*, 2020 WL 1502864

22   at *1 (stating that "[o]ver the years, and as recently as 2018, DHS's Office of the

ORDER - 18

1   Inspector General had, repeatedly, found that significant and various health and safety

2   risks existed at Adelanto"), at *2 (stating that the plaintiff detainees do not have access to

3   hand sanitizer).  It would be improper for this court to rely on conditions at other

4   detention facilities to conclude that the conditions at the NWDC represent a Fifth

5   Amendment violation.

6                        2.      Likelihood of Irreparable Harm

7           The court also concludes that Ms. Almeida has not meet her burden to show that

8   "irreparable injury is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22.  As

9   discussed above, given the measures the Attorney General is currently taking, the court

10  cannot conclude either that the spread of COVID-19 inside NWDC is inevitable, or that

11  the Attorney General will be unable to contain it if it occurs.  No one can entirely

12  guarantee safety in the midst of a global pandemic.  However, the standard under which

13  the court evaluates Ms. Almeida's TRO motion is not guaranteed safety—an impossible

14  standard to meet no matter the circumstances—but rather a likelihood of irreparable

15  harm.  The evidence before the court does not meet that standard.

16          Therefore, the court DENIES Ms. Almeida's motion for a TRO.[9]

17  //

18  //

19  //

20  //

21

22  _____
        [9] Having concluded that Ms. Almeida fails to meet the first two prongs of the TRO
    standard, the court finds it unnecessary to address the third and fourth prongs at this time.

ORDER - 19

## IV.  CONCLUSION

For the foregoing reasons, the court DENIES Ms. Almeida's motion for a

TRO (Dkt. # 2).

Dated this 6th day of April, 2020.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER - 20

# EXHIBIT P

UCLA Law Covid-19 Behind Bars Data Project - Court Orders

→ COVID-19 BEHIND BARS
DATA PROJECT - COURT
ORDERS
(/ACADEMICS/CENTERS/C
RIMINAL-JUSTICE-
PROGRAM/UCLA-COVID-
19-BEHIND-BARS-DATA-
PROJECT/UCLA-COVID-
19)

COVID-19 BEHIND BARS
DATA PROJECT - OPEN
POSITIONS
(/ACADEMICS/CENTERS/C
RIMINAL-JUSTICE-
PROGRAM/UCLA-COVID-
19-BEHIND-BARS-DATA-
PROJECT/UCLA-COVID-
19-0)

🏠 ⟩ Academics (/academics) ⟩ Centers (/academics/centers) ⟩
Criminal Justice Program (/academics/centers/criminal-justice-program) ⟩
UCLA Covid-19 Behind Bars Data Project (/academics/centers/criminal-justice-program/ucla-covid-19-behind-bars-data-project) ⟩
UCLA Covid-19 Behind Bars Data Project - Court Orders

As the Covid-19 pandemic continues, state and federal judges have been increasingly asked to use their authority to release people from jails and prisons and to order improvements to conditions for those who remain. This page tracks those orders. If you would like to submit an order for inclusion in the database, please email COVIDBehindBars@law.ucla.edu (mailto:COVIDBehindBars@law.ucla.edu).

For the full record on many of these cases and more Covid-19-related legal filings, please visit the Civil Rights Litigation Clearinghouse, Covid-19 Special Collection (https://clearinghouse.net/results.php?searchSpecialCollection=62) (from the University of Michigan Law School).

Federal Court Orders
Targeted Releases: Jails
Targeted Releases: Prisons
Group Releases: Jails
Group Releases: Prisons

State Court Orders
Targeted Releases: Jails
Targeted Releases: Prisons
Group Releases: Jails
Group Releases: Prisons

Federal court orders

- Targeted releases: jails

## Contact

Professor Sharon Dolovich

Director, UCLA Prison Law & Policy Program

COVIDBehindBars@law.ucla.edu (mailto:COVIDBehindBars@law.ucla.edu)


**County Jails and COVID-19: UCLA Law Clinics Shape Landmark Lawsuit**

READ MORE (/NEWS/COUNTY-JAILS-AND-COVID-19-UCLA-LAW-CLINICS-SHAPE-LANDMARK-LAWSUIT)

**EVENTS**     SEE ALL (/EVENTS?CENTERS=576)

**07 16** 12:00 PM - 1:00 PM
ZOOM INFORMATION PROVIDED UPON REGISTRATION

## Disorienting Moments: How we learn to Lawyer through Crises

As law schools across the country grapple with the devastating secondary effects of COVID-19 on their campuses and communities, we know that law students are wondering not only what legal education will look like this fall, but also what roles law students and lawyers can play during this unprecedented moment in history. In anticipation of fall registration, UCLA Law's Experiential Education Program is bringing together students, faculty, and lawyers to discuss the ways in which we can "lawyer through crises" and plan for legal challenges ahead.

→ READ MORE (/EVENTS/DISORIENTING-MOMENTS-HOW-WE-LEARN-LAWYER-THROUGH-CRISES)

**03 18** 5:30 PM - 7:00 PM
UCLA SCHOOL OF LAW

## CANCELED - Being Out after Serving Life: Reflections from the Front Lines of Reentry

This event has been cancelled until further notice.

→ READ MORE (/EVENTS/CANCELED-BEING-OUT-AFTER-SERVING-LIFE-REFLECTIONS-FRONT-LINES-REENTRY)

# APPLY     VISIT     MEET US

ABOUT UCLA LAW (/ABOUT-UCLA-LAW)    NEWS (/NEWS)    EVENTS (/EVENTS)    LIBRARY (/LIBRARY)

ABA REQUIRED DISCLOSURES (/ABA-REQUIRED-DISCLOSURES)    MAKE A GIFT (/ALUMNI-GIVING)

UCLA DIRECTORY (HTTP://WWW.DIRECTORY.UCLA.EDU)

Terms of Use & Privacy Policy (http://www.ucla.edu/terms-of-use/)    Accessibility (http://www.ucla.edu/accessibility)

Copyright Information (http://www.ucla.edu/site-information)

Licensure & Certification Disclosures (https://www.ucop.edu/institutional-research-academic-planning/content-analysis/academic-planning/licensure-and-certification-disclosures.h

© Copyright 2020 The Regents of the University of California. UCLA School of Law. All Rights Reserved.



Case 1:20-cv-03590-FLN Document 20-5 Filed 07/24/20 Page 178 of 184 (PAGE = TXT $ $ $ $ + $ $ (NUM=5)

| Covid-19 Court Orders and Filings : Federal, Individual, Jails | | | |
| --- | --- | --- | --- |
| **Citation (if available)** | **Date** | **Source or case link** | **Case Details** |
| Zollicoffer v. United States, No. 15-cv-03337 (C.D. Ill. Jan . 9, 2017) | 1/9/2017 | https://bit.ly/2XQlsfl | https://bit.ly/3auQRro |
| Guerrero v. Decker, No. 19-cv-11644 (S.D.N.Y. Mar. 16, 2020), Dkt. No. 14 | 3/16/2020 | https://bit.ly/3cGzrK4 | https://bit.ly/2VoJspj |
| In re Manrique, No. 19-mj-71055, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020), Dkt. No. 115. | 3/19/2020 | https://bit.ly/2JVdOsV | https://bit.ly/3eIeEY6 |
| United States v. Hudson, No. 19-cr-496 (CM), minute entry (S.D.N.Y. Mar. 19, 2020) (McMahon, CJ); <br> Federal, Individual, Jails | 3/19/2020 | https://bit.ly/2W39EGn | https://bit.ly/2Kod1B8 |

- Targeted releases: prisons

| Covid-19 Court Orders and Filings : Federal, Individual, Prisons | | | |
| --- | --- | --- | --- |
| **Citation (if available)** | **Date** | **Source or case link** | **Case Details** |
| Swanson v. Barr, No. 15-cv-03262 (C.D. Ill. Sept. 28, 2016), Dkt. No. 25. | 9/28/2016 | https://bit.ly/2VgDBIQ | https://bit.ly/3by8JmQ |
| United States v. Bryant, No. 06-cr-00017, 2020 WL 1435066 (S.D.N.Y. Mar. 24, 2020), Dkt. No. 140. | 3/16/2020 | https://bit.ly/3c6PzEh | https://bit.ly/3ap3XGz |
| United States v. Matthaei, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) | 3/16/2020 | https://bit.ly/34oqW3j | https://bit.ly/2VQckpB |
| United States v. Barkman, No. 19-cr-0052, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020), Dkt. No 21. <br> Federal, Individual, Prisons | 3/17/2020 | https://bit.ly/3c6NPuE | https://bit.ly/3bsANrn |

- Group releases: jails

| Covid-19 Court Orders and Filings : Federal, Group, Jails | | | |
| --- | --- | --- | --- |
| **Citation (if available)** | **Date** | **Source or case link** | **Case Details** |
| Gray v. County of Riverside, No. 13-cv-00444 (C.D. Cal. Apr. 14, 2020), Dkt. No. 191 (order) | 4/14/2020 | 91/quinton-gray-v-county-of-riverside/ | https://bit.ly/2yuxf9E |
| Swain v. Junior, No. 20-cv-21457 (S.D. Fla. Apr. 7, 2020), Dkt. No. 25 (Order Granting in Part Plaintiff's Emergency Motion for a Temporary Injunction) | 4/14/2020 | https://www.courtlistener.com/docket/17044205/25/swain-v-junior/ | https://bit.ly/2yBDk3W |
| Fraihat v. ICE (19-cv-1546) (C.D. Cal. Apr. 15, 2020), Dkt. No. 126 | 4/15/2020 | https://bit.ly/2RQfKr0 | https://bit.ly/2wW1gyE |
| Valentine v. Collier, No. 4:20-cv-01115 (S.D. Tex. Apr. 16, 2020), Dkt. No. 40 | 4/16/2020 | https://bit.ly/2VgNQqi | https://bit.ly/2VsitcD |
| Cameron v. Bouchard, No. 20-cv-10949 (E.D. Mich. Apr. 17, 2020), Dkt. No. 12 (order) <br> Federal, Group, Jails | 4/17/2020 | https://bit.ly/2XLF0Td | https://bit.ly/34RV1IG |

- Group releases: prisons

| Covid-19 Court Orders and Filings : Federal, Group, Prisons | | | |
| --- | --- | --- | --- |
| **Citation (if available)** | **Date** | **Source or case link** | **Case Details** |
| In re: Coronavirus/Covid-19 Pandemic, Admin. Order No. 2020-14 (E.D.N.Y. Apr. 2, 2020) | 4/2/2020 | https://bit.ly/2xIKRhm | https://bit.ly/2VNIstR |
| Lewis v. Cain, 15-cv-00318 (M.D. La. Mar. 31, 2020) | 4/2/2020 | https://bit.ly/2wHprAM | https://bit.ly/2Vp6Rag |
| Parsons v. Shinn, No. CV-12-00601-PHX-ROS (D. Ariz. Apr. 2, 2020) | 4/2/2020 | https://bit.ly/3ac71WM | https://bit.ly/2XYvjRp |
| Chunn et al v. Edge, 1:20-CV-01590 (E.D.N.Y Apr. 3, 2020) | 4/3/2020 | https://bit.ly/3e43uwN | https://bit.ly/2XVhHX2 |
| Coleman et al v Newsom, No. 2:90-cv-0520 KJM DB | 4/4/2020 | https://bit.ly/2UXQBfW | https://bit.ly/2xON4I7 |
| Hope et al. v. Doll, No. 1:20-cv-562 (M.D. Pa. Apr. 7, | 4/7/2020 | https://aclupa.org/sites/d | https://bit.ly/2Vrl8lN |
| Federal, Group, Prisons | | | |

## State court orders

- Targeted releases: jails

| Covid-19 Court Orders and Filings : State, Individual, Jails | | | |
| --- | --- | --- | --- |
| **Citation (if available)** | **Date** | **Source or case link** | **Case Details** |
| In the Matter of Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency, No. 25700-B-606 (Wash. Mar. 18, 2020) | 3/18/2020 | https://bit.ly/3ccrUCr | https://bit.ly/2Vpbh0P |
| In re State and National Emergency and Protection of the Life and Health of Detainees in the County Jail and Those Who Interact With, No. 2020 MR 00010 (Cir. Ct. Cook County, Mar. 23, 2020) | 3/23/2020 | https://bit.ly/2V8yV1z | https://bit.ly/3atawlq |
| Karr, et al v. Alaska, Nos. 3/24(A-13630/A-13639/A-13640 (Cir. App. Alaska March 24, 2020) <br> State, Individual, Jails | 3/24/2020 | https://bit.ly/3anbaQB | https://bit.ly/2K6s1t16 |

- Targeted releases: prisons

| Covid-19 Court Orders and Filings : State, Individual, Prisons | | | |
| --- | --- | --- | --- |
| Citation (if available) | Date | Source or case link | Case Details |
| In re COVID-19 Pandemic, No. 2020-0428 (Tenn. Mar. 25, 2020) | 3/25/2020 | https://bit.ly/3ac730Q | https://bit.ly/2VpbbX1 |

State, Individual, Prisons

- Group releases: jails

| Covid-19 Court Orders and Filings : State, Group, Jails | | | |
| --- | --- | --- | --- |
| Citation (if available) | Date | Source or case link | Case Details |
| In re Request to Commute or Suspend County Jail Sentences, Docket No. 084230 (N.J. Mar. 22, 2020) | 3/22/2020 | https://bit.ly/3c8HUVQ | https://bit.ly/2VtDjlG |
| Committee For Public Counsel Services et al v. Chief Justice of the Trial Court et al, SJC-12926 (Mass. Apr. 3, 2020) | 4/3/2020 | https://bit.ly/2UUVjLy | https://bit.ly/34RuJq8 |
| In the Matter of: Petition Requesting the Indiana Supreme Court to Engage in Emergency Rulemaking to Address the Issue of Imprisoned Persons and the COVID-19 Crisis, No. 20-MS-00234 (Ind. Mar 30 2020) | 4/8/2020 | https://bit.ly/2Vux2ei | https://bit.ly/34UTYHU |

State, Group, Jails

- Group releases: prisons

| Covid-19 Court Orders and Filings : State, Group, Prisons | | | |
| --- | --- | --- | --- |
| Citation (if available) | Date | Source or case link | Case Details |
| In the Matter of: Petition Requesting the Indiana Supreme Court to Engage in Emergency Rulemaking to Address the Issue of Imprisoned Persons and the COVID-19 Crisis, No. 20-MS-00234 (Ind. Mar 30 2020) | 4/8/2020 | https://bit.ly/2Vux2ei | https://bit.ly/34UTYHU |

State, Group, Prisons

**NEWS**   SEE ALL (/NEWS?CENTERS[]=576)

JUN 29, 2020

# COVID-19 Behind Bars Project Enhances Prison/COVID-19 Database

→ READ MORE (/NEWS/COVID-19-BEHIND-BARS-PROJECT-ENHANCES-PRISON/COVID-19-DATABASE)

MAY 11, 2020

Grant Launches Juvenile Justice Initiative, Fellowship at UCLA Law

RE AD MO RE (/NEWS/GRANT-LAUNCHES-JUVENILE-JUSTICE-INITIATIVE-FELLOWSHIP-UCLA-LAW)

MAY 01, 2020

# EXHIBIT Q



UNIVERSITY OF MICHIGAN LAW SCHOOL

## CIVIL RIGHTS LITIGATION CLEARINGHOUSE

HOME    ABOUT    FOR TEACHERS    SEARCH    QUESTIONS    RECENT ADDITIONS    feedback/    log in/
                                                                         suggestions    register

# SEARCH RESULTS

new search
refine this search
permalink for this search

---

S P E C I A L   C O L L E C T I O N

### COVID-19 (novel coronavirus)

This page collects cases that address the challenges posed by the COVID-19
pandemic, social distancing, etc. (We're not able to catalog every single-
person request for release, but are presenting the cases affecting multiple
persons.)

In addition to cases, in many states there have been court orders directing
releases and other COVID-19 responses. To see a catalog of these, check out
the Prison Policy Initiative's list of jail/prison-related COVID-19 responses,
and the spreadsheet compiled by the UCLA Law School, here.

If you know of a case NOT listed here, please email us: clearinghouse@umich.edu (We'll try to update this page in close-to-real-time.)

Permalink to this Collection | Clearinghouse Search Page



Esther Kim & Carl T. Bergstrom via Wikimedia Commons

*The below cases represent a special subset of the full Clearinghouse collection.*

---

| Your search returned **225** results | Save Search As: | [_____] | Save Search |

---

| 1 | **Calvary Chapel of Ukiah et al v. Newsom et al** | Speech and Religious Freedom |
| | 2:20-cv-01431 (E.D. Cal.) | Presidential/Gubernatorial Authority |
| | Filed 07/15/2020 - Case Ongoing | PR-CA-0005 |
| | State of California | Coding Complete |

*Summary not yet on record* [view]

---

| 2 | **Commonwealth of Massachusetts et al v. United States Department of** | Immigration and/or the Border |
| | **Homeland Security** | IM-MA-0021 |
| | 1:20-cv-11311 (D. Mass.) | Coding Complete |
| | Filed 07/13/2020 - Case Ongoing | |
| | United States Department of Homeland Security | |
| | Department of Homeland Security (DHS) | |

COVID-19 Summary: This is a lawsuit brought by seventeen different states and Washington D.C. regarding the July 2020
release of ICE regulations which, in effect, meant that students on F-1 visas would risk deportation if their school shifted to
online learning. No outcome yet.

**Background** Generally speaking, F-1 visas (colloquially " ... [view]

---

| 3 | **University of Oregon v. United States Department of Homeland Security** | Immigration and/or the Border |
| | 6:20-cv-01127 (D. Or.) | Education |
| | Filed 07/13/2020 - Case Ongoing | IM-OR-0011 |
| | United States Department of Homeland Security | Coding Complete |
| | Department of Homeland Security (DHS) | |

COVID-19 Summary: This is a lawsuit brought by the University of California regents regarding the July 2020 release of ICE
regulations which, in effect, meant that students on F-1 visas would risk deportation if their school shifted to online learning.
No outcome yet.

**Background** Generally speaking, F-1 visas (colloquially "student ... [view]

---

| 4 | **The Regents of the University of California v. U.S. Department of Homeland** | Immigration and/or the Border |
| | **Security** | Education |
| | 4:20-cv-04621 (N.D. Cal.) | IM-CA-0165 |
| | Filed 07/10/2020 - Case Ongoing | Coding Complete |
| | United States Department of Homeland Security | |
| | Department of Homeland Security | |

COVID-19 Summary: This is a lawsuit brought by the University of California regents regarding the July 2020 release of ICE
regulations which, in effect, meant that students on F-1 visas would risk deportation if their school shifted to online learning.
No outcome yet.

**Background** Generally speaking, F-1 visas (colloquially "student ... [view]

---

| 5 | **State of Washington v. United States Department of Homeland Security** | Immigration and/or the Border |
| | 2:20-cv-01070 (W.D. Wash.) | Education |
| | Filed 07/10/2020 - Case Ongoing | |

United States Department of Homeland Security
Department of Homeland Security                                          Coding Complete

COVID-19 Summary: This is a lawsuit brought by the state of Washington regarding the July 2020 release of ICE regulations which, in effect, meant that students on F-1 visas would risk deportation if their school shifted to online learning. No outcome yet.

**Background** Generally speaking, F-1 visas (colloquially "student visas") can be ... [view]

---

6   **Johns Hopkins University v. U.S. Department of Homeland Security**          Immigration and/or the Border
    1:20-cv-01873 (D.D.C.)                                                        Education
    Filed 07/10/2020 - Case Ongoing                                              IM-DC-0081
        United States Department of Homeland Security
        Department of Homeland Security (DHS)                                     Coding Complete

    COVID-19 Summary: This is a lawsuit brought by Johns Hopkins University regarding the July 2020 release of ICE regulations which, in effect, meant that students on F-1 visas would risk deportation if their school shifted to online learning. No outcome yet.

    **Background** Generally speaking, F-1 visas (colloquially "student visas") can be ... [view]

---

7   **State of California v. U.S. Department of Homeland Security**               Immigration and/or the Border
    4:20-cv-04592 (N.D. Cal.)                                                     Education
    Filed 07/09/2020 - Case Ongoing                                              IM-CA-0167
        United States Department of Homeland Security
        Department of Homeland Security (DHS)                                     Coding Complete

    COVID-19 Summary: This is a lawsuit brought by the state of California regarding the July 2020 release of ICE regulations which, in effect, meant that students on F-1 visas would risk deportation if their school shifted to online learning. No outcome yet.

    **Background** Generally speaking, F-1 visas (colloquially "student visas") can be ... [view]

---

8   **President and Fellows of Harvard College v. U.S. Department of Homeland**   Immigration and/or the Border
    **Security**                                                                 Education
    1:20-cv-11283 (D. Mass.)                                                     IM-MA-0020
    Filed 07/08/2020 - Case Ongoing
        U.S. Department of Homeland Security                                      Coding Complete
        Department of Homeland Security

    COVID-19 Summary: This is a lawsuit brought by Harvard and MIT regarding the July 2020 release of ICE regulations which, in effect, meant that students on F-1 visas would risk deportation if their school shifted to online learning. No outcome yet.

    **Background** Generally speaking, F-1 visas (colloquially "student visas") can be granted ... [view]

---

9   **J.B.B.C. v. Wolf**                                                         Immigration and/or the Border
    1:20-cv-01509 (D.D.C.)
    Filed 06/09/2020 - Case Ongoing                                              IM-DC-0077
        U.S. Department of Homeland Security
        U.S. Department of Homeland Security,                                     Coding Complete

    COVID-19 Summary: This lawsuit was filed on behalf on an unaccompanied minor subject to deportation, alleging that the Trump administrations' system of authorizing the summary removal of persons to prevent the introduction of COVID-19 bypassed procedural protections otherwise granted to minor children. On June 24, the court granted a TRO.

    On ... [view]

---

10  **Don't Shoot Portland v. City of Portland**                                 Policing
    3:20-cv-00917 (D. Or.)
    Filed 06/05/2020 - Case Ongoing                                             PN-OR-0002
        City of Portland                                                         Multnomah County
                                                                                 Coding Complete

    *Summary not yet on record* [view]

---

11  **Hallinan v. Scarantino**                                                    Prison Conditions
    5:20-hc-02088 (E.D.N.C.)
    Filed 05/26/2020 - Case Ongoing                                             PC-NC-0020
        Federal Bureau of Prisons                                                Coding Complete

    COVID-19 Summary: This is a class action filed on behalf of all individuals incarcerated at FCI Butner, seeking release as well as mitigation measures due to COVID-19. The court denied the plaintiff's motion for temporary restraining order, preliminary injunction, and writ of habeas corpus on June 11, 2020.

    On May 26, 2020, eleven people ... [view]

---

12  **High Plains Harvest Church v. Polis**                                       Speech and Religious Freedom
    1:20-cv-01480 (D. Colo.)
    Filed 05/25/2020 - Case Ongoing                                             FA-CO-0009
        Governor of Colorado                                                    Coding Complete

    COVID-19 Summary: This is a suit brought by a church against the State of Colorado's enforcement of stay-at-home orders, including the policy prohibiting in-person religious activities. Following a Supreme Court decision denying a similar application for injunctive relief, plaintiffs withdrew their request for injunctive relief. They later filed ... [view]

---

13  **Republican National Committee v. Newsom**                                   Election/Voting Rights
    2:20-cv-01055 (E.D. Cal.)
    Filed 05/24/2020 - Case Ongoing                                             VR-CA-0168
        Governor of California                                                  Coding Complete

COVID-19 summary: This is an action seeking to enjoin California from enforcing EO N-64-20, which allowed Californians to vote by mail in light of the COVID-19 pandemic. No outcome yet.

On May 24, 2020, the Republican National Committee, the National Republican Congressional Committee, and the California Republican Party filed this action in ... [view]

| | | |
|---|---|---|
| 14 | **League of Women Voters v. Benson** | Election/Voting Rights |
| | 353654 (State Court) | VR-MI-0076 |
| | Filed 05/22/2020 - Case Ongoing | Coding Complete |
| | Michigan Secretary of State | |

COVID-19 summary: On May 22, the League of Women Voters of Michigan sued the Michigan Secretary of State, challenging the statutory requirement that absentee ballots must be received by 8 PM on election day. An oral argument was scheduled for June 18.

On May 22, the League of Women Voters of Michigan filed a lawsuit against the Michigan ... [view]

| | | |
|---|---|---|
| 15 | **League of Independent Fitness Facilities and Trainers, Inc. v. Whitmer** | Presidential/Gubernatorial Authority |
| | 1:20-cv-00458 (W.D. Mich.) | PR-MI-0005 |
| | Filed 05/22/2020 - Case Ongoing | Coding Complete |
| | Governor of the State of Michigan | |

COVID-19 Summary: This lawsuit was filed against the state of Michigan by 22 individual companies operating fitness businesses in Michigan and an organization representing over 150 fitness facilities in the state to enjoin executive orders that caused their facilities to remain closed. The court granted a preliminary injunction on June 19. On ... [view]

| | | |
|---|---|---|
| 16 | **Issa v. Newsom** | Election/Voting Rights |
| | 2:20-cv-01044 (E.D. Cal.) | VR-CA-0169 |
| | Filed 05/21/2020 - Case Ongoing | Coding Complete |
| | Governor of California | |

COVID-19 Summary: This is an action seeking to enjoin California from enforcing EO N-64-20, which allowed Californians to vote by mail in light of the COVID-19 pandemic. No outcome yet.

On May 21, 2020, five registered California voters filed this action in the U.S. District Court for the Eastern District of California. Represented by ... [view]

| | | |
|---|---|---|
| 17 | **Busby v. Bonner** | Jail Conditions |
| | 2:20-cv-02359 (W.D. Tenn.) | JC-TN-0012 |
| | Filed 05/20/2020 - Case Ongoing | Shelby County |
| | Shelby County Sheriff | Coding Complete |
| | Shelby County Sheriff's Office | |

COVID-19 Summary: This is a habeas action filed by individuals in the Shelby County Jail, alleging that their underlying medical conditions made them especially vulnerable to COVID-19. They brought constitutional claims under the Fourteenth Amendment, as well as claims of violations of the ADA and Rehabilitation act, requesting release. On June 10, ... [view]

| | | |
|---|---|---|
| 18 | **J.P. v. Educational Testing Services** | Disability Rights-Pub. Accom. |
| | 2:20-cv-04502 (C.D. Cal.) | Education |
| | Filed 05/19/2020 - Case Ongoing | ED-CA-0037 |
| | the College Entrance Examination Board | Coding Complete |
| | the College Entrance Examination Board | |

COVID-19 summary: This is a class-action complaint brought by four parents and a public charity against College Entrance Examination Board and Education Testing Services for breach of contract on behalf of all students registered to take at-home Advanced Placement (AP) exams, for the defendant's failure to administer its AP exams without ... [view]

| | | |
|---|---|---|
| 19 | **League of Women Voters of Minnesota Education Fund v. Simon** | Election/Voting Rights |
| | 0:20-cv-01205 (D. Minn.) | VR-MN-0017 |
| | Filed 05/19/2020 - Case Ongoing | Coding Complete |
| | Secretary of State of Minnesota | |

*Summary not yet on record* [view]

| | | |
|---|---|---|
| 20 | **Martinez v. Cuomo** | Disability Rights-Pub. Accom. |
| | 1:20-cv-03338 (S.D.N.Y.) | DR-NY-0016 |
| | Filed 05/17/2020 - Case Ongoing | Coding Complete |
| | Governor of New York | |

COVID-19 Summary: On April 29, 2020, four individuals with disabilities and Disability Rights New York sued the Governor of New York State for the absence of live televised American Sign Language (ASL) interpretation on the Governor's daily televised briefings. Given the COVID-19 pandemic, the plaintiffs alleged that lack of live ASL ... [view]

| | | |
|---|---|---|
| 21 | **Torres v. Milusnic** | Prison Conditions |
| | 2:20-cv-04450 (C.D. Cal.) | PC-CA-0079 |
| | Filed 05/16/2020 - Case Ongoing | Coding Complete |
| | Warden of Lompoc | |
| | Lompoc Federal Correctional Complex | |

COVID-19 Summary: This is a putative class action by five individuals held at Lompoc, a low-security prison facing one of the largest outbreaks of COVID-19 among U.S federal prisons. The plaintiffs alleged that the defendants failed to undertake reasonable preventative measures, which allowed the virus to spread to 60% of those in custody. The ... [view]

| | | |
|---|---|---|
| 22 | **Wilson v. Ponce** | Prison Conditions |
| | 2:20-cv-04451 (C.D. Cal.) | PC-CA-0080 |
| | Filed 05/16/2020 - Case Ongoing | Coding Complete |

Federal Correctional Institution, Terminal Island

COVID-19 Summary: This is a class action by individuals held at Terminal Island, a Care Level 3 medical facility designed for those with long-term medical needs. The plaintiffs alleged violations of their Eighth Amendment rights and sought declaratory and injunctive relief, and a writ of habeas corpus requiring immediate downsizing of the ... [view]

---

23    **Bayley's Campground, Inc v. Mills**                                      Presidential/Gubernatorial Authority
       2:20-cv-00176 (D. Me.)                                                        PR-ME-0001
       Filed 05/15/2020 - Case Ongoing                                          Coding Complete
         Governor of the State of Maine

COVID-19 Summary: This is a suit brought by several campgrounds and individuals wishing to travel to Maine against the State of Maine's enforcement of stay-at-home orders and quarantine requirements for those traveling into Maine. The plaintiffs alleged that Maine's orders violated their rights to interstate travel, due process, and equal ... [view]

---

24    **Waddell v. Taylor**                                                      Prison Conditions
       3:20-cv-00340-TSL-RHW (S.D. Miss.)                           Disability Rights-Pub. Accom.
       Filed 05/14/2020 - Case Ongoing                                        PC-MS-0011
         Mississippi Department of Corrections                                Coding Complete

COVID-19 Summary: This is a class action lawsuit brought on behalf of 6,000 incarcerated individuals to challenge the inadequate response to the COVID-19 outbreak at Mississippi's two largest prisons, alleging that the Mississippi Department of Corrections' response to the pandemic violates the Americans with Disabilities Act and the ... [view]

---

25    **N.H. ex rel J.H. v. Edwards**                                                   Juvenile Institution
       3:20-cv-00293-JWD-EWD (M.D. La.)                                          JI-LA-0013
       Filed 05/14/2020 - Case Ongoing                                          Coding Complete
         Governor of Louisiana

COVID-19 Summary: This is a joint class action lawsuit and habeas petition brought on behalf of children confined in four secure care facilities operated by the Louisiana Office of Juvenile Justice, seeking release and mitigation in light of the COVID-19 pandemic. The plaintiffs alleged that children are at-risk for contracting and transmitting ... [view]

---

< prev                          **1** 2 3 4 5 6 7 8 9                          next >

new search
refine this search

- top of page -



1

## CERTIFICATE OF SERVICE

2

*Immigrant Legal Resources Center, et al. v. City of McFarland, et al.*
U.S.D.C. Eastern District of CA Case No. 1:20-cv-00966-TLN-AC

3

4
STATE OF CALIFORNIA                    )
                                       )   ss.
COUNTY OF ORANGE                       )

5

6
        I, Chelsea Snow, declare:

7
        I am a citizen of the United States and employed in Orange County, California.  I am over
the age of eighteen years and not a party to the within-entitled action.  My business address is 895

8
Dove Street, 5th Floor, Newport Beach, California  92660.  My business e-mail address is
Chelsea.Snow@ndlf.com. On July 21, 2020, I served a copy of the within document(s):

9
                    **APPENDIX OF EXHIBITS IN SUPPORT OF**

10
                    **RESPONSE TO ORDER TO SHOW CAUSE**

11

12
☒     **VIA CM/ECF SYSTEM – VIA NOTICE OF ELECTRONIC FILING:** I certify that
      on the date referenced above, I electronically transmitted the document(s) listed for

13
      submission to the United States District Court – Eastern District of California, using the
      ECF System required for filing and transmission of Electronic Notices to the ECF

14
      registrants/recipients registered with the United States District Court – Eastern District of
      California.

15

16
        I declare that I am employed in the office of a member of the bar of this court at whose

17
direction the service was made. I declare under penalty of perjury that the foregoing is true and
correct. Executed on July 21, 2020, at Newport Beach, California.

18

19
                                            _____

20
                                                        Chelsea Snow

21

22

23

24

25

26

27

28

4530.102 / 8853090.1