1   NOSSAMAN LLP
    DAVID C. LEE (SBN 193743)
2   dlee@nossaman.com
    ALEXANDER WESTERFIELD (SBN 295676)
3   awesterfield@nossaman.com
    ELIZABETH KEY (SBN 323544)
4   ekey@nossaman.com
    50 California Street, 34th Floor
5   San Francisco, CA 94111
    Telephone:    415.398.3600
6   Facsimile:    415.398.2438
7

8   Attorneys for Petitioners IMMIGRANT LEGAL RESOURCE
    CENTER; FREEDOM FOR IMMIGRANTS
9

10

11

12                    UNITED STATES DISTRICT COURT

13                   EASTERN DISTRICT OF CALIFORNIA

14
    IMMIGRANT LEGAL RESOURCE CENTER;          Case No:  1:20-cv-966-TLN-AC
15  FREEDOM FOR IMMIGRANTS,
                                              Assigned to: Hon. Troy L. Nunley
16              Petitioners,
                                              **DECLARATION OF ELIZABETH KEY
17        vs.                                 IN SUPPORT OF REPLY TO ORDER TO
                                              SHOW CAUSE**
18  CITY OF MCFARLAND; MCFARLAND
    PLANNING COMMISSION,                      Filed: June 30, 2020
19                                            Trial: No date set
                Respondents,
20
    THE GEO GROUP, INC.,
21
                Real Party in Interest.
22

23

24

25

26

27

28

KEY DECL ISO REPLY RE ORDER SHOW CAUSE
57593453.v1

I, Elizabeth Key, declare as follows:

1.      I am over the age of eighteen and competent to provide testimony, and I am a resident of San Francisco, California. I have personal knowledge of all information provided herein, except as to those matters stated upon my information or belief, and as to those matters I believe it to be true. If called upon to testify, I could and would testify as sworn in this declaration.

2.      I am an associate with the law firm of Nossaman LLP, and I am counsel to Petitioners Immigrant Legal Resource Center and Freedom for Immigrants in this action.

3.      I am providing this declaration in support of Petitioners' Reply to Order to Show Cause ("Reply").

4.      The Reply references court documents filed in other cases involving the same parties. For the Court's convenience, I have attached to this Declaration copies of those briefs. Additionally, Petitioners previously provided, and the Court relied upon, Exhibit P to the Fialho Declaration.  I have attached to this Declaration an updated version of that Exhibit.

5.       Attached as **Exhibit 1** is a true and correct copy of the Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction filed by Plaintiff The Geo Group, Inc. in *The Geo Group, Inc. v. Newsom et al.*, No. 3:19-cv-02491 (S.D. Cal. Jan. 7, 2020).

6.      Attached as **Exhibit 2** is a true and correct copy of the Notice of Motion and Motion to Dismiss; Memorandum of Points and Authorities filed by Defendants Governor Gavin Newson and Attorney General Xavier Becerra in *The Geo Group, Inc. v. Newsom et al.*, No. 3:19-cv-02491 (S.D. Cal. Mar. 5, 2020).

7.      Attached as **Exhibit 3** is a true and correct copy of the Motion of Immigrant Legal Resource Center, Faith in the Valley, & Inland Coalition for Immigrant Justice for Leave to Participate as Amicus Curiae, and to File in Support of Defendants' Motion to Dismiss in *The Geo Group, Inc. v. Newsom et al.*, No. 2:20-cv-00533 (E.D. Cal. June 25, 2020).

8.      Attached as **Exhibit 4** is a true and correct copy of a printout from the California Department of Public Health website as it appeared on July 24, 2020, available to the public at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CountyMonitoringDataStep2.aspx.

1    I declare under penalty of perjury that the foregoing is true and correct. Executed on this

2    24th day of July, 2020 at San Francisco, California.

3

4                                              /s/ Elizabeth Key

5                                              Elizabeth Key

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KEY DECL. ISO REPLY RE ORDER SHOW CAUSE
57593453.v1

# EXHIBIT 1

1  Charles J. Cooper (Appearing *Pro Hac Vice*),
   DC Bar No. 248070
2  COOPER & KIRK, PLLC
   1523 New Hampshire Avenue, NW
3  Washington, DC 20036
   Telephone: (202) 220-9600
4  Email: ccooper@cooperkirk.com

5  Michael B. McClellan, CBN 241570
   NEWMEYER & DILLION LLP
6  895 Dove Street, Fifth Floor
   Newport Beach, CA 92660
7  Telephone: (949) 854-7000
   Email: Michael.McClellan@ndlf.com
8
9  Michael W. Battin, CBN 183870
   NAVIGATO & BATTIN, LLP
   755 West A Street, Suite 150
10 San Diego, CA 92101
   Telephone: (619) 233-5365
11 Email: mike@navbat.com



12 *Attorneys for Plaintiff The GEO Group, Inc.*

13          UNITED STATES DISTRICT COURT

14         SOUTHERN DISTRICT OF CALIFORNIA

| 15 | THE GEO GROUP, INC., | Case No. 19cv2491-JLS-WVG |
|---|---|---|
| 16 | Plaintiff, | Assigned to District Judge Janis L. Sammartino |
| 17 | v. | Assigned to Magistrate Judge William v. Gallo |
| 18 | GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; XAVIER BECERRA, in his official capacity as Attorney General of the State of California, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| 19 | | |
| 20 | | |
| 21 | Defendants. | [*Notice of Motion and Motion, Declarations of Amber Martin and C. Kendie Schlecht, Appendix of Exhibits filed concurrently herewith; Order lodged concurrently herewith*] |
| 22 | | |
| 23 | | |
| 24 | | Hearing Date:   April 16, 2020 |
| 25 | | Hearing Time:   1:30 p.m. Place:      4D (4th Floor – Schwartz) |
| 26 | | FILE DATE:    December 30, 2019 |
| 27 | | TRIAL DATE:   No Date Set |
| 28 | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... 3

MEMORANDUM OF POINTS AND AUTHORITIES ........................... 8

STATEMENT ............................................................................................ 8

    I.    U.S. Marshals Service Detention Policy ................................. 8

    II.   U.S. Immigration And Customs Enforcement Detention Policy .... 10

    III.  GEO's Detention Facilities In California ............................... 12

          A.    GEO's USMS Detention Facilities .............................. 12

              1.    Western Region Detention Facility ............... 12

              2.    El Centro Service Processing Center ............ 13

          B.    GEO's ICE Detention Facilities ................................. 13

    IV.  California's Early Efforts To Obstruct
          Federal Immigration Policy ............................................. 14

    V.   The Enactment Of AB-32 ................................................... 16

ARGUMENT ......................................................................................... 19

    I.    GEO Is Likely To Succeed On The Merits ........................... 19

          A.    AB-32 Violates The Intergovernmental-Immunity
              Doctrine ................................................................. 19

              1.    AB-32 directly regulates the
                    Federal Government ...................................... 20

              2.    AB-32 discriminates against the
                    Federal Government ...................................... 25

          B.    AB-32 Is Preempted By Federal Law ........................ 29

              1.    AB-32 is preempted by federal immigration law ........... 30

              2.    AB-32 is preempted by federal criminal law ................ 34

          C.    Alternatively, GEO Is Entitled To Continue Operating Its USMS
              And ICE Facilities Under AB-32's Temporary Safe-Harbor
              Provision ............................................................... 37

    II.   GEO Is Likely To Suffer Irreparable Harm Without A Preliminary
          Injunction ......................................................................... 38

    III.  The Public Interest And Balance Of Equities
          Favor An Injunction ........................................................ 39

    IV.  The Court Should Enter Final Judgment Awarding A Permanent
          Injunction ......................................................................... 40

CONCLUSION ....................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*,
    901 F.3d 1166 (9th Cir. 2018) .................................................................. 19

*All. for the Wild Rockies v. Pena*,
    865 F.3d 1211 (9th Cir. 2017) .................................................................. 19

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) .................................................................. 38

*Arizona v. California*,
    283 U.S. 423 (1931) ................................................................................. 21

*Assoc. Gen. Contractors v. Coal. for Econ. Equity*,
    950 F.2d 1401 (9th Cir. 1991) .................................................................. 38

*Az. Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) .................................................................... 38

*Az. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) .................................................................. 39

*Baby Tam & Co. v. City of Las Vegas*,
    154 F.3d 1097 (9th Cir. 1998) .................................................................. 40

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
    517 U.S. 25 (1996) ................................................................................... 32

*Blackburn v. United States*,
    100 F.3d 1426 (9th Cir. 1996) .................................................................. 21

*Boeing Co. v. Movassaghi*,
    768 F.3d 832 (9th Cir. 2014) ...................................... 20, 23, 24, 26, 28

*Brown v. Plata*,
    563 U.S. 493 (2011) ........................................................................... 17, 28

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
    596 F.3d 1098 (9th Cir. 2010) .................................................................. 39

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
    563 F.3d 847 (9th Cir. 2009) ............................................................. 39, 40

*California v. U.S. Dep't of Health & Human Servs.*,
    941 F.3d 410 (9th Cir. 2019) .................................................................... 39

*Coleman v. Brown*,
    952 F. Supp. 2d 901 (E.D. Cal. 2013) ..................................................... 17

*Comm. of Cent. Am. Refugees v. INS*,
    795 F.2d 1434 (9th Cir. 1986) .................................................................. 31

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ........................................................................... 31, 32

*Davis v. Mich. Dep't of Treasury*,
    489 U.S. 803 (1989) ................................................................................. 26

*Dawson v. Steager,*
　　139 S. Ct. 698 (2019) ........................................................ 25, 26, 27, 28

*Demore v. Kim,*
　　538 U.S. 510 (2003) ........................................................................ 30

*Dream Palace v. County of Maricopa,*
　　384 F.3d 990 (9th Cir. 2004) .......................................................... 40

*English v. Gen. Elec. Co.,*
　　496 U.S. 72 (1990) .......................................................................... 29

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,*
　　458 U.S. 141 (1982) ........................................................................ 32

*Gartrell Construction Inc. v. Aubry,*
　　940 F.2d 437 (9th Cir. 1991) ...................................................... 33, 34

*Goodyear Atomic Corp. v. Miller,*
　　486 U.S. 174 (1988) .................................................................. 22, 24

*Greenwood v. United States,*
　　350 U.S. 366 (1956) ........................................................................ 34

*Hancock v. Train,*
　　426 U.S. 167 (1976) ........................................................ 20, 21, 22, 24

*Harisiades v. Shaughnessy,*
　　342 U.S. 580 (1952) ........................................................................ 30

*Hines v. Davidowitz,*
　　312 U.S. 52 (1941) .......................................................................... 30

*Jennings v. Rodriguez,*
　　138 S. Ct. 830 (2018) ...................................................................... 10

*Johnson v. Maryland,*
　　254 U.S. 51 (1920) .......................................................................... 21

*Kentucky v. Graham,*
　　473 U.S. 159 (1985) ........................................................................ 39

*Leslie Miller, Inc. v. Arkansas,*
　　352 U.S. 187 (1956) .............................................................. 22, 24, 34

*Lusnak v. Bank of Am., N.A.,*
　　883 F.3d 1185 (9th Cir. 2018) ........................................................ 32

*Mayo v. United States,*
　　319 U.S. 441 (1943) .................................................................. 20, 21

*McCulloch v. Maryland,*
　　17 U.S. (4 Wheat.) 316 (1819) ................................................ 19, 20, 25

*Moore v. Madigan,*
　　702 F.3d 933 (7th Cir. 2012) .......................................................... 40

*Nelson v. Nat'l Aeronautics & Space Admin.,*
　　530 F.3d 865 (9th Cir. 2008) .......................................................... 38

*North Dakota v. United States*,
495 U.S. 423 (1990) ...................................................................... 19, 20, 25, 26, 29

*Nw. Cent. Pipeline v. State Corp. Comm'n of Kan.*,
489 U.S. 493 (1989) ......................................................................................... 29

*Osborn v. Bank of the U.S.*,
22 U.S. (9 Wheat.) 738 (1824) ...................................................................... 21, 22

*Paul v. United States*,
371 U.S. 245 (1963) ........................................................................................... 23

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*,
361 U.S. 376 (1960) ........................................................................................... 26

*Pub. Utils. Comm'n of Cal. v. United States*,
355 U.S. 534 (1958) .................................................................................. 22, 23, 24

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ........................................................................... 40

*Savage v. Jones*,
225 U.S. 501 (1912) ........................................................................................... 29

*South Carolina v. Baker*,
485 U.S. 505 (1988) ........................................................................................... 25

*Student Loan Servicing All. v. District of Columbia*,
351 F. Supp. 3d 26 (D.D.C. 2018) .................................................................... 33

*United States v. Arizona*,
641 F.3d 339 (9th Cir. 2011) ................................................................... 30, 38, 40

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ................................................... 10, 24, 25, 26, 40

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) ............................................................................. 28

*United States v. City of Manassas*,
830 F.2d 530 (4th Cir. 1987) ............................................................................. 29

*United States v. City of Pittsburg*,
661 F.2d 783 (9th Cir. 1981) ............................................................................. 32

*United States v. City of St. Paul*,
258 F.3d 750 (8th Cir. 2001) ............................................................................. 22

*United States v. Ga. Pub. Serv. Comm'n*,
371 U.S. 285 (1963) ........................................................................................... 23

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ................................................................ 38, 39, 40

*Washington v. United States*,
460 U.S. 536 (1983) ........................................................................................... 27

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .............................................................................................. 19

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) ...................................................... 40

*Wyeth v. Levine*,
   555 U.S. 555 (2009) .................................................................... 30

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) .................................................................... 30

**Statutes**

U.S. Const. amend. XI ......................................................................... 39

6 U.S.C. § 557 .................................................................................... 33

8 U.S.C.
   § 1225 ................................................................................... 107
   § 1226 ..................................................................................... 10
   § 1231 ............................................................... 10, 30, 31, 33
   § 1252 ..................................................................................... 31

18 U.S.C.
   § 4002 ................................................................................... 335
   § 4013 .................................................. 8, 9, 10, 35, 36
   § 4086 ............................................................................. 34, 35

28 U.S.C.
   § 530C ............................................................................ 8, 9, 35
   § 561 ............................................................................ 8, 34, 36
   § 566 ....................................................................................... 36

Cal. Civ. Code § 1670.9 ...................................................................... 15

Cal. Gov't Code § 7310 ...................................................................... 15

Cal. Health & Safety Code § 25359.20 .............................................. 28

Cal. Penal Code
   § 5003.1 ................................................................................. 16
   § 9500 ................................................................................ 17, 26
   § 9501 ....................................................................... 17, 26, 27
   § 9502 ..................................................................................... 27
   § 9505 ..................................................... 17, 18, 27, 37

**Declarations Cited**

Decl. of Amber Martin, Exec. Vice President of Contract Admin.,
   The GEO Grp., Inc (Dec. 31, 2019) ............................ 12, 13, 14, 18, 25, 36, 39

**Exhibits Cited**

Assemb. Comm. on Judiciary, Analysis of SB-29, 2017–18 Sess.
   (Cal. June 27, 2017), https://bit.ly/2O9c3eP, Ex. P ........................... 16

Cal. Dep't of Corr. and Rehab., Monthly Report of Population
   (Dec. 1, 2019), https://bit.ly/38ZnK07, Ex. Q .................................. 17

Caitlin Dickerson, *ICE Faces Migrant Detention Crunch as Border Chaos Spills
Into Interior of the Country*, N.Y. Times (Apr. 22, 2019),
   https://nyti.ms/2BEKvGS, Ex. N ....................................................... 11

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

ERO CUSTODY MGMT. DIV., AUTHORIZED DEDICATED FACILITY LIST
(Dec. 2, 2019), https://bit.ly/2PXHNmM, Ex. U ................................................. 25

Press Release, Assembly Member Rob Bonta, *Bonta Introduces Bills Ending
State's Involvement in For-Profit, Private Prison Industry* (Dec. 3, 2018),
https://bit.ly/2Pga7Ch, Ex. R ...................................................................................... 18

Senate Rules Comm., Senate Floor Analyses for AB-32, 2019–20 Sess.
(Cal. Sept. 9, 2019), https://bit.ly/35htShk, Ex. S ................................................. 18

Senate Rules Comm., Senate Floor Analyses for SB-29, 2017–18 Sess.
(Cal. May 27, 2017), https://bit.ly/2O9c3eP, Ex. O ....................................... 15, 16

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

1   On January 1, 2020, California's Assembly Bill 32 (AB-32) will take effect.
2   The law purports to prohibit the United States from using detention facilities operated
3   by private contractors to house detainees in the custody of the U.S. Marshals Service,
4   U.S. Immigration and Customs Enforcement, or the Federal Bureau of Prisons. This
5   transparent attempt by the State to shut down the Federal Government's detention
6   efforts within California's borders is a direct assault on the supremacy of federal law
7   that serves as the foundation for the American Constitution.

8   The GEO Group, Inc. (GEO), as the owner and operator of federal private
9   detention facilities threatened by the State, brings this action to vindicate the
10  supremacy of federal law. This Court should declare AB-32 unconstitutional and
11  enter a preliminary and permanent injunction restraining Defendants from enforcing
12  the statute against GEO.

**STATEMENT**

**I.    U.S. Marshals Service Detention Policy**

15  Established in 1789, the United States Marshals Service (USMS) is an agency
16  within the United States Department of Justice under the supervision of the Attorney
17  General. *See* 28 U.S.C. § 561(a). Congress has authorized the Attorney General to
18  provide for "the housing, care, and security of persons held in custody of a United
19  States marshal pursuant to Federal law under agreements with State or local units of
20  government or contracts with private entities." 18 U.S.C. § 4013(a)(3). Congress has
21  also authorized the Attorney General, in his "reasonable discretion," to carry out the
22  activities of the Department of Justice "through any means," including "through
23  contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C.
24  § 530C(a)(4); *see also id.* § 530C(b)(7).

25  "The U.S. Marshals Service houses and transports all federal prisoners from
26  the time they enter federal custody until they are either acquitted or convicted and
27  delivered to their designated federal Bureau of Prisons facility. The Marshals Service
28  assumes custody for all prisoners charged with a federal offense, no matter which

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

agency made the arrest."[1] Pursuant to the Attorney General's statutory authority under 18 U.S.C. § 4013(a)(3) and 28 U.S.C. § 530C(a)(4), "[t]he Marshals Service does not own or operate detention facilities but partners with state and local governments using intergovernmental agreements to house prisoners. Additionally, the agency houses prisoners in Federal Bureau of Prisons facilities and private detention facilities."[2] Because "both defense attorneys and prosecutors require routine access to prisoners, the Marshals attempt to house prisoners in close proximity to the judicial district in which they are prosecuted."[3]

Along the Southwest Border, "DOJ has not been able to rely as much on [intergovernmental agreements with state and local detention facilities] and Federal facilities to meet housing requirements . . . . As less space in Federal facilities is available, DOJ has increasingly had to rely on the private sector" to meet its detention obligations.[4] USMS estimates that 28.6 percent of the detention facilities used by the Marshals to house detainees from the Southern District of California are privately run.[5] And now that GEO has begun operating the El Centro Service Processing Center on December 23, 2019, *see infra* Statement Section III.A.2, that figure has

---

[1] U.S. MARSHALS SERV., DEFENDANTS IN CUSTODY AND PRISONER MANAGEMENT, https://bit.ly/2MSd4Wv (last visited Dec. 30, 2019), Ex. F at 102.

[2] U.S. MARSHALS SERV., FACT SHEET: PRISONER OPERATIONS 2 (2019), https://bit.ly/2Yi5RED, Ex. G at 106.

[3] *Id.*

[4] U.S. MARSHALS SERV., FY 2020 PERFORMANCE BUDGET PRESIDENT'S BUDGET: FEDERAL PRISONER DETENTION APPROPRIATION 15 (2019), https://bit.ly/2SnzdAx, Ex. H at 115.

[5] U.S. MARSHALS SERV., USMS DETENTION POPULATION 2 (Apr. 31, 2019) [hereinafter DETENTION POPULATION], https://bit.ly/2BmUFMp, Ex. I at 126. This excludes facilities located in other States used by the Marshals to house detainees from this District, to which Section 2 of AB-32 does not apply. It also excludes intergovernmental service agreement facilities with an average daily population (ADP) below 50 because publicly available data does not identify these facilities and the number of individuals detained in them is minimal. These facilities are omitted from all data provided herein unless otherwise stated. And finally, this excludes Metropolitan Detention Center, Los Angeles, because that Federal Bureau of Prisons facility held only a single detainee as of April 31, 2019, and has no reported ADP for Fiscal Years 2018 and 2019.

1  risen to 37.5 percent. Two of those private facilities—the Western Region Detention
2  Facility and El Centro Service Processing Center—are operated by GEO.

3  **II.    U.S. Immigration And Customs Enforcement Detention Policy**

4        In November 2002, Congress assigned the border-enforcement functions of
5  the former Immigration and Naturalization Service to the newly created Bureau of
6  Immigration and Customs Enforcement, housed within the Department of Homeland
7  Security.[6] The Bureau began operations in March 2003 and was renamed U.S.
8  Immigration and Customs Enforcement (ICE) in March 2007.[7]

9        Congress has authorized or required the detention of aliens under several
10  different statutes and conditions. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii),
11  1225(b)(2)(A), 1226(a), 1226(c); *see also Jennings v. Rodriguez*, 138 S. Ct. 830,
12  836–38 (2018). Congress has also directed that "[t]he Attorney General shall arrange
13  for appropriate places of detention for aliens detained pending removal or a decision
14  on removal," 8 U.S.C. § 1231(g)(1), and it has instructed that ICE "shall consider the
15  availability for purchase or lease of any existing prison, jail, detention center, or other
16  comparable facility suitable for [detention]" "[p]rior to initiating any project for the
17  construction of any new detention facility," *id.* § 1231(g)(2). Thus, like USMS's
18  authority under Section 4013(a)(3), Section 1231(g)(2) authorizes ICE to use private
19  contractors to arrange for detention. *See United States v. California*, 921 F.3d 865,
20  882 n.7 (9th Cir. 2019).

21        "[I]n FY2018 the number of book-ins to ICE facilities was nearly 400,000,"
22  yet "[a]s of July 12, 2018, ICE's detention capacity was approximately 45,700
23  beds."[8] "Filling every available bed in a detention facility would necessitate housing

---

25  [6] U.S. IMMIGRATION & CUSTOMS ENF'T, CELEBRATING THE HISTORY OF ICE
(Mar. 1, 2019), https://bit.ly/35Jas68, Ex. J at 130.

26  [7] *Id.*, Ex. J at 128, 131.

27  [8] AUDREY SINGER, CONG. RESEARCH SERV., R45804, IMMIGRATION:
28  ALTERNATIVES TO DETENTION (ATD) PROGRAMS 14 (July 8, 2019),
https://bit.ly/2ojQNsE, Ex. M at 171.

detainees of varied threat levels together, posing serious safety concerns for detainees, officers, staff, and facility owners. ICE consequently maintains a target utilization rate of about 85 to 90% of total facility capacity," which "also allows for flexibility to respond to emergencies or other unforeseen circumstances that might require immediate availability of detention beds (e.g., charter flight cancellations, surges, or smuggling loads)."[9] In the facilities ICE currently uses, "ICE meets or exceeds its target utilization in almost every instance."[10]

Across the country, ICE's ability to house detainees is "already dire."[11] As then-Acting Secretary of Homeland Security, Kevin K. McAleenan, said in April 2019: "It's clear that all of our resources are being stretched thin. The system is full, and we are beyond capacity."[12] Homeland Security officials "are struggling to identify new locations where migrants can be held in detention."[13]

Thus, ICE has determined that "additional ICE detention capacity is necessary" to meet the surge of aliens detained at the border.[14] Indeed, "[a]n increase in detention capacity is critical to supporting ICE's ability to apprehend, detain, and remove aliens."[15]

/ / /

/ / /

---

[9] U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., BUDGET OVERVIEW: FISCAL YEAR 2020 CONGRESSIONAL JUSTIFICATION ICE-O&S-119 (2019) [hereinafter 2020 CONGRESSIONAL JUSTIFICATION], https://bit.ly/336G3g3, Ex. L at 154.

[10] Id.

[11] Caitlin Dickerson, *ICE Faces Migrant Detention Crunch as Border Chaos Spills Into Interior of the Country*, N.Y. TIMES (Apr. 22, 2019), https://nyti.ms/2BEKvGS, Ex. N at 164.

[12] Id.

[13] Id.

[14] STATEMENT OF MATTHEW T. ALBENCE, ACTING DIR., U.S. IMMIGRATION & CUSTOMS ENF'T, THE FISCAL YEAR 2020 PRESIDENT'S BUDGET REQUEST 4 (July 25, 2019), https://bit.ly/2Bllfp9, Ex. K at 136.

[15] 2020 CONGRESSIONAL JUSTIFICATION, *supra* note 9, at ICE-O&S-16, Ex. L at 149.

NEWMEYER DILLION

## III.    GEO's Detention Facilities In California

The GEO Group, Inc. is a publicly traded corporation that owns and operates detention facilities worldwide. As a contractor for the Federal Government, GEO provides detention services for both USMS and ICE in the State of California.

### A.    GEO's USMS Detention Facilities

#### 1.    Western Region Detention Facility

Since 2000, GEO has operated the Western Region Detention Facility in San Diego under a lease from the County of San Diego. Martin Decl. ¶ 5. With a capacity of 725 beds,[16] Western Region is one of only two USMS facilities in San Diego, the other being the Metropolitan Correction Center operated by the Federal Bureau of Prisons. *Id.* ¶¶ 4, 9. USMS has exercised an option to continue its contract with GEO for the Western Region Detention Facility through September 30, 2021. *Id.* ¶ 7. USMS has the authority to exercise three additional two-year options, such that the total contract term runs through September 30, 2027. *Id.* ¶ 6.

The next-closest USMS facility outside of San Diego—Otay Mesa Detention Center—is also privately run. *Id.* ¶ 9. It is primarily used by ICE to house aliens, though USMS is permitted to use the facility for its own detainees. *Id.* Thus, if no privately run USMS detention facilities were permitted in California, there would be only one USMS detention facility in the San Diego area.[17] *Id.* ¶ 10. The next-closest non-private USMS facilities are located approximately 90 miles away from San Diego in Santa Ana, California. *Id.* ¶ 11. Those two USMS facilities in Santa Ana had a combined average daily population of 213 in April 2019, less than one-third the average daily population of the Western Region Detention Facility alone.[18]

/ / /

---

[16] Capacity numbers provided herein refer to capacity as stated in the relevant contract, unless a source other than the contract is indicated.

[17] DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

[18] *Id.*

### 2.     El Centro Service Processing Center

GEO's second California USMS facility—El Centro Service Processing Center—is also located in the San Diego area and has a capacity of 512 beds. *Id.* ¶ 12. El Centro is owned by ICE, which has authorized USMS to use the facility for USMS detainees. *Id.* ¶ 13. GEO was awarded a contract to operate El Centro on December 23, 2019. *Id.* ¶ 14. The base contract period is for two years, with the Marshals retaining the authority to exercise three additional two-year options and one nine-month option. *Id.* Thus, the El Centro contract's period of performance runs through September 25, 2028. *Id.*

### B.     GEO's ICE Detention Facilities

GEO currently operates five ICE detention facilities in California. *Id.* ¶ 15. First, GEO owns and operates the Adelanto ICE Processing Center, located in Adelanto, California, with a capacity of 1,940 beds. *Id.* ¶ 16. GEO has operated the facility as an ICE detention center since 2011. *Id.* ¶ 17. ICE and GEO signed a new contract for Adelanto on December 19, 2019. *Id.* ¶ 20. The contract has a 15-year period of performance starting on December 20, 2019, and ending December 19, 2034. *Id.* ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024. *Id.*

Second, GEO owns and operates the Desert View Modified Community Correctional Facility (MCCF) as an annex to the Adelanto facility. *Id.* ¶ 22. The Desert View facility has a capacity of 750 beds. *Id.* It is incorporated into the same contract as the Adelanto facility, with a period of performance beginning on December 20, 2019, and continuing through December 20, 2034. *Id.* ¶ 24. Although currently used by the California Department of Corrections and Rehabilitation (CDCR) for state inmates, CDCR has notified GEO that it will phase out its contract and use of the facility by March 31, 2020. *Id.* ¶ 22. In the meantime, GEO is required by its contract with ICE to operate the facility by undertaking "Pre-Transition/Mobilization" activities. *Id.* ¶ 25.

1    Third, GEO owns and operates the Mesa Verde ICE Processing Center, located

2    in Bakersfield, California, with a capacity of 400 beds. *Id.* ¶ 27. GEO has operated

3    the facility as an ICE detention center since 2015. *Id.* ¶ 28. ICE and GEO signed a

4    new contract for Mesa Verde on December 19, 2019. *Id.* ¶ 31. Like the Adelanto

5    contract, the Mesa Verde contract has a 15-year period of performance starting on

6    December 20, 2019, and ending December 19, 2034. *Id.* ICE has the option of

7    terminating the contract early every five years, with the first such option occurring

8    on December 20, 2024. *Id.*

9    GEO's fourth and fifth facilities—Central Valley MCCF and Golden State

10   MCCF—are operated as annexes to the Mesa Verde facility. Each has a capacity of

11   700 beds. *Id.* ¶¶ 33, 38. Central Valley is a former CDCR facility previously operated

12   for CDCR through September 30, 2019, *id.* ¶ 33, while Golden State's contract with

13   CDCR will phase out by June 30, 2020, *id.* ¶ 38. Both facilities are incorporated into

14   the Mesa Verde contract, with a period of performance running from December 20,

15   2019, through December 19, 2034. *Id.* ¶¶ 35, 40. As with Desert View, GEO is

16   required by its contract to operate the facility by undertaking "Pre-

17   Transition/Mobilization" activities. *Id.* ¶¶ 25, 36, 41.

18   In addition to the foregoing GEO facilities, ICE has two other dedicated

19   detention facilities in California: Imperial Regional Detention Facility in Calexico,

20   California (capacity of 704 beds) and Otay Mesa Detention Center in San Diego,

21   California (capacity 1,994 beds). *Id.* ¶¶ 43, 45. Both of these facilities are operated

22   by private contractors. Imperial Regional is operated by Management & Training

23   Corporation, while Otay Mesa is operated by CoreCivic. *Id.* ¶¶ 43, 45. Thus, all

24   dedicated ICE processing centers in California are privately operated.

25   **IV.   California's Early Efforts To Obstruct Federal Immigration Policy**

26   The 2016 election ushered in a new President whose views on immigration

27   policy differed markedly from those held by a majority of the California Legislature.

28   Less than a month after the election, the Legislature began enacting a series of

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

measures designed to interfere with the execution of federal immigration policy, an effort that culminated in the enactment of AB-32.

On December 5, 2016, Senate Bill 29 (SB-29) was introduced in the California Legislature. As enacted, the bill prohibits city, county, and local law enforcement agencies from entering into contracts "with the federal government or any federal agency or a private corporation to house or detain noncitizens for purposes of civil immigration custody" unless those contracts were in effect before January 1, 2018. CAL. CIV. CODE § 1670.9(a). The statute also prohibits the renewal or modification of such contracts thereafter "in a manner that would expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody." *Id.* § 1670.9(b). And SB-29 prohibits cities, counties, and public agencies from "approv[ing] or sign[ing] a deed, instrument, or other document related to a conveyance of land or issue a permit for the building or reuse of existing buildings by any private corporation, contractor, or vendor to house or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and county, or public agency" provides the public 180 days' notice and allows for public comment at two separate public meetings. *Id.* § 1670.9(d).

On January 10, 2017, Assembly Bill 103 (AB-103) was introduced in the California Legislature. As enacted, AB-103 prohibits, among other things, city, county, and local law enforcement agencies from entering into contracts "with the federal government or any federal agency to detain adult noncitizens for purposes of civil immigration custody" unless those contracts were in effect before June 15, 2017. CAL. GOV'T CODE § 7310(a). The statute also prohibits the renewal or modification of such contracts thereafter "in such a way as to expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody." *Id.* § 7310(b).

The Senate Floor Analysis of SB-29 baldly stated that the purpose of its enactment was to obstruct federal immigration policy: "President Donald Trump

1   has . . . made it clear that he intends to detain more immigrants and expand private

2   for profit detention facility use. This bill would protect immigrants held in immigrant

3   detention in California."[19] The Assembly Committee on Judiciary analysis of the bill

4   likewise stated that it was needed "[i]n light of the changed circumstances in the

5   White House,"[20] and quotes SB-29's author as saying that the bill was necessary due

6   to "the new administration's commitment to deport millions."[21] Governor Jerry

7   Brown signed AB-103 into law on June 27, 2017, and he signed SB-29 into law a

8   few months later, on October 5, 2017.

9   **V.    The Enactment Of AB-32**

10   On December 3, 2018, Assembly Bill 32 was introduced in the California

11   Legislature. AB-32 builds on SB-29 and AB-103 by amending the California Penal

12   Code in two principal ways.

13   <u>First</u>, it generally prohibits the California Department of Corrections and

14   Rehabilitation from contracting with private, for-profit prison facilities to house state

15   inmates. As enacted, Section 1 of AB-32, codified at California Penal Code § 5003.1,

16   prohibits CDCR from entering or renewing a "contract with a private, for-profit

17   prison facility located in or outside of the state" to house or incarcerate state prison

18   inmates.

19   Significantly, Section 1 of AB-32 contains an exception permitting the CDCR

20   to "renew or extend a contract with a private, for-profit prison facility to provide

21   housing for state prison inmates in order to comply with the requirements of any

22   court-ordered population cap." CAL. PENAL CODE § 5003.1(e). California's prison

23   system is subject to a court-ordered population cap in which its total prison

24   population may not exceed 137.5 percent of the prisons' design capacities.

---

[19] Senate Rules Comm., Senate Floor Analyses for SB-29, 2017–18 Sess., at 5 (Cal. May 27, 2017), https://bit.ly/2O9c3eP, Ex. O at 172.

[20] Assemb. Comm. on Judiciary, Analysis of SB-29, 2017–18 Sess., at 2 (Cal. June 27, 2017), https://bit.ly/2O9c3eP, Ex. P at 177.

[21] *Id.*, Ex. P at 179.

NEWMEYER DILLION

*See generally Brown v. Plata*, 563 U.S. 493 (2011); *Coleman v. Brown*, 952 F. Supp. 2d 901 (E.D. Cal. 2013). As of December 1, 2019, California's prison system was operating at 131.2 percent of design capacity. Its male institutions were at 131.3 percent of capacity, while its female institutions were at 129.9 percent of capacity.[22]

<u>Second</u>, Section 2 of AB-32 generally prohibits the operation of a private detention facility in the State of California, including a facility housing federal detainees. The prohibition is codified at California Penal Code § 9501: "Except as otherwise provided in this title, a person shall not operate a private detention facility within the state." Section 9500, defines the key terms as follows:

(a) "Detention facility" means any facility in which persons are incarcerated or otherwise involuntarily confined for purposes of execution of a punitive sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding.

(b) "Private detention facility" means a detention facility that is operated by a private, nongovernmental, for-profit entity, and operating pursuant to a contract or agreement with a governmental entity.

Section 9502 then enumerates a series of exceptions to Section 9501's prohibition on the operation of private detention facilities, but as discussed below, these exceptions apply almost exclusively to state private detention facilities, not to federal facilities.

Finally, Section 9505 contains two additional exceptions to the prohibition against the operation of private detention facilities set forth in Section 9501. The first, Section 9505(a), is a temporary safe-harbor provision:

Section 9501 does not apply to . . . [a] private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract.

The second, Section 9505(b), provides a more categorical exception at the option of the CDCR: "Section 9501 does not apply to . . . [a] private detention facility contract

---

[22] CAL. DEP'T OF CORR. AND REHAB., MONTHLY REPORT OF POPULATION (Dec. 1, 2019), https://bit.ly/38ZnK07, Ex. Q at 188.

1   renewed pursuant to subdivision (e) of Section 5003.1." Subdivision (e) of Section

2   5003.1, as noted above, allows the CDCR to use private facilities "in order to comply

3   with the requirements of any court-ordered population cap."

4        Thus, after January 1, 2020 (the effective date of AB-32), the operation of a

5   federal private detention facility will generally be prohibited in California unless the

6   contract was in effect before January 1, 2020. As described above, this will cause the

7   closure of at least ten privately operated facilities totaling 10,925 beds, which

8   represent the overwhelming majority of detention capacity held by the Federal

9   Government in the State of California.   Martin Decl. ¶¶ 4, 12, 14 n.1, 16, 22, 27, 33,

10   38, 43, 45. GEO manages seven of the privately operated facilities for USMS and

11   ICE, totaling 5,727 beds. *Id.* ¶¶ 4, 12, 16, 22, 27, 33, 38.

12        On the day he introduced AB-32, Assembly Member Rob Bonta issued a press

13   release in which he denounced "the Trump Administration['s] . . . cruel immigration

14   policies" and criticized GEO for "facilitating the Trump Administration's political

15   agenda."[23] Similarly, the Senate Floor Analysis of AB-32 anticipated litigation

16   challenging   its   constitutionality   by   "this   anti-immigrant   President's

17   Administration."[24] And Christina Fialho, co-founder of Freedom for Immigrants—a

18   group listed as a supporter of AB-32 in the Senate Floor Analysis[25]—observed that

19   AB-32 "will deal a critical blow to the Trump administration's efforts to further

20   expand its system of immigration detention, especially as other states follow our

21   lead."[26] Governor Newsom signed AB-32 into law on October 11, 2019.

22

23        [23] Press Release, Assembly Member Rob Bonta, *Bonta Introduces Bills Ending
24   State's Involvement in For-Profit, Private Prison Industry* (Dec. 3, 2018),
     https://bit.ly/2Pga7Ch, Ex. R at 191.

25        [24] Senate Rules Comm., Senate Floor Analyses for AB-32, 2019–20 Sess., at 5
     (Cal. Sept. 9, 2019), https://bit.ly/35htShk, Ex. S at 198.

26        [25] *Id.*, Ex. S at 206.

27        [26] Don Thompson & Amy Taxin, *California To End its Use of Private, For-
28   Profit Prisons*, ASSOCIATED PRESS (Oct. 11, 2019), https://bit.ly/2Pgb6C6, Ex. T
     at 208.

**ARGUMENT**

"A party seeking a preliminary injunction must meet one of two variants of the same standard." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). As articulated by the Supreme Court, " [a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction by showing serious questions go[ ] to the merits of its claims and a balance of hardships that tips sharply towards the plaintiff, so long as it makes a showing on the other two factors." *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (alteration in original) (quotation marks omitted). GEO is entitled to a preliminary injunction under either test.

## I.    GEO Is Likely To Succeed On The Merits.

AB-32 is unconstitutional under two related doctrines that, consistent with the Supremacy Clause, prohibit state interference with the implementation of federal law: (1) intergovernmental immunity and (2) preemption. *See North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion). In the alternative, under AB-32's temporary safe-harbor provision, GEO's USMS contract for its Western Region facility continues to be valid under state law through September 30, 2027; its contract for its El Centro facility continues to be valid through September 25, 2028; and its ICE contracts continue to be valid through December 19, 2034.

### A.    AB-32 Violates The Intergovernmental-Immunity Doctrine.

The Supreme Court first recognized the doctrine of intergovernmental immunity two hundred years ago in the foundational case of *McCulloch v. Maryland*. Maryland had attempted to enforce a state tax against a branch of the Bank of the United States. 17 U.S. (4 Wheat.) 316, 317–21 (1819). The Supreme Court held that

the supremacy of the Federal Government within its legitimate sphere of action necessarily meant that the States had no power to interfere with a constitutionally valid federal activity. *Id.* at 427–30. Because "the power to tax involves the power to destroy," the Court held that Maryland's tax was unconstitutional. *Id.* at 431.

In so holding, the Court set forth the canonical formulation of the intergovernmental-immunity doctrine:

> [T]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

*Id.* at 436. In short, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). AB-32 violates intergovernmental immunity twice over, for it both directly regulates the Federal Government and it discriminates against the Federal Government and its contractors.

### 1.    AB-32 directly regulates the Federal Government.

A state violates the doctrine of intergovernmental immunity when it purports to directly regulate the Federal Government. *See North Dakota*, 495 U.S. at 436. Direct regulation can manifest itself in different ways. For example, a state may not require the Federal Government to obtain a permit or license in order to carry out a federal function, even if the permit or license requirement is generally applicable. *See, e.g.*, *Hancock v. Train*, 426 U.S. 167, 179–80 (1976) (state could not require federal installations to obtain a state permit to operate an air contaminant source); *Mayo*, 319 U.S. at 447–48 (Secretary of Agriculture could not be required to submit to state inspection and pay inspection fee for fertilizer imported into the state); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839–42 (9th Cir. 2014) (state could not regulate the way in which a contractor conducted environmental remediation on behalf of the Federal Government). Because there can be no doubt that AB-32

NEWMEYER
DILLION

directly and substantially interferes with federal operations at GEO's USMS and ICE facilities, AB-32 is an unconstitutional form of direct regulation.

The Supreme Court has repeatedly held unconstitutional the application of generally applicable state laws to federal activities under the intergovernmental-immunity doctrine. For example, in *Johnson v. Maryland*, a Post Office employee who was delivering U.S. mail was arrested for driving without a state-issued driver's license. 254 U.S. 51, 55 (1920). The Supreme Court acknowledged that "an employee of the United States does not secure a general immunity from state law while acting in the course of his employment," and that state laws that "merely touch the Government servants remotely"—such as laws "regulating the mode of turning at the corners of streets"—might very well be constitutional. *Id.* at 56–57. Nonetheless, the Court held Maryland's generally applicable driver's license law unconstitutional as applied to federal employees carrying out their federal functions because the driver's license law "la[id] hold of [federal employees] in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient." *Id.* at 57. While generally applicable laws that incidentally and minimally burden federal activities do not run afoul of intergovernmental immunity, *see Hancock*, 426 U.S. at 179, such laws are unconstitutional to the extent that they substantially interfere with federal operations, *see id.* at 180; *Mayo*, 319 U.S. at 447–48; *Arizona v. California*, 283 U.S. 423, 451 (1931) (state could not require the Secretary of Interior to submit plans for building a federal dam and reservoir to a state engineer for approval); *see also Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996) (holding that the generally applicable California Resort Act could not be applied to the Federal Government's operations at Yosemite National Park).

The same principle holds true when general state laws are applied to federal activities carried out by federal contractors. In *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824), the Supreme Court held that "the right of the State to

control [a federal contractor's] operations, if those operations be necessary to its character, as a machine employed by the government, cannot be maintained." *Id.* at 867 (Marshall, C.J.). The rule announced in *Osborn* has been repeatedly reaffirmed by the Supreme Court. In *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988), the Supreme Court held that "a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." *Id.* at 181.[27] Because states can just as readily interfere with federal operations by regulating the activities of federal contractors as by regulating the activities of federal employees, the doctrine must extend to both. *See Hancock*, 426 U.S. at 174 n.23, 180 (generally applicable environmental regulations invalid as applied to a private contractor operating federal uranium-enrichment facility); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (state could not require a federal contractor to obtain a license before constructing facilities at an Air Force Base); *see also United States v. City of St. Paul*, 258 F.3d 750, 754 (8th Cir. 2001).

Nor has the Supreme Court limited the application of intergovernmental immunity to contractors operating federally owned facilities. For example, in *Public Utilities Commission of California v. United States*, 355 U.S. 534 (1958), California prohibited common carriers from transporting federal property at reduced rates without first obtaining the permission of the state's Public Utilities Commission. *Id.* at 535–39. The Court held the State's common-carrier law invalid, pointing to "[t]he seriousness of the impact of California's regulation on the action of federal procurement officials." *Id.* at 544. The Court did so even though the immediately regulated parties were private contractors using privately owned vehicles to transport

---

[27] The Court ultimately held that the state regulation could be applied to the nuclear facility because federal law authorized the state's workers' compensation scheme. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 182 (1988). But the important point is that the Supreme Court drew no distinction between federal activities carried out by federal employees and federal activities carried out by federal contractors for purposes of intergovernmental immunity.

property on non-federal highways. *See id.* at 537 & n.2. What mattered was that the *activity* in question was *federal* activity, and California had no power to interfere with it. *See also Paul v. United States*, 371 U.S. 245, 254–55 (1963) (California minimum wholesale price regulation invalid as applied to milk contractor selling to Travis Air Force Base); *United States v. Ga. Pub. Serv. Comm'n*, 371 U.S. 285, 292–93 (1963).

In line with this precedent, the Ninth Circuit has squarely held that intergovernmental immunity forbids a state from substantially interfering with federal activity carried out by a private contractor, even where the activity occurs on private land. In *Boeing Co. v. Movassaghi*, California enacted a statute imposing environmental-remediation standards on a site that had been contaminated with radiological material over the course of several decades by the Federal Government and its contractor, Boeing. 768 F.3d at 837–38. A small portion of the site was owned by NASA, but the remainder of the site was owned by Boeing. *Id.* at 834. Because the radiological contamination was entirely the result of federal activity, the Federal Government had taken responsibility for remediating it. *Id.* at 835, 839. The Government had hired Boeing to implement the remediation of the site under federal direction. *Id.* at 836.

Even though the statute purportedly applied to Boeing as a private contractor conducting federal activities at a site that was owned almost entirely by Boeing, the Ninth Circuit held that California's statute constituted impermissible direct state regulation of federal activities in violation of the intergovernmental-immunity doctrine. The statute "directly interfere[d] with the functions of the federal government" by "mandat[ing] the ways in which Boeing render[ed] services that the federal government hired Boeing to perform"; it "replace[d] the federal cleanup standards that Boeing ha[d] to meet to discharge its contractual obligations to DOE with the standards chosen by the state"; and it "regulate[d] not only the federal contractor but the effective terms of federal contract itself." *Id.* at 840. Relying on *Goodyear*, the Ninth Circuit held that "[t]he federal government's decision to hire

1   Boeing to perform its cleanup work d[id] not affect the legal analysis." *Id.* at 839. As

2   the Ninth Circuit observed in a subsequent case: "For purposes of intergovernmental

3   immunity, federal contractors are treated the same as the federal government itself."

4   *United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

5       *Boeing* is directly applicable here, and in conjunction with the foregoing

6   Supreme Court precedent, it requires holding that AB-32 violates intergovernmental

7   immunity as applied to GEO's ICE and USMS facilities. As in *Boeing*, the activity

8   being carried out by GEO is federal activity. *See also Goodyear Atomic Corp.*,

9   486 U.S. at 180–81; *Pub. Utils. Comm'n of Cal.*, 355 U.S. at 544; *Leslie Miller, Inc.*,

10   352 U.S. at 189–90. In fact, the activity at issue here is *inherently* federal: *only* the

11   Federal Government or its authorized contractor may detain aliens and federal

12   criminal defendants. As in *Boeing*, California seeks to "directly interfere[ ] with the

13   functions of the federal government" with respect to the detention of aliens and

14   federal prisoners. 768 F.3d at 840. Indeed, while in *Boeing* California only sought to

15   regulate *how* the contractor carried out its federal activities, here California seeks to

16   *prohibit* the contractor from carrying out an activity that only the Federal

17   Government can perform, a paradigmatic violation of intergovernmental immunity

18   that makes this an easy case. *See Hancock*, 426 U.S. at 179–80.

19       Indeed, Section 9501 effectively prohibits the Federal Government from using

20   *any* private detention facilities in the State, requiring it instead to directly operate

21   such facilities using federal employees. Simply put, California cannot bar the Federal

22   Government from using private contractors to carry out a uniquely federal function.

23       There can be no question that AB-32 substantially interferes with federal

24   operations. Once it takes full effect, *every dedicated ICE detention center in*

25   *California* would be required to shut down, leaving only a few non-dedicated

26   facilities capable of housing only a small fraction of the average daily population of

27

28

1  ICE detainees in the State.[28] The same is true of the Federal Government's USMS

2  facilities in the Southern District of California. Under AB-32, two of the three USMS

3  facilities in the San Diego area (GEO's Western Region Detention Facility and the

4  El Centro Service Processing Center) would be shut down, depriving USMS of nearly

5  two-thirds of its beds in the San Diego area.[29] The next-closest USMS facilities in

6  California that are *not* privately run are located in Santa Ana, which is not even in

7  the Southern District, and could house only a fraction of the average daily population

8  of the Western Region facility.[30] This restriction constitutes substantial interference

9  under any definition of that phrase, and AB-32 is therefore unconstitutional.

10                    **2.      AB-32 discriminates against the Federal Government.**

11          Like the prohibition of direct state regulation of Federal Government

12  functions, the constitutional prohibition of state regulatory discrimination against the

13  Federal Government prevents states from "defeat[ing] the legitimate operations of a

14  supreme government." *McCulloch*, 17 U.S. (4 Wheat.) at 427. If a state legislature

15  had the authority to tax or regulate the Federal Government's operations without

16  imposing the same tax or regulation on the state's own activities, it could do so

17  without fear of political repercussion from its constituents. *Id.* at 128;

18  *South Carolina v. Baker*, 485 U.S. 505, 525 n.15 (1988). In short, "[t]he

19  nondiscrimination rule finds its reason in the principle that the States may not directly

20  obstruct the activities of the Federal Government." *North Dakota*, 495 U.S. at 437–

21  38 (plurality opinion).[31]

22  _____

23  ²⁸ ERO CUSTODY MGMT. DIV., AUTHORIZED DEDICATED FACILITY LIST (Dec. 2, 2019), https://bit.ly/2PXHNmM, Ex. U at 210–11.

24  ²⁹ DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

25  ³⁰ Martin Decl. ¶ 11; DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

26  ³¹ It does not matter whether the discriminatory state law does, in fact, interfere with federal operations; unlike the direct-regulation line of cases (which prohibit only substantial interference with federal operations), the intergovernmental-immunity

27  doctrine forbids *any* discrimination against the Federal Government, no matter how *de minimis* its burden on federal activity. *See Dawson v. Steager*, 139 S. Ct. 698, 704

28  (2019); *United States v. California*, 921 F.3d 865, 883 (9th Cir. 2019) ("Supreme

And because the Federal Government often uses private contractors to carry out its activities, the nondiscrimination principle protects federal contractors just as it protects the Federal Government itself:

> Since a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself, the Court has required that the regulation be one that is imposed on some basis unrelated to the object's status as a Government contractor or supplier, that is, that it be imposed equally on other similarly situated constituents of the State.

*Id.* at 438. Accordingly, a state must "treat those who deal with the [Federal] Government as well as it treats those with whom it deals itself." *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385 (1960); *see also Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814–15 (1989); *Boeing*, 768 F.3d at 842–43.

In applying the non-discrimination principle, the key question is whether the state law in question "treat[s] similarly situated persons differently." *Dawson v. Steager*, 139 S. Ct. 698, 705 (2019). State laws that treat similarly situated state and federal contractors differently are invalid. "[T]he State's interest in adopting the discriminatory [law], no matter how substantial, is simply irrelevant." *Id.* at 704 (quotation marks omitted). In assessing whether two classes are similarly situated, courts ask whether there are "significant difference[s]" between the state and federal classes that are "directly related to" the differential treatment. *Id.*; *Davis*, 489 U.S. at 815–16; *Phillips Chem. Co.*, 361 U.S. at 383.

There can be no doubt that AB-32 does, in fact, discriminate against the Federal Government. Section 9501 prohibits *a type of activity* in which both state and federal contractors engage: the "operat[ion] [of] . . . private detention facilit[ies] within the state." Section 9500(b) defines "private detention facility"—the operative term in Section 9501's prohibition—without distinguishing between state and federal facilities; nor does the definition of "detention facility" in Section 9500(a) distinguish

---

Court case law compels the rejection of a *de minimis* exception to the doctrine of intergovernmental immunity.").

1    between state and federal facilities. Accordingly, there can be no question that state

2    and federal contractors operating private detention facilities in California are

3    similarly situated.

4         Nevertheless, AB-32 treats state private detention facilities very differently

5    than those operated by federal contractors. The general prohibition against the

6    operation of private detention facilities set forth in Section 9501 ostensibly applies to

7    both, but Sections 9502(a)–(g) and 9505(b) create exceptions to the general

8    prohibition that almost exclusively favor state contractors. Subsections 9502(a)–(b)

9    and 9502(d)–(f) describe detention activity that is *only* carried out by the State,

10   specifically referencing parts of the California Code under which the activity is being

11   carried out.[32] Likewise, the exception contained in Section 9505(b) applies *only* to

12   private detention facilities under contract with California Department of Corrections

13   and Rehabilitation. Thus, these exceptions create a favored class of state contractors

14   operating private detention facilities whose activity is not prohibited. States may not

15   discriminate against the Federal Government by granting state actors the benefit of

16   exceptions to a general rule that are denied to similarly situated federal actors.

17   *See Dawson*, 139 S. Ct. at 705–06.

18        The brazen nature of this favoritism comes into sharp focus when one

19   considers the sum-total effect of AB-32's exceptions. *See Washington v.*

20   *United States*, 460 U.S. 536, 541–46 (1983) (collecting cases examining the overall

21   effect of the regulatory scheme in determining whether a state violated

22   intergovernmental immunity). Taken together, the net effect of the exceptions is that

23   California systematically exempts the State's *own* contractors from the general

24   prohibition on the operation of private detention facilities even as it enforces the

25   prohibition against federal contractors. For instance, Section 9505(b) effectively

26

27        [32] Section 9502(e) does not refer to provisions of the California Code, but the
     Federal Government does not operate school facilities for minors, so it is clear that

28   this exception does not apply to federal contractors.

allows the State to exempt its *entire prison system* from the prohibition set forth in Section 9501 because it can always credibly maintain that it is using any private detention facilities it wishes to operate "in order to comply with the requirements of" the population cap imposed on it by *Brown v. Plata*, 563 U.S. 493 (2011).

Once again, the Ninth Circuit's decision in *Boeing* guides the way. In that case, the California statute imposing stringent environmental-remediation standards appeared to be neutral; it did not expressly target the Federal Government for differential treatment. Instead, it applied to "a responsible party or parties" at the Santa Susana Field Laboratory. 768 F.3d at 839; *see also* CAL. HEALTH & SAFETY CODE § 25359.20(a). But this purported neutrality was, in truth, a farce, because the Federal Government was the "responsible party" at Santa Susana and the California statute singled out Santa Susana for "more stringent cleanup standards than generally applicable state environmental laws." *Boeing Co.*, 768 F.3d at 839, 843. By targeting a federal cleanup site for differential treatment not imposed on any other environmental site in the State, the California statute engaged in impermissible discrimination against the Federal Government and its contractor, Boeing. *Id.* at 842–43. Just as the California statute in *Boeing* was gerrymandered to "discriminat[e] against the federal government and against Boeing as a federal contractor," *id.* at 843, AB-32 is gerrymandered to discriminate against the Federal Government and GEO as a federal contractor, *see also United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (ordinances discriminated against the Federal Government because "they specifically target[ed] and restrict[ed] the conduct of military recruiters").

The fact that one exception, set forth in Section 9502(c), applies to the operation of some federal private-detention facilities commonly known as halfway houses does not change the analysis. *Dawson* makes clear that the relevant comparison for purposes of determining intergovernmental discrimination is between the favored class of state entities and the disfavored class of federal entities. 139 S. Ct. at 705–06. In other words, that the State treats *some* federal contractors no

1    worse than *some* state contractors says nothing about whether federal contractors *as*
2    *a class* are discriminated against, relative to state contractors. Section 9502(c) only
3    shows that the State's discrimination against the Federal Government is not *total*; it
4    does not at all detract from the reality that AB-32 systematically exempts state
5    contractors from its prohibition while leaving the Federal Government as the target
6    of Section 9501. *See United States v. City of Manassas*, 830 F.2d 530, 533 (4th Cir.
7    1987) (state statute unconstitutionally discriminated against the Federal Government
8    even though it treated the State and Federal Governments alike in most
9    respects), *aff'd*, 485 U.S. 1017 (1988).

10       Because California has gerrymandered AB-32 to treat federal contractors
11   worse than state contractors, AB-32 discriminates against the Federal Government,
12   and it is unconstitutional.

13   **B.  AB-32 Is Preempted By Federal Law.**

14       Whereas intergovernmental immunity arises directly from the Supremacy
15   Clause even in the absence of an applicable federal statute, preemption occurs when
16   a state regulation "conflict[s] with an *affirmative* command of Congress." *North*
17   *Dakota*, 495 U.S. at 434 (emphasis added). State law "actually conflicts" with federal
18   law, *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), when it "stands as an obstacle
19   to the accomplishment and execution of congressional objectives," *Nw. Cent.*
20   *Pipeline v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989). And when
21   deciding whether a state law presents such an obstacle, courts consider "the entire
22   scheme of the statute," and "that which needs must be implied is of no less force than
23   that which is expressed." *Savage v. Jones*, 225 U.S. 501, 533 (1912). In other words,
24   if the federal law's "operation within its chosen field . . . must be frustrated and its
25   provisions be refused their natural effect—the state law must yield to the regulation
26   of Congress within the sphere of its delegated power." *Id.*

27       AB-32 is preempted because it denies to both federal immigration and criminal
28   law-enforcement statutes their "natural effect[s]" and obviously "frustrate[s]" their

NEWMEYER
DILLION

operation. *Id.* These statutory schemes authorize ICE and the USMS to carry out their respective detention operations using private contractors. AB-32 directly undermines these authorizations, prohibiting not only what Congress permitted, but also those actions that Congress clearly *anticipated* that the Attorney General and his subordinates would take to enforce federal law.

### 1. AB-32 is preempted by federal immigration law.

Congress's "considerable authority over immigration matters" includes the "power to detain aliens in connection with removal." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001) (Kennedy, J., dissenting)). Indeed, "*any policy* toward aliens" is "exclusively entrusted to the" Federal Government. *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (emphasis added). Therefore, "[w]hen the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land." *Hines v. Davidowitz*, 312 U.S. 52, 62–63 (1941).

By contrast, when a state enacts any law touching on the field of immigration, whatever "concurrent state power that may exist is restricted to the narrowest of limits[,]" and must be "subordinate to supreme national law." *Id.* at 68. Because the States' historic police powers do not include immigration-related matters, the presumption against preemption—sometimes applicable for regulatory fields in which the States "have traditionally occupied," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation marks omitted)—has no purchase in the immigration context, *see United States v. Arizona*, 641 F.3d 339, 348 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012).

The Immigration and Nationality Act (INA) provides that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). And the statute expressly authorizes him to use "facilities adapted or suitably located for detention [that] are

[]available for rental." *Id*. Indeed, the statute authorizes the Attorney General to expend funds to acquire new facilities only when United States facilities are unavailable or suitable facilities are "unavailable for rental." *Id*.

The "natural effect" of Section 1231(g) is unmistakable: "Congress . . . placed the responsibility of determining where aliens are detained within the discretion of the Attorney General." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986) (interpreting the similarly worded 8 U.S.C. § 1252(c) (1986)). And that discretion is "broad." *Id.* California may not circumscribe that discretion by prohibiting the Federal Government from contracting with private detention facility operators.

The State's attempt to limit the Attorney General's delegated discretion is unlawful for the same reasons marshalled by the Supreme Court in *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000). Massachusetts had prohibited its agencies from purchasing goods or services from companies doing business with Burma (now Myanmar). 530 U.S. at 367. Meanwhile, Congress had passed a statute imposing certain sanctions on Burma; authorizing the President to impose additional sanctions subject to certain prescribed conditions; and directing the President to develop a strategy for improving Burma's human-rights practices. *See id.* at 368–69. The Court held that this statute preempted the Massachusetts law because the state law "undermine[d] the intended purpose and 'natural effect' of at least three provisions of the federal Act." *Id.* at 373.

Most pertinent here, the Court explained that "Congress clearly intended the federal Act to provide the President with flexible and effective authority over economic sanctions against Burma." *Id.* at 374. Indeed, "[w]ithin the sphere defined by Congress . . . the statute . . . placed the President in a position with as much discretion to exercise economic leverage against Burma . . . as our law will admit." *Id.* at 375–76.

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

1   The same is true of AB-32: it undermines the grant of substantial discretion
2   afforded to the Attorney General by the INA. And it is equally "implausible" here
3   that Congress  "would have gone to such lengths to empower" the Attorney General
4   with such broad discretion in detaining aliens awaiting removal proceedings and yet,
5   at the same time, "been willing to compromise his effectiveness by deference to every
6   provision of state statute or local ordinance that might, if enforced, blunt the
7   consequences of discretionary . . . action." *Id*. at 376. And, importantly, even *Crosby*
8   did not confront the sort of obstacle posed by AB-32. The state law here does not
9   merely "blunt the consequences" of the Attorney General's exercise of discretion; it
10  narrows his sphere of discretion and essentially *prohibits* him from even taking
11  actions authorized by the federal statute.

12      Settled precedent makes clear that "normally Congress would not want States
13  to forbid, or to impair significantly, the exercise of a power that Congress explicitly
14  granted." *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1192 (9th Cir. 2018) (quoting
15  *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996)). Conflict
16  between state and federal law "does not evaporate" because the federal law "simply
17  permits, but does not compel" federal instrumentalities to take certain acts. *Fidelity
18  Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155 (1982). For example, in
19  *United States v. City of Pittsburg*, 661 F.2d 783 (9th Cir. 1981), the Ninth Circuit
20  found a "clear" conflict between federal and local law where the local ordinance
21  prohibited postal carriers from crossing lawns without first obtaining the owner's
22  express consent, even as federal law authorized postal carriers to cross such lawns
23  unless the owner objected. *Id.* at 785. Because the ordinance interfered with the postal
24  carriers' federal duties to deliver mail efficiently, it was preempted. *Id.* at 786. The
25  same is true here.

26      AB-32 impermissibly conflicts with the INA because it necessarily restricts
27  the otherwise broad discretion delegated to the Attorney General for detaining aliens
28  within the United States. However, AB-32 also conflicts with the broader federal

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

NEWMEYER
DILLION

1  policies and priorities expressed in the INA. Most significantly, the INA instructs the

2  Director of ICE,[33] "[p]rior to initiating any project for the construction of any new

3  detention facility," to "consider the availability for purchase or lease of any existing

4  prison, jail, detention center, or other comparable facility suitable for such use."

5  8 U.S.C. § 1231(g)(2). In other words, under the INA, building new federally owned

6  immigration detention facilities should be a last resort, not to be undertaken when

7  suitably private facilities are available for lease.

8      AB-32—working in tandem with California's other regulatory statutes—

9  essentially makes it all but impossible for the Attorney General to avoid this last

10  resort. After the passage of AB-103 and SB-29, cities, counties, and other localities

11  in California were largely forbidden from housing federal alien detainees within their

12  jurisdictions.

13      By prohibiting private detention, AB-32 all but requires the Attorney General

14  to either build or purchase ICE facilities or begin transferring aliens out of California.

15  In no conceivable world did Congress delegate broad authority to the Attorney

16  General to arrange for "appropriate places of detention," only to have the States

17  reduce him to choosing between only two oftentimes *inappropriate* options. And

18  while Congress recognized a variety of potentially "appropriate" arrangements for

19  housing aliens pending removal, it even explicitly disfavored one of the two options

20  left to the Attorney General after AB-32—building or purchasing new facilities.

21      In particular, it is well settled that "any state law that impedes the federal

22  government's ability to contract . . . [is] preempted." *Student Loan Servicing All. v.*

23  *District of Columbia*, 351 F. Supp. 3d 26, 62 (D.D.C. 2018), *appeal dismissed sub*

24  *nom. Student Loan Servicing All. v. Taylor*, No. 19-7001, 2019 WL 2158372

25  (D.C. Cir. May 15, 2019). In *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th

26

27  [33] The statute identifies the Commissioner of the Immigration and
28  Naturalization Services, but his functions have been transferred to the Director of
   ICE. *See* 6 U.S.C. § 557.

Cir. 1991), the Ninth Circuit held—consistent with longstanding Supreme Court precedent—that the state's attempt to regulate contractors performing services on a federal construction project was preempted. *Id.* at 438–41 (citing *Leslie Miller, Inc.*, 352 U.S. 187). While the Federal Government had concluded that the contractor in *Gartrell* had satisfied the requirements for "responsibility" dictated by the Federal Acquisition Regulations, the state imposed a parallel licensing regime that "effectively attempt[ed] to review the federal government's responsibility determination." *Id.* 439. Such second-guessing of the Federal Government's contracting choices "interfere with federal government functions and would frustrate the federal policy." *Id.* at 441.

This same analysis applies to AB-32: federal law requires the Attorney General to arrange for "appropriate" places of detention for aliens detained pending removal and authorizes him to lease private detention facilities to carry out this function. But the state statute categorically *prohibits* of the use of private detention facilities. AB-32 thus represents precisely the kind of second-guessing that is preempted under *Gartrell Construction.*

No matter how one characterizes AB-32—as a limitation on the Attorney General's congressionally delegated discretion, or as an interference with the Federal Government's ability to contract with private entities whose facilities it deems "appropriate" under the INA, or both—it clearly conflicts with federal law. AB-32 is an impermissible obstacle to federal immigration law and is therefore preempted.

## 2. AB-32 is preempted by federal criminal law.

AB-32 likewise conflicts with the Federal Government's unique interest in enforcing federal criminal law. The United States has authority to detain individuals accused of committing federal crimes. *See, e.g.*, *Greenwood v. United States*, 350 U.S. 366, 375 (1956). The United States Marshals Service—housed within the Department of Justice and supervised by the Attorney General, *see* 28 U.S.C. § 561(a)—is tasked with the responsibility to execute that federal function, *see*

18 U.S.C. § 4086 ("United States marshals shall provide for the safe-keeping of any person arrested, or held under authority of any enactment of Congress pending commitment to an institution.").

The federal statutory scheme also provides the Marshals with ample means for detaining federal criminal defendants. The Attorney General may contract with state or local jurisdictions to house federal detainees. 18 U.S.C. § 4002. Congress has also authorized the Attorney General to "make payments from funds appropriated for Federal prisoner detention for," among other things, "the housing, care, and security of persons held in custody of a United States marshal pursuant to . . . *contracts with private entities.*" *Id.* § 4013(a)(3) (emphasis added). In short, the Attorney General has express statutory authority to contract with "private entities" for the purpose of assisting the Marshals' detention operations.

Congress has confirmed elsewhere in the statutory scheme that the Attorney General's contracting discretion is, like in the immigration context, quite broad. In particular, "the activities of the Department of Justice . . . may, in the *reasonable discretion* of the Attorney General, be carried out through *any means*, including . . . through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4) (emphases added); *see also id.* § 530C(b)(7).

Reading 18 U.S.C. § 4013(a)(3) and 28 U.S.C. § 530C(a)(4) together, Congress has authorized the Attorney General to enter into contracts with private parties to provide for the detention of federal prisoners in non-federal institutions and has left these contracting decisions to his reasonable discretion. And as in the immigration context, AB-32 necessarily conflicts with these federal laws because it purports to withdraw from the Attorney General discretion delegated to him by Congress. *Crosby*, *City of Pittsburg*, *Leslie Miller*, and *Gartrell Construction* all preclude AB-32 from interfering with the Marshals' detention obligations by prohibiting the use of private detention facilities that Congress has expressly authorized.

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

The conflict between AB-32 and federal law is all the more acute when considering the Marshals' growing need for private detention, especially in the Southern District of California. Federal law authorizes the Marshals to "designate districts that need additional support from private detention entities" based on "the number of Federal detainees in the district" and "the availability of appropriate Federal, State, and local government detention facilities." 18 U.S.C. § 4013(c)(1)(A)–(B). In fact, private entities are *only* eligible to contract for the housing of persons held in custody of the Marshals if they are "located in a district that has been designated as needing additional Federal detention facilities." *Id.* § 4013(c)(2)(A).

AB-32 would, if allowed to take effect, force GEO to close the Western Region Detention Facility and the El Centro Service Processing Center, reducing the detention capacity available to the Marshals in the San Diego area by nearly two-thirds.[34] The next-closest, non-private facilities—in Santa Ana, California, roughly 90 miles from San Diego—have a combined average daily population of less than one-third the average daily population of the Western Region Detention Facility alone.[35] Congress expressly authorized the Marshals to contract for private detention in districts where other forms of detention prove inadequate. This authority is crucial in light of the Marshals' statutory obligation to remain in or near the judicial district to which they are assigned. *See, e.g.*, 28 U.S.C. §§ 561(c), (e), 566(b). And yet, AB-32 purports to nullify that authorization and override the Marshals' discretionary determination that private detention is necessary for them to fulfill their statutory obligation within the Southern District of California. AB-32 denies to federal law enforcement the very detention tools that Congress expressly provided for, and the law therefore cannot stand under bedrock preemption principles.

---

[34] DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

[35] Martin Decl. ¶ 11; DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

C.   **Alternatively, GEO Is Entitled To Continue Operating Its USMS And ICE Facilities Under AB-32's Temporary Safe-Harbor Provision.**

For the foregoing reasons, AB-32 is a direct assault on the supremacy of federal law, and GEO is entitled to a declaration that it is unconstitutional and an injunction against its enforcement *in toto*. If, however, the Court declines to grant GEO the foregoing equitable relief, it should *at a minimum* provide partial relief by declaring that AB-32's temporary safe-harbor provision protects GEO's facilities through the end of their contractual terms and enjoining Defendants from attempting to shut down GEO's facilities until the contracts terminate.

As noted earlier, Section 9505(a) of AB-32 states: "Section 9501 does not apply to . . . [a] private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract." GEO's USMS and ICE detention facilities are currently operating within this temporary safe harbor.

As recounted above, USMS signed a contract with GEO in November 2017 to operate the Western Region Detention Facility, and it exercised an option on October 1, 2019 to continue the contract. Because both the original contract and the option were "in effect before January 1, 2020," GEO's Western Region contract is therefore valid under Section 9505(a) through its full contract term ending on September 30, 2027. Likewise, USMS signed its contract with GEO to operate the El Centro Service Processing Center on December 23, 2019, and because that contract was "in effect before January 1, 2020," GEO's El Centro contract is valid under AB-32's temporary safe-harbor provision through its full contract term ending on September 25, 2028.

GEO signed new contracts with ICE on December 19, 2019, with an effective date of December 20, 2019. These contracts were therefore "in effect before January

NEWMEYER
DILLION

1, 2020" as to all five of GEO's ICE detention facilities: Adelanto, Desert View (as an annex to Adelanto), Mesa Verde, Central Valley (as an annex to Mesa Verde), and Golden State (also as an annex to Mesa Verde). Because GEO's new ICE contracts have a full contract term ending on December 19, 2034, these facilities are protected under AB-32's safe harbor through that date.

## II.   GEO Is Likely To Suffer Irreparable Harm Without A Preliminary Injunction.

GEO has shown a substantial likelihood that AB-32 violates the Federal Constitution and, in the alternative, that GEO's USMS and ICE contracts are protected by AB-32's temporary safe harbor through the end of the contract terms. It follows that the likely harm AB-32 would inflict on GEO during the pendency of litigation—forcing GEO to close its facilities—is irreparable. The Ninth Circuit has long maintained that a "constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (presuming irreparable harm from a preempted state law); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012); *Assoc. Gen. Contractors v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991). This presumption makes eminent sense because "constitutional violations cannot be adequately remedied through damages." *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011).

Even if this Court does not presume irreparable harm from AB-32's conflict with the Constitution, GEO's harm is irreparable under the standard for non-constitutional injuries. "[I]rreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Az. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (amended opinion). GEO has no adequate

1  legal remedy for one obvious reason: it may not pursue a damages suit in federal court

2  against the State of California for the immense financial harm it will suffer if AB-32

3  takes effect. *See* U.S. CONST. amend. XI; *Kentucky v. Graham*, 473 U.S. 159, 169

4  (1985).

5          The Ninth Circuit regularly holds that monetary harms that cannot be

6  compensated because of sovereign immunity are irreparable. *See, e.g.*, *California v.*

7  *U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 431 (9th Cir. 2019). Where, as

8  here, plaintiffs show that a state law violates the Supremacy Clause, any resulting

9  monetary harm is irreparable because the Eleventh Amendment "bars the [plaintiff]

10 from ever recovering damages in federal court." *Cal. Pharmacists Ass'n v.*

11 *Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) (per curiam), *vacated on other*

12 *grounds and remanded sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,

13 565 U.S. 606 (2012). Here, GEO would suffer over $4 billion in monetary harm.

14 Martin Decl. ¶¶ 53–56. Therefore, "because [GEO] . . . will be unable to recover

15 damages against the [State] even if [it is] successful on the merits of [its] case, [it]

16 will suffer irreparable harm if the requested injunction is not granted." *Id.* at 852; *see*

17 *also Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1113–14 (9th Cir.

18 2010) ("[T]o show a risk of irreparable harm, plaintiffs may show . . . that they will

19 lose considerable revenue . . . that they will be unable to recover due to the State's

20 Eleventh Amendment sovereign immunity."), *vacated on other grounds and*

21 *remanded sub nom. Douglas*, 565 U.S. 606.

22 **III.   The Public Interest And Balance Of Equities Favor An Injunction.**

23          Because GEO has shown a strong likelihood that AB-32 violates the Federal

24 Constitution, it has "also established that both the public interest and the balance of

25 the equities favor a preliminary injunction." *Az. Dream Act Coalition v. Brewer*,

26 757 F.3d 1053, 1069 (9th Cir. 2014). "[I]t is clear that it would not be equitable or in

27 the public's interest to allow the state . . . to violate the requirements of federal law,

28 especially when there are no adequate remedies available." *Valle del Sol Inc.*,

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

732 F.3d at 1029 (quoting *Arizona*, 641 F.3d at 366). "In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Arizona*, 641 F.3d at 366 (quoting *Cal. Pharmacists Ass'n*, 563 F.3d at 853); *see also California*, 921 F.3d at 893 (reaffirming the court's "previous recognition that preventing a violation of the Supremacy Clause serves the public interest"). Moreover, the State cannot claim hardship from the preliminary injunction "because it cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

## IV.  The Court Should Enter Final Judgment Awarding A Permanent Injunction.

For the foregoing reasons, GEO is entitled to a preliminary injunction against enforcement of AB-32, and because the legal questions in this case require no further factual development, permanent injunctive relief is likewise appropriate. The Ninth Circuit has held that, where a plaintiff seeking a preliminary injunction has shown a "100% probability of success on the merits" due to the legal nature of the claim, and "[n]o facts which might be adduced at a trial w[ould] change this result," courts should enter final judgment awarding a permanent injunction. *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1102 (9th Cir. 1998), *abrogated on other grounds Dream Palace v. County of Maricopa*, 384 F.3d 990, 1002 (9th Cir. 2004). That standard is met here: "the merits of the plaintiffs' challenge are certain and don't turn on disputed facts." *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017); *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).

## CONCLUSION

Plaintiff GEO respectfully requests that this Court declare AB-32 unconstitutional and grant its motion for a preliminary injunction and restrain Defendants from enforcing AB-32 against GEO. In the alternative, GEO respectfully requests a preliminary injunction restraining Defendants from attempting to close GEO's Western Region facility before October 1, 2027, GEO's El Centro facility

1 before September 26, 2028, and GEO's ICE facilities before December 20, 2034.

2 Finally, because there are no genuine disputes of material fact, Plaintiff also

3 respectfully requests that—regardless of whether this Court enters preliminary

4 injunctive relief on the basis of unconstitutionality or on the basis of AB-32's

5 temporary safe harbor—this Court convert its preliminary injunction into a

6 permanent injunction and enter final judgment.

7

8 Dated:     December 31, 2019

9

10                                              By: _/s/ Michael B. McClellan_____
                                                 Michael B. McClellan, CBN 241570
11                                               NEWMEYER & DILLION LLP
                                                 895 Dove Street, Fifth Floor
12                                               Newport Beach, CA 92660
                                                 Telephone: (949) 854-7000
13                                               Email: Michael.McClellan@ndlf.com

14                                               Charles J. Cooper,* DC Bar No. 248070
                                                 Michael W. Kirk,* DC Bar No. 424648
15                                               J. Joel Alicea,* DC Bar No. 1022784
                                                 Steven J. Lindsay,* VA Bar No. 92363
16                                               COOPER & KIRK, PLLC
                                                 1523 New Hampshire Avenue, NW
17                                               Washington, DC 20036
                                                 Telephone: (202) 220-9600
18                                               Email: ccooper@cooperkirk.com
                                                 *Appearing *Pro Hac Vice*

19                                               Michael W. Battin, CBN 183870
20                                               NAVIGATO & BATTIN, LLP
                                                 755 West A Street, Suite 150
21                                               San Diego, CA 92101
                                                 Telephone: (619) 233-5365
22                                               Email: mike@navbat.com

23                                               *Attorneys for Plaintiff The Geo Group, Inc.*

24

25

26

27

28



19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

# EXHIBIT 2

1  XAVIER BECERRA
   Attorney General of California
2  ANTHONY R. HAKL
   Supervising Deputy Attorney General
3  GABRIELLE D. BOUTIN
   Deputy Attorney General
4  State Bar No. 267308
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone:  (916) 210-6053
     Fax:  (916) 324-8835
7    E-mail:  Gabrielle.Boutin@doj.ca.gov
   *Attorneys for Governor Gavin Newsom and*
8  *Attorney General Xavier Becerra, in their*
   *official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13

14  | **THE GEO GROUP, INC.,** | Case No. 3:19-cv-2491-JLS-WVG |
    | --- | --- |

15  Plaintiff,  | **NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** |

16  **v.**

17

18  **GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; XAVIER BECERRA, in his official capacity as Attorney General of the State of California,**

    Date:        April 23, 2020
    Time:        1:30 p.m.
    Dept:        4D
    Judge:       Hon. Janis L. Sammartino
    Trial Date:  None set
    Action Filed:  1/24/2020

19

20                                    Defendants.

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

**Page**

Notice Of Motion And Motion To Dismiss ............................................................ 1

Memorandum Of Points And Authorities ............................................................. 3

Introduction ........................................................................................................... 3

Background ............................................................................................................. 3

    I.    AB 32 ......................................................................................... 3

    II.    Relevant Federal Immigration Detention Statutes ................. 6

    III.    Relevant Federal Law Related to U.S. Marshal Service Detention Facilities ............................................................... 7

    IV.    Plaintiff's Complaint ............................................................. 8

Legal Standard for Motion to Dismiss ................................................................. 8

Argument ............................................................................................................... 9

    I.    AB 32 Does Not Violate Governmental Immunity Principles ............. 9

        A.    AB 32 Does Not Directly Regulate the Federal Government ...................................................................... 10

        B.    AB 32 Does Not Discriminate Against the Federal Government ...................................................................... 12

            1.    AB 32 Does Not Treat Private Companies That Contract With the Federal Government Worse Than Private Companies That Contract With State or Local Governments ........................................ 12

            2.    AB 32's Exceptions are Not Discriminatory ................. 13

    II.    AB 32 Is Not Preempted by Federal Law ........................................... 16

            1.    Congress Did Not Clearly and Manifestly Intend to Preempt AB 32 Through Federal Immigration Law ...... 17

            2.    Congress Did Not Clearly and Manifestly Intend to Preempt AB 32 Through Federal Criminal Law ............ 22

Conclusion ............................................................................................................ 23

i

1

# TABLE OF AUTHORITIES

2

**Page**

3      CASES

4
5      *Arizona v. United States*
       567 U.S. 387 (2012) ...................................................................... 7, 19

6
7      *Ashcroft v. Iqbal*
       556 U.S. 662 (2009) ............................................................................ 8

8
9      *Boeing Co. v. Movassaghi*
       768 F.3d 832 (9th Cir. 2014) .............................................. 9, 11, 12, 13

10     *Brown v. Plata*
11     563 U.S. 493 (2011) .......................................................................... 15

12     *Chamber of Commerce of U.S. v. Whiting*
       563 U.S. 582 (2011) .......................................................................... 18

13
14     *Chinatown Neighborhood Ass'n v. Harris*
       794 F.3d 1136 (9th Cir. 2015) ........................................................... 17

15
16     *Comm. of Cent. Am. Refugees v. INS*
       795 F.2d 1434 (9th Cir. 1986) ........................................................... 20

17     *Crosby v. National Foreign Trade Council*
18     530 U.S. 363 (2000) ..................................................................... 20, 21

19     *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*
20     928 F.3d 832 (9th Cir. 2019) ........................................................ 16, 17

21     *Davis v. Michigan Dep't of Treasury*
       489 U.S. 803 (1989) ..................................................................... 14, 15
22
23     *Dawson v. Steager*
       139 S. Ct. 698 (2019) ........................................................................ 14
24
25     *Gade v. National Solid Wastes Management Ass'n*
       505 U.S. 88 (1992) ............................................................................ 16

26
27     *Gartrell Construction Inc. v. Aubry*
       940 F.2d 437 (9th Cir. 1991) ........................................................ 21, 22

28

ii

# <u>TABLE OF AUTHORITIES</u>
## (continued)

<u>Page</u>

*Goodyear Atomic Corp. v. Miller*
    486 U.S. 174 (1988) ...................................................................................... 10

*Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*
    471 U.S. 707 (1985) ...................................................................................... 17

*In re Nat'l Security Agency Telecomms. Records Litig.*
    633 F. Supp. 2d 892 (N.D. Cal. 2007) ..................................................... 9

*Johnson v. Riverside Healthcare Sys., LP*
    534 F.3d 1116 (9th Cir. 2008) ................................................................... 9

*Kansas v. Garcia*
    No. 17-834, slip op. (U.S. 2020) ................................................... 21, 23

*Knox v. Brnovich*
    907 F.3d 1167 (9th Cir. 2018) ................................................................. 17

*Lazy Y Ranch Ltd. v. Behrens*
    546 F.3d 580 (9th Cir. 2008) ..................................................................... 9

*Medtronic, Inc. v. Lohr*
    518 U.S. 470 (1996) ...................................................................... 16, 17, 18

*N. Star Int'l v. Ariz. Corp. Comm'n*
    720 F.2d 578 (9th Cir. 1983) ..................................................................... 8

*North Dakota v. United States*
    495 U.S. 423 (1990) ..........................................................................*passim*

*Public Utilities Comm'n. of Cal. v. United States*
    355 U.S. 534 (1958) ...................................................................................... 10

*Puente Arizona v. Arpaio*
    821 F.3d 1098 (9th Cir. 2016) ................................................................. 17

*Red Top Mercury Mines, Inc. v. United States*
    887 F.2d 198 (9th Cir. 1989) ................................................................... 16

*Student Loan Serving Alliance v. District of Columbia*
    351 F. Supp. 3d 26 (D.D.C. 2016) ......................................................... 22

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. California*
    921 F.3d 865 (9th Cir. 2019)............................................................9, 12, 17, 18

*United States v. City of Arcata*
    629 F.3d 986 (9th Cir. 2010).......................................................................9, 10

*United States v. City of Pittsburg, Cal.*
    661 F.2d 783 (9th Cir. 1981).............................................................................21

*United States v. Nye Cnty.*
    178 F.3d 1080 (9th Cir. 1999)...........................................................................14

*Virginia Uranium, Inc. v. Warren*
    139 S. Ct. 1894 (2019) ....................................................................................18

*Wyeth v. Levine*
    555 U.S. 555 (2009) ..................................................................................16, 17

**STATUTES**

United States Code, Title 8
    § 1103 ................................................................................................................6, 7
    § 1103(a) ................................................................................................................7
    § 1103(a)(4) ...........................................................................................................7
    § 1103(a)(6) ...........................................................................................................7
    § 1103(a)(11) ..................................................................................................18, 19
    § 1103(a)(11)(B) ....................................................................................................7
    § 1226 .....................................................................................................................6
    § 1231 ................................................................................................................6, 7
    § 1231(g)(1) ...................................................................................................*passim*
    § 1357(g)(1) .........................................................................................................19
    § 1357(g)(1) ...........................................................................................................7
    § 1357(g)(3) ...........................................................................................................7

United States Code, Title 18
    § 4013 .....................................................................................................................8
    § 4013(a), (c)(1).....................................................................................................22
    § 4013(c)(1) ......................................................................................................8, 20
    § 4013(c)(2) ...........................................................................................................8
    § 4013(c)(2)(C).................................................................................................8, 22

# TABLE OF AUTHORITIES
### (continued)

**Page**

United States Code, Title 28
   § 530C ............................................................................................................ 22

California Penal Code
   § 5003.1 ................................................................................................ 5, 13, 15
   § 5003.1(a) ......................................................................................................... 5
   § 5003.1(b) ......................................................................................................... 5
   § 5003.1(c) ....................................................................................................... 16
   § 5003.1(e) ........................................................................................... 5, 15, 16
   § 9500 ................................................................................................................. 5
   § 9500(a) .................................................................................................... 5, 14
   § 9500(b) ............................................................................................................ 6
   § 9501 ................................................................................................... 5, 10, 13
   §§ 9501-03 ....................................................................................................... 10
   § 9502 ......................................................................................................... 6, 13
   § 9502(a) ......................................................................................................... 14
   § 9502 (a)-(g) .................................................................................................... 6
   § 9502(b) ......................................................................................................... 14
   §§ 9502(c) ....................................................................................................... 13
   § 9502(d) ......................................................................................................... 14
   § 9502(e) ......................................................................................................... 14
   § 9502(f) .......................................................................................................... 14
   § 9502(g) ......................................................................................................... 14
   § 9503 ................................................................................................................. 6
   § 9505(a) ............................................................................................................ 6
   § 9505(b) ......................................................................................................... 15
   § 9505, subsec. (b) .......................................................................................... 15

**CONSTITUTIONAL PROVISIONS**

United States Constitution
   Article VI, cl. 2 ............................................................................................... 23

**COURT RULES**

Federal Rules of Civil Procedure
   Rule 12(b)(6) ............................................................................................... 1, 8

Motion to Dismiss Complaint (19-cv-2491-JLS-WVG)

1

### <u>TABLE OF AUTHORITIES</u>
**(continued)**

2

<u>Page</u>

3

OTHER AUTHORITIES

4

8 C.F.R.

5
§ 2.1 ......................................................................................................... 7
§ 287.1(g) ............................................................................................... 7
6
§ 287.5 .............................................................................................. 7, 19
§ 287.5(c)(6) .................................................................................... 7, 19
7

8
136 Cong. Rec. S17595-01, S17596, 1990 WL 168469 (Oct. 27, 1990) ............ 8, 22

9
AMERICAN CIVIL LIBERTIES UNION, BANKING ON BONDAGE: PRIVATE
10
PRISONS AND MASS INCARCERATION (2011), available at
https://www.aclu.org/banking-bondage-private-prisons-and-mass-
11
incarceration; ...................................................................................... 4

12
Assembly Bill 32 2019-2020 Reg. Sess. (Cal. 2019) ................................... 3
13
§ 1 ....................................................................................................... 5
§ 2 ................................................................................................. 5, 12
14
§ 3 ....................................................................................................... 6

15

16
https://www.cdcr.ca.gov/research/population-reports-2/ ....................... 15

17
KARA GOTSCH & VINAY BASTI, THE SENTENCING PROJECT,
CAPITALIZING ON MASS INCARCERATION: US GROWTH IN PRIVATE
18
PRISONS (2018), available at
https://www.sentencingproject.org/publications/capitalizing-on-
19
mass-incarceration-u-s-growth-in-private-prisons/ ............................... 4

20
OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF JUSTICE, REVIEW
21
OF THE FEDERAL BUREAU OF PRISONS' MONITORING OF CONTRACT
PRISONS (2016), available at
22
https://oig.justice.gov/reports/2016/e1606.pdf ...................................... 4

23

24
TARA JOY, JUSTICE POLICY INSTITUTE, THE PROBLEM WITH PRIVATE
PRISONS (2018), available at
25
http://www.justicepolicy.org/news/12006; ........................................... 4

26

27

28

vi

## TABLE OF AUTHORITIES
### (continued)

<u>Page</u>

U.S. Dep't of Justice, Office of the Attorney General,
    Memorandum for the Acting Director, Federal Bureau of
    Prisons From Jefferson B. Sessions III Re: Rescission of
    Memorandum on Use of Private Prisons (Feb. 21, 2017),
    available at https://www.justice.gov/oip/foia-
    library/attorney_general_memorandum_advising_the_federal_bure
    au_of_prisons_that_the_department_will_continue_to_use_private
    _prisons.pdf/download ..........................................................................................4

U.S. Dep't of Justice, Office of the Attorney General,
    Memorandum for the Acting Director, Federal Bureau of
    Prisons From Sally Q. Yates Re: Reducing Our Use of
    Private Prisons (Aug. 18, 2016), available at
    https://www.justice.gov/OIP/FOIA-Library/davis/download..............................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE THAT on April 23, 2020, at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Janis L. Sammartino in Courtroom 4D of the United States District Court for the Southern District of California, located at 221 West Broadway in San Diego, California, 92101, Defendants Governor Gavin Newsom and Attorney General Xavier Becerra, in their official capacities, will and hereby do move this Court to dismiss Plaintiff The Geo Group's Complaint and all claims therein, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure.

This motion to dismiss is made on the grounds that:

The complaint's first cause of action fails to state a claim upon which relief can be granted because California's AB 32 does not violate the Federal Constitution's Supremacy Clause under principles of preemption.

The complaint's second cause of action fails to state a claim upon which relief can be granted because California's AB 32 does not violate the Federal Constitution's Supremacy Clause under principles of intergovernmental immunity.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, Defendants' Request for Judicial Notice in Support of Opposition to Motion for Preliminary Injunction, the papers and pleadings on file, and upon such matters that may be submitted at the hearing.

1

1  Dated:  March 5, 2020                    Respectfully Submitted,

2                                           XAVIER BECERRA
                                            Attorney General of California
3                                           ANTHONY R. HAKL
                                            Supervising Deputy Attorney General
4                                           JOHN W. KILLEEN
                                            Deputy Attorney General
5

6

7                                           /s/ Gabrielle D. Boutin
8                                           GABRIELLE D. BOUTIN
                                            Deputy Attorney General
9                                           Attorneys for Governor Gavin
                                            Newsom and Attorney General Xavier
10                                          Becerra, in their official capacities

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The California Legislature determined in 2019, based on ample evidence, that private prisons and detention facilities pose an unacceptable danger to detainees in California.  Pursuant to its sovereign police powers to protect the safety and well-being of all Californians, the Legislature therefore enacted Assembly Bill 32 (AB 32) to generally prohibit private persons and entities from operating detention facilities in the state.  Plaintiff The Geo Group filed this lawsuit, alleging that AB 32 violates the Federal Constitution's Supremacy Clause under principles of intergovernmental immunity and preemption.

Even accepting as true the factual allegations of the complaint, Plaintiff cannot state a claim upon which relief can be granted.  The doctrine of intergovernmental immunity does not apply because AB 32 is a law of neutral applicability that neither directly regulates the federal government nor discriminates against it.  Plaintiff's preemption allegations are equally unavailing.  AB 32 does not regulate in a field that is exclusively the province of the federal government, and it does not conflict with any federal law.  For these reasons, the Court should dismiss Plaintiff's Complaint without leave to amend.

### BACKGROUND

### I.   AB 32

AB 32 arose from the California Legislature's concerns about serious, documented harms to the safety and welfare of those detained in private detention facilities.  *See* Defs.' Req. for Judicial Notice in Support of Opp'n to Mot. for Prelim. Inj. (RJN)[1] Ex. 1 at 4-5; RJN Ex. 2 at 2; RJN Ex. 3 at 1-2; RJN Ex. 4 at 1-9; RJN Ex. 5 at 6-8; RJN No. 6 at 4-5; *see also* Assem. Bill 32, 2019-2020 Reg. Sess. (Cal. 2019) (AB 32).  The Legislature was not alone in these concerns, relying on a

---

[1] Concurrently, Defendants are filing a request for judicial notice in support of their opposition to the United States' motion for preliminary injunction. Defendants rely on the same request for judicial notice here.

1   number of reports and studies including a report by the U.S. Department of Justice

2   Office of the Inspector General finding that federal private prisons are unsafe, lack

3   transparency and accountability, create unfair and exploitive conditions for

4   detainees, and prioritize profits over inmate rehabilitation and wellbeing. *See, e.g.*,

5   RJN Ex. 1 at 4; RJN Ex. 4 at 7-8. [2]  In addition, the Legislature was aware that as

6   recently as 2016, the U.S. Department of Justice (DOJ) announced a plan to end its

7   use of private prisons, citing safety and security in the facilities as major reasons.[3]

8   That decision was later reversed after a change in federal administration, although

9   that change of course came with no explanation regarding the previously asserted

10  safety and security concerns.[4]

11       When first introduced in the Legislature in 2018, AB 32 applied only to the

12  California Department of Corrections and Rehabilitation (CDCR), prohibiting

13  CDCR from contracting with any private, for-profit prison facility to house state

14  prisoners.  RJN Ex. 1 at 1-4.  As it evolved, the bill was amended to more broadly

15
16       [2] *See also* OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF JUSTICE, REVIEW OF THE FEDERAL BUREAU OF PRISONS' MONITORING OF CONTRACT PRISONS (2016), available at https://oig.justice.gov/reports/2016/e1606.pdf, at 14
17  ("Contract Prisons Had More Frequent Incidents per Capita of Contraband Finds, Assaults, Uses of Force, Lockdowns, Guilty Findings on Inmate Discipline Charges, and Selected Categories of Grievances"); TARA JOY, JUSTICE POLICY
18  INSTITUTE, THE PROBLEM WITH PRIVATE PRISONS (2018), available at http://www.justicepolicy.org/news/12006; AMERICAN CIVIL LIBERTIES UNION,
19  BANKING ON BONDAGE: PRIVATE PRISONS AND MASS INCARCERATION (2011), available at https://www.aclu.org/banking-bondage-private-prisons-and-mass-
20  incarceration; KARA GOTSCH & VINAY BASTI, THE SENTENCING PROJECT, CAPITALIZING ON MASS INCARCERATION: US GROWTH IN PRIVATE PRISONS (2018),
21  available at https://www.sentencingproject.org/publications/capitalizing-on-mass-incarceration-u-s-growth-in-private-prisons/.
22
23       [3] U.S. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, MEMORANDUM FOR THE ACTING DIRECTOR, FEDERAL BUREAU OF PRISONS FROM SALLY Q. YATES
24  RE: REDUCING OUR USE OF PRIVATE PRISONS (Aug. 18, 2016), available at https://www.justice.gov/OIP/FOIA-Library/davis/download.
25
26       [4] U.S. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, MEMORANDUM FOR THE ACTING DIRECTOR, FEDERAL BUREAU OF PRISONS FROM JEFFERSON B.
27  SESSIONS III RE: RESCISSION OF MEMORANDUM ON USE OF PRIVATE PRISONS (Feb. 21, 2017), available at https://www.justice.gov/oip/foia-
28  library/attorney_general_memorandum_advising_the_federal_bureau_of_prisons_that_the_department_will_continue_to_use_private_prisons.pdf/download.

4

1  prohibit anyone from operating a private detention facility in California.  RJN Ex. 4

2  at 1, 4.  As enacted in 2019, AB 32 encompasses any detention facility operated by

3  a private, nongovernmental, for-profit entity, and operating pursuant to a contract or

4  agreement with any local, state, or federal governmental entity.  *See* AB 32, §§ 1, 2.

5  Among others, these facilities include prisons and immigration detention facilities.

6  *See* RJN Ex. 6 at 4-5; Cal. Pen Code § 9500.

7      AB 32 consists of three sections.  Section 1 regulates the California

8  Department of Corrections and Rehabilitation.  AB 32 § 1.  Specifically, as of

9  January 1, 2020, Penal Code section 5003.1 prohibits the department from entering

10  or renewing any "contract with a private, for-profit prison facility located in or

11  outside of the state to provide housing for state prison inmates."  Cal. Penal Code §

12  5003.1 (a), (b).  Subdivision (e) of section 5003.1 provides that the department

13  may, however, "renew or extend a contract with a private, for-profit prison facility

14  to provide housing for state prison inmates in order to comply with the

15  requirements of any court-ordered population cap."[5]

16      Section 2 of AB 32 consists of a handful of statutes that regulate anyone

17  seeking to operate a private detention facility in California.  AB 32 § 2.  Most

18  notably, California Penal Code section 9501 states, "Except as otherwise provided

19  in this title, a person shall not operate a private detention facility within the state."

20  A "detention facility" is defined as "any facility in which persons are incarcerated

21  or otherwise involuntarily confined for purposes of execution of a punitive sentence

22  imposed by a court or detention pending a trial, hearing, or other judicial or

23  administrative proceeding."  Cal. Penal Code § 9500(a).  A "private detention

24  facility" is defined as "a detention facility that is operated by a private,

25

26      [5] Although it is not directly relevant to the pending motions, subdivision (e) of section 5003.1 further provides that "[a]fter January 1, 2028, a state prison
27  inmate or other person under the jurisdiction of the department shall not be incarcerated in a private, for-profit prison facility."

28

1    nongovernmental, for-profit entity, and operating pursuant to a contract or

2    agreement with a governmental entity."  Cal. Penal Code § 9500(b).

3        Section 9502 sets forth certain exceptions to the prohibition of private

4    detention facilities, identifying seven types of facilities to which AB 32 does not

5    apply.  Cal. Penal Code § 9502.  These include, for example, certain facilities

6    providing primarily medical, educational, and juvenile care services.  *Id.* § 9502

7    (a)-(g).

8        Finally, AB 32 does not apply to any privately owned property that is leased

9    and operated by CDCR or a county sheriff or other law enforcement agency.  Cal.

10   Penal Code § 9503.  Nor does it apply to persons operating detention facilities

11   pursuant to contracts entered prior to January 1, 2020, not including "any

12   extensions made to or authorized by that contract."  *Id.* § 9505(a).

13       Section 3 of AB 32 provides that the act's provisions are severable and that if

14   any provision of the act is held invalid, that shall not invalidate any other provision

15   that can still be given effect.  AB 32, § 3.

16   **II.    RELEVANT FEDERAL IMMIGRATION DETENTION STATUTES**

17       The Immigration and Nationality Act (INA) in Title 8 of the United States

18   Code is the primary law governing immigration and related matters.  Aside from its

19   general delegation of authority to detain immigrants (*see* 8 U.S.C. §§ 1226, 1231),

20   the INA contains few provisions related to the actual operation of immigration

21   detention facilities, i.e., *how* immigrants are housed.  These include sections 1231

22   and 1103 of Title 8.

23       Section 1231 governs when the federal government may construct and operate

24   new detention facilities, providing "[w]hen United States Government facilities are

25   unavailable or facilities adapted or suitably located for detention are unavailable for

26   rental, the Attorney General may expend … amounts necessary to acquire land and

27   to acquire, build, remodel, repair, and operate facilities … necessary for detention."

28   8 U.S.C. § 1231(g)(1).

Section 1103 authorizes the federal government "to enter into a cooperative agreement with any State" for construction related to housing immigration detainees in state facilities.  *Id.* § 1103(a)(11)(B).

Neither section 1231, 1103, nor any other provision in the INA contemplates immigration detention facilities operated by private companies.

The INA does include provisions governing who may perform immigration-related duties.  Generally, the INA authorizes the Secretary of the Department of Homeland Security (DHS) to delegate Title 8 powers to any employee of DHS or other federal agency with the consent of the agency head.  8 U.S.C. § 1103(a)(4), (6); 8 C.F.R. § 2.1.  It does not authorize the Secretary to delegate Title 8 duties to private citizens.  *See* 8 U.S.C. § 1103(a).  In addition, the regulations promulgated under the INA specifically designate particular federal employees to perform specified immigration functions, including detention.  8 C.F.R. § 287.5; *id.* § 287.5(c)(6).  Those employees must complete specialized training.  8 C.F.R. § 287.5; *see also* 8 C.F.R. § 287.1(g) (defining mandatory training).  The only exception to these requirements is the delegation of certain immigration-enforcement duties to state officials pursuant to an agreement, and even then only "to the extent consistent with State and local law," and under the U.S. Attorney General's "direction and supervision."  8 U.S.C. § 1357(g)(1), (3); *see also Arizona v. United States*, 567 U.S. 387, 408-09 (2012) ("Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer").  There is no similar exception permitting private persons to act as immigration officials.

## III.   RELEVANT FEDERAL LAW RELATED TO U.S. MARSHAL SERVICE DETENTION FACILITIES

Federal laws relating to the detention of federal prisoners are primarily set forth in Title 18 of the United States Code.

Title 18 authorizes the U.S. Marshal Service (USMS) to contract with private detention facility operators only by "designat[ing] districts that need additional support from private detention entities…." 18 U.S.C. § 4013(c)(1).  Congress has enumerated several express restrictions on these contractors. *Id.* § 4013(c)(2). Among other things, the contractors must "comply with all applicable State and local laws and regulations." *Id.* § 4013(c)(2)(C).  As explained by the author of the relevant bill amending section 4013, that provision "permit[s] the Marshals Service to enter into contracts only with private jails that meet strict standards designed to protect public safety." 136 Cong. Rec. S17595-01, S17596, 1990 WL 168469 (Oct. 27, 1990) (statement of Sen. Kohl).

## IV.  PLAINTIFF'S COMPLAINT

Plaintiff filed its complaint on December 30, 2019.  *See* ECF No. 1. According to its complaint, Plaintiff currently contracts with the federal government as a private operator of detention facilities which house immigration detainees and USMS prisoners within California. *See* Compl., at 12-14 (USMS), 19-22 (Immigration and Customs Enforcement Agency (ICE)).  Plaintiff alleges that by prohibiting private companies from operating detention facilities on behalf of any governmental entity, AB 32 violates the intergovernmental immunity aspect of the Supremacy Clause. *See* Compl., at 25-26.  Plaintiff also alleges that AB 32 is preempted by federal law. *See* Compl., at 26-28.

## LEGAL STANDARD FOR MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). To survive a motion to dismiss, a complaint must contain sufficient facts to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."

8

1   *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008)

2   (internal quotation omitted).  The court accepts as true all material allegations in the

3   complaint and construes them in the light most favorable to the plaintiff.  *Lazy Y*

4   *Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

5                                              **ARGUMENT**

6   **I.    AB 32 DOES NOT VIOLATE GOVERNMENTAL IMMUNITY PRINCIPLES**

7            Under the Supremacy Clause, a state may not "regulate[] the United States

8   directly or discriminate[] against the Federal Government or those with whom it

9   deals."  *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality

10  opinion).  While the Supreme Court, at one time, invalidated a state regulation that

11  made "it more costly for the Government to do its business," the Court has since

12  recognized that this "view has been thoroughly repudiated."  *Id.* at 434.  Instead, the

13  Court's "modern-day treatment of the intergovernmental immunity doctrine has

14  been marked by restraint[.]"  *In re Nat'l Security Agency Telecomms. Records*

15  *Litig.*, 633 F. Supp. 2d 892, 903 (N.D. Cal. 2007).  The Court has taken "a

16  functional approach to claims of intergovernmental immunity, accommodating of

17  the full range of each sovereign's legislative authority and respectful of the primary

18  role of Congress in resolving conflicts between the National and State

19  Governments."  *North Dakota*, 495 U.S. at 435.  For this reason, the notable

20  majority of modern cases have involved claims alleging impermissible targeting of

21  and discrimination against the federal government.  *See, e.g.*, *United States v.*

22  *California*, 921 F.3d 865, 882-85 (9th Cir. 2019) (*petition for cert. filed*) (state law

23  alleged to impose more burdensome inspection requirements on facilities housing

24  immigration detainees than facilities housing state prisoners); *Boeing Co. v.*

25  *Movassaghi*, 768 F.3d 832, 839-43 (9th Cir. 2014) (state law imposing stricter

26  cleanup standards on a single federal facility than on similar state facilities); *United*

27  *States v. City of Arcata*, 629 F.3d 986, 991-92 (9th Cir. 2010) (local ordinance

28  restricting speech of federal employees, and no one else).  In any event, as

                                                      9

1   explained below, AB 32 neither directly regulates nor discriminates against the

2   federal government.

3      **A.   AB 32 Does Not Directly Regulate the Federal Government**

4      AB 32 does not directly regulate the federal government.  It is a law of neutral

5   application that applies to private actors.  In the interest of protecting the health and

6   safety of the public, AB 32 regulates any "person" within the State of California by

7   forbidding them from operating private detention facilities.  *See* Cal. Penal Code §

8   9501 ("[a] *person* shall not operate a private detention facility within the state"

9   (emphasis added)).  This does not amount to a direct regulation of the federal

10   government.  Rather, it is a regulation of private persons in California, such as its

11   citizens and residents, and those persons doing business here.

12      While AB 32 may tangentially affect the federal government—to the extent

13   the federal government might want to arrange for the private operation of certain

14   detention facilities—such an incidental impact is not a *direct* regulation of the

15   federal government.  Under AB 32, the federal government here retains the ability itself

16   to operate any detention facility in California.  *Cf. United States v. Arcata*, 629 F.3d

17   986 (9th Cir. 2010) (ordinance targeting military recruiters).  And AB 32 allows

18   federal officers to operate such detention facilities as they see fit, in accordance

19   with applicable federal laws, whether on federal land or private land.[6]  *See* Cal.

20   Penal Code §§ 9501-03.

21      The doctrine of intergovernmental immunity does not insulate the federal

22   government or those it seeks to do business with from any impact whatsoever from

23   a state regulation of neutral applicability.  *See North Dakota*, 495 U.S. at 435

24   (plurality) ("Whatever burdens are imposed on the Federal Government by a neutral

---

25   [6] Though Plaintiff emphasizes a line of cases involving the direct regulation
26   of federal property, *see* Pl. Br. at 22 (citing e.g. *Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988), *Public Utilities Comm'n. of Cal. v. United States*, 355 U.S.
27   534 (1958)), this line of cases is of limited applicability here because nearly all of
    the detention facilities operated by Plaintiff are privately or locally owned.  *See*
28   Decl. of Amber Martin, ECF No. 15-3, ¶¶ 5, 13, 16, 22, 27, 33, 38.

1   state law regulating its suppliers are but the normal incidents of the organization

2   within the same territory of two governments."); *id.* at 434 (rejecting view that any

3   regulation that made "it more costly for the Government to do its business" was

4   unconstitutional).  AB 32 does not directly regulate the federal government.

5       *Boeing* illustrates how AB 32 is not a direct regulation of the federal

6   government.  *See Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014).  Shortly

7   after World War II, the federal government began nuclear testing at Santa Susana

8   Field Laboratory in Southern California, causing radioactive contamination.  *Id.* at

9   834-35.  In 2007, the State of California enacted SB 990, which required the

10  "responsible party" to perform environmental cleanup at Santa Susana according to

11  more stringent standards than those generally applicable within the state.[7]  *Id.* at

12  837.  The Ninth Circuit held that the federal government (specifically, the U.S.

13  Department of Energy), was the "responsible party" under SB 990, not contractor

14  Boeing.  *Id.* at 839.  In other words, the law required the *Department of Energy* to

15  clean up the site under stricter standards.  Because SB 990 specifically obligated the

16  federal government to act, the law impermissibly directly regulated the federal

17  government.  *See id.*  Those obligations existed regardless of whether the federal

18  government chose to outsource the work to a contractor and regardless of any

19  contract terms that were inconsistent with the cleanup standards of SB 990.

20      Therefore, in *Boeing*, there was no question that the relevant state law directly

21  regulated the federal government.  In contrast here, AB 32 does not directly

22  regulate or obligate the United States in any way because it does not forbid it from

23  operating detention facilities in the state.

24

25

26  _____

[7] The Ninth Circuit recognized that rather than setting a neutral rule applicable throughout the State, the law mandated "more stringent cleanup procedures, not generally applicable within the state, to a particular site [Santa Susana]," and only to that site.  *Id.* at 836.  This illustrates how the issue of "discrimination" often features prominently in any governmental immunity analysis, even in the context of a "direct regulation" claim.  *See also id.* at 839.

27

28

11

1    Finally, to the extent Plaintiff suggests that AB 32 is a direct regulation of the

2    federal government because of the number of private facilities that would allegedly

3    be forced close that argument must be rejected.  *See* Pl. Mem. in Support of Mot.

4    for Prelim. Inj. [ECF No. 15] (Pl. MPI Br.) at 25.  Again, under *North Dakota*, a

5    burden on the federal government that arises from a state law of neutral application

6    does not violate intergovernmental immunity.  *North Dakota*, 495 U.S. at 435.

7    Rather, the issue of an alleged burden is properly analyzed within the framework of

8    conflict or obstacle preemption.  Defendants therefore address that issue below.

9    *See* Argument section II, *infra*.

10       **B.    AB 32 Does Not Discriminate Against the Federal Government**

11          **1.    AB 32 Does Not Treat Private Companies That Contract
                With the Federal Government Worse Than Private
12              Companies That Contract With State or Local Governments**

13    AB 32 also does not discriminate against the "Federal Government or those

14    with whom it deals."  *North Dakota*, 495 U.S. at 437 (plurality).

15       "[A] state does not discriminate against the Federal Government and those

16    with whom it deals unless it treats someone else better than it treats them."

17    *California*, 921 F.3d at 881 (internal citation omitted).  The Supreme Court "has

18    required that the regulation be one that is imposed on some basis unrelated to the

19    object's status as a Government contractor or supplier, that is, that it be imposed

20    equally on other similarly situated constituents of the State."  *North Dakota*, 495

21    U.S. at 438; *see Boeing*, 768 F.3d at 843; *California*, 921 F.3d at 882.

22       For example, in *Boeing*, the court determined that SB 990 discriminated

23    against the United States and its contractor because it "applie[d] more stringent

24    cleanup standards [to the Santa Susana site] than generally applicable state

25    environmental laws."  *Boeing*, 768 F.3d at 843.  And in *California*, the court

26    recognized that a state law might be discriminatory if it applied more stringent

27    inspection requirements to facilities housing immigration detainees than to similar

28    facilities housing state criminal detainees.  *California*, 921 F.3d at 882.

12

1  AB 32 does not treat private companies that contract with the federal

2  government worse than private companies that contract with state or local

3  governments.  AB 32 prohibits *anyone* from operating a private detention facility in

4  California.  Cal. Penal Code § 9501.  This even-handed prohibition is not

5  discriminatory against either federal contractors or the federal government itself.  In

6  fact, AB 32 imposes direct restrictions on CDCR that it does not impose on the

7  federal or local governments.  Cal. Pen. Code § 5003.1.

8  Nor does AB 32 single out federal contractors based solely on their "status as

9  a Government contractor or supplier."  *North Dakota*, 495 U.S. at 438.  Unlike in

10  *Boeing*, where the State targeted the Department of Energy with uniquely

11  burdensome regulation (thereby uniquely impacting Boeing as DOE's contractor

12  for the cleanup), *see Boeing*, 768 F.3d at 837, AB 32 does not impose more

13  stringent requirements on federal contractors than are imposed on similarly situated

14  state contractors.  AB 32 prohibits anyone from operating a private detention center

15  for any governmental entity.  Such private prison contractors are being regulated

16  because of their status as operators of private prisons in general, not because of

17  their status as private prison operators for the federal government in particular.

### 2.   AB 32's Exceptions are Not Discriminatory

19  Plaintiff contends that AB 32's statutory exceptions render it discriminatory.

20  *See* Compl. at 26.  This is incorrect.

21  Several of AB 32's exceptions, on their face, are equally available to federal,

22  state, *and* local government contractors.  *See* Cal. Penal Code §§ 9502(c)

23  ("educational, vocational, medical, or other ancillary services" to federal, state, or

24  local inmates), 9503 (privately owned or leased facilities operated by a government

25  agency), 9505(a) (existing contracts).

26  Plaintiff takes issue with certain exceptions in California Penal Code section

27  9502 to AB 32's general prohibition of private detention facilities, arguing that

28  these exceptions describe only state detention activities.  Compl., ¶ 121.  Even

13

1  assuming that is true, however, such a situation does not amount to discrimination

2  resulting from AB 32.  It simply reflects the reality that "there are no federal

3  contractors analogous to the state contractors who benefit from" these exceptions.

4  *United States v. Nye Cnty.*, 178 F.3d 1080, 1088 (9th Cir. 1999) (tax exemption for

5  state universities held not discriminatory where no federally-run universities existed

6  in the state).  In other words, the state and federal governments themselves are *not*

7  "similarly situated" to the extent the State of California happens to provide

8  additional services that do not implicate the same health and safety concerns

9  addressed in AB 32.  *Dawson v. Steager*, 139 S. Ct. 698, 705 (2019).

10       AB 32 regulates private "detention facilit[ies]" "in which persons are

11  incarcerated or otherwise involuntarily confined for purposes of execution of a

12  punitive sentence imposed by a court or detention pending a trial, hearing, or other

13  judicial or administrative proceeding."  Cal. Penal Code § 9500(a).  Private prisons

14  and immigration detention facilities, "in which persons are incarcerated or

15  otherwise involuntarily confined" for criminal or administrative proceedings, are

16  quite different than the facilities covered by the exceptions about which Plaintiff

17  complains:  private children's schools (Cal. Penal Code § 9502(e)), other non-

18  punitive environments for children (Cal. Penal Code § 9502(a)), grocery stores

19  (Cal. Penal Code § 9502(g)), nursing homes (Cal. Penal Code § 9502(d)), places for

20  the mentally ill (Cal. Penal Code § 9502(b)), and medical quarantine facilities (Cal.

21  Penal Code § 9502(f)).  Any disparate treatment between contractors operating

22  these facilities and private prison and detention center operators is justified by the

23  significant differences between the types of private contractors and facilities.  *See*

24  *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 815-16 (1989) (describing how

25  disparate treatment between "those who deal with one sovereign" and "those who

26  deal with the other" may be justified if there are "significant differences between

27  the two classes") (alterations and internal quotation marks omitted).  AB 32 permits

28

1   private contractors to provide services to federal, state, or local governments on

2   equal terms.

3        Finally, Plaintiff suggests that the exception in California Penal Code section

4   9505, subsection (b) (and reflected in section 5003.1), makes AB 32 discriminatory.

5   Compl., ¶ 122.  This subsection permits the State of California to "renew[]" a

6   contract with a private detention facility "pursuant to subdivision (e) of Section

7   5003.1," which in turn provides that CDCR "may renew or extend a contract with a

8   private, for-profit prison facility to provide housing for state prison inmates in order

9   to comply with the requirements of any court-ordered population cap," Cal. Penal

10  Code § 5003.1(e).

11       Subsection (b) does not create an exception generally related to overcrowding

12  in California's prisons; it accommodates compliance with a particular court order

13  currently in place.  A federal three-judge court has been supervising California's

14  prison system for years.  *See generally Brown v. Plata*, 563 U.S. 493 (2011).  One

15  remedy ordered by the three-judge court was a population cap of 137.5% of design

16  capacity.  *Id.* at 539.  Complying with the court order is an ongoing obligation of

17  California's Department of Corrections and Rehabilitation.[8]

18       Neither the federal government nor local governments are subject to similar

19  litigation.  Accordingly, the federal court's overcrowding order is a constraint that

20  makes California differently situated to the federal government or local

21  governments.  *See Davis*, (*supra.*) 489 U.S. at 815-16.  Rather than being

22  discriminatory, this provision simply recognizes the reality that AB 32 must yield

23  to the orders of a federal court that is actively overseeing the population size of

24  California's prisons.

25       Moreover, this exception's scope is limited.  First, the exception applies only

26  to contract "renew[als]," and is therefore limited in time.  Cal. Penal Code

27  § 9505(b).  Second, the exception is available only to the extent necessary to meet

28  ───────────────
     [8] *See generally* https://www.cdcr.ca.gov/research/population-reports-2/.

15

1   the court-ordered population cap, *id.* § 5003.1(e), and even then only until January

2   1, 2028, *id.* § 5003.1(c).  California is making all efforts to comply with the

3   population order, and it must be presumed that California will continue to do so in

4   good faith.  *See Red Top Mercury Mines, Inc. v. United States*, 887 F.2d 198, 202-

5   03 (9th Cir. 1989) ("There is a presumption of regularity in the performance of their

6   duties by government officials").  The provision in AB 32 is a temporary bridge

7   that enables California to comply with an existing federal court order while it

8   transitions its inmate population away from private operators, not a permanent,

9   discriminatory loophole for California.

10      For all of these reasons, AB 32 does not violate intergovernmental immunity.

11   **II.   AB 32 IS NOT PREEMPTED BY FEDERAL LAW**

12      "Federal preemption occurs when: (1) Congress enacts a statute that explicitly

13   pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal

14   law occupies a legislative field to such an extent that it is reasonable to conclude

15   that Congress left no room for state regulation in that field."  *CTIA - The Wireless*

16   *Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 849 (9th Cir. 2019).  The second

17   category is often referred to as conflict (or obstacle) preemption.  Plaintiff alleges

18   this form of preemption.  *See* Compl. at 26-28.

19      Any preemption inquiry is "guided by two cornerstones."  *Wyeth v. Levine*,

20   555 U.S. 555, 565 (2009).  "First, the purpose of Congress is the ultimate

21   touchstone in every pre-emption case."  *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518

22   U.S. 470, 485 (1996).  "Congress' intent, of course, primarily is discerned from the

23   language of the pre-emption statute and the 'statutory framework' surrounding it."

24   *Medtronic*, 518 U.S. at 486 (quoting *Gade v. National Solid Wastes Management*

25   *Ass'n*, 505 U.S. 88, 111, 112 (1992) (Kennedy, J., concurring in part and

26   concurring in judgment)).

27      Second, there is an assumption that the historic police powers of the state have

28   not been superseded unless that was the "clear and manifest purpose of Congress."

16

1  *Wyeth*, 555 U.S. at 565; *see also Knox v. Brnovich*, 907 F.3d 1167, 1173-74 (9th

2  Cir. 2018).  Thus, "[s]ilence, without more, does not preempt."  *Chinatown*

3  *Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1143 (9th Cir. 2015).

4      California possesses the historic police power "to ensure the health and

5  welfare of inmates and detainees in facilities within its borders."  *See California*,

6  921 F.3d at 885-86; *Medtronic*, 518 U.S. at 475 ("States traditionally have had

7  great latitude under their police powers to legislate as to the protection of the lives,

8  limbs, health, comfort, and quiet of all persons" (internal quotation marks

9  omitted)); *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719

10 (1985) ("[T]he regulation of health and safety matters is primarily, and historically,

11 a matter of local concern"); *see also Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104

12 (9th Cir. 2016) ("[W]hile the identity theft laws certainly have effects in the area of

13 immigration, the text of the laws regulate for the health and safety of the people of

14 Arizona").

15      Through AB 32, the California Legislature exercised its historic police power

16 to protect the health and safety of detainees within the state.  Based on the evidence

17 before it, the Legislature determined that privately-operated detention facilities pose

18 an unacceptable danger to the detainees, and the Legislature therefore barred

19 anyone from operating such facilities.  Thus, Plaintiff would have to show that it

20 was Congress's "clear and manifest purpose" to preempt AB 32.  As explained

21 below, because Plaintiff cannot show this, conflict preemption does not apply to

22 AB 32.

### 1.  Congress Did Not Clearly and Manifestly Intend to Preempt AB 32 Through Federal Immigration Law

25      "Conflict preemption arises either when compliance with both federal and

26 state regulations is a physical impossibility . . . or when state law stands as an

27 obstacle to the accomplishment and execution of the full purposes and objectives of

28 Congress."  *CTIA*, 928 F.3d at 849 (internal quotation omitted); *see also California*,

17

1   921 F.3d at 879 ("To determine whether obstacle preemption exists, the Supreme

2   Court has instructed that we employ our judgment, to be informed by examining the

3   federal statute as a whole and identifying its purpose and intended effects" (internal

4   quotation omitted)).

5        The conflict preemption analysis "does not justify a freewheeling judicial

6   inquiry into whether a state statute is in tension with federal objectives; such an

7   endeavor would undercut the principle that it is Congress rather than the courts that

8   preempts state law." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607

9   (2011) (plurality opinion) (internal quotation omitted); *accord United States v. Cal.*,

10  921 F.3d at 879. "[E]vidence of pre-emptive purpose, whether express or implied,

11  must therefore be sought in the text and structure of the statute at issue." *Virginia*

12  *Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019).

13       Federal immigration law does not conflict preempt AB 32, because there is no

14  "clear and manifest" intent to do so.  First, it is possible to comply with both federal

15  immigration law and AB 32; federal immigration law does not compel private

16  companies to operate immigration detention facilities.

17       Second, AB 32 poses no obstacle to federal immigration law because

18  Congress did not clearly and manifestly intend for immigration detention facilities

19  to be operated by private companies.

20       Plaintiff alleges that 8 U.S.C. section 1231(g)(1) purportedly conflict preempts

21  AB 32.  Compl. at 27.  That statute and the "statutory framework surrounding it,"

22  *Medtronic*, 518 U.S. at 486, evince no clear and manifest Congressional intent for

23  the federal government to utilize private immigration detention facilities.  Rather,

24  section 1231(g)(1), together with 8 U.S.C. section 1103(a)(11), sets forth a different

25  scheme to address the limited capacity of existing immigration detention centers.

26  The federal government must use available existing facilities,

27

28

8 U.S.C. § 1231(g)(1), rent out and operate other facilities,[9] *id.*, construct new facilities, *id.*, or enter into an agreement with *states* to operate facilities, *id.* § 1103(a)(11).  Congress therefore contemplated that only the federal government and *states* would operate these facilities.[10]  Plaintiff has not pointed to any other statutes or promulgated regulations that diverge from or supplement these instructions.  Thus, in section 1231(g)(1), Congress has expressed not only a general intent for the federal government to house immigration detainees, but a specific intent on how federal agencies should do so.  AB 32 poses no obstacle to that specific intent, which is the dispositive issue for purposes of conflict preemption.

The legal limitations on who may act as an immigration detention officer confirm the lack of clear and manifest Congressional intent to utilize private immigration detention facilities.  The functions of immigration detention officers may be performed only by federal and state employees who have received specialized training and are under the direction and supervision of the U.S. Attorney General.  8 C.F.R. § 287.5; 8 C.F.R. § 287.5(c)(6); *see also Arizona v. United States*, 567 U.S. 387, 408-09 (2012).  Even then, state officers may act as immigration detention officers only pursuant to a written agreement and "to the extent consistent with State and local law."  8 U.S.C. § 1357(g)(1).  There is no similar exception permitting private persons to act as immigration detention officials.

---

[9] Section 1231(g)'s provisions requiring the federal government to "rent[]" or "lease" a facility rather than construct one does not authorize the government to contract for a privately-operated detention facility.  Rather, section 1231(g) is concerned with inadequate bed space, and the references to "rent[]" and "lease" refer to the federal government leasing a facility *from* another entity and the federal government operating that facility itself.

[10] Congress's provision for the *states* to operate some immigration detention facilities (and omission of operational details) actually suggests that Congress expected state health and safety regulations to apply to those facilities.  This further undercuts the argument that a state's health and safety regulation of detention facilities clearly and manifestly *conflicts* with Congressional intent here.

19

1    In support of its pending motion for preliminary injunction, Plaintiff has cited

2   a number of cases in an attempt to demonstrate Congressional intent for federal

3   agencies to utilize private immigration detention facilities. *See* Pl. MPI Br. at 31-

4   33. None of these cases support Plaintiff's preemption arguments.

5    In particular, *Committee of Central American Refugees* did not involve any

6   claim or analysis of preemption. *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d

7   1434, 1435 (9th Cir. 1986). In that case, immigration detainees alleged that their

8   transfer from one detention facility to another violated due process. *Id.* The Ninth

9   Circuit merely ruled that the detainees had failed to show that their transfer violated

10  due process. *Id.* at 1440-41.

11   Plaintiff also cites *Crosby v. National Foreign Trade Council*, 530 U.S. 363,

12  368-70 (2000). *See* Pl. MPI Br. at 31. There, Congress had enacted detailed

13  provisions giving the President authority to impose and remove economic sanctions

14  against Burma.[11] The Court found that the federal law conflict preempted

15  a separate trade ban related to Burma imposed by Massachusetts, reasoning that

16  Congress had clearly intended for the President to have exclusive authority to

17  impose a "calibrated" scheme of economic pressure on Burma. *Crosby*, 530 U.S. at

18  376-78. Here, in contrast to the situation in *Crosby*, section 1231 provides

19  instructions on how the U.S. Attorney General is to "arrange" for immigration

20  detention facilities. 8 U.S.C § 1231(g)(1). Those instructions simply do not

21  contemplate immigration detention facilities operated by private companies. And

22  nothing about those instructions reveal a clear and manifest Congressional intent for

23  those immigration detention facilities to be exempt from state or local regulatory

24  constraints. *Compare* 8 U.S.C § 1231(g)(1) (listing options for detention facilities

25  that do not include privately-operated facilities) *with* 18 U.S.C. § 4013(c)(1)

26  (expressly allowing certain USMS detention facilities to be operated by private

27

28   [11] This brief uses the name Burma rather than Myanmar, because that is the
name used by the Supreme Court in its opinion. *See Crosby*, 530 U.S. at 366, n. 1.

20

1    contractors, subject to state regulation).  Unlike the circumstances in *Crosby*, AB

2    32 does *not* undermine any "plenitude of Executive authority."  *Crosby*, 530 U.S. at

3    376.

4          The Ninth Circuit's decision in *Pittsburg* is also inapplicable because that case

5    involved a "clear" and direct conflict between federal and state laws.  *See United*

6    *States v. City of Pittsburg, Cal.*, 661 F.2d 783, 785 (9th Cir. 1981); Pl. MPI Br. at.

7    32.  In *Pittsburg*, state law prohibited mail carriers from crossing lawns without the

8    owner's express consent, whereas federal law "authorizes postal carriers to cross

9    lawns unless the owner objects."  *Pittsburg*, 661 F.2d at 785.  Here, AB 32's

10   prohibition on persons within California operating private immigration detention

11   facilities poses no such direct conflict with the U.S. Attorney General's general

12   responsibility to arrange for immigration detention in federally owned, rented, or

13   newly constructed facilities.  8 U.S.C. § 1231(g)(1).

14         Plaintiff has also argued that AB 32 is conflict preempted because it impedes

15   the government's ability to contract.  Pl. MPI Br. at 33.  This argument fails

16   because Plaintiff has not identified any statute or regulation related to government

17   contracting with which AB 32 purportedly conflicts.  *Id.*; *see also Kansas v.*

18   *Garcia*, No. 17-834, slip op. at 9 (U.S. 2020) ("In all cases, the federal restrictions

19   or rights that are said to conflict with state law must stem from either the

20   Constitution itself or a valid statute enacted by Congress").  "There is no federal

21   preemption *in vacuo* without a constitutional text, federal statute, or treaty made

22   under the authority of the United States."  *Id.*

23         In support of its contract-related preemption argument, Plaintiff has cited

24   *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991).  *See* Pl. MPI Br.

25   at 33.  There, the Ninth Circuit ruled that specific federal construction contracting

26   regulations conflict preempted a state licensing law because the state requirements

27   overlapped with the federal criteria for assessing contractors' experience and

28   qualifications.  *Gartrell*, 940 F.2d at 439.  The states were therefore "effectively

21

1    attempting to review the federal government's responsibility determination." *Id.* at

2    439.  The same reasoning applied in *Student Loan Serving Alliance*, which Plaintiff

3    also cites, in which a state licensing law was preempted by federal regulations

4    providing assessment criteria for loan servicer qualifications.  *Student Loan Serving*

5    *Alliance v. District of Columbia*, 351 F. Supp. 3d 26, 62-63 (D.D.C. 2016); Pl. MPI

6    Br. at. 33.  Here, there are no federal regulations related to contracting that overlap,

7    much less conflict, with AB 32's regulation of detention facility contractors.  Thus,

8    there is no conflict with any federal contracting laws.

9         For all of these reasons, federal immigration law does not conflict preempt

10   AB 32.

11                **2.    Congress Did Not Clearly and Manifestly Intend to Preempt**
                         **AB 32 Through Federal Criminal Law**
12

13        Federal criminal detention law also does not conflict preempt AB 32.

14   Congress did not clearly and manifestly intend to outsource its USMS facility

15   operations to private contractors who would not be subject to state regulation.

16        Congress has expressly permitted private contractors to operate criminal

17   detention facilities housing USMS detainees in specially designated districts.  *See*

18   18 U.S.C. § 4013(a), (c)(1); 28 U.S.C. § 530C.  *However*, Congress has also

19   expressly made those contractors are subject to state regulation.  *Id.* §

20   4013(c)(2)(C).  The purpose of this limitation is to require contractors to "meet

21   strict standards designed to protect public safety."  136 Cong. Rec. S17595-01,

22   S17596, 1990 WL 168469 (Oct. 27, 1990) (statement of Sen. Kohl).  Congress'

23   clear and manifest intent therefore was to permit states to enact health and safety

24   regulations applicable to private USMS detention facilities.  *See* 18 U.S.C. §

25   4013(c)(2)(C).

26        AB 32 is the kind of state regulation that section 4013(c)(2)(C) contemplates.

27   The law embodies the California Legislature's determination that private detention

28   facilities pose unacceptable safety risks to detainees.  AB 32's application to private

                                        22

operators of detention facilities is therefore consistent, and does not clearly and manifestly conflict, with Congress' intent.

Importantly, AB 32 cannot be preempted as a policy matter. "[T]he possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Garcia*, slip op. at 19. "The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Id.* (quoting U.S. CONST. art. VI, cl. 2). The possible policy effects of AB 32 therefore cannot direct a finding of preemption.

Federal criminal detention law therefore also does not conflict preempt AB 32.

## CONCLUSION

For the reasons above, Defendants request that the Court dismiss the Complaint without leave to amend.


Dated:  March 5, 2020                    Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
JOHN W. KILLEEN
Deputy Attorney General



*/s/ Gabrielle D. Boutin*
GABRIELLE D. BOUTIN
Deputy Attorney General
*Attorneys for Governor Gavin
Newsom and Attorney General Xavier
Becerra, in their official capacities*

SA2020100025
14500248.docx

23

## CERTIFICATE OF SERVICE

Case Name:   **The GEO Group, Inc. v. Gavin**            No.   **19CV2491 JLS WVG**
                      **Newsom, et al**

I hereby certify that on <u>March 5, 2020,</u> I electronically filed the following documents with the
Clerk of the Court by using the CM/ECF system:

### NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT;
### MEMORANDUM OF POINTS AND AUTHORITIES

I certify that **all** participants in the case are registered CM/ECF users and that service will be
accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true
and correct and that this declaration was executed on <u>March 5, 2020,</u> at Sacramento, California.


_____                 _____
             Eileen A. Ennis                                              Signature
               Declarant

SA2020100025
14498177.docx

**EXHIBIT 3**

1    Collin P. Wedel (SBN 278461)
     cwedel@sidley.com
2    Alexandria V. Ruiz (SBN 313286)
     aruiz@sidley.com
3    SIDLEY AUSTIN LLP
     555 West Fifth Street
4    Los Angeles, CA 90013
     Telephone: +1 213 896 6649
5    Facsimile: +1 213 896 6600

6    *Attorneys for Amici Curiae*
     *IMMIGRANT LEGAL RESOURCE CENTER,*
7    *FAITH IN THE VALLEY, & INLAND*
     *COALITION FOR IMMIGRANT JUSTICE*

8

9                   UNITED STATES DISTRICT COURT

10                  EASTERN DISTRICT OF CALIFORNIA

11                      SACRAMENTO DIVISION

12   THE GEO GROUP, INC.,                    Case No. 2:20-cv-00533-TLN-AC

13              Plaintiff,                   Assigned to: Hon. Troy L. Nunley

14        vs.                               **[PROPOSED] MEMORANDUM OF THE
                                            IMMIGRANT LEGAL RESOURCE
15   GAVIN C. NEWSOM, in is official capacity as   CENTER AS *AMICI CURIAE* IN SUPPORT
     Governor of the State of California; XAVIER   OF DEFENDANTS' MOTION TO DISMISS**
16   BECERRA, in his official capacity as Attorney
     General of the State of California,    Date:
17                                          Time:
                Defendants.                 Place:
18
                                            FILE DATE:  March 9, 2020
19                                          TRIAL DATE:  No Date Set

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................................1

BACKGROUND ...................................................................................................................................2

I.      Section 1670.9(d) Provides Local Communities With Input Via Notice and Hearing Requirements on Zoning Decisions That Affect Them. ................................................2

II.      Plaintiff Seeks to Convert Three of Its Criminal Detention Facilities to Immigration Detention Centers to Preserve Billions in Profits. ..........................................................2

III.      Communities Wield Their Participation Rights and Speak Out Against For-Profit Immigration Detention Facilities. ..................................................................................5

         A.      Public Participation in the City of McFarland ...................................................5

         B.      Public Participation in the City of Adelanto ......................................................6

ARGUMENT: FOR-PROFIT IMMIGRATION DETENTION FACILITIES IMPOSE UNIQUE HARMS ON LOCAL COMMUNITIES, UNDERSCORING THE NEED FOR LOCAL INPUT .....8

I.      Local Government Dealings With For-Profit Immigration Detention Facilities Lack Transparency, Resulting in Limited Accountability to the Local Community..............9

II.      Local Governments Face Substantial Risks of Corruption Through Their Dealings With For-Profit Immigration Detention Facilities ......................................................11

III.      Local Government Entanglement With For-Profit Immigration Detention Centers Engenders Public Fear and Distrust of Law Enforcement...........................................14

IV.      Local Government Entanglement With For-Profit Immigration Detention Centers Stunts Community Development.................................................................................16

V.      Local Government Entanglement With For-Profit Immigration Detention Centers Ignore Negative Environmental and Health Impacts in the Community....................18

CONCLUSION.................................................................................................................................19

# TABLE OF AUTHORITIES

**Cases**        **Page(s)**

*Lyttle v. United States*,
No. 4:11-cv-152 (CDL) (M.D. Ga. 2011) ..................16

*Mendia v. Garcia*,
No. 10-cv-03910-MEJ (N.D. Cal. 2010) ..................16

*Morales v. Chadbourne*,
No. 12-301-M-DLM (D.R.I. 2012) ..................16

*Murphy v. NCAA*,
138 S. Ct. 1461 (2018) ..................14

*Plascencia v. United States*,
No. 5:17-cv-02515-JGB-SP (C.D. Cal. 2017) ..................16

*Printz v. United States*,
521 U.S. 898 (1997) ..................14

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ..................14

**Statutes and Rules**

Cal. Civ. Code § 1670.9(d) .................. *passim*

Cal. Gov. Code § 23002 ..................1

Fed. R. Civ. P. 12(b)(6) ..................1

**Other Authorities**

41 C.F.R. § 102-73, *et seq.* ..................10

*A Call for Change: Protecting the Rights of LGBTQ Detainees*, JUST DETENTION
INTERNATIONAL (Feb. 2009), https://tinyurl.com/ybtbbus8 ..................8

Auditor of the State of California, *City and County Contracts with U.S. Immigration
and Customs Enforcement: Local Governments Must Improve Oversight to
Address Health and Safety Concerns and Cost Overruns*, Report No. 2018-117,
https://tinyurl.com/y77f8kgn ..................10

Ben Christopher, *"Everything happened all at once": Can California Cities Weather
the COVID Recession?*, CALMATTERS (May 8, 2020),
https://tinyurl.com/yb9xujah ..................17

Bishop Joseph V. Brennan, *It took McFarland residents to stand up against a plan for a private detention center*, FRESNO BEE (Mar. 5, 2020), https://tinyurl.com/y8cgpf4g ........................................................................................................ 6

Clara Long & Grace Meng, *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention*, HUMAN RIGHTS WATCH (May 8, 2017), https://tinyurl.com/y7co7uuh ................................................................................ 9

Detention Watch Network and Center for Constitutional Rights, *New Information from ICE ERO's July Facility List*, https://tinyurl.com/yb6xb5fg (last visited June 24, 2020) ........................................................................................................................ 3

Detention Watch Network, *Detention Quotas*, https://tinyurl.com/yd8udrdo (last visited June 23, 2020) ............................................................................................. 15

Elly Yu, *California Banned Private Immigrant Detention Centers. So How Could Some Exist for Another 15 Years?*, LAIST (Dec. 27, 2019), https://tinyurl.com/y94bjbkm .............................................................................................. 3

Florida Immigrant Coalition, *Banking On Detention: Local Lockup Quotas and The Immigrant Dragnet*, https://tinyurl.com/ya9ccgs9 (last visited June 23, 2020) ............ 15

GEO Group. Inc., *2019 Annual Report,* https://tinyurl.com/y8jymlpw .............................. 3

Hamed Aleaziz, *More Than 52,000 People Are Now Being Detained By ICE, An Apparent All-Time High*, BUZZFEED NEWS (May 20, 2019), https://tinyurl.com/y5ldhrtp ................................................................................................ 3

Hamid Yazdan Panah, *Open Forum: Stopping ICE raids begins with ending immigration detention*, SAN FRANCISCO CHRONICLE (July 16, 2019), https://tinyurl.com/yb47tdma .............................................................................................. 15

Hauwa Ahmed, *How Private Prisons Are Profiting Under the Trump Administration*, CENTER FOR AMERICAN PROGRESS (Aug. 30, 2019), https://tinyurl.com/y75edurx ............ 3

Inland Coalition for Immigrant Justice, *Adelanto Residents file an appeal to GEO's attempt to expand Detention Facility* (Mar. 2, 2020), https://tinyurl.com/yckoeqez ............ 5, 7

Isabela Dias, *ICE Is Detaining More People Than Ever—And For Longer*, PACIFIC STANDARD (Aug. 1, 2019), https://tinyurl.com/ybhthyot; ................................................... 3

*Letter to Adelanto Mayor Gabriel Reyes, et al. from Grisel Ruiz of Immigrant Legal Resource Center, et al re: Recusal of Councilmember Ed Camargo during the May 13, 2020 hearing on the appeal of CUP 96-11* (May 12, 2020), https://tinyurl.com/ycpyotdo .......................................................................................... 12

257736575

*Letter to Mayor Gabriel Reyes, et al. from Grisel Ruiz of Immigrant Legal Resource Center, et al. re: SB 29 Compliance: Appeal of Planning Commission Request to Modify Conditional Use Permit No. 96-11* (April 22, 2020), https://tinyurl.com/ya6ktp6x .........................................................................4, 18

*Letter to Mayor Pro Tem, Stephen McFarland, et al. from Grisel Ruiz of Immigrant Legal Resource Center re: Recusal of Mayor Pro Tem Stephen McFarland and Councilmember Eric Rodriguez during the April 23, 2020 public hearing for the appeal of the Central Valley Modified Community Correctional Facility Conditional Use Permit Nos. 01-96 and 02-96* (April 23, 2020), https://tinyurl.com/yd9x7z6b ...............................................................................13

*Letter to Thomas D. Homan, Director, U.S. Immigration and Customs Enforcement, et al.*, CIVIC (Apr. 11, 2017), https://tinyurl.com/y8y5nqt7 .............................................8

*Letter to Timothy S. Aitken, Field Office Director, U.S. Immigration and Customs Enforcement re: Violations of Policy Regarding Detention, Shackling, and Care of Pregnant Women at Mesa Verde Detention Facility*, AM. CIVIL LIBERTIES UNION OF S. CAL. (June 18, 2015), https://tinyurl.com/ycc867lu ..............................9

Lizette Chavez and Marco Rodriguez, *Hundreds Protest, Counter-Protest Expansion of Immigration Detention at McFarland Planning Commission Meeting*, KERN SOL NEWS (Jan. 27, 2020), https://tinyurl.com/y8ohgjmm; ...................................4, 5, 6

Madison Pauly, *A Judge Says Thousands of Detainees May Sue a Prison Company for Using Them as a "Captive Labor Force,"* MOTHER JONES (Dec. 5, 2019), https://tinyurl.com/y8nxtt52 ...............................................................................8

Martin Estacio, *GEO Group request to increase beds for detainees draws packed crowd in Adelanto*, DESERT DISPATCH (Jan. 25, 2020), https://tinyurl.com/ybbmuvf8 ...............................................................................4, 7

*McFarland City Council Appoints Eric Rodriguez to Fill Vacant Seat*, KERN SOL NEWS (Apr. 10, 2020), https://tinyurl.com/y7fhsha2...........................................13

Miriam Jordan, *An ICE Detention Center? You Picked the Wrong Town, Residents Say*, N.Y. TIMES (Feb. 20, 2020) , https://tinyurl.com/wev2snc............................. *passim*

Miriam Jordan, *In Reversal, California Farm Town Approves ICE Detention Centers*, N.Y. TIMES (Apr. 24, 2020), https://tinyurl.com/y7fxszwp.........................................13

Office of Inspector General, Dep't Homeland Security, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (June 3, 2019), https://tinyurl.com/y5lp2d6h.......................................................................8

Rebecca Plevin, *Adelanto approves GEO plan to expand capacity at California immigration detention center,* DESERT SUN (Palm Springs) (Feb. 20, 2020), https://tinyurl.com/y9mmn5ey.......................................................................4, 7, 12

Rebecca Plevin, *Adelanto, McFarland to vote on GEO's Proposal to Convert Prisons into ICE detention centers*, DESERT SUN (Apr. 21, 2020, updated Apr. 22, 2020), https://tinyurl.com/ycwfk6cv ..................................................................4, 6, 17

Rebecca Plevin, *Adelanto planner who voted against detention center expansion ousted from commission*, DESERT SUN (Feb. 27, 2020), https://tinyurl.com/ychr9eop ..................................................................12

Rebecca Plevin, *How a private prison giant has continued to thrive in a state that wants it out*, DESERT SUN (Jan. 25, 2020), https://tinyurl.com/tpgmodd ..................................7, 11

Rebecca Plevin, *McFarland City Council approves GEO's plan to expand immigration detention in Kern County*, DESERT SUN (Apr. 24, 2020), https://tinyurl.com/ybdnfcly ..................................................................13, 17, 18

Roxana Kopetman, *American citizen from San Bernardino detained by ICE, threatened with deportation wins settlement*, THE SUN (Oct. 26, 2018, updated Oct. 29, 2018), https://tinyurl.com/yc4brg8d ..................................16

Sam Morgen, *McFarland Mayor Manuel Cantu resigns following Planning Commission vote* (Feb. 20, 2020), https://tinyurl.com/ybhqhbgu ..................................12

Sam Morgen, *McFarland to hold second meeting on expanding immigrant detention capabilities* (Feb. 11, 2020), https://tinyurl.com/y837s279 ..................................5

Sen. Bill 29, 2017-2018 Reg. Sess. (Cal. 2017) § 2 ..................................2

Steve Coll, *When ICE Tries To Deport Americans, Who Defends Them?*, THE NEW YORKER (Mar. 21, 2018), https://tinyurl.com/yafs2gru ..................................16

*The GEO Group Comments on Bank of America Decision and Expects No Impact on Recently Extended Senior Revolving Credit Facility*, BUSINESSWIRE (June 26, 2019), https://tinyurl.com/ y9j3gsg5 ..................................3

*There Is No Safety Here: The Dangers for People with Mental Illness and Other Disabilities in Immigration Detention at GEO Group's Adelanto ICE Processing Center*, DISABILITY RIGHTS CALIFORNIA (Mar. 5, 2019), https://tinyurl.com/yd5odw42 ..................................8

*Top Complaints in CA Immigration Detention Facilities*, COMMUNITY INITIATIVES FOR VISITING IMMIGRANTS IN CONFINEMENT (Aug. 28, 2017), https://tinyurl.com/ybkqy6s4 ..................................8

Yesenia Amaro, *New ICE detention facility moves forward in rural San Joaquin Valley town despite outcry*, FRESNO BEE (Apr. 24, 2020), https://tinyurl.com/y97kbejg. ..................................4

## INTRODUCTION AND SUMMARY OF ARGUMENT

For years, Californians had uniquely limited oversight of their local governments' dealings with for-profit immigration detention facilities. Unlike virtually every other sort of state or federal facility—which would be subject to a host of permitting, public comment, and public records requirements—for-profit immigration detention facilities existed in an accountability-free loophole, skirting government procurement requirements and state sunshine laws, all while raking in billions of dollars in profits paid from taxpayer funds.

Recognizing the community demand for public participation in local government dealings with these for-profit immigration detention facilities, the California Legislature enacted Civil Code § 1670.9(d) to create an informed process for municipalities to follow when making these zoning decisions. Through this litigation, Plaintiff, an operator of multiple for-profit detention institutions in this state, would have this Court declare as unconstitutional the simple notice and hearing requirements that ensure Californians have some voice in the placement and operation of these carceral complexes. But Plaintiff ignores the key distinction between state, federal, and for-profit immigration facilities: namely, for-profit facilities have a perverse financial incentive to minimize oversight while maximizing profits. That drive for profits leads private facilities to inflict unique harms on local communities, including impaired oversight, corrupting effects on local governments, public fear and distrust, stunted economic development, and negative environmental impacts.

As set forth in Defendants' motion to dismiss, Section 1670.9(d)'s notice and hearing requirements do not violate intergovernmental immunity principles. ECF No. 23 at 8-12. These narrow provisions neither regulate nor discriminate against the federal government, and they do not treat any agent of the federal government worse than similarly situated entities. Rather, Section 1670.9(d) regulates the issuance of zoning permits by local governments, which are units of the state government, Cal. Gov. Code § 23002. Because Section 1670.9(d) does not violate intergovernmental immunity, Plaintiff fails to state a claim for which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). Accordingly, the Court should grant Defendants' motion and dismiss Plaintiff's complaint.

**BACKGROUND**

I. **Section 1670.9(d) Provides Local Communities With Input Via Notice and Hearing Requirements on Zoning Decisions that Affect Them.**

Some local governments have facilitated the operation of immigration detention facilities in their communities for years. Such decisions, "for example, conveyance of real property or issuance of building permits," were generally made and executed "with little public awareness" or input. Defendants' Request for Judicial Notice ("Def. RJN"), ECF No. 23-1, Ex. 1 at 3-4. In response to California communities' calls for transparency and accountability in the permitting processes related to these facilities, Section 1670.9(d) added notice and hearing requirements applicable to local governments prior to the issuance of new zoning permits for existing facilities. *See* Sen. Bill 29, 2017-2018 Reg. Sess. (Cal 2017) (SB 29) § 2. As enacted, § 1670.9(d) provides:

> A city, county, city and county, or public agency shall not . . .issue a permit for the building or reuse of existing buildings by any private corporation . . .to house or detain noncitizens for . . . civil immigration proceedings unless the city, county, city and county, or public agency has done both of the following:
>
> (1) Provided notice to the public of the proposed . . . permitting action at least 180 days before execution of the . . . permit.
>
> (2) Solicited and heard public comments on the proposed . . . permit action in at least two separate meetings open to the public.

Cal. Civ. Code. § 1670.9(d). These notice and hearing requirements were enacted to provide communities with a formal public opinion process. In fact, hundreds of residents in Adelanto and McFarland have participated in the public forums Section 1670.9(d) required with respect to Plaintiff's facilities, demonstrating both the legitimate need for these processes, as well as the overwhelming local demand for input in local government decision-making.

II. **Plaintiff Seeks to Convert Three of Its Criminal Detention Facilities to Immigration Detention Centers to Preserve Billions in Profits.**

Plaintiff, according to its website, "is the world's leading provider of diversified correctional, detention, and community reentry, and electronic monitoring services to government agencies

worldwide."[1] With approximately three-fourths of the immigration detainee population nationwide held in a for-profit detention facility,[2] Plaintiff profits from policies that have led to a record-high number of immigration detainees across the country.[3] Indeed, for every 100 U.S. immigrant detainees, 32 are held in one of Plaintiff's facilities.[4] As a result, in 2019, Plaintiff's total revenues were $2.48 billion, up from $2.33 billion in 2018.[5]

As relevant here, Plaintiff owns and operates two immigration detention facilities in California: (1) the Mesa Verde ICE Processing Center, located in Bakersfield, near the city of McFarland; and (2) the Adelanto ICE Processing Center, in the city of Adelanto. Compl. ¶ 32. Plaintiff also owns three additional facilities it previously operated as private prisons through a contract with the California Department of Corrections and Rehabilitation: (1) the Desert View Modified Community Correctional Facility ("MCCF") in Adelanto; (2) the Central Valley MCCF in McFarland; and (3) the Golden State MCCF also in McFarland. *Id.* ¶¶ 35-36. Plaintiff now intends to operate the Desert View MCCF as an "annex" to the Adelanto ICE Processing Center, and the Central Valley and Golden State MCCFs as "annexes" to the Mesa Verde ICE Processing Center— all thanks to hastily awarded 15-year contracts[6] with ICE that "incorporate[]" the "annex" facilities

---

[1] *The GEO Group Comments on Bank of America Decision and Expects No Impact on Recently Extended Senior Revolving Credit Facility*, BUSINESSWIRE (June 26, 2019), https://tinyurl.com/y9j3gsg5.

[2] Detention Watch Network and Center for Constitutional Rights, *New Information from ICE ERO's July Facility List*, https://tinyurl.com/yb6xb5fg (last visited June 24, 2020).

[3] Isabela Dias, *ICE Is Detaining More People Than Ever—And For Longer*, PACIFIC STANDARD, (Aug. 1, 2019), https://tinyurl.com/ybhthyot; Hamed Aleaziz, *More Than 52,000 People Are Now Being Detained By ICE, An Apparent All-Time High*, BUZZFEED NEWS (May 20, 2019), https://tinyurl.com/y5ldhrtp.

[4] Hauwa Ahmed, *How Private Prisons Are Profiting Under the Trump Administration*, CENTER FOR AMERICAN PROGRESS (Aug. 30, 2019), https://tinyurl.com/y75edurx.

[5] GEO Group. Inc., *2019 Annual Report,* at 3, https://tinyurl.com/y8jymlpw.

[6] State lawmakers have accused ICE of evading the federal procurement process. California Assemblyman Rob Bonta stated that ICE "should've complied with federal law. And if it did, [the procurement process] would've been longer and more competitive and moved past Jan. 1, 2020. But they deliberately manipulated the process, gamed it and rigged it." Elly Yu, *California Banned Private Immigrant Detention Centers. So How Could Some Exist for Another 15 Years?*, LAIST (Dec. 27, 2019), https://tinyurl.com/y94bjbkm.

[PROPOSED] MEMORANDUM OF IMMIGRANT LEGAL RESOURCE CENTER AS *AMICI CURIAE*

257736575

into Plaintiff's existing immigration detention facilities. *Id.* ¶¶ 33-36, 38, 42, 46; Decl. of Richard Long ¶¶ 6-7. Plaintiff's existing conditional use permits ("CUPs") for the three MCCFs, however, do not permit Plaintiff to hold immigration detainees in any of those facilities. Compl. ¶¶ 55-56. As a result, Plaintiff had to apply for approval from both cities to modify the existing CUPs for the facilities. *Id.* ¶¶ 60-69. Pursuant to Section 1670.9(d), the public was guaranteed a voice in that process.

Both the cities of Adelanto and McFarland held nominally "public" forums addressing Plaintiff's applications, in satisfaction of their obligations under Section 1670.9(d).[7] The city of McFarland held two hearings regarding Plaintiff's proposed CUP modifications for the Central Valley and Golden State MCCFs in January and February 2020.[8] After the McFarland Planning Commission did not approve the requested CUP modifications, though, Plaintiff appealed to the McFarland City Council,[9] which unanimously approved the proposal on April 23, 2020, during a virtual meeting.[10] The city of Adelanto also held two public hearings regarding the proposed CUP modification for the Desert View MCCF in January and February 2020.[11] The Adelanto Planning Commission approved Plaintiff's application at the second hearing, which residents immediately

---

[7] ILRC disputes that the cities fully complied with the requirements of SB 29, or even the requirements of Brown Act or the California Environmental Quality Act ("CEQA"), both of which require complete public disclosure, review, and participation in qualifying zoning projects such as this. *See, e.g.*, *Letter to Mayor Gabriel Reyes, et al. from Grisel Ruiz of Immigrant Legal Resource Center, et al. re: SB 29 Compliance: Appeal of Planning Commission Request to Modify Conditional Use Permit No. 96-11* (April 22, 2020), https://tinyurl.com/ya6ktp6x.

[8] Lizette Chavez and Marco Rodriguez, *Hundreds Protest, Counter-Protest Expansion of Immigration Detention at McFarland Planning Commission Meeting*, Kern Sol News (Jan. 27, 2020), https://tinyurl.com/y8ohgjmm; Miriam Jordan, *An ICE Detention Center? You Picked the Wrong Town, Residents Say*, N.Y. Times (Feb. 20, 2020), https://tinyurl.com/wev2snc.

[9] Rebecca Plevin, *Adelanto, McFarland to vote on GEO's Proposal to Convert Prisons into ICE detention centers*, Desert Sun (Apr. 21, 2020, updated Apr. 22, 2020), https://tinyurl.com/ycwfk6cv.

[10] Yesenia Amaro, *New ICE detention facility moves forward in rural San Joaquin Valley town despite outcry*, Fresno Bee (Apr. 24, 2020), https://tinyurl.com/y97kbejg.

[11] Martin Estacio, *GEO Group request to increase beds for detainees draws packed crowd in Adelanto*, Desert Dispatch (Jan. 25, 2020), https://tinyurl.com/ybbmuvf8; Rebecca Plevin, *Adelanto approves GEO plan to expand capacity at California immigration detention center*, Desert Sun (Feb. 20, 2020), https://tinyurl.com/y9mmn5ey.

[PROPOSED] MEMORANDUM OF IMMIGRANT LEGAL RESOURCE CENTER AS *AMICI CURIAE*

appealed to the Adelanto City Council.[12] As of the date of filing, the Adelanto City Council has not yet voted on the appeal.

### III. Communities Wield Their Participation Rights and Speak Out Against For-Profit Immigration Detention Facilities.

#### A. Public Participation in the City of McFarland

The residents of the city of McFarland first learned of Plaintiff's plan to convert the Central Valley and Golden State MCCFs into immigration detention centers with 1,400 new beds less than a week before the January 21, 2020, hearing during which the City Planning Commission would hear public comment. They immediately jumped into action. McFarland residents opposed to the CUP modification volunteered and organized with Faith in the Valley after mass in their community churches, and 11 additional organizations, including the United Farm Workers Foundation, the Dolores Huerta Foundation, Kern Welcoming and Extending Solidarity to Immigrants, California Immigrant Youth Justice Alliance, the Democratic Socialists of America Kern County, Rapid Response Network of Kern, Visión y Compromiso, Women's March Kern County, the Immigrant Legal Resource Center ("ILRC"), and the American Civil Liberties Union of Southern California ("ACLU"), formed a coalition to do the same. These individuals and organizations submitted written comments to the City Clerk prior to the hearing.

Despite the short notice, on January 21, 2020, hundreds of McFarland residents attended the public hearing and voiced their opposition, via public comment and physical presence, to the proposed CUP modification that would convert the criminal detention centers into immigration detention centers.[13] Due to the overwhelming attendance, which dwarfed ordinary attendance numbers,[14] advocates demanded that the hearing be translated into Spanish, which the Commission ultimately arranged.[15] Because only 50 people were permitted inside the hearing room, many

---

[12] Inland Coalition for Immigrant Justice, *Adelanto Residents file an appeal to GEO's attempt to expand Detention Facility* (Mar. 2, 2020), https://tinyurl.com/yckoeqez.

[13] Chavez and Rodriguez, *supra* note 8.

[14] Sam Morgen, *McFarland to hold second meeting on expanding immigrant detention capabilities*, Bakersfield.com (Feb. 11, 2020), https://tinyurl.com/y837s279 (noting that City Planning Commission meetings "rarely see[] more than two public speakers per meeting").

[15] Chavez and Rodriguez, *supra* note 8.

residents were forced to voice their opposition from outside. Their chants to "Shut Down GEO" were easily heard through the thin walls inside the hearing room.[16]

The second public hearing before the City Planning Commission was held on February 18, 2020. In the lead-up to the hearing, long-time McFarland resident and farmworker turned community organizer, Maribel Ramirez, ran a door-to-door campaign with her sons, asking residents to sign their names, addresses, and phone numbers to cards that read in Spanish, "No to Immigration Detention Centers in McFarland."[17] Despite fears of sharing their personal information, Ms. Ramirez gathered cards from 1,000 McFarland residents opposed to converting state prisons to immigration detention facilities.[18] The campaign inspired Joseph V. Brennan, bishop of the Roman Catholic Diocese of Fresno, which serves the area's one million Catholics, to write an op-ed in the Fresno Bee supporting McFarland residents' opposition to the CUP request.[19] Hundreds of residents marched through the streets of McFarland to protest the immigration detention centers in the days immediately before the hearing.[20] And, during the hearing, hundreds of residents voiced their opposition by chanting together outside of the hearing building.[21] Ultimately, the McFarland Planning Commission did not pass the plan to convert the former state prisons into immigration detention centers, voting 2-2. One Commissioner who voted against the plan said, "The community made a big difference."[22] Another Commissioner said, "'We are a tight community."[23]

**B.    Public Participation in the City of Adelanto**

Plaintiff's plan to convert the Desert View MCCF, in Adelanto, into an immigration

---

[16] Chavez and Rodriguez, *supra* note 8.

[17] Jordan, *An ICE Detention Center?*, *supra* note 8.

[18] *Id.*

[19] Bishop Joseph V. Brennan, *It took McFarland residents to stand up against a plan for a private detention center*, FRESNO BEE (Mar. 5, 2020), https://tinyurl.com/y8cgpf4g.

[20] Plevin, *Adelanto, McFarland to vote on GEO's proposal to convert prisons into ICE detention centers*, *supra* note 9.

[21] Jordan, *An ICE Detention Center?*, *supra* note 8.

[22] *Id.*

[23] *Id.*

---

6

detention facility with 750 new beds was first considered at a standing-room only hearing before the Adelanto Planning Commission on January 22, 2020.[24] Community members, led by the Inland Coalition for Immigrant Justice ("IC4IJ") and joined by (among others) High Desert Southern Christian Leadership Conference, certain Adelanto High School teachers, High Desert Progressive Democrats, Christ the Good Shepherd Church, and El Sol, voiced their opposition to the immigration detention facility inside and outside of Adelanto's City Hall. Jose Villafuerte, a local biology teacher, said Adelanto's reliance on the prison industry contributes to his students' negative outlook of their city: "The fact that their city has a jail and a[n immigration] detention center and that's all it has, to them it's a negative thing."[25] Lizbeth Abeln, an immigration detention coordinator with the IC4IJ, expressed her desire for Adelanto to "choose people over profit" and invest in the community, "not cages."[26] Others who spoke at the Commission meeting sought to highlight Plaintiff's notoriously abysmal record of violations of federal detention standards at the existing Adelanto facility; they also pointed to the multiple lawsuits filed against Plaintiff, as well as ICE.[27]

At a second hearing regarding the proposed plan held on February 19, 2020, the Adelanto Planning Commission heard more than three hours of public testimony before voting 4-1 to approve the CUP modification and permit Plaintiff to convert the Desert View MCCF into an annex of the Adelanto ICE Processing Center.[28] Local residents appealed the Commission's decision to the Adelanto City Council.[29] The final hearing on the appeal was scheduled for April 22, 2020, but the vote was postponed. The Adelanto City Council has not yet held another hearing or vote.

As the overwhelming public participation in Adelanto and McFarland shows, California had

---

[24] Estacio, *supra* note 11.

[25] Rebecca Plevin, *How a private prison giant has continued to thrive in a state that wants it out*, DESERT SUN (Jan. 25, 2020), https://tinyurl.com/tpgmodd.

[26] Estacio, *supra* note 11.

[27] *Id.*

[28] Plevin, *Adelanto approves GEO plan to expand capacity at California immigration detention center*, *supra* note 11.

[29] Inland Coalition for Immigrant Justice, *Adelanto Residents file an appeal to GEO's attempt to expand Detention Facility*, *supra* note 12.

a legitimate interest in requiring public notice and comment via Section 1670.9(d).

<u>**ARGUMENT**</u>

**FOR-PROFIT IMMIGRATION DETENTION FACILITIES IMPOSE UNIQUE HARMS ON LOCAL COMMUNITIES, UNDERSCORING THE NEED FOR LOCAL INPUT**

There are five immigration detention centers in California, four of which are privately run by for-profit corporations. The four for-profit immigration detention facilities are far larger—and impose far greater negative externalities—than their government-run counterparts. California's four private facilities hold on average, 3,700 people on a given day—or approximately 85% of the State's total immigration detainee population. *See* Def. RJN, Ex. 1 at 3. As compared to detainees in government-run facilities, detainees in for-profit facilities face more inhumane conditions, ranging from lack of basic food and personal hygiene safety,[30] inadequate medical and mental health care,[31] and sexual abuse and assault,[32] to deficient physical-plant conditions[33] and labor exploitation.[34] Such

---

[30] Office of Inspector General, Dep't Homeland Security *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*, at 4 (June 3, 2019) ("OIG-19-47"), https://tinyurl.com/y5lp2d6h (finding "egregious" violations of basic food safety practices at Adelanto, including "lunch meat and cheese were mixed and stored uncovered in large walk-in refrigerators; lunch meat was also unwrapped and unlabeled; chicken smelled foul and appeared to be spoiled; and food in the freezer was expired").

[31] *Top Complaints in CA Immigration Detention Facilities*, COMMUNITY INITIATIVES FOR VISITING IMMIGRANTS IN CONFINEMENT ("CIVIC") (Aug. 28, 2017), https://tinyurl.com/ybkqy6s4; *There Is No Safety Here: The Dangers for People with Mental Illness and Other Disabilities in Immigration Detention at GEO Group's Adelanto ICE Processing Center*, DISABILITY RIGHTS CALIFORNIA (Mar. 5, 2019), https://tinyurl.com/yd5odw42.

[32] *Letter to Thomas D. Homan, Director, U.S. Immigration and Customs Enforcement, et al.*, CIVIC (April 11, 2017), https://tinyurl.com/y8y5nqt7 (citing data from the Office of the Inspector General showing more than 1,000 reports of physical and sexual abuse filed by people in detention nationwide between May 2014 and July 2016, with two of the GEO Group's facilities receiving the highest number of complaints); *A Call for Change: Protecting the Rights of LGBTQ Detainees*, Just Detention International (Feb. 2009), https://tinyurl.com/ybtbbus8 (showing that LGBTQ detained persons are 15 times more likely than the general population of detained persons to be sexually assaulted in detention centers).

[33] OIG-19-47, *supra* note 30, at 8 (identifying the "poor condition" of physical plant at Adelanto and three other facilities "including mold and peeling paint on walls, floors, and showers, and unusable toilets" in the bathrooms, which creates "health issues for detainees, including allergic reactions and persistent illnesses").

[34] Madison Pauly, *A Judge Says Thousands of Detainees May Sue a Prison company for Using Them as a "Captive Labor Force,"* MOTHER JONES (Dec. 5, 2019), https://tinyurl.com/y8nxtt52.

conditions are suffered by immigration detainees, with often serious and sometimes deadly consequences,[35] and with limited accountability or means for redress.

The harms inflicted by for-profit immigration detention facilities are not borne solely by those detained within their walls. These private facilities inflict at least five unique harms on the residents of the communities where they are located, justifying California's requirements for increased community input on how local governments interact with for-profit immigration detention facility operators.[36] For-profit immigration detention centers: (A) operate with limited transparency, accountability to, or oversight from the local community in their dealings with local government; (B) have a corrupting effect on local governments; (C) contribute to public fear distrust of law enforcement; (D) stunt the development of local communities; and (E) impose negative environmental and health impacts.

## I. Local Government Dealings with For-Profit Immigration Detention Facilities Lack Transparency, Resulting in Limited Accountability to the Local Community.

Some local governments have facilitated the operation of for-profit immigration detention facilities in their communities behind closed doors. Facing no obligations to seek public input and no consequences for failing to exercise appropriate oversight, these local governments have essentially served as pass-through entities between ICE and for-profit immigration detention facility operators, permitting the generation of billions in profits outside the public-eye.

Until § 1670.9(d), in contrast to virtually every other commercial or industrial facility that is

---

[35] Raul Ernesto Morales-Ramos died while detained at Plaintiff's Adelanto Detention Facility, from organ failure after receiving inadequate, if not outright negligent, medical care for cancer over two years. Clara Long & Grace Meng, *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention*, HUMAN RIGHTS WATCH (May 8, 2017), https://tinyurl.com/y7co7uuh; Monserrat Ruiz Cuevas suffered a miscarriage while detained at Plaintiff's Mesa Verde Detention Center after receiving inadequate care before, during, and after suffering a fall onto her stomach while fully shackled in arm and leg restraints. *Letter to Timothy S. Aitken, Field Office Director, U.S. Immigration and Customs Enforcement re: Violations of Policy Regarding Detention, Shackling, and Care of Pregnant Women at Mesa Verde Detention Facility*, AM. CIVIL LIBERTIES UNION OF S. CAL. (June 18, 2015), https://tinyurl.com/ycc867lu.

[36] Though the description of these harms that follow are certainly generalizable to each of the communities where an immigration detention center is located, *amicus* focuses on these harms as experienced in the cities of Adelanto and McFarland, which are threatened by Plaintiff's planned conversion of three state prisons into annexes to two existing immigration detention facilities.

9

1    slated to be opened, residents of local communities lacked meaningful forums to comment on zoning

2    decisions relating to the operation of for-profit immigration detention facilities. California local

3    governments and law enforcement entities, while not required to detain immigrants on behalf of

4    federal immigration authorities, could, until recently, choose to do so. Def. RJN, Ex. 1 at 5. Local

5    entities that opted to detain immigrants could only do so by entering into Intergovernmental Service

6    Agreements ("IGSAs") with ICE. *Id.* These entities would then hold immigrant detainees in local

7    municipal facilities or in private immigration detention facilities via subcontracts with for-profit

8    prison companies.[37] Rather than seek public input, conduct oversight or practice effective contract

9    management, cities—including Adelanto and McFarland—simply signed the IGSAs, approved

10   permits, and passed payments from ICE on to the operators.[38]

11       The utter lack of public input is unique to for-profit immigration detention facilities

12   contracting with municipalities and demonstrates why local preapproval input is critical in avoiding

13   substantial harm to local communities. For example, if a local government sought to open a new

14   public jail, or expand an existing public jail, residents in that community are afforded an opportunity

15   to participate in their government's decision-making process. Likewise, if the federal government

16   intended to directly build an immigration detention facility, that process, too, would be subject to a

17   host of federal procurement regulations, which require full and open competition, and provide

18   opportunities for public input and oversight. *See, e.g.*, 41 C.F.R. § 102-73, *et seq*. However, by using

19   IGSAs to encourage local governments to subcontract with private prison companies, the companies

20   evaded not only rigorous federal procurement processes, but also any public accountability and

21   oversight at the local level. Unlike government owned and operated facilities, for-profit immigration

22   detention facilities like Plaintiff's are not subject to the Freedom of Information Act or the California

23   Public Records Act. This prevents local communities from obtaining information about the nature of

24   the contractual relationship, the origins and continuance of which are often shrouded by allegations

25   

26   [37] Auditor of the State of California, *City and County Contracts with U.S. Immigration and Customs
     Enforcement: Local Governments Must Improve Oversight to Address Health and Safety Concerns
     and Cost Overruns*, Report No. 2018-117, https://tinyurl.com/y77f8kgn.

27   

28   [38] *Id.*

[PROPOSED] MEMORANDUM OF IMMIGRANT LEGAL RESOURCE CENTER AS *AMICI CURIAE*

of corruption.

## II. Local Governments Face Substantial Risks of Corruption Through Their Dealings With For-Profit Immigration Detention Facilities.

When the State enacted Section 1670.9(d), it recognized that private prison companies—like Plaintiff—often utilize corrupt practices to obtain necessary approvals and permits from cash-strapped local governments. Such practices underscore the need for transparency and public input.

Plaintiff's actions with respect to converting the MCCFs into immigration detention centers in Adelanto—thereby expanding what is already one of the country's largest immigration detention centers—are illustrative. *See generally* Ex. A. As reported in the Desert Sun, Plaintiff's CEO contacted the City Manager in February 2019 to secure the city's immediate termination of its contracts for the MCCFs—a necessary first step toward facilitating the continued expansion of immigration detention in the region.[39] Plaintiff provided the City Manager with pre-drafted termination letters, as well as assurances that "there would be no financial impact to the City,"[40] meaning that Plaintiff would continue to annually compensate the city $50,000 for facilitating the IGSA and approximately $1 million in bed taxes despite the termination of the contract that required such payments. In other words, the city would continue receiving these payments despite there being no contractual basis for them. A month later, the City Manager unilaterally terminated the contracts, using the same pre-drafted letters provided by Plaintiff. The day after Adelanto's contracts with Plaintiff were officially terminated, ICE entered into a nine-month contract with Plaintiff to operate the primary Adelanto facility. A few months after that, Plaintiff entered into a 15-*year* contract that covers the Adelanto ICE Detention facility, and provides for the annexing of the MCCFs.[41]

During the Adelanto Planning Commission hearing on February 19, 2020, Commissioner JayShawn Johnson alleged that Plaintiff had improperly influenced the City Manager's decision to unilaterally terminate Adelanto's contracts, and suggested that Plaintiff may have been assured

---

[39] Plevin, *How a private prison giant has continued to thrive in a state that wants it out*, *supra* note 25.

[40] *Id.*

[41] *Id.*

improperly that the MCCF expansion would pass.[42] After the rest of the commissioners voted to approve to permit the new immigration detention centers, Commissioner Johnson expressed his disappointment on the record: "With all the respect I have for this body tonight, I admonish you. . . . procedurally, we can't keep being complicit with what's going on that's not right in upper management."[43] A week later, the City Council retaliated and voted to remove Commissioner Johnson, effectively silencing the dissent in its ranks.

Since then, the Adelanto City Council has attempted to move forward with consideration of the community's appeal of the Planning Commission's vote to approve the expansion. In an effort to preserve a fair and unbiased process, the ACLU and ILRC have urged Councilmember Ed Camargo to recuse himself from the proceedings based on a conflict of interest arising from his partner's employment by Plaintiff.[44] The same entities have fought to ensure that any meetings remain accessible to the public while the city's practices change in response to the COVID-19 health crisis.

A similar story has played out in McFarland. There, Plaintiff and its allies exploited the health crisis to thwart public input on its appeal of the McFarland Planning Commission's decision to block the immigration detention facility expansion. And, when McFarland Mayor Cantu resigned, Plaintiff and its allies succeeded in filling the resulting City Council vacancy with a former employee of Plaintiff.[45]

On April 9, 2020, the McFarland City Council conducted a virtual teleconference hearing that was plagued with technical issues and lacked interpretation. Unable to access or understand the meeting (due to connection and lack of translation problems), many McFarland residents were unable to voice their opposition to the appointment of Eric Rodriguez, Plaintiff's former employee,

---

[42] Plevin, *Adelanto approves GEO plan to expand capacity at California immigration detention center*, *supra* note 11.

[43] Rebecca Plevin, *Adelanto planner who voted against detention center expansion ousted from commission*, DESERT SUN (Feb. 27, 2020), https://tinyurl.com/ychr9eop.

[44] *Letter to Adelanto Mayor Gabriel Reyes, et al. from Grisel Ruiz of Immigrant Legal Resource Center, et al re: Recusal of Councilmember Ed Camargo during the May 13, 2020 hearing on the appeal of CUP 96-11* (May 12, 2020), https://tinyurl.com/ycpyotdo.

[45] Sam Morgen, *McFarland Mayor Manuel Cantu resigns following Planning Commission vote*, BAKERSFIELD.COM (Feb. 20, 2020), https://tinyurl.com/ybhqhbgu.

[PROPOSED] MEMORANDUM OF IMMIGRANT LEGAL RESOURCE CENTER AS *AMICI CURIAE*

257736575

to the City Council.[46]

The City Council's virtual hearing on Plaintiff's appeal was then scheduled, over the protests of the community, on April 23, 2020. Prior to the meeting, the ACLU and ILRC requested that Mayor Pro Tem Stephen McFarland and Councilmember Eric Rodriguez recuse themselves due to their conflicts of interest stemming from past employment with Plaintiff.[47] McFarland residents, unable to march in the streets, took to their cars and drove through the city with signs reading (in Spanish), "ICE, GEO out of McFarland."[48] Opposition comments were made via email, and orally during the Zoom meeting by those able to access the meeting, including by renowned labor leader and civil rights activist Dolores Huerta, who spoke against the permits and requested that the hearing be postponed until after the COVID-19 pandemic.[49] Because virtual attendance for the hearing was capped, many in opposition were dropped from the Zoom call and unable to call back in. Finally, to push the vote over the edge, Plaintiff dangled one-time $1,000 scholarships to graduating seniors that were contingent on "receiv[ing] a unanimous vote in support of [its] request."[50] The McFarland City Council acquiesced, and traded a few thousand dollars in scholarships for a coerced 4-0 vote. These irregular procedures demonstrate the unique risk of corruption that accompanies the operation of for-profit immigration detention facilities. And the State's recognition of that risk supports its interest in providing a statutory opportunity for public notice and comment via Section 1670.9(d).

---

[46] *McFarland City Council Appoints Eric Rodriguez to Fill Vacant Seat*. KERN SOL NEWS (April 10, 2020), https://tinyurl.com/y7fhsha2.

[47] *Letter to Mayor Pro Tem, Stephen McFarland, et al. from Grisel Ruiz of Immigrant Legal Resource Center re: Recusal of Mayor Pro Tem Stephen McFarland and Councilmember Eric Rodriguez during the April 23, 2020 public hearing for the appeal of the Central Valley Modified Community Correctional Facility Conditional Use Permit Nos. 01-96 and 02-96* (April 23, 2020), https://tinyurl.com/yd9x7z6b.

[48] Miriam Jordan, *In Reversal, California Farm Town Approves ICE Detention Centers*, N.Y. TIMES (Apr. 24, 2020), https://tinyurl.com/y7fxszwp.

[49] Rebecca Plevin, *McFarland City Council approves GEO's plan to expand immigration detention in Kern County,* DESERT SUN (Apr. 24, 2020), https://tinyurl.com/ybdnfcly.

[50] *Id.*

III.    **Local Government Entanglement with For-Profit Immigration Detention Centers
Engenders Public Fear and Distrust of Law Enforcement.**

The entanglement of large for-profit immigration detention facilities with local governments
instills widespread fear and distrust. Residents of the Cities of Adelanto and McFarland, many of
whom are low-income people of color that are part of mixed-status families, are alarmed by the
potential impact an increased presence of federal law enforcement will have on their daily lives, and
by the role their local governments play in bringing that reality to fruition. Their concerns are well-
founded and further demonstrate why a formal public opinion process is needed in municipalities
considering whether to permit or expand the operation of for-profit immigration detention facilities.

First, residents fear that a for-profit immigration detention facility will bring a massive
increase of federal immigration agents into the community, leading to increased deportations of
family and friends. The federal government cannot force states to enforce federal laws, including
federal immigration laws.[51] Thus, under basic federalism principles, California residents typically
have a say through the democratic process in how much their state chooses to enforce (or not)
federal immigration policies.[52] The for-profit immigration detention facilities, though, almost
entirely circumvent that process of public input, allowing decisions by (usually coerced or captured)
city councils to turn a community into a hive of ICE activity overnight. As Antero Sanchez, the
priest at St. Elizabeth's Catholic Church in McFarland, explained, an immigration detention center in
an immigrant community like McFarland "'would mean constant fear of ICE presence in the
area.'"[53] Maribel Ramirez, a farmworker turned community organizer and a McFarland resident of
20 years, explained, "An ICE detention center, that would bring fear to our community. We might

---

[51] *Cf. Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018); *Printz v. United States*, 521 U.S. 898, 925
(1997) ("[T]he Federal Government may not compel the States to implement, by legislation or
executive action, federal regulatory programs."); *United States v. California*, 921 F.3d 865, 890-91
(9th Cir. 2019) ("California has the right, pursuant to the anticommandeering rule," to "frustrate the
federal government's immigration enforcement efforts").

[52] *California*, 921 F.3d at 887 n.11 ("A state's ability to regulate its internal law enforcement
activities is a quintessential police power.").

[53] Jordan, *An ICE Detention Center?*, *supra* note 8.

14

have to leave."[54] Indeed, several McFarland residents predict that so many McFarland residents would leave—driven by fear of deportation and harassment—that the city would turn into a "ghost town."[55]

Residents' fears are legitimate. Evidence suggests that ICE's ability and incentive to conduct mass deportations is tied to the number of immigration detention center beds available in the area of operation. For example, in Northern California, ICE's ability to conduct mass deportations was limited by the closure of local immigration detention facilities. Senior ICE officials admitted as much, pointing to the loss of bed space in California as a "challenge" to their operations.[56]

These operational "'challenges'" are inherently tied to the contractual relationships for-profit immigration detention facilities have with local governments. Typically, for-profit immigration detention facilities operate pursuant to contracts with "guaranteed minimums." These minimums are effectively quotas, which require ICE to pay for a minimum number of detention beds regardless of how many people are detained and fill them.[57] These quotas fuel a perverse fiscal incentive for ICE, through which ICE agents increase enforcement and detain more individuals in order to maximize taxpayer dollars that, pursuant to the contract minimums, were already spent on detaining people.[58] Those same incentives do not exist vis-à-vis government-run facilities.

Second, in addition to their desire for a voice in the extent of their community's legitimate immigration enforcement, residents fear that the presence of for-profit immigration detention centers will lead to abuses of federal immigration enforcement authority owing to increased enforcement activity more generally. An appalling track record of racial profiling and wrongful detention

---

[54] *Id.*

[55] *Id.*

[56] Hamid Yazdan Panah, *Open Forum: Stopping ICE raids begins with ending immigration detention*, SAN FRANCISCO CHRONICLE (July 16, 2019), https://tinyurl.com/yb47tdma.

[57] Detention Watch Network, *Detention Quotas*, https://tinyurl.com/yd8udrdo (last visited June 23, 2020); *see also* Florida Immigrant Coalition, *Banking On Detention: Local Lockup Quotas and The Immigrant Dragnet*, https://tinyurl.com/ya9ccgs9 (last visited June 23, 2020).

[58] *Id.*

[PROPOSED] MEMORANDUM OF IMMIGRANT LEGAL RESOURCE CENTER AS *AMICI CURIAE*

substantiates community members' fears.[59] Between fiscal years 2008 and 2012, for instance, 834 U.S. citizens and nearly 30,000 legal permanent residents were wrongfully detained by ICE.[60] An analysis of 2016 alone showed that 693 U.S. citizens were detained at the request of immigration authorities, while an additional 818 were held in immigration detention facilities from 2007 through 2015.[61] On average 150 Americans are mistakenly detained for deportation each year.[62] Given that for-profit facilities increase the likelihood of encounters with federal immigration enforcement officers—and, necessarily, increase the likelihood of abusive encounters—Section 1670.9(d) helps to ensure that communities have a say in whether such increased presence of immigration authorities, and the resulting increased risk of unjustified and discriminatory enforcement actions, is desirable in the community.

## IV. Local Government Entanglement With For-Profit Immigration Detention Centers Stunts Community Development.

The primary argument operators of for-profit immigration detention facilities make in favor of expanding into local communities is money. But the financial incentives are short lived, and, through the sorts of dead-end, low-paying jobs these centers create, often perversely result in stunting the development and enrichment of the local communities in ways that federal, state or local facilities—which offer civil service and law enforcement jobs—do not.

In cash-strapped towns with struggling economies, for-profit immigration detention facilities

---

[59] *See, e.g.*, *Plascencia v. United States*, No. 5:17-cv-02515-JGB-SP (C.D. Cal. 2017) (U.S. citizen detained and threatened with deportation wins settlement from federal and state law enforcement authorities); *Morales v. Chadbourne*, No. 12-301-M-DLM (D.R.I. 2012) (naturalized U.S. citizen wrongly imprisoned pursuant to an immigration detainer); *Lyttle v. United States*, No. 4:11-cv-152 (CDL) (M.D. Ga. 2011) (U.S. citizen with diminished mental capacity detained for 51 days before being deported to Mexico, thereafter suffering imprisonment and abuse in Mexico, Honduras, and Nicaragua for 125 days); *Mendia v. Garcia*, No. 10-cv-03910-MEJ (N.D. Cal. 2010) (naturalized U.S. citizen held after authorities erroneously lodged an immigration detainer against him while in county jail).

[60] Roxana Kopetman, *American citizen from San Bernardino detained by ICE, threatened with deportation wins settlement*, THE SUN (Oct. 26, 2018, updated Oct. 29, 2018), https://tinyurl.com/yc4brg8d.

[61] *Id.*

[62] Steve Coll, *When ICE Tries To Deport Americans, Who Defends Them?*, THE NEW YORKER (Mar. 21, 2018), https://tinyurl.com/yafs2gru.

[PROPOSED] MEMORANDUM OF IMMIGRANT LEGAL RESOURCE CENTER AS *AMICI CURIAE*

257736575

promise "good jobs" for "local people," as well as a stream of revenue for local coffers. However, operators of such facilities, like Plaintiff, simply leverage the local communities' financial need to maximize their own profits, leaving communities continuing to financially flail. These circumstances have only been compounded by the COVID-19 crisis, which has devastated the finances of communities throughout the State.[63]

In the Adelanto, for example, the city's finances are closely tied to Plaintiff. Not only is Plaintiff the city's largest property taxpayer, each year, Plaintiff pays the city the costs of two sheriff deputies as well as more than $1 million in fiscal mitigation costs and administrative fees.[64] Plaintiff's payment accounts for almost 10% of the city's total revenue.[65] As of July 2019, Adelanto faced a $6.3 million budget deficit, and is currently anticipating a 20% reduction in revenues for this fiscal year.[66] Though the Adelanto facilities employ hundreds of workers, prosperity eludes many more, as approximately 35% of Adelanto residents live below the poverty level, and the city's median household income is just above $40,000.[67] In other words, GEO provides just enough jobs at just enough pay to make the city dependent on GEO, but not enough to thrive.

The same goes for the McFarland, which claims to be in "desperate financial condition,"[68] and facing a $500,000 budget deficit.[69] Many of McFarland's residents, 95% of whom are Latino, work in nearby fields and dairies and earn a median household income of less than $34,000.[70] There, Plaintiff will be paying the city $511,000 in annual fiscal mitigation payments, as well as awarding one-time $1,000 scholarships to all McFarland High School graduating seniors attending college,

---

[63] Ben Christopher, "*Everything happened all at once": Can California Cities Weather the COVID Recession?*, CALMATTERS (May 8, 2020). https://tinyurl.com/yb9xujah.

[64] Plevin, *Adelanto, McFarland to vote on GEO's proposal to convert prisons into ICE detention centers*, *supra* note 9.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] Jordan, *An ICE Detention Center?*, *supra* note 8.

[70] Plevin, *McFarland City Council approves GEO's plan to expand immigration detention in Kern County*, *supra* note 49.

[PROPOSED] MEMORANDUM OF IMMIGRANT LEGAL RESOURCE CENTER AS *AMICI CURIAE*

257736575

university, or vocational school.[71] Plaintiff also promised a combined 420 jobs in the expansion.[72]

However, many residents in both cities do not want Plaintiff's jobs because they are relatively lower paying, provide less protections like unionization, offer less or lower-quality benefits like healthcare and pensions, and have limited job security (all compared to their federal, state, or local counterparts), while coming at significant costs to their communities. In public comment at both hearings, residents shared that for-profit immigration detention facility jobs fail to bring prosperity to their communities. Beyond inflicting the substantial harms described above, most jobs are unavailable to local residents who do not meet eligibility requirements. Residents instead voiced their desire for jobs in industries that are sustainable and contribute to the health of the community, like jobs in hospitals, food service, grocery, and the like. Moreover, McFarland residents predicted that many residents will leave rather than stay and live in fear of ICE and its record of unjust and discriminatory deportation, turning the city into a '"ghost town."'[73] Section 1670.9(d) ensures residents have an opportunity to provide input on these critical decisions with long-lasting impact on their communities.

## V. Local Government Entanglement with For-Profit Immigration Detention Centers Ignore Negative Environmental and Health Impacts in the Community.

The conversion of the state prisons into immigration detention centers will also impact the local environment and public health. Immigration facilities are subject to much greater detainee turnover as compared to prisons, resulting to increasing traffic to and from the area. Such facilities also affect air quality related to construction, and water quality from the increased pressure on the existing water and wastewater infrastructure.[74] All of these potential impacts are sustained directly by residents in the local communities via, for example, increased air pollution and poor water quality, which contributes to diminished health outcomes via asthma and heart disease, as well as

---

[71] *Id.*

[72] *Id.*

[73] Jordan, *An ICE Detention Center?*, *supra* note 8.

[74] *Letter to Mayor Gabriel Reyes, et al. from Grisel Ruiz of Immigrant Legal Resource Center, et al. re: SB 29 Compliance: Appeal of Planning Commission Request to Modify Conditional Use Permit No. 96-11*, *supra* note 7.

through stress induced from living with such conditions.[75] Although Plaintiff pays the cities of Adelanto and McFarland mitigation payments, residents deserve input on whether these payments are appropriate, or even sufficient relative to the burden they and their families bear by having a for-profit immigration detention center operating in their community. Section 1670.9(d) ensures that residents are part of that process.

<strong>CONCLUSION</strong>

For the foregoing reasons, Defendants' motion to dismiss should be granted.

Date: June 25, 2020                SIDLEY AUSTIN LLP


By: */s/Collin P. Wedel*_____

Attorneys for *Amici Curiae*
IMMIGRANT LEGAL RESOURCE
CENTER, FAITH IN THE VALLEY, AND
INLAND COALITION FOR
IMMIGRANT JUSTICE

---

[75] *Id.*

257736575

# EXHIBIT 4

COVID-19

# County Data Monitoring

**Step 2: Targeted Engagement with CDPH**

## <u>County Data Chart</u>

In partnership, CDPH will work with Local Health Departments to set up strategy calls and provide technical assistance. The following areas will be discussed:

- Identify the drivers of the changing situation and whether it is increasing confirmed cases, uptick in hospitalizations and ICU patients, outbreaks in congregate settings such as skilled nursing facilities (SNFs) or jails/prisons, or community transmissions in settings such as churches, workplaces, or agriculture, and amongst other specific populations experiencing disease disproportionately.

- Review of the strategies already in place by the Local Health Department and community to address each of the areas of concern, including locally defined plans and protocols published through variance attestations.

- Discuss additional steps that should be taken in various environments such as more aggressive testing strategies, any issues with contact tracing, need for healthcare resources or infection control strategies.

- Discuss issues that may develop as a result of currently identified issues, e.g. additional SNF or community outbreaks leading to a healthcare surge.

- Discuss any gaps in resources and clear articulation of any additional roles for the state and/or local jurisdiction.  Resource gaps should include commodities such as personal protective equipment (PPE), testing supplies, or other consumables.

- Review of business sectors that are open and whether any other state agencies may be needed in the discussion given their ownership of the facility or role in regulating that business sector.

- Review of Local Containment Triggers and Consideration of renewing non-pharmaceutical interventions (NPI).

The state will work closely with Local Health Departments to identify action steps and timelines for addressing issues that impact indicators of concern. Counties currently being monitored at this step, the drivers of their situation, and key action steps identified are below:

- **Alameda County (has variance)** is experiencing an increase in reported COVID-19 cases in recent weeks, indicating elevated disease transmission. This change is above what we expected as a result of the County's substantial expansion of testing. Likely drivers include: 1) increased interpersonal interactions without face coverings and physical distancing, and 2) ongoing transmission among health care workers, within households, in frontline workplace settings, and in skilled nursing and other congregate living facilities. County has reopened more slowly than the rest of the state and reports they are affected by accelerated reopenings across the region and state, as their residents routinely live, work, and recreate across county boundaries. Key actions to address COVID-19 transmission include: 1) pausing their reopening on June 29; 2)

physical distancing; 3) continuing case detection (testing); 4) continuing and increasing case investigation and contact tracing staffing with trusted community partners; 5) increasing support for addressing workplace COVID-19 prevention and response; and 6) coordinating response efforts with the State and regional partners. (Date added to CDM list: July 12, 2020)

- **Butte County (has variance)** is experiencing an increase in reported COVID-19 cases in recent weeks, indicating elevated disease transmission. Likely drivers of this increase include: 1) private gatherings and 2) outbreaks in congregate living facilities. While they have experienced an increase in cases and hospitalizations have increased slightly, the number of COVID patients in ICU have remained low and the hospitals are not concerned about surge at this time. The ICU capacity metric for Butte County shows less than 20%, however the majority of the patients in ICU are non-COVID patients and the hospitals could bring on additional capacity for COVID patients if needed. Actions to address COVID-19 transmission include: 1) testing of all residents and staff in congregate facilities experiencing outbreaks; 2) established regular testing of all staff in skilled nursing facilities; 3) expanding number of contact tracers to continue follow up on each case; 4) development and distribution of flow charts for businesses on "what to do if….."; 5) working closely with the schools to plan for distance or in-person learning; 6) more community outreach and public information: PSAs for TV and radio, regular social media posts, weekly press conferences, information distributed to businesses, signage for businesses to require face coverings. (Date added to CDM List: July 22, 2020)

- **Colusa County (has variance)** is experiencing elevated disease transmission. Drivers of this include family and community gatherings. Actions to address these concerns include 1) NPI interventions such as encouraging social distancing, use of face coverings and hand hygiene.  2) Increasing case investigators and contact tracing 3) reassign staff to assist investigators and contact tracers 4) provide just in time training to current DHHS bilingual staff so they can immediately begin case investigation and contact tracing. 5) identify bilingual staff that can be reassigned within the County that can assist with translation only, not investigation or tracing 6) utilize the language line to allow non-bilingual staff to case investigate and contact trace 7) daily Facebook posts encouraging individuals to wear face coverings 8)Media campaign to explain the importance of both isolation and quarantine. (Date added to CDM list: July 5, 2020)

- **Contra Costa County (has variance)** is experiencing elevated disease transmission and increasing hospitalization. There is a concerning rise in the number of people hospitalized. This is in parallel to a rise in overall cases.  Key actions to address the increase include 1) delaying the opening of additional business and activities in an effort to encourage people to stay home and avoid gatherings, 2) continuing to adhere to the State's guidance on face coverings and enforcement activities, 3) working with communities and community-based organizations to share messaging about face coverings and other prevention techniques along with the importance of testing, and 4) continuing to provide infection prevention expertise to assist skilled nursing facilities and other congregate care facilities on infection control practices and proper use of PPE. (Date added to CDM list: July 5, 2020)

- **Fresno County (has variance)** is experiencing elevated disease transmission. A driver of this are outbreaks in SNFs and the impact of the Avenal State Prison outbreak on staff who live in surrounding counties, such as Fresno. Key actions to address concerns include 1) continuing to provide Infection Preventionists expertise to assist SNFs on infection control practices; 2) ensure baseline testing of SNF residents and health care workers; 3) ensure adequate and proper use of PPE; and, 4) coordination and communication between CDCR, CDPH, and the Local Health Department to mitigate outbreaks at state prisons with employees who return to live in Fresno County. (Date added to CDM list: June 8, 2020)

Glenn County (has variance) is experiencing elevated disease transmission. Drivers of this include an increase in outbreaks and clusters related to 1) household contacts, 2) social gatherings 3) businesses in the county 4) one church gathering and 5) one case that traveled to Mexico. Actions to address these concerns include 1) Working with businesses on health check screenings and NPI enforcement and monitoring 2) Increasing case investigators and contact tracing 3) Increase testing and media campaigning for those that are symptomatic 4) Develop a process to handle incoming cases in a timely and efficient manner. (Date added t o CDM list: June 29, 2020)

- **Imperial County** is experiencing elevated disease transmission. Drivers of this include U.S. citizens/residents traveling to or from Mexicali to work and/or seek healthcare and other services, continued need for staffing solutions at hospitals, and outbreak at meat packing facility. Key actions to address concerns include 1) building additional testing capacity, 2) training and onboarding contact tracing staff, 3) transporting patients to hospitals in neighboring counties when hospital capacity is full or limited; and, 4) stand up support for alternative care sites. (Date added to CDM list: June 5, 2020)

- **Kern County (has variance)** is experiencing an increase in reported COVID-19 cases during the last few weeks. The county has also significantly increased testing. The likely drivers of elevated disease transmission include: 1) An exponential expansion of testing Kern County residents; 2) Transmission in Skilled Nursing Facilities, prisons and other congregate facilities; 3) Household contacts and social gatherings among separate households. Strategies and actions to address the concerns include: 1) Continuing to implement an aggressive outreach program that strongly encourages disease prevention methods and targeting areas disproportionately impacted; 2) Working with the California Department of Public Health to require significant operational changes within our Skilled Nursing Facilities and positioning our new SNF accountability officer to effectively coordinate Kern County and State efforts; and 3) Coordinating and communicating with State agencies to mitigate disease transmission and outbreaks at State prisons. (Date added to CDM list: July 21, 2020)

- **Kings County (has variance)** is experiencing elevated disease transmission, increasing hospitalizations, and limited hospital capacity. Drivers of this include county experiencing outbreaks at Avenal State prison within their jurisdiction, resulting in secondary infection to staff working within the central and satellite kitchens; outbreak at local Adventist Health (AH) admitting COVID positive patients from Tulare, Reedley, and SNF outbreaks. Key actions to address concerns include 1) coordination and communication between local health department, CDPH, and California Department of Corrections and Rehabilitation (CDCR) to mitigate outbreak at Avenal State Prison; 2) order needed resources through the Standardized Emergency Management System such as oxygen concentrators, health care staff, testing kits, and PPEs; and, 3) continue to engage with SNFs on infection control measures. (Date added to CDM list: June 5, 2020)

- **Los Angeles County (has variance)** is experiencing the possibility of elevated disease transmission. Drivers of this include having a high case rate that is highly related to high testing capacity and volume countywide, which also includes testing all residents and staff at over 235 SNFs. Key actions to monitor the situation include 1) monitoring positivity rate among those tested to ensure that there isn't a significant increase that may signal more community transmission; 2) continuing to provide Infection Preventionists expertise to assist SNFs and to ensure baseline testing at every SNF that has not reported any positive cases; and, 3) working with the state to ensure supply chain issues related to PPE at SNFs are resolved. (Date added to CDM list: June 5, 2020)

- **Madera County (has variance)** is experiencing elevated disease transmission and limited hospital capacity. Drivers of this include an increase in community spread cases related to 1) social gatherings 2) work exposure 3) person-to-person transmission in large households. Actions to address these concerns include 1) contact

collaborate with regional hospitals to make plans to transfer if needed 5) Setup Alternate Care Site for
patients. (Date added to CDM list: July 4, 2020)

- **Marin County (has variance)** is experiencing elevated disease transmission, increasing hospitalizations, and
  limited hospital capacity. Drivers of this include county experiencing an outbreak at San Quentin State Prison
  within their jurisdiction; increased community transmission among essential workers; and outbreaks in
  congregate settings and Latinx neighborhoods. Key actions to address concerns include 1) coordination and
  communication between local health department, CDPH, and California Department of Corrections and
  Rehabilitation (CDCR) to mitigate outbreak at San Quentin State Prison; 2) enhanced infection control
  practices and testing at residential care facilities for the elderly (RCFE) and skilled nursing facilities (SNF); and
  3) partnerships with community-based organizations to increase testing, access to care and supports for
  vulnerable populations. (Date added to CDM list: July 3, 2020)

- **Merced County (has variance)** is experiencing elevated disease transmission, increasing hospitalizations,
  and limited hospital capacity. Drivers of this include increased community transmission, increased
  exposures at work places (including several small outbreaks), and household clusters, particularly in the
  Latinx/Hispanic community. Action steps to address these concerns include: 1) increased
  marketing of community testing among priority populations; 2) increasing culturally responsive public
  messaging and education on the importance personal protection measures including face coverings; and, 3)
  educational outreach to businesses to convey importance of implementing safety measures in order
  to prevent future shutdown. (Date added to CDM list: June 29, 2020)

- **Mono County** (**has variance**) has evidence of increasing disease transmission with recent rapid rise in
  positive cases and percent positives. The only hospital, Mammoth Hospital, a 17 bed CAH with 2 bed ICU,
  remains relatively unimpacted. About 95% of their cases have been in the Town of Mammoth Lakes (TOML),
  the largest town, with much less evidence of community transmission in unincorporated areas. County
  reports that the Hispanic community is disproportionately affected. Drivers include: 1) cases in the
  restaurant sector (Two-thirds of cases over the last 4 weeks have occurred in restaurant workers or their
  contacts), 2) Contact and exposure in tourism sector, 3) informal gatherings. County reports that tourism
  greatly increases their population and social activity and is believed to increase transmission. Informal
  gatherings are believed to be a significant source of new infections. Key actions to address these concerns
  include: 1) setting capacity limits on transient lodging in TOML, 2) active promotion of StaySafeToStayOpen
  behaviors, 3) enforcement of face covering orders and other applicable to businesses. County is working to
  increase access to testing although reliance on send-out testing is not optimal. Targeted testing in affected
  business sectors is ongoing. County's contact tracing staff have been able to meet needs to date. (Date added
  to the CDM list: July 23, 2020).

- **Monterey County (has variance)** is experiencing elevated disease transmission. Drivers include 1)
  community transmission as more individuals leave their homes to work or to seek services, and 2) workplace
  transmission followed by household transmission. Key actions to slow transmission of COVID-19 include 1)
  promoting and building additional testing capacity in geographic areas with low testing rates; 2) continuing
  case and contact investigations; 3) continuing to coordinate with local hospitals, clinics, and skilled nursing
  facilities to ensure surge response readiness, and; 4) focusing additional outreach and educational
  messaging in geographic areas and among populations disproportionately affected by COVID-19. (Date
  added to CDM list: July 2, 2020)

**Napa County (has variance)** is experiencing elevated disease transmission. Drivers of this include family and community gatherings, increased community transmission, increased transmission among the Latino population within crowded household settings, and disproportionate impact on agricultural workers. Actions to address these concerns include: 1) NPI interventions such as encouraging social distancing, use of face coverings and hand hygiene; 2) increasing bilingual case investigators and contact tracing staff; 3) education on staying within household bubbles, using traditional and social media and door-hanger campaigns; 4) public education of social distancing and face coverings through radio, Facebook Live, newspaper and social media; 5) testing of all case contacts, surveillance testing of skilled nursing facilities and farmworkers within vineyard management with exposures or outbreaks; 6) formation of an intergovernmental compliance task force to enforce social distancing and face coverings; and 7) engagement of industry groups and community based organizations for vulnerable populations. (Date added to CDM list: July 8, 2020)

- **Orange County (has variance)** is experiencing an increase in hospitalization. Drivers of this include: a) community transmission from gatherings, b) workplace transmission, c) outbreaks in non-medical congregate livings such as assisted living facilities, memory care facilities, etc. Orange County's key action steps to address concerns include: 1) collaborating with cities and the business community to increase public messaging on the importance of social distancing, not gathering, and mandate face covering. 2) increase testing sites and education outreach in communities where positive cases are high; and, aggressive targeted educational outreach to ethnic communities, 3) working with hospital and health systems to monitor and understand hospitalizations and prepare for the surge, 4) implementation of hospital criteria for shifting to Crisis Care Strategies (surge plan activations), 5) prioritizing medical resource distribution to hospitals most burdened with COVID-19 patients. 6) monitoring positivity rate among those tested to ensure that there isn't a significant increase that may signal more community transmission, 7) contracting with community-based organizations to provide outreach to specific ethnic groups; share messaging about face coverings and other prevention techniques along with the importance of testing; provide necessary supports for social determinant of health needs, 8) providing infection prevention expertise to assist skilled nursing facilities and other congregate care facilities on infection control practices and proper use of PPE. (Date added to CDM list: June 29, 2020)

- **Placer County (has variance)** is experiencing increased hospitalizations and limited hospital capacity. Placer County is also experiencing an increasing trend in disease transmission. Drivers of increased disease transmission include large households where staying away from others while ill is difficult, community and extended family gatherings, and indoor work environments where physical distancing is difficult. The rising number of cases of COVID-19 in Placer County as well as in neighboring counties are driving an increase in hospitalizations. Placer County's two largest hospitals lie on the Placer-Sacramento County border and provide care to residents of both counties, as well as other neighboring counties. Key actions to address the situation include 1) Working with community-based organizations to provide guidance and support to residents of large households were isolation is difficult; 2) Public messaging on the importance of not gathering with non-household members; 3) Outreach to the business community regarding the importance of temperature checks, symptom screenings, face coverings for staff and customers, and supporting ill and exposed employees to stay home; and 4) Working with hospitals to review and, if necessary, implement surge plans. (Date added to CDM list: July 9, 2020)

- **Riverside County (has variance)** is experiencing elevated disease transmission. Drivers of this include: 1) outbreaks at state prisons and skilled nursing facilities (SNFs), 2) potential transmission at public protests with large numbers of people in close proximity without face coverings, 3) in-county patient transfers from Imperial County, 4) patients seeking care from Northern Baja California and traveling along SR-86 corridor

Case in20-ceav-0096feThN-5sAgeneeDriturnaestiB2be1 gaFithdnBs37K24420n Rappeoaddresi 2d5fs

include: 1) close monitoring of data; 2) increase testing volume at county and state sites; 3) continue SNF outreach and support and implement Quick Response Task Force assistance for high risk facilities; 4) expand contact tracing workforce; 5) increase public messaging on the importance of personal protection measures; and 6) coordination and communication between the local health department, CDPH, and California Department of Corrections and Rehabilitation (CDCR) to mitigate outbreaks at state prisons. (Date added to CDM list: June 17, 2020)

- **Sacramento County (has variance)** has experienced the possibility of increasing hospitalization. Drivers of this include community transmission due to holiday gatherings amongst large families. Key action steps to address concerns include (1) increase of public messaging on the importance of social distancing, not gathering, and mandate face covering, (2) more testing sites and education outreach in communities where positive cases are high, and (3) targeted educational outreach to ethnic communities. (Date added to CDM list: June 24, 2020)

- **San Benito County (has variance)** is experiencing elevated disease transmission. Drivers of this include an increase in outbreaks and clusters related to 1) household contacts, 2) social gatherings and 3) businesses in the county. Actions to address these concerns include: 1) working with businesses on health check screenings and NPI enforcement; 2) monitoring increasing case investigators and contact tracing; 3) increasing testing and media campaigning for those that are symptomatic; and 4) working with external partners to improve efficient case reporting and processing. (Date added to CDM list: July 8, 2020)

- **San Bernardino County (has variance)** is experiencing elevated disease transmission and increasing hospitalizations. Drivers of this include: 1) community transmission from gatherings, 2) workplace transmission, 3) transmissions at state prison, state hospital, county jails and academy, and skilled nursing facilities, 4) transfer of patients from Imperial County. Action steps to address these concerns include: 1) expanding community testing and testing among priority populations; 2) coordination and communication between local health department, CDPH, and California Department of Corrections and Rehabilitation (CDCR) to mitigate outbreaks at state prisons; and with CDPH for outbreak mitigation at the State Hospital, 3) providing SNF Taskforce support and Infection Prevention expertise to support SNFs; 4) increasing public messaging and education on the importance personal protection measures including face coverings and personal responsibility; 5) working with labs and employers to increase turn-around time from diagnosis to isolation and initiation of case contacting; and 6) increasing number of contact tracers. (Date added to CDM list: June 21, 2020)

- **San Diego County (has variance)** has an elevated case rate due to widespread COVID-19 disease transmission. County has taken following key actions to mitigate the situation 1) closing restaurants, bar, and breweries to decrease access, exposure, and gatherings; 2) requiring customers of these venues to be seated at socially distanced tables; 3) encouraging outdoor dining, which contributes to a lower risk of infection; 4) encouraging the younger population to use face coverings and practice social distancing through outreach to universities, colleges, transitional age youth, and other community youth organizations; and 5) working with industry associations to conduct education and outreach. County has taken the following key actions to manage the situation 1) continuing to onboard sufficient case investigators and contact tracers to prevent additional community transmission; 2) increasing testing sites to reach vulnerable and younger populations; 3) deploying County strike teams to conduct site assessment at skilled nursing facility (SNFs), non-SNFs/long-term care facilities, and community setting outbreaks; and 4) evaluating and modifying efforts to ensure testing is available throughout the community for all populations. Lastly, county has taken the following key actions to monitor the situation include 1) monitoring the positivity rate among those tested to ensure that

the Division of Public Health Communicable Disease Control Branch is continuing to work with congregate care facilities to implement infection prevention and control measure and assist with education and testing; and 3) continuing to monitor, identify and assess impacts due to local demographics. (Date added to CDM list: July 3, 2020)

- **San Francisco County (has variance)** is experiencing a significant increase in SARS-CoV-2 infections and COVID-19 hospitalizations. Since early to mid-June San Francisco case rates, positivity proportion, and hospitalizations have more than tripled. The Latinx community continues to be the most impacted, but infections have increased in other racial/ethnic groups, in low-income neighborhoods, in younger persons, in lower-wage essential workers, and across the city. Although the county currently has a variance, they paused their reopening two weeks ago. County believes drivers of increases in infections are due to multiple causes including (1) increases in economic activity, movement, and mixing, (2) increases in social gatherings, (3) increases in mixing opportunities for persons from different households, (4) limited compliance to indoor worksite requirements for face coverings, physical distancing, hand hygiene, and environment disinfection, and (5) continuing infections in low-income crowded housing and among lower-wage essential workers. We are developing a comprehensive plan to (a) expand community outreach, engagement, and mobilization with an equity focus, (b) expand education, support, and enforcement of worksites to comply with health and safety requirements, (c) expand and prioritize community testing, (d) expand case investigation and contact tracing, and (e) improve our surveillance and epidemiology efforts to identify the strongest risk factors for infection, and to evaluate our containment efforts. County plans to follow state directives and guidance. (Date added to CDM list: July 17, 2020)

- **San Joaquin County (has variance)** is experiencing increasing hospitalization and limited hospital capacity. Drivers of this include 1) community transmission due to gatherings, 2) workplace transmission followed by household transmission; 3) SNF outbreaks; and, 4) increase in widespread testing. Action steps to address concerns include: 1) increase public messaging on the importance of personal protection measures and the risks involved with mass gatherings in multiple languages; 2) continuing to provide Infection Preventionists expertise to assist SNFs on infection control practices, ensure baseline testing and proper use of PPE. (Date added to CDM list: June 7, 2020)

- **San Luis Obispo County (has variance)** has an elevated case rate due to widespread COVID-19 disease transmission. Drivers of the increase in cases include: 1)Re-opening of many business sectors that allow for more community mingling; 2) Increases in Community/Family gatherings; 3) Increase in certain community sector perception that the pandemic is not serious. County has taken following key actions to mitigate the situation 1) Increased testing to identify outbreaks and infected persons; 2) Engagement and enforcement to increase distance between patrons of bars and restaurants; 3) Increased social messaging to the public to encourage social distancing, and increase the understanding of the dangers of increased disease transmission; 4) Continuing to onboard case investigators, contact tracers and support staff to prevent additional community transmission; 5) Deployment of County strike teams to conduct site assessment at skilled nursing facility (SNFs), non-SNFs/long-term care facilities, and community setting outbreaks; 6) Offer rapid turn-around testing to identified contacts of known cases. (Date added to CDM list: July 13, 2020)

- **Santa Barbara County (has variance)** is experiencing increasing hospitalization related to increasing cases in our north county region. Drivers of this increase include 1) community transmission due to gatherings, 2) workplace transmission and household transmission; 3) SNF outbreaks; and 4) increase in widespread community testing. Key action areas to address concerns include 1) engage community leaders, stakeholders, and members in taking actions to prevent community transmission; 2) continue prevention

measures to the medical facilities to ensure bracing are able to provide Infection Preventionists expertise to assist SNFs on infection control practices, ensure baseline testing, and proper use of PPE. (Date added to CDM list: June 15, 2020)

- **Santa Clara County (has variance)** is experiencing increased hospitalization. Drivers of increased hospitalization of COVID-19 patients may include: 1) increased transmission in the community; 2) patient transfers from outside the county; 3) patient transfers from long term care facilities; 4) /or increased transmission among residents or individuals from neighboring counties who seek care in hospitals in Santa Clara County. Although the percentage change in hospitalizations shows an increase, the increase in the absolute number of patients hospitalized is still low relative to the size of the population in Santa Clara County and is low relative to the number of hospital beds available in the County. Key actions to address the increase include: 1) coordination and communication between the local health department and hospitals in the county experiencing increases to identify underlying causes; 2) data collection from hospitals that serve large proportions of out-of- jurisdiction patients to identify county of residence; 3) coordination and communication between the local health department and long term care facilities to support these facilities with outbreak detection and control as well as care for residents with confirmed COVID-19 when appropriate to avoid transfer to the hospital; and 4) increased public messaging, in multiple languages, on harm reduction, including the importance of social distancing, consistent use of face coverings and the risks involved with mass gatherings. (Date added to CDM list: July 12, 2020)

- **Solano County (has variance)** is experiencing increasing hospitalization. Drivers include a large outbreak among farm workers in the vineyards in Sonoma and Napa who are residing in Solano, as well as an ongoing surge in cases related to family gatherings and other social gatherings on the weekends.  The farm worker cases total many dozens over the past one to two weeks, and the close-contact cases appear to have begun with weekend activities in early May and are continuing to the present.  The large number of such cases overall is resulting in an increase in hospitalized cases.  These cases are not at present resulting in a strain on the hospitals or in ICU admissions but the county is monitoring this closely.  County reports that hospitals in their jurisdiction have multiple levels of surge capacity for hospitalizations and for ICU admissions, if these become necessary. Key action steps include: working with the neighboring counties and with the vineyard management companies to implement social distancing measures; 2) educating the workers themselves (using Spanish interpreters) on social distancing measures; 3) providing appropriate cautionary messages through social media and the press about the risks of gatherings, not social distancing and not using personal protection measures. (Date added to CDM list: June 29, 2020)

- **Sonoma County (has variance)** is experiencing increasing hospitalization.  Drivers of the situation include outbreaks in skilled nursing facilities (SNFs) and residential care facilities for the elderly, and rising case rates, particularly in the Latinx community, due to exposure of essential workers, household clusters, increasing workplace and community transmission with the state's reopening, and large social gatherings.  Sonoma County's key actions to address concerns are: 1) restructuring of SNFs to allow for quarantine/isolation of PUIs and positive cases to avoid further spread, 2) field surveillance and testing at congregate care sites, 3) formation of a Latinx community workgroup, pop-up testing sites in Latinx community locations with highest rates of case transmission, and partnerships with community organizations and health partners to provide culturally sensitive case management and connection to resources, 4) building contact tracing and case investigation capacity and hiring of additional bilingual/bicultural staff, 5) public messaging and education on the importance of hygiene, social distancing, not gathering, and facial coverings, 6) outreach and support to businesses around implementing safety measures, 7) building alternate care site capacity to

Case exposure include expanding contact tracing and encouraging all site is closed (individuals to quarantine and 4) securing PPE
supplies in preparation for possible shortages in hospitals and skilled nursing facilities. (Date added to CDM
list: July 10, 2020)

- **Stanislaus County (has variance)** is experiencing increasing hospitalization. Drivers of this include an 1)
  increase in outbreaks and clusters related to family gatherings, businesses (in and out of county) and
  healthcare facilities; 2) the hospital being a regional hospital accepting patients that are residents outside the
  county; 3) decreased attention to personal protection measures such as face coverings and social distancing.
  Action steps to address concerns include 1) prioritizing rapid contact tracing, isolation and quarantine by
  public health staff for new positive cases; 2) continual monitoring of tests being conducted in the county and
  relocating sites, when necessary, to more densely populated and higher incidence areas, 3) continually
  offering businesses resources and technical assistance to comply with local requirements; 4) closely
  monitoring healthcare facilities and continuing to provide Infection Preventionist expertise to assist SNFs
  with planning and response; 5) retaining trained employees from other county departments to continue to
  assist in contact tracing; 6) partnering with community-based organizations serving minorities for outreach,
  education, and mobile testing; and 7) increased messaging including a public media campaign to promote
  face covering and social distancing. (Date added to CDM list: June 17, 2020)

- **Tulare County (has variance)** is experiencing elevated disease transmission. Drivers of this include
  outbreaks in skilled nursing facilities and work places and barriers to preventing transmission within
  households. Increased hospitalizations and ICU utilization have been related to multiple conditions other
  than COVID19. Key action areas to address concerns include 1) continue to engage with SNFs and
  businesses and with ongoing collaboration with Licensing and Certification and the HAI program; 2) continue
  to enhance contact tracing; and, 3) continue public messaging through multiple mediums about actions to
  prevent community transmission. (Date added to CDM list: June 5, 2020)

- **Ventura County (has variance)** is experiencing increasing hospitalizations related to increasing cases in our
  county. Drivers of this increase include: 1) community transmission due to gatherings; 2) essential workplace
  transmission followed by household transmission; 3) transmission in overcrowded housing; 4) SNF
  outbreaks; and 5) increase in widespread community testing through our drive-thru testing locations. Key
  action areas to address concerns include: 1) engage community leaders, stakeholders, and members in
  taking actions to prevent community transmission; 2) continue prevention messaging through multiple
  mediums including visiting workplaces/residential complexes in areas where we have increased community
  transmission; 3) continue to enhance case investigation and contact tracing efforts; and 4) continuing to
  provide Infection Preventionists expertise to assist SNFs on infection control practices, ensure baseline
  testing, and proper use of PPE. (Date added to CDM list: June 24, 2020)

- **Yolo County (has variance)** is experiencing elevated disease transmission and limited hospital capacity.
  Drivers of this include: 1) community transmission due to social and family gatherings; 2) workplace
  transmission; and 3) an increase in widespread testing at skilled nursing facilities. Action steps to address
  concerns include: 1) increase in disease investigation and contact tracing; 2) ongoing support for long-term
  care and congregate community facilities on infection control practices; 3) public messaging on social
  distancing and face covering mandates; 4) targeted educational outreach to religious groups and Latino
  communities; and 5) increased enforcement of mandated health and safety measures. (Date added to CDM
  list: July 8, 2020)

- **Yuba County and Sutter County (has variance)** are experiencing elevated disease transmission. Drivers of
  this include 1) household clusters relating to friend and family gatherings 2) workplace transmissions 3) 40%
  are unknown due to cases not able or not willing to provide source of exposure. Actions to address these

communications/messaging campaign to avoid large gatherings 2) aggressive outreach to the Latino community who have experienced a disproportionate burden of cases and hospitalizations 3) outreach and education to the Punjabi community given rising cases in this population in the past several weeks 4) Information campaign to the public regarding the importance of working with public health in regards to contact investigation and tracing as much as possible 5) hiring two additional teams of contact investigators and contact tracers 6) continue to aggressively work on education and outreach to businesses in the community. (Dates added to CDM list: July 11 and July 9, 2020, respectively)

Page Last Updated : July 23, 2020