1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   IMMIGRANT LEGAL RESOURCE            No.  1:20-cv-00966-TLN-AC
     CENTER; and FREEDOM FOR
12   IMMIGRANTS,

13            Petitioners,

14       v.                              **ORDER**

15
     CITY OF MCFARLAND; and
16   MCFARLAND PLANNING
     COMMISSION,
17
              Respondents,
18

19   GEO GROUP, INC.,

20            Real Party in Interest,

21

22

23        On July 12, 2020, Petitioners Freedom for Immigrants ("FFI") and Immigrant Legal

24   Resource Center's ("ILRC") (collectively, "Petitioners") filed an *Ex Parte* Application for

25   Temporary Restraining Order and Order to Show Cause.  (ECF No. 3.)  On July 14, 2020, the

26   Court granted Petitioners' application for temporary restraining order and granted Petitioners'

27   application for an order to show cause as to why a preliminary injunction should not issue.  (ECF

28

No. 8.)  Respondent City of McFarland ("the City") and Real Party in Interest GEO Group, Inc. ("GEO") filed oppositions.  (ECF Nos. 19, 20.)  Petitioners filed a reply.  (ECF No. 21.)  For the reasons set forth below, the Court GRANTS Petitioners' request for a preliminary injunction.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In December 2019, GEO contracted with United States Immigration and Customs Enforcement ("ICE") to operate immigration detention facilities at Central Valley ("Central Valley") and Golden State ("Golden State") Modified Community Correctional Facilities in McFarland, California.  (ECF No. 3-1 at 8.)  Shortly thereafter, GEO applied to the City of McFarland Planning Commission ("the Planning Commission") for modifications to Conditional Use Permits 01-96 and 02-96 ("Proposed Modifications") that would allow GEO to house federal immigration detainees at those facilities.  (*Id.*)

The Planning Commission first notified the public of the Proposed Modifications on January 10, 2020.  (*Id.*)  The Planning Commission also held two hearings concerning the Proposed Modifications: the first on January 21, 2020, and the second on February 18, 2020.  (*Id.*)  At the end of the February 18 meeting, the Planning Commission voted to reject the Proposed Modifications.  (*Id.* at 9.)

On February 26, 2020, GEO appealed the Planning Commission's decision to the McFarland City Council ("City Council").  (*Id.*)  The City Council held a public meeting to address the issue on April 23, 2020.  (*Id.*)  Due to the COVID-19 pandemic, the City Council held the meeting via videoconference on the Zoom platform and via dial-in.  (*Id.*)  During the meeting, the City Council approved the Proposed Modifications by adopting Resolutions 2020-13 and 2020-14.  (*Id.*)  Resolutions 2020-13 and 2020-14 provide that the Proposed Modifications shall not be considered "issued, executed, or effective until July 15, 2020."  (*Id.*)  After that date, the Proposed Modifications would allow GEO to accept transfers of federal immigration detainees to Central Valley and Golden State.  (*Id.* at 10.)

On June 30, 2020, Petitioners filed a Verified Petition for Writ of Mandate in Kern County Superior Court seeking to compel Respondents to revoke approval of the Proposed Modifications.  (*See* ECF No. 1-2.)  Petitioners named the City and the Planning Commission

1   (collectively, "Respondents") as Respondents and GEO as a Real Party in Interest. (*Id.*) On July

2   10, 2020, Petitioners filed an *ex parte* application for a temporary restraining order in state court

3   to enjoin the transfer of detainees, which would be permissible under the Resolutions as of July

4   15, 2020. (*See* ECF Nos. 1-3, 1-4.) That same day, GEO removed the action to this Court. (*See*

5   ECF No. 1.)

6          Petitioners then filed an e*x parte* application for a temporary restraining order in this

7   Court on July 12, 2020, seeking to enjoin the City from taking any action to issue, execute, or

8   make effective the Proposed Modifications and seeking to enjoin GEO from transferring any ICE

9   detainees into or out of, and accepting any transfer of any detainee into or out of, and housing any

10  detainee at Central Valley or Golden State in reliance on the Proposed Modifications. (ECF No.

11  3.) On July 14, 2020, the Court granted Petitioners' request and ordered Respondents and GEO

12  to show cause as to why a preliminary injunction should not issue. (ECF No. 8.) GEO and the

13  City filed separate oppositions on July 21, 2020. (ECF Nos. 19, 20.) Petitioners filed a reply on

14  July 24, 2020. (ECF No. 21.)

15         **II.      STANDARD OF LAW**

16         Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

17  showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555

18  U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "The

19  purpose of a preliminary injunction is merely to preserve the relative positions of the parties until

20  a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)

21  (emphasis added); *see also Costa Mesa City Employee's Assn. v. City of Costa Mesa*, 209 Cal.

22  App. 4th 298, 305 (2012) ("The purpose of such an order is to preserve the status quo until a final

23  determination following a trial.") (internal quotation marks omitted); *GoTo.com, Inc. v. Walt*

24  *Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to

25  any situation before the filing of a lawsuit, but instead to the last uncontested status which

26  preceded the pending controversy.") (internal quotation marks omitted). In cases where the

27  movant seeks to alter the status quo, a preliminary injunction is disfavored and a higher level of

28  scrutiny must apply. *Schrier v. University of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005). A

preliminary injunction is not automatically denied simply because the movant seeks to alter the status quo, but instead the movant must meet heightened scrutiny. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id.*  A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.*  Simply put, Plaintiff must demonstrate, "that [if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply in the plaintiff's favor," in order to succeed in a request for preliminary injunction. *Id.* at 1134–35 (emphasis added).

### III.   ANALYSIS

#### A.   Likelihood of Success on the Merits

The thrust of Petitioners' argument is that the City unlawfully approved the Proposed Modifications.  More specifically, Petitioners argue Respondents violated California Civil Code § 1670.9(d) ("§ 1670.9(d)"), which provides,

> (d)  A city, county, city and county, or public agency shall not, on and after January 1, 2018, approve or sign a deed, instrument, or other document related to a conveyance of land or issue a permit for the building or reuse of existing buildings by any private corporation, contractor, or vendor to house or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and county, or public agency has done both of the following:
>
> (1)  Provided notice to the public of the proposed conveyance

4

or permitting action at least 180 days before execution of the conveyance or permit.

(2) Solicited and heard public comments on the proposed conveyance or permit action in at least two separate meetings open to the public.

Petitioners argue Respondents violated § 1670.9(d) in three ways: (1) the City Council held only one public meeting before approving the Proposed Modifications on April 23, 2020; (2) the City Council "executed" the Proposed Modifications on April 23, 2020, less than 180 days from when the public was first given notice; and (3) both the Planning Commission and the City Council impermissibly restricted public participation during the public meetings.

The Court previously found there were at the very least serious questions as to whether Respondents violated § 1670.9(d).  In response, the City argues Petitioners' motion fails to address standing and was improperly brought under California Code of Civil Procedure § 1085. GEO and the City also argue Petitioners cannot succeed on the merits of their claim because the City fully complied with § 1670.9(d).  Lastly, GEO argues § 1670.9(d) is unconstitutional under the intergovernmental immunity doctrine.  The Court will address the parties' arguments in turn.

       *i.*     *Standing*

The City argues Petitioners failed to address standing.  (ECF No. 19 at 4.)  The City does not go so far as to argue that Petitioners lack standing to bring their claims.  Rather, the City merely points out that Petitioners did not discuss standing in their motion.  (*Id.* at 5.)

"To establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Sierra Club v. Trump*, 963 F.3d 874, 883 (9th Cir. 2020).  "An organization has standing to sue on its own behalf when it suffers both a diversion of its resources and a frustration of its mission."  *Id.* at 884 (9th Cir. 2020) (internal quotation marks omitted).

The sworn, verified petition initiating this action states ILRC "works . . . to ensure that immigrants have a voice on issues that impact them the most, such as immigration detention." (ECF No. 1-2 at 4.)  The petition also states FFI "monitors conditions in immigration detention

1    facilities nationwide." (*Id.* at 5.)  Finally, the petition states Petitioners "would necessarily divert

2    considerable organizational resources to working with individuals detained in McFarland."  (*Id.* at

3    4–5.)  Because Petitioners assert that they will suffer both a diversion of resources and a

4    frustration of mission, the Court finds Petitioners have sufficiently demonstrated they have

5    standing to bring this action.  *See Sierra Club*, 963 F.3d at 884.

6                    *ii.      California Code of Civil Procedure § 1085*

7            The City argues Petitioners are unlikely to succeed on the merits because they improperly

8    brought their petition under California Code of Civil Procedure § 1085 ("§ 1085") rather than

9    California Code of Civil Procedure § 1094.5 ("§ 1094.5").  (ECF No. 19 at 3.)  The City argues

10   the approval of conditional use permits is an administrative or adjudicatory act, and therefore §

11   1094.5 is the exclusive remedy for reviewing the City's actions.  (*Id.*)  Petitioners respond that §

12   1094.5 is appropriate only when a petitioner is challenging the manner in which a public agency

13   has exercised discretion.  (ECF No. 21 at 6.)  According to Petitioners, they are alleging the City

14   violated ministerial duties imposed by § 1670.9(d), which imposes mandatory prerequisites rather

15   than discretionary decisions.  (*Id.*)  As such, Petitioners argue § 1085 — which concerns statutory

16   duties that require a particular action be taken or not taken — is the correct vehicle for this case.

17   (*Id.* at 6–7.)

18           "To be enforceable by writ of mandate [under § 1085], a statutory duty must be

19   obligatory, rather than merely discretionary or permissive, in its directions to the public entity; it

20   must require, rather than merely authorize or permit, that a particular action be taken or not

21   taken." *Pich v. Lightbourne*, 221 Cal. App. 4th 480, 493 (2013).  In contrast, § 1094.5 is a

22   mechanism for challenging discretionary decisions.  *See Saad v. City of Berkeley*, 24 Cal. App.

23   4th 1206, 1212 (1994), *as modified* (May 5, 1994) ("Section 1094.5 clearly contemplates that at

24   minimum, the reviewing court must determine both whether substantial evidence supports the

25   administrative agency's findings and whether the findings support the agency's decision.").

26           Here, Petitioners are not challenging the City's discretionary decision to approve the

27   Proposed Modifications.  Instead, Petitioners are challenging the City's failure to follow the

28   mandatory procedural requirements set forth in § 1670.9(d) prior to making that decision.

1   Because Petitioners are not challenging the City's exercise of discretion, they were not required to

2   bring their petition under § 1094.5.

3              *iii.        Compliance with § 1670.9(d)*

4        As mentioned, Petitioners argue Respondents violated § 1670.9(d) in three ways.  The

5   Court will address Petitioners' arguments — and GEO and the City's responses — in turn.

6        First, Petitioners argue that proper interpretation of § 1670.9(d) requires each public body

7   considering any action pertaining to an immigration detention facility to provide 180 days' notice

8   and to hold at least two public meetings before approving the action.  In other words, Petitioners

9   argue that even though the Planning Commission held two public meetings, the City Council was

10  also required to independently hold two public meetings once the matter was before it.

11  Petitioners argue the City Council violated § 1670.9(d) by holding only one meeting before

12  approving the Proposed Modifications on April 23, 2020.

13       In response, GEO and the City argue the City Council and the Planning Commission are

14  not separate municipal bodies.  Rather, they argue the Planning Commission acted on behalf of

15  the City and the City Council functioned as an appellate body to the Planning Commission,

16  holding a total of three hearings.

17       In its previous order, the Court agreed with Petitioners that the disjunctive use of the word

18  "or" when listing "city, county, city and county, or public agency" supports a reasonable

19  interpretation that each separate municipal body considering a permitting decision must

20  independently satisfy § 1670.9(d).  (ECF No. 8 at 6.)  The Court also agrees with Petitioners that

21  because § 1670.9(d) is a statute which "furthers the people's right of access" to government, the

22  California Constitution demands that it be construed broadly.  *See* Cal. Const. art I, § 3.  Neither

23  GEO nor the City provide authority to suggest that the City and its Planning Commission are

24  considered a single entity in the context of laws dealing with "the people's right of access."

25  Further, Petitioners submit minutes from the April 23 meeting to show that the City Council did

26  not limit itself to the review of the record from the Planning Commission.[1]  (*See* ECF No. 3-2 at

27

28   _____

[1]       Petitioners request the Court take judicial notice of the minutes from the April 23 City
    Council meeting.  Pursuant to Federal Rule of Evidence 201, Petitioners' request is GRANTED.

7

33–36.)  To the extent the City Council made its decision independent of the record from the Planning Commission proceedings, such independence reinforces a reasonable interpretation that the City Council acted as a separate municipal body rather than an appellate body.  Accordingly, there are at the very least serious questions as to whether the Planning Commission and the City Council were each required to hold two public meetings under § 1670.9(d).

Second, Petitioners argue the City Council "executed" the Proposed Modifications on April 23, 2020, which was less than 180 days from when the public was first notified as required under § 1670.9(d).  Petitioners argue it is improper to consider the Proposed Modifications "executed" when they were to become effective on July 15, 2020, primarily because doing so undermines the statute's purpose of maximizing public participation by allowing permitting decisions to be formally approved months before that permit's effective date.

GEO and the City argue the City complied with the 180-day notice requirement.  GEO argues the City issued notice on January 10, 2020, and then "interpreted its own zoning powers" to allow for the delayed execution of the Proposed Modifications until July 15, 2020.  (ECF No. 20 at 14.)  The City adds that the term "execute" is not ambiguous and applies to when the Proposed Modifications were effective on July 15, 2020.  (ECF No. 19 at 11.)

In its previous order, the Court found it was reasonable to interpret "execution" of the Proposed Modifications to have taken place upon approval by the City Council on April 23, 2020.  (ECF No. 8 at 6.)  Notably, neither GEO nor the City responded to the Court's concern that allowing a municipal body to postdate the effective date of its decisions could undercut § 1670.9(d)'s notice requirement.  For example, under GEO and the City's interpretation, the City could have given public notice of the Proposed Modifications on January 10, 2020, held the first public meeting January 11, 2020, and held the second public meeting and approved the Proposed Modifications on January 12, 2020, without violating § 1670.9(d) so long as the City postdated

The facts relied on in the aforementioned document are not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  As for the other documents included in Petitioners' request, the Court did not rely on such facts or documents and therefore need not and does not rule on Petitioners' request for judicial notice thereof.

1  the effective date of the Proposed Modifications to 180 days later.  Such an interpretation renders

2  § 1670.9(d) a nullity as the public would be left essentially no time to be solicited or heard on the

3  issue before the City made its final decision.  Further, although GEO and the City argue the term

4  "execute" unambiguously referred to the Proposed Modifications' effective date, it bears

5  mentioning that the City's own municipal code implies city documents are executed when signed

6  by the mayor.  *See* McFarland Mun. Code § 2.10.010.  Here, the mayor signed the resolutions

7  approving the Proposed Modifications on April 23, 2020.  (*See* ECF No. 19-6 at 169, 176.)  For

8  all these reasons, the Court finds there are serious questions as to whether the City violated §

9  1670.9(d)'s 180-day notice requirement.

10       Third, Petitioners argue both the Planning Commission and the City Council

11  impermissibly restricted participation during public meetings.[2]  More specifically, Petitioners

12  argue the City capped videoconference attendance for the City Council meeting at 100

13  participants even though the Zoom platform permits up to 1,000 attendees and between 200–300

14  members of the public had attended the previous Planning Commission meetings on the issue.

15  Petitioners also file declarations from attendees who claim they were wrongly prohibited from

16  commenting or were unable to connect either through dial-in or videoconference.

17       GEO and the City argue there were no unreasonable restrictions on public participation at

18  the City Council meeting.  GEO emphasizes that although videoconferencing was capped at 100

19  participants, the public could also participate by teleconference without any participation cap.

20  GEO also argues that minutes from the hearing indicate only seven people spoke during the

21  public comment period and only nineteen spoke on the agenda item for the Proposed

22  Modifications.  As such, GEO argues there is no evidence the videoconferencing cap impeded

23  public participation.  The City also argues public participation was not hampered, as evidenced by

24  the 848 written comments they received.  The City argues that although members of the public

25  claim to have experienced technical difficulties that prevented them from connecting to the

26
_____

27  [2]       Because the Court finds there are serious questions as to whether the City unreasonably
restricted public participation in the City Council meeting on April 23, 2020, the Court need not
and does not discuss the parties' arguments regarding the two prior Planning Commission
28  meetings.

9

1    meeting, these technical difficulties were not caused by or within the City's control.

2        In its previous order, the Court found it arguable that the City Council's use of dial-in and

3    videoconferencing — specifically the alleged cap on attendance/comment and connection issues

4    — was inadequate.  (ECF No. 8 at 6.)  The arguments set forth by GEO and the City do not

5    persuade the Court otherwise.  Petitioners have submitted declarations from members of the

6    public attesting to the fact that they were prevented from participating in the April 23 hearing.

7    (*See* ECF No. 3-2 at 148 ("At the April 23, 2020 City Council meeting, I addressed the City

8    Council during its open public comment session [and] requested that the meeting be postponed

9    given the difficulties that many members of the public were experiencing connecting to the

10   meeting.")[3]; *see id.* at 154 ("During the meeting, I used Zoom's 'hand-raise' function to indicate

11   that I wished to address City Council.  Despite this, I was never permitted to address City

12   Council.")) Petitioners raise novel legal issues.  Not only has no other court interpreted §

13   1670.9(d), but these are unprecedented times where new technological measures for public

14   participation have suddenly become necessary and require careful scrutiny.  As such, the Court

15   finds serious questions remain about whether the City Council meeting satisfied § 1670.9(d)'s

16   requirement that the public be "solicited and heard."

17       In sum, the Court again finds that each of the arguable defects in the City's approval

18   process are sufficient to raise "serious questions going to the merits" of Petitioners' claims.  *See*

19   *Alliance*, 632 F.3d at 1134–35.

20                  *iv.      Intergovernmental Immunity Doctrine*

21       Lastly, GEO argues Petitioners cannot succeed on the merits of their claims because §

22   1670.9(d) is unenforceable in any event because it violates the doctrine of intergovernmental

---

23   [3]      The City objects to several aspects of the declaration of Alex Gonzalez, arguing that the

24   declaration relies on inadmissible hearsay.  (*See generally* ECF No. 19-5.)  However, "the rules of

     evidence do not apply strictly to preliminary injunction proceedings."  *Herb Reed Enter., LLC v.*

25   *Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Republic of the*

26   *Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the

     district court to accept . . . hearsay for purposes of deciding whether to issue the preliminary

27   injunction.").  Therefore, the City's evidentiary objections are OVERRULED.

28

1   immunity.  "The doctrine of intergovernmental immunity is derived from the Supremacy Clause,

2   U.S. Const., art. VI, which mandates that the activities of the Federal Government are free from

3   regulation by any state."  *United States v. California*, 921 F.3d 865, 878 (9th Cir. 2019), *cert.*

4   *denied*, No. 19-532, 2020 WL 3146844 (U.S. June 15, 2020) (citation and internal quotations

5   marks omitted).   "Accordingly, state laws are invalid if they 'regulate[ ] the United States

6   directly or discriminate[ ] against the Federal Government or those with whom it deals.'"  *Id.*

7   (alterations in original) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990)

8   (plurality opinion)).

9        GEO specifically argues § 1670.9(d) violates the intergovernmental immunity doctrine

10   because the statute (1) discriminates against and (2) directly regulates the federal government.

11   The Court will address discrimination and direct regulation in turn.

12                          *a.      Discrimination*

13        GEO argues § 1670.9(d) is facially discriminatory because it regulates the housing and

14   detention of noncitizens for the purposes of civil immigration proceedings, which is the exclusive

15   province of the federal government.  (ECF No. 20 at 18.)  GEO further argues § 1670.9(d)

16   discriminates against the federal government by imposing additional procedural requirements and

17   burdens that do not apply to contractors who detain individuals on behalf of the State.  (*Id.*)

18        GEO relies on the Ninth Circuit's decision in *California*.  In *California*, the United States

19   challenged and moved to enjoin several California laws related to federal immigration

20   enforcement.  921 F.3d at 872–73.  One of the challenged laws was AB 103, which imposed

21   inspection requirements on facilities that house civil immigration detainees.  *Id.*  More

22   specifically, AB 103 "require[d] the California Attorney General to review 'the conditions of

23   confinement,' 'the standard of care and due process provided,' and 'the circumstances around

24   [the] apprehension' of civil immigration detainees, and then prepare 'a comprehensive report

25   outlining the findings of the review.'"  *Id.* at 876.

26        The United States argued AB 103 violated the intergovernmental immunity doctrine

27   because it "require[d] facilities housing federal immigration detainees to cooperate with broad

28   investigations that examine [1] the due process provided to detainees and [2] the circumstances

                                   11

1  surrounding the detainee's apprehension and transfer to the facility." *Id.* at 882.  In opposition,

2  California argued AB 103 did not discriminate against the federal government because "all of AB

3  103's requirements duplicate[d] preexisting inspection demands imposed on state and local

4  detention facilities." *Id.* at 884.

5      Although the Ninth Circuit noted AB 103 imposed a "specialized burden" on federal

6  activity, the court did not find AB 103 to be unconstitutional in its entirety for the purposes of

7  ruling on the preliminary injunction.  *Id.* at 882, 884.  Rather, the court concluded AB 103's

8  provision requiring inspectors to examine the due process provided to detainees likely did not

9  violate the doctrine of intergovernmental immunity to the extent it merely replicated the

10 inspection scheme that already applied to California facilities.  *Id.* at 884.  In contrast, the court

11 concluded AB 103's provision requiring inspectors to examine the circumstances surrounding the

12 apprehension and transfer of immigration detainees likely did violate the doctrine of

13 intergovernmental immunity because that provision was "a novel requirement, apparently distinct

14 from any other inspection requirements imposed by California law" and thus "burden[ed] federal

15 operations, and *only* federal operations."  *Id.* at 883, 885 (emphasis in original).

16     GEO argues that unlike the due process provision in AB 103, § 1670.9(d) is not

17 duplicative of any other law that affects California detention facilities.  In other words, GEO

18 argues "nowhere does the California Code impose burdens on contractors carrying out state

19 operations like those imposed on federal contractors."  (ECF No. 20 at 19.)  GEO points to its

20 own experience, arguing that when it was a state contractor tasked with detaining state inmates, it

21 was never required to comply with any procedures comparable to those imposed by § 1670.9(d).

22     In reply, Petitioners argue § 1670.9(d) does not discriminate against the federal

23 government because the statute is imposed on a basis unrelated to GEO's status as a federal

24 contractor.  Petitioners argue that California's interest in § 1670.9(d) — encouraging public

25 participation in decisions concerning private immigration detention facilities — is incidental to

26 the relationship that private immigration detention facilities enjoy with the federal government.

27 Petitioners further argue that private immigration detention poses a suite of unique local concerns,

28 such as good governance, community safety, public trust, and economic development, that are

1    untethered to facility operators' status as federal contractors.  Given these unique concerns,

2    Petitioners argue there are significant differences between the entities affected by § 1670.9(d) —

3    private immigration detention facility contractors and municipalities that issue permits — and

4    entities that are not.

5         Petitioners also argue § 1670.9(d) does not discriminate against the federal government

6    because other provisions of California law restrict the State's relationship with private detention

7    contractors to a greater extent than § 1670.9(d) affects the federal government.  More specifically,

8    Petitioners argue that as of 2020, AB 32 prohibits the State from entering into or renewing an

9    existing contract with any private detention contractor except to comply with a court-ordered

10   population cap.  Cal. Penal Code § 5003.1(a), (b), (e).  AB 32 also affects the federal government

11   by broadly mandating "a person shall not operate a private detention facility" unless such

12   operation is pursuant to a contract in effect before 2020 or a court-ordered population cap.  *Id.* §§

13   9501, 9505.4.  Petitioners emphasize that California, however, is subject to an even greater

14   restriction than the federal government: as of 2028, the State may not incarcerate any person in a

15   private detention facility without exception, regardless of any contract's effective date.  *Id.* §

16   5003.1(c).  Petitioners argue this restriction has no effect on the federal government, which may

17   continue to work with private detention contractors beyond 2028 pursuant to contracts in effect

18   before 2020.  In other words, Petitioners argue that unlike state contractors, federal contractors

19   may continue to house detainees in private detention facilities well after 2028, and new facilities

20   pursuant to existing contracts require only the notice and hearing requirements of § 1670.9(d)

21   rather than the more onerous requirement of a court order.

22        The Court has reviewed the relevant case law and finds the plurality opinion in *North*

23   *Dakota* to be instructive.  In *North Dakota*, the United States challenged North Dakota laws

24   regulating liquor sold to military bases within the state.  495 U.S. at 426.  The two regulations at

25   issue "require[ed] out-of-state shippers to file monthly reports and to affix a label to each bottle of

26   liquor sold to a federal enclave for domestic consumption."  *Id.*  After out-of-state suppliers

27   informed the federal government that they would not ship liquor to the North Dakota bases due to

28   the burden of complying with the North Dakota regulations, the United States instituted an action

1  seeking declaratory and injunctive relief against the application of North Dakota's regulations.

2  *Id.* at 429–30.  The United States argued, among other things, that the state provisions violated

3  the intergovernmental immunity doctrine.  *Id.* at 434.

4         The plurality explained that "a regulation imposed on one who deals with the Government

5  has as much potential to obstruct governmental functions as a regulation imposed on the

6  Government itself."  *Id.* at 438.  Therefore, "the Court has required that the regulation be one that

7  is imposed on some basis unrelated to the object's status as a Government contractor or supplier,

8  that is, that it be imposed equally on other similarly situated constituents of the State."  *Id.*  The

9  plurality added that "in analyzing the constitutionality of a state law, it is not appropriate to look

10  to the most narrow provision addressing the Government or those with whom it deals."  *Id.*

11  Rather, "[a] state provision that appears to treat the Government differently on the most specific

12  level of analysis may, in its broader regulatory context, not be discriminatory."  *Id.*  The plurality

13  emphasized, "We have held that [t]he State does not discriminate against the Federal Government

14  and those with whom it deals unless it treats someone else better than it treats them."  *Id.* (citation

15  and internal quotation marks omitted).  Applying these principles, the plurality concluded,

16
17
18
19
20
21
22
23
> The North Dakota liquor control regulations . . . do not disfavor the Federal Government but actually favor it [because the] labeling and reporting regulations are components of an extensive system of statewide regulation that . . . applies to all liquor retailers in the State.  In this system, the Federal Government is favored over all those who sell liquor in the State.  All other liquor retailers are required to purchase from state-licensed wholesalers, who are legally bound to comply with the State's liquor distribution system.  The Government has the option, like the civilian retailers in the State, to purchase liquor from licensed wholesalers.  However, alone among retailers in the State, the Government also has the option to purchase liquor from out-of-state wholesalers if those wholesalers comply with the labeling and reporting regulations.  The system does not discriminate with regard to the economic burdens that result.  A regulatory regime which so favors the Federal Government cannot be considered to discriminate against it.

24  *Id.* at 438–39.  Similarly, the Ninth Circuit in *California* stated that even if a state law "singles out

25  federal activities," it does not violate the intergovernmental immunity doctrine so long as it "does

26  not treat the federal government worse than anyone else."  921 F.3d at 881.

27         In light of the recent changes to California's regulatory scheme relating to private

28

14

detention facilities, it is unclear whether § 1670.9(d) treats the federal government "worse than anyone else." *See id.*  GEO only provides its own past experience as an example.  GEO submits a declaration by Richard Long, the Senior Vice President of Project Development for GEO, in which Long states that "absent [§ 1670.9(d)], GEO's applications would have been processed under the McFarland municipal codes." (ECF No. 20-5 at 106.)  Long also states "[i]n GEO's more than 20 years of experience with [conditional use permit] applications and modifications in . . . McFarland, the process typically requires no more than 90 days from beginning to end, inclusive of appeals to the city council."  (*Id.*)  As such, Long states that § 1670.9(d) "imposes an additional delay of approximately 90 days or three months before GEO can obtain modified [conditional use permits] from . . . McFarland, which it needs to operate [its facilities] on behalf of the Federal Government."  (*Id.*)

The record before the Court is too incomplete at this time to determine whether § 1670.9(d) discriminates against the federal government.  More to the point, GEO's past experience as a state contractor appears to have predated the current regulatory scheme.  GEO's current federal contract, which it entered into in December 2019, would allow it to operate a private detention center until December 2034.  (*See* ECF No. 20-5 at 80.)  Looking at the "broader regulatory context," it is unclear whether there is a similarly situated state contractor that would be treated better than GEO.  Indeed, considering AB 32's new limitations that prevent state contractors from operating private detention facilities after 2028, it appears unlikely that is the case.  *North Dakota*, 495 U.S. at 438; *see* Cal. Penal Code § 5003.1(c).  By having the option to operate private detention facilities past 2028, GEO, as a federal contractor, appears to be favored over state contractors despite being subject to § 1670.9(d)'s notice and hearing requirements.  *See id.* at 448 (Scalia, J., concurring) ("In giving the Federal Government a choice between purchasing label-free bottles from in-state wholesalers or purchasing labeled bottles from out-of-state distillers, North Dakota provides an option that no other retailer in the State enjoys.").  Moreover, it is also unclear whether private immigration facilities are sufficiently different than other detention facilities such that § 1670.9(d) is properly imposed "on some basis unrelated to the object's status as a Government contractor."  *Id.* at 438.  Based on the limited information

15

1    before the Court and in the context of this preliminary injunction, the Court finds GEO has not

2    shown that § 1670.9(d) discriminates against the federal government.

3                              b.      *Direct Regulation*

4           GEO next argues § 1670.9(d) directly regulates the Federal Government by conditioning

5    the ability of a federal contractor to carry out federal immigration detention operations on

6    compliance with extra procedural requirements, and it subjects the Federal Government to review

7    by municipal zoning commissions.[4]

8           In reply, Petitioners argue § 1670.9(d) is far too remote from the federal government to

9    directly regulate it because the statute directly regulates only municipalities and public agencies

10   who issue permits to federal contractors.  Petitioners also argue § 1670.9(d) does not disrupt

11   federal operations because it is a one-time permitting statute that applies only before the

12   contractor operates a federal facility and GEO has offered no evidence that the law affects any

13   federal interest aside from its own revenues.

14          A state law does not impermissibly regulate the federal government merely by making it

15   "more costly for the Government to do its business."  *North Dakota*, 495 U.S. at 434.  Rather,

16   "[t]hose dealing with the Federal Government enjoy immunity from state control . . . when a state

17   law actually and substantially interferes with specific federal programs."  *Id.* at 452 (Brennan, J.,

18   concurring) (citing *United States v. New Mexico*, 455 U.S. 720, 735, n. 11 (1982)).  In *North*

19   *Dakota*, for example, the plurality found "there is no claim in this case, nor could there be, that

20   North Dakota regulates the Federal Government directly" because "[b]oth the reporting

21   requirement and the labeling regulation operate against suppliers, not the Government."  *Id.* at

22   436–37.  The plurality went on to note "[i]n this respect, the regulations cannot be distinguished

23   from the price control regulations and taxes imposed on Government contractors that we have

24   repeatedly upheld against constitutional challenge."  *Id.*

25

26

27   [4]      To the extent GEO complains of the permitting requirement generally, the Court notes
     that GEO is not expressly challenging the constitutionality of the City law that requires permits
28   and gives the City discretion to approve or deny permits.

GEO argues this scenario is like *Hancock*, *Leslie Miller*, and *Johnson*, in which the Supreme Court found certain state permitting requirements substantially interfered with federal operations. *See Hancock v. Train*, 426 U.S. 167 (1976) ("It is clear from the record that prohibiting operation of the air contaminant sources for which the State seeks to require permits is tantamount to prohibiting operation of the federal installations on which they are located"); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (holding an Arkansas statute requiring procurement of a license by federal contractors and review by a state licensing board interfered with federal government's power to select its contractors); *Johnson v. Maryland*, 254 U.S. 51, 57 (concluding that federal postal workers were not required to hold a state driver's license during the course of their employment because "[s]uch a requirement . . . lays hold of [Government agents] in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient"). GEO also argues this case is similar to *United States v. California*, No. 2:18-CV-00721-WBS-DB, 2018 WL 5780003, at *4 (E.D. Cal. Nov. 1, 2018) ("[C]onditioning purchasers' ability to record a title to recently acquired federal public lands on whether the government provided the Lands Commission with refusal rights in those lands trespasses on the federal government's ability to convey land to whomever it wants.").

GEO's cited case law is distinguishable from the instant case. In *Hancock*, *Leslie Miller*, and *Johnson*, the state laws directly regulated the federal government or its contractors, while § 1670.9(d) most directly regulates cities, counties, and public agencies. *See* Cal. Civ. Code § 1670.9(d). Further, unlike the regulations at issue in the cases cited by GEO, the procedural requirements of § 1670.9(d) are not "tantamount to prohibiting" operation of private immigration detention facilities. Section 1670.9(d) does not prevent the government from contracting with GEO, nor does the law prevent the facilities from operating. To the contrary, the City ultimately approved the Proposed Modifications. Although GEO argues § 1670.9(d)'s requirements increase costs and create a 90-day delay before GEO can begin operating a facility, it cannot be said that these procedural requirements "substantially interfere" with federal operations to the same degree as the laws at issue in GEO's cited cases. Indeed, there is a lack of evidence as to

1    any burden on the federal government other than potentially increasing the cost of business,

2    which alone is not sufficient.  *See North Dakota*, 495 U.S. at 434.  For all these reasons, the Court

3    finds GEO has not shown that § 1670.9(d) directly regulates the federal government.

4         In sum, the Court cannot say at this stage that § 1670.9(d) violates the intergovernmental

5    immunity doctrine either by discriminating against or directly regulating the federal government.

6    Therefore, GEO's constitutional arguments do not preclude the Court from finding that

7    Petitioners have at the very least raised serious questions as to the merits of their claims for the

8    purposes of ruling on the preliminary injunction.

9                B.     Irreparable Harm

10        As to irreparable harm, the Court previously found Petitioners sufficiently demonstrated

11    that preventing detainee transfers is an effective method for reducing unnecessary risks to public

12    health related to COVID-19, and that absent an injunction, there is an imminent threat of

13    irreparable harm resulting from detainee transfers.  (ECF No. 8 at 7.)

14        In response, both GEO and the City argue the alleged harm is too speculative to warrant

15    an injunction.  GEO additionally argues Petitioners egregiously delayed seeking the TRO and

16    their "invocation of the COVID-19 pandemic is bare opportunism."  (ECF No. 20 at 24.)  GEO

17    emphasizes that its Adelanto ICE Processing Center has successfully limited spread, reporting

18    only one staff case and 11 detainee cases at a facility with the capacity to hold 1,940 detainees.

19    Further, GEO submits declarations about the precautions GEO has undertaken to mitigate the

20    spread of COVID-19, especially during the transfer process.  Lastly, GEO argues the alleged

21    harms have nothing to do with the procedural violations at issue and ceasing operation of its

22    facilities is too broad.

23        The Court disagrees that the alleged harm is too speculative.  COVID-19 poses a concrete

24    threat to the public health, especially in the context of detention facilities and detainee transfers.

25    As discussed in the Court's previous order, Petitioners cite government statistics regarding

26    outbreaks at detention facilities generally and in Kern County specifically, as well as public

27    health advisories recommending against transferring inmates unless necessary.  (ECF No. 8 at 7.)

28

1    Petitioners also submit a declaration by an epidemiologist named Dr. Eric Lofgren.[5] (ECF No. 3-

2    2 at 156.) Dr. Lofgren describes his extensive background as an epidemiologist and his research

3    regarding the spread and control of infectious diseases through mathematics and computer

4    simulation. (*Id.* at 157–58.) Dr. Lofgren states he relied on a mathematical model using data

5    from Allegheny County, Pennsylvania to simulate an urban area of 1.2 million people with a jail

6    of 2,500 people. (*Id.* at 158.) Dr. Lofgren states "the results of this model in terms of trends and

7    patterns are broadly generalizable to . . . other types of detention facilities in other communities."

8    (*Id.*) He concludes "[b]ased on this model, the underlying research, and my experience as an

9    epidemiologist, it is my professional judgment that the transfer of detainees into detention

10   facilities within McFarland would increase the severity and duration of the COVID-19 pandemic

11   among the population of detained persons, corrections officers employed at detention facilities,

12   and the community of McFarland at large." (*Id.* at 159.) Despite GEO's arguments that it is

13   capable of mitigating the spread of COVID-19, the Court again finds Petitioners' evidence is

14   sufficient to show there is a likelihood of irreparable harm if the Proposed Modifications take

15   effect and detainees are transferred to GEO's facilities.

16                        C.      Balance of Equities and Public Interest

17           Having found there are serious questions going to the merits of Petitioners' claims and a

18   likelihood of irreparable harm absent an injunction, Petitioners must demonstrate the balance of

19   hardships tips sharply in their favor. *See Alliance*, 632 F.3d at 1134–35. The Court previously

20   found Petitioners met their burden due to the severe risks related to COVID-19. (ECF No. 8 at 7–

21   8.)

22           In response, GEO argues it would lose $79.6 million per year with an injunction in effect

23   and would also be required to eliminate at least 420 jobs with an annual payroll loss totaling $36

24   million. (ECF No. 20 at 25.) Similarly, the City argues it is relying on the GEO revenue to

---

26   [5]       The City objects to several aspects of Dr. Lofgren's declaration, including that Dr.
27   Lofgren's opinions lack foundation and/or rely on hearsay. (*See generally* ECF No. 19-3.) As
     already discussed, "the rules of evidence do not apply strictly to preliminary injunction
     proceedings." *Herb Reed*, 736 F.3d at 1250 n.5. As such, the Court OVERRULES the City's
28   objections.

1  account for somewhere between 10 to 20 percent of its annual budget.  (ECF No. 19 at 13.)  The

2  City also argues the indirect consequences of COVID-19 — such as unemployment, public safety

3  revenue, declining tax revenues, and increased demands on social services — are just as great as

4  the direct threat of infection.  (*Id.*)

5      The COVID-19 pandemic undoubtedly has caused devastating economic consequences

6  that have been felt across the nation.  Federal, state, and local governments have urgently

7  struggled to find a balance between mitigating the economic effects of the pandemic and

8  preventing the risks to human life.  However, as the Ninth Circuit has stated, "[f]aced with such a

9  conflict between financial concerns and preventable human suffering, we have little difficulty

10  concluding that the balance of hardships tips decidedly in plaintiffs' favor."  *Lopez v. Heckler*,

11  713 F.2d 1432, 1437 (9th Cir. 1983); *see also Golden Gate Rest. Ass'n v. City & Cnty. of San*

12  *Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008).  Here, the Court finds the need to avoid the

13  preventable risk of severe illness and death that is likely to result from detainee transfers far

14  outweighs GEO and the City's financial concerns.

15      For these reasons, the Court again finds the balance of hardships tips sharply in

16  Petitioners' favor.  *See Alliance*, 632 F.3d at 1135.  And for the same reasons, the public interest

17  factor weighs strongly in favor of granting an injunction.

18      **IV.   CONCLUSION**

19      For the reasons set forth above, the Court GRANTS Petitioners' request for a preliminary

20  injunction.  (ECF No. 3.)

21      IT IS ORDERED that, while this action remains pending, Respondents City of McFarland

22  and City of McFarland Planning Commission ARE HEREBY ENJOINED from taking any action

23  to issue, execute, or make effective the modifications to Conditional Use Permits 01-96 and 02-96

24  approved by the City Council on April 23, 2020, in which the following text was approved for

25  both conditional use permits: "The facility may house Federal inmates and detainees, both male

26  and/or female."

27      IT IS FURTHER ORDERED that, while this action remains pending, Real Party in

28  Interest Geo Group, Inc. ("GEO"), GEO's employees, agents, assigns, and any other persons

1  acting on GEO's behalf, ARE HEREBY ENJOINED from transferring any detainee into or out

2  of, and accepting any transfer of any detainee into or out of, and housing any detainee at, the

3  Central Valley Modified Community Correctional Facility (254 Taylor Avenue, McFarland, CA

4  93250) or the Golden State Modified Community Correctional Facility (611 Frontage Road,

5  McFarland, CA 93250) in reliance on the modifications to Conditional Use Permits 01-96 and 02-

6  96 approved by the City Council on April 23, 2020, in which the following text was approved for

7  both conditional use permits: "The facility may house Federal inmates and detainees, both male

8  and/or female."

9          IT IS FURTHER ORDERED that no bond is required to be posted by Petitioners as a

10  condition for the issuance of this relief.

11          IT IS SO ORDERED.

12  DATED:  August 10, 2020

13

14

15                                                          Troy L. Nunley
                                                            United States District Judge
16

17

18

19

20

21

22

23

24

25

26

27

28

21